**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-91 (RCL)** |
| | : | |
| **CRAIG MICHAEL BINGERT,** | : | |
| **ISAAC STEVE STURGEON, and** | : | |
| **TAYLOR JAMES JOHNATAKIS,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to Defendant Isaac S. Sturgeon's (the "Defendant") Motion to Dismiss Counts One, Three, Four, Five, and Six of the Superseding Indictment, filed through counsel on December 7, 2021 (ECF No. 55, hereinafter "Def. Mot."). The referenced counts allege violations of 18 U.S.C. §§ 1512, 2 (Count One), 18 U.S.C. § 231 (Count Three), and 18 U.S.C. §§ 1752(a) (Counts Four through Six). In his motion, the Defendant argues that the referenced counts fail to state an offense and fail to give proper notice to the Defendant. Additionally, he asserts, Count Five unconstitutionally infringes on his First Amendment Rights.

As discussed below, the certification of the Electoral College vote is in fact a "proceeding before the Congress," and the Defendant did act corruptly to obstruct the proceeding. Section 1512 is not vague as applied to the Defendant's conduct, and the Defendant's actions are prohibited by the obstruction statute.

Furthermore, the Defendant's claim that Section 231 provided inadequate notice that he was subject to enforcement under a vague statute is difficult to reconcile with his conduct on January 6, when he intentionally interfered with law enforcement's efforts to protect the Capitol

1

building and grounds by shoving a gate into officers. Similarly, claims that Section 1752 unnecessarily targets his "expression," in violation of his First Amendment Rights, completely ignores his conduct.

Finally, the Capitol was a restricted area on January 6, with signs prominently posted and law enforcement deployed. Multiple United States Secret Service ("USSS") protectees, including the direct line of succession to the President of the United States, were present during the attack. The statute plainly applies here.

For the reasons set forth below, the Court should deny the Defendant's motion to dismiss the indictment.

## **PROCEDURAL HISTORY**

On February 5, 2021, a grand jury returned an eight count indictment charging the Defendant and two other individuals with the following charges: 18 U.S.C. §§ 1512(c)(2), 2 (obstruction of an official proceeding); 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers); 18 U.S.C. § 231(a)(3) (civil disorder); 18 U.S.C. §§ 1752(a)(1), (2) and (4) (entering and remaining in a restricted building or grounds, disorderly and disruptive conduct in a restricted building or grounds, and engaging in physical violence in a restricted building or grounds); and 40 U.S.C. §§ 5104(e)(2)(E) and (F) (impeding passage through the capitol grounds or buildings and act of physical violence in the capitol grounds of buildings). *See* ECF No. 3. An arrest warrant for the Defendant issued that same date, and on March 6, 2021, the Defendant was arrested. ECF No. 14.

On May 7, 2021, the grand jury returned a superseding indictment that updated the 18 U.S.C. § 111 language in Count Two. *See* ECF No. 34. On November 10, the grand jury returned

a second superseding indictment, updating the language in Counts One and Three of the first superseding indictment. *See* ECF No. 53.

This Court set a filing deadline of December 7, 2021 for the Defendant's motion to dismiss. The government's response was due on December 21, 2021. *See* ECF No. 51. Defendant Sturgeon filed his motion to dismiss on December 7, 2021 (ECF No. 55), and defendant Craig M. Bingert moved to adopt and join the motion on December 13, 2021 (ECF No. 56). Defendant Taylor J. Johnatakis joined the motion on December 29, 2021 (ECF No. 59). The government filed a consent motion for extension of time to file its opposition. That motion was granted, and the government's opposition is due on January 4, 2022. *See* December 14, 2021 Minute Order, ECF No. 58.

## FACTUAL BACKGROUND

The U.S. Capitol is secured 24 hours a day by the United States Capitol Police ("USCP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time ("EST"). Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.

USCP ordered a similar lockdown in the House chamber. As individuals attempted to break into the House chamber by breaking the windows on the chamber door, law enforcement officers were forced to draw their weapons to protect the victims sheltering inside.

At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown subjects resulted in the disruption and ultimate delay of the vote Certification.

Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" references members of Congress.

Between 3:25 and around 6:30 p.m. EST, law enforcement officers were able to clear the U.S. Capitol of all subjects. Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol,

including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm EST after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

On January 6, 2021, Sturgeon, along with Craig Michael Bingert ("Bingert") and Taylor James Johnatakis ("Johnatakis," collectively, "the defendants"), picked up a gate and pushed it into police officers. The officers were attempting to prevent the defendants from gaining access to the Capitol grounds and building.

More specifically, the defendants were at the front of a mob on the west terrace of the U.S. Capitol grounds facing a line of D.C. Metropolitan Police Department ("MPD") officers. Between the officers and the defendants were metal police barricades. The MPD officers were wearing body worn camera ("BWC"), and the defendants were in clear view of several officers' BWC.

Johnatakis waved member of the mob forward toward the barricaded line of MPD officers and, using the bullhorn attached to this backpack, yelled to the surrounding crowd, "push them out of here, we're just using our bodies!" Johnatakis then directed the other rioters to push the barricades into the MPD officers, encouraging them as they progressed, yelling "one foot," and "1, 2, 2, go."

Sturgeon and Bingert stood directly to the right of Johnatakis, such that the three men were side-by-side. As Johnatakis counted down, Sturgeon and Bingert joined Johnatakis, using their hands to grab the metal barricade. At approximately 2:46 p.m. EST, the defendants, along with

other members of the crowd, use their collective force to shove the barricade into the police officers.

At one point, the defendants managed to push the barricade far enough and high enough that they were able to duck underneath it. In response to the physical aggression, MPD officers used both physical force and chemical irritants to push back the defendants and stop the rioters from breaking through the line of officers.

After the assault, Bingert remained in the area for several more minutes. He turned around and faced the crowd while waiving a large American flag as the crowd taunted the police line and chanted slogans in anger, such as "fuck the police."

Sturgeon also remained in the area. Several minutes after the assault, BWC captures Sturgeon approaching law enforcement officers and handing them a large object.

Sturgeon posed in a picture posted to Instagram during the January 6, 2021, riot with a comment which stated, "I fear this is just the beginning." In another post, posted on or about January 6, 2021, Sturgeon commented, "…[t]oday we stand to make a statement, not to hurt the police. But to represent a real issue! STAND." In yet another post, Sturgeon posted a video of rioters, with a comment indicating that the then-Vice President refused to reject the electoral count. Sturgeon also posted a video depicting sparks and smoke in the air as the rioting continued, explaining that a veteran once told him to "…do what you know is right" and that "[t]hose words echo yet still…"

Before the assault, Johnatakis posted a video to Facebook in which he stated, "Trump's speech is over…he went over the voter fraud…we're walking over to the Capitol right now and I don't know, maybe we will break down the doors." After the assault, Johnatakis posted to Facebook, "If there were ANTIFA, they sprinkled right along with us because we got the same

mission and that was to take that Capitol…I organized a push up to the Capitol because I felt like that is exactly what we needed."

## **LEGAL STANDARD**

Before trial, a defendant in a criminal case may move to dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). A valid indictment must set out "the elements of the offense intended to be charged and sufficiently apprise the defendant of what he must be prepared to meet." *United States v. Pickett*, 353 F.3d 62, 67 (D.C. Cir. 2004). The Government must state the essential elements of the crime and allegations "with sufficient specificity." *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995), *see also United States v. Griffin*, 21-cr-92 (TNM), 2021 WL 2778557 (D.D.C. Jul. 2, 2021).

A pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." *Id*. "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id*. Although a court's supervisory powers provide the authority to dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."

## ARGUMENT

### I.   COUNT ONE STATES AN OFFENSE; THE DEFENDANT'S ALLEGED CONDUCT CLEARLY VIOLATES SECTION 1512

The Defendant argues that Count One of the second superseding indictment fails to state an offense. In support of his arguments, the Defendant claims that the Electoral Count on January 6 was not an "official proceeding" (Def. Mot. at 7), and that 18 U.S.C. §1512(c)(2) is unconstitutionally vague - and especially vague as applied to this case (Def. Mot. at 10, 14). None of these arguments has any merit.

Section 1512(c)(2) provides that "[w]hoever corruptly . . . obstructs, influences, or impedes any official proceeding" has committed a crime. A person violates that statute when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding. *See* 18 U.S.C. § 1512(c)(2); § 1515(a)(1)(B). As several judges in this district have recently concluded, Congress's certification of the Electoral College vote on January 6, 2021 was an "official proceeding." *See United States v. Sandlin,* 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery*, 21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021).

Furthermore, Section 1512(c)(2) is not unconstitutionally vague or overbroad, and nothing in its text, structure, or history limits it to obstruction tied to documentary or tangible evidence. Nor does the Supreme Court's decision in *Yates v. United States*, 574 U.S. 528 (2015)—which construed a different term in a different statute—support imposing such an atextual limitation in Section 1512(c)(2). But even if such a limitation existed, the statute encompasses the Defendant's alleged conduct.

**A.      The Certification of the Electoral College Vote is an Official Proceeding**

Contrary to the Defendant's claims, Congress's joint session on January 6, 2021, to review, count, and certify the Electoral College constitutes an "official proceeding" under the definition in Section 1515(a)(1). Congress's meeting to certify the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress" under Section 1515(a)(1)(B), and therefore an "official proceeding" for purposes of Section 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. *See Caldwell*, 2021 WL 6062718 at * 4 ("A straightforward reading of that definition easily reaches the Certification of the Electoral College vote."). Skipping past the text, the Defendant argues that Congress's intent and other language in the obstruction statute import an "adversarial" or at least a "quasi-adjudicative" requirement into the term "official proceeding" (Def. Mot. at 6, 9). That argument is incorrect, but even if somehow valid, would still not disqualify Congress's Joint Session on January 6.

### 1.   Background, Congressional Intent, and Statutory Construction

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Two separate provisions in the Constitution mandate that the Vice President, while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed: The President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the

floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id*. The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

Here, the Defendant is charged with violating Section 1512(c)(2) by corruptly obstructing, influencing, or impeding any official proceeding. An "official proceeding" for purposes of Section 1512(c)(2) is defined in Section 1515 as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce.

18 U.S.C. § 1515(a)(1) (emphasis added).

The Defendant suggests that legislative history shows that Congress intended the obstruction statute to be interpreted narrowly to protect witness tampering and destruction of evidence (Def. Mot. at 4, 9).[1] Putting aside that the "best evidence of [a statute's purpose] is the

---

[1] The Defendant also cites the Victim and Witness Protection Act (VWPA) of 1982 (Def. Mot. at 9). But the Senate Judiciary Committee report that supported the VWPA justified the inclusion of a "broad residual clause" (in a

statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), the obstruction statute's legislative history in fact underscores that Congress intended "official proceeding" to reach broadly.

Additionally, as other judges of this Court have concluded, *see Montgomery* 2021 WL 6134591, at *15, title of the legislation's section supports a broad interpretation of Section 1512(c). This provision was enacted in 2002 as part of the Sarbanes-Oxley Act, Pub. L. 107-204, specifically Section 1102 of the law, which is titled "Tampering with a Record or Otherwise Impeding an Official Proceeding." In other words, Congress evidenced its intent that "otherwise impeding an official proceeding" would indeed be a crime and would be a separate crime from "tampering with a record."

      2.  Congress's Joint Session to Certify the Electoral College Vote is a "Proceeding <u>Before the Congress.</u>"

Section 1515(a)(1)(B) defines "official proceeding" as a "proceeding before the Congress." To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted).

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a "proceeding"

---

provision that has since been amended) by noting that the "purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses. There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice." S. Rep. 97-532, at 18 (1982).

refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting Proceeding, Oxford English Dictionary, available at http://www.oed.com). The Defendant does not meaningfully contend that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding— under that broad definition. *See* Def. Mot. at 9 (referring to the electoral vote as an "administrative and ceremonial proceeding").

A narrower definition of the term "proceeding" would look to the "legal—rather than the lay—understanding" of the term. *Ermoian*, 752 F.3d at 1170. This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "Proceeding" (11th ed. 2019). Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170; *see also United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512"). For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including the cases relied upon by the Defendant—courts analyze the degree of formality involved in an investigation. *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs

and Border Patrol not an "official proceeding" because that term "contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added). Thus, even under this narrower definition, Congress's Joint Session to certify the Electoral College vote—business conducted by an official body, in a formal session—would easily qualify.

Finally, the formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding, *see Perez*, 575 F.3d at 169, even under the narrower legal definition of the term "proceeding." Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Indeed, other judges of this Court have concluded that even if not all actions occurring before Congress constitute an "official proceeding," the certification of the Electoral College does. *Sandlin,* 2021 WL 5865006, at *3-4 (finding that the certification of the Electoral College is an official proceeding because the "Joint Session has the trappings of a formal hearing before an official body[,]… the certificates of electoral results are akin to records or documents produced during judicial proceedings, and any objection to these certificates can be analogized to evidentiary objections."); *Mostofsky*, 2021 WL 6049891, at *10 (concluding that the certification of the Electoral College is an official proceeding within the meaning of 18 U.S.C. §§ 1515, 1512(c)(2)); *Caldwell*, 2021 WL 6062718 at * 4 ("The Certification of the Electoral College vote thus meets

14

the definition of an 'official proceeding.'"); *Montgomery*, 2021 WL 6134591, at *4 ("Although Defendants are correct that not every action taken within the walls of Congress constitutes an 'official proceeding' within the meaning of Section 1512(c), a joint session of Congress convened to verify and count the electoral vote for President and Vice President of the United States does"); *Nordean*, 2021 WL 6134595, at *5 ("For all these reasons, the certification is therefore a 'series of actions' that requires 'some formal convocation,' making it a 'proceeding before the Congress,' 18 U.S.C. § 1515(a)(1)(B), and thus an 'official proceeding,' *id.* § 1512(c)(2).").

Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body."   *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id*. And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until "the count of electoral votes" is "completed," and the "result declared." *Id*. In short, the certification of the Electoral College vote is a "proceeding before the Congress." *See* Section 1515(a)(1)(B).

   3.   Section 1515(a)(1)(B) Has No Limitation on the Type of Congressional
        <u>Proceeding</u>

The Defendant incorrectly asks this Court to limit the interpretation of the "proceeding before the Congress" to encompass only the obstruction of proceedings before Congress which are adversarial in nature (Def. Mot. at 6), such as a congressional committee investigating a violation of the law where witnesses are subpoenaed to appear and give testimony or to provide relevant evidence (Def. Mot. at 7-9). But this narrow reading of the statute finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress." Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, as the Defendant contends, it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency. Indeed, Section 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress could limit the obstruction prohibition under § 1505 to congressional investigations, it could have done so in the text of § 1515(a)(1)(B). But it did not. *See Russello v. United States,* 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.") Instead, Congress enacted broader language— "a proceeding before the Congress"—to cover a broader range of proceedings than the "inquir[ies] and investigation[s]" envisioned in Section 1505. That broader definition includes the Electoral College vote certification. *See, e.g., Caldwell*, 2021 WL 6062718 at * 5 (rejecting the same argument and holding that "Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its

16

adjudicatory, investigative, or legislative functions. And the court will not add a requirement to the statute that Congress did not see fit to include."); *Sandlin*, 2021 WL 5865006, at *4 ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'"); *Montgomery*, 2021 WL 6134591, at *6 (rejecting argument that Congress intended to limit the definition of "official proceeding" and "quasi-judicial" proceedings, to proceedings at which witnesses appear and give testimony, or to proceedings related "to the administration of justice"); *Nordean*, 2021 WL 6134595, at *5-6 (rejecting argument that Congress intended to limit the definition of "official proceeding" to "quasi-adjudicative" or "quasi-judicial" proceedings and finding that, "even if an 'official proceeding' had to be quasi-adjudicative or quasi-judicial in some way—a requirement missing from the plain text of the statute—because Congress's certification of the Electoral College vote has *some* of those features, it would pass the test.").

Rather than engage with Section 1515's text, the Defendant relies on surrounding statutory provisions and legislative intent to argue that the certification of the Electoral College vote is not an "official proceeding" because it does not enhance and protect the criminal justice process (Def. Mot. at 6) (quoting *Ramos*, 537 F.3d at 462). That approach fails in three respects. First, it is methodologically flawed. As discusses above, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, a proceeding before the Congress. Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). The Defendant offers no rationale for breezing past the statute's plain text to reach for other interpretive tools.

17

Second, the Defendant contends that Section 1512 is a witness tampering statute and that an "official proceeding before Congress" is logically limited to the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents destroyed. *See* Def. Mot. at 6 (*citing* S.Rep. No. 107-146, at *6 (2002) and implying that the "official proceeding" definition in Section 1515 does not cover the Electoral College vote certification). However, the specific statutory provision under which the Defendant is charged, 18 U.S.C. § 1512(c)(2), explicitly reaches more broadly than tampering: it "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2104)). The Defendant's narrowed reading of "proceeding before the Congress" in 18 U.S.C. § 1515(a)(1)(B)—importing an extra-textual "administration of justice" requirement—would undercut the broad statute that Congress enacted. That crabbed approach fails to recognize that the certification of the Electoral College vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes." *Sutherland*, 921 F.3d at 426. Whatever the outer limits of a "proceeding before the Congress" for purposes of the obstruction statute, the Electoral College vote certification falls well within them. *See also Montgomery*, 2021 WL 6134591, at *7 ("Section 1515(a)(1) reaches all three branches of government, and the definition of 'official proceeding' is properly understood in the unique context of each branch.").

Furthermore, the Defendant's reliance on cases interpreting the term "proceeding," Def. Mot. at 6, in 1515, is misplaced, because those decisions hinge on the phrase "which is authorized by law" that is absent from subsection (a)(1)(B). In *Ermoian*, the question was whether an FBI

18

investigation was an "official proceeding" that was "authorized by law" under subsection (a)(1)(C). 752 F.3d at 1170. The same question was addressed in *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol); *United States v. Binette*, 828 F. Supp. 2d 402, 404 (D. Mass. 2011) (preliminary SEC investigation); and *Perez*, 575 F.3d at 169 (review panel within the Bureau of Prisons). The Defendant also relies on *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994), but there the D.C. Circuit was interpreting the word "proceeding" in Section 1505, and it rejected Kelley's argument that Section 1505 applies to only adjudicatory or rule-making activities.[2]

Finally, the "adjudicatory" gloss the Defendant purports to give to the "official proceeding" definition in Section 1515(a)(1) finds no support in the statute itself. But even if such a gloss applied, the certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would qualify. Far from a "ceremonial and administrative event" (Def. Mot. at 7), the certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15. That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election. Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress. U.S. Const. amend. XII. Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act. 3 U.S.C. § 15; *see* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. Rev. 1653, 1659 (2002) (Under the Electoral Count Act, "the President-elect is not elected by 'We the People' on election day, or even by the electors on the

---

[2] The D.C. Circuit did not interpret "official proceeding" in Sections 1512 or 1515 because the parties agreed that the phrase had the same meaning as "proceeding" in Section 1505. *Id*. at 1128.

day they cast their votes, but by the joint convention of the Senate and House of Representatives on the day the electoral votes are formally counted"). As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. 3 U.S.C. § 15. And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16.1. Nothing in the history the Defendant describe suggests a different conclusion.

**B.   Section 1512(c)(2) is Not Unconstitutionally Vague or Overbroad.**

The Defendant argues that Section 1512(c)(2) is unconstitutionally vague and does not provide fair notice as to the conduct it punishes (Def. Mot. 10). As several judges of this Court have recently concluded, this argument, too, lacks merit. *Sandlin,* 2021 WL 5865006; *Caldwell*, 2021 WL 6062718; *Mostofsky*, 2021 WL 6049891; *Montgomery*, 2021 WL 6134591; *Nordean*, 2021 WL 6134595.

### 1.   Legal Standard

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532

(1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). A statute is instead vague where it fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). "As a general matter," however, a law is not constitutionally vague where it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

2.   <u>Section 1512 is Specific Enough to Provide Notice</u>

The Defendant fails to overcome the strong presumption that Section 1512(c)(2) passes

constitutional muster. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963)

("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold

many times that statutes are not automatically invalidated as vague simply because difficulty is

found in determining whether certain marginal offenses fall within their language."). Section

1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or

"indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S.

at 306, nor does it require application of a legal standard to an "idealized ordinary case of the

crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly . . . obstruct[ing],

influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy."

*Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of

wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily

defined official proceeding. While "it may be difficult in some cases to determine whether these

clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and

intent—the state of men's minds—having before them no more than evidence of their words and

conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.*

(quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

The Defendant's more targeted attack on "corruptly" (Def. Mot. at 10-13), relying on

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), is equally unavailing. The D.C. Circuit

in *Poindexter* held that the term "corruptly" was "vague . . . in the absence of some narrowing

gloss." 951 F.2d at 378. *Poindexter* is inapposite for three reasons.[3] First, the D.C. Circuit

---

[3] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459. As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505

narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id*. at 629-30. Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). The Defendant's invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt" and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id*. at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502.

Third, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen*. For purposes of Section 1512(c)(2), "corruptly" includes two components: (1) intent to obstruct, impede, or influence; and (2) wrongfulness. *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an

---

"means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement."

improper purpose" and "with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing") (internal quotation marks omitted); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512(c) ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice.").

That the term "corruptly" requires the government to prove that a defendant acted not only with intent to obstruct but also with "consciousness of wrongdoing" ensures that Section 1512(c)(2) "reaches only" those who have committed felony obstruction. *Andersen*, 544 U.S. at 706. That limitation is particularly important where, as here, the Defendant is alleged to have obstructed a congressional proceeding.

To prove that an attempted or actual obstruction of a congressional proceeding amounts to felony obstruction in violation of 18 U.S.C. § 1512(c)(2), the government must therefore adduce evidence establishing beyond a reasonable doubt that a defendant acted intentionally and with "consciousness of wrongdoing." *Andersen*, 544 U.S. at 706. That standard could be met where, for example, evidence showed that the defendants, intent on storming the Capitol building and preventing the Certification, shoved a barricade into a police line protecting the Capitol grounds and building.[4] *See Montgomery*, 2021 WL 6134591, at *20 ("It is unsurprising, for example, that

---

[4] The "high maximum[] and no minimum[]" penalty provision that Congress enacted in Section 1512(c)(2), moreover, reflects that obstruction offenses "may run the gamut from major to minor," and empowers district court judges to "recognize differences between such cases" and to "try to make the punishment fit the crime." *Yates*, 574 U.S. at 569-70 (Kagan, J., dissenting); *see Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) (noting that "judges in this country

the words 'obstruct' and 'impede,' 18 U.S.C. § 1512(c)(2), mean to come in the way of, to block, or to hold up or that 'a proceeding before the Congress,' *id.* § 1515(a)(1)(B), includes the joint session of the Senate and House of Representatives held to certify the Electoral College vote.").

Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries. The Defendant provides no support for his position. Nor could he. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974). Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section 1512(c)'s "corruptly" element provided ample notice to the Defendant that *his conduct* was criminal. *Mostofsky*, 2021 WL 604891 at *11 ("As a result, to the extent that Mostofsky argues that § 1512(c)(2) is vague on its face, such an argument cannot succeed. . . .The Court will also not dismiss the § 1512 charge as vague as applied to Mostofsky, given that mapping the statutory language on to his conduct") (emphasis in original); *See Sandlin*, 2021 WL 5865006 at *10-14 (rejecting defendant's challenge that "corruptly" was unconstitutionally vague as used in Section 1512(c)(2)); *Montgomery*, 2021 WL 6134591, at *19 ("the Supreme Court did not cast any doubt on the constitutional adequacy of a "corruptly" standard … Neither ignorance about the existence of a statute nor reasonable debate about how best to interpret the statute render the law unconstitutionally vague…"); *Nordean*, 2021 WL 6134595, at *12 (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) and concluding, that

---

have long exercised discretion" to impose sentences within a statutory sentencing range by "taking into consideration various factors relating both to offense and offender"). The same is true of the criminal contempt statute, 18 U.S.C. § 401, which has been applied to a wide range of conduct, *see United States v. McGainey*, 37 F.3d 682, 683 (D.C. Cir. 1994) (threatening gesture that led to "disruption" of a criminal trial constituted "'obstruction of the administration of justice'"); id. at 684-85 (citing other disruption case), and prescribes no maximum or minimum penalty, see 18 U.S.C. § 401 (permitting court the "power to punish by fine or imprisonment, or both, at its discretion").

while "no court has interpreted Section 1512(c)(2) to include the precise allegations made here. But that does not mean that this reading 'unexpectedly broadens' it").

The Defendant cherry picks five Capitol riot cases and argues that this "illustrates how vague and arbitrary the enforcement of the statute can be" (Def. Mot. at 13-14). This effort is flawed. As a threshold matter, the government's charging decisions reflect clear consistency with Section 1512(c)(2)'s offense elements. Each defendant had the intent to "corruptly"—through wrongdoing, whether by violence, force, or other means—obstruct, interfere with, and impede the certification of the Electoral College vote count. Their obstructive methods varied: for instance, some defendants assaulted officers outside the Capitol while others entered the Senate Chamber and rifled through Senators' paperwork. But such factual distinctions lack salience under the statute. Each type of conduct "corruptly" "obstruct[ed], influence[d], or impede[d]" a proceeding before Congress, accordingly, comes within the statute's scope. 18 U.S.C. § 1512(c).

Moreover, the vagueness doctrine asks whether "*the statute* … provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304 (emphasis added). "Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *See Williams*, 553 U.S. at 306. The Defendant cites no authority, and the government has found none, showing that charging decisions postdating the offense conduct have any bearing on this inquiry. The relevant question turns on whether the statute fairly informed the Defendant that he would face criminal sanction for his conduct on January 6, 2021. The answer is yes, for the reasons articulated above. *Nordean*, 2021 WL 6134595, at *13 ("Section 1512(c)(2) is not 'narrow' at all. It sweeps broadly—punishing a host of 'corrupt' conduct. Thus, it hardly lulled Defendants into a false sense of security…").

The Defendant further states that "the government does not specify what 'influence' these defendants had or how exactly they 'impeded.'" Def. Mot. at 15. But the government does not have to describe in the charging instrument how it will prove those statutory elements at trial. *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (en banc) ("[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the Defendant on notice as to every means by which the prosecution hopes to prove that the crime was committed."). If the government fails to carry its burden on these elements at trial, the jury will say so. But that future presentation has no bearing on the question here—whether Section 1512(c)'s text provided the Defendant with adequate notice.

Ultimately, the Defendant suggests that Section 1512(c)(2) is vague because it does not encompass his conduct. The Defendant cannot be subjected to prosecution, he argues, when he did not even enter the building (Def. Mot. at 15). Yet the Defendant did not further enter the Capitol grounds or buildings because the law enforcement officers against whom he struggled were able to repel his aggressive advance – not because the Defendant did not try to "impede" or "obstruct."

C.    **The Supreme Court's Decision in *Yates v. United States* Does Not Counsel a Different Interpretation.**

The Defendant analyzes the term "tangible object' (Def. Mot. at 5) and argues that "obstruction of an official proceeding before Congress" was never intended to apply to an "event, like the vote count, that involves no witness testimony, documentary or tangible evidence…" (Def. Mot. at 9). However, the Supreme Court's decision in *Yates v. United States*, which considered how to construe the statutory term "tangible object" in Section 1519, 574 U.S. at 532 (plurality opinion), does not undermine the interpretation of Section 1512(c)(2) articulated above. *See Montgomery*, 2021 WL 6134591, at *14; ("… neither the plurality opinion in *Yates* nor Justice Alito's concurrence requires the Court to read Section 1512(c)(2) to only cover acts impairing the

availability or integrity of evidence."); *Nordean*, 2021 WL 6134595, at *8 ("Reading Section 1512(c)(2) to include conduct unrelated to the impairment of evidence is most consistent with the text and structure of the statute…")

      1.  <u>Section 1512 is Not Limited to Document-Focused Obstructive Conduct</u>

      In *Yates*, a plurality of the Court undertook a "contextual reading" to narrow the scope of "tangible object" in Section 1519 to "only objects one can use to record or preserve information, not all objects in the physical world." *Id.* at 536 (plurality opinion). The contextual features that animated that narrow interpretation in Section 1519 are, however, absent in Section 1512(c)(2).

      The Court in *Yates* considered a prosecution brought under Section 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" a federal investigation. 18 U.S.C. § 1519. Yates was a commercial fisherman who ordered his crew to throw his catch back into the sea to prevent federal authorities from determining whether he had harvested undersized fish. *Yates*, 574 U.S. at 531 (plurality opinion).The question presented was whether "tangible object" as used in Section 1519 included a fish. A fractured Supreme Court produced three opinions.

      A four-Justice plurality concluded that Section 1519's "context" supported a "narrower reading." *Yates*, 574 U.S. at 539. A holding that "tangible object" included "any and all objects," the plurality concluded, would "cut § 1519 loose from its financial-fraud mooring" in the Sarbanes-Oxley Act. *Id.* at 532. The plurality grounded its analysis in several "[f]amiliar interpretive guides." *Id.* at 539. First, neither Section 1519's caption, "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy," nor the title within the Sarbanes-Oxley Act within which Section 1519 was placed, "Criminal penalties for altering documents," suggested

that Congress aimed to "sweep" in "physical objects of every kind." *Id.* at 539-40.

Second, the plurality relied on Section 1519's placement within Title 18's Chapter 73. *Yates*, 574 U.S. at 540. Specifically, its placement at the end of the chapter following several provisions "prohibiting obstructive acts in specific contexts," suggested that Congress did not intend Section 1519 as an "across-the-board" spoliation ban. *Id.* In contrast, the plurality noted, Congress directed codification of the Sarbanes-Oxley Act's "other additions . . . within or alongside retained provisions that address obstructive acts relating broadly to official proceedings and criminal trials." *Id.* To illustrate one such "broad[]" provision, the plurality specifically referred to the provision at issue in this case, Section 1512(c), which, as noted above, was titled "Tampering with a record or otherwise impeding an official proceeding," and which Congress placed (as Section 1512(c)) within the "broad proscription[]" found in the "pre-existing" Section 1512. *Id.* at 541.

Third, the plurality compared Section 1519 with the "contemporaneous passage" in the Sarbanes-Oxley Act of Section 1512(c)(1). *See* 574 U.S. at 541. Because Section 1512(c)(1)'s reference to "'other object'" encompassed "any and every physical object," the plurality "resist[ed] a reading of § 1519" that would make Section 1512(c)(1) superfluous. *Id.* at 542-43. Moreover, the plurality reasoned, the fact that Congress's formulation in Section 1519 did not track the language in Section 1512(c)(1) indicated that Congress intended Section 1519 to be construed differently from Section 1512. *Id.* at 545 n.7. More specifically, the plurality concluded that, by adopting those different formulations, Congress intended the phrase "tangible object" in Section 1519 to "have a narrower scope" than the phrase "'other object'" in Section 1512(c)(1). *Id.* at 544-45.

Fourth, the plurality found support for its narrowing construction in the *noscitur a sociis*

and *ejusdem generis* interpretive canons.  574 U.S. at 543-46.  Because "tangible object" in Section 1519 was the "last in a list of terms that begins 'any record [or] document,'" the *noscitur a sociis* canon counseled interpreting that term "to refer . . . specifically to the subject of tangible objects involving records and documents." *Id.* at 544. That reading, moreover, "accord[ed] with" Section 1519's verbs, which include "'falsif[ying]'" and "'mak[ing] a false entry in'"—terms that commonly "take as grammatical objects records, documents, or things used to record or preserve information." *Id.* (emphasis omitted). Similarly, application of the *ejusdem generis* canon—that "general words" following "specific words" when listed in a statute are "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *id.* at 545 (internal quotation marks omitted)—indicated that Congress "would have had no reason to refer specifically to 'record' or 'document'" if it intended Section 1519 to "capture physical objects as dissimilar as documents and fish."  *Id.* at 546.[5]

Finally, the plurality stated that, to the extent its "recourse to traditional tools of statutory construction" left "any doubt" about how to interpret "'tangible object'" in Section 1519, the rule of lenity favored a narrow interpretation of that phrase. 574 U.S. at 547-48. Because a broad reading of Section 1519 would criminalize "tampering with *any* physical object that *might* have evidentiary value in *any* federal investigation into *any* offense, no matter whether the investigation is pending or merely contemplated, or whether the offense subject to investigation is criminal or civil," the plurality reasoned that before it opted for the "harsher alternative," Congress must speak

---

[5] By way of example, the Supreme Court cited its decision in *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015), wherethe Court interpreted the residual clause in the Armed Career Criminal Act (ACCA), which covered "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The ACCA's enumeration of specific crimes suggested that the "otherwise involves" provisions applied only to "*similar* crimes, rather than *every* crime that'presents a serious potential risk of physical injury to another.'" *Begay*, 553 U.S. at 142.

"in language that is clear and definite." *Id.* at 548 (internal quotation marks omitted).

Justice Alito concurred in the judgment on narrower grounds.[6] Observing that the statutory "question is close," Justice Alito reasoned that the combined effect of "the statute's list of nouns, its list of verbs, and its title" favored the plurality's conclusion. *Yates*, 574 U.S. at 549 (Alito, J., concurring). Section 1519's nouns suggested that "'tangible object'" in that provision "should refer to something similar to records or documents." *Id.* at 550. Similarly, Section 1519's list of verbs are "closely associated with filekeeping," and at least one verb phrase—"'makes a false entry in'"—"makes no sense outside of filekeeping." *Id.* at 551. Finally, Section 1519's title—"Destruction, alteration, or falsification of records in Federal investigations andbankruptcy," § 1519—suggested that "no matter how other statutes might be read," Section 1519"does not cover every noun in the universe with tangible form." *Id.* at 552.

The decision in *Yates* does not unsettle the straightforward interpretation of Section 1512(c)(2) articulated above because the "familiar interpretive guides" on which the plurality (and to some extent Justice Alito) relied to narrow the scope of Section 1519 do not apply to Section 1512(c)(2).

Consider first, as the plurality did, Section 1512's statutory title. *See Yates*, 574 U.S. at 539-40 (plurality opinion); *see also id.* at 552 (Alito, J., concurring) (considering Section 1519's title). Even leaving aside the "the wise rule" that neither "the title of a statute" nor "the heading of a section" can "limit the plain meaning of the text," *Brotherhood of R.R. Trainmen*, 331 U.S. at 528-29, Section 1512's title, "Tampering with a witness, victim, or an informant," provides no reason to narrow the interpretation of Section 1512(c)(2). *See supra*, at 15-17. For one thing, Congress named that title 20 years before it enacted 1512(c) in the Sarbanes-Oxley Act, and then

---

[6] Under the rule announced in *Marks v. United States*, 430 U.S. 188 (1977), Justice Alito's concurrence represents the binding holding as the narrowest opinion among those concurring in the judgment. *See id.* at 193.

simply opted not to rename Section 1512 to reflect either of the two new obstruction prohibitions added in Section 1512(c). Section 1512's overarching title therefore does not have the same interpretive force as Section 1519's title, which was enacted by the same Congress that enacted the rest of Section 1519. *See Yates*, 574 U.S. 541 n.4 (plurality opinion). Additionally, whereas Section 1519's title within the Sarbanes-Oxley Act, "Criminal penalties for altering documents," suggested a narrow focus on document destruction, *see id.* at 539-40, Section 1512(c)'s title within the Sarbanes-Oxley Act reflected both the document-destruction prohibition in Section 1512(c)(1) *and* the broader catch-all obstruction provision in Section 1512(c)(2): "Tampering with a record *or otherwise impeding an official proceeding.*" Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered).

Similarly inapposite here is Section 1512(c)(2)'s placement within Chapter 73. *See Yates*, 574 U.S. at 540-41 (plurality opinion). Whereas Congress enacted Section 1519 as a standalone prohibition and placed it at the end of the chapter "together with specialized provisions expressly aimed at corporate fraud and financial audits," it instead inserted Section 1512(c) within the "pre-existing" Section 1512. *Id.* at 541 (plurality opinion). So situated, Section 1512(c)(2)'s function as a catch-all obstruction prohibition is consistent with Section 1512's role as a "broad proscription" on obstructive acts. *See id.* (plurality opinion).

That reading, moreover, is consistent with how the *Yates* plurality opinion describes Section 1512(c). *See* 574 U.S. at 541-43, 545. Contrasting the term "other object" in the document-destruction provision in Section 1512(c)(1) with "tangible object" in Section 1519, the plurality concluded that Section 1512(c)(1)'s later enactment suggested Congress intended it to reach more broadly than Section 1519. *Id.* at 542-43; *id.* at 545 n.7 ("Congress designed § 1519 to be interpreted apart from § 1512, not in lockstep with it."). And if Congress intended Section

1512(c)(1) to cover more ground than Section 1519, Section 1512(c)'s text and structure make plain that it further intended Section 1512(c)(2) to cover more ground than Section 1512(c)(1).

The plurality, 574 U.S. at 544-45, and Justice Alito, *id.* at 550, also drew support for their narrowing construction of Section 1519 from interpretive canons, but those canons do not help the Defendant here. "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370-71 (D.C. Cir. 1998). Section 1519's structure—a list of specific terms ("record" and "document") followed by a more general term ("tangible object")—in a singular provision is susceptible to that analysis. *Yates*, 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring). But Section 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separate numbered provision containing the separate catch-all obstruction prohibition. "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in Section 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has no application to Section 1512(c)(2), which embodies the same structure. *Cf. Loughrin*, 573 U.S. at 359 (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprised "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus

placing the clauses on an equal footing and indicating that they have separate meanings").

The *noscitur a sociis* canon is similarly inapplicable here. That canon is used only to construe terms that are "of obscure or doubtful meaning," not to change the meaning of unambiguous terms that are simply broad. *Russell Motor Car Co.,* 261 U.S. at 520.  Moreover, the canon may be invoked only "when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *S. D. Warren Co. v. Maine Bd. of Env'tProt.,* 547 U.S. 370, 378 (2006) (internal quotation marks omitted); *see Beecham v. United States,*511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). As noted above, the first and second clauses of Section 1512(c) are not items in a list of related terms; rather, they are distinct offenses phrased in the disjunctive. 18 U.S.C. § 1512(c). That structure therefore does not lend itself to application of *noscitur a sociis*.  *See De Bruhl-Daniels*, 491 F. Supp. 3d at 251 (declining to apply the *noscitur a sociis* canon to Section 1512(c)).

Finally, the *Yates* plurality's reliance on the rule of lenity has no application here.[7] The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). As discussed at length above, there is no grievous ambiguity here. Section 1512(c)(2)'s text, structure, history, and purpose make clear that it functions as a broad catch-all

---

[7] Justice Alito did not rely on several features that guide the plurality opinion, including the rule of lenity. *See* 574 U.S. at 549 (noting that the case "should be resolved on narrow grounds," namely, "the statute's list of nouns, its list of verbs, and its title," but not discussing the Sarbanes-Oxley Act, Section 1519's placement within Chapter 73, the Supreme Court's decision in *Begay*,or the rule of lenity). It follows that that his controlling opinion, *see supra* note 6, makes even more clear that Section 1512(c)(2) should not be interpreted differently than its text and structurewould suggest.

prohibition on obstructive conduct that covers "otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *Petruk*, 781 F.3d at 447 (internal quotation marks omitted).

The plurality also found the rule of lenity "relevant" in part given the absence of limiting principles under a broad construction of Section 1519. *See Yates*, 574 U.S. at 548. But neither of the features that constrain Section 1512(c)(2)'s reach—the government's requirement to establish that the defendant acted "corruptly" and a nexus to a contemplated official proceeding, *see supra*, 17-22—is present in Section 1519. Section 1519 requires that the defendant act "knowingly" and "with the intent to impede, obstruct, or influence," 18 U.S.C. § 1519, but does not impose the more stringent "corruptly" *mens rea*. And courts of appeals have uniformly concluded that Section 1519 does not include a "nexus" requirement. *See United States v. Scott*, 979 F.3d 986, 992 (2d Cir. 2020) (Supreme Court's decisions in *Marinello*, *Arthur Andersen*, and *Aguilar* do not "overrule[]" existing circuit precedent that Section 1519 "does not have a nexus requirement"); *United States v. Moyer*, 674 F.3d 192, 209 (3d Cir. 2012) (declining to extend nexus requirement from Section 1503 and 1512(b)(2) to Section 1519); *United States v. Kernell*, 667 F.3d 746, 753-55 (6th Cir. 2012); *United States v. Yielding*, 657 F.3d 688, 712-14 (8th Cir. 2011); *see also* S. Rep. No. 107-146, at 14-15 ("[Section 1519] is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter."). [8]

To be sure, no court appears to have applied Section 1512(c)(2) to conduct precisely akin to the Defendant's alleged actions, namely, confronting and assaulting law enforcement officers as

---

[8] The Defendant's rule-of-lenity argument (Def. Mot. at 3), which relies heavily on the *Yates* plurality's analysis, fails for the same reasons.

the defendants attempted to force their way into the Capitol to halt or delay a congressional proceeding. Even if Section 1512(c)(2)'s application to this case was "not expressly anticipated by Congress," that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (internal quotation marks and brackets omitted). That is so even if the statute's application in a particular case "reaches 'beyond the principal evil' legislators may have intended or expected to address." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)). And any policy-based suggestion "that the current scheme should be altered," *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 778 (2020), ought to be addressed to Congress, not this Court, *see, e.g.*, *United States v. Rodgers*,466 U.S. 475, 484 (1984) ("Resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress.").

> 2. Even if Section 1512(c)(2) Required that the Obstructive Act Relate to Documentary or Tangible Evidence, the Defendant's Alleged Conduct Would be <u>Covered</u>

At a bare minimum, Section 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding. If, for example, the Defendant had corruptly blocked the vehicle carrying the election returns to the Capitol for congressional examination at the certification proceeding, that conduct would clearly fit within Section 1512(c)(2). Section 1512(c)(2) would likewise cover blocking a bus carrying the Members of Congress to the Capitol to examine the election returns at the certification proceeding. And it just as readily covers displacing the Members of Congress from the House and Senate Chambers, where they would examine and discuss those returns and other records.

No court following *Yates* has adopted an interpretation of Section 1512(c)(2) that limits it

36

to document-focused obstructive conduct.  *See, e.g.*, *Petruk*, 781 F.3d at 447-48; *De Bruhl-Daniels*, 491 F. Supp. 3d at 251; *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021). But even were this Court to adopt the limitation that Section 1512(c)(2) "requires some nexus to tangible evidence," *United States v. Singleton*, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006), or a "tangible object," *United States v. Hutcherson*, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006), the Defendant's alleged conduct would still fall within the scope of Section 1512(c)(2) because the Defendant "otherwise obstruct[ed], influence[d], or impede[d]" Congress's ability to review documents that it was constitutionally and statutorily required to receive and act upon, thereby obstructing the certification of the Electoral College vote.

The certification of the Electoral College vote is rooted in federal constitutional and statutory law that requires the creation and consideration of various documents.  Under the Twelfth Amendment, the state Electors must "vote by ballot," marking one set of ballots for the individual voted for as President and "distinct ballots" for the vice-presidential selection.  U.S. Const. amend. XII.  The Electors must then create "lists" of the presidential and vice-presidential candidates who received votes, "which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States." *Id.* These certified lists, or "certificates," are then opened by the President of the Senate "in the presence of the Senate and House of Representatives." *Id.*  After opening them, the President of the Senate hands the certificates to two appointed "tellers," who in turn create a new "list" that comprises "the votes as they shall appear from the said certificates." 3 U.S.C. § 15. During the reading of the certificates, the President of the Senate must open the floor to objections; any objection "shall be made in writing . . . and shall be signed by at least one Senator and one Member of the House of Representatives." *Id.* Congress's certification of the Electoral College vote, therefore, operates through a deliberate and legally prescribed assessment

of ballots, lists, certificates, and, potentially, written objections.

Had the Defendant sought to alter or destroy any of those documents, he also would have violated Section 1512(c)(1). Instead, the Defendant allegedly sought to stop the Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election. Because the Defendant's alleged conduct thus precluded a full and fair examination of physical or documentary evidence at an official proceeding, the indictment's allegations would satisfy any extratextual "requirement" in Section 1512(c)(2) "for some nexus to a document or other tangible evidence." *Singleton*, 2006 WL 1984467, at *5.

Finally, while Section 1512(c) may have been enacted due to concerns over document destruction and corporate malfeasance, "[s]tatues often reach beyond the principle evil that animated them." *Sandlin,* 2021 WL 5865006, at *9 (finding that Section 1512(c)(2) may apply to defendants who attempted to stop the certification of the Electoral College on January 6, 2021); *see also Mostofsky*, 2021 WL 6049891 at *11 (rejecting defendant's argument that Section 1512 only applies to conduct similar to document destruction and explaining that the defendant's position "would have the Court ignore the plain meaning of the words contained in (c)(2)—to wit, 'obstructs, influences, or impedes'—which cannot be read so narrowly. The use of 'otherwise' is better understood as 'clarif[ying] that the latter prohibits obstruction by means <u>other than</u> document destruction.'") (emphasis in original); *Caldwell*, 2021 WL 6062718 at * 14 ("The natural reading of the two sections is that section 1512(c)(2) 'operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction'").

Congress's certification of the Electoral College vote on January 6, 2021 was an "official proceeding." Section 1512(c)(2) is not unconstitutionally vague or overbroad, and nothing in its text, structure, or history limits it to obstruction tied to documentary or tangible evidence. But even if such a limitation existed, the statute encompasses the Defendant's alleged conduct. Therefore, the Defendant's motion to dismiss Count One should be denied.

## II.   SECTION 231 IS NOT VAGUE; IT CLEARLY ENCOMPASSES THE DEFENDANT'S ALLEGED CONDUCT

The Defendant argues that 18 U.S.C. § 231 is void for vagueness because it "improperly hinders a person of ordinary intelligence from discovering what conduct it prohibits" (Def. Mot. at 16), it relies on "subjective reactions" rendering violations unpredictable" (Def. Mot. at 19), and it lacks a scienter requirement (Def. Mot. at 20). A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Johnson*, 576 U.S. 591; *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996). As at least one judge in this district has concluded, *see Nordean*, 2021 WL 6134595, neither applies to Section 231.

Constitutional statutory analysis begins with the statute's plain language. *United States v. Shill,* 740 F.3d 1347, 1351 (9th Cir. 2014). Federal legislation enjoys a presumption of constitutionality that may only be overturned "upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison,* 529 U.S. 598, 607 (2000).

Section 231(a)(3) criminalizes "any act to obstruct, impede, or interfere with any fireman or law enforcement officer" who is engaged in the lawful performance of his official duties during a civil disorder that obstructed, delayed, or adversely affected the conduct or performance of a

39

federally protected function. 18 U.S.C. § 231(a)(3). And it does so in the context of a civil disorder, which is "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

The civil disorder statute punishes intentional conduct directed against firefighters and law enforcement officers working to protect the public during violent protests. The statute prohibits only concrete "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere" with firefighters or law enforcement. Contrary to the Defendant's arguments, those terms are quite different from statutory terms that courts have found to be vague, such as statutes that turn on subjective judgments of whether a defendant's conduct was "annoying" or "indecent." *See Williams*, 553 U.S. at 306; *see also Nordean*, 2021 WL 6134595, at *16 ("Section 231(a)(3) does not carry the potential for misunderstanding or arbitrary enforcement ... It prohibits any 'act' done "to obstruct, impede, or interfere" with law enforcement responding to a 'civil disorder.' 18 U.S.C. 231(a)(3). These terms are not 'dependent on the subjective reaction of others.'").

The statute's scope consists primarily, if not exclusively, of conduct or unprotected speech, such as threats. In other words, the civil disorder statute prohibits not the presence at a civil disorder, but rather, "an act committed during the course of such disorder." *United States v. Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971). It covers intentional conduct, not "mere inadvertent conduct." *United States v. Featherston*, 461 F.2d 1119, 1122 (5th Cir. 1972). Moreover, Section 231(a)(3) is not unique; many state and federal statutes likewise criminalize obstructing the government's efforts to enforce the law and maintain public order. *See, e.g.*, 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation);

*United States v. Brice*, 926 F.2d 925, 930-31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101-20.305, regulation prohibiting impeding or disrupting government duties); *see also* Cal. Penal Code § 148 (prohibiting resisting, delaying, or obstructing any peace officer or emergency medical technician); *State v. Illig-Renn*, 341 Or. 228 (2006) (rejecting constitutional attacks leveled against O.R.S. 162.247(1)(b), which prohibits interference with a police officer); *State v. Steen*, 164 Wash. App. 789, 808 (2011) (rejecting as applied constitutional challenge to RCW 9A.76.020(1), which criminalizes obstructing police officers).

The Defendant's argument that the statute lacks an express *mens rea* ignores the fact that Section 231(a)(3) requires intent, which narrows its scope. *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad). The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a firefighter or police officer, *i.e.*, the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 854 F.2d at 854 (construing Section 231(a)(3) to include an intent requirement). This requirement that a defendant who violates Section 231(a)(3) act with the intent to obstruct, interfere or impede is critical to the First Amendment analysis. *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987) (intent requirement prevents application of statute to protected speech). And even if the statute lacked an express scienter requirement, courts "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a mens rea element even when none appears on the face of the statute.").

As to the Defendant's arguments that Section 231 is overbroad, potentially including "free speech and expressive conduct" (Def. Mot. at 16, 18), as discussed above, this suggestion directly conflicts with the plain text of the statute, which is directed at "any act to obstruct, impede, or interfere." *See Nordean*, 2021 WL 6134595, at *17 (internal citation omitted). "But even acknowledging the potential for unlawful applications, '[t]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Mostofsky*, 2021 WL 6049891 at * 8 (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)); *see also Howard*, 2021 WL 3856290, at *11 (rejecting overbreadth claim that "because the statute does not require a violent act or an assaultive act, the government perhaps could charge someone who yelled at an officer during a civil disorder and could argue that the yelling was an "act" that "attempted to obstruct" an officer performing her lawful duties"). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Laws like Section 231(a)(3) that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124. Indeed an "overbreadth challenge" to such a law will "[r]arely, if ever … succeed." *Id.*

Overbreadth can invalidate a criminal law only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008), quoting *New York v. Ferber*, 458 U.S. 747, 769-771 (1982); *see also City of Houston v. Hill*, 482 U.S. 451, 458 (1987). "A statute is facially invalid if it prohibits a substantial amount of protected speech."

*Williams*, 553 U.S. at 293; *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). An overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as Section 231(a)(3) assuredly does. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

Because "the statute does not attempt to curtail speech the defendants may not challenge it as vague or overly broad if their own conduct may be constitutionally prohibited, since … one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." 854 F.2d at 853, citing *United States v. Raines*, 362 U.S. 17, 21 (1960). Accordingly, as the Court in *Mostofsky* found, Section 231's "plain text, however, indicates that it is 'targeted primarily if not exclusively at conduct rather than speech'" and the defendant's overbreadth challenge was without merit. *Mostofsky*, 2021 WL 6049891 at * 8.

The indictment identifies a federally protected function that was obstructed, delayed or adversely affected by a civil disorder. Because Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden," *Mechanic*, 454 F.2d at 854, the Defendant's motion to dismiss as to Count Three should be denied.

## III.   18 U.S.C. § 1752(a)(1) DOES NOT INFRINGE UPON THE DEFENDANT'S FIRST AMENDMENT RIGHTS

The Defendant suggests that the act of shoving a barricade into police officers tasked with protecting the Capitol building and grounds is somehow shielded from prosecution because it represents expression (Def. Mot. at 21-22). The Defendant's argument is both legally and factually flawed. Notwithstanding the Defendant's efforts to characterize his conduct as mere political

protest to "convey his disagreement with the results of the 2020 election" where the "target of his expression was Congress … certifying the election results that same day" (Def. Mot. at 22), the Defendant intentionally invaded the Capitol grounds. These unlawful actions by the Defendant plainly distinguish his conduct from lawful assembly. Indeed, the Defendant fails "to identify *any* protected activity that the statute covers—or even chills." *Montgomery* 2021 WL 6134591, at *24 (where government alleged defendants assaulted an officer on Capitol grounds before entering the Capitol building, the Court noted that, to the extent defendants maintain that they merely intended to utilize their First Amendment rights to free speech and assembly, that is a "factual argument for the jury") (emphasis in original).

In *Texas v. Johnson*, 491 U.S. 397, 403, (1989), the Supreme Court explained the procedure for determining whether a defendant may invoke the First Amendment to challenge a criminal charge. First, the court must determine whether the defendant's conduct "constituted expressive conduct." *Id*. If the conduct was not expressive, the challenge fails. *Id*. Second, if the conduct was expressive, the court must determine if the statute is "related to the suppression of free expression." *Id*. If the statute is not related to the suppression of free expression, the court applies the "less stringent standard" for noncommunicative conduct laid out in *United States v. O'Brien*, 391 U.S. 367, 377 (1968). *Johnson*, 491 U.S. at 403. If the statute is related to the suppression of free expression, the court must apply a "more demanding standard" to determine if the government's interest justifies imposition of criminal liability. *Id*.

Under *O'Brien*, the statute is constitutional only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental

44

restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377.

Here, the Defendant's conduct was not "expressive," and thus his challenge fails before reaching the *O'Brien* factors. Whatever the Defendant was doing in Washington, D.C. on January 6, there is no doubt that it culminated with him grabbing a barricade on Capitol grounds and pushing it into officers *to gain further access to restricted grounds without lawful authority to do so*. This is the conduct at issue, not his "expressive conduct" (or speech). As an example, say a person, believing an ongoing trial to be unjust, breaks into a courtroom in order to delay a judge from presiding over the trial, and accomplishes that delay by both her presence in the courtroom and her shouting at the judge. The First Amendment does not protect the person from an obstruction of justice charge; her "expressive conduct" of shouting at the judge is not the conduct that the statute criminalizes. To the contrary, it is the person's *actus reus* (presence and physical disturbance in the courtroom) coupled with her *mens rea* (corruptly intending to prevent the trial from proceeding) that violates the obstruction statute. The same is true here. "[E]ven if the charged conduct had some expressive aspect, it lost whatever First Amendment protection it may have had" *Nordean*, 2021 WL 6134595, at *13 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment."); *Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (government may punish physical obstruction); *Cox v. Louisiana*, 379 U.S. 536, 555 (1965) (The First Amendment does not allow a "group of demonstrators" to "insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."); *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir. 2000) ("Activities that

injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message.")).

But even if the *O'Brien* factors apply, the Defendant's argument still fails. The Defendant argues that the government's application here violates the fourth *O'Brien* factor, *i.e.*, the restriction on alleged First Amendment freedoms is greater than is essential to further the government interest (Def. Mot. at 23). But here, the government interest in protecting the integrity and continuity of congressional proceedings is unrelated to any incidental impact that the application of the law may have on the ability to petition government for a redress of grievances. Additionally, the statute goes no further than what is "essential" to prevent the obstruction of official proceedings of Congress. The Supreme Court has upheld restrictions on demonstrations in Washington, D.C., with far less at stake than the integrity of the U.S. Presidential Election. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (upholding a ban on overnight camping on the National Mall and finding a "substantial Government interest in conserving park property, an interest that is plainly served by, and requires for its implementation, measures such as the proscription of sleeping that are designed to limit the wear and tear on park properties").

Ultimately, the Section 1752 does not touch exclusively expressive conduct. The statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…" It does not criminalize speech or peaceful assembly, nor does the government allege such conduct. Instead, the government alleges that the Defendant entered and remained on restricted grounds, engaged in disorderly and disruptive conduct, and committed an act of physical violence against officers. *See* ECF No. 53. The Defendant's attempts to recharacterize his behavior as peaceful assembly fail, and his motion to dismiss Counts Four through Six should be denied.

IV.    **COUNTS FOUR THROUGH SIX STATE AN OFFENSE; THE DEFENDANT'S ALLEGED CONDUCT CLEARLY VIOLATES SECTION 1752**

The second superseding indictment charges the Defendant with violating 18 U.S.C. § 1752(a) by being unlawfully present on restricted grounds, engaging in disorderly and disruptive conduct, and committing an act of physical violence against officers. The Defendant challenges Counts Four through Six in three respects: (1) the Secret Service was required to establish the restricted grounds; (2) the government did not allege that the Secret Service restricted the Capitol Grounds on January 6; and (3) the Secret Service protectee—whose presence makes certain grounds restricted— was not a "visitor" (Def. Mot. at 24-29). Courts in this district have rightly rejected this contention. *See Griffin*, 2021 WL 2778557; *Mostofsky*, 2021 WL 6049891; *Nordean*, 2021 WL 6134595. Because the U.S. Capitol was a restricted building on or about January 6, 2021, the Defendant's argument fails.

### A.    **18 U.S.C. § 1752 Does Not Require the Government to Prove That the Restricted Area Was Restricted at the Secret Service's Direction**

The Defendant argues that the indictment should be dismissed for failure to state an offense because the USSS did not designate the "restricted area" under 18 U.S.C. § 1752 (Def. Mot. at 24), and therefore the government cannot allege that the Secret Service restricted the Capitol Grounds on January 6 (Def. Mot. at 25). That argument misunderstands Section 1752's text.

Section 1752 provides in relevant part:

(a) Whoever—

   (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(c) In this section—

   (1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

47

(B) of a building or grounds where the President or other person protected
by the Secret Service is or will be temporarily visiting;

18 U.S.C. § 1752. In short, Section 1752 "prohibits persons from knowingly entering without
lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or
grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson
v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir.
2020).

To determine the meaning of a statute, the Court "look[s] first to its language, giving the
words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal*, 498 U.S. at 108);
*see Public Investors Arbitration Bar Association v. U.S. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C. 2013)
(Howell, J.) ("a reviewing court must accord first priority in statutory interpretation to the plain
meaning of the provision in question."). Where, as here, the statute in question's words "are
unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020)
(internal quotation marks omitted).

Section 1752's text is clear. It proscribes certain conduct in and around "any restricted
building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term
"restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or
otherwise restricted area . . . of a building or grounds where the President or other person protected
by the Secret Service is or will be temporarily visiting." § 1752(c)(1)(B). Through a cross-
reference, Section 1752 makes clear—and the Defendant does not appear to dispute—that
"person[s] protected by the Secret Service" include the Vice President and the Vice President-
elect. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or
grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, §
1752(a)(1); knowingly and with intent to impede or disrupt government business, engaging in

48

"disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," §
1752(a)(2); and knowingly engaging in any act of physical violence against any person or property,
§ 1752(a)(4).

That straightforward analysis has a straightforward application to the facts alleged in the
Defendant's case. The second superseding indictment alleges that, on January 6, 2021, a protected
person was present inside the Capitol building or on the Capitol grounds, and that some portion of
the Capitol building and grounds was posted, cordoned off, or otherwise restricted—making it a
"restricted building or grounds" under § 1752(c)(1). The indictment further alleges that the
Defendant knowingly and without lawful authority entered and remained in that restricted
buildings and grounds. It also alleges that the Defendant, knowingly and with the intent to impede
or disrupt government business, engaged in disorderly conduct that resulted in a disruption to
government business. Finally, it alleges that the Defendant knowingly engaged in any act of
physical violence against any person or property. In short, the allegations closely track the statutory
language.

Looking outside Section 1752's language, the Defendant urges the Court to import an
extra-textual requirement that the USSS be required to designate the restricted area. That is so, the
Defendant claims, because Section 1752 "does not state that any other agency is permitted to
designate events for security…" (Def. Mot. at 25). This argument fails. Section 1752 is directed
not at the USSS, but at ensuring the protection of the President and the office of the Presidency.
*See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using
the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668-
69 (2006)*. Second, the legislative history in fact undercuts the Defendant's argument. As he
explains (Def. Mot. at 24), an earlier version of the statute explicitly incorporated regulations

promulgated by the Department of the Treasury (which at the time housed the USSS) governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). But Congress's decision in 2006 to "eliminate reference to regulations" indicates that the statute no longer depends on whether the USSS has defined an area as "restricted."

The Defendant's reliance on statutory purpose and legislative history suffers a bigger flaw: it focuses outside the text when the text itself is clear. Such an inquiry is permissible only where literal application of statutory language either results in an outcome that can truly be characterized as absurd or produces an outcome that is demonstrably at odds with clearly expressed Congressional intent. *See United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940). Here, neither is the case. The statute sets clear limitations on where restricted areas may be established. The statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…" The statute does not criminalize an individual who enters an area in a building or grounds separate from where a Secret Service protectee is present, regardless of restrictions placed by law enforcement.

Nor does the Defendant muster support for the claim that the literal application of the statute would be at odds with Congressional intent. The language of the statute is the best evidence of Congressional intent. *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 84 (1991). This statute was intended to ensure the safety of USSS protectees. If Congress intended to give USSS sole authority to designate a restricted area, it could have written that into the statute or amended the statute to reflect that intent. In 1970, Congress enacted 18 U.S.C. § 1752 to include subsection (d), which gave authority to the Department of Treasury, which then oversaw USSS, to

"prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). Congress was clearly aware that the prohibitions in 18 U.S.C. § 1752 could turn on decisions made by USSS but chose not to include that in the revised statute.

**B.  Claims That Then-Vice President Pence Was Not a "Visitor" Are Meritless**

The Defendant makes much of whether Vice President Pence was merely "visiting" or whether he was working on at his normal place of business on January 6. This distinction is meaningless. Despite the Defendant's assertion that the Vice President "lives and works" in the Capitol (Def. Mot. at 28), the statute itself accounts for where the Vice president resides in Section 1752(c)(1)(A). And, the Vice President regularly "works" in several places. That former Vice President Pence had a permanent office for when he visited the Capitol building does not invalidate the clear text of the statute.

As discussed above, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). At the time the Defendant assaulted officers on Capitol grounds on January 6, 2021, three Secret Service protectees—Vice President Pence and two immediate family members—were present. The Defendant's conduct accordingly falls within the Section 1752's plain sweep because he unlawfully entered restricted grounds while the Vice President and his family were "temporarily visiting."

The Defendant stresses that Vice President Pence had a permanent U.S. Capitol office. Section 1752(c)(1)(B), however, defines the restricted area by reference to the location of the protectee—not his office. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]."[9]

The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[10] Either definition describes the Secret Service protectees' activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. Similarly, the Vice President's family members came to the U.S. Capitol for a particular purpose: to observe these proceedings. Finally, as President of the Senate, Vice President Pence oversaw the vote certification. Given the presence of the Vice President and his family members, the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

The parties need not go into a deep dive of legislative history to determine the exact length of time needed to qualify as a "temporary visit." To the extent that Vice President Pence's stay was extended, it was because a crowd of rioters, including the Defendant, were holding hostage the certification process. However long that ultimate stay, it did not morph into residence.

---

[9] This argument also ignores the fact that the Vice President's family did not live or work at the U.S. Capitol. Assuming, *arguendo,* the defendant's argument that the Vice President cannot "temporarily visit" a place where he maintains an office, the charges in the Superseding Indictment remain supported because these other Secret Service protectees did not work at the U.S. Capitol or have offices there.

[10] https://www.merriam-webster.com/dictionary/visit

All told: The Defendant's position defies Section 1752's clear purpose. *Cf. Genus Med. Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 637 (D.C. Cir. 2021) ("[I]f the text alone is insufficient to end the inquiry, we may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.") (internal quotation marks and citation omitted). In drafting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or grounds" where they happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B).

The Defendant's cited cases—involving either an arrest or conviction under Section 1752—do not discuss the "temporarily visiting" language (Def. Mot. at 28-29); *see United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990); *Blair v. City of Evansville, Ind.,* 361 F. Supp.2d 846 (S.D. Ind. 2005). They accordingly lack relevance to the present dispute. No support exists for the Defendant's effort to insert such large and irrational exceptions into the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (noting that courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it") (citation omitted).

All the relevant metrics—plain language, statutory structure, and congressional purpose—foreclose the Defendant's crabbed reading of Section 1752(c)(1)(B). This Court should reject it and should deny the Defendant's motion to dismiss Counts Four through Six.

## **CONCLUSION**

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the Defendant's motion be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:     */s/ Angela N. Buckner*
Angela N. Buckner
DC Bar #1022880
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (202) 252-2656
Email: angela.buckner@usdoj.gov