# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Eleven   Month: Four   Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 122 Filed 04/10/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91-3 (RCL) MOTION FOR ORDER FOR MENTAL COMPETENCY EVALUATION**, Page 2 of 2 Respectfully submitted MATTHEW M. GRAVES United States Attorney By: */s/ Kaitlin Klamann* KAITLIN KLAMANN Assistant United States Attorney By: */s/ Courtney A. Howard* COURTNEY A. HOWARD Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Case 1:21-cr-00091-RCL Document 122-1 Filed 04/10/23 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91-3 (RCL) ORDER**, Page 2 of 3, Page 3 of 3 ENTERED:"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 122 Filed 04/10/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91-3 (RCL) MOTION FOR ORDER FOR MENTAL COMPETENCY EVALUATION**, Page 2 of 2 Respectfully submitted MATTHEW M. GRAVES United States Attorney By: */s/ Kaitlin Klamann* KAITLIN KLAMANN Assistant United States Attorney By: */s/ Courtney A. Howard* COURTNEY A. HOWARD Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Case 1:21-cr-00091-RCL Document 122-1 Filed 04/10/23 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91-3 (RCL) ORDER**, Page 2 of 3, Page 3 of 3 ENTERED:" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

COPY

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Eleven   Month: Four   Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

Attachment: "Case 1:21-cr-00091-RCL Document 122 Filed 04/10/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Case No. 21-CR-91-3 (RCL) **MOTION FOR ORDER FOR MENTAL COMPETENCY EVALUATION**, Page 2 of 2 Respectfully submitted MATTHEW M. GRAVES United States Attorney By: */s/ Kaitlin Klamann* KAITLIN KLAMANN Assistant United States Attorney By: */s/ Courtney A. Howard* COURTNEY A. HOWARD Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Case 1:21-cr-00091-RCL Document 122-1 Filed 04/10/23 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Case No. 21-CR-91-3 (RCL) **ORDER**, Page 2 of 3, Page 3 of 3 ENTERED:"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves, United States Attorney Judiciary, Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Kaitlin Klamann, Assistant United States Attorney, 601 D Street NW, Washington, D.C. 20001
cc: Courtney A. Howard, Detailed to the U.S. Attorney's Office, 601 D Street NW, Washington, D.C. 20001
cc: Christopher R Black, BLACK AND ASKEROV PLLC, 705 2ND AVE #1111, Seattle, Washington 98104
cc: Dr. Brent J. O'Neal, 2366 Eastlake Ave E #323, Seattle, WA 98102

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

**COPY**

Notice Date:          Day: Twelve          Month: Four          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Document 125 Filed 04/12/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91-3 (RCL) <u>ORDER</u>**, Page 2 of 2 Royce C. Lamberth U.S. District Judge April 12, 2023"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Document 125 Filed 04/12/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Case No. 21-CR-91-3 (RCL) **<u>ORDER</u>**, Page 2 of 2 Royce C. Lamberth U.S. District Judge April 12, 2023" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Document 125 Filed 04/12/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Case No. 21-CR-91-3 (RCL) **<u>ORDER</u>**, Page 2 of 2 Royce C. Lamberth U.S. District Judge April 12, 2023"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves, United States Attorney Judiciary, Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Kaitlin Klamann, Assistant United States Attorney, 601 D Street NW, Washington, D.C. 20001
cc: Courtney A. Howard, Detailed to the U.S. Attorney's Office, 601 D Street NW Washington DC 20001
cc: Christopher R Black, BLACK AND ASKEROV PLLC, 705 2ND AVE #1111, Seattle, Washington 98104
cc: Dr. Brent J. O'Neal, 2366 Eastlake Ave E #323, Seattle, WA 98102

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-three        Month: Two        Year: 2023 CE

Christopher R Black
BLACK AND ASKEROV PLLC
705 2ND AVE #1111
SEATTLE WA 98104

In reply to : "Case 3:21-mj-05036-DWC Document 1 Filed 02/11/21 Page 1 of 1 UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA No. MJ21-5036-DWC NOTICE OF APPEARANCE OF COUNSEL Respectfully submitted BLACK & ASKEROV PLLC Christopher Black"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 3:21-mj-05036-DWC Document 1 Filed 02/11/21 Page 1 of 1 UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA No. MJ21-5036-DWC NOTICE OF APPEARANCE OF COUNSEL Respectfully submitted BLACK & ASKEROV PLLC Christopher Black" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date, I request you perform the following duties:

1.  Do not argue the facts, jurisdiction, law or venue.
2.  Issue me the Appearance Bond and waive all Public costs.
3.  Close the Account and issue the Order of the Court to me immediately.
4.  Adjust and set-off all Public Charges by the exemption in accord with Public Policy.
5.  Request Discharge

Please respond within three (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 3:21-mj-05036-DWC Document 1 Filed 02/11/21 Page 1 of 1 UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA No. MJ21-5036-DWC NOTICE OF APPEARANCE OF COUNSEL Respectfully submitted BLACK & ASKEROV PLLC Christopher Black"

cc: Judge David W. Christel United States Courthouse 1717 Pacific Avenue Room 3100 Tacoma WA 983402
cc: William Kennelly Dreher US ATTORNY'S OFFICE (SEA) 700 STEWART ST STE 5220 SEATTLE WA 98101
cc: Angela D. Caesar Clerk of Court United States District Court District of Columbia 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: WILLIAM M MCCOLL CLERK OF COURT, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON 1717 Pacific Ave., Suite 3100 Tacoma, WA 98402

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-three        Month: Two        Year: 2023 CE

Christopher R Black
BLACK AND ASKEROV PLLC
705 2ND AVE #1111
SEATTLE WA 98104

In reply to : "Case 3:21-mj-05036-DWC Document 1 Filed 02/11/21 Page 1 of 1 UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA No. MJ21-5036-DWC NOTICE OF APPEARANCE OF COUNSEL Respectfully submitted BLACK & ASKEROV PLLC Christopher Black"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 3:21-mj-05036-DWC Document 1 Filed 02/11/21 Page 1 of 1 UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA No. MJ21-5036-DWC NOTICE OF APPEARANCE OF COUNSEL Respectfully submitted BLACK & ASKEROV PLLC Christopher Black" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date, I request you perform the following duties:

1. Do not argue the facts, jurisdiction, law or venue.
2. Issue me the Appearance Bond and waive all Public costs.
3. Close the Account and issue the Order of the Court to me immediately.
4. Adjust and set-off all Public Charges by the exemption in accord with Public Policy.
5. Request Discharge

Please respond within three (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 3:21-mj-05036-DWC Document 1 Filed 02/11/21 Page 1 of 1 UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA No. MJ21-5036-DWC NOTICE OF APPEARANCE OF COUNSEL Respectfully submitted BLACK & ASKEROV PLLC Christopher Black"

cc: Judge David W. Christel United States Courthouse 1717 Pacific Avenue Room 3100 Tacoma WA 983402
cc: William Kennelly Dreher US ATTORNY'S OFFICE (SEA) 700 STEWART ST STE 5220 SEATTLE WA 98101
cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Angela D. Caesar Clerk of Court United States District Court District of Columbia 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: WILLIAM M MCCOLL CLERK OF COURT, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON 1717 Pacific Ave., Suite 3100 Tacoma, WA 98402

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:         Day: Seven         Month: Three         Year: 2023 CE



Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 83 Filed 10/17/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S MOTION TO COMPEL DISCOVER UNDER RULE 16 AND BRADY V. MARYLAND,** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 <u>Conclusion</u> Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 83 Filed 10/17/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S MOTION TO COMPEL DISCOVER UNDER RULE 16 AND BRADY V. MARYLAND,** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 <u>Conclusion</u> Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 83 Filed 10/17/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S MOTION TO COMPEL DISCOVER UNDER RULE 16 AND BRADY V. MARYLAND,** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 <u>Conclusion</u> Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

RECEIVED
Mail Room

MAR 1 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**



"Accepted"

MAR 0 7 2023

Taylor James Johnatakis

**United States of America,**

**v.**

Case No. 21-cr-091 (RCL)

**ISAAC STURGEON,**

**Defendant.**

### DEFENDANT'S MOTION TO COMPEL DISCOVERY UNDER RULE 16 AND BRADY V. MARYLAND

Defendant Isaac Sturgeon, through undersigned counsel, respectfully moves this Court to compel the government to disclose evidence that is potentially exculpatory and otherwise material to the preparation of Mr. Sturgeon's defense. Counsel states the following in support of his Motion.

### Introduction

The Government's case against Mr. Sturgeon centers mostly on the theory that Mr. Sturgeon knowingly trespassed on Capitol Grounds, engaged in disorderly conduct, and that he intentionally obstructed and/or impeded the certification of the vote count on January 6, 2021.

As a result of these accusations, the Defense made the following requests[1]:

---

[1] The defense made most of these requests in a letter dated July 26, 2022 that was sent via email to government counsel. The defense never received a response. When new government counsel noticed their appearance, undersigned counsel sent another similar but revised letter to new government counsel on October 12, 2022, and a slightly revised

Accepted"

1. Any and all information pertaining to the investigation of the Secret Service after the Department of Homeland Security learned of the deletion of messages before and after January 6, 2021.[2] More specifically, and in addition, letters or memoranda detailing efforts or lack of efforts to preserve these text messages and reasons for the failure to preserve.

2. Any Secret Service and/or Capitol Police communications, including text messages, emails, radio calls pertaining to the events on January 6, 2021. More specifically, communications pertaining to: (1) the decision to declare parts of the Capitol Grounds and Complex restricted (including identification of any such restricted area and mechanisms used to delineate restricted areas ), (2) any steps taken to communicate restricted areas to the public, (3) the reasons the certification proceedings were delayed, (4) the status of any sign postings, racks, cordons, or other restrictions after the certification proceedings were halted, (5) the status of any open or unlocked doors after the certification proceedings were halted, (6) the identity/actions of any law enforcement personnel who encouraged activity among the crowd at the Capitol or Capitol Grounds on January 6, 2021.

3. Any communications between former President Trump's staff on the day of January 6, 2021, regarding former President Trump's failure to stop the riot as well as affirmative steps he took to further encourage it.[3]

## Legal Standards

Federal Rule of Criminal Procedure 16(a)(1)(E) provides defendants with broad

discovery rights. The rule requires the production, upon defendant's request, of

documents and objects within the government's possession, custody, or control that

---

version on October 16, 2022. It is understood that new government counsel was not informed of the previously made request until now. Undersigned counsel has also made a similar requests in other cases dating back to July of 2022 and has yet to receive a response. With the impending trial in this matter, a response to this request is necessary.
[2] Secret Service identified potential missing text messages on phones of 10 individuals - CNNPolitics; Secret Service erased Jan. 6 texts after officials requested them, watchdog says : NPR https://www.cnn.com/2022/07/22/politics/secret-service-investigators-text-messages/index.html
[3] Jan. 6 hearing focuses on Trump's inaction during Capitol riot (nbcnews.com) https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737

are "*material* to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E) (emphasis added). Materiality "is not a heavy burden." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). Evidence is material—whether exculpatory or inculpatory—"as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (quoting *Lloyd*, 992 F.2d at 351). A defendant makes an adequate showing of materiality where he "present[s] any facts which would tend to show that the government was in possession of information that would be helpful to the defense." *United States v. Cadet*, 727 F.2d 1453, 1466 (9th Cir. 1984).

In determining what to disclose under Rule 16, "the government cannot take a narrow reading of the term 'material' . . . [n]or may it put itself in the shoes of defense counsel in attempting to predict the nature of what the defense may be or what may be material to its preparation." *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005). Rather, "[t]he language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Libby*, 429 F. Supp. 2d 1, 5 (D.D.C. 2006) (quoting *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989); *see also* Fed. R. Crim. P. 16, Advisory Committee Notes (amend. 1974) (explaining how "broad discovery contributes to the fair and efficient administration of criminal justice" and that Rule 16 provides "the *minimum* amount of discovery to

which the parties are entitled.  It is not intended to limit the judge's discretion to order broader discovery in appropriate cases" (emphasis added)).  Because it is in the interest of fairness that criminal defendants have "the widest possible opportunity to inspect and receive" material in the government's possession that may aid in the defense, disputes regarding the discoverability of information under Rule 16 "should be resolved in the defendants' favor."  *United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003).

Disclosure obligations are also governed by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.  Specifically, in the pretrial setting, *Brady* requires disclosure of any information that is "favorable" to the defense, "without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial."[4]  *United*

---

[4] *Brady's* pretrial disclosure requirements are different from their post-conviction disclosure requirements because there is no prejudice requirement in the pretrial setting.  *Compare Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (discussing that, in the post-conviction context, *Brady* requires the information to be favorable, suppressed, and "prejudice must have ensued"), *with United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) ("Because the definition of [prejudice] discussed in *Strickler* and other appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase."); *United States v. Moore*, 867 F. Supp. 2d 150 (D.D.C. 2012) (same); *United States v. Singhal*, 876 F. Supp. 2d 82, 104 (D.D.C. 2012) (same); *United States v. Naegele*, 468 F. Supp. 2d 150, 153 (D.D.C. 2007) (same); *United States v. Olsen*, 704 F.3d 1172, 1883 n.3 (9th Cir. 2013) ("[S]ome trial courts therefore have concluded that the retrospective definition of materiality is appropriate only in the context of appellate review, and that trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial.").  Indeed, in *Safavian*, Judge Friedman emphatically rejected the government's contention that, in the pretrial setting, *Brady* only required disclosure of items that would have an impact on the outcome of the trial.  *Safavian*, 233 F.R.D. at 16.  As Judge Friedman recognized, "[t]he problem with this iteration of *Brady* and the government's view of its obligations at this stage of the proceedings, however, is that it permits prosecutors to withhold admittedly favorable evidence whenever the prosecutors, in their wisdom, conclude that it would not make a difference to the outcome of the trial."  *Id.*

4

*States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005). Favorable information includes any information "that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." *Id.*

The government's broad disclosure obligations arise out of the "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). The prosecutor's interest "is not that [she] shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 99 (1935). And in her pursuit of justice, "'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in th[e] case,'" including the MPD, the FBI, Department of Homeland Security, and to disclose that information to the defendant. *See Strickler*, 527 U.S. at 281 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *In Re Sealed Case*, 185 F.3d 887, 896 (D.C. Cir. 1999). Because of the prosecutor's special role, courts "look with disfavor on narrow readings by prosecutors of the government's obligations under *Brady*." *United States v. Singhal*, 876 F. Supp. 2d 82, 104 (D.D.C. 2012). "Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure." *Safavian*, 233 F.R.D. at 17; *See also* U.S. Attorney's Manual § 9-5.001.C.1 (requiring disclosure of "information that is inconsistent with any element of any crime charged . . . regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.").

As the Supreme Court explained, "a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. This is as it should be." *Kyles v. Whitley*, 514 U.S. 419, 439 (1995).

Lastly, the government is required to identify *Brady* material when the discovery is voluminous. *United States v. Saffarinia*, 424 F. Supp. 3d 46, 58 (D.D.C. 2020) (government ordered to identify *Brady* material, to the extent that government knows of such information). There is no question that the discovery in January 6 cases has been uniquely voluminous requiring the government to contract with Deloitte to create a complicated database in order to share it. Every few weeks, thousands of materials are added to this database. While the government sends a letter summarizing the production, it should also specifically identify any *Brady* material it knows of in these massive and unprecedented productions spanning almost two years.

## Argument

It is beyond dispute that the Government is in possession of information that is material to the preparation of the defense and potentially exculpatory. The information requested by the Defense relates first to the security measures that were in place on January 6, 2021, to ensure that members of the public knew that the grounds were restricted. The Government agrees that the testimony is critical to its case, because one of the central parts of its case in chief has been having a member of law enforcement testify to the security perimeter in great detail. *See e.g. United States v. Guy Reffitt*, 21-cr-32 (DLF), *United States v. Cuoy Griffin*, 21-cr-92 (TNM),

*United States v. Matthew Martin*, 21-cr-394 (TNM), Trial Transcripts. The Secret Service is currently under investigation after it was discovered that 10 Secret Service Personnel that contained metadata showing text messages were sent and received around January 6, 2021, but were not retained. This investigation as well as information regarding all Secret Service and/or Capitol police communications during January 6, 2021, is relevant to impeachment testimony and the ability of the defense to potentially rebut the government's claim that all areas were clearly restricted at all times. For example, if a defendant claims that at the point they entered the grounds, there were no restrictions, this information could be relevant to impeach an agent who claims that all locations were restricted. If members of the Secret Service or Capitol police were messaging each other about these restrictions, the defense is entitled to inspect these messages.

Furthermore, information about the status of the restrictions as the afternoon progressed is relevant to when exactly some of those signs may have not been visible to certain individuals depending on when they arrived. For example, after the initial breach occurred, it would be relevant to know whether or not there were personnel who reinstated or re-enforced those restrictions at any point in time. Lastly, information regarding former President Trump's inactions/actions before, during, and after January 6, 2021, are directly relevant to a potential affirmative defense, namely that Mr. Sturgeon may have relied on a public authority that day when entering the allegedly restricted area.

Case 1:21-cr-00091-RCL   Document

This evidence is also potentially exculpatory.  This information includes not potential impeachment evidence but also evidence that could exonerate Mr. Sturgeon. *United States v. Wilson*, 605 F.3d 985, 1006 (D.C. Cir. 2010).  The D.C. Circuit has held: "The defense was entitled to information that would strengthen its impeachment of [the witness]... Given its relevance as impeachment evidence, the government had a duty under *Brady* to make a timely pretrial disclosure to the defense." *Id.*

In fact, the Local Criminal Rules of this district *require* timely disclosure of such materials.  Local Criminal Rule 5.1 provides that "[b]eginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose" all information "favorable to an accused" that is "material" under *Brady* "***as soon as reasonably possible after its existence is known***, so as to enable the defense to make effective use of the disclosed information in the preparation of its case." LCrR 5.1(a) (emphasis added).  *See also* Order, *United States v. Brynee Baylor*, No. 16-cr-180 (ESH) (D.D.C. Nov. 8, 2016), ECF No. 10 (*sua sponte* ordering the government to produce, "in a timely manner, including during plea negotiations" all *Brady* material notwithstanding the fact that "such evidence also constitutes evidence that must be produced later pursuant to the Jencks Act, 18 U.S.C. § 3500, or by the fact that such evidence need not be produced according to Rule 16.").

Finally, the Secret Service and the Capitol police are government officials who have participated in the investigation and prosecution of the offenses charged and so

the government has an obligation to seek from these sources all information subject to disclosure under the Rules.  LCr.R 5.1(e).

## Conclusion

For the reasons set forth above, and for such other reasons as this Court may determine, Mr. Sturgeon respectfully requests that this motion be granted and that the Court order the government to produce the information requested.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

9

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day: Fourteen        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 117 Filed 03/13/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** No.: 21 CR 91 **NOTICE OF APPEARANCE** Respectfully submitted MATTHEW M. GRAVES United States Attorney D.C. Bar No. 481052 By: /s/ *Courtney A. Howard* Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Page 2 of 2 **CERTIFICATE OF SERVICE** By: /s/ Courtney A. Howard Trial Attorney Criminal Division Detailed to the U.S. Attorney's office"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 117 Filed 03/13/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** No.: 21 CR 91 **NOTICE OF APPEARANCE** Respectfully submitted MATTHEW M. GRAVES United States Attorney D.C. Bar No. 481052 By: /s/ *Courtney A. Howard* Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Page 2 of 2 **CERTIFICATE OF SERVICE** By: /s/ Courtney A. Howard Trial Attorney Criminal Division Detailed to the U.S. Attorney's office" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR 20 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 117 Filed 03/13/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** No.: 21 CR 91 **NOTICE OF APPEARANCE** Respectfully submitted MATTHEW M. GRAVES United States Attorney D.C. Bar No. 481052 By: /s/ *Courtney A. Howard* Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Page 2 of 2 **CERTIFICATE OF SERVICE** By: /s/ Courtney A. Howard Trial Attorney Criminal Division Detailed to the U.S. Attorney's office"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20001
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington, D.C. 20530
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington DC 20004
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Courtney A. Howard Detailed to the U.S. Attorney's Office 601 D Street NW Washington DC 20001

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

"Accepted"

*Taylor James Johnatakis*

MAR 14 2023

UNITED STATES OF AMERICA

    v.

No.: 21 CR 91

CRAIG MICHAEL BINGERT,
ISAAC STEVE STURGEON, and
TAYLOR JAMES JOHNATAKIS,

## NOTICE OF APPEARANCE

The UNITED STATES OF AMERICA, by and through its attorney, Matthew M. Graves, the United States Attorney for the District of Columbia, informs the Court that the above-captioned matter is assigned to Courtney A. Howard, who may be contacted by telephone at 202-514-3130 or email at Courtney.Howard2@usdoj.gov. This is notice of her appearance in this matter on behalf of the United States.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Courtney A. Howard*
        Courtney A. Howard
        Trial Attorney, Criminal Division
        Detailed to the U.S. Attorney's Office
        601 D Street NW
        Washington, D.C. 20001
        NY Bar No. 4513909
        202-514-3130
        Courtney.Howard2@usdoj.gov

"Accepted" *Taylor James Johnataker*

## CERTIFICATE OF SERVICE

MAR 1 4 2023

On this 13th day of March 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:    /s/ Courtney A. Howard
       Courtney A. Howard
       Trial Attorney, Criminal Division
       Detailed to the U.S. Attorney's Office
       601 D Street NW
       Washington, D.C. 20001
       NY Bar No. 4513909
       202-514-3130
       Courtney.Howard2@usdoj.gov

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:      Day: Eleven      Month: Three      Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 111 Filed 01/31/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR LEAVE TO LATE FILE A REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE PUBLIC AUTHORITY DEFENSE AND/OR ENTRAPMENT BY ESTOPPEL.** Page 2 of 2 Respectfully submitted Allen H. Orenberg, Dated: January 31 2023, Case 1:21-cr-00091-RCL Document 111-1 Filed 01/31/23 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 1:21-cr-0091-RCL-01 ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 111 Filed 01/31/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR LEAVE TO LATE FILE A REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE PUBLIC AUTHORITY DEFENSE AND/OR ENTRAPMENT BY ESTOPPEL,** Page 2 of 2 Respectfully submitted Allen H. Orenberg, Dated: January 31 2023, Case 1:21-cr-00091-RCL Document 111-1 Filed 01/31/23 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 1:21-cr-0091-RCL-01 ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR 20 2023

Angela D. Caesar, Clerk of Court
U. S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 111 Filed 01/31/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR LEAVE TO LATE FILE A REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE PUBLIC AUTHORITY DEFENSE AND/OR ENTRAPMENT BY ESTOPPEL,** Page 2 of 2 Respectfully submitted Allen H. Orenberg, Dated: January 31 2023, Case 1:21-cr-00091-RCL Document 111-1 Filed 01/31/23 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 1:21-cr-0091-RCL-01 ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,       :
                                :
          v.                    :
                                :       Case No. 21-cr-0091-RCL-01
CRAIG MICHAEL BINGERT, et al.,  :
    Defendant.                  :
                                :

### DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR LEAVE TO LATE FILE A REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE  THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEFENSE"

COMES NOW defendant, Craig Michael Bingert, by and through his undersigned counsel, Allen H. Orenberg, Esquire, and hereby respectfully moves this Court for the entry of an Order granting leave to late file a reply to the to the Governments Response (Doc. 96) to the Defendant's Notice  the "Public Authority Defense" And/or "Entrapment by Estoppel Defense. (Doc. 88)

1.      Counsel has recently contacted AUSA Kaitlin Klamman requesting the government's position on this motion for leave to late file but has not yet received a response.

2.      On November 6, 2022, Mr. Bingert filed his Notice of Public Authority Defense. (Doc. 88).  The government filed a response (opposition) on December 2, 2022 (Doc. 96).

3.      LcrR 47(d) requires a reply to be filed within seven days after service of an opposition.

4.      Counsel seeks leave to late file this reply because of  other professional obligations which caused this delay, including a recent trial in this Court, in United States v. Robert Dennis, 21-679-JEB. (I am counsel for Mr. Dennis). Furthermore, I

was waiting to receive and review the "Final Report of the Select Committee to Investigate the January 6th Attack on the U.S. Capitol," which issued in December, 2022. Portions of this Report are referred to in the reply.

WHEREFORE, for the foregoing reasons and such other reasons that may appear just and proper, defendant Craig M. Bingert respectfully moves for the entry of an Order granting leave to late file a reply to the Governments Response (Doc. 96) to the Defendant's Notice the "Public Authority Defense" And/or "Entrapment by Estoppel Defense. (Doc. 88)

Respectfully submitted,

Allen H. Orenberg

Digitally signed by Allen H. Orenberg
Date: 2023.01.31 09:06:33 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-phone (301) 807-3847
aorenberg@orenberglaw.com

Counsel for Craig M. Bingert

Dated: January 31, 2023

"Accepted"

MAR 11 2023

*Taylor James Johnston*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    v.

    :   No. 1:21-cr-0091-RCL-01

CRAIG MICHAEL BINGERT, et al.,

### ORDER

This matter is before the Court on the Defendant Craig Michael Bingert's Motion for Leave to Late File a Reply to the Governments Response (Doc. 96) to the Defendant's Notice the "Public Authority Defense" And/or "Entrapment by Estoppel Defense. (Doc. 88), and for good cause shown,

It is this _____day of _____2023,

**ORDERED** that the Motion should be and hereby is GRANTED. Defendant Bingert may file his Reply to the Governments Response (Doc. 96) to the Defendant's Notice the "Public Authority Defense" And/or "Entrapment by Estoppel Defense. (Doc. 88)

**SO ORDERED.**

_____
Judge, U. S. District Court for the
District of Columbia

Copies to:

All registered case registered parties

1

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Four        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



In reply to : "Case 1:21-cr-00091-RCL Document 67 Filed 05/25/22 Page 1 of 29 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** <u>MEMORANDUM OPINION</u>, Page 2 of 29, Page 3 of 29, Page 4 of 29, Page 5 of 29, Page 6 of 29, Page 7 of 29, Page 8 of 29, Page 9 of 29, Page 10 of 29, Page 11 of 29, Page 12 of 29, Page 13 of 29, Page 14 of 29, Page 15 of 29, Page 16 of 29, Page 17 of 29, Page 18 of 29, Page 19 of 29, Page 20 of 29, Page 21 of 29, Page 22 of 29, Page 23 of 29, Page 24 of 29, Page 25 of 29, Page 26 of 29, Page 27 of 29, Page 28 of 29, Page 29 of 29 **CONCLUSION** Date:_5/25/22_ Royce C. Lamberth"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 67 Filed 05/25/22 Page 1 of 29 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** <u>MEMORANDUM OPINION</u>, Page 2 of 29, Page 3 of 29, Page 4 of 29, Page 5 of 29, Page 6 of 29, Page 7 of 29, Page 8 of 29, Page 9 of 29, Page 10 of 29, Page 11 of 29, Page 12 of 29, Page 13 of 29, Page 14 of 29, Page 15 of 29, Page 16 of 29, Page 17 of 29, Page 18 of 29, Page 19 of 29, Page 20 of 29, Page 21 of 29, Page 22 of 29, Page 23 of 29, Page 24 of 29, Page 25 of 29, Page 26 of 29, Page 27 of 29, Page 28 of 29, Page 29 of 29 **CONCLUSION** Date:_5/25/22_ Royce C. Lamberth" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 67 Filed 05/25/22 Page 1 of 29 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** <u>MEMORANDUM OPINION</u>, Page 2 of 29, Page 3 of 29, Page 4 of 29, Page 5 of 29, Page 6 of 29, Page 7 of 29, Page 8 of 29, Page 9 of 29, Page 10 of 29, Page 11 of 29, Page 12 of 29, Page 13 of 29, Page 14 of 29, Page 15 of 29, Page 16 of 29, Page 17 of 29, Page 18 of 29, Page 19 of 29, Page 20 of 29, Page 21 of 29, Page 22 of 29, Page 23 of 29, Page 24 of 29, Page 25 of 29, Page 26 of 29, Page 27 of 29, Page 28 of 29, Page 29 of 29 **CONCLUSION** Date:_5/25/22_ Royce C. Lamberth"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: James I. Pearce, United States Attorney's Office 555 Forth Street, N.W. Washington, DC 20530



"Accepted"

MAR 0 4 2023

Taylor James Johnatakis

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

v.                                                      **Case No. 1:21-cr-91-RCL**

**CRAIG MICHAEL BINGERT**, *et al.*,

  *Defendants*.

---

## MEMORANDUM OPINION

On January 6, 2021, a violent mob attacked the United States Capitol as Congress attempted to certify the Electoral College vote. Defendants Isaac Sturgeon, Craig Bingert, and Taylor Johnatakis allegedly joined the fray and rammed a line of police officers with a metal barricade. The government charged each defendant with eight different offenses related to their participation in this unsuccessful insurrection. *See* Superseding Indictment, ECF No. 53. Isaac Sturgeon moved to dismiss Counts One, Three, Four, Five, and Six of the Superseding Indictment, arguing that these counts do not state an offense and do not give defendants fair notice. *See* Defs.' Mot. 1, ECF No. 55.[1] He also argues that Count Five infringes on defendants' First Amendment rights. *Id.* Johnatakis and Bingert moved for joinder. ECF Nos. 56 & 59. The government opposed, Gov't Opp'n 1, ECF No. 60, and Sturgeon replied, Defs.' Reply, ECF No. 62. Upon consideration of the parties' filings, applicable law, and the record herein, the Court will **DENY** defendants' motion to dismiss.

RECEIVED
Mail Room

MAR - 9 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

---

[1] Because all defendants ultimately joined in this motion, the Court will refer to ECF No. 55 as "defendants' motion."

"Accepted"

MAR 0 4 2022

Judge James Johnatakis

# I.   BACKGROUND

On January 6, 2021, both houses of Congress assembled in the United States Capitol building to certify the vote count of the Electoral College of the 2020 Presidential election.[2] Compl. 1, ECF No. 1. As President of the Senate, former Vice President Michael Pence was present to perform his duties under the Twelfth Amendment. *Id.* United States Capitol Police secure the Capitol 24 hours a day, and on January 6, 2021, police had closed off both the Capitol building itself and the exterior plaza to members of the public. *Id.* The police blocked off the entrances to the Capitol with temporary and permanent barricades. *Id.*

As the certification proceeded in full swing, a large crowd began to gather outside of the Capitol. *Id.* Many members of the crowd had attended then-President Donald Trump's political rally on the National Mall, where he decried the 2020 election as fraudulent. *United States v. McHugh*, No. 1:21-cr-453 (JDB), 2022 WL 296304, at *1 (D.D.C. Feb. 1, 2022). At the rally, President Trump implored the crowd to march towards the Capitol and "demand that Congress do the right thing and only count the electors who have been lawfully slated." *Id.* When members of the mob who braved the two-mile trek from President Trump's rally arrived at the Capitol, the scene soon dissolved into chaos. Gov't Opp'n 5. Agitated protestors became enraged rioters. *Id.* Rioters forced their way through police line perimeters and past metal barricades, assaulting officers and breaking Capitol windows in an attempt to reach the lawmakers inside. *Id.* Many of these rioters were armed; they brought "tire irons, sledgehammers, bear spray, and Tasers." *Id.*

Defendants Sturgeon, Bingert, and Johnatakis were videotaped at the front of a large crowd on the west terrace of the Capitol grounds. *Id.* at 6. Together with other members of the mob, they picked up a metal fence and heaved it into a line of police officers. *Id.* Johnatakis, armed with a

---

[2] For the purposes of this motion, the Court will assume that the government's alleged facts are true.

bullhorn, urged the crowd to "push them out of here, we're just using our bodies." *Id.* Once the defendants jammed the barricade into the line of police officers, they ducked underneath it. *Id.* at 7. The police officers used chemical irritants and physical force to push them back. *Id.*

The government has arrested and charged more than 800 individuals for their conduct on January 6, 2021—a riot that caused millions of dollars in damage to the Capitol, injured over one hundred police officers, and caused multiple deaths. Sturgeon, Bingert, and Johnatakis were each arrested after the Federal Bureau of Investigation ("FBI") posted photos and body-worn camera footage of the three men and requested the public's help to identify them. Compl. 2. All three were charged with eight counts related to their participation on January 6, 2021. *See* Superseding Indictment.

Defendants now challenge several of the counts charged in their indictments. They move to dismiss Count One, obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2), arguing that the Electoral College certification is not an "official proceeding" as contemplated in § 1512 and that the statute is unconstitutionally vague. Defs.' Mot. 7, 10. They also move to dismiss Count Three, obstructing a police officer during civil disorder in violation of 18 U.S.C. § 231(a)(3), maintaining that § 231(a)(3) is unconstitutionally vague and fails to provide proper notice. Defs.' Mot. 15. Then, they argue that 18 U.S.C. § 1752(a)(1), the statute undergirding Count Four, is unconstitutional as applied because it violates their First Amendment rights. Defs.' Mot. 21. Finally, they move to dismiss Counts Four, Five, and Six, arguing that the Capitol complex was not a "restricted building or grounds" as contemplated by § 1752. Defs.' Mot. 24. The government opposed on all counts. Gov't Opp'n. Defendants' motion is now ripe.

3

"Accepted"

MAR 0 4 2022

Taylor James Johnstone

Defendants' arguments echo those that other January 6, 2021 defendants have filed. Plenty of ink has been spilled in this district denying motions that raise a combination of these arguments.[3] One judge, however, has granted a motion to dismiss based on one of defendants' arguments—that § 1512(c)(2) does not apply to the conduct alleged. *United States v. Miller*, No. 1:21-cr-119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022). Now, this Court has the opportunity to consider these questions anew.

## II.   LEGAL STANDARD

The purpose of an indictment is to "inform the defendant of the nature of the accusation against him." *Russell v. United States*, 369 U.S. 749, 767 (1962). Accordingly, an indictment need only contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The indictment must inform the defendant of the "precise offense" he is accused of so that "he may prepare his defense and plead double jeopardy in any further prosecution for the same offense," *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014), but need not include detailed allegations, *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007).

Rule 12 of the Federal Rules of Criminal Procedure permits defendants to raise by pretrial motion "any defense, objection, or request that a court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Under Rule 12, a defendant may move to dismiss an indictment for "failure to state an offense" or "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). Because

---

[3] *See McHugh*, 2022 WL 296304; *United States v. Puma*, No. 1:21-cr-0454 (PLF), 2022 WL 823079 (D.D.C. Mar. 19, 2022); *United States v. Andries*, No. 1:21-cr-093 (RC), 2022 WL 768684 (D.D.C. Mar. 14, 2022); *United States v. Bozell*, No. 1:21-cr-216 (JDB), 2022 WL 474144 (D.D.C. Feb. 16, 2022); *United States v. Grider*, No. 1:21-cr-0022 (CKK), 2022 WL 392307 (D.D.C. Feb. 9, 2022); *McHugh*, 2022 WL 296304; *United States v. Montgomery*, No. 1:21-cr-046 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 1:21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v. Mostofsky*, No. 1:21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Caldwell*, No. 1:21-cr-028 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Sandlin*, No. 1:21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Griffin*, No. 1:21-cr-92 (TNM), 549 F. Supp. 3d 49 (D.D.C. July 2, 2021).

"Accepted"

MAR 0 4 2022

Taylor James Johnatakis

a motion to dismiss an indictment "challenges the adequacy of an [i]ndictment on its face," a court determining a Rule 12(b) motion must accept all allegations in the indictment as true. *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011). The relevant question in a Rule 12(b) motion is whether the allegations are "sufficient to permit a jury to find that the crimes charged were committed." *Id.* at 146. This standard is not difficult to meet—dismissal under Rule 12(b) is granted "only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

## III.   COUNT ONE OF THE INDICTMENT PROPERLY STATES AN OFFENSE

Count One of the Superseding Indictment alleges that all three defendants "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College" in violation of 18 U.S.C. § 1512(c)(2). Superseding Indictment 1–2, ECF No. 52. The relevant statute states that

> (c) Whoever corruptly—
>
> > (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > (2) otherwise obstructs, influences, or impedes an official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c). Defendants raise three challenges to this count of the indictment. First, they argue that the certification of the Electoral College vote was not an "official proceeding." Defs.' Mot. 7. Second, they assert that § 1512(c)(2) is unconstitutionally vague both facially and as applied to this case. *Id.* at 10. Third, they contend that their alleged conduct does not fall within the bounds of § 1512(c)(2). ECF No. 64. None of these arguments persuade the Court.

5

"Accepted"

MAR 0 4 2022

Taylor James Arnatakis

A. **Congress's Certification of the Electoral College Vote Is An "Official Proceeding" For The Purposes Of 18 U.S.C. § 1512(c)**

Defendants aver that an "official proceeding" under § 1512(c) must involve "adjudicative or at least 'quasi-adjudicative responsibilities.'" *Id.* (quoting *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009)). They appeal to "legislative history" and "Congress's role in counting electoral votes" to support their argument that the certification of the Electoral College is not an adjudicative hearing, but instead a "ceremonial and administrative event that does not qualify as an 'official proceeding.'" Defs.' Mot. 7.

The Court starts, "as it must, with the text." *United States v. Little*, No. 1:21-cr-315 (RCL) 2022 WL 768685, at *3 (D.D.C. Mar. 14, 2022). When statutory language is disputed, a court must first determine if the statute "has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)). Here, Congress has explicitly defined the term "official proceeding" as used in § 1512 as, among other things, "a proceeding before Congress." *See* 18 U.S.C. § 1515(a)(1)(B). This eliminates the need to determine whether the vote certification was "official." But this definition does not fully answer the question. Because § 1515 does not explicitly define the term "proceeding," "some interpretation is required." *Puma*, 2022 WL 823079, at *5.

"Proceeding" could be interpreted two ways: It could be read broadly by its lay interpretation as any "act or step that is part of a larger action," *Proceeding*, Black's Law Dictionary (11th ed. 2019), or it could be read more narrowly as a formal proceeding. For several reasons, the Court agrees with all other judges in this district to face the question that it is the formal, legal understanding of the term "proceeding" that is implicated by § 1512(c). *Puma*, 2022 WL 823079, at *5 (collecting cases). First, when a Court confronts a legal "term[] of art," those terms should be given their technical meanings. *See* Antonin Scalia & Bryan Garner, Reading Law: The

6

Interpretation of Legal Texts 73. Second, using the broad lay interpretation here (any "act or step that is part of a larger action") would rip the term from its statutory context: the proceeding here must be one "before" Congress, which implies that Congress "has convened in some *formal* respect for the purpose of conducting that business." *Montgomery*, 2021 WL 6134591, at *5 (emphasis added). And there are additional statutory clues that support a technical reading of the term: as defendants note, the term "official proceeding" further suggests a "formal appearance before a tribunal." Defs.' Mot. 6 (quoting *United States v. Ermoian*, 752 F.3d 1165, 1170–71 (9th Cir. 2013)). Accordingly, under this understanding, a "proceeding before Congress" must involve something akin to "a formal assembly or meeting of Congress for the purpose of conducting official business," as opposed to merely a "step that is part of the larger action." *Montgomery*, 2021 WL 6134591, at *5.

Defendants are unsatisfied with this definition and seek to narrow the term further. They would interpret "proceeding" as an adjudicative or quasi-adjudicative event that involves "witness testimony," "documentary" evidence, or other "tangible evidence." Defs.' Mot. 9. They justify this narrow reading by moving beyond the text itself and emphasizing the legislative history of the Sarbanes-Oxley Act, through which Congress enacted § 1512(c)(2). But when the language of the statute is "unambiguous, the 'judicial inquiry is complete.'" *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003)). And besides, "[h]ad Congress intended to limit the definition of 'official proceeding' to judicial and 'quasi-judicial' proceedings, to proceedings at which witnesses appear and give testimony, or to proceedings related 'to the administration of justice' . . . it could easily have done so." *Montgomery*, 2021 WL 6134591, at *6. For example, other statutes within the same chapter explicitly require a quasi-adjudicative setting: 18 U.S.C. § 1505 criminalizes obstruction of "the due and proper

7

"Accepted"

MAR 0 4 2022

administration of law under which any pending proceeding is being had." 18 U.S.C. § 1505. The Court will not read "proceeding" to require a specific adjudicative event.

The Court can reject defendants' final argument off the bat because it is not interpretive at all—it instead assumes a different set of facts and attempts to recharacterize the alleged proceeding at question here. Defendants reason that the Electoral College certification is not a proceeding under § 1512(c)(2) because it is merely "administrative" and "ceremonial." Defs.' Mot. 8. This Court disagrees. It is "inaccurate to characterize the Certification . . . as a purely ministerial, legislative vote-counting event." *Caldwell*, 2021 WL 6062718, at *7. Even defendants concede that Congress's role in counting electoral votes includes "[s]ettl[ing] procedural issues for conducting the joint session at which Congress counts the states' electoral votes" and determining generally whether "procedural rules have been followed." Defs.' Mot. 8–9. Such tasks are hardly "ceremonial" in nature. This Court will also reject defendants' contention that, because 3 U.S.C. § 15 (which governs counting electoral votes) twice uses the phrase "meet," the Electoral College certification is merely a ceremonial "meeting" of Congress and not a proceeding. *See* Defs.' Reply 5. The language they quote from 3 U.S.C. § 15 conveniently skips over the extensive procedural requirements of the Electoral College certification delineated in the same section. The use of the term "meeting" does not negate the fact that the certification is a proceeding before Congress.

Like every other court in the district to decide the issue, this Court concludes that the Electoral College vote certification constituted an official proceeding as described in 18 U.S.C. § 1512(c).

## B.  18 U.S.C. § 1512(c)(2) Is Not Unconstitutionally Vague

Defendants next argue that § 1512(c)(2) is unconstitutionally vague and fails to provide fair notice of the conduct it punishes. Defs.' Mot. 10. A criminal law violates the Fifth Amendment

"Accepted"

MAR 0 4 2022

Taylor James Schnabbli

if it is either "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Unconstitutional vagueness accordingly involves two separate but often interlocking inquiries. Subsection 1512(c)(2) is not vague under either rubric.

First, criminal statutes do not provide fair notice when they tie culpability to "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). Fair notice does not concern itself with the possibility that "it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved." *Id.* Instead, to provide fair notice the relevant incriminating fact simply must not be "indetermina[te]." *Id.* A statute is not vague because certain cases may present "close calls," *id.* at 305, or because it is "broad," *United States v. Andries*, No. 1:21-cr-93 (RC), 2022 WL 768684, at *9 (D.D.C. Mar. 14, 2022). A statute is vague if it is unclear what the relevant incriminating fact is.

Second, a law authorizes "arbitrary and discriminatory enforcement" when it lacks any standards to govern the discretion it grants. *Agnew v. Gov't of D.C.*, 920 F.3d 49, 55 (D.C. Cir. 2019). This category includes laws whose application turns on subjective judgments or preferences. *Id.* A statute that criminalized "annoying" a passerby, for example, would invite arbitrary and discriminatory enforcement—what "annoys some people does not annoy others." *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). But a statute that sets an "imprecise" but ultimately comprehensible normative standard is not unconstitutionally vague. *Id.*

Using both of these frameworks (often somewhat interchangeably), a majority of defendants' argument is addressed towards the term "corruptly." Subsection 1512(c) criminalizes one who "corruptly . . . [o]therwise obstructs, influences, or impedes any official proceeding." 18

9

"Accepted"

MAR 0 4 2023

Taylor James Johnatakis

U.S.C. § 1512(c). Defendants rely on *United States v. Poindexter*, where the D.C. Circuit held that the term "corruptly" as used in 18 U.S.C. § 1505[4] was unconstitutionally vague. 951 F.2d 369, 379 (D.C. Cir. 1991). They argue that here, too, "corruptly" invites arbitrary enforcement and requires people to guess at its meaning. Defs.' Mot. 11–12. But subsequent Supreme Court decisions and acts of Congress have cabined *Poindexter* into a narrow holding related solely to 18 U.S.C. § 1505, not a broad holding about the term "corruptly."

In *Poindexter*, former National Security Advisor John M. Poindexter was charged with violating 18 U.S.C. § 1505 by lying to or misleading Congress during the Iran/Contra Affair. 951 F.2d at 371. The Court first found that, absent some "narrowing gloss," the term "corruptly" was vague because people are forced to "guess at its meaning and differ as to its application." *Id.* at 378. Analogizing to phrases like "immoral," the Circuit explained that "corruptly" affords too much discretion for "individual assessment of the morality of another's behavior." *Id.* at 379. The Circuit found no help from Congress to decipher the term, either. "If the legislative history of § 1505 clearly indicate[d] a more specific meaning of the term 'corruptly,' then the statute might constitutionally be applied to conduct" within that meaning. *Id.* But the Circuit found no such instruction from Congress. Nor had the statute "been sufficiently clarified by prior judicial decisions to give requisite notice and to protect against" prosecutors and jurors with their own agendas and interpretations. *Id.* at 384. Ultimately, while noting that "corruptly" can either be

---

[4] At the time, 18 U.S.C. § 1505 provided that:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1505 (1991).

"Accepted"

MAR 0 4 2022

Judge James Boasberg

intransitive (a person acting corruptly) or transitive (a person acting to corrupt another), the Circuit concluded that reading the statute intransitively to cover conduct related to lying to Congress was too broad and failed to give constitutionally required fair notice. *Id.* at 386.

But five years after *Poindexter*, Congress expressly defined "corruptly": "As used in section 1505, the term 'corruptly' means acting with improper purpose, *personally or by influencing another*, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or another information." 18 U.S.C. § 1515(b) (1996) (emphasis added). So while defendants argue that the Circuit in *Poindexter* "ruled *specifically* that the adverb 'corruptly' should be read 'transitively' and requires that the defendant 'corrupt' *another*," Defs.' Reply 9, that holding is of no matter—Congress has cured any vagueness by setting forth a more specific meaning of the term and endorsing the intransitive reading. Defendants maintain that "this amendment did not resolve the vagueness that still exists in § 1512 as Congress did not amend § 1515 as it applies to § 1512." Defs.' Mot. 12. But defendants ask the Court to find § 1512 vague *because* of the similarities to § 1505 and the issues the Circuit raised in *Poindexter*. So the fact that Congress promptly set forth a new definition for § 1505 is highly relevant.

Additionally, § 1512(c)(2) has now "been sufficiently clarified by prior judicial decisions to give requisite notice." *Poindexter*, 951 F.2d at 384. First, "courts of appeal since *Poindexter* have refused to extend its holding to other obstruction provisions." *Caldwell*, 2021 WL 6062718, at *9 (collecting cases). "[N]o court of appeals, including the D.C. Circuit [in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996)], has read *Poindexter* to mean, as [d]efendants seem to urge, that the term 'corruptly' in any obstruction statute is fatally vague." *Id.* Even the Supreme Court now has had the opportunity to address the term "corruptly" in 18 U.S.C. § 1512(b). In *Arthur Andersen LLP v. United States*, the Supreme Court defined "corrupt" and "corruptly" as

11

terms "normally associated with wrongful, immoral, depraved, or evil." 544 U.S. 696, 705 (2005). Relying on these terms to provide the *mens rea* requirement of § 1512(b)(2), the Supreme Court did not raise any issues of vagueness. *Id.*

The term "corruptly" thus requires the government to prove that a defendant not only intended to obstruct but also had "consciousness of wrongdoing." *Id.* at 706; *see Caldwell*, 2021 WL 6062718, at *11 (holding that the term "corruptly," "at the very least, requires [d]efendants to have acted with consciousness of wrongdoing"). The courts of appeals have "built upon this focus to interpret 'corruptly'" as requiring "at least an 'improper purpose' and an 'intent to obstruct.'" *Andries*, 2022 WL 768684, at *10 (quoting *Montgomery*, 2021 WL 6134591, at *21 & n.4 (collecting cases)). Using this definition does not rely on an "individual assessment of the morality of another's behavior," *Poindexter*, 951 F.2d at 378, and resolves the vagueness issues the D.C. Circuit identified in *Poindexter*.

Moving beyond "corruptly," defendants also gesture towards the term "official proceeding" to illustrate that § 1512(c)(2) is unconstitutionally vague. Defs.' Mot. 11. But while they highlight the potential for "resulting ambiguity caused by a wide range of interpretation and disparity among courts," *id.*, this Court does not find any ambiguity in practice. Every court in this district to address the issue has come to a similar conclusion as to what constitutes an "official proceeding." To be sure, the "failure of persistent efforts to establish a standard can provide evidence of vagueness." *Johnson*, 576 U.S. at 598. But there is no such failure here.[5]

---

[5] Defendants also point to the "government's approach to charging defendants with violating § 1512(c)(2)" to "illustrat[e] how vague and arbitrary the enforcement of this statute can be." Defs.' Reply 13. This argument misunderstands the nature of the vagueness challenge. The mere fact that a statute is precise but includes a wide variety of conduct does not make it vague. Subsection 1512(c)(2) may be a "broad, catch-all prohibition" but that does not mean it is "a vague one." *Andries*, 2022 WL 768684, at *9. Defendants' sister argument, that Sturgeon "could not have possibly been on notice that he was committing a felony obstruction of an 'official proceeding,'" Defs.' Mot. 15, similarly misunderstands the theory of unconstitutional vagueness. If defendants' argument is that Sturgeon did not *intend* to obstruct a proceeding occurring inside the building, that problem is "addressed, not by the doctrine of

Neither the term "corruptly" nor the phrase "official proceeding" render § 1512(c)(2) unconstitutionally vague.

## C. Defendants' Conduct Fits Within The Scope Of 18 U.S.C. § 1512(c)(2)

The district courts have uniformly held that the certification of the Electoral College was an official proceeding and that the term "corruptly" is not unconstitutionally vague. But in a supplemental notice, defendants raise a new argument that the term "otherwise" in § 1512(c)(2) indicates that the subsection is limited by § 1512(c)(1) and should be narrowly construed to prohibit only actions taken "with respect to a document, record, or other object." ECF No. 64 at 3. The government responds both that this understanding of § 1512(c)(2) is improper and that even if this was the proper interpretation, pretrial dismissal based on this interpretation is premature. ECF No. 65 at 1, 22. Though this argument has split the district, the Court agrees with the government's broad interpretation of § 1512(c)(2). Defendants' conduct fits within the scope of § 1512(c)(2) and so Count One properly states an offense against them.

### 1. The Plain Meaning Of § 1512(c)(2) Indicates That It Is Not Narrowed By § 1512(c)(1)

To determine what conduct is proscribed by § 1512(c)(2), the Court again starts with the text. A court must, after all, read a criminal statute "in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). And if the meaning of the statute's language is plain, the court has no need to inquire further. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020). To refresh, § 1512(c) states:

(c) Whoever corruptly—

---

vagueness, but by the requirement of proof beyond a reasonable doubt." *Williams*, 553 U.S. at 305. Perhaps it may be difficult to determine whether Sturgeon intended to impede or obstruct the Electoral College vote certification with an improper purpose. But "what renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved"; instead, a statute is vague when it is unclear precisely what that fact is. *Id.* at 306. There is no such indeterminacy here.

"Accepted"

MAR 0 4 2022

Taylor James Johnatakis

> (1) *alters, destroys, mutilates, or conceals a record, document, or other object*, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

> (2) *otherwise* obstructs, influences, or impedes an official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c)(2) (emphasis added).

The crux of defendants' argument is the meaning of the term "otherwise." The term "otherwise" is typically interpreted to mean "in a different way." *United States v. McHugh*, No. 1:21-cr-453 (JDB), 2022 WL 1302880, at *4 (D.D.C. May 2, 2022); *see Otherwise*, Webster's Third New Int'l Dictionary (1965) (defining otherwise as meaning "in a different way or manner"). Using this definition, § 1512(c)(2) would criminalize all activity that "obstructs, influences, or impedes" an official proceeding "in a different way" than the examples listed in § 1512(c)(1). The government urges the Court to adopt this broader reading—a reading which, to this Court, appears the most natural.

Relying on *United States v. Miller*, defendants entreat this Court to interpret "otherwise" more narrowly: as essentially meaning "in a different, but similar in type, way." ECF No. 64 at 2. They contend the term "otherwise" renders § 1512(c)(2) "a residual clause . . . for the prohibition contained in subsection [(c)(1)]." *Id.* (quoting *Miller*, 2022 WL 823070, at *9). The court in *Miller* rested this textual interpretation on the Supreme Court's discussion of the meaning of the word "otherwise" in *Begay v. United States*, 553 U.S. 137 (2008). *Miller*, 2022 WL 823070, at *6–15. But this narrow interpretation strains the statute beyond its ordinary meaning.

To start, the decision in *Begay* does not compel the defendants' requested meaning of the term "otherwise." In *Begay*, the Supreme Court determined whether driving under the influence

14

"Accepted"

MAR 0 4 2022

Taylor James Johnatakis

was a "violent felony" as defined by the Armed Career Criminal Act ("ACCA"). The ACCA defines a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves the use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another.*

18 U.S.C. § 924(e)(2)(B) (emphasis added). The Supreme Court concluded that the examples at the beginning of clause (ii), which appear before the term "otherwise," "limit the scope of the clause to crimes that are similar to the examples themselves." *Begay*, 553 U.S. at 143. In other words, the conduct that "otherwise . . . presents a serious potential risk of physical injury" must be similar in type to burglary, arson, or extortion. But the Supreme Court's conclusion hardly rested on the term "otherwise" itself. In a single paragraph, the Supreme Court noted that "otherwise" is not "*sufficient* to demonstrate that the examples do not limit the scope of" clause (ii), because the word "can (we do not say must) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144 (emphasis in original) (citation omitted).

It was only Justice Scalia's concurrence (and Justice Alito's dissent) that opined extensively on the function of the term "otherwise." Justice Scalia argued that "otherwise" "signifies a similarity" between the example crimes and the unenumerated crimes. *Id.* at 150 (Scalia, J., concurring in the judgment). And that similarity is the "*particular* similarity specified after the 'otherwise'—*i.e.*, that they all pose a serious potential risk of physical injury to another. They need not be similar in any other way." *Id.* at 151. Justice Alito's dissent, which Justice Souter and Justice Thomas joined, reiterated this understanding of the term "otherwise." Justice Alito explained that "offenses falling within the residual clause must be similar to the named offenses

"Accepted"

MAR 0 6 2023

Taylor James Johnatakis

in one respect only: They must 'otherwise'—which is to say, 'in a different manner,'—'involv[e] conduct that presents a serious potential risk of physical injury to another.'" *Id.* at 159 (Alito, J., dissenting) (citations omitted) (alteration in original).

So the textual discussion of the term "otherwise" from *Begay* does little to help defendants here. Five Justices held that "otherwise" *can* "refer to a crime that is similar to the listed examples ·in some respects but different in others." *Id.* at 144. Four Justices contend that "otherwise" *must* refer to a crime that is similar based only on the specified similarity that appears after the term "otherwise." *Id.* at 151 (Scalia, J., concurring in the judgment); *id.* at 159 (Alito, J., dissenting). No Justices contend that the term "otherwise," on its own, somehow inherently narrows the scope of a statute so that the antecedent clause is limited by what precedes "otherwise"—the defendants' requested interpretation of the term.

Because the *Begay* decision tells us little about the meaning of the term "otherwise" and because the plain, ordinary meaning of the term "otherwise" would not limit § 1512(c)(2) to only those crimes which are "different, but similar in type" to those enumerated in § 1512(c)(1), the Court rejects defendants' requested interpretation of § 1512(c)(2). "[G]iving 'otherwise' its ordinary meaning—'in a different way'—makes paragraph (c)(2) a catch-all provision that prohibits a set of actions inclusive of, but broader than, the acts proscribed by paragraph (c)(1)." *McHugh*, 2022 WL 1302880, at *7.

In total, the Court finds that the text answers the question of whether defendants' alleged behavior is criminalized under § 1512(c)(2): it is. And so the inquiry can stop there—"if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'" a court need not look any further. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United*

*States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)). But the Court will address defendants'

additional arguments and why they are unpersuasive.

### 2. Neither The Context Of § 1512(c)(2) Nor Its Historical Development Suggest That § 1512(c)(2) Is Limited By 1512(c)(1)

Moving beyond the text itself, defendants argue that the context and purpose—the

"structure and scope"—of § 1512 "suggests that subsection (c)(2) has a narrow focus, because the

other subsections criminalize specific conduct in narrow contexts." ECF No. 64 at 2. They present

a number of contextual reasons why, contrary to the plain meaning of the statute's text, it should

be read narrowly. None is sufficient to "displace the statute's ordinary meaning." *McHugh*, 2022

WL 1302880, at *7.

First, this Court can find no case law or statutory interpretation canon that insists that

narrow and broader criminal provisions cannot exist side-by-side in the same statutory section.

While Congress may not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531

U.S. 457, 468 (2001), there is no hiding here—the elephant has been "standing before us all along,"

*Bostock*, 140 S. Ct. at 1753. Within a statute that targets various types of obstruction and

harassment, Congress has criminalized directly obstructing or impeding an official proceeding.

This Court will not disregard Congress's plain text because defendants feel it is not similar in

breadth to neighboring subsections. It is similarly unsurprising that, if § 1512(c)(2) is interpreted

broadly, the main or more comprehensive offense of § 1512(c) is included in the second

subsection. "[T]hat is simply how catch-alls work. Indeed, the exact same critique could be

levelled at any . . . statutes that end with catch-all provisions introduced by 'otherwise.'" *McHugh*,

2022 WL 1302880, at *7.

Nor does this Court agree that "the historical development of § 1512 supports the

conclusion that § 1512(c)(2)" is limited by the offenses in § 1512(c)(1). ECF No. 64 at 3. As

Case 1:21-cr-00091-RCL   Document

another court in this district has identified, "[p]rior to the enactment of subsection 1512(c) in 2002, § 1512 made criminal only actions directed at other persons." *Miller*, 2022 WL 823070, at *12. Subsection 1512(b)(2), for example, stated:

> b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> > (2) *cause or induce any person to*—
> >
> > > (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
> > >
> > > (B) *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;*
> > >
> > > (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
> > >
> > > (D) be absent from an official proceeding to which such person has been summoned by legal process; . . .
>
> shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. §§ 1512(b)(1) (1996) (emphasis added). This created a gap in the statutory scheme— persuading others to take certain actions was criminalized, while taking those actions directly was not. When § 1512(c) was added in 2002, § 1512(c)(1) quoted language from only one subsection of § 1512(b)(2) nearly verbatim:

> (c) Whoever corruptly—
>
> > (1) *alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or*
> >
> > (2) otherwise obstructs, influences, or impedes an official proceeding, or attempts to do so,

Case 1:21-cr-00091-RCL   Document

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c) (emphasis added). Defendants theorize this indicates § 1512(c) was used merely "close the gap," not criminalize *other* obstructive behavior. ECF No. 64 at 3.

*Miller* further highlights that, when Congress added § 1512(a)(2)(b) the same year, which created harsher penalties for using force against another, Congress adopted "*all* of § 1512(b)(2) in § 1512(a)(2)(B)." 2022 WL 823070, at *13. The new § 1512(a)(2)(B) provided:

> (2) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—
>
> (B) cause or induce any person to—
>
> > (i) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
> >
> > (ii) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
> >
> > (iii) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
> >
> > (iv) be absent from an official proceeding to which such person has been summoned by legal process; . . .
>
> shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(a)(2)(B).

Relying on *Miller*, defendants argue that by "drawing heavily from a single provision already included in subsection (b)," Congress intended § 1512(c) to have a narrow, limited focus. *Miller*, 2022 WL 823070, at *13. Defendants contend that Congress's choice to adopt all the language from § 1512(b)(2) in § 1512(a)(2)(B), which it could have done in § 1512(c), further supports a narrow reading. But none of this historical reasoning reckons with the fact that Congress chose to include a second, broader statement about other types of obstruction in § 1512(c).

Case 1:21-cr-00091-RCL   Document

"Accepted"

MAR 0 4 2022

*Taylor James Johnston*

In their last contextual argument, relying on the canon against surplusage, defendants argue that if § 1512(c)(2) could be read broadly, Congress would not need many of the other subsections: "'the majority of § 1512 would be unnecessary' and paragraph (c)(2) would be 'a duplicate to nearly all of § 1512.'" *McHugh*, 2022 WL 1302880, at *8 (quoting *Miller*, 2022 WL 823070, at *12); *see* ECF No. 64 at 1. When interpreting a statute, courts "presume that Congress did not 'include words that have no effect,' and so we generally 'avoid a reading that renders some words altogether redundant.'" *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 176-77). Defendants' argument recalls the Supreme Court's considerations in *Begay*, which in truth relied much more on the canon against surplusage than the term "otherwise." *Begay*, 553 U.S. at 142. Unluckily for defendants, the canon against surplusage does not aid them here for three reasons.

To start, the canon against surplusage is not helpful where, like here, the plain meaning of the statutory text is clear. Textual redundancies that are "subtle or pitted against otherwise plain meanings" are "feeble interpretive tools." *Mercy Hosp., Inc.*, 891 F.3d at 1068. While courts should avoid interpreting ambiguous statutes in a way that creates redundancies in the law, a court cannot rewrite an unambiguous statute because it identifies a purported redundancy.

Second, the Court is not convinced there is a redundancy here. Defendants' argument ignores crucial differences between the subsections within § 1512. Subsection 1512(c)(2) criminalizes *direct* obstruction (specifically obstructing, influencing, or impeding an official proceeding), while other subsections of § 1512 criminalize *indirect* obstruction (taking action against a witness or evidence with the intent of ultimately obstructing, influencing, or impeding an official proceeding). Direct obstruction necessarily includes indirect obstruction—like "squares and rectangles, every example of indirect obstruction—say, threatening a witness to keep them

from testifying at a hearing—is also an example of (or an attempt at) direct obstruction, since the act of threatening the witness itself obstructs, influences, or impedes the hearing." *McHugh*, 2022 WL 1302880, at \*8. So a broad reading of § 1512(c)(2) would not swallow the other subsections of § 1512 and render them surplusage: the statutes have different direct objects and target different types of behavior. *Montgomery*, 2021 WL 6134591, at \*12. While it is true that the conduct criminalized sometimes overlaps, substantial overlap between criminal statutes is "not uncommon." *See Loughrin v. United States*, 573 U.S. 351, 411 n.4 (2014).

Third, using defendants' proposed narrow interpretation would not solve the alleged surplusage problem they identify. Even using their narrower definition of § 1512(c)(2), "conduct proscribed by seven other provisions of § 1512—subparagraphs (a)(1)(B), (a)(2)(B)(i)–(iii), and (b)(2)(A)–(C)—would also violate § 1512(c)." *McHugh*, 2022 WL 1302880, at \*9. The "canon against surplusage merely favors that interpretation which *avoids* surplusage"—it is not a tool for the court to use to "substitut[e] one instance of superfluous language for another." *United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013). The alleged redundancy present here would not be avoided with a narrower interpretation of § 1512(c)(2).

### 3.  The Legislative History Here Is Neither Helpful Nor Dispositive

Legislative history is an uneven tool that cannot be used to contravene plain text. When, for example, a court is "presented, on one hand, with clear statutory language and, on the other, with dueling committee reports, [it] must choose the language." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011). And because § 1512(c) originated as a floor amendment, this Court lacks even the guidance of committee reports. 148 Cong. Rec. S6542 (daily ed. July 10, 2002). Instead, it is left with mere floor statements, which the Supreme Court has considered a wholly unreliable form of legislative history for over a hundred years. *See Duplex Printing Press Co. v. Deering*, 254 U.S.

"Accepted"

MAY 04 2022

Taylor James Johnatakis

443, 474 (1921) ("By repeated decisions of this court it has come to be well established that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body."). The text of 18 U.S.C. § 1512(c)(2) is unambiguous, however, and so the Court need not analyze the scant legislative history here.

## IV.    SECTION 231(A)(3) IS NOT UNCONSTITUTIONALLY VAGUE

Mirroring their § 1512(c)(2) arguments, defendants argue that 18 U.S.C. § 231(a)(3) is void for vagueness because it fails to give fair notice and encourages arbitrary enforcement. Defs.' Mot. 16. Section 231(a)(3) provides:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function . . . [s]hall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3). Defendants claim that this statute lacks a scienter requirement, relies on "subjective reactions" that render violations unpredictable, and hinders a "person of ordinary intelligence" from deciphering what conduct it prohibits. Defs.' Mot. 16, 19–20. Each of these three claims is incorrect. Like all other courts in this district to have considered the question, the Court holds that § 231(a)(3) is not void for vagueness.

The Court will start with the scienter argument because much of defendants' arguments rest on the concern that an individual "could not predict the potential consequences" of his or her actions during a civil disorder. *See* Defs.' Mot. 19. Section 231(a)(3) has a scienter requirement: it criminalizes "any act" done *with the intent* "to obstruct, impede, or interfere with a law enforcement officer" during the commission of a civil disorder. While the D.C. Circuit has not

"Accepted"

MAR 04 2023

addressed the issue, the Seventh and Eighth Circuits have both found that § 231(a)(3) requires the defendant to act with obstructive intent. *McHugh*, 2022 WL 296304, at *14 (citing *Nat'l Mobilization Comm. to End War in Vietnam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) and *United States v. Mechanic*, 454 F.2d 849, 854 (8th Cir. 1971)). This specific intent requirement "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). And because specific intent is required, defendants' arguments that an individual could not predict the consequences of her actions is baseless—to be convicted under § 231(a)(3), obstruction must be the intended outcome.

Moving next to subjectivity, Section 231(a)(3) does not criminalize conduct that relies on subjective reactions. As explored above, *see supra* Part III.B, statutes that rely on a subjective reaction—like whether conduct is "annoying"—do not give fair notice. *See Coates*, 402 U.S. at 614. What annoys one person might not annoy another. Accordingly, a statute that criminalizes "annoying" conduct does not give a citizen sufficient notice to properly conform their conduct with the law. But § 231(a)(3) contains no such subjective terms.

First, defendants' argument that Section 231(a)(3) requires a police officer to subjectively "*feel* impeded or interfered with" has no basis in the text of the statute, which requires specific intent. Defs.' Mot. 19 (emphasis added). The officer's feelings are irrelevant.

Second, the phrase "incident to and during a civil disorder" is not subjective. Defendants claim a person has "no way of knowing what civil disorder is." Defs.' Mot. 62. But the statute itself defines a civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). While certain parties may

"Accepted"

MAR 04 2023

Taylor James Schladles

disagree whether a given action is "incident to and during" a civil disorder, "there is a crucial difference between reasonable people differing over the meaning of a word and reasonable people differing over its application to a given situation—the latter is perfectly normal, while the former is indicative of constitutional difficulty." *McHugh*, 2022 WL 296304 at *16. Here, the terms "incident to a civil disorder" are not subjective like "indecent" or "annoying," words defendants cite. Defs.' Mot. 14. They do not require a potential defendant or a jury to guess at their meaning or import their own sense of morality. *See United States v. Fischer*, No. 1:21-cr-00234 (CJN), 2022 WL 782413, at *3 (D.D.C. Mar. 15, 2022) ("[T]he terms [defendant] attacks do not carry the potential for misunderstanding or make the statute 'so standardless that it invites arbitrary enforcement.'" (quoting *Johnson*, 576 U.S. at 595)).

Defendants final argument is that the statute uses "imprecise language" that would "hinde[r] a person of ordinary intelligence from discerning what conduct it prohibits." Defs.' Mot. 16. But an "ordinary person would have an intuitive understanding of what is proscribed by a ban on obstructing, impeding, or interfering with law enforcement." *McHugh*, 2022 WL 296304, at *16. An ordinary person would intuitively understand what it means for an act to be "incident to *and* during" a civil disorder—which the statute defines in detail. These are questions of fact that can be determined. The statutory language is precise. That some people may differ on their interpretation of *what conduct* falls under this statutory language, which may not "mean the same thing to all people, all the time, everywhere," does not render the statute unconstitutionally vague. *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Roth v United States*, 354 U.S. 476, 491 (1957)). "The law is full of instances where a man's fate depends on his

estimating rightly . . . some matter of degree." *Johnson*, 576 U.S. at 604 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).[6] That does not make those statutes unconstitutionally vague.

## V.   18 U.S.C. § 1752(A)(1) IS CONSTITUTIONAL AS APPLIED TO DEFENDANTS' CONDUCT

Section 1752(a)(1) criminalizes "knowingly enter[ing] and remain[ing] in any restricted building or grounds without the lawful authority to do so." 18 U.S.C. § 1752(a)(1). Defendants argue that, as applied to their conduct, § 1752(a)(1) violates the First Amendment because the statute's "restrictions on [their] First Amendment rights go beyond what is essential to further the government's interests." Defs.' Mot. 21. Prevailing on an as-applied First Amendment challenge requires defendants to demonstrate that the statute is unconstitutional as applied to their particular expressive activity. *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). But if defendants' activity was not expressive conduct, defendants cannot succeed on their challenge. *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016). Defendants' activity here was plainly not expressive conduct.

As the government points out, defendant Sturgeon's actions "culminated with him grabbing a barricade on Capitol grounds and pushing it into officers to gain further access to restricted grounds," Gov't Opp'n 45—actions that were allegedly caught on video, *see* ECF No. 20 at 5. Defendants Bingert and Johnatakis face similar allegations and were caught on video allegedly ramming a metal barricade into a line of police officers. Compl. at 3, ECF No. 1-1. In fact, an image of the three men at the barricade together appears in the first complaint on the

---

[6] Like our fellow district judge, this Court rejects defendants' comparison of this statute to the statute held unconstitutionally vague in *McCoy v. City of Columbia*, 929 F. Supp. 2d 541 (D.S.C. 2013). Defs.' Mot. 17; *see McHugh*, 2022 WL 296304, at *16 n.24. The statute there made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties." *McCoy*, 929 F. Supp. 2d at 546. The district court found that the statute was "not intelligible" in part because it lacked "neighboring words" that would give the statute "more precise content." *Id.* at 553 (quoting *United States v. Stevens*, 559 U.S. 460, 474 (2010)). But the statute here contains a number of additional words that clarify and narrow the statute. *McCoy* is not relevant here.

"Accepted"

MAR 0 4 2023

*Taylor James Johnatakis*

docket. *Id.* This is not expressive conduct. "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). The mere fact that defendants were "present at the Capitol to convey [their] disagreement with the results of the 2020 election" does not render this conduct expressive. Defs.' Mot. 22. "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

The Court is not required, as defendants suggest, to consider *only* defendants' alleged trespassing when determining whether their conduct was "expressive." Defs.' Reply 15. Defendants emphasize that only trespass, not assault, is required for conviction under § 1752(a)(1). "It is *this* alleged conduct that [defendants] argu[e] is protected conduct, not allegedly pushing a barricade into an officer." *Id.* (emphasis added). But the Court is not limited in considering only defendants' conduct that would be *sufficient* for conviction. The Court considers defendants' "particular expressive activity." *Caputo*, 201 F. Supp. 3d at 71. And here, that activity allegedly included violence against police officers. That is not expressive conduct. *Grayned*, 408 U.S. at 116.

## VI. COUNTS FOUR, FIVE, AND SIX STATE AN OFFENSE

Counts Four, Five, and Six charged defendants with "entering and remaining in a restricted" area in violation of 18 U.S.C. § 1752. Defendants argue that these counts fail to state a claim because only the United States Secret Service ("Secret Service") can designate restricted areas under § 1752. Defs.' Mot. 25. Because the Capitol Police, not the Secret Service, designated the Capitol as "restricted" on January 6, 2021, defendants claim the area does not qualify as "restricted" for the purposes of § 1752. *Id.* In the alternate, defendants argue that the area could

Case 1:21-cr-00091-RCL   Document

"Accepted"

MAR 0 4 2023

Taylor James Johnatakis

not have been restricted because the Vice President was not "temporarily visiting" the Capitol. Defs.' Mot. 27.

## A. The Capitol Police May Properly Designate Restricted Areas Under § 1752

Section 1752 criminalizes various activities related to trespassing in any "restricted building or grounds." 18 U.S.C. § 1752(a). The statute explains that a "restricted building or grounds" is any "posted, cordoned off, or otherwise restricted area . . . of a building where the President or other person protected by the Secret Service is or will temporarily visiting." *Id.* § 1752(c)(1)(B). The Vice President and his family are protected by Secret Service. 18 U.S.C. § 3056(a)(1). From this language, defendants fashion a bizarre requirement, seemingly out of thin air: that *only* the Secret Service can designate an area as restricted. Defs.' Mot. 24.

Nothing in the text indicates that the Secret Service is the only agency that can designate a restricted area. And the statutory history defendants point to leaves them grasping. It is true that when § 1752 was enacted, it granted the Treasury Department (and the Secret Service, as part of the Treasury) the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President" and "prescribe regulations governing ingress or egress to . . . posted, cordoned off, or otherwise restricted areas" where Secret Service protectees were present. 18 U.S.C. § 1752(d) (1971). But the previous statute "did not say *who* must restrict an area of a building or grounds." *United States v. Griffin*, 549 F. Supp. 3d 49, 55 (D.D.C. 2021). And even if § 1752(d) did limit who could designate a restricted area, Congress removed that subsection in its entirety in 2006. *See* USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. 109-177, 120 Stat. 192, 252 (Mar. 9, 2006). So what does this statutory history really tell us? As Judge McFadden explained, "Not much." *Griffin*, 549 F. Supp. 3d at 56.

"Accepted"

MAY 04 2023

Taylor James Johnatakis

## B. Former Vice President Michael Pence Was "Temporarily Visiting" The Capitol Building On January 6, 2021

Defendants' final argument is perhaps their most peculiar: because former Vice President Michael Pence, in his capacity as President of the Senate, maintains an office within the Capitol building, he was not "temporarily visiting." Defs.' Mot. 27. Accordingly, the area could not be restricted under § 1752(c)(B).

The semantic games defendants play here are laughable. They define "temporary" as "lasting for a time only." Defs.' Mot. 28 (citing Black's Law Dictionary (11th ed. 2019)). "Visiting," they contend, means "invited to join or attend an institution for a limited time."[7] *Id.* (citing Merriam-Webster Online (2021)). Despite the opportunity to cherry-pick the exact definitions of "temporarily" and "visiting" that would support their argument, defendants' chosen definitions confirm what is evident to anyone with a basic grasp of the English language: former Vice President Pence was temporarily visiting the Capitol building on January 6, 2021. He was "invited to join or attend" a meeting of Congress for a finite time—a period "lasting for a time only." The former Vice President did not remain or reside in the Capitol building indefinitely. Defendants' bizarre alternate construction of the phrase "temporarily visit"—"temporary travel to a location where the person does not normally live or work on a regular basis," Defs.' Mot. 28— would mean that no one could "temporarily visit" a place they attend regularly.

Because the Capitol Police properly restricted an area where the former Vice President was temporarily visiting, Counts Four, Five, and Six state a claim against defendants.

---

[7] Defendants provide the definition for the adjective "visiting"—as in, "visiting professor" or "visiting team." *See* Defs.' Mot. 18. But the word "visiting" in the statute is used as a present continuous and future continuous verb. *See* 18 U.S.C. § 1752(c)(1)(A) ("...where the President *is* or *will be* . . . visiting."). And the verb definitions of "visit" support the government's argument that the former Vice President was temporarily visiting the Capitol building. *See Visit*, Webster's Third New Int'l Dictionary (1965) (defining "visit" as, *inter alia*, "to go to see or sojourn at (a place) for a particular purpose (such for business, pleasure, or sightseeing)" and "to go or come officially to oversee or correct the operation of").

## VII.   CONCLUSION

Based on the foregoing, the Court will **DENY** defendants' motion to dismiss by separate order.

Date: _____5/25/22_____

Royce C. Lamberth
United States District Judge

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Sixteen          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE"**, Page 2 of 16, Page 3 of 16, Page 4 of 16, Page 5 of 16, Page 6 of 16, Page 7 of 16, Page 8 of 16, Page 9 of 16, Page 10 of 16, Page 11 of 16, Page 12 of 16, Page 13 of 16, Page 15 of 16, Page 16 of 16 Respectfully Submitted Allen H. Orenberg"

---

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE"** Page 2 of 16, Page 3 of 16, Page 4 of 16, Page 5 of 16, Page 6 of 16, Page 7 of 16, Page 8 of 16, Page 9 of 16, Page 10 of 16, Page 11 of 16, Page 12 of 16, Page 13 of 16, Page 15 of 16, Page 16 of 16 Respectfully Submitted Allen H. Orenberg" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE"** Page 2 of 16, Page 3 of 16, Page 4 of 16, Page 5 of 16, Page 6 of 16, Page 7 of 16, Page 8 of 16, Page 9 of 16, Page 10 of 16, Page 11 of 16, Page 12 of 16, Page 13 of 16, Page 15 of 16, Page 16 of 16 Respectfully Submitted Allen H. Orenberg"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:         Day: Fifteen        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 110 Filed 01/29/23 Page 1 of 6 UNITED STATES DISTRICT COURT **FOR THE DISTRICT Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S MOTION FOR SEVERANCE OF DEFENDANT PUSUANT TO FED. R. CRIM. P. 14(a) WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 Respectfully Submitted Allen H. Orenberg Counsel for Mr. Craig Michael Bingert"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 110 Filed 01/29/23 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT Case No. 1:21-cr-00091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR SEVERANCE OF DEFENDANT PUSUANT TO FED. R. CRIM. P. 14(a) WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 Respectfully Submitted Allen H. Orenberg Counsel for Mr. Craig Michael Bingert" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 110 Filed 01/29/23 Page 1 of 6 UNITED STATES DISTRICT COURT FOR THE DISTRICT Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S MOTION FOR SEVERANCE OF DEFENDANT PUSUANT TO FED. R. CRIM. P. 14(a) WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 Respectfully Submitted Allen H. Orenberg Counsel for Mr. Craig Michael Bingert"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Eight          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 84 Filed 10/17/22 Page 1 of 1 **UNITED STATES FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL)** NOTICE OF PUBLIC AUTHORITY DEFENSE Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 84 Filed 10/17/22 Page 1 of 1 **UNITED STATES FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL)** NOTICE OF PUBLIC AUTHORITY DEFENSE Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 84 Filed 10/17/22 Page 1 of 1 **UNITED STATES FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL)** NOTICE OF PUBLIC AUTHORITY DEFENSE Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Eight   Month: Three   Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 82-1 Filed 10/17/22 Page 1 of 17 **EXHIBIT 1**, Page 2 of 17 February 4 2022, Page 3 of 17, Page 4 of 17, Page 5 of 17, Page 6 of 17, Page 7 of 17, Page 8 of 17, Page 9 of 17, Page 10 of 17, Page 11 of 17, Page 12 of 17 Sincerely yours Harrison Hickman, Page 13 of 17, **Select Litigation Results**, Page 14 of 17, Page 15 of 17, Page 16 of 17, Page 17 of 17 "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 82-1 Filed 10/17/22 Page 1 of 17 **EXHIBIT 1**, Page 2 of 17 February 4 2022, Page 3 of 17, Page 4 of 17, Page 5 of 17, Page 6 of 17, Page 7 of 17, Page 8 of 17, Page 9 of 17, Page 10 of 17, Page 11 of 17, Page 12 of 17 Sincerely yours Harrison Hickman, Page 13 of 17, **Select Litigation Results**, Page 14 of 17, Page 15 of 17, Page 16 of 17, Page 17 of 17" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 82-1 Filed 10/17/22 Page 1 of 17 **EXHIBIT 1**, Page 2 of 17 February 4 2022, Page 3 of 17, Page 4 of 17, Page 5 of 17, Page 6 of 17, Page 7 of 17, Page 8 of 17, Page 9 of 17, Page 10 of 17, Page 11 of 17, Page 12 of 17 Sincerely yours Harrison Hickman, Page 13 of 17, **Select Litigation Results**, Page 14 of 17, Page 15 of 17, Page 16 of 17, Page 17 of 17"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

COPY

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:  Day: Eight  Month: Three  Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "U.S. Department of Justice Channing D. Phillips Acting United States Attorney District of Columbia August 3 2021 **BY EMAIL** Christopher Black Re: *United States v. Craig m. Bingers et al* Criminal Case No. 21-cr-91 Page 1 of 12, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 10 of 12, Sincerely yours Channing D. Phillips/ATF By: Angela N. Buckner Page 11 of 12, DEFENDANT'S ACCEPTANCE Page 12 of 12"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "U.S. Department of Justice Channing D. Phillips Acting United States Attorney District of Columbia August 3 2021 **BY EMAIL** Christopher Black Re: *United States v. Craig m. Bingers et al* Criminal Case No. 21-cr-91 Page 1 of 12, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 10 of 12, Sincerely yours Channing D. Phillips/ATF By: Angela N. Buckner Page 11 of 12, DEFENDANT'S ACCEPTANCE Page 12 of 12" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CASE NO. 21-CR-91-3 (RCL) 18 U.S.C. 1512(c)(2) 18 U.S.C. 111(a)(1) STATEMENT OF OFFENSE** Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner Page 5 of 6, DEFENDANT'S ACKNOWLEDGMENT ATTORNEY'S ACKNOWLEDGMENT Page 6 of 6"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Channing D. Phillips 555 Fourth St. N.W. Washington D.C. 20530

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Eight          Month: Three          Year: 2023 CE

*COPY*

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 81 Filed 10/11/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-01 CONSENT MOTION TO EXTEND TIME TO FILE PRE-TRIAL MOTIONS AND PROPOSED BRIEFING SCHEDULE,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: October 11 2022, Case 1:21-cr-00091-RCL Document 81-1 Filed 10/11/22 Page 1 of 1 **ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 81 Filed 10/11/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-01 CONSENT MOTION TO EXTEND TIME TO FILE PRE-TRIAL MOTIONS AND PROPOSED BRIEFING SCHEDULE,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: October 11 2022, Case 1:21-cr-00091-RCL Document 81-1 Filed 10/11/22 Page 1 of 1 **ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 81 Filed 10/11/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-01 CONSENT MOTION TO EXTEND TIME TO FILE PRE-TRIAL MOTIONS AND PROPOSED BRIEFING SCHEDULE,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: October 11 2022, Case 1:21-cr-00091-RCL Document 81-1 Filed 10/11/22 Page 1 of 1 **ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:    Day: Eight    Month: Three    Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : **"IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CASE NO. 21-CR-91-3 (RCL) 18 U.S.C. 1512(c)(2) 18 U.S.C. 111(a)(1) STATEMENT OF OFFENSE** Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner Page 5 of 6, DEFENDANT'S ACKNOWLEDGMENT ATTORNEY'S ACKNOWLEDGMENT Page 6 of 6"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment **"IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CASE NO. 21-CR-91-3 (RCL) 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 111(a)(1) STATEMENT OF OFFENSE** Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner Page 5 of 6, DEFENDANT'S ACKNOWLEDGMENT ATTORNEY'S ACKNOWLEDGMENT Page 6 of 6"** and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: **"IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CASE NO. 21-CR-91-3 (RCL) 18 U.S.C. 1512(c)(2) 18 U.S.C. 111(a)(1) STATEMENT OF OFFENSE** Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner Page 5 of 6, DEFENDANT'S ACKNOWLEDGMENT ATTORNEY'S ACKNOWLEDGMENT Page 6 of 6"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Channing D. Phillips 555 Fourth St. N.W. Washington D.C. 20530

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Eight        Month: Three        Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 86 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 <u>DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER</u>,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 86-1 Filed 11/06/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 <u>ORDER</u>"**

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 86 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 <u>DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER</u>,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 86-1 Filed 11/06/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 <u>ORDER</u>"** and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 86 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 <u>DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER</u>,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 86-1 Filed 11/06/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 <u>ORDER</u>"**

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Eight     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 82 Filed 10/17/22 Page 1 of 25 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Crim. Action No. 21-91 (RCL) **ISAAC STURGEON'S MOTION FOR TRANSFER OF VENUE**, Page 2 of 25, Page 2 of 25, Page 3 of 25, Page 4 of 25, Page 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 **CONCLUSION** A. J. Kramer Federal Public Defender for the District of Columbia By: /s/Maria Jacob"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 82 Filed 10/17/22 Page 1 of 25 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Crim. Action No. 21-91 (RCL) **ISAAC STURGEON'S MOTION FOR TRANSFER OF VENUE**, Page 2 of 25, Page 2 of 25, Page 3 of 25, Page 4 of 25, Page 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 **CONCLUSION** A. J. Kramer Federal Public Defender for the District of Columbia By: /s/Maria Jacob" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 82 Filed 10/17/22 Page 1 of 25 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Crim. Action No. 21-91 (RCL) **ISAAC STURGEON'S MOTION FOR TRANSFER OF VENUE**, Page 2 of 25, Page 2 of 25, Page 3 of 25, Page 4 of 25, Page 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 **CONCLUSION** A. J. Kramer Federal Public Defender for the District of Columbia By: /s/ Maria Jacob"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day: Five       Month: Three     Year: 2023 CE

Kaitlin Klamann
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 116 Filed 3/06/23 Page 1 of 4 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. CRAIG MICHAEL BINGERT ISAAC STEVE STURGEON and TAYLOR JAMES JOHNATAKIS Defendants Case No.: 1-21-ccr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER, Page 2 of 4, Page 3 of 4, Page 4 of 4 CONCLUSION Respectfully submitted MATTHEW M. GRAVES United States Attorney By: Kaitlin Klamann Assistant United States Attorney"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 116 Filed 3/06/23 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. CRAIG MICHAEL BINGERT ISAAC STEVE STURGEON and TAYLOR JAMES JOHNATAKIS Defendants Case No.: 1-21-ccr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER,** Page 2 of 4, Page 3 of 4, Page 4 of 4 **CONCLUSION** Respectfully submitted MATTHEW M. GRAVES United States Attorney By: Kaitlin Klamann Assistant United States Attorney" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 116 Filed 3/06/23 Page 1 of 4 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. CRAIG MICHAEL BINGERT ISAAC STEVE STURGEON and TAYLOR JAMES JOHNATAKIS Defendants Case No.: 1-21-ccr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER, Page 2 of 4, Page 3 of 4, Page 4 of 4 CONCLUSION Respectfully submitted MATTHEW M. GRAVES United States Attorney By: Kaitlin Klamann Assistant United States Attorney"



## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Five        Month: Three   Year: 2023 CE

Kaitlin Klamann
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20001

cc: Angela D. Caesar, Clerk of Court United States District Court District of Columbia 333 Constitution Avenue N.W. Washington, D.C.
20001
cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Seven          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 79 Filed 08/31/22 Page 1 of 9 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) MOTION TO SEVER MR. STURGEION'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Conclusion Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 79 Filed 08/31/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) MOTION TO SEVER MR. STURGEION'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 **Conclusion** Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 79 Filed 08/31/22 Page 1 of 9 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) MOTION TO SEVER MR. STURGEION'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Conclusion Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Seven          Month: Three          Year: 2023 CE



Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 71 Filed 07/30/22 Page 1 of 1 IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-01 NOTICE OF FILING Respectfully
Submitted Allen H. Orenberg Dated: July 30 2020, Case 1:21-cr-00091-RCL Document 71-1 Filed 07/30/22 Page 1 of 2
THE ORENBERG LAW FIRM P.C. Dear Ms. Buckner, Page 2 of 2 Very truly yours THE ORENBERG LAW FIRM
P.C. BY: Allen H. Orenberg"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your
Presentment "Case 1:21-cr-00091-RCL Document 71 Filed 07/30/22 Page 1 of 1 **IN
THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA Case No. 1:21-cr-00091-01 NOTICE OF FILING** Respectfully
Submitted Allen H. Orenberg Dated: July 30 2020, Case 1:21-cr-00091-RCL
Document 71-1 Filed 07/30/22 Page 1 of 2 **THE ORENBERG LAW FIRM P.C.**
Dear Ms. Buckner, Page 2 of 2 Very truly yours THE ORENBERG LAW FIRM P.C.
BY: Allen H. Orenberg" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
• I do not argue the facts, jurisdiction, law or venue.

                                        Sincerely,

                                        *Taylor James Johnatakis*

                                        Taylor James Johnatakis
                                        ℅ 29628 Gamble PL NE
                                        Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 71 Filed 07/30/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-01 NOTICE OF FILING** Respectfully Submitted Allen H. Orenberg
Dated: July 30 2020, Case 1:21-cr-00091-RCL Document 71-1 Filed 07/30/22 Page 1 of 2 **THE ORENBERG LAW FIRM P.C.**
Dear Ms. Buckner, Page 2 of 2 Very truly yours THE ORENBERG LAW FIRM P.C. BY: Allen H. Orenberg"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

COPY

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Seven          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "**Case 1:21-cr-00091-RCL Document 83 Filed 10/17/22 Page 1 of 9 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S MOTION TO COMPEL DISCOVER UNDER RULE 16 AND BRADY V. MARYLAND,** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 <u>Conclusion</u> Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "**Case 1:21-cr-00091-RCL Document 83 Filed 10/17/22 Page 1 of 9 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S MOTION TO COMPEL DISCOVER UNDER RULE 16 AND BRADY V. MARYLAND,** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 **<u>Conclusion</u>** Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "**Case 1:21-cr-00091-RCL Document 83 Filed 10/17/22 Page 1 of 9 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S MOTION TO COMPEL DISCOVER UNDER RULE 16 AND BRADY V. MARYLAND,** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 **<u>Conclusion</u>** Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Four          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 67 Filed 05/25/22 Page 1 of 29 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** MEMORANDUM OPINION, Page 2 of 29, Page 3 of 29, Page 4 of 29, Page 5 of 29, Page 6 of 29, Page 7 of 29, Page 8 of 29, Page 9 of 29, Page 10 of 29, Page 11 of 29, Page 12 of 29, Page 13 of 29, Page 14 of 29, Page 15 of 29, Page 16 of 29, Page 17 of 29, Page 18 of 29, Page 19 of 29, Page 20 of 29, Page 21 of 29, Page 22 of 29, Page 23 of 29, Page 24 of 29, Page 25 of 29, Page 26 of 29, Page 27 of 29, Page 28 of 29, Page 29 of 29 CONCLUSION Date:_5/25/22_ Royce C. Lamberth"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 67 Filed 05/25/22 Page 1 of 29 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** MEMORANDUM OPINION, Page 2 of 29, Page 3 of 29, Page 4 of 29, Page 5 of 29, Page 6 of 29, Page 7 of 29, Page 8 of 29, Page 9 of 29, Page 10 of 29, Page 11 of 29, Page 12 of 29, Page 13 of 29, Page 14 of 29, Page 15 of 29, Page 16 of 29, Page 17 of 29, Page 18 of 29, Page 19 of 29, Page 20 of 29, Page 21 of 29, Page 22 of 29, Page 23 of 29, Page 24 of 29, Page 25 of 29, Page 26 of 29, Page 27 of 29, Page 28 of 29, Page 29 of 29 CONCLUSION Date:_5/25/22_ Royce C. Lamberth" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 67 Filed 05/25/22 Page 1 of 29 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** MEMORANDUM OPINION, Page 2 of 29, Page 3 of 29, Page 4 of 29, Page 5 of 29, Page 6 of 29, Page 7 of 29, Page 8 of 29, Page 9 of 29, Page 10 of 29, Page 11 of 29, Page 12 of 29, Page 13 of 29, Page 14 of 29, Page 15 of 29, Page 16 of 29, Page 17 of 29, Page 18 of 29, Page 19 of 29, Page 20 of 29, Page 21 of 29, Page 22 of 29, Page 23 of 29, Page 24 of 29, Page 25 of 29, Page 26 of 29, Page 27 of 29, Page 28 of 29, Page 29 of 29 CONCLUSION Date:_5/25/22_ Royce C. Lamberth"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: James I. Pearce, United States Attorney's Office 555 Forth Street, N.W. Washington, DC 20530

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Four     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-00091-RCL Document 66 Filed 05/03/22 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY <u>REGARDING DEFENDANT'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2)</u>**, Page 2 of 2 Respectfully submitted Matthew M. Graves United States Attorney"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-00091-RCL Document 66 Filed 05/03/22 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY <u>REGARDING DEFENDANT'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2)</u>**, Page 2 of 2 Respectfully submitted Matthew M. Graves United States Attorney" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-00091-RCL Document 66 Filed 05/03/22 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY <u>REGARDING DEFENDANT'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2)</u>**, Page 2 of 2 Respectfully submitted Matthew M. Graves United States Attorney"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Four     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 115 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR <u>SEVERANCE [110] SCHEDULED FOR MARCH 9 2023</u>**, Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 **<u>CERTIFICATE OF SERVICE</u>** Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 **<u>ORDER</u>**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 115 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR <u>SEVERANCE [110] SCHEDULED FOR MARCH 9 2023</u>,** Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 **<u>CERTIFICATE OF SERVICE</u>** Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 **<u>ORDER</u>**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 115 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR <u>SEVERANCE [110] SCHEDULED FOR MARCH 9 2023</u>,** Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 **<u>CERTIFICATE OF SERVICE</u>** Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 **<u>ORDER</u>**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: James I. Pearce, United States Attorney's Office 555 Forth Street, N.W. Washington, DC 20530

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

*COPY*

Notice Date:          Day: Three          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 64 Filed 03/15/22 Page 1 of 4 UNITED STATES DISTRICT OF COLUMBIA Case 21-091 (RCL) NOTICE OF ADDITIONAL AUTHORITY SUPPORTING MR. STURGEON'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2) ARGUMENT, Page 2 of 4, Page 3 of 4, Page 4 of 4 Respectfully submitted A.J. KRAMER Maria N. Jacob"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 64 Filed 03/15/22 Page 1 of 4 **UNITED STATES DISTRICT OF COLUMBIA Case 21-091 (RCL) NOTICE OF ADDITIONAL AUTHORITY SUPPORTING MR. STURGEON'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2) ARGUMENT,** Page 2 of 4, Page 3 of 4, Page 4 of 4 Respectfully submitted A.J. KRAMER Maria N. Jacob" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 64 Filed 03/15/22 Page 1 of 4 UNITED STATES DISTRICT OF COLUMBIA Case 21-091 (RCL) NOTICE OF ADDITIONAL AUTHORITY SUPPORTING MR. STURGEON'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2) ARGUMENT, Page 2 of 4, Page 3 of 4, Page 4 of 4 Respectfully submitted A.J. KRAMER Maria N. Jacob"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104



# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Three          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 65-2 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 4 2022 9:02 a.m. TRANSCRIPT OF JURY (MORNING SESSION) TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 1 of 134, Page 2 of 134, Page 3 of 134, Page 4 of 134, Page 5 of 134, Page 6 of 134, Page 7 of of 134, Page 8 of 134, Page 9 of 134, Page 10 of 134, Page 11 of 134, Page 12 of 134, Page 13 of 134, Page 14 of 134, Page 15 of 134, Page 16 of 134, Page 17 of 134, Page 18 of 134, Page 19 of 134, Page 20 of 134, Page 21 of 134, Page 22 of 134, Page 23 of 134, Page 24 of 134, Page 25 of 134, Page 26 of 134, Page 27 of of 134, Page 28 of 134, Page 29 of 134, Page 30 of 134, Page 31 of 134, Page 32 of 134, Page 33 of 134, Page 34 of 134, Page 35 of 134, Page 36 of 134, Page 37 of 134, Page 38, of 134, Page 39 of 134, Page 40 of 134, Page 41 of 134, Page 42 of 134, Page 43 of 134, Page 44 of 134, Page 45 of 134, Page 46 of of 134, Page 47 of 134, Page 48 of 134, Page 49 of 134, Page 50 of 134, Page 51 of 134, Page 52 of 134, Page 53 of 134, Page 54 of 134, Page 55 of 134, Page 56 of 134, Page 57 of 134, Page 58 of 134, Page 59 of 134, Page 60 of 134, Page 61 of 134, Page 62 of 134, Page 63 of 134, Page 64 of 134, Page 65 of 134, Page 66 of 134, Page 67 of 134, Page 68 of 134, Page 69 of 134, Page 70 of 134, Page 71 of 134, Page 72 of 134, Page 73 of 134, Page 74 of 134, Page 75 of 134, Page 76 of 134, Page 77 of 134, Page 78 of 134, Page 79 of 134, Page 80 of 134, Page 81 of 134, Page 82 of 134, Page 83 of 134, Page 84 of 134, Page 85 of 134, Page 86 of 134, Page 87 of 134, Page 88 of 134, Page 89 of 134, Page 90 of 134, Page 91 of 134, Page 92 of 134, Page 93 of 134, Page 94 of 134, Page 95 of 134, Page 96 of 134, Page 97 of 134, Page 98 of 134, Page 99 of 134, Page 100 of 134, Page 101 of 134, Page 102 of 134, Page 103 of 134, Page 104 of 134, Page 105 of 134, Page 106 of 134, Page 107 of 134, Page 108 of 134, Page 109 of 134, Page 110 of 134, Page 111 of 134, Page 112 of 134, Page 113 of 134, Page 114 of 134, Page 115 of 134, Page 116 of 134, Page 117 of 134, Page 118 of 134, Page 119 of 134, Page 120 of 134, Page 121 of 134, Page 122 of 134, Page 123 of 134, Page 124 of 134, Page 125 of 134, Page 126 of 134, Page 127 of 134, Page 128 of 134, Page 129 of 134, Page 130 of 134, Page 131, of 134, Page 132 of 134, Page 133 of 134, Page 134 of 134 CERTIFICATE OF OFFICIAL COURT REPORTER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 65-2 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 4 2022 9:02 a.m. TRANSCRIPT OF JURY (MORNING SESSION) TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 1 of 134, Page 2 of 134, Page 3 of 134, Page 4 of 134, Page 5 of 134, Page 6 of 134, Page 7 of of 134, Page 8 of 134, Page 9 of 134, Page 10 of 134, Page 11 of 134, Page 12 of 134, Page 13 of 134, Page 14 of 134, Page 15 of 134, Page 16 of 134, Page 17 of 134, Page 18 of 134, Page 19 of 134, Page 20 of 134, Page 21 of 134, Page 22 of 134, Page 23 of 134, Page 24 of 134, Page 25 of 134, Page 26 of 134, Page 27 of of 134, Page 28 of 134, Page 29 of 134, Page 30 of 134, Page 31 of 134, Page 32 of 134, Page 33 of 134, Page 34 of 134, Page 35 of 134, Page 36 of 134, Page 37 of 134, Page 38, of 134, Page 39 of 134, Page 40 of 134, Page 41 of 134, Page 42 of 134, Page 43 of 134, Page 44 of 134, Page 45 of 134, Page 46 of of 134, Page 47 of 134, Page 48 of 134, Page 49 of 134, Page 50 of 134, Page 51 of 134, Page 52 of 134, Page 53 of 134, Page 54 of 134, Page 55 of 134, Page 56 of 134, Page 57 of 134, Page 58 of 134, Page 59 of 134, Page 60 of 134, Page 61 of 134, Page 62 of 134, Page 63 of 134, Page 64 of 134, Page 65 of 134, Page 66 of 134, Page 67 of 134, Page 68 of 134, Page 69 of 134, Page 70 of 134, Page 71 of 134, Page 72 of 134, Page 73 of 134, Page 74 of 134, Page 75 of 134, Page 76 of 134, Page 77 of 134, Page 78 of 134, Page 79 of 134, Page 80 of 134, Page 81 of 134, Page 82 of 134, Page 83 of 134, Page 84 of 134, Page 85 of 134, Page 86 of 134, Page 87 of 134, Page 88 of 134, Page 89 of 134, Page 90 of 134, Page 91 of 134, Page 92 of 134, Page 93 of 134, Page 94 of 134, Page 95 of 134, Page 96 of 134, Page 97 of 134, Page 98 of 134, Page 99 of 134, Page 100 of 134, Page 101 of 134, Page 102 of 134, Page 103 of 134, Page 104 of 134, Page 105 of 134, Page 106 of 134, Page 107 of 134, Page 108 of 134, Page 109 of

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Three     Month: Three   Year: 2023 CE

134, Page 110 of 134, Page 111 of 134, Page 112 of 134, Page 113 of 134, Page 114 of 134, Page 115 of 134, Page 116 of 134, Page 117 of 134, Page 118 of 134, Page 119 of 134, Page 120 of 134, Page 121 of 134, Page 122 of 134, Page 123 of 134, Page 124 of 134, Page 125 of 134, Page 126 of 134, Page 127 of 134, Page 128 of 134, Page 129 of 134, Page 130 of 134, Page 131, of 134, Page 132 of 134, Page 133 of 134, Page 134 of 134 CERTIFICATE OF OFFICIAL COURT REPORTER" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 65-2 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 4 2022 9:02 a.m. TRANSCRIPT OF JURY (MORNING SESSION) TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 1 of 134, Page 2 of 134, Page 3 of 134, Page 4 of 134, Page 5 of 134, Page 6 of 134, Page 7 of of 134, Page 8 of 134, Page 9 of 134, Page 10 of 134, Page 11 of 134, Page 12 of 134, Page 13 of 134, Page 14 of 134, Page 15 of 134, Page 16 of 134, Page 17 of 134, Page 18 of 134, Page 19 of 134, Page 20 of 134, Page 21 of 134, Page 22 of 134, Page 23 of 134, Page 24 of 134, Page 25 of 134, Page 26 of 134, Page 27 of 134, Page 28 of 134, Page 29 of 134, Page 30 of 134, Page 31 of 134, Page 32 of 134, Page 33 of 134, Page 34 of 134, Page 35 of 134, Page 36 of 134, Page 37 of 134, Page 38, of 134, Page 39 of 134, Page 40 of 134, Page 41 of 134, Page 42 of 134, Page 43 of 134, Page 44 of 134, Page 45 of 134, Page 46 of 134, Page 47 of 134, Page 48 of 134, Page 49 of 134, Page 50 of 134, Page 51 of 134, Page 52 of 134, Page 53 of 134, Page 54 of 134, Page 55 of 134, Page 56 of 134, Page 57 of 134, Page 58 of 134, Page 59 of 134, Page 60 of 134, Page 61 of 134, Page 62 of 134, Page 63 of 134, Page 64 of 134, Page 65 of 134, Page 66 of 134, Page 67 of 134, Page 68 of 134, Page 69 of 134, Page 70 of 134, Page 71 of 134, Page 72 of 134, Page 73 of 134, Page 74 of 134, Page 75 of 134, Page 76 of 134, Page 77 of 134, Page 78 of 134, Page 79 of 134, Page 80 of 134, Page 81 of 134, Page 82 of 134, Page 83 of 134, Page 84 of 134, Page 85 of 134, Page 86 of 134, Page 87 of 134, Page 88 of 134, Page 89 of 134, Page 90 of 134, Page 91 of 134, Page 92 of 134, Page 93 of 134, Page 94 of 134, Page 95 of 134, Page 96 of 134, Page 97 of 134, Page 98 of 134, Page 99 of 134, Page 100 of 134, Page 101 of 134, Page 102 of 134, Page 103 of 134, Page 104 of 134, Page 105 of 134, Page 106 of 134, Page 107 of 134, Page 108 of 134, Page 109 of 134, Page 110 of 134, Page 111 of 134, Page 112 of 134, Page 113 of 134, Page 114 of 134, Page 115 of 134, Page 116 of 134, Page 117 of 134, Page 118 of 134, Page 119 of 134, Page 120 of 134, Page 121 of 134, Page 122 of 134, Page 123 of 134, Page 124 of 134, Page 125 of 134, Page 126 of 134, Page 127 of 134, Page 128 of 134, Page 129 of 134, Page 130 of 134, Page 131, of 134, Page 132 of 134, Page 133 of 134, Page 134 of 134 CERTIFICATE OF OFFICIAL COURT REPORTER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Three       Month: Three      Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 65-1 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 8 2022 9:30 a.m. TRANSCRIPT OF JURY TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 CERTIFICATE OF OFFICIAL COURT REPORTER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 65-1 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 8 2022 9:30 a.m. TRANSCRIPT OF JURY TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 CERTIFICATE OF OFFICIAL COURT REPORTER" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 65-1 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 8 2022 9:30 a.m. TRANSCRIPT OF JURY TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 CERTIFICATE OF OFFICIAL COURT REPORTER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

**Notice Date:**          Day: Three          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "CJA-23 (Rev 3/21) **FINANCIAL AFFIDAVIT**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "**CJA-23 (Rev 3/21) FINANCIAL AFFIDAVIT**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "**CJA-23 (Rev 3/21) FINANCIAL AFFIDAVIT**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:         Day: Three         Month: Three         Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 65 Filed 04/13/22 Page 1 of 26 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S SUPPLEMENTAL BRIEF ADDRESSING <u>18 U.S.C. 1512(c)(2)</u> AND <u>UNITED STATES V. MILLER</u>**, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 **Conclusion** Respectfully submitted Matthew M. Graves By: Angela N. Buckner James I. Pearce"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 65 Filed 04/13/22 Page 1 of 26 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S SUPPLEMENTAL BRIEF ADDRESSING <u>18 U.S.C. 1512(c)(2) AND UNITED STATES V. MILLER</u>,** Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 **Conclusion** Respectfully submitted Matthew M. Graves By: Angela N. Buckner James I. Pearce" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 65 Filed 04/13/22 Page 1 of 26 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S SUPPLEMENTAL BRIEF ADDRESSING <u>18 U.S.C. 1512(c)(2) AND UNITED STATES V. MILLER</u>**, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 **Conclusion** Respectfully submitted Matthew M. Graves By: Angela N. Buckner James I. Pearce"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: James I. Pearce, United States Attorney's Office 555 Forth Street, N.W. Washington, DC 20530

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Three        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 32-1 Filed 05/05/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 <u>ORDER</u>**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 32-1 Filed 05/05/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 <u>ORDER</u>**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 32-1 Filed 05/05/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 <u>ORDER</u>**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

COPY

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-eight          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 114 Filed 02/28/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 2**1-091 **(RCL)** **UNOPPOSED MOTION TO CONTINUE TRIAL,** Page 2 of 2 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender, Case 1:21-cr-00091-RCL Document 114-1 Filed 2/28/23 Page 1 of 1 **ORDER"**

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 114 Filed 02/28/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 21-091 (RCL)** **UNOPPOSED MOTION TO CONTINUE TRIAL,** Page 2 of 2 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender, Case 1:21-cr-00091-RCL Document 114-1 Filed 2/28/23 Page 1 of 1 **ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 114 Filed 02/28/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 21-091 (RCL)** **UNOPPOSED MOTION TO CONTINUE TRIAL,** Page 2 of 2 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender, Case 1:21-cr-00091-RCL Document 114-1 Filed 2/28/23 Page 1 of 1 **ORDER"**

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

COPY

Notice Date:        Day: Twenty-seven        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 25-1 Filed 4/20/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** PROTECTIVE ORDER GOVERNING DISCOVERY, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 25-1 Filed 4/20/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** PROTECTIVE ORDER GOVERNING DISCOVERY, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 25-1 Filed 4/20/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** PROTECTIVE ORDER GOVERNING DISCOVERY, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

COPY

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Twenty-seven     Month: Two     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 45 Filed 09/22/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL AGREED MOTION TO CONTINUE STATUS CONFERENCE**, Page 2 of 2 Christopher Black, Case 1:21-cr-00091-RCL Document 45-1 Filed 09/22/21 Page 1 of 1 **ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 45 Filed 09/22/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL AGREED MOTION TO CONTINUE STATUS CONFERENCE**, Page 2 of 2 Christopher Black, Case 1:21-cr-00091-RCL Document 45-1 Filed 09/22/21 Page 1 of 1 **ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 45 Filed 09/22/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL AGREED MOTION TO CONTINUE STATUS CONFERENCE**, Page 2 of 2 Christopher Black, Case 1:21-cr-00091-RCL Document 45-1 Filed 09/22/21 Page 1 of 1 **ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-seven        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 46 Filed 09/24/21 Page 1 of 1 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE DONE this 24 day of September 2021 Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 46 Filed 09/24/21 Page 1 of 1 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE DONE this 24 day of September 2021 Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

How
Attachment: "Case 1:21-cr-00091-RCL Document 46 Filed 09/24/21 Page 1 of 1 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE DONE this 24 day of September 2021 Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-seven        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 32 Filed 05/05/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 MOTION FOR AN ORDER TO DISCLOSE ITEMS PROTECTED BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e) AND SEALED MATERIALS**, Page 2 of 2 Respectfully submitted Channing D. Phillips Acting United States Attorney By: Angela N. Buckner"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 32 Filed 05/05/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 MOTION FOR AN ORDER TO DISCLOSE ITEMS PROTECTED BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e) AND SEALED MATERIALS**, Page 2 of 2 Respectfully submitted Channing D. Phillips Acting United States Attorney By: Angela N. Buckner" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 32 Filed 05/05/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 MOTION FOR AN ORDER TO DISCLOSE ITEMS PROTECTED BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e) AND SEALED MATERIALS**, Page 2 of 2 Respectfully submitted Channing D. Phillips Acting United States Attorney By: Angela N. Buckner"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C.  20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-seven          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 31 Filed 05/04/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>PROTECTIVE ORDER GOVERNING DISCOVERY</u>, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **SO ORDERED** 44th day of May 2021 Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 31 Filed 05/04/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>PROTECTIVE ORDER GOVERNING DISCOVERY</u>, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **SO ORDERED** 44th day of May 2021 Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 31 Filed 05/04/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>PROTECTIVE ORDER GOVERNING DISCOVERY</u>, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **SO ORDERED** 44th day of May 2021 Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-seven        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 33 Filed 05/06/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 ORDER** Date: 5/6/21 HONORABLE ROYCE C. LAMBERTH United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 33 Filed 05/06/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 ORDER** Date: 5/6/21 HONORABLE ROYCE C. LAMBERTH United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 33 Filed 05/06/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 ORDER** Date: 5/6/21 HONORABLE ROYCE C. LAMBERTH United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Two          Month: Three        Year: 2023 CE

*COPY*

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 52 Filed 10/25/21 Page 1 of 8 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES' MEMORANDUM REGARDING STATUS OF DISCOVERY AS OF OCTOBER 21 2021 Page 2 of 8, Page 3 of 8, Page 4 of 8, Page 5 of 8, Page 6 of 8, Page 7 of 8, Page 8 of 8 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 52 Filed 10/25/21 Page 1 of 8 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES' MEMORANDUM REGARDING STATUS OF DISCOVERY AS OF OCTOBER 21 2021** Page 2 of 8, Page 3 of 8, Page 4 of 8, Page 5 of 8, Page 6 of 8, Page 7 of 8, Page 8 of 8 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
  • I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 52 Filed 10/25/21 Page 1 of 8 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES' MEMORANDUM REGARDING STATUS OF DISCOVERY AS OF OCTOBER 21 2021 Page 2 of 8, Page 3 of 8, Page 4 of 8, Page 5 of 8, Page 6 of 8, Page 7 of 8, Page 8 of 8 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Two          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 59-1 Filed 12/29/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISSAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 59-1 Filed 12/29/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING MOTION TO ADOPT AND JON CO-DEFENDANT ISSAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 59-1 Filed 12/29/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING MOTION TO ADOPT AND JON CO-DEFENDANT ISSAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Two          Month: Three          Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 5 Filed 02/05/21 Page 1 of 3 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO. **UNDER SEAL** GOVERNMENT'S MOTION TO SEAL INDICTMENT AND TO DELAY ENTRY ON THE PUBLIC DOCKET **OF THE FILING OF THIS MOTION TO SEAL AND RELATED MATTERS**, Page 2 of 3, Page 3 of 3 Respectfully submitted MICHAEL R. SHERWIN Assistant United States Attorney, Case 1:21-cr-00091-RCL Document 5-1 Filed 02/05/21 Page 1 of 1 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO. **UNDER SEAL** ORDER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 5 Filed 02/05/21 Page 1 of 3 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO. UNDER SEAL GOVERNMENT'S MOTION TO SEAL INDICTMENT AND TO DELAY ENTRY ON THE PUBLIC DOCKET OF THE FILING OF THIS MOTION TO SEAL AND RELATED MATTERS,** Page 2 of 3, Page 3 of 3 Respectfully submitted MICHAEL R. SHERWIN Assistant United States Attorney, Case 1:21-cr-00091-RCL Document 5-1 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO. UNDER SEAL ORDER"** and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 5 Filed 02/05/21 Page 1 of 3 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO. UNDER SEAL** GOVERNMENT'S MOTION TO SEAL INDICTMENT AND TO DELAY ENTRY ON THE PUBLIC DOCKET **OF THE FILING OF THIS MOTION TO SEAL AND RELATED MATTERS,** Page 2 of 3, Page 3 of 3 Respectfully submitted MICHAEL R. SHERWIN Assistant United States Attorney, Case 1:21-cr-00091-RCL Document 5-1 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO. UNDER SEAL** ORDER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:

Day: Two

Month: Three

Year: 2023 CE

*COPY*

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 59 Filed 12/29/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL DEFENDANT TAYLOR JOHNATAKIS'S MOTION TO ADOPT AND JOIN CO-DEFENDANT ISAAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT, Page 2 of 2 BLACK & ASKEROV PLLC Christopher Black"

PLEASE TAKE NOTICE that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 59 Filed 12/29/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL DEFENDANT TAYLOR JOHNATAKIS'S MOTION TO ADOPT AND JOIN CO-DEFENDANT ISAAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT, Page 2 of 2 BLACK & ASKEROV PLLC Christopher Black" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 59 Filed 12/29/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL DEFENDANT TAYLOR JOHNATAKIS'S MOTION TO ADOPT AND JOIN CO-DEFENDANT ISAAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT, Page 2 of 2 BLACK & ASKEROV PLLC Christopher Black"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Two        Month: Three        Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 63 Filed 02/14/22 Page 1 of 20 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) UNITED STATES' MEMORANDUM REGARDING STATUS OF DISCOVERY AS OF FEBRUARY 9 2022**, Page 2 of 20, Page 3 of 20, Page 4 of 20, Page 5 of 20, Page 6 of 20, Page 7 of 20, Page 8 of 20, Page 9 of 20, Page 10 of 20, Page 11 of 20, Page 12 of 20, Page 13 of 20, Page 14 of 20, Page 15 of 20, Page 16 of 20, Page 17 of 20, Page 18 of 20 CONCLUSION, Page 19 of 20, Page 20 of 20 Respectfully submitted MATTHEW M. GRAVES By: Emily A. Miller By: Angela N. Buckner"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 63 Filed 02/14/22 Page 1 of 20 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) UNITED STATES' MEMORANDUM REGARDING STATUS OF DISCOVERY AS OF FEBRUARY 9 2022**, Page 2 of 20, Page 3 of 20, Page 4 of 20, Page 5 of 20, Page 6 of 20, Page 7 of 20, Page 8 of 20, Page 9 of 20, Page 10 of 20, Page 11 of 20, Page 12 of 20, Page 13 of 20, Page 14 of 20, Page 15 of 20, Page 16 of 20, Page 17 of 20, Page 18 of 20 **CONCLUSION**, Page 19 of 20, Page 20 of 20 Respectfully submitted MATTHEW M. GRAVES By: Emily A. Miller By: Angela N. Buckner" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 63 Filed 02/14/22 Page 1 of 20 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) UNITED STATES' MEMORANDUM REGARDING STATUS OF DISCOVERY AS OF FEBRUARY 9 2022**, Page 2 of 20, Page 3 of 20, Page 4 of 20, Page 5 of 20, Page 6 of 20, Page 7 of 20, Page 8 of 20, Page 9 of 20, Page 10 of 20, Page 11 of 20, Page 12 of 20, Page 13 of 20, Page 14 of 20, Page 15 of 20, Page 16 of 20, Page 17 of 20, Page 18 of 20 **CONCLUSION**, Page 19 of 20, Page 20 of 20 Respectfully submitted MATTHEW M. GRAVES By: Emily A. Miller By: Angela N. Buckner"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Emily A. Miller Chief, Capital Siege Discovery Unit United States Attorney's Office 555 Fourth Street, N.W., Room 5826 Washington, DC 20530

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

**Notice Date:**     Day: Two     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-0091-RCL Document 47 Filed 10/17/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) <u>NOTICE OF FILING</u>** Page 2 of 2, Document 47-1 Page 1 of 11, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11, Document 47-2 Page 1 of 2 **EXHIBIT A,** Page 2 of 2, Document 47-3 Page 1 of 9, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9, Document 47-4 Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **<u>Conclusion</u>**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-0091-RCL Document 47 Filed 10/17/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) <u>NOTICE OF FILING</u>** Page 2 of 2, Document 47-1 Page 1 of 11, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11, Document 47-2 Page 1 of 2 **EXHIBIT A,** Page 2 of 2, Document 47-3 Page 1 of 9, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9, Document 47-4 Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **<u>Conclusion</u>**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-0091-RCL Document 47 Filed 10/17/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) <u>NOTICE OF FILING</u>** Page 2 of 2, Document 47-1 Page 1 of 11, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11, Document 47-2 Page 1 of 2 **EXHIBIT A,** Page 2 of 2, Document 47-3 Page 1 of 9, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9, Document 47-4 Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **<u>Conclusion</u>**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Two        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 40 Filed 08/04/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 NOTICE OF LETTER PROVIDED TO DEFENSE COUNSEL Page 2 of 2, Case 1:21-cr-00091-RCL Document 40-1 Filed 08/04/21 Page 1 of 15, Page 2 of 15, Page 3 of 15, Page 4 of 15, Page 5 of 15, Page 6 of 15, Page 7 of 15, Page 8 of 15, Page 9 of 15, Page 10 of 15, Page 11 of 15, Page 12 of 15, Page 13 of 15, Page 14 of 15, Page 15 of 15 Sincerely Channing D. Phillips"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 40 Filed 08/04/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 NOTICE OF LETTER PROVIDED TO DEFENSE COUNSEL** Page 2 of 2, Case 1:21-cr-00091-RCL Document 40-1 Filed 08/04/21 Page 1 of 15, Page 2 of 15, Page 3 of 15, Page 4 of 15, Page 5 of 15, Page 6 of 15, Page 7 of 15, Page 8 of 15, Page 9 of 15, Page 10 of 15, Page 11 of 15, Page 12 of 15, Page 13 of 15, Page 14 of 15, Page 15 of 15 Sincerely Channing D. Phillips" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 40 Filed 08/04/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 NOTICE OF LETTER PROVIDED TO DEFENSE COUNSEL Page 2 of 2, Case 1:21-cr-00091-RCL Document 40-1 Filed 08/04/21 Page 1 of 15, Page 2 of 15, Page 3 of 15, Page 4 of 15, Page 5 of 15, Page 6 of 15, Page 7 of 15, Page 8 of 15, Page 9 of 15, Page 10 of 15, Page 11 of 15, Page 12 of 15, Page 13 of 15, Page 14 of 15, Page 15 of 15 Sincerely Channing D. Phillips"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

COPY

Notice Date:          Day: Two          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 57 Filed 12/14/21 Page 1 of 3 UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) CONSENT MOTION TO EXTEND FILING
DEADLINE, Page 2 of 3, Page 3 of 3, Case 1:21-cr-00091-RCL Document 57-1 Filed 12/14/21 Page 1 of 1 UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Cas No. 21-CR-91 (RCL) ORDER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your
Presentment "Case 1:21-cr-00091-RCL Document 57 Filed 12/14/21 Page 1 of 3
**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
Case No. 21-CR-91 (RCL) CONSENT MOTION TO EXTEND FILING
DEADLINE, Page 2 of 3, Page 3 of 3, Case 1:21-cr-00091-RCL Document 57-1
Filed 12/14/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA Cas No. 21-CR-91 (RCL) ORDER**" and return your
offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 57 Filed 12/14/21 Page 1 of 3 UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) CONSENT MOTION TO EXTEND FILING DEADLINE, Page 2 of 3,
Page 3 of 3, Case 1:21-cr-00091-RCL Document 57-1 Filed 12/14/21 Page 1 of 1 UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA Cas No. 21-CR-91 (RCL) ORDER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day: Twenty-eight       Month: Two       Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 34 Filed 05/07/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE** Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT** A TRUE BILL: FOREPERSON Channing D Phillips Attorney of the United States in and for the District of Columbia"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 34 Filed 05/07/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE**, Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT A TRUE BILL: FOREPERSON** Channing D Phillips Attorney of the United States in and for the District of Columbia" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 34 Filed 05/07/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE**, Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT A TRUE BILL: FOREPERSON** Channing D Phillips Attorney of the United States in and for the District of Columbia"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:      Day: Twenty-eight      Month: Two      Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 53 Filed 11/10/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE**,Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT** A TRUE BILL: FOREPERSON Mathew M Graves of the United States in and for the District of Columbia"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 53 Filed 11/10/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE**, Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT** A TRUE BILL: FOREPERSON** Mathew M Graves Attorney of the United States in and for the District of Columbia" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 53 Filed 11/10/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE**, Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT** A TRUE BILL: FOREPERSON** Mathew M Graves Attorney of the United States in and for the District of Columbia"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

COPY

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: One          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 55 Filed 12/07/21 Page 1 of 30 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91-(RCL) DEFENDANT'S MOTION TO DISMISS COUNTS ONE THREE FOUR, <u>FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>**, Page 2 of 30, Page 3 of 30, Page 4 of 30, Page 5 of 30, Page 6 of 30, Page 7 of 30, Page 8 of 30, Page 9 of 30, Page 10 of 30, Page 11 of 30, Page 12 of 30, Page 13 of 30, Page 14 of 30, Page 15 of 30, Page 16 of 30, Page 17 of 30, Page 18 of 30, Page 19 of 30, Page 20 of 30, Page 21 of 30, Page 22 of 30, Page 23 of 30, Page 24 of 30, Page 25 of 30, Page 26 of 30, Page 27 of 30, Page 28 of 30, Page 29 of 30 **<u>CONCLUSION</u>** Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Page 30 of 30"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 55 Filed 12/07/21 Page 1 of 30 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91-(RCL) DEFENDANT'S MOTION TO DISMISS COUNTS ONE THREE FOUR, <u>FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>**, Page 2 of 30, Page 3 of 30, Page 4 of 30, Page 5 of 30, Page 6 of 30, Page 7 of 30, Page 8 of 30, Page 9 of 30, Page 10 of 30, Page 11 of 30, Page 12 of 30, Page 13 of 30, Page 14 of 30, Page 15 of 30, Page 16 of 30, Page 17 of 30, Page 18 of 30, Page 19 of 30, Page 20 of 30, Page 21 of 30, Page 22 of 30, Page 23 of 30, Page 24 of 30, Page 25 of 30, Page 26 of 30, Page 27 of 30, Page 28 of 30, Page 29 of 30 **<u>CONCLUSION</u>** Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Page 30 of 30" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 55 Filed 12/07/21 Page 1 of 30 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91-(RCL) DEFENDANT'S MOTION TO DISMISS COUNTS ONE THREE FOUR, <u>FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>**, Page 2 of 30, Page 3 of 30, Page 4 of 30, Page 5 of 30, Page 6 of 30, Page 7 of 30, Page 8 of 30, Page 9 of 30, Page 10 of 30, Page 11 of 30, Page 12 of 30, Page 13 of 30, Page 14 of 30, Page 15 of 30, Page 16 of 30, Page 17 of 30, Page 18 of 30, Page 19 of 30, Page 20 of 30, Page 21 of 30, Page 22 of 30, Page 23 of 30, Page 24 of 30, Page 25 of 30, Page 26 of 30, Page 27 of 30, Page 28 of 30, Page 29 of 30 **<u>CONCLUSION</u>** Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Page 30 of 30"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:      Day: One      Month: Three      Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 51 Filed 10/19/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER It is **SO ORDERED** Date: October 19, 2021 Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 51 Filed 10/19/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER It is **SO ORDERED** Date: October 19, 2021 Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 51 Filed 10/19/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER It is **SO ORDERED** Date: October 19, 2021 Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: One          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 98 Filed 12/06/22 Page 1 of 10 **IN THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN** <u>OPPOSITION TO DEFENDANTS' MOTION TO COMPEL</u>, Page 2 of 10, Page 3 of 10, Page 4 of 10, Page 5 of 10, Page 6 of 10, Page 7 of 10, Page 8 of 10, Page 9 of 10, Page 10 of 10 Respectfully submitted Matthew M. Graves by Kaitlin Klamann"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 98 Filed 12/06/22 Page 1 of 10 **IN THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN** <u>OPPOSITION TO DEFENDANTS' MOTION TO COMPEL</u>, Page 2 of 10, Page 3 of 10, Page 4 of 10, Page 5 of 10, Page 6 of 10, Page 7 of 10, Page 8 of 10, Page 9 of 10, Page 10 of 10 Respectfully submitted Matthew M. Graves by Kaitlin Klamann" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 98 Filed 12/06/22 Page 1 of 10 **IN THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN** <u>OPPOSITION TO DEFENDANTS' MOTION TO COMPEL</u>, Page 2 of 10, Page 3 of 10, Page 4 of 10, Page 5 of 10, Page 6 of 10, Page 7 of 10, Page 8 of 10, Page 9 of 10, Page 10 of 10 Respectfully submitted Matthew M. Graves by Kaitlin Klamann"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

COPY

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: One        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 58 Filed 12/14/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) <u>ORDER</u>** It Is So Ordered Royce C. Lamberth United States District Judge Entered:<u>12/14/21</u>"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 58 Filed 12/14/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) <u>ORDER</u>** It Is So Ordered Royce C. Lamberth United States District Judge Entered:<u>12/14/21</u>" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 58 Filed 12/14/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) <u>ORDER</u>** It Is So Ordered Royce C. Lamberth United States District Judge Entered:<u>12/14/21</u>"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: One        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 60 Filed 01/04/22 Page 1 of 54 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** <u>GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>, Page 2 of 54, Page 3 of 54, Page 4 of 54, Page 5 of 54, Page 6 of 54, Page 7 of 54, Page 8 of 54, Page 8 of 54, Page 9 of 54, Page 10 of 54, Page 11 of 54, Page 12 of 54, Page 13 of 54, Page 14 of 54, Page 15 of 54, Page 16 of 54, Page 17 of 54, Page 18 of 54, Page 19 of 54, Page 20 of 54, Page 21 of 54, Page 22 of 54, Page 23 of 54, Page 24 of 54, Page 25 of 54, Page 26 of 54, Page 27 of 54, Page 28 of 54, Page 29 of 54, Page 30 of 54, Page 31 of 54, Page 32 of 54, Page 33 of 54, Page 34 of 54, Page 35 of 54, Page 36 of 54, Page 37 of 54, Page 38 of 54, Page 39 of 54, Page 40 of 54, Page 41 of 54, Page 42 of 54, Page 43 of 54, Page 44 of 54, Page 45 of 54, Page 46 of 54, Page 47 of 54, Page 48 of 54, Page 49 of 54, Page 50 of 54, Page 51 of 54, Page 52 of 54, Page 53 of 54, Page 54 of 54 <u>CONCLUSION</u> Respectfully submitted Matthew M. Graves United States Attorney By: Angela N. Buckner"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 60 Filed 01/04/22 Page 1 of 54 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** <u>GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>, Page 2 of 54, Page 3 of 54, Page 4 of 54, Page 5 of 54, Page 6 of 54, Page 7 of 54, Page 8 of 54, Page 8 of 54, Page 9 of 54, Page 10 of 54, Page 11 of 54, Page 12 of 54, Page 13 of 54, Page 14 of 54, Page 15 of 54, Page 16 of 54, Page 17 of 54, Page 18 of 54, Page 19 of 54, Page 20 of 54, Page 21 of 54, Page 22 of 54, Page 23 of 54, Page 24 of 54, Page 25 of 54, Page 26 of 54, Page 27 of 54, Page 28 of 54, Page 29 of 54, Page 30 of 54, Page 31 of 54, Page 32 of 54, Page 33 of 54, Page 34 of 54, Page 35 of 54, Page 36 of 54, Page 37 of 54, Page 38 of 54, Page 39 of 54, Page 40 of 54, Page 41 of 54, Page 42 of 54, Page 43 of 54, Page 44 of 54, Page 45 of 54, Page 46 of 54, Page 47 of 54, Page 48 of 54, Page 49 of 54, Page 50 of 54, Page 51 of 54, Page 52 of 54, Page 53 of 54, Page 54 of 54 <u>CONCLUSION</u> Respectfully submitted Matthew M. Graves United States Attorney By: Angela N. Buckner" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:  Day: One     Month: Three  Year: 2023 CE

Attachment: "Case 1:21-cr-00091-RCL Document 60 Filed 01/04/22 Page 1 of 54 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**, Page 2 of 54, Page 3 of 54, Page 4 of 54, Page 5 of 54, Page 6 of 54, Page 7 of 54, Page 8 of 54, Page 8 of 54, Page 9 of 54, Page 10 of 54, Page 11 of 54, Page 12 of 54, Page 13 of 54, Page 14 of 54, Page 15 of 54, Page 16 of 54, Page 17 of 54, Page 18 of 54, Page 19 of 54, Page 20 of 54, Page 21 of 54, Page 22 of 54, Page 23 of 54, Page 24 of 54, Page 25 of 54, Page 26 of 54, Page 27 of 54, Page 28 of 54, Page 29 of 54, Page 30 of 54, Page 31 of 54, Page 32 of 54, Page 33 of 54, Page 34 of 54, Page 35 of 54, Page 36 of 54, Page 37 of 54, Page 38 of 54, Page 39 of 54, Page 40 of 54, Page 41 of 54, Page 42 of 54, Page 43 of 54, Page 44 of 54, Page 45 of 54, Page 46 of 54, Page 47 of 54, Page 48 of 54, Page 49 of 54, Page 50 of 54, Page 51 of 54, Page 52 of 54, Page 53 of 54, Page 54 of 54 **CONCLUSION** Respectfully submitted Matthew M. Graves United States Attorney By: Angela N. Buckner"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:      Day: One      Month: Three      Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 61 Filed 01/05/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISACC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE AND SIX OF THE SUPERSEDING INDICTMENT** DONE this 4th day of January, 2022 Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 61 Filed 01/05/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISACC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE AND SIX OF THE SUPERSEDING INDICTMENT** DONE this 4th day of January, 2022 Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 61 Filed 01/05/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISACC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE AND SIX OF THE SUPERSEDING INDICTMENT** DONE this 4th day of January, 2022 Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:      Day: One      Month: Three      Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 6 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** UNDER SEAL CASE: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ORDER** Date: Febuary 5 2021 G. Michael Harvey UNITED STATES MAGISTRATE JUDGE"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 6 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** UNDER SEAL CASE: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ORDER** Date: Febuary 5 2021 G. Michael Harvey UNITED STATES MAGISTRATE JUDGE" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 6 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** UNDER SEAL CASE: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ORDER** Date: February 5 2021 G. Michael Harvey UNITED STATES MAGISTRATE JUDGE"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Judge G. Michael Harvey U.S. District Court, District of Columbia (Washington, DC) 333 Constitution Avenue NW Washington, D.C. 20001

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-eight        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : " Case 1:21-cr-00091-RCL Document 12 Filed 2/17/21 Page 1 of 3 UNITED STATES DISTRICT COURT for the District of Columbia Case No. C21-91-03 **ORDER SETTING CONDITIONS OF RELEASE,** Page 2 of 3, Page 3 of 3 Magistrate Judge Robin Meriweather "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 12 Filed 2/17/21 Page 1 of 3 UNITED STATES DISTRICT COURT for the District of Columbia Case No. C21-91-03 **ORDER SETTING CONDITIONS OF RELEASE,** Page 2 of 3, Page 3 of 3 Magistrate Judge Robin Meriweather" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 12 Filed 2/17/21 Page 1 of 3 UNITED STATES DISTRICT COURT for the District of Columbia Case No. C21-91-03 **ORDER SETTING CONDITIONS OF RELEASE,** Page 2 of 3, Page 3 of 3 Magistrate Judge Robin Meriweather"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Judge Robin M. Meriweather U.S. District Court, District of Columbia (Washington, DC) 333 Constitution Avenue NW Washington, D.C. 20001

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:      Day: Twenty-seven      Month: Two      Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 25 Filed 04/20/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>UNOPPOSED MOTION FOR PROTECTIVE ORDER</u> Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 25 Filed 04/20/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>UNOPPOSED MOTION FOR PROTECTIVE ORDER</u> Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 25 Filed 04/20/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>UNOPPOSED MOTION FOR PROTECTIVE ORDER</u> Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

COPY

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Twenty-eight      Month: Two      Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : " Case 1:21-cr-00091-RCL Document 43 Filed 02/16/21 Page 1 of 4 UNITED STATES DISTRICT COURT for the
District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B)
**ARREST WARRANT** G. Michael Harvey, U.S. Magistrate Judge, Page 2 of 14, Page 3 of 14, Page 4 of 14, Page 5 of 14, Page 6 of
14, Page 7 of 14 **ARREST WARRANT,** Page 8 of 14, Page 9 of 14 David 2. Christel United States Magistrate Judge, Page 10 of 14
**APPEARANCE BOND CASE No.: MJ21-5036-DWC**, Page 11 of 14 David Christel United States Magistrate Judge, Page 12 of 14
BOND CLOSED PASSPORT, Page 13 of 14, Page 14 of 14 "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment
"Case 1:21-cr-00091-RCL Document 43 Filed 02/16/21 Page 1 of 4 UNITED STATES
DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth
Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** G.
Michael Harvey, U.S. Magistrate Judge, Page 2 of 14, Page 3 of 14, Page 4 of 14, Page 5 of 14,
Page 6 of 14, Page 7 of 14 **ARREST WARRANT,** Page 8 of 14, Page 9 of 14 David 2. Christel
United States Magistrate Judge, Page 10 of 14 **APPEARANCE BOND CASE No.:
MJ21-5036-DWC**, Page 11 of 14 David Christel United States Magistrate Judge, Page 12 of 14
**BOND CLOSED PASSPORT**, Page 13 of 14, Page 14 of 14" and return your offer herein attached
to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF
ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington



# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Twenty-eight   Month: Two   Year: 2023 CE

Attachment: "Case 1:21-cr-00091-RCL Document 43 Filed 02/16/21 Page 1 of 4 UNITED STATES DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** G. Michael Harvey, U.S. Magistrate Judge, Page 2 of 14, Page 3 of 14, Page 4 of 14, Page 5 of 14, Page 6 of 14, Page 7 of 14 **ARREST WARRANT,** Page 8 of 14, Page 9 of 14 David 2. Christel United States Magistrate Judge, Page 10 of 14 **APPEARANCE BOND CASE No.: MJ21-5036-DWC,** Page 11 of 14 David Christel United States Magistrate Judge, Page 12 of 14 **BOND CLOSED PASSPORT,** Page 13 of 14, Page 14 of 14"

cc: Judge David W. Christel United States Courthouse 1717 Pacific Avenue Room 3100 Tacoma WA 983402
cc: WILLIAM M MCCOLL CLERK OF COURT, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON 1717 Pacific Ave., Suite 3100 Tacoma, WA 98402
cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Judge G. Michael Harvey U.S. District Court, District of Columbia (Washington, DC) 333 Constitution Avenue NW Washington, D.C. 20001

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-eight          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 68 Filed 05/25/22 Page 1 of 1 UNITED STATES **DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER Date: May 25 2022 Hon. Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 68 Filed 05/25/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER Date: May 25 2022 Hon. Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 68 Filed 05/25/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER Date: May 25 2022 Hon. Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

COPY

Notice Date:    Day: One    Month: Three    Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 92 Filed 11/30/22 Page 1 of 25 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN <u>OPPOSITION TO MOTION TO TRANSFER VENUE</u>**, Page 2 of 25, 3 of 25, Page 4 of 25, 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 Respectfully submitted Matthew M. Graves By: Kaitlin Klamann"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 92 Filed 11/30/22 Page 1 of 25 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN <u>OPPOSITION TO MOTION TO TRANSFER VENUE</u>,** Page 2 of 25, 3 of 25, Page 4 of 25, 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 Respectfully submitted Matthew M. Graves By: Kaitlin Klamann" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 92 Filed 11/30/22 Page 1 of 25 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN <u>OPPOSITION TO MOTION TO TRANSFER VENUE</u>,** Page 2 of 25, 3 of 25, Page 4 of 25, 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 Respectfully submitted Matthew M. Graves By: Kaitlin Klamann"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:    Day: Eleven    Month: Three    Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 111 Filed 01/31/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR LEAVE TO LATE FILE A REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE PUBLIC AUTHORITY DEFENSE <u>AND/OR ENTRAPMENT BY ESTOPPEL</u>**, Page 2 of 2 Respectfully submitted Allen H. Orenberg, Dated: January 31 2023, Case 1:21-cr-00091-RCL Document 111-1 Filed 01/31/23 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 1:21-cr-0091-RCL-01 <u>ORDER</u>**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 111 Filed 01/31/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR LEAVE TO LATE FILE A REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE PUBLIC AUTHORITY DEFENSE <u>AND/OR ENTRAPMENT BY ESTOPPEL</u>**, Page 2 of 2 Respectfully submitted Allen H. Orenberg, Dated: January 31 2023, Case 1:21-cr-00091-RCL Document 111-1 Filed 01/31/23 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 1:21-cr-0091-RCL-01 <u>ORDER</u>**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 111 Filed 01/31/23 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR LEAVE TO LATE FILE A REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE PUBLIC AUTHORITY DEFENSE <u>AND/OR ENTRAPMENT BY ESTOPPEL</u>**, Page 2 of 2 Respectfully submitted Allen H. Orenberg, Dated: January 31 2023, Case 1:21-cr-00091-RCL Document 111-1 Filed 01/31/23 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 1:21-cr-0091-RCL-01 <u>ORDER</u>**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Fourteen        Month: Three        Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 117 Filed 03/13/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** No.: 21 CR 91 **NOTICE OF APPEARANCE** Respectfully submitted MATTHEW M. GRAVES United States Attorney D.C. Bar No. 481052 By: /s/ *Courtney A. Howard* Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Page 2 of 2 **CERTIFICATE OF SERVICE** By: /s/ Courtney A. Howard Trial Attorney Criminal Division Detailed to the U.S. Attorney's office"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 117 Filed 03/13/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** No.: 21 CR 91 **NOTICE OF APPEARANCE** Respectfully submitted MATTHEW M. GRAVES United States Attorney D.C. Bar No. 481052 By: /s/ *Courtney A. Howard* Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Page 2 of 2 **CERTIFICATE OF SERVICE** By: /s/ Courtney A. Howard Trial Attorney Criminal Division Detailed to the U.S. Attorney's office" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 117 Filed 03/13/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** No.: 21 CR 91 **NOTICE OF APPEARANCE** Respectfully submitted MATTHEW M. GRAVES United States Attorney D.C. Bar No. 481052 By: /s/ *Courtney A. Howard* Trial Attorney Criminal Division Detailed to the U.S. Attorney's Office, Page 2 of 2 **CERTIFICATE OF SERVICE** By: /s/ Courtney A. Howard Trial Attorney Criminal Division Detailed to the U.S. Attorney's office"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Courtney A. Howard Detailed to the U.S. Attorney's Office 601 D Street NW Washington DC 20001



# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Seven          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 101 Filed 12/20/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL DISCOVERY UNDER RULE 16 AND BRADY V. MARYLAND**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12, **Conclusion** Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 101 Filed 12/20/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL DISCOVERY UNDER RULE 16 AND BRADY V. MARYLAND**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12, **Conclusion** Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 101 Filed 12/20/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL DISCOVERY UNDER RULE 16 AND BRADY V. MARYLAND**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12, **Conclusion** Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104



## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Eleven          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 62 Filed 01/11/12 Page 1 of 22 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91 (RCL) DEFENDANT ISAAC STURGEON'S REPLY IN FURTHER SUPORT OF HIS MOTION TO DISMISS COUTNS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT**, Page 2 of 22, Page 3 of 22, Page 4 of 22, Page 5 of 22, Page 6 of 22, Page 7 of 22, Page 8 of 22, Page 9 of 22, Page 10 of 22, Page 11 of 22, Page 12 of 22, Page 13 of 22, Page 14 of 22, Page 15 of 22, Page 16 of 22, Page 17 of 22, Page 18 of 22, Page 19 of 22, Page 20 of 22, Page 21 of 22 **CONCLUSION**, Page 22 of 22 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 62 Filed 01/11/12 Page 1 of 22 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91 (RCL) DEFENDANT ISAAC STURGEON'S REPLY IN FURTHER SUPORT OF HIS MOTION TO DISMISS COUTNS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT**, Page 2 of 22, Page 3 of 22, Page 4 of 22, Page 5 of 22, Page 6 of 22, Page 7 of 22, Page 8 of 22, Page 9 of 22, Page 10 of 22, Page 11 of 22, Page 12 of 22, Page 13 of 22, Page 14 of 22, Page 15 of 22, Page 16 of 22, Page 17 of 22, Page 18 of 22, Page 19 of 22, Page 20 of 22, Page 21 of 22 **CONCLUSION**, Page 22 of 22 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 62 Filed 01/11/12 Page 1 of 22 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91 (RCL) DEFENDANT ISAAC STURGEON'S REPLY IN FURTHER SUPORT OF HIS MOTION TO DISMISS COUTNS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT**, Page 2 of 22, Page 3 of 22, Page 4 of 22, Page 5 of 22, Page 6 of 22, Page 7 of 22, Page 8 of 22, Page 9 of 22, Page 10 of 22, Page 11 of 22, Page 12 of 22, Page 13 of 22, Page 14 of 22, Page 15 of 22, Page 16 of 22, Page 17 of 22, Page 18 of 22, Page 19 of 22, Page 20 of 22, Page 21 of 22 **CONCLUSION**, Page 22 of 22 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

COPY

Notice Date:          Day: Eleven          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 56 Filed 12/13/21 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO ADOPT AND JOIN MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE & SIX OF THE SUPERSEDING INDICTMENT <u>FILED BY CO-DEFENDANT ISAAC STEVE STURGEON (Doc. 55)</u>,** Page 2 of 2 Respectfully submitted Allen H. Orenberg Counsel for Craig M. Bingert Dated: December 13 2021"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 56 Filed 12/13/21 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO ADOPT AND JOIN MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE & SIX OF THE SUPERSEDING INDICTMENT <u>FILED BY CO-DEFENDANT ISAAC STEVE STURGEON (Doc. 55)</u>,** Page 2 of 2 Respectfully submitted Allen H. Orenberg Counsel for Craig M. Bingert Dated: December 13 2021" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 56 Filed 12/13/21 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO ADOPT AND JOIN MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE & SIX OF THE SUPERSEDING INDICTMENT <u>FILED BY CO-DEFENDANT ISAAC STEVE STURGEON (Doc. 55)</u>,** Page 2 of 2 Respectfully submitted Allen H. Orenberg Counsel for Craig M. Bingert Dated: December 13 2021"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day:Nine          Month: Three          Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 104 Filed 12/21/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Case No. 21-091 (RCL) **DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO SEVER MR. STURGEON'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Case No. 21-091 (RCL) **ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Case No. 21-091 (RCL) **ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Four     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 115 Filed 03/03/23 Page 1 of 3 COPY **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR** <u>SEVERANCE [110] SCHEDULED FOR MARCH 9 2023</u>, Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 <u>CERTIFICATE OF SERVICE</u> Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 <u>ORDER</u>"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 115 Filed 03/03/23 Page 1 of 3 COPY **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR** <u>SEVERANCE [110] SCHEDULED FOR MARCH 9 2023</u>, Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 <u>CERTIFICATE OF SERVICE</u> Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 <u>ORDER</u>" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 115 Filed 03/03/23 Page 1 of 3 COPY **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR** <u>SEVERANCE [110] SCHEDULED FOR MARCH 9 2023</u>, Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 <u>CERTIFICATE OF SERVICE</u> Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 <u>ORDER</u>"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

**COPY**

Notice Date:          Day:Nine          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 88 Filed 11/06/22 Page 1 of 2 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 NOTICE OF PUBLIC AUTHORITY DEFENSE Respectfully Submitted Allen H. Orenberg, Page 2 of 2 Dated: November 6, 2022"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 88 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01** NOTICE OF PUBLIC AUTHORITY DEFENSE Respectfully Submitted Allen H. Orenberg, Page 2 of 2 Dated: November 6, 2022" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 88 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01** NOTICE OF PUBLIC AUTHORITY DEFENSE Respectfully Submitted Allen H. Orenberg, Page 2 of 2 Dated: November 6, 2022"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day:Nine          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 89 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES FOR THE DISTRICT OF COLUMBIA** Case No. **1:21-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER**, Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 89-1 Filed 11/06/22 Page 1 of 1 **ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 89 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER**, Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 89-1 Filed 11/06/22 Page 1 of 1 **ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 89 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER**, Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 89-1 Filed 11/06/22 Page 1 of 1 **ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Nine          Month: Three       Year: 2023 CE



Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 15 Filed 02/17/21 Page 1 of 1 UNITED STATES DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C. Assign Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** Date 02/05/2021 G. Michael Harvey Digitally signed G. Michael Harvey U.S. Magistrate Judge, Return This warrant was received on *(date)* 2-05-2021 and the person was arrested on *(date)* 2-11-2021 at *(city and state)* Kingston WA Date: 2-11-2021"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 15 Filed 02/17/21 Page 1 of 1 UNITED STATES DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C. Assign Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** Date 02/05/2021 G. Michael Harvey Digitally signed G. Michael Harvey U.S. Magistrate Judge, Return This warrant was received on *(date)* 2-05-2021 and the person was arrested on *(date)* 2-11-2021 at *(city and state)* Kingston WA Date: 2-11-2021" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 15 Filed 02/17/21 Page 1 of 1 UNITED STATES DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C. Assign Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** Date 02/05/2021 G. Michael Harvey Digitally signed G. Michael Harvey U.S. Magistrate Judge, Return This warrant was received on *(date)* 2-05-2021 and the person was arrested on *(date)* 2-11-2021 at *(city and state)* Kingston WA Date: 2-11-2021"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: G Michael Harvey, U.S. Magistrate Judge, 333 Constitution Avenue NW Washington, D.C. 20001

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

**Notice Date:**          Day:Nine          **Month: Three**          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 90 Filed 11/07/22 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL) DEFENDANT ISAAC STURGEON'S MOTION FOR JOINDER,** Page 2 of 2 A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Case 1:21-cr-00091-RCL Document 90-1 Filed 11/07/22 Page 1 of 1 **ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 90 Filed 11/07/22 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL) DEFENDANT ISAAC STURGEON'S MOTION FOR JOINDER,** Page 2 of 2 A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Case 1:21-cr-00091-RCL Document 90-1 Filed 11/07/22 Page 1 of 1 **ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 90 Filed 11/07/22 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL) DEFENDANT ISAAC STURGEON'S MOTION FOR JOINDER,** Page 2 of 2 A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Case 1:21-cr-00091-RCL Document 90-1 Filed 11/07/22 Page 1 of 1 **ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day:Nine          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Twenty-One     Month: Two     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 113 Filed 02/15/23 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 MOTION TO REUEST THE COURT <u>TO SCHEDULE A STATUS HEARING</u>, Page 2 of 3, Page 3 of 3 Allen H. Orenberg, Case 1:21-cr-009-RCL Document 113-1 Filed 02/15/23 Page 1 of 1"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "**Case 1:21-cr-00091-RCL Document 113 Filed 02/15/23 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 MOTION TO REUEST THE COURT <u>TO SCHEDULE A STATUS HEARING</u>**, Page 2 of 3, Page 3 of 3 Allen H. Orenberg, Case 1:21-cr-009-RCL Document 113-1 Filed 02/15/23 Page 1 of 1" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 113 Filed 02/15/23 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 MOTION TO REUEST THE COURT <u>TO SCHEDULE A STATUS HEARING</u>, Page 2 of 3, Page 3 of 3 Allen H. Orenberg, Case 1:21-cr-009-RCL Document 113-1 Filed 02/15/23 Page 1 of 1"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

RECEIVED
Mail Room

FEB 27 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

COPY

"Accepted" FEB 21 2023

Taylor James Johnatakis

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  :
                :
    v.           :    Case No. 1:21-cr-0091-RCL-01
                :
CRAIG MICHAEL BINGERT, et al. :
    Defendant.      :
                :

## MOTION TO REQUEST THE COURT
## TO SCHEDULE A STATUS HEARING

COMES NOW Defendant, Craig Michael Bingert, by and through undersigned counsel, and respectfully moves this Honorable Court to schedule a status hearing on a date and time convenient to the Court and to the parties. As grounds, the following is stated:

1.    This motion is joined by counsel for defendant Isaac S. Sturgeon and the government does not oppose this motion.  On February 13, 2023, undersigned counsel sent an e-mail to defendant Taylor J. Johnatakis, requesting his position on this motion. On February 15, 2023, Mr. Johnatakis replied via e-mail, stating, "All, Please communicate with by mail only. Look for my reply by mail shortly."

2.    Trial of this matter is scheduled for May 15, 2023.  The Court has not yet scheduled a pre-trial conference, or any other hearing dates. Furthermore, the Court has not issued a Scheduling Order in anticipation of trial.

3.    At this time the following pre-trial motions are pending:

- Motion to Sever Defendant by Isaac Steve Sturgeon. (Doc. 79)
- Motion to Change Venue by Isaac Steve Sturgeon. (Doc. 82)

-1-

- Motion to Compel Discovery by Isaac Steve Sturgeon. (Doc. 83)

- Motion for Joinder of Co-defendant Sturgeon's Motions Nos. 82 & 83 by Craig Michael Bingert. (Doc. 86)

- Motion to Dismiss Count 4, 5, 6, 7, & 8 as Multiplicitous by Craig Michael Bingert. (Doc. 87)

- Motion for Joinder to Join Defendant Issac Steve Sturgeon's Motion for Severance (Dkt. 79) by Craig Michael Bingert. (Doc. 89)

- Motion for Joinder by Isaac Steve Sturgeon. (Doc. 90)

- Motion to Sever Defendant Pursuant to Fed. R. Crim. P 14(a) by Craig Michael Bingert. (Doc. 110)

In addition, defendants Bingert and Sturgeon have each filed a Notice of Public Authority Defense. (Docs. 84 & 88).

WHEREFORE for the foregoing reasons and such other reasons that may appear just and proper, the parties are requesting the Court to schedule a status hearing, on a date and time convenient to the Court and to the parties.

Respectfully Submitted,

Allen H. Orenberg
Digitally signed by Allen H. Orenberg
Date: 2023.02.15 14:08:41 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Mr. Craig Michael Bingert

-2-

"Accepted" FEB 21 2023

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of February, 2023,  copies of the foregoing  Motion to Request the Court to Schedule a Status Hearing, and a proposed Order, were served to case registered parties by CM/ECF, and by mail to:

Taylor James Johnatakis
29628 Gamble Place NE
Kingston, Washington 98346-9560

Allen H. Orenberg

Digitally signed by Allen H. Orenberg
Date: 2023.02.15 14:09:01 -05'00'

Allen H. Orenberg, # 395519

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COPY

UNITED STATES OF AMERICA,  :
           :
 v.          :
           :  Case No. 1:21-cr-0091-RCL-01
CRAIG MICHAEL BINGERT, et al. :
 Defendant.     :

## ORDER

Upon consideration of the motion requesting the Court to schedule a status hearing filed by defendant Craig Michael Bingert, and for good cause shown, it is hereby this _____ day of _____, 2023, the motion is GRANTED.

The Clerk of Court is instructed to consult with the parties to schedule a status hearing.

_____
Judge,
U. S. District Court for the District of Columbia

"Accepted"
"Accepted"
FEB 21 2023
Taylor James Johnstone

1

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day:Nine     Month: Three     Year: 2023 CE

COPY

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 87 Filed 11/06/22 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO DISMISS COUNTS 4 5 6 7 & 8 AS MULTIPLICITOUS WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES, Page 2 of 3, Page 3 of 3 Respectfully Submitted Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 87-1 Filed 11/06/22 Page 1 of 1 ORDER"

PLEASE TAKE NOTICE that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 87 Filed 11/06/22 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO DISMISS COUNTS 4 5 6 7 & 8 AS MULTIPLICITOUS WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES, Page 2 of 3, Page 3 of 3 Respectfully Submitted Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 87-1 Filed 11/06/22 Page 1 of 1 ORDER" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 87 Filed 11/06/22 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO DISMISS COUNTS 4 5 6 7 & 8 AS MULTIPLICITOUS WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES, Page 2 of 3, Page 3 of 3 Respectfully Submitted Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 87-1 Filed 11/06/22 Page 1 of 1 ORDER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:

Day: Twenty-One

Month: Two

Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 113 Filed 02/15/23 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 MOTION TO REUEST THE COURT TO SCHEDULE A STATUS HEARING, Page 2 of 3, Page 3 of 3 Allen H. Orenberg, Case 1:21-cr-009-RCL Document 113-1 Filed 02/15/23 Page 1 of 1"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "**Case 1:21-cr-00091-RCL Document 113 Filed 02/15/23 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 MOTION TO REUEST THE COURT TO SCHEDULE A STATUS HEARING**, Page 2 of 3, Page 3 of 3 Allen H. Orenberg, Case 1:21-cr-009-RCL Document 113-1 Filed 02/15/23 Page 1 of 1" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 113 Filed 02/15/23 Page 1 of 3 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 MOTION TO REUEST THE COURT TO SCHEDULE A STATUS HEARING, Page 2 of 3, Page 3 of 3 Allen H. Orenberg, Case 1:21-cr-009-RCL Document 113-1 Filed 02/15/23 Page 1 of 1"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:    Day: Sixteen    Month: Two    Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 99 Filed 12/08/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL** <u>ORDER</u> Date: 12/6/22 Royce C. Lamberth"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 99 Filed 12/08/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL** <u>ORDER</u> Date: 12/6/22 Royce C. Lamberth" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 99 Filed 12/08/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL** <u>ORDER</u> Date: 12/6/22 Royce C. Lamberth"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Fifteen        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE" "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE""** and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE""

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Sixteen          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 99 Filed 12/08/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL** <u>ORDER</u> Date:" 12/6/22 Royce C. Lamberth"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 99 Filed 12/08/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL** <u>ORDER</u> Date: 12/6/22 Royce C. Lamberth" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 99 Filed 12/08/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL** <u>ORDER</u> Date: 12/6/22 Royce C. Lamberth"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

Page 1 of 1



RECEIVED
Mail Room

FEB 2 2 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

"Accepted"

FEB 16 2023

*Taylor James Johnatakis*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

**Case No.: 1:21-cr-00091-RCL**

CRAIG MICHAEL BINGERT, ISAAC
STEVE STURGEON, and TAYLOR
JAMES JOHNATAKIS,

        Defendants.

### ORDER

Upon consideration of the United States' unopposed motion for leave to file certain transcripts under seal, the Court finds that filing the transcripts under seal in this case is necessary to ensure compliance with the Court's "Transcript Filing Instructions for Attorneys and Pro Se Litigants" effective May 19, 2008 (available at https://www.dcd.uscourts.gov/sites/dcd/files/Transcript-Policy.pdf). Accordingly, it is hereby

ORDERED that the motion is GRANTED. It is further

ORDERED that the transcripts of the voir dire proceedings in *United States v. Webster*, No. 21-cr-208 shall be, and hereby are, accepted for filing under seal in this case. It is further

ORDERED that nothing herein shall affect the public availability of the above-referenced transcripts.

Date:   12/6/22

                          The Honorable Royce C. Lamberth
                          UNITED STATES DISTRICT JUDGE

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day: Fifteen        Month: Two        Year: 2023 CE

Angela D. Caesar

Clerk of Court United States District Court District of Columbia

333 Constitution Avenue N.W.

Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 110 Filed 01/29/23 Page 1 of 6 UNITED STATES DISTRICT COURT FOR THE DISTRICT Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S MOTION FOR SEVERANCE OF DEFENDANT PUSUANT TO FED. R. CRIM. P. 14(a) WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 Respectfully Submitted Allen H. Orenberg Counsel for Mr. Craig Michael Bingert"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 110 Filed 01/29/23 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S MOTION FOR SEVERANCE OF DEFENDANT PUSUANT TO FED. R. CRIM. P. 14(a) WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 Respectfully Submitted Allen H. Orenberg Counsel for Mr. Craig Michael Bingert" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

FEB 2 1 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis

℅ 29628 Gamble PL NE

Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 110 Filed 01/29/23 Page 1 of 6 UNITED STATES DISTRICT COURT FOR THE DISTRICT Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S MOTION FOR SEVERANCE OF DEFENDANT PUSUANT TO FED. R. CRIM. P. 14(a) WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 Respectfully Submitted Allen H. Orenberg Counsel for Mr. Craig Michael Bingert"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day:Nine        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 104 Filed 12/21/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) <u>DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO SEVER MR. STURGEON'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS</u>**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) <u>ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE</u>**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) <u>ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE</u>**, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia
MAR 16 2023
RECEIVED
Mail Room

"Accepted"

MAR 0 9 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 21-091 (RCL) |
| | ) | |
| ISAAC STEVE STURGEON, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION SEVER MR. STURGEON'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS

Defendant, Isaac Sturgeon, through counsel, respectfully submits this reply to the government's opposition to the defendant's request to sever the defendants. *See* ECF No. 91 ("Gov. Opp."). For the reasons stated below, the Court should grant a severance pursuant to Fed. R. Crim. P. 8(b), Rule 14, and other applicable law.

## ARGUMENT

January 6 trials have now been conducted for the past two years. Individual trials have become the norm – not mass trials as the government is trying to do in this case. Saving time and resources does not outweigh a defendant's right to a fair trial. Sturgeon, Bingert, and Johnatakis did not "work together" as the government suggests. Rather, they were simply at the same place at the same time. That is just not enough for any type of joinder. Most importantly, Mr. Sturgeon is not requesting this severance as an academic exercise. Rather, he faces trial on serious

1

"Accepted"

MAR 09 2023

*Taylor James Johnatakis*

charges and his life and liberty are on the line. Mr. Sturgeon will most certainly not have a fair trial if the defendants remain joined.

## I. The defendants are improperly joined under Rule 8(b)

The government in its response asserts that joinder is appropriate because all three defendants participated in the same "series of acts." *See* Gov. Opp. at 9-10. As an initial matter, the government did not address each count of the indictment and only claims that they all committed a Civil Disorder, an Assault, and an Obstruction of an official proceeding together. In any event, the government leaves out the most important well settled D.C. law and that is that the "series or transactions" *must have a logical relationship* between them. *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984) (emphasis added). Even by the government's account of the evidence, there is no relationship between the defendants or what they allegedly did. The government claims they acted in unison and "followed the directions of Johnatakis." *See* Gov. Opp. at 9-10. That claim is *sheer make believe* and is not supported by the evidence. Not only was there no verbal communication between the defendants but there also was no non-verbal communication suggesting unity – such as a head nod for example.

The government's argument stretches credulity, especially when taking a look at one of the screen shots it provided in its response.

"Accepted"

MAR 09 2023



*Taylor James Johnatakis*

    The individual circled in black to the right of Mr. Sturgeon is theoretically a part of the same "series of transactions." So why is it that Mr. Sturgeon is included in Bingert and Johnatakis's indictment and not the individual who is just as close to him who theoretically would have heard Johnatakis's voice too? The government attempts to ignore its arbitrary decision to join these three defendants by claiming that "Rule 8 is permissive, not mandatory...and not just premised on the simple fact that each defendant participated generally in the riot...but also on the fact that these three defendants worked together...using the same implement...a metal barricade." *See* Gov. Opp. at 11. However, as we can see from this photograph, the individual circled in black is also using the same "implement," a metal barricade. There is no justifiable reason to join these three defendants specifically when there is no logical relationship other than proximity to one another.

    The government offers only the promise to save the Court from overlapping evidence as it asserts that most of the evidence will be the same. *Id.* Besides the testimony from the alleged victim officers (which likely will be minimal), that assertion is true in every single January 6 trial – yet here we are with 800+ cases which all will have substantial overlapping evidence at trial. Saving the court two more trials out of hundreds at the expense of these defendants' rights is

nonsensical.

The government next asserts that joinders are not only appropriate in conspiracy cases but fails to acknowledge that most criminal trials in which defendants are joined are conspiracy cases. *See, e.g., United States v. Mason*, 951 F.3d 567, 575 (D.C. Cir. 2020) ("The indictment's allegation that [the defendants] conspired to distribute drugs made joinder of their trials proper": "'The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense.'" (quotation omitted)); *United States v. Bostick*, 791 F.3d 127, 145 (D.C. Cir. 2015) (Kavanaugh, J.) ("D.C. offenses were committed in furtherance of the charged drug conspiracy or were predicate acts committed in furtherance of the charged RICO conspiracy, or both"); *United States v. (George) Wilson*, 605 F.3d 985, 997 (D.C. Cir. 2009) (per curiam) (conspiracy and RICO conspiracy case); *United States v. Carson*, 455 F.3d 336, 373 (D.C. 2005) (per curiam) ("all of these counts were overt acts in furtherance of the narcotics conspiracy and predicate acts in furtherance of the RICO conspiracy"); *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. 1996) (per curiam) ("all of the defendants participated in a single conspiracy ... joinder of the defendants was proper"), *amended*, 102 F.3d 1245 (D.C. 1997); *United States v. (Lance) Wilson*, 26 F.3d 142, 153-54 (D.C. 1994) (defendants were indicted and unindicted co-conspirators in same conspiracies); *United States v. Delpit*, 94 F.3d 1134, 1142-43 (8th Cir. 1996) (interconnected drug conspiracies and evidence sole defendant not alleged part of conspiracy was hired as

contract killer to advance the conspiracy); *United States v. Eiland*, 406 F. Supp.2d 46, 50 (D.D.C. 2005) ("While each defendants' alleged role in the overall scheme may vary, all counts relate either directly or indirectly to the underlying conspiracy."); *United States v. Hubbard*, 474 F. Supp. 64, 87 (D.D.C. 1979) (joinder proper of overlapping and interlocking charges related to one conspiracy to collect data and the other conspiracy to cover-up unlawful data collection); *United States v. Moore*, 216 F. Supp.3d 566, 584 (E.D. Pa. 2016) ("The presence of a conspiracy count linking the two bank robberies made the initial joinder of the offenses appropriate.").

The government also does not even try to distinguish Supreme Court precedent that announced a warning when dealing with joinder in *non-conspiracy* cases:

> Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for the prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth.

*Kotteakos v. United States*, 328 U.S. 750, 773 (1946). The government does not heed this warning and provides mostly cases where joinder was permitted in *conspiracy* cases.

Lastly, the charge of Civil Disorder is not the same as a conspiracy as the government claims. *See* Gov. Opp. at 10. There is nothing in the language of 18 U.S.C. §231(3) that requires defendants to act in concert with one another. The

"Accepted"

MAR 09 2023

Taylor James Johnatakis

definition of "civil disorder" only requires three or more persons to be present but says nothing about working towards a common goal or scheme. Again, any of the defendants present on the Capitol Grounds would suffice under the definition of civil disorder and we do not have an 800 co-defendant trial.

## II. Even if the Court finds that it *could* join the defendants, the Court should sever Mr. Sturgeon's trial from his co-defendants to protect his substantive rights.

The government did not address the most important concern of joinder in this case and that is the result of an unfair trial. The government simply at the end of its response says, "Defendants also utterly fail to identify any potential prejudice that they will suffer..." *See* Gov. Opp. at 12. However, in asserting that conclusion, the government ignores the defense's position and Supreme Court precedent. The government also ignores the fact that Mr. Johnatakis has announced his intention to represent himself at trial.

The Supreme Court has observed that severance of properly joined defendants is appropriate where, as here, there the dangers for "transference of guilt from one defendant to another...are so great that no one can really say prejudice to a substantial right has not taken place." *Kotteakos*, 328 U.S. at 750. The D.C. District Court reiterated the Supreme Court's concerns that this risk is "heightened" when, for example, "many defendants are tried together...and they have markedly different degrees of culpability." *United States v. Franklin*, 2005 WL 8157514 *2 (D.D.C. Dec. 16, 2005) (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). In *Franklin*, the district court also observed the D.C. Circuit's instruction

6

that severance is required when "evidence against one defendant is far more damaging than the evidence against the other defendants." *Id.* at *3 (quoting *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991)).

There is just simply no doubt here that Mr. Johnatakis's allegations and evidence against him bear a far greater degree of culpability than for Mr. Sturgeon. Johnatakis is alleged to be on video surveillance encouraging the crowd to press on forward to push past the police line. There is no such allegation against Mr. Sturgeon – as he was essentially silent the entire time he was on the Capitol grounds. The joinder of these defendants would prejudice Mr. Sturgeon because it would be difficult for the jury to compartmentalize the evidence against each of them to judge independently. *Franklin*, 2005 WL 8157514 *3 (the critical question is "whether a jury could reasonably compartmentalize the evidence introduced against each defendant.") (quoting *Halliman*, 923 F.2d at 884). Mr. Sturgeon would not receive a fair trial if joined with the other co-defendants because the evidence against them, specifically Johnatakis would have a "spillover" effect causing the jury to implicate Mr. Sturgeon and would "prevent the jury from making a reliable judgment about [his] guilt or innocence." *Id.* at *15 (quoting *Zafiro*, 506 U.S. at 539).

Furthermore, Mr. Johnatakis has announced his wish to represent himself. In doing so, there is no telling what kinds of evidence he will attempt to present at trial. *See* ECF Nos. 72, 76, 88, 78. The effects of his self-representation will undoubtedly have a spill-over effect on Mr. Sturgeon and prejudice him in front the

jury. *See United States v. Tucker*, 12 F.4th 804, 815-16 (D.C. Cir. 2021). In *Tucker*, the district court denied a defendant's request to represent himself mid trial and recognized the harmful effects it would have on the other co-defendants, especially given the defendant's unwarranted hostility he showed to fair proceedings. *Id.* The court quoted the Eleventh Circuit saying "a trial involving a *pro se* defendant and co-defendants who are assisted by counsel is pregnant with the possibility of prejudice." *Id.* (quoting *United States v. Veteto*, 701 F.2d 136, 139 (11th. Cir. 1983)). Although Mr. Johnatakis has the right to represent himself, the Court must acknowledge the inevitable harmful effects it will have on Mr. Sturgeon who will want his arguments to be meritorious in front of the jury and not clouded by other potentially frivolous arguments made by a *pro se* defendant. In addition, cross-examination of government witnesses and re-direct by the government will undoubtedly open the door to testimony successfully suppressed by represented counsel through objection practice – only to be unraveled by a pro se defendant who does not have knowledge of the rules of evidence.

For these reasons, prejudice will surely result from a joined trial in this matter as the jury will be unable "to consider each defendant's case separately" because the error that resulted permeated the atmosphere throughout the entire trial. *Kotteakos*, 328 U.S. at 769-70.

## Conclusion

Based on the compelling factors above, Mr. Sturgeon respectfully requests

Case 1:21-cr-00091-RCL Document 104 Filed 12/21/22 Page 9 of 9

"Accepted"

that the Court sever Mr. Sturgeon's case from his co-defendants as they are MAR 04 2023

unrelated to him and joinder would result in serious prejudice.

*Taylor James Johnstone*

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500
Maria_Jacob@fd.org

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Eleven     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 56 Filed 12/13/21 Page 1 of 2 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO ADOPT AND JOIN MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE & SIX OF THE SUPERSEDING INDICTMENT FILED BY CO-DEFENDANT ISAAC STEVE STURGEON (Doc. 55), Page 2 of 2 Respectfully submitted Allen H. Orenberg Counsel for Craig M. Bingert Dated: December 13 2021"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 56 Filed 12/13/21 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO ADOPT AND JOIN MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE & SIX OF THE SUPERSEDING INDICTMENT FILED BY CO-DEFENDANT ISAAC STEVE STURGEON (Doc. 55)**, Page 2 of 2 Respectfully submitted Allen H. Orenberg Counsel for Craig M. Bingert Dated: December 13 2021" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 56 Filed 12/13/21 Page 1 of 2 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO ADOPT AND JOIN MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE & SIX OF THE SUPERSEDING INDICTMENT FILED BY CO-DEFENDANT ISAAC STEVE STURGEON (Doc. 55), Page 2 of 2 Respectfully submitted Allen H. Orenberg Counsel for Craig M. Bingert Dated: December 13 2021"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia
RECEIVED Mail Room
MAR 16 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**"Accepted"**
*Taylor James Johnston*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Case No. 21-cr-0091-RCL-01 |
| | : | |
| CRAIG MICHAEL BINGERT, et al., | : | |
| Defendant. | : | |

## DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO ADOPT AND JOIN MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE & SIX OF THE SUPERSEDING INDICTMENT FILED BY CO-DEFENDANT ISAAC STEVE STURGEON (Doc. 55)

COMES NOW defendant, Craig Michael Bingert, by and through his undersigned counsel, Allen H. Orenberg, Esquire, and hereby respectfully moves this Court for the entry of an Order granting leave to adopt and join, the Motion to Dismiss Counts One, Three, Four, Five & Six of the Superseding Indictment Filed by co-defendant Isaac Steve Sturgeon. (Doc. 55)

The facts and circumstances set forth in the co-defendant's motion to dismiss are equally and specifically applicable to Craig M. Bingert in this prosecution. And the legal arguments and authorities set forth in the co-defendant's motion are those which defendant Craig M. Bingert would have cited, had he filed a separate motion. It would be entirely duplicative for this defendant to expend compensable and considerable time preparing and filing this motion which would be identical to the motion filed by his co-defendant, Isaac Steve Sturgeon.

WHEREFORE, for the foregoing reasons and such other reasons that may appear just and proper, defendant Craig M. Bingert respectfully moves for the entry of an Order granting leave to adopt and join, the above-referenced motion to dismiss (Doc. 55) filed by his co-defendant, Isaac Steve Sturgeon.

"Accepted"

MAR 11 2023

Respectfully submitted,

*Taylor James Johnatakis*

_____/s/_____

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cellphone (301-807-3847)
aorenberg@orenberglaw.com

Counsel for Craig M. Bingert

Dated: December 13, 2021

2

COPY

"Accepted"

FEB 15 2023

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   :
                               :
   **v.**                     :     **Case No. 1:21-cr-0091-RCL-01**
                               :
CRAIG MICHAEL BINGERT, et al. :
   **Defendant.**              :

## DEFENDANT CRAIG MICHAEL BINGERT'S
## MOTION FOR SEVERANCE OF DEFENDANT PURSUANT
## TO FED. R. CRIM. P. 14(a) WITH INCORPORATED
## MEMORANDUM OF POINTS AND AUTHORITIES

COMES NOW Defendant, Craig Michael Bingert, by and through undersigned counsel, and pursuant to Rule14(a) of the Federal Rules of Criminal Procedure, hereby respectfully moves this Honorable Court for the entry of an Order of severance for trial. Mr. Bingert requests a separate trial be ordered for him (and co-defendant Isaac Steve Sturgeon) apart from co-defendant Taylor James Johnatakis. As grounds, the following is stated:

Co-defendant Isaac Steve Sturgeon joins this motion, by his counsel. It is believed that the government will oppose this motion.

It is counsel's understanding that on or about August 9, 2023, the Court granted co-defendant Taylor James Johnatakis leave to proceed *pro se.* (Attorney Chris Black is now stand-by counsel.) [1]

---

[1]    A review of the Court Docket does not reveal a Court entry permitting Mr. Johnatakis to proceed *pro se.* However, attorney Chris Black has recently informed undersigned counsel that it is his recollection the Court granted the motion to proceed *pro se* during the August 9, 2022, status hearing.

Trial is schedule to commence on May 15, 2023.

Fed. R. Crim P. 14(a) allows that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Mr. Bingert believes that by allowing Mr. Johnatakis to proceed to trial, *pro se,* it will irreparably prejudice Mr. Bingert (and his co-defendant), inasmuch as Mr. Johnatakis's apparent lack of legal training and utter lack of trial experience will likely be unseemly, and/or confuse the jury, and/or blur the issues before the jury thus compromising Mr. Bingert's right to a fair trial. And, not knowing the rules of criminal procedure and/or the rules of evidence, the Court or the stand by counsel will have to constantly educate Mr. Johnatakis on these vital rules which will cause undue delay in the trial prejudicing the Mr. Bingert ( and Mr. Sturgeon) as well as the prejudicial spill over effect of his false steps, fumbling, etc.

And, Mr. Johnatakis "may conduct his own defense ultimately to his own detriment," *Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1976), but his co-defendants should not likewise be deprived of their right to a fair trial by his so doing.

The U.S. Supreme Court has made clear that severance should be ordered when "there is a serious risk that a joint trial would compromise a specific trial

-2-

right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

Counsel has researched the applicable case law and has not found any reported D.C. District Court decisions cases concerning a *pro se* defendant's pretrial decision to proceed *pro se* could prejudice other co-defendants.

However, on January 20, 2023, Judge Amit P. Mehta of this Court ordered a separate trial for a *pro se* defendant in a January 6th trial: *United States v. James Beeks*, 21-cr-00028-APM-19. Undersigned counsel has recently spoken with stand-by counsel for defendant Beeks, who informs that one of the reasons a separate trial was ordered was to avoid potential prejudice to other co-defendants who are proceeding to trial in the near future.

Although a written Order (or a Minute Order) to this effect has not yet been docketed,[2] this Court may consider the reasoning of Judge Mehta (to avoid potential prejudice to other co-defendants) and similarly order a trial severance for Mr. Johnatakis.

And, on January 25, 2023, Judge Carl J. Nichols of this Court ordered a separate trial for a *pro se* defendant in another January 6th trial: *United States v. Jonathan Daniel Pollock*, et. al., 21-447-CJN. Judge Nichols granted a motion for severance of *pro se* defendant Joseph Daniel Hutchinson, III, because of the

---

[2]        As of the date/time of the filing of this instant  Severance Motion, the docket in 21-cr-00028-APM-19 has not been updated to reflect the Court's activity on January 20, 2023.

-3-

"Accepted" FEB 15 2023

potential of prejudice to the other co-defendants if all were tried together.[3]

Furthermore, in *United States v. Tucker*, 12 F.4th 804, 815–16(D.C. Cir. 2021) the D.C. Circuit considered the District Court's decision to deny a defendant's mid-trial decision to go *pro se* based on potential prejudice to co-defendants. When affirming the District Court"s decision to deny (defendant Fields) the request to proceed *pro se,* The D.C. Circuit observed in *Tucker:* "A trial involving a *pro se* defendant and co-defendants who are assisted by counsel is pregnant with the possibility of prejudice." *United States v. Veteto*, 701 F.2d 136, 139 (11th Cir. 1983) *Id.* At 816. *See also, United States v. Maxwell*, No. 5:15-cr-35-2, 2017 WL 6055785, at * 1 (M.D. Ga. Feb. 2, 2017) (granting motion to sever where pro se defendant had a history of disruptive behavior).

It is submitted that severing Mr. Johnatakis from the trial of Mr. Bingert and his co-defendant Mr. Sturgeon at this time (some fifteen weeks before commencement of trial) will not prejudice the Court and the parties.

## CONCLUSION

Notwithstanding the presence of stand-by counsel, there is a distinct possibility that Mr. Johnatakis's conduct at trial will be unseemly, confusing and he will otherwise blur the issues before the jury. This type of prejudice to Mr. Bingert (and to his co-defendant should) not be allowed by this Court. Fed. R. Crim. P. Rule

---

[3] In 21-447-CJN, undersigned counsel represents co-defendant Joshua C. Doolin and, accordingly, participated in the January 25, 2023 hearing when Judge Nichols orally announced his decision/reasons to sever the *pro se* defendant.

14(a) safeguard defendants from the prejudicial effects of joined defendants and, as argued herein, even more so when a co-defendant is proceeding to trial *pro se*.

WHEREFORE for the foregoing reasons and such other reasons that may appear just and proper, defendant Joshua Christopher Bingert,(and co-defendant Isaac Steve Sturgeon)  respectfully requests that his motion for a trial severance be granted – and a separate trial be ordered apart from co-defendant Taylor James Johnatakis.

Respectfully Submitted,

# Allen H. Orenberg

Digitally signed by Allen H. Orenberg
Date: 2023.01.29 14:37:48 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Mr. Craig Michael Bingert

"Accepted" FEB 15 2023

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of January, 2023, copies of the foregoing

Motion for Severance and a proposed Order, were served to case registered parties

by CM/ECF, and by mail to:

Taylor James Johnatakis
29628 Gamble Place NE
Kingston, Washington 98346-9560

Allen H. Orenberg

Digitally signed
by Allen H.
Orenberg
Date: 2023.01.29
14:38:25 -05'00'

Allen H. Orenberg, # 395519

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Fifteen        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE" "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE""** and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

RECEIVED
Mail Room

**FEB 2 1 2023**

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Attachment: "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDENT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE""**

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C.  20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854



COPY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,　　:
　　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　:　　Case No. 1:21-cr-0091-RCL-01
　　　　　　　　　　　　　　　　　　　:
CRAIG MICHAEL BINGERT, et al.　:
Defendant.　　　　　　　　　　　　:

RECEIVED
Mail Room

**FEB 2 1 2023**

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

### DEFENDANT CRAIG MICHAEL BINGERT'S REPLY
### TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S
### NOTICE  THE "PUBLIC AUTHORITY DEFENSE" AND/OR
### <u>"ENTRAPMENT BY ESTOPPEL DEFENSE"</u>

Defendant Craig Michael Bingert, by and through his attorney, Allen H. Orenberg, respectfully submits this reply to the governments response (Doc. 96) to the defendant's Notice of Public Authority Defense and/or entrapment by estoppel defense. (Doc. 88) [1]

To be certain, Mr. Doolin asserts a Public Authority Defense as to all Counts of the Indictment, as well as an entrapment by estoppel defense as to all Counts.

### <u>BACKGROUND FACTS</u>

The U.S. Capitol had barriers restricting its grounds removed by a group of rioters long before Mr. Bingert arrived. In fact, barriers were gone before then-President Trump finished speaking at the Ellipse that day. The barriers were the

---

[1]   Defendant Isaac Steve Sturgeon, by his counsel, joins in this reply..

only demarcation that U.S. Capitol grounds were restricted. By the time Mr. Bingert arrived, Mr. Bingert was on U.S. Capitol grounds among an estimated 10,000 others.

Many parts of the District of Columbia (and, in particular near and around the U.S. Capitol) had been lawfully permitted for First Amendment Assembly on January 6. (See Exhibits A - F).[2] Mr. Bingert believed that Capitol grounds were similarly permitted and unrestrained. Mr. Bingert never entered the Capitol.

To be clear, Mr. Bingert does not use the public authority and/or entrapment by estoppel defense to lawfully sanction the attack on the United States Capitol. However, the public authority defense does apply to all the counts Mr. Bingert is charged with because the instruction to go to the Capitol from President Trump was an instruction to join with others who had already breached the barricaded perimeter before the end of President Trump's speech. This barricaded perimeter was thereafter never restored and when Mr. Bingert arrived, he had no way to tell where the previously restricted area had been established. He thereafter followed thousands of other people on to the West Side of the Capitol.

Mr. Bingert acted on a good faith belief that the President's invitation, combined with a lack of barricades or sign-age, or law enforcement telling people to leave the area, meant that the Capitol grounds that day were unrestricted and available for Trump supporters to gather in First Amendment Assembly. In fact,

---

[2]  Exh. A. – Bryan Lewis Permit; Exh. B. – Jesus Lives Permit; Exh. C. – One Nation Under God Permit; Exh. D. – Rock Ministries Permit; Exh. E .– Virginia Freedom Keepers Permit; Exh. F. – Women For Great America Permit.

The President had invited them to do just that during his speech on the Ellipse and as proof, thousands of people walked the very same path as Mr. Bingert towards what they believed was a continuation of the Rally they had just attended.

It is believed that this particular Court (U.S. District Judge Royce C. Lamberth) has yet to rule on the public authority defense in light of new facts discovered by the Congressional Select Committee to Investigate the January 6th Attack on the United States Capital ("the Committee").[3] The Committee thoroughly investigated the words and actions of then-President Trump in the aftermath of January 6th.

New evidence reveals that the legal statement then-President Trump espoused was a Twelfth Amendment legal statement:

> Eastman offered Vice President Pence two options. First, the Vice President could unilaterally reject the certified electors from several States won by former Vice President Biden, thereby handing the presidency to President Trump. Or, according to Eastman, Vice President Pence could delay the joint session to give State legislatures the opportunity to certify new electors loyal to the President.[4]

In Eastman's theory, which was the foundation of President Trump's January 6th plot, the Vice President of the United States is the "ultimate

---

[3]   Counsel is aware that another member of this Court has recently ruled on this same issue, when it denied – in trial – the defendant's Notice of a Public Authority Defense and/or entrapment by estoppel defense, in *USA v. Robert Dennis*, 21-679-JEB. (See pp. 7-8, transcript (excerpts) dated 1/13/2023, attached as Exhibit G)

[4] H.R. Rep No. 117-000, at 428 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

arbiter" and could unilaterally decide the victor of the 2020 Presidential election.[5]

Then President Trump tweeted the legal statement in colloquial terms two times on January 6th, once early in the morning at 6:00AM and once later in the afternoon at 1:17PM:

> If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back![6]

> States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval. All Mike Pence has to do is send them back to the States, AND WE WIN. Do it, Mike, this is a time for extreme courage![7]

Then-President Trump's team planned a rally at the Ellipse to show popular support for the legal statement. A rally organizer said the former President would call on his supporters to march to the Capitol from the Ellipse.[8] Then-President Trump affirmatively told Bingert and other supporters "to walk down Pennsylvania

---

[5]  H.R. Rep No. 117-000, at 432 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

[6] The American Presidency Project, Tweets of January 6, 2021, 06:00:50, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[7] The American Presidency Project, Tweets of January 6, 2021, 13:17:22, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[8]  H.R. Rep No. 117-000, at 66 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

4

Avenue" "to demand that Congress do the right thing and only count the electors who have lawfully slated."[9]

As his supporters were at the Capitol, then-President Trump specifically rejected telling his supporters to leave:

> Around 3:00 p.m., one proposal was written in block capital letters on a pocket card from the chief of staff's office: ANYONE WHO ENTERED THE CAPITOL ILLEGALLY WITHOUT PROPER AUTHORITY SHOULD LEAVE IMMEDIATELY. The handwriting appears to have been scrawled quickly and somewhat messily. Hutchinson recalled Meadows returning from the dining room with the note in hand and placing it on her desk. The word "illegally" had been newly crossed out. But there would be no further action, Meadows told her.[10]

> Cipollone also made it clear that the advice they were giving to the President never changed throughout this three-hour period. Trump refused to do what was necessary. Committee Staff: [I]t sounds like you from the very onset of violence at the Capitol right around 2 o'clock were pushing for a strong statement that people should leave the Capitol. Is that right? Cipollone: I was, and others were as well.[11]

Then-President Trump sent tweets encouraging his supporters to stay peaceful at the Capital, but not to leave:

---

[9] *Transcript of Trump's speech at rally before US Capitol riot* (Jan. 13, 2021) *available at* https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27

[10] H.R. Rep No. 117-000, at 602 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

[11] H.R. Rep No. 117-000, at 79 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

I am asking for everyone at the U.S. Capitol to remain peaceful. No violence! Remember, WE are the Party of Law & Order—respect the Law and our great men and women in Blue. Thank you![12]

Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful![13]

Only at 6:49 P.M. did former President Trump tell his supporters to leave the Capital, when Mr. Bingert had already been arrested (and released):

I know your pain. I know you're hurt. We had an election that was stolen from us. It was a landslide election and everyone knows it, especially the other side. But you have to go home now... I know how you feel, but go home and go home in peace.[14]

The video made clear what had been evident to many, including those closest to him: The President could have called off the rioters far earlier and at any point that day. But he chose not to do so.[15]

---

[12] The American Presidency Project, Tweets of January 6, 2021, 19:24:22, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[13] The American Presidency Project, Tweets of January 6, 2021, 19:38:58, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[14] H.R. Rep No. 117-000, at 606 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

[15] H.R. Rep No. 117-000, at 606 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

## ARGUMENT

The public authority/entrapment by estoppel defense is based on Fifth Amendment Due Process:

> "The [public authority/entrapment by estoppel] defense ... is based on fundamental fairness concerns of the Due Process Clause," and thus relies on an assessment of whether the challenged prosecution "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" because of the lack of notice and fairness to the charged defendant. The Supreme Court recognized this defense... in three cases, *Raley v. Ohio*, 360 U.S. 423 (1959), *Cox v. Louisiana*, 379 U.S. 559 (1965), and *United States v. Pennsylvania Industrial Chemical Corp.* ("*PICCO*"), 411 U.S. 655 (1973).

*United States v. Chrestman*, 525 F.Supp.3d 14, 29-30 (some internal quotation marks and citation omitted).

This Court recently grappled with the public authority/entrapment by estoppel defense in Judge John D. Bates' recent Memorandum Opinion in *United States v. Sheppard,* Criminal Action No. 21-203 (JDB), (ECF 63, December 28, 2022). "The state of the public authority defense (and its close cousin, entrapment by estoppel) in the D.C. Circuit remains somewhat unsettled. In light of that uncertainty, district courts in this Circuit have adopted other courts of appeals' formulations of the two defenses," as explained:

> To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's

7

reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*Id.*; *see also* 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (*quoting United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)); *see also United States v. Grider* (*Grider II*), Crim. A. No. 21-022 (CKK), 2022 WL 3030974, at *2 (D.D.C. Aug. 1, 2022) (citing *Chrestman*'s four-factor test).

Many lawyers and judges have thoughtfully reasoned that the public authority/ entrapment by estoppel defense is not a proper defense for statements made by then-President Trump. But how would it look to a jury if the people who incited the failed insurrection go free, while the victims of lies and disinformation pay the price? Such an outcome is offensive to the idea of fundamental fairness and equal justice for all.

## 1.   Then-President Trump Actively Misled Mr. Bingert about the State of the Law Defining the Offense.

"Despite the uncertainty over the elements of the defenses, it is undisputed that [the defendant] must show that he relied on a 'conclusion or statement of law' by the relevant official—here, then-President Trump. The authorization need not necessarily be clear-cut—there is no requirement that former President Trump said exactly: 'It is legal for you to enter the Capitol today and stop the certification.' The official's words or conduct can, in some instances, imply that the conduct is legal."

*See United States v. Sheppard,* Criminal Action No. 21-203 (JDB), (ECF 63, December 28, 2022) (internal quotation marks and citations omitted).

It is believed that this particular Court, has not had the opportunity to rule on the Congressional Committee's newly-discovered evidence (delineated in the

Background Facts, herein-above) [16] that then-President Trump espoused a Twelfth Amendment legal statement, sent two tweets communicating the legal theory on January 6th, encouraged Mr. Bingert to march to the Capital, and specifically rejected telling his supporters to leave the Capital. To date, the other Judges of this Court may have heard statements (and may have considered) from then-President Trump's Ellipse Speech encouraging supporters to march to the Capital. Given this new information, this case may properly be analogized to *Cox v. State of La.*, 379 U.S. 559 (1965). In *Cox*, the appellant was convicted of violating a Louisiana statute which provided:

> 'Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a court of the State of Louisiana * * * shall be fined not more than five thousand dollars or imprisoned not more than one year, or both.' LSA—Rev.Stat. s 14:401 (Cum.Supp.1962).

The Supreme Court in *Cox* held that "[t]he record here clearly shows that the officials present gave permission for the demonstration to take place across the street from the courthouse." *Id.* at 569. "The police admittedly had prior notice that the demonstration was planned to be held in the vicinity of the courthouse." *Id.* at 569. "As Cox approached the vicinity of the courthouse, he was met by the Chief of Police and other officials." *Id.* at 570-71. "At this point not only was it not suggested that they hold their assembly elsewhere, or disband, but they were affirmatively told that they could hold the demonstration on the sidewalk of the far side of the

---

[16] *See* Footnote No. 3, above.

9

street, 101 feet from the courthouse steps." *Id.* at 571. "Thus, the highest police officials of the city, in the presence of the Sheriff and Mayor, in effect told the demonstrators that they could meet where they did, 101 feet from the courthouse steps, but could not meet closer to the courthouse." *Id.* at 570–71.

The Supreme Court in *Cox* distinguished its holding from a "waiver of law" which "is beyond the power of the police." *Id.* at 569. "Obviously telling demonstrators how far from the courthouse steps is 'near' the courthouse for purposes of a permissible peaceful demonstration is a far cry from allowing one to commit, for example, murder, or robbery." *Id.* at 569.

Here, Mr. Bingert is charged mainly with violating similar statutes:

| | |
|---|---|
| Count One: | Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and 2. |
| Count Two: | Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). |
| Count Three: | Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). |
| Count Four: | Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(l). |
| Count Five: | Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § l752(a)(2). |
| Count Six: | Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § l752(a)(4). |
| Count Seven: | Obstructing, or Impeding Passage Through or Within the Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E). |

Count Eight:            Engaging in an Act of Physical Violence in the Grounds or
                        Any of the Capitol Buildings, in violation of 40 U.S.C. §
                        5104(e)(2)(F).

The statutes here parallel the statute in *Cox* for several reasons. The statutes
are intent-based. *Compare Cox* ("Whoever, with the intent of interfering with");
*with* 18 U.S.C. § 1 752(a)(2) ("with intent to impede or disrupt"). The statutes
prohibit the disruption of government. *Compare Cox* ("obstructing, or impeding the
administration of justice"); *with* 18 U.S.C. § 11l(a)(l) ("any person... engaged in or
on account of the performance of official duties") *and* 18 U.S.C. § 23l(a)(3)(" to
obstruct, impede, or interfere with any fireman or law enforcement officer lawfully
engaged in the lawful performance of his official duties") *and* 18 U.S.C. § 1752(a)(2)
("to impede or disrupt the orderly conduct of Government business or official
functions"). The statutes also apply to restricted government buildings. *Compare
Cox* ("near a building housing a court of the State of Louisiana"); *with* 18 U.S.C. §
1752(a)(l) ("any restricted building or grounds") *and* 40 U.S.C. § 5104(e)(2)(F)
("within such proximity to, any restricted building or grounds") *and* ("in the
Grounds or any of the Capitol Buildings").

Here, "the record here clearly shows that" then-President Trump "gave
permission for the demonstration to take place across the street" from the Capital.
*Transcript of Trump's speech at rally before US Capitol riot (Jan. 13, 2021; see*
Footnote No. 6) (then-President Trump affirmatively told Mr. Bingert and other
supporters "to walk down Pennsylvania Avenue" "to demand that Congress do the
right thing and only count the electors who have lawfully slated"); *and Cox* at 569

11

("The record here clearly shows that the officials present gave permission for the demonstration to take place across the street from the courthouse"). Furthermore, Metropolitan Police "had prior notice" of the demonstration in proximity to the Capital. H.R. Rep No. 117-000, at 432 ("Although certain members of the Capitol Police leadership regarded their approach to January 6th as "all hands on deck," the Capitol Police leadership did not have sufficient assets in place"); *and Cox* at 159 ("The police admittedly had prior notice that the demonstration was planned to be held in the vicinity of the courthouse"). However, unlike *Cox* where protesters: (a) decided on their own to protest; and then (b) "were affirmatively told that they could hold the demonstration on the sidewalk of the far side of the street" by the Chief of Police, here, Mr. Bingert: (a) was encouraged to protest by then-President Trump; and then (b) approached police officers to seek clarification as to its legality, as required by the public authority/ entrapment by estoppel defense. *Cox.* at 570-71. This difference more persuasively allows for the public authority/ entrapment by estoppel defense because Mr. Bingert, here, was arrested after the Chief Executive and police officers failed to act in unison regarding the state of the law.

Furthermore, Mr. Bingert did not act on a "waiver of law." *Cox* at 569. Mr. Bingert approached the police officers, who assumed bad intent and arrested him. Then-President Trump also made clear that his statements were not a waiver of law by tweeting:

Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful![17]

I am asking for everyone at the U.S. Capitol to remain peaceful. No violence! Remember, WE are the Party of Law & Order – respect the Law and our great men and women in Blue. Thank you![18]

Lastly, this case is so suitable for the public authority/ entrapment by estoppel defense because it "offends some principle of justice." *Chrestman*, 525 F. Supp. 3d at 29-30. In *Cox*, the Chief of Police told protesters that "picketing in a particular area was lawful" and then arrested protesters for doing just that. *Id.* at 570. Here, then-President Trump used his supporters as a tool to manipulate. In both cases, unknowing protesters were deliberately led into legal error by a high-ranking Executive officer to achieve his personal goal. This is the entire reason behind the public authority/ entrapment by estoppel defense: fairness to the defendant. *Raley v. Ohio*, 360 U.S. 423 (1959), *Cox v. Louisiana*, 379 U.S. 559 (1965), and *United States v. Pennsylvania Industrial Chemical Corp.* ("*PICCO*"), 411 U.S. 655 (1973).

### 2. Then-President Trump Was Responsible for Interpreting, Administering, or Enforcing the Law Defining the Offense Because He Was Chief Executive.

"The executive Power shall be vested in a President of the United States of America." U.S. Const. art. 2, § 1. "Before he enter on the Execution of his Office, he

---

[17] The American Presidency Project, Tweets of January 6, 2021, 19:38:58, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[18] The American Presidency Project, Tweets of January 6, 2021, 20:13:26, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

shall take the following Oath or Affirmation: 'I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States.'" *Id.*

Then-President Trump was Chief Executive responsible for enforcement of all laws. Like *Cox* where the Supreme Court reasoned that "demonstrators... would justifiable tend to rely on this administrative interpretation" of the law made by the Chief of Police, here Mr. Bingert "justifiabl[y] rel[ied]" on the interpretation of law made by the President. *Cox* at 568. If the United States alleges that the interpretation of law was made in bad faith for personal gain, then the United States should charge former-President Trump.

### 3. Mr. Bingert Actually Relied on Then-president Trump's Misleading Pronouncement in Committing the Offense.

It is axiomatic that Mr. Bingert actually relied on then-President Trump's misleading pronouncement.

### 4. Mr. Bingert's Reliance Was Reasonable in Light of Then-president Trump Being the Chief Executive, the Point of Law Misrepresented, and the Substance of the Misrepresentation.

"[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (internal quotation marks omitted). This Court in *Chrestman* held that "January 6 defendants asserting the entrapment by estoppel defense could not

argue that they were at all uncertain as to whether their conduct ran afoul of the criminal law, given the obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Id.* at 32.

All barricades had been removed by the time he arrived, and he never entered the Capitol building. Mr. Bingert was unsure as to whether his "conduct ran afoul of the law" and approached the group of police officers "to make further inquiries." *Chrestman* at 32; *Lynch* at 1077. Mr. Bingert was one of roughly 10,000 in the crowd and had just reached the West front area near the inaugural stands when a police officer pepper-sprayed him.

Mr. Bingert was not in a group of people who toppled barriers, unlike the defendant in *Chrestman*. That "defendant and his co-conspirators toppled the metal barriers used by Capitol Police to control the crowd… and breached the building." *Chrestman*, 525 F. Supp. at 20. Furthermore, Mr. Bingert had no weapons (he was carrying a U.S. Flag) on his person, unlike the defendant in *Chrestman*. That defendant "can be seen in surveillance footage using his axe handle to obstruct one of the barriers, while all but one of his co-conspirators are seen using their arms, a chair, and a podium to keep other barriers from closing." *Chrestman*, 525 F. Supp. at 20. Instead, Bingert did exactly what a "sincerely desirous [person] of obeying the law" would do: ask a police officer. *Lynch*, 903 F.3d 1061, 1077.

In conclusion, Mr. Bingert's reliance was reasonable because he was unsure as to whether his "conduct ran afoul of the law" and approached the group of police officers "to make further inquiries." *Chrestman* at 32; *Lynch* at 1077. Moreover, Mr. Bingert was always under the impression that the Capitol ground on which he stood

15

were unrestricted that day due to the President's own statements to have his supporters change the venue from the Ellipse to the Capitol to have their voices heard. Mr. Bingert expected the same peaceful rally to be carried on at the Capitol after the speech, but what he saw instead were officers pushing and hitting innocent citizens invited to peacefully have their voices heard.

## CONCLUSION

For the reasons presented herein, and for such other reasons which may appear just and proper, Defendant Craig Michael Bingert Bingert, by and through his attorney, Allen H. Orenberg, respectfully submits that this Court should allow Mr. Bingert to raise at trial a public authority and/or entrapment by estoppel defense.

Respectfully Submitted,

Allen H. Orenberg

Digitally signed by Allen H. Orenberg
Date: 2023.01.31 09:16:13 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Fl.
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Craig M. Bingert

Dated: January 31, 2023

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Sixteen        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE",** Page 2 of 16, Page 3 of 16, Page 4 of 16, Page 5 of 16, Page 6 of 16, Page 7 of 16, Page 8 of 16, Page 9 of 16, Page 10 of 16, Page 11 of 16, Page 12 of 16, Page 13 of 16, Page 15 of 16, Page 16 of 16 Respectfully Submitted Allen H. Orenberg"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE"** Page 2 of 16, Page 3 of 16, Page 4 of 16, Page 5 of 16, Page 6 of 16, Page 7 of 16, Page 8 of 16, Page 9 of 16, Page 10 of 16, Page 11 of 16, Page 12 of 16, Page 13 of 16, Page 15 of 16, Page 16 of 16 Respectfully Submitted Allen H. Orenberg" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

RECEIVED
Mail Room
FEB 2 2 2023
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Attachment: "Case 1:21-cr-00091-RCL Document 112 Filed 01/31/23 Page 1 of 16 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S REPLY TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR "ENTRAPMENT BY ESTOPPEL DEENSE"** Page 2 of 16, Page 3 of 16, Page 4 of 16, Page 5 of 16, Page 6 of 16, Page 7 of 16, Page 8 of 16, Page 9 of 16, Page 10 of 16, Page 11 of 16, Page 12 of 16, Page 13 of 16, Page 15 of 16, Page 16 of 16 Respectfully Submitted Allen H. Orenberg"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

RECEIVED
Mail Room

FEB 22 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia



COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   :
                            :
    v.                  :     Case No. 1:21-cr-0091-RCL-01
                            :
CRAIG MICHAEL BINGERT, et al. :
Defendant.              :

**DEFENDANT CRAIG MICHAEL BINGERT'S REPLY
TO THE GOVERNMENTS RESPONSE TO THE DEFENDANT'S
NOTICE THE "PUBLIC AUTHORITY DEFENSE" AND/OR
<u>"ENTRAPMENT BY ESTOPPEL DEFENSE"</u>**

Defendant Craig Michael Bingert, by and through his attorney, Allen H. Orenberg, respectfully submits this reply to the governments response (Doc. 96) to the defendant's Notice of Public Authority Defense and/or entrapment by estoppel defense. (Doc. 88) [1]

To be certain, Mr. Doolin asserts a Public Authority Defense as to all Counts of the Indictment, as well as an entrapment by estoppel defense as to all Counts.

<u>**BACKGROUND FACTS**</u>

The U.S. Capitol had barriers restricting its grounds removed by a group of rioters long before Mr. Bingert arrived. In fact, barriers were gone before then-President Trump finished speaking at the Ellipse that day. The barriers were the

---

[1]   Defendant Isaac Steve Sturgeon, by his counsel, joins in this reply..

1

"Accepted"  FEB 16 2023

only demarcation that U.S. Capitol grounds were restricted. By the time Mr. Bingert arrived, Mr. Bingert was on U.S. Capitol grounds among an estimated 10,000 others.

Many parts of the District of Columbia (and, in particular near and around the U.S. Capitol) had been lawfully permitted for First Amendment Assembly on January 6. (See Exhibits A - F).[2] Mr. Bingert believed that Capitol grounds were similarly permitted and unrestrained. Mr. Bingert never entered the Capitol.

To be clear, Mr. Bingert does not use the public authority and/or entrapment by estoppel defense to lawfully sanction the attack on the United States Capitol. However, the public authority defense does apply to all the counts Mr. Bingert is charged with because the instruction to go to the Capitol from President Trump was an instruction to join with others who had already breached the barricaded perimeter before the end of President Trump's speech. This barricaded perimeter was thereafter never restored and when Mr. Bingert arrived, he had no way to tell where the previously restricted area had been established. He thereafter followed thousands of other people on to the West Side of the Capitol.

Mr. Bingert acted on a good faith belief that the President's invitation, combined with a lack of barricades or sign-age, or law enforcement telling people to leave the area, meant that the Capitol grounds that day were unrestricted and available for Trump supporters to gather in First Amendment Assembly. In fact,

---

[2]  Exh. A. – Bryan Lewis Permit; Exh. B. – Jesus Lives Permit; Exh. C. – One Nation Under God Permit; Exh. D. – Rock Ministries Permit; Exh. E .– Virginia Freedom Keepers Permit; Exh. F. – Women For Great America Permit.

The President had invited them to do just that during his speech on the Ellipse and as proof, thousands of people walked the very same path as Mr. Bingert towards what they believed was a continuation of the Rally they had just attended.

It is believed that this particular Court (U.S. District Judge Royce C. Lamberth) has yet to rule on the public authority defense in light of new facts discovered by the Congressional Select Committee to Investigate the January 6th Attack on the United States Capital ("the Committee").[3] The Committee thoroughly investigated the words and actions of then-President Trump in the aftermath of January 6th.

New evidence reveals that the legal statement then-President Trump espoused was a Twelfth Amendment legal statement:

> Eastman offered Vice President Pence two options. First, the Vice President could unilaterally reject the certified electors from several States won by former Vice President Biden, thereby handing the presidency to President Trump. Or, according to Eastman, Vice President Pence could delay the joint session to give State legislatures the opportunity to certify new electors loyal to the President.[4]

In Eastman's theory, which was the foundation of President Trump's January 6th plot, the Vice President of the United States is the "ultimate

---

[3]  Counsel is aware that another member of this Court has recently ruled on this same issue, when it denied – in trial – the defendant's Notice of a Public Authority Defense and/or entrapment by estoppel defense, in *USA v. Robert Dennis*, 21-679-JEB. (See pp. 7-8, transcript (excerpts) dated 1/13/2023, attached as Exhibit G)

[4] H.R. Rep No. 117-000, at 428 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

"Accepted"

FEB 16 2023

arbiter" and could unilaterally decide the victor of the 2020 Presidential election.[5]

Then President Trump tweeted the legal statement in colloquial terms two times on January 6th, once early in the morning at 6:00AM and once later in the afternoon at 1:17PM:

> If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back![6]

> States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval. All Mike Pence has to do is send them back to the States, AND WE WIN. Do it, Mike, this is a time for extreme courage![7]

Then-President Trump's team planned a rally at the Ellipse to show popular support for the legal statement. A rally organizer said the former President would call on his supporters to march to the Capitol from the Ellipse.[8] Then-President Trump affirmatively told Bingert and other supporters "to walk down Pennsylvania

---

[5] H.R. Rep No. 117-000, at 432 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

[6] The American Presidency Project, Tweets of January 6, 2021, 06:00:50, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[7] The American Presidency Project, Tweets of January 6, 2021, 13:17:22, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[8] H.R. Rep No. 117-000, at 66 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

Avenue" "to demand that Congress do the right thing and only count the electors who have lawfully slated."[9]

As his supporters were at the Capitol, then-President Trump specifically rejected telling his supporters to leave:

> Around 3:00 p.m., one proposal was written in block capital letters on a pocket card from the chief of staff's office: ANYONE WHO ENTERED THE CAPITOL ILLEGALLY WITHOUT PROPER AUTHORITY SHOULD LEAVE IMMEDIATELY. The handwriting appears to have been scrawled quickly and somewhat messily. Hutchinson recalled Meadows returning from the dining room with the note in hand and placing it on her desk. The word "illegally" had been newly crossed out. But there would be no further action, Meadows told her.[10]

> Cipollone also made it clear that the advice they were giving to the President never changed throughout this three-hour period. Trump refused to do what was necessary. Committee Staff: [I]t sounds like you from the very onset of violence at the Capitol right around 2 o'clock were pushing for a strong statement that people should leave the Capitol. Is that right? Cipollone: I was, and others were as well.[11]

Then-President Trump sent tweets encouraging his supporters to stay peaceful at the Capital, but not to leave:

---

[9] *Transcript of Trump's speech at rally before US Capitol riot* (Jan. 13, 2021) *available at* https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27

[10] H.R. Rep No. 117-000, at 602 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

[11] H.R. Rep No. 117-000, at 79 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

I am asking for everyone at the U.S. Capitol to remain peaceful. No violence! Remember, WE are the Party of Law & Order—respect the Law and our great men and women in Blue. Thank you![12]

Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful![13]

Only at 6:49 P.M. did former President Trump tell his supporters to leave the Capital, when Mr. Bingert had already been arrested (and released):

I know your pain. I know you're hurt. We had an election that was stolen from us. It was a landslide election and everyone knows it, especially the other side. But you have to go home now... I know how you feel, but go home and go home in peace.[14]

The video made clear what had been evident to many, including those closest to him: The President could have called off the rioters far earlier and at any point that day. But he chose not to do so.[15]

---

[12] The American Presidency Project, Tweets of January 6, 2021, 19:24:22, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[13] The American Presidency Project, Tweets of January 6, 2021, 19:38:58, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[14] H.R. Rep No. 117-000, at 606 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

[15] H.R. Rep No. 117-000, at 606 (2022), *available at* https://www.documentcloud.org/documents/23515172-report_finalreport_jan6selectcommittee

"Accepted"

FEB 16 2023

Taylor James Johnatakis

# ARGUMENT

The public authority/entrapment by estoppel defense is based on Fifth Amendment Due Process:

> "The [public authority/entrapment by estoppel] defense … is based on fundamental fairness concerns of the Due Process Clause," and thus relies on an assessment of whether the challenged prosecution "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" because of the lack of notice and fairness to the charged defendant. The Supreme Court recognized this defense… in three cases, *Raley v. Ohio*, 360 U.S. 423 (1959), *Cox v. Louisiana*, 379 U.S. 559 (1965), and *United States v. Pennsylvania Industrial Chemical Corp.* ("*PICCO*"), 411 U.S. 655 (1973).

*United States v. Chrestman*, 525 F.Supp.3d 14, 29-30 (some internal quotation marks and citation omitted).

This Court recently grappled with the public authority/entrapment by estoppel defense in Judge John D. Bates' recent Memorandum Opinion in *United States v. Sheppard*, Criminal Action No. 21-203 (JDB), (ECF 63, December 28, 2022). "The state of the public authority defense (and its close cousin, entrapment by estoppel) in the D.C. Circuit remains somewhat unsettled. In light of that uncertainty, district courts in this Circuit have adopted other courts of appeals' formulations of the two defenses," as explained:

> To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's

reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*Id.*; *see also* 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (*quoting United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)); *see also United States v. Grider* (*Grider II*), Crim. A. No. 21-022 (CKK), 2022 WL 3030974, at *2 (D.D.C. Aug. 1, 2022) (citing *Chrestman*'s four-factor test).

Many lawyers and judges have thoughtfully reasoned that the public authority/ entrapment by estoppel defense is not a proper defense for statements made by then-President Trump. But how would it look to a jury if the people who incited the failed insurrection go free, while the victims of lies and disinformation pay the price? Such an outcome is offensive to the idea of fundamental fairness and equal justice for all.

### 1. Then-President Trump Actively Misled Mr. Bingert about the State of the Law Defining the Offense.

"Despite the uncertainty over the elements of the defenses, it is undisputed that [the defendant] must show that he relied on a 'conclusion or statement of law' by the relevant official—here, then-President Trump. The authorization need not necessarily be clear-cut—there is no requirement that former President Trump said exactly: 'It is legal for you to enter the Capitol today and stop the certification.' The official's words or conduct can, in some instances, imply that the conduct is legal."

*See United States v. Sheppard*, Criminal Action No. 21-203 (JDB), (ECF 63, December 28, 2022) (internal quotation marks and citations omitted).

It is believed that this particular Court, has not had the opportunity to rule on the Congressional Committee's newly-discovered evidence (delineated in the

Background Facts, herein-above) [16] that then-President Trump espoused a Twelfth Amendment legal statement, sent two tweets communicating the legal theory on January 6th, encouraged Mr. Bingert to march to the Capital, and specifically rejected telling his supporters to leave the Capital. To date, the other Judges of this Court may have heard statements (and may have considered) from then-President Trump's Ellipse Speech encouraging supporters to march to the Capital. Given this new information, this case may properly be analogized to *Cox v. State of La.*, 379 U.S. 559 (1965). In *Cox*, the appellant was convicted of violating a Louisiana statute which provided:

> 'Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a court of the State of Louisiana * * * shall be fined not more than five thousand dollars or imprisoned not more than one year, or both.' LSA—Rev.Stat. s 14:401 (Cum.Supp.1962).

The Supreme Court in *Cox* held that "[t]he record here clearly shows that the officials present gave permission for the demonstration to take place across the street from the courthouse." *Id.* at 569. "The police admittedly had prior notice that the demonstration was planned to be held in the vicinity of the courthouse." *Id.* at 569. "As Cox approached the vicinity of the courthouse, he was met by the Chief of Police and other officials." *Id.* at 570-71. "At this point not only was it not suggested that they hold their assembly elsewhere, or disband, but they were affirmatively told that they could hold the demonstration on the sidewalk of the far side of the

---

[16] *See* Footnote No. 3, above.

"Accepted" FEB 16 2023 *Taylor James Johnston*

street, 101 feet from the courthouse steps." *Id.* at 571. "Thus, the highest police officials of the city, in the presence of the Sheriff and Mayor, in effect told the demonstrators that they could meet where they did, 101 feet from the courthouse steps, but could not meet closer to the courthouse." *Id.* at 570–71.

The Supreme Court in *Cox* distinguished its holding from a "waiver of law" which "is beyond the power of the police." *Id.* at 569. "Obviously telling demonstrators how far from the courthouse steps is 'near' the courthouse for purposes of a permissible peaceful demonstration is a far cry from allowing one to commit, for example, murder, or robbery." *Id.* at 569.

Here, Mr. Bingert is charged mainly with violating similar statutes:

| | |
|---|---|
| Count One: | Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and 2. |
| Count Two: | Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). |
| Count Three: | Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). |
| Count Four: | Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(l). |
| Count Five: | Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). |
| Count Six: | Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4). |
| Count Seven: | Obstructing, or Impeding Passage Through or Within the Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E). |

"Accepted"

FEB 16 2023

Taylor James Johnatakis

Count Eight:    Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

The statutes here parallel the statute in *Cox* for several reasons. The statutes are intent-based. *Compare Cox* ("Whoever, with the intent of interfering with"); *with* 18 U.S.C. § 1 752(a)(2) ("with intent to impede or disrupt"). The statutes prohibit the disruption of government. *Compare Cox* ("obstructing, or impeding the administration of justice"); *with* 18 U.S.C. § 11l(a)(l) ("any person... engaged in or on account of the performance of official duties") *and* 18 U.S.C. § 23l(a)(3)(" to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties") *and* 18 U.S.C. § 1752(a)(2) ("to impede or disrupt the orderly conduct of Government business or official functions"). The statutes also apply to restricted government buildings. *Compare Cox* ("near a building housing a court of the State of Louisiana"); *with* 18 U.S.C. § 1752(a)(l) ("any restricted building or grounds") *and* 40 U.S.C. § 5104(e)(2)(F) ("within such proximity to, any restricted building or grounds") *and* ("in the Grounds or any of the Capitol Buildings").

Here, "the record here clearly shows that" then-President Trump "gave permission for the demonstration to take place across the street" from the Capital. *Transcript of Trump's speech at rally before US Capitol riot (Jan. 13, 2021; see* Footnote No. 6) (then-President Trump affirmatively told Mr. Bingert and other supporters "to walk down Pennsylvania Avenue" "to demand that Congress do the right thing and only count the electors who have lawfully slated"); *and Cox* at 569

"Accepted

FEB 16 2023

("The record here clearly shows that the officials present gave permission for the demonstration to take place across the street from the courthouse"). Furthermore, Metropolitan Police "had prior notice" of the demonstration in proximity to the Capital. H.R. Rep No. 117-000, at 432 ("Although certain members of the Capitol Police leadership regarded their approach to January 6th as "all hands on deck," the Capitol Police leadership did not have sufficient assets in place"); *and Cox* at 159 ("The police admittedly had prior notice that the demonstration was planned to be held in the vicinity of the courthouse"). However, unlike *Cox* where protesters: (a) decided on their own to protest; and then (b) "were affirmatively told that they could hold the demonstration on the sidewalk of the far side of the street" by the Chief of Police, here, Mr. Bingert: (a) was encouraged to protest by then-President Trump; and then (b) approached police officers to seek clarification as to its legality, as required by the public authority/ entrapment by estoppel defense. *Cox.* at 570-71. This difference more persuasively allows for the public authority/ entrapment by estoppel defense because Mr. Bingert, here, was arrested after the Chief Executive and police officers failed to act in unison regarding the state of the law.

Furthermore, Mr. Bingert did not act on a "waiver of law." *Cox* at 569. Mr. Bingert approached the police officers, who assumed bad intent and arrested him. Then-President Trump also made clear that his statements were not a waiver of law by tweeting:

Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful![17]

I am asking for everyone at the U.S. Capitol to remain peaceful. No violence! Remember, WE are the Party of Law & Order – respect the Law and our great men and women in Blue. Thank you![18]

Lastly, this case is so suitable for the public authority/ entrapment by estoppel defense because it "offends some principle of justice." *Chrestman*, 525 F. Supp. 3d at 29-30. In *Cox*, the Chief of Police told protesters that "picketing in a particular area was lawful" and then arrested protesters for doing just that. *Id.* at 570. Here, then-President Trump used his supporters as a tool to manipulate. In both cases, unknowing protesters were deliberately led into legal error by a high-ranking Executive officer to achieve his personal goal. This is the entire reason behind the public authority/ entrapment by estoppel defense: fairness to the defendant. *Raley v. Ohio*, 360 U.S. 423 (1959), *Cox v. Louisiana*, 379 U.S. 559 (1965), and *United States v. Pennsylvania Industrial Chemical Corp.* ("*PICCO*"), 411 U.S. 655 (1973).

## 2. Then-President Trump Was Responsible for Interpreting, Administering, or Enforcing the Law Defining the Offense Because He Was Chief Executive.

"The executive Power shall be vested in a President of the United States of America." U.S. Const. art. 2, § 1. "Before he enter on the Execution of his Office, he

---

[17] The American Presidency Project, Tweets of January 6, 2021, 19:38:58, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

[18] The American Presidency Project, Tweets of January 6, 2021, 20:13:26, *available at* https://www.presidency.ucsb.edu/documents/tweets-january-6-2021

"Accepted" FEB 16 2023 Taylor James Johnatakis

"Accepted"

FEB 16 2023

*Taylor James Johnston*

shall take the following Oath or Affirmation: 'I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States.'" *Id.*

Then-President Trump was Chief Executive responsible for enforcement of all laws. Like *Cox* where the Supreme Court reasoned that "demonstrators… would justifiable tend to rely on this administrative interpretation" of the law made by the Chief of Police, here Mr. Bingert "justifiabl[y] rel[ied]" on the interpretation of law made by the President. *Cox* at 568. If the United States alleges that the interpretation of law was made in bad faith for personal gain, then the United States should charge former-President Trump.

### 3.   Mr. Bingert Actually Relied on Then-president Trump's Misleading Pronouncement in Committing the Offense.

It is axiomatic that Mr. Bingert actually relied on then-President Trump's misleading pronouncement.

### 4.   Mr. Bingert's Reliance Was Reasonable in Light of Then-president Trump Being the Chief Executive, the Point of Law Misrepresented, and the Substance of the Misrepresentation.

"[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (internal quotation marks omitted). This Court in *Chrestman* held that "January 6 defendants asserting the entrapment by estoppel defense could not

"Accepted"   FEB 16 2023   *Taylor James Johnsbles*

argue that they were at all uncertain as to whether their conduct ran afoul of the criminal law, given the obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Id.* at 32.

All barricades had been removed by the time he arrived, and he never entered the Capitol building. Mr. Bingert was unsure as to whether his "conduct ran afoul of the law" and approached the group of police officers "to make further inquiries." *Chrestman* at 32; *Lynch* at 1077. Mr. Bingert was one of roughly 10,000 in the crowd and had just reached the West front area near the inaugural stands when a police officer pepper-sprayed him.

Mr. Bingert was not in a group of people who toppled barriers, unlike the defendant in *Chrestman.* That "defendant and his co-conspirators toppled the metal barriers used by Capitol Police to control the crowd... and breached the building." *Chrestman*, 525 F. Supp. at 20. Furthermore, Mr. Bingert had no weapons (he was carrying a U.S. Flag) on his person, unlike the defendant in *Chrestman*. That defendant "can be seen in surveillance footage using his axe handle to obstruct one of the barriers, while all but one of his co-conspirators are seen using their arms, a chair, and a podium to keep other barriers from closing." *Chrestman*, 525 F. Supp. at 20. Instead, Bingert did exactly what a "sincerely desirous [person] of obeying the law" would do: ask a police officer. *Lynch*, 903 F.3d 1061, 1077.

In conclusion, Mr. Bingert's reliance was reasonable because he was unsure as to whether his "conduct ran afoul of the law" and approached the group of police officers "to make further inquiries." *Chrestman* at 32; *Lynch* at 1077. Moreover, Mr. Bingert was always under the impression that the Capitol ground on which he stood

were unrestricted that day due to the President's own statements to have his supporters change the venue from the Ellipse to the Capitol to have their voices heard. Mr. Bingert expected the same peaceful rally to be carried on at the Capitol after the speech, but what he saw instead were officers pushing and hitting innocent citizens invited to peacefully have their voices heard.

## <u>CONCLUSION</u>

For the reasons presented herein, and for such other reasons which may appear just and proper, Defendant Craig Michael Bingert Bingert, by and through his attorney, Allen H. Orenberg, respectfully submits that this Court should allow Mr. Bingert to raise at trial a public authority and/or entrapment by estoppel defense.

Respectfully Submitted,

Allen H. Orenberg
Digitally signed by Allen H. Orenberg
Date: 2023.01.31 09:16:13 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Fl.
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Craig M. Bingert

Dated: January 31, 2023

"Accepted" FEB 16 2023

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day:Nine     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL)** <u>ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE</u>. Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL)** <u>ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE</u>, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 103 Filed 12/20/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL)** <u>ISSAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TRANSFER VENUE</u>. Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defenders"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

RECEIVED MAR 16 2023 Angela D. Caesar, Clerk of Court U.S. District Court, District of Columbia Mail Room

**"Accepted"**

MAR 09 2023

*Taylor James Johnstone*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,     )
                              )
          v.                  )          Case No. 21-091 (RCL)
                              )
ISAAC STURGEON,               )
                              )
                  Defendant.  )
                              )

## ISAAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO TRANSFER VENUE

Isaac Sturgeon, files this reply in further support of his motion to transfer venue to a district that will ensure him a fair jury trial. Nowhere in its opposition to Mr. Sturgeon's motion to transfer venue *see* ECF No. 92 ("Gov. Opp."), does the government address the many compelling reasons to transfer venue, which would protect Mr. Sturgeon's constitutional right to a fair trial. Instead, the government attacks the objective jury survey that provides statistical data which suggests that it would be near impossible to impanel a fair jury in this case.

The government then suggests a novel solution – it encourages the Court to spend time and resources, empanel a venire, and undertake a time consuming voir dire and then decide if the objective data in the jury survey is in fact accurate.

For the reasons discussed below, the government's arguments are without merit and do not address the main issue before the court: the irreparable bias that exists if venue were deemed to be proper in Washington, D.C. (herein after "D.C.").

1

I. **The Government Fails to Undermine the Jury Survey that Exposes the Clear Bias that Exists in the D.C. Jury Pool**

To elucidate, Mr. Sturgeon argues that one reason the jury pool shows bias is the continuous negative media coverage that the January 6 defendants, their defense lawyers and their cases have received. *See* Def. Mot. The data that supports this argument is found in the jury survey attached to the motion that explains that after potential jurors were polled, 90% of them were exposed to media coverage and that most of them say the media coverage implied that the defendants are "guilty of the charges brought against them." *See* Def. Mot., Exhibit 1, Jury Survey at pg. 3.

The government tries to undermine the jury survey itself by suggesting that the Court should not consider the data because (1) courts have "commonly rejected such polls" and (2) based on only one critique as to the methodology employed. *See* Gov. Opp. at 14-18.

a. **The Government selects past cases where the polls were distinguishable from the instant one.**

In its opposition, the government cites cases that found survey results could not support a finding of presumed prejudice. *Id.* However, in many of those cases, the survey participants were asked entirely different questions than the ones asked here. Most notably, in many of those cases, the participants were not asked to opinion on the "guilt" of the defendants. *See, e.g., United States v. Campa*, 459 F.3d 1121 (2006) (survey in support of transfer motion in Miami district were not asked to opine on anyone's guilt).

Furthermore, the government's reliance on *U.S. v. Haldeman*, 559 F. 2d 31, 64

2

n. 43 (D.C.C. 1976), relegated to a footnote is misplaced for two reasons. First, the government generalizes that polls can be open to errors and should be viewed as suspect because appellants pay the expert to conduct the poll. *Id.* But, the government routinely pays the expert it hires, and surely the rules for the DOJ are no different than those for a defendant. All experts are paid and that goes to weight not admissibility. Also relevant is that the *Haldeman* court does not address why the specific expert hired in *Haldeman* was not to be trusted and why or how that poll was flawed.

Secondly, in *Haldeman*, the Court reviewed the media coverage and the overwhelming pre-trial publicity was found to consist of "straightforward, unemotional factual accounts of events" rather than the inflammatory nature of the media coverage in these cases. *Id.* at 61, *See also U.S. v. Rodriquez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19 (cited by the government but where court also found the poll did not demonstrate the media coverage being "inflammatory"). Therefore, *Haldeman* is entirely different than the instant matter and provides no support or basis for rejecting the poll results here.

### b. The critique that the poll does not provide an option of "unsure" about guilty is unavailing.

The government's only critique of the questions asked by the expert in conducting the poll is that the expert did not instruct the participants that they could answer by saying they were "unsure" about the guilt of January 6 defendants. *See* Gov. Opp. at 18. However, the government relies only on a single source, without further argument, that opined that respondents must be made aware of this option.

*Id.* The government offers no evidence such an option is widely adopted by other experts in the area. That comes as no surprise as peer-reviewed research published four years after the government's citation explains precisely why offering an option of "don't know" (or unsure) may ultimately discourage people to "generate a meaningful answer from expressing it." Jon A. Krosnick & Stanley Presser, "Question and Questionnaire Design," in *Handbook of Survey Research* (2d. ed. 2010, Peter V. Marsdean & James D. Wright, eds.) at 263, 282.[1] Lastly, as the government points out, the jury survey results here reveal that about a quarter of respondents did not respond concretely and rather said they did not know or that it depends or refused to answer all together. *See* Def. Mot., Exhibit 1, Jury Survey at pg. 14. Clearly people know even when not specifically not instructed, that "unsure" is always an available response.

### c. Mr. Sturgeon is not Required to Choose Another Appropriate Venue

Lastly, the government harps on the fact that the survey provided did not survey the District of Montana. *See* Gov. Opp. at 17. Realistically, the Federal Defender agency could not survey every district in the United States and so it initially chose Atlanta as a comparable district because of its similar size and characteristics. However, that is not relevant at this stage as the first determination the court must make is whether a fair trial can be obtained in this district. Fed. R. Crim. P. 21(a). The Federal Rules do not require a defendant to specify another district, it simply

---

[1] Emerald_HSR-V017_9 263..313 (stanford.edu)

4

"Accepted"

MAR 0 9 2022

Taylor James Schneble

mandates that the court transfer the proceeding "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." *Id.* The government inserts a requirement that simply is not present in the statute. The first relevant determination is whether Mr. Sturgeon can have a fair trial here and he argues that he cannot.

## II. The Government Ignores the Impact of the Constant Pre-trial Publicity in January 6 Cases whose Uniqueness is conceded by Attorney General Garland and the DOJ.

Simply put, this is the most unique set of prosecutions in American history and is a case of first impression. Mr. Sturgeon does not argue that the "mere existence" of pre-trial publicity creates a presumption of prejudice, but rather that the pre-trial publicity has been constant, unrelenting, and has been irreversibly biased towards the guilt of these defendants. The government attempts to compare the pre-trial publicity of January 6, 2021, to other high profile cases such as the Boston Marathon bomber prosecution, the fraud trial of CEO of Enron, the Watergate prosecutions, and the 9-11 prosecutions. *See* Gov. Opp. at 9. And yet it ignores the biggest difference between those cases and the January 6 prosecutions. Unlike any other case, the January 6 prosecutions involve over 800 individuals so far with the DOJ being on the record as saying that 1000 more arrests are to be expected. Below is what the Attorney General proclaimed about the January 6 prosecutions:

### Extraordinary resources devoted to the Jan. 6 probe

Every FBI office, almost every U.S. attorney's office in the country is working on this matter. We've issued thousands of subpoenas, seized

and examined thousands of electronic devices, examined terabytes of data, thousands of hours of videos. People are working every day, 24/7, and are fully aware of how important this is. This had to do with the interference with the peaceful transfer of power from one administration to another. And it doesn't get more important than that.[2]

Media coverage has been relentless. As the jury survey points out, 93% of the D.C. jury pool is aware that "several hundred people were arrested on charges related" to January 6, 2021. *See* Def. Mot., Exhibit 1, Jury Survey at pg. 2. The almost daily reporting of capitol protest prosecutions makes this case more like *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963), where the Supreme Court found the people of Calcasieu Parish saw and heard Rideau's confession too many times and as a result a fair trial was not possible there. Similarly, the people of D.C. have been exposed to the January 6 prosecutions almost on a daily basis and have read too many articles depicting defendants in a negative and inflammatory fashion. We are hard pressed to find a single mainstream newspaper article that casts a January 6 defendant in a positive or unbiased light.

In its original motion, Mr. Sturgeon provided a long list of local politicians and leaders publicly characterizing the actions on January 6, 2021. Not a single one of these actors provide the caveat that some of these defendants could be innocent and that our society is built on the fundamental principle of "innocent until proven guilty." Rather, in an orchestrated fashion, these leaders drill in themes of white supremacy, the violent mob, terrorism, and threats to democracy.

---

[2]  *See*  https://www.npr.org/2022/03/10/1085016383/garland-says-the-jan-6-investigation-wont-end-until-everyone-is-held-to-account.

6

Mr. Sturgeon has shown that he cannot receive a fair and impartial trial in D.C. because the constant media coverage affects D.C. residents in a way that does not affect other parts of the country. D.C. residents were present in the city during a national disaster that directly affected them, making them alleged "victims" in a sense. As a result, D.C. residents would be more afraid of a January 6 recurrence than anyone else in the country. The D.C. local media coverage is also more consistent because this is where all of the hearings are taking place, making it more of a priority to regularly report.

## III.   Voir Dire Cannot Fix this Problem

The government proposes that voir dire is the solution here pointing to past jury trials where the government opines that a fair jury was selected. *See* Gov. Opp. at 21-25. The first flaw with the government's argument is that it does not allow for any scenario in which a transfer of venue is granted short of proceeding to voir dire. If presumptive prejudice exists, it follows that the prejudice is carried into voir dire and irreversibly comprises the process no matter how many safeguards are in place. At that point, it is not the Court's fault that a fair jury cannot be selected, it is a virus that has spread with no cure. If voir dire could fix any presumptive prejudice, then a transfer of venue would never be granted and the defendant in *Rideau v. Louisiana*, 373 U.S. 723 (1963) would have remained convicted in violation of his Sixth Amendment right to a fair trial. In *Rideau*, the court emphatically stated:

> We do not hesitate to hold, *without pausing to examine a particularized transcript of the voir dire examination of the members of the jury*, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised

interview.

*Id.* at 727 (emphasis added). The Court in *Rideau* recognized that what had transpired in that community was far too pervasive to be cured by the voir dire process. While Mr. Sturgeon did not participate in a televised confession, the media continues to release every piece of negative evidence found in all January 6 cases. The community has been bombarded by incriminating evidence of all January 6 defendants and it will be impossible for a jury in D.C. to put aside what has been already hammered into them – that these defendants are not only all guilty but that they are terrorists and insurrectionists.

Voir dire is not a perfect process as the government suggests, especially in a courtroom where the media is watching every move and reporting on it. Even without that added spotlight, many people do not want to admit that they cannot be fair even if that is what they feel. There is an obvious temptation to not want to recognize your own prejudice, which makes a telephone poll when there is no pressure and anonymity more likely to produce honest results.[3]

## CONCLUSION

For all the reasons discussed above, and those in his moving papers, the Court should grant Mr. Sturgeon's motion to transfer venue.

---

[3] Eileen C. Moore, *Judicial Voir Dire More Important Than Ever*, 13 Cal. Litig. 45, 45 (2000) ("I have concluded from my experience as a trial judge . . . that, perhaps due to political correctness, agendas or disgust with the system, many jurors either attempt to hide their true feelings, or approach their task with preconceptions, cynicism and activism."); Jerry Markon, *Jurors With Hidden Agendas*, Wall St. J., July 31, 2001, at B1.

*Taylor James Johnston* **Accepted"**

Respectfully submitted,

MAR 0 9 2023

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
Assistant Federal Public
Defenders
625 Indiana Avenue, N.W., Suite
550
Washington, D.C.  20004
(202) 208-7500

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Eleven          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 62 Filed 01/11/12 Page 1 of 22 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91 (RCL) <u>DEFENDANT ISAAC STURGEON'S REPLY IN FURTHER SUPORT OF HIS MOTION TO DISMISS COUTNS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>**, Page 2 of 22, Page 3 of 22, Page 4 of 22, Page 5 of 22, Page 6 of 22, Page 7 of 22, Page 8 of 22, Page 9 of 22, Page 10 of 22, Page 11 of 22, Page 12 of 22, Page 13 of 22, Page 14 of 22, Page 15 of 22, Page 16 of 22, Page 17 of 22, Page 18 of 22, Page 19 of 22, Page 20 of 22, Page 21 of 22 **CONCLUSION**, Page 22 of 22 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 62 Filed 01/11/12 Page 1 of 22 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91 (RCL) <u>DEFENDANT ISAAC STURGEON'S REPLY IN FURTHER SUPORT OF HIS MOTION TO DISMISS COUTNS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>**, Page 2 of 22, Page 3 of 22, Page 4 of 22, Page 5 of 22, Page 6 of 22, Page 7 of 22, Page 8 of 22, Page 9 of 22, Page 10 of 22, Page 11 of 22, Page 12 of 22, Page 13 of 22, Page 14 of 22, Page 15 of 22, Page 16 of 22, Page 17 of 22, Page 18 of 22, Page 19 of 22, Page 20 of 22, Page 21 of 22 **CONCLUSION**, Page 22 of 22 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 62 Filed 01/11/12 Page 1 of 22 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91 (RCL) <u>DEFENDANT ISAAC STURGEON'S REPLY IN FURTHER SUPORT OF HIS MOTION TO DISMISS COUTNS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>**, Page 2 of 22, Page 3 of 22, Page 4 of 22, Page 5 of 22, Page 6 of 22, Page 7 of 22, Page 8 of 22, Page 9 of 22, Page 10 of 22, Page 11 of 22, Page 12 of 22, Page 13 of 22, Page 14 of 22, Page 15 of 22, Page 16 of 22, Page 17 of 22, Page 18 of 22, Page 19 of 22, Page 20 of 22, Page 21 of 22 **CONCLUSION**, Page 22 of 22 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

MAR 16 2023 RECEIVED

"Accepted"

MAR 11 2023

Taylor James Johnatakis

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,    )
                                   )
                                   )
      v.                     )     Case No. 21-91 (RCL)
ISAAC STEVE STURGEON,    )
                                   )
          Defendant.      )
                                   )

**DEFENDANT ISAAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS**
**TO MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE, AND SIX, OF**
**THE SUPERSEDING INDICTMENT**

The defendant, Isaac Sturgeon, files this reply to the government's response filed on

January 4, 2021. *See* ECF Dkt. No. 60 (hereafter "Gov't. Res."). For the reasons discussed

below, Counts One, Three, Four, Five, and Six of the Superseding Indictment still fail to state

an offense and fail to give proper notice to the defendant.

I.     **THE PLAIN LANGUAGE, LEGISLATIVE HISTORY, AND**
        **CONGRESSIONAL INTENT CONTINUE TO SUPPORT A CONCLUSION**
        **THAT NO VIOLATION OF 1512(c)(2) HAS BEEN STATED HERE**

In his moving papers, Mr. Sturgeon showed, among other things, that he did not disrupt

an "official proceeding" of the government for purposes of 18 U.S.C. §1512(c)(2). *See* Def. Mot.

at 4-10 (ECF Dkt. No. 55). Section 1512(c)(2)'s purpose is to protect the integrity of hearings

before tribunals and its remit does not extend to ceremonial and administrative events such as the

electoral count that took place on January 6, 2021, which does not qualify as an "official

proceeding" under the statute. *Id.*

In response, the government contends that Mr. Sturgeon has inserted an "adjudicatory

gloss" to the "official proceeding" definition that is unsupported. *See* Gov't Res. at 19. The

government is wrong.  While §1512(c)(2) does not include the specific word "adjudicatory," the

Court's inquiry does not end there.  Rather, the Court should examine the legislative history of

the statute and carefully analyze the key words contained therein. *See* Antonin Scalia & Brayn A.

Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) (where a statute addresses a

technical subject, it is a "term of art" that requires a look at its ordinary legal meaning).  Here,

§1512(c)(2)'s legislative history, and the ordinary legal meaning of the term "proceeding" that is

contained in the statute, supports dismissal of this count.

Section 1512(c)(2)'s legislative history shows that its abiding purpose is protecting the

integrity of hearings before tribunals by preventing witness tampering and destruction of

evidence.  Likewise, the ordinary legal meaning of "proceeding" is:

> 1. The regular and orderly progression of a lawsuit, including all acts and events
> between the time of commencement and the entry of judgment. 2. Any procedural
> means for seeking redress from a tribunal or agency. 3. An act or step that is part
> of a larger action. 4. *The business conducted by a court or other official body; a
> hearing.* 5. *Bankruptcy.* A particular dispute or matter arising within a pending
> case – as opposed to the case as a whole.

Black's Law Dictionary, "proceeding" (11th ed. 2019) (emphasis added).  The legal definition of

"proceeding" plainly describes the word to mean "a hearing" and "hearing" means "the hearing

of the arguments of the counsel for the parties upon the pleadings, or pleadings and proofs;

corresponding to the trial of an action at law." *Id.* (definition of hearing).  These legal definitions,

together with the legislative history, strongly support the conclusion that there must be some

kind of adjudicative hearing – i.e., an "official decision about who is right in (a dispute)."

(Merriam-Webster.com Dictionary, definition of "adjudicate" (2021)). *See also United States v.

Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) ) (investigation conducted by Bureau of

Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses

"events that are best thought of as hearings (or something akin to hearings").

"Accepted"
MAR 11 2023
Taylor James Johnatakis

If not "adjudicative," the term "a proceeding before the Congress" in §1515(a)(1)(B) requires, at a minimum, some kind of investigative or legislative action or purpose. Here, there was no adjudicative, investigative, or legislative purpose to the gathering of Congress to certify the electoral vote. The event on January 6, 2021 was purely a ceremonial meeting of both houses of Congress. The outcome was already finally determined. Any objections or speeches were purely political performances that could have no impact on the outcome. No "proceeding before the Congress" took place, because there was nothing towards which to "proceed."

The government tries to contend that the definition of "proceeding before congress" as outlined in §1515(a)(1)(B) should be read broadly because, unlike 18 U.S.C. §1505, no specific agencies and committees are identified. *See* Gov't. Res. at 16. However, Mr. Sturgeon does deny that Congress is covered by §1512(c)(2), the issue is whether Congress's ceremonial vote count that day qualified as a "proceeding" (a word that exists in both statutes).

In an unpersuasive effort to transform the Joint Session on January 6, the government notes that the Joint Session is a deliberative body where objections are permitted and a decision must be made pursuant to the procedures set forth in 3 U.S.C. §15. *See* Gov't. Res. at 19. However, the courts interpret "official proceeding" more narrowly. It is not enough to be a deliberative body where decisions are made. There also must be characteristics of a hearing, such as findings of fact, and the power to issue subpoenas. *See, e.g., United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (explaining that agency investigations may qualify as "proceedings" under 18 U.S.C. §1505 if those investigations involve "some adjudicative power" such as the power to issue subpoenas, and compel sworn testimony in conjunction with an investigation). In other words, it is not enough that a decision is made in a formal environment, but rather that the characteristics surrounding the event must be "akin to a hearing." *Id. See also*

3

*United States v. Sandlin*, 21-CR-88 (DLF), Dkt. No. 63, Memorandum Opinion at 7 (ruling that

an "official proceeding" under §1512(c)(2) does not include any and all series of actions before

Congress; rather, the proceeding must be akin to a formal hearing).

     Nor does the fact that 3 U.S.C. §15 provides Congress with the authority to lodge

objections transform the Joint Session into a "hearing" or "official proceeding." Although the

Electoral Count takes place in a "formal environment," has proscribed procedures, it is not a

"hearing." It is, in the plain text of the statute, simply a "meeting" of both houses. 3 U.S.C. §15.

And although 3 U.S.C. §15 provides for the lodging of objections; these "objections" are not the

same type of objections that exist in a typical "proceeding before Congress," as contemplated in

§1512. As explained in detail in the defendant's motion to dismiss, the Congress's "counting of

the votes" is purely ceremonial; the count is predetermined because the Joint Session does not

have the authority to change any of the votes that have been certified by the states. Congress

makes no decision because there is no decision for Congress to make. Moreover, the vote count

is neither investigative nor legislative. Simply put, the "counting function" of Congress does not

have an "adjudicative," or "judicial" or "hearing" aspect to it. The "electoral vote is merely

ministerial. Vasan Kesavan, *"Is the Electoral Count Act Unconstitutional?"* 80 North Carolina

Law Review 1653, 2002, at page 258.

     Five recent district courts have found that the vote count on January 6 was a "proceeding

before Congress."[1] In neither case, however, did those courts consider or resolve the arguments

raised by Mr. Sturgeon here. In *Caldwell*, for example, the district court did not address the

---

[1] *United States v. Caldwell et al.*, 21-CR-28 (APM) (hereafter *"Caldwell"*), *United States v. Sandlin, Degrave*, 21-CR-88 (DLF) (hereafter *"Sandlin"*), *United States v. Nordean et al.*, 21-CR-175 (TJK) (hereafter *"Nordean"*), *and United States v. Montgomery, Brady, Knowlton*, 21-CR-046 (RDM) (hereafter *"Montgomery"*), and *United States v. Mostofsky*, 21-cr-138 (JEB) (hereafter "Mostofsky").

4

ceremonial and predetermined nature of the electoral count, and how that predetermination is antithetical to the vote count being considered a "proceeding" or "hearing." *See Caldwell* Opinion. The *Caldwell* and *Montgomery* courts ruled that an "official proceeding" means "the business conducted before an official body." *Caldwell* Opinion at 8-10; *Montgomery* Opinion at 13, 19. The *Nordean* court had the most broad interpretation ruling that an "official proceeding" is a "series of actions" that requires "some formal convocation." *Nordean* Opinion at 11. Lastly, the *Sandlin* court ruled that a "proceeding" need not be "court-like" and did not require an "administration of justice," however requires more than just a formal convocation and must be akin to a hearing. *See* Sandlin Opinion at 7-9.

In reaching those determinations, the *Caldwell*, *Nordean*, and *Mongtomery* courts left a crucial part of the definition of "proceeding" out of its analyses. *See Caldwell* Opinion at 9; *Nordean* Opinion at 11; *Montgomery* Opinion at 11. Black's Law Dictionary defines "proceeding" to be "the business conducted by a court or other official body; *a hearing*." (11th ed. 2019) (emphasis added). The word "hearing," which was left out of the three courts definitions, provides crucial context to the definition of "proceeding" by requiring something more than a "formal convocation" or "business conducted before an official body."

Furthermore, not considered by any court, is whether the Joint Session is not a "proceeding" at all because 3 U.S.C. §15 that governs the Joint Session repeatedly makes clear, A Joint Session is simply a "meeting" of both Congressional bodies:

> The Senate and House of Representatives shall ***meet*** in the Hall of the House of Representatives........When the two Houses have voted, they shall immediately again ***meet***....

3 U.S.C. § 15. (emphases added). Not only does the language of the statute governing the Joint Session plainly describe it as a meeting, the House and the Senate meet together only for

ceremonies or events. (i.e., for the State of the Union, *see* U.S. Const., Article II, Section 3, and to hear speeches from visiting dignitaries). In fact, the only time the Constitution mentions "proceedings" in reference to Congress, the *bicameral* nature of the Congress is stressed.[2] It follows that a "proceeding before Congress" in §1512 must refer to a separate and bicameral adjudicative, investigative, or legislative functions of the House or the Senate.

As stated above, the *Sandlin* court agreed that a "proceeding" must be akin to a formal hearing. *See Sandlin* Opinion at 7, 9; *See also Mostofsky* Opinion at 21-22. A "hearing" is defined as a "judicial session, open to the public, held for the purpose of deciding issues of fact or of law. Black's Law Dictionary (11th ed. 2019). The *Sandlin* court, however, reasoned that the vote count is a formal hearing because of the procedures it must follow pursuant to 3 U.S.C. § 15, but did not address the "ceremonial and ministerial" nature of the meeting, or consider the procedures that govern the meeting in the context of the meeting's ceremonial nature. *See Sandlin* Opinion at 7-9. The ceremonial nature of the vote count, however, is crucial to determining whether or not that count is akin to a formal hearing and, in turn, whether it may constitute a "proceeding." The vote count is entirely ministerial – it certifies vote counts that have been determined. It does not meaningfully decide any issues of fact or law because those have already been decided by each state, and the Joint Session does not have the power under the Constitution to actually reject the votes of any State. *See* Vasan Kesavan, *"Is the Electoral Count Act Unconstitutional?"* 80 North Carolina Law Review 1653, 2002 (hereafter, "Kesavan").

The history of objections lodged at the Electoral Count were mostly made in the 1800's because of the confusion of when new states were admitted to the union and how that impacted

---

[2] "Each House may determine the Rules of its *Proceedings*....[e]ach House shall keep a Journal of its *Proceedings*…" Article I Section V. (emphases added).

"Accepted"

MAR 11 2023

Taylor James Johnakin

whether their votes should count.  Objections were ultimately rejected because it was determined that the Joint Session did not have the authority to judge the proceedings already had in the states. *See* Kesavan at 1678-1694.  In 1876, the most tumultuous election, Samuel Tilden and Rutherford Hayes were separated by one electoral vote and four states sent Congress multiple electoral returns. *Id.*  Instead of the Joint Session resolving this issue, Congress formed a separate commission to sort through the chaos and decide the issues of fact and law presented.  *Id.*  To address issues like this that arose during these rare occasions in history, Congress drafted the Electoral Count Act of 1887, placing on the states, the responsibility on the states to resolve disputes about electors and their appointments and certifications.  Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 540, 543 (July 2004).

In 1969, there was an objection that a vote sent up to Congress from North Carolina should not be counted because it reflected the "faithless" elector that had refused to give his vote to Richard Nixon, despite Nixon winning the popular vote in that State.  The objection was rejected, and the vote at issue counted, because of the strong reminder of representatives such as R. Rarick who said, "We are not election supervisors nor given the discretion to recompute the vote received from a sovereign state.  The Constitution clearly proscribes our duty as to 'count the electoral votes,' the *ministerial* function of a central *collecting agency* and a *tabulating point*." *See Kesavan* at 1694, 2022 (emphases added).  For all these reasons, the Electoral Count is not a proceeding akin to a formal hearing.  Rather, it is a ceremonial meeting of both houses of Congress steeped in the tradition that decides nothing.  It is a political performance conducted in order to give the country a feeling of finality over the already final election results.  As a result, the Electoral Count does not qualify as an "official proceeding" and count One of the

"Accepted"

MAR 11 2023

Taylor James Johnston

Superseding Indictment should be dismissed.

## II. THE COUNT AT ISSUE ALSO SHOULD BE DISMISSED BECAUSE" 18 U.S.C. §1512(C)(2) REMAINS UNCONSTITUTIONALLY VAGUE

In his moving papers, Mr. Sturgeon explained that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague because it requires a factfinder to speculate as to the meaning of "corruptly...influences," the phrase "official proceeding," and where exactly the line must be drawn in determining if a defendant is *otherwise* obstructing, impeding, or influencing an official proceeding before Congress. *See* Def. Mot. at 10-14. In response, the government contends that a provision is only impermissibly vague if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *See* Gov't. Res. at 21. That, however, is precisely the situation confronting Mr. Sturgeon here. In, *United States v. Williams*, the Supreme Court reversed a circuit court's finding of vagueness with regard to a pandering statute. 553 U.S. 285 (2008). *Id.* The Supreme Court reasoned that:

> "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but *rather the indeterminacy of precisely what that fact is*. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent" – wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

*Id.* at 306. (emphasis added). The reasoning in *Williams* is exactly what Mr. Sturgeon argues -viz, that the language in §1512(c)(2) would leave a juror to doubt precisely what fact or facts are needed to make a decision. The word "corruptly" in §1512(c)(2) creates the same problem as the words "annoying" and "indecent" that the *Williams* court acknowledged were impermissibly vague in the pandering statute.

Try as it might, the government cannot successfully ignore the vagueness of the language of 18 U.S.C. §1512(c)(2). It cites to a series of cases to argue that "corruptly" is not vague and

that the defendant's reliance on *United States v. Poindexter,* 951 F.2d 369, 379 (D.C. Cir. 1991) is misplaced. *See* Gov't. Res. at 22-25. It is the government, however, that misunderstands the crux of *Poindexter.*

In *Poindexter,* the Court ruled *specifically* that the adverb "corruptly" should be read "transitively" and requires that the defendant "corrupt" *another* into violating their legal duty. The reason that *Poindexter* reached a different outcome than *United States v. Morrison,* 98 F. 3d 619 (D.C. Cir. 1996) was because, in *Morrison,* the word "corruptly" was applied exactly as described in the statute, i.e., persuading another to violate their legal duty. *Id.* at 630. So, *Morrison* and *Poindexter* are not at odds as the government suggests. Rather, the cases go hand and hand to rule that the word "corruptly" is only clear when it is applied transitively to circumstances where one individual corrupts another to violate their legal duty. That is because the word "corruptly" in the statute at issue in *Poindexter* and *Morrison* is followed by another phrase that provides context and identifies the specific action required to violate the law. Such circumstances are absent in this case as §1512(c)(2) has no such requirement. Indeed, the phrase "corruptly influences" does not resolve the ambiguity – it heightens the unconstitutional vagueness of the statute – because "influence" alone is another vague word that may mean many things and lacks the definiteness of "influencing another to violate their legal duty" at issue in *Poindexter* and *Morrison. See also Ricks v. District of Columbia,* 414 F.2d 1097 (D.C. Cir. 1968) (holding that a statute that criminalized "leading an immoral or profligate life" vague because "immoral" is synonymous with "corrupt, depraved, indecent, dissolute," all of which would result in "an almost boundless area for the individual assessment of another's behavior").

The government further questions *Poindexter* by citing to *Arthur Andersen v. United States,* 544 U.S. 696 (2005), a case that involved a jury instruction that failed to "convey the

requisite consciousness of wrongdoing." *Id.* at 698. This holding is not inconsistent with *Poindexter*, which involved an entirely different dispute and has no bearing or effect on why the word "corruptly" was deemed vague in *Poindexter*. The cases the government cite from other circuits are inapposite for the same reason. *See* Gov't. Res. at 24-31. *Poindexter* remains good law and identifies one of the many problems that the word "corruptly" presents in the obstruction statute. It is impermissibly vague because it does not provide a discernable standard for what conduct is prohibited, thereby allowing for arbitrary or discriminatory enforcement as in this case. For this reason too, count One of the Superseding Indictment should be dismissed.

The five recent district court decisions, *Sandlin, Caldwell, Nordean, Montgomery, and Mostofsky,* did not resolve the vagueness of §1512(c)(2) as applied to Mr. Sturgeon. In *Sandlin,* the Court refused to find the word "corruptly" vague as applied to the defendants because it found there was a clear nexus between their alleged conduct and the intent to obstruct the vote. *Sandlin* Opinion at 24-26. In *Sandlin,* the defendants allegedly engaged in advance planning, forcibly breached the Capitol building, assaulted Capitol police officers inside the building, and encouraged others to steal paperwork from the Senate Chamber. *Id.* In contrast to *Sandlin,* there is no nexus between Mr. Sturgeon's alleged actions and an intent to obstruct the vote count.

In *Sandlin,* the Court found the term "corruptly" in §1512(c)(2) to mean "wrongfully" and "independently criminal" and therefore was not impermissibly vague in that case because the defendants' alleged behavior was so intertwined with his concerted efforts to obstruct the vote that it fit squarely within the term. *Id.* at 25. *See also Nordean* at 24; *Motofsky* at 24 (agreeing with *Sandlin*). The *Sandlin* Court noted, however, that other cases with different facts could present closer questions. *Id.* This case is a perfect example of one that presents a closer question. Here, Mr. Sturgeon's conduct does not fit squarely within the core coverage of "corruptly"

10

"Accepted"

MAR 11 2023

Taylor James Johnatakis

because his actions are not inextricably intertwined with an intent to obstruct the vote count. Mr. Sturgeon did not enter the Capitol building and did not take any actions or say any words that demonstrated an intent to obstruct the vote count. The government's claim that he tried to "advance" on the Capitol building by allegedly pushing a barricade quite far from the entrance is purely speculative, especially in light of the fact that Mr. Sturgeon could have easily entered the Capitol building later in the afternoon when hundreds of other defendants were able to simply walk in. *See* Gov't Res. at 27.

At most, Mr. Sturgeon's actions are typical of a protest, similar to the thousands that have occurred in our country where protesters mass and law enforcement has to contain the crowd by deploying tear gas and control tactics. Being involved in a protest, or even a riotous protest, does not mean that one has the specific intent to obstruct a proceeding. The most glaring problem with charging some January 6 defendants with §1512(c)(2) is that it conflates their other alleged conduct, such as the alleged assaults on police officers on the grounds of the Capitol with an intent to obstruct the vote count taking place in the Capitol building. Here, there is no evidence- and the government does not contend – that Mr. Sturgeon entered the Capitol building or even tried to enter the Capitol to disrupt the Electoral Count. Accordingly, §1512(c)(2) is vague as to Mr. Sturgeon.

Shortly after the *Sandlin* decision, the district courts in *Caldwell* and *Nordean* also ruled that §1512(c)(2) is not impermissibly vague. *See Caldwell* and *Nordean* Opinions. In *Caldwell* and *Nordean*, the district courts agreed that the term "corruptly" must be understood in its intransitive form and that is why *Poindexter* does not control in a prosecution under §1512(c)(2). *Caldwell* Opinion *at* 22-33; *Nordean* Opinion at 22. However, it is the intransitive form of the term "corruptly" that makes it especially vague in this case. Mr. Sturgeon did not personally act

"corruptly" with respect to any intent to obstruct the vote count. Furthermore, it cannot be that the alleged assault via barricade is evidence of intent to obstruct the vote, a separate crime with a separate *mens rea* – without any further indication of intent to obstruct the vote count itself. It also could not have been the statements the government alleges he made while present on the Capitol grounds because none of those statements indicated a desire to stop the vote count. In fact, one of those statements expressed a desire to peacefully protest and "not to hurt the police" but to "represent a real issue, STAND." *See* Gov't. Res. at 7. Simply put, there is no action that could have put Mr. Sturgeon on notice that he was acting corruptly with regards to the allegation that he tried to stop the vote count.

The district court in *Caldwell* relied on *Arthur Anderson* and other circuit decisions that interpreted "corruptly" to require the "consciousness of wrongdoing." *Caldwell* at 23-24. The Court found that interpretation readily applied to the *Caldwell* defendants who were allegedly members of the Oath keepers and conspired and pre-planned their January 6, 2021 activities and that (except for one) forcibly breached the Capitol. *Id.* at 3-5 (defendants allegedly collected paramilitary gear and were armed with such gear on January 6, chatted together about plans prior to January 6, and some were allegedly part of a group that pushed through a line of officers inside the Capitol building). With those alleged facts, none of which are present here, the Court found a logical nexus existed between the inherent "consciousness of wrongdoing" and the intent to halt the vote count. *Id.* at 23-24. That same nexus, however, does not exist or apply to those individuals, like Mr. Sturgeon, who did not plan anything in advance and did not even enter the Capitol building. Further, the "consciousness of wrongdoing" of the acts attributed to Mr. Sturgeon – protesting on the Capitol grounds and allegedly pushing a barricade– are unconnected to the intent or "consciousness" of halting a vote count.

In *Montgomery*, the court also found that a "nexus" requirement is consistent with past decisions. *Montgomery* Opinion at 44-45 (defendants allegedly wore tactical vests, used violence on officers, and stormed the Senate). The court reasoned that §1512(c)(2) requires the defendant's conduct to have the "natural and probable effect of interfering with an official proceeding and the accused must have known his actions were likely to affect a particular proceeding." *Id.* (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)). In this case, that link cannot be made. It is not reasonable to say that Mr. Sturgeon's actions of protesting on the Capitol grounds had the "natural and probable effect" of halting the vote when there was no particular action that Mr. Sturgeon took that could be reasonably linked to the interference of the vote. For these reasons, the statute is unconstitutionally vague as applied to Mr. Sturgeon.

## III. SECTION 231(A)(3) IS STILL UNCONSTITUTIONALLY VAGUE

In his moving papers, Mr. Sturgeon explained that §231(a)(3)'s imprecise language is overbroad and unduly vague, both generally and as applied to him, and impermissibly relies on a police officer's subjective reaction to the conduct of others to determine whether or not the statute has been violated. *See* Def. Mot. at 16-20.

To try to paper over these material flaws in the statute, the government purports to read an express *mens rea* requirement into §231(a)(3) by contending there must be an intent on the part of the defendant to impede or interfere. *See* Gov't Res. at 41. In so contending, the government ignores that various parts of the statute do not rely on the defendant's *mens rea* but rather allow for police officers and the government to subjectively determine what does, or does not, constitute improper conduct by a defendant, rather than providing enumerated conduct that can be readily understood and uniformly applied. In this regard, it is not the defendant who decides whether or not there is (1) a civil disorder; (2) if his conduct is "incident to" that civil

13

disorder; and (3) whether that conduct delayed, obstructed, or adversely affected commerce. That leaves a lack of an express scienter requirement as whole because it is impossible to intend to obstruct or impede a civil disorder where a potential defendant that (1) has no way of knowing what civil disorder is; (2) cannot know if their actions are incident to that civil disorder and; (3) cannot possibly know whether their conduct delays or obstructs or adversely affects commerce.

Moreover, the government fails to address Mr. Sturgeon's remaining arguments regarding the inherent vagueness that exists in the statute. Nor does the government address why §231(a)(3) is not impermissibly vague as applied to Mr. Sturgeon. Mr. Sturgeon could not have been on notice that he was allegedly committing a civil disorder given the unconstitutionally vague nature of the statute.

The government cites to *Nordean*, which recently ruled that §231(a)(3) is not unconstitutionally vague, explaining that its terms are not dependent on the subjective reaction of others. *See Nordean* Opinion at 35. However, the Court did not reason why it found so, leaving the question of how its terms are any less subjective than the terms "annoying" or "indecent" found to be vague in *Williams*. *See Williams*, 553 U.S. at 306. In *Nordean*, the court also found §231(a)(3) was not vague as applied to the defendants in that case because their alleged actions of "evading detection by law enforcement on January 6" and charging over metal barriers and past law enforcement officers toward the Capitol that day, fit within the type of conduct prohibited by §231(a)(3). *See Nordean* Opinion at 36. However, the Court did not explain why those alleged actions fit squarely within all of the required elements of the civil disorder statute. To be convicted of §231(a)(3), it is not sufficient just to "interfere with law enforcement," one must do so during a *civil disorder* and in way that *obstructs* or *delays* or *adversely affects* interstate commerce. As such, the *Nordean* decision does not resolve the vagueness of

§231(a)(3) on its face or as applied to Mr. Sturgeon.

**IV.    18 U.S.C. §1752(a)(1) DOES INFRINGE UPON MR. STURGEON'S FIRST AMENDMENT RIGHTS**

In response to Mr. Sturgeon's argument that §1752(a)(1) unconstitutionally infringes on his First Amendment rights, the government asserts he is not shielded from prosecution because he allegedly shoved a barricade into police officers. *See* Gov't. Res. at 43. However, to be convicted of §1752(a)(1), there need not be an act of assault, it simply penalizes anyone who enters and remains in a restricted area. It is this alleged conduct that Mr. Sturgeon argues is protected conduct, not allegedly pushing a barricade into an officer. Therefore, the government's entire reasoning is flawed because it has based its analysis on all of the conduct alleged in the indictment, and not specifically the conduct alleged in Count Four.

The government incorrectly relies on *Nordean*, which ruled that §1512(c)(2) does not violate the First Amendment. *See Nordean* Opinion at 28-30. However, §1512(c)(2) requires an action or series of actions that result in obstruction, which is why the *Nordean* court ruled it is not "expressive" conduct. *Id.* at 29. Section 1752(a)(1) only requires presence in a restricted area. Mr. Sturgeon argues that the restriction of his presence on the Capitol grounds is a violation of the First Amendment. The government cannot conflate his other alleged conduct that is separate and apart with this particular allegation that has First Amendment implications. Therefore, the *O'Brien* factors do apply.

The government then argues, that even if the *O'Brien* factors apply, that protecting the integrity of the Presidential Election is a substantial government interest that outweighs the First Amendment. *See* Gov't. Res. at 46. However, the government does not support its argument with any further reasoning. It simply cites to a case that upheld a ban on overnight camping on the National Mall. *Id.* (citing *Clark Cmty. For Creative Non-Violence*, 468 U.S. 288, 299

15

"Accepted"

MAR 11 2023

Taylor James Johnston

(1984)). However, that case involved a group of demonstrators who were permitted to protest on the National Mall but were prohibited simply from sleeping there overnight. *Id.* That case is not on point as the discussion here is whether the Capitol grounds can be restricted to demonstrators during a congressional meeting, not whether or not they can sleep on the grounds overnight.

## V. 18 U.S.C. §1752 REMAINS AMBIGUOUS AND THE LEGISLATIVE HISTORY CONTINUES TO COMPEL THE CONCLUSION THAT THE UNITED STATES SECRET SERVICE IS THE ONLY ENTITY DESIGNATED TO RESTRICT AREAS UNDER THE STATUTE

The government argues that 18 U.S.C. §1752 is unambiguous and, therefore, there is no need to consider the legislative history of the statute. *See* Gov't. Res. at 48. The government is wrong.

The language of §1752 is unclear. It states: "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area." Yet, it does not identify who may do the restricting, and Congress could not possibly have intended that anyone could impose a restriction. This lack of clarity and guidance to law enforcement or to the public as to who is authorized to impose restrictions under the statute makes the statute ambiguous. Given this ambiguity, we must look to the legislative history to determine what Congress intended. *See U.S. v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) (citing *Staples v. United States*, 511 U.S. 600, 605 (1994)).

The government is incorrect that the legislative history supports broad authority for any entity to restrict Congressional grounds. *See* Gov't. Res. at 49-50 (citing *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2015)). *Bursey*, however, involved in *what manner* the area is deemed restricted, holding that §1752 did not require a physical demarcation and that the presence of law enforcement was sufficient to mark the area as restricted. *Id.* at 308. *Bursey* actually supports Mr. Sturgeon's position, fully supported by the legislative history, that only the Secret Service is

"Accepted"  MAR 11 2023  *Taylor James Johnston*

vested with the power to set federal restricted areas because, in *Bursey*, the Secret Service was the entity that designated an area at the Columbia airport as restricted. *Id.* at 304.

The government seeks to have the Court forego any consideration of the legislative history of §1752 even though the Senate Judicial Committee report unambiguously vests the Secret Service with the power to set federal restricted areas. S. Rep. No. 91-1252 (1970) at 7. If Congress did not intend to vest that authority with the Secret Service, it would not have named that agency specifically. Moreover, vesting this power with the Secret Service makes perfect sense, as it is the entity that is charged with protecting the President and Vice President.

The government contends that, because the current version of the statute does not specifically reference the Secret Service, that means Congress purposefully removed it to broaden the authority to other entities. This assumption is unfounded and the government cites to no legislative statement or other authority stating that this was intended as part of revising the statute. In the absence of any such clear direction, the Court should not interpret §1752 to provide authority for any entity to restrict the grounds other than the entity that protects the President and Vice President and has historically had the sole authority to do so.

## VI. THE COUNTS AT ISSUE SHOULD BE DISMISSED BECAUSE FORMER VICE PRESIDENT MIKE PENCE WAS NOT "TEMORARILY VISITING" THE U.S. CAPITOL ON JANUARY 6, 2021

As an initial matter, the government cannot amend the Grand Jury's indictment through a pleading. The Superseding Indictment in this case charges Mr. Sturgeon with conduct "*where the Vice President was temporarily visiting.*" *See* ECF No. 53 (emphasis added). The Superseding Indictment does not charge that "Vice President Mike Pence and his family were present" in the U.S. Capitol building when Mr. Sturgeon is alleged to have violated 18 U.S.C. § 1752. *See* Gov't. Res. at 51. The indictment does not charge what the government now

17

apparently wishes it did and those counts at issue cannot stand on the basis of what might have been. Moreover, even if the Superseding Indictment did charge that "Vice President Mike Pence and his family were present" in the U.S. Capitol building on January 6, 2021, the indictment still would fail to state any offense. Section 1752 requires, in pertinent part, that the restricted area be "grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c).

The government acknowledges, as it must, that Vice President Pence worked at the Capitol building. *See* Gov't. Res. at 51. Contrary to the government's assertion, this fact is crucial when analyzing the plain text of the statute. It could not be more relevant that Vice President Pence lived in D.C. and had a permanent U.S. Capitol office. The statute and the "temporarily visiting" part of the statute, was promulgated specifically to address the difficulties of protecting the President "when he is outside the White House complex traveling or residing temporarily *in some other section of the country.*" Auth. Of Sec'y Treasury to Ord. Closing of Certain Sts. Located Along the Perimeter of the White House, 19 Op. O.L.C. 109 (1995) ("*Authority of the Secretary*") (emphasis added).[3] In the floor debate on the bill, legislators discussed "the problems confronting the Secret Service when protecting the President *outside of Washington.*" *Id.* (emphasis added). Nonetheless, Mr. Sturgeon does not suggest the statute applies "only to locations outside the District of Columbia." Mr. Sturgeon simply highlights the obvious: that a person generally cannot be said to be "temporarily visiting" his own office building located approximately four miles from his residence.

The government contends Vice President Pence was only "temporarily visiting" the Capitol because he was "physically present . . . for a particular purpose" and "intended to leave

---

[3] Available at https://www.justice.gov/file/20226/download.

18

at the close of the session." *See* Gov't Res. at 52. This novel interpretation of "temporarily visiting" proves too much and is unworkable. If adopted by the Court, every person "physically present" at the Capitol that day—or any day- every Congressperson, every staffer, every U.S. Capitol Police officer—is just "temporarily visiting" the Capitol. By that logic, only a person meandering aimlessly through the Capitol for no purpose, or a person who never intended to leave the Capitol, would fall outside the scope of "temporarily visiting." The Court should reject the government's invitation to effectively read all meaning out of an express limitation in a criminal statute. *See United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself" and "is founded on the tenderness of the law for the rights of individuals . . . .").

To the extent that unidentified family members of Vice President Pence are now alleged to constitute a basis to impose federal criminal liability on thousands of people for trespassing on January 6, the government's argument fares no better. *See* Gov't. Res. at 52. Members of Vice President Pence's family were, in the government's own words, allegedly "present" to "attend" and "to observe" a Congressional meeting in a federal building where the Vice President maintains a *permanent* office and *presides*. The Vice President's family members were not on vacation or at a speaking event. That a family member may not work independently or have an independent office at the U.S. Capitol does not transform the U.S. Capitol into a "temporary visit," as expressly required by the criminal statute at issue. After almost one year of charging January 6 defendants and just weeks after filing a Superseding Indictment that does not mention them, the government now tries to shoehorn new protectees into this case out of the blue and without providing a basis for why they were "temporarily visiting" as intended by Congress. The Court should reject the government's transparent and improper efforts to save Counts that

should be stricken.

In effect, the government reads the words "temporarily visiting" out of the statute completely. Under the government's limitless interpretation, the words "temporarily visiting" are meaningless and superfluous. "The Government's reading is thus at odds with one of the most basic interpretive canons, that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *see also Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative") (citing *United States v. Menasche*, 348 U.S. 528, 538–539 (1955)).

If Congress wanted to define "restricted building or grounds" to encompass anywhere a Secret Service protectee "is or will be physically present" at any given time, Congress easily could have, and would have, omitted the words "temporarily visiting" or used the words "physically present" instead in § 1752(c)(1)(B). *See Burgess v. United States*, 553 U.S. 124, 130 (2008) ("As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated.") (alteration and ellipsis in original) (quoting *Colautti*, 439 U.S. at 392-393 n. 10). "Congress did not write the statute that way." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Naftalin*, 441 U.S. 768, 773–774 (1979)). Consequently, the statute simply does not restrict any government building in which a Secret Services protectee is or will be "physically present." *Id.* And, "[r]eading the statute to proscribe a wider range of offensive conduct," as the government now urges, "would raise the due process concerns underlying the vagueness doctrine." *Skilling v. United States*, 561 U.S. 358, 408 (2010).

Section 1752 expressly delineates three definitions of the term "restricted building or

grounds" pursuant to which individuals may be criminally punished. "When 'a statute includes an explicit definition' of a term, 'we must follow that definition . . . .'" *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020)). In addition, section 3056(d) criminalizes obstruction and interference with a Secret Service officer's performance of his or her "protective functions," including deterring and punishing those individuals who the government fears may seek unauthorized access to the President's or Vice President's location. See 18 U.S.C. §3056(d); *see also Authority of the Secretary*, 19 Op. O.L.C. at 109 (§ 3506 "grants the Secretary broad authority to take actions that are necessary and proper to protect the President").

The government's purported concern should be directed to Congress to amend the statute, not to a request that this Court interpret a statute contrary to its language. The Supreme Court has recently rejected other government attempts to stretch federal criminal statutes beyond their natural boundaries. *See Kelly v. United States*, 140 S.Ct. 1565, 1574 (2020) (government's use of federal fraud statutes to try to criminalize the regulatory actions of government officials an impermissible and overbroad application of the statute); *Van Buren*, 141 S.Ct. at 1661 (finding the government's broad construction of the computer fraud and abuse statute would implicate a large amount of commonplace activity not meant to be covered by the statute). This Court should reject the government's attempt to do the same here.

## CONCLUSION

For all of the reasons discussed above, and his moving motion to dismiss, Isaac Sturgeon,

respectfully requests that the Court dismiss counts One, Three, Four, Five, and Six of the

Superseding Indictment.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500
Maria_Jacob@fd.org

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE



Notice Date:        Day:Nine        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 90 Filed 11/07/22 Page 1 of 2 UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL) **DEFENDANT ISAAC
STURGEON'S MOTION FOR JOINDER**, Page 2 of 2 A.J. KRAMER FEDERAL PUBLIC DEFENDER
Maria N. Jacob, Case 1:21-cr-00091-RCL Document 90-1 Filed 11/07/22 Page 1 of 1 **ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept
your Presentment "Case 1:21-cr-00091-RCL Document 90 Filed 11/07/22 Page 1
of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA No. 21-cr-091 (RCL) DEFENDANT ISAAC STURGEON'S
MOTION FOR JOINDER**, Page 2 of 2 A.J. KRAMER FEDERAL PUBLIC
DEFENDER Maria N. Jacob, Case 1:21-cr-00091-RCL Document 90-1 Filed
11/07/22 Page 1 of 1 **ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 90 Filed 11/07/22 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL) DEFENDANT ISAAC STURGEON'S MOTION FOR
JOINDER**, Page 2 of 2 A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Case 1:21-cr-00091-RCL
Document 90-1 Filed 11/07/22 Page 1 of 1 **ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**"Accepted"**

MAR 09 2023

*Taylor James Johnatakis*

UNITED STATES OF AMERICA,      )
                               )
                 v.            )      No. 21-cr-091 (RCL)
                               )
ISAAC STURGEON,                )
                               )
            Defendant          )
                               )

RECEIVED
Mail Room

MAR 15 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## DEFENDANT ISAAC STURGEON'S MOTION FOR JOINDER

COMES NOW Defendant, Isaac Sturgeon, by and through undersigned counsel, hereby respectfully moves to join defendant Craig Michael Bingert's Motion to Dismiss (Dkt. No. 87). As grounds, Mr. Sturgeon states as follows:

1. Isaac Sturgeon, along with co-defendant's Craig Bingert and Taylor Johnatakis, are charged in all eight counts of the Superseding Indictment (Dkt. No. 53).

2. The facts and circumstances set forth in Mr. Bingert's Motion to Dismiss are equally applicable to Mr. Sturgeon.

3. Mr. Sturgeon respectfully requests that the Court allow him to join this motion filed by co-defendant Craig Bingert in the interests of judicial efficiency.

4. Mr. Sturgeon seems the same relief applicable to him in the event that this motion is granted by the Court.

Wherefore, for the foregoing reasons, Mr. Sturgeon, hereby respectfully moves to join Craig Bingert's Motion to Dismiss (Dkt. No. 87).

Respectfully submitted,

1

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____

Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

2

"Accepted"

MAR 09 2022

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*Taylor James Johnstaters*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 21-091 (RCL)** |
| | ) | |
| **ISAAC STURGEON** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Upon consideration of the motion for joinder filed by defendant Isaac Sturgeon, and for good cause shown, it is hereby this _____ day of _____, 2022

ORDERED that said motion be, and hereby is, GRANTED.

IT IS FURTHER ORDERED that Isaac Sturgeon is permitted to join Craig Bingert's Motion to Dismiss (Dkt. No. 87).

Dated _____, day of _____, 2022.

_____
Honorable Royce C. Lamberth
Senior United States District Judge

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date: ~          Day: Nine          Month: Three          ~~Year: 2023 CE~~



RECEIVED
Mail Room

MAR 15 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 15 Filed 02/17/21 Page 1 of 1 UNITED STATES DISTRICT COURT for the
District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C. Assign Date: 02/05/2021 Description: INDICTMENT
(B) **ARREST WARRANT** Date 02/05/2021 G. Michael Harvey Digitally signed G. Michael Harvey U.S. Magistrate Judge,
Return This warrant was received on (*date*) 2-05-2021 and the person was arrested on (*date*) 2-11-2021 at (*city and state*)
Kingston WA Date: 2-11-2021"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 15 Filed 02/17/21 Page 1 of 1 UNITED STATES DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C. Assign Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** Date 02/05/2021 G. Michael Harvey Digitally signed G. Michael Harvey U.S. Magistrate Judge, Return This warrant was received on (*date*) 2-05-2021 and the person was arrested on (*date*) 2-11-2021 at (*city and state*) Kingston WA Date: 2-11-2021" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment:"Case 1:21-cr-00091-RCL Document 15 Filed 02/17/21 Page 1 of 1 UNITED STATES DISTRICT COURT for the District of Columbia
Case: 1:21-cr-00091 Assigned To: Lamberth Royce C. Assign Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** Date
02/05/2021 G. Michael Harvey Digitally signed G. Michael Harvey U.S. Magistrate Judge, Return This warrant was received on (*date*)
2-05-2021 and the person was arrested on (*date*) 2-11-2021 at (*city and state*) Kingston WA Date: 2-11-2021"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: G Michael Harvey, U.S. Magistrate Judge, 333 Constitution Avenue NW Washington, D.C. 20001

FILED _____ LODGED
_____ RECEIVED

**February 11, 2021**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

**"Accepted"**

MAR 09 2023

*Taylor James Johnatakis*

United States of America

v.

Taylor James Johnatakis

_____
Defendant

)
)
)
)
)

Case: 1:21-cr-00091
Assigned To : Lamberth, Royce C.
Assign. Date : 02/05/2021
Description: INDICTMENT (B)

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

MAR 15 2023

RECEIVED
Mail Room

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*     Taylor James Johnatakis

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint

☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. §§ 1512(c)(2), 2 - Obstruction of an Official Proceeding; 18 U.S.C. § 111(a)(1) - Assaulting, Resisting, or
Impeding Certain Officers; 18 U.S.C. § 231(a)(3) - Civil Disorder; 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a
Restricted  Building or Grounds; 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or
Grounds; 18 U.S.C. § 1752(a)(4) - Engaging in Physical Violence in a Restricted Building or Grounds;
40 U.S.C. § 5104(e)(2)(E) - Impeding Passage Through the Capitol Grounds or Buildings; 40 U.S.C. § 5104(e)(2)(F) -
Act of Physical Violence in the Capitol Grounds or Buildings.

Digitally signed by G. Michael
Harvey
Date: 2021.02.05 16:15:25 -05'00'

Date:   02/05/2021                                      _____
                                                        *Issuing officer's signature*

City and state:   Washington, D.C.                     G. Michael Harvey, U.S. Magistrate Judge
                                                        *Printed name and title*

| Return |
|---|
| This warrant was received on (date) 2-05-2021, and the person was arrested on (date) 2-11-2021 |
| at (city and state) Kingston, WA . |

Date:  2-11-2021                                     _____
                                                      *Arresting officer's signature*

                                                      SH Kathryn Hamstra, FBI
                                                      *Printed name and title*

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day:Nine        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



In reply to : "Case 1:21-cr-00091-RCL Document 89 Filed 11/06/22 Page 1 of 2 IN THE UNITED STATES FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER, Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 89-1 Filed 11/06/22 Page 1 of 1 ORDER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 89 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01** DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER, Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 89-1 Filed 11/06/22 Page 1 of 1 ORDER" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 89 Filed 11/06/22 Page 1 of 2 IN THE UNITED STATES FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER, Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 89-1 Filed 11/06/22 Page 1 of 1 ORDER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

MAR 09 2023

*Taylor James Johnatakis*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　　　:　　**Case No. 1:21-cr-0091-RCL-01**
　　　　　　　　　　　　　　　　　　　:
CRAIG MICHAEL BINGERT, et al.,　　:
　　　　Defendant.　　　　　　　　　　:

## DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER

COMES NOW Defendant, Craig Michael Bingert, by and through undersigned counsel, hereby respectfully moves to join defendant Isaac Steve Sturgeon's Motion for Severance. (Dkt. No. 79) As grounds, Mr. Bingert states as follows:

1.　Craig Michael Bingert, along with co-defendants Isaac Steve Sturgeon and Taylor James Johnatakis, are charged in all eight counts of the Superseding Indictment. (Dkt. No. 53)

2.　The facts and circumstances set forth in Mr. Sturgeon's severance motion are equally and specifically applicable to Mr. Bingert in this prosecution. And the legal arguments and authorities set forth in the subject motion are those which Mr. Bingert would have cited, had he filed a separate motion. It would be entirely duplicative for this defendant to expend compensable and considerable time preparing and filing a severance motion which would be identical to the motion filed by his co-defendant, Isaac Steve Sturgeon.

-1-

3.     Mr. Bingert respectfully request that the Court allow him to join the severance motion filed by co-defendant Isaac Steve Sturgeon to the extent that it is applicable to him in the interests of judicial efficiency.

4.     Mr. Bingert seeks the same relief applicable to him in the event that Mr. Sturgeon's severance motions is granted by the Court.

WHEREFORE, for the foregoing reasons and such other reasons which may appear just and proper, defendant, Craig Michael Bingert, hereby respectfully moves to join defendant Isaac Steve Sturgeon's Motion for Severance. (Dkt. No. 79)

Respectfully Submitted,

**Allen H. Orenberg**
Digitally signed by Allen H. Orenberg
Date: 2022.11.06 17:28:33 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Craig Michael Bingert

Dated: November 6, 2022

"Accepted"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAR 0 9 2022

UNITED STATES OF AMERICA,     :
                              :
        v.                    :        Case No. 1:21-cr-0091-RCL-01
                              :
CRAIG MICHAEL BINGERT, et al. :
        Defendant.            :

*Taylor James Johnstalas*

## ORDER

Upon consideration of the motion for joinder filed by defendant Craig Michael

Bingert to join co-defendant Isaac Steve Sturgeon's motion for severance (Dkt. 79), and

for good cause shown, it is hereby this _____ day of _____, 2022, the

motion is GRANTED.

Defendant, Craig Michael Bingert, is permitted leave of Court to join defendant

Isaac Steve Sturgeon's Motion for Severance. (Dkt. No. 79)


_____
Judge,
U. S. District Court for the District of Columbia

1

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day:Nine          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



In reply to : "Case 1:21-cr-00091-RCL Document 88 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 NOTICE OF PUBLIC AUTHORITY DEFENSE** Respectfully Submitted Allen H. Orenberg, Page 2 of 2 Dated: November 6, 2022"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 88 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 NOTICE OF PUBLIC AUTHORITY DEFENSE** Respectfully Submitted Allen H. Orenberg, Page 2 of 2 Dated: November 6, 2022" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 88 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 NOTICE OF PUBLIC AUTHORITY DEFENSE** Respectfully Submitted Allen H. Orenberg, Page 2 of 2 Dated: November 6, 2022"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted" MAR 09 2023    *Taylor James Johnstakis*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      v.

                     :      Case No. 1:21-cr-0091-RCL-01

CRAIG MICHAEL BINGERT, et al.,
Defendant.

RECEIVED
Mail Room

MAR 15 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## NOTICE OF PUBLIC AUTHORITY DEFENSE

    Craig Michael Bingert, through counsel, and pursuant to Federal Rule of Criminal Procedure 12.3, hereby gives notice that he may assert as a defense at trial that he was acting under actual or believed public authority at the time of some of the alleged offenses. Mr. Bingert submits that, on or about January 6, 2021, he was and believed he was directed and authorized to march to the Capitol building and enter the Capitol Grounds by Donald J. Trump and his various agents and representatives. At the time, Mr. Trump was vested with the full authority of the Executive Branch as President of the United States of America and was acting under color of that authority.

                          Respectfully Submitted,

Allen H. Orenberg
    Digitally signed by Allen H. Orenberg
    Date: 2022.11.06 14:39:42 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008

-1-

Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Craig Michael Bingert

Dated: November 6, 2022

"Accepted"

MAR 09 2023

Taylor James Johnston

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day:Nine        Month: Three       Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

**RECEIVED**
**Mail Room**

**MAR 15 2023**

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

In reply to : "Case 1:21-cr-00091-RCL Document 87 Filed 11/06/22 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO DISMISS COUNTS 4 5 6 7 & 8 AS MULTIPLICITOUS WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES,** Page 2 of 3, Page 3 of 3 Respectfully Submitted Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 87-1 Filed 11/06/22 Page 1 of 1 **ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 87 Filed 11/06/22 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO DISMISS COUNTS 4 5 6 7 & 8 AS MULTIPLICITOUS WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES,** Page 2 of 3, Page 3 of 3 Respectfully Submitted Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 87-1 Filed 11/06/22 Page 1 of 1 **ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 87 Filed 11/06/22 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO DISMISS COUNTS 4 5 6 7 & 8 AS MULTIPLICITOUS WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES,** Page 2 of 3, Page 3 of 3 Respectfully Submitted Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 87-1 Filed 11/06/22 Page 1 of 1 **ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :
                                     :

    v.    :        Case No. 1:21-cr-0091-RCL-0

                                       :

CRAIG MICHAEL BINGERT    :
    Defendant.    :

## DEFENDANT CRAIG MICHAEL BINGERT'S MOTION TO DISMISS COUNTS 4, 5, 6, 7, & 8 AS MULTIPLICITOUS WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES

COMES NOW Defendant, Craig Michael Bingert, by and through undersigned counsel, hereby respectfully moves this Honorable Court for the entry of an Order dismissing Counts 5, 6, 7, 8 & 9 of the Superseding Indictment (Doc. 53) 4, as multiplicitous. As grounds, the following is stated:

### Background

1.    Mr. Bingert is charged in Counts 4, 5, 6, 7, & 8 with violations of:

Count 4 – 18 U.S.C. § 1752(a)(1) (Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority).

Count 5 – 18 U.S.C. §1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds)

Count 6 – 18 U.S.C. §1752(a)(4) (Engaging in Physical Violence in a Restricted Building or Grounds)

Count 7 – 40 U.S.C. §5104 (e)(2)(E) (Obstructing, or Impeding Passage Through or Within, the Grounds or Any of the Capital Buildings)

-1-

Count 8 – 40 U.S.C. §5104 (e)(2)(F) (Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol)

A jury trial is scheduled for May 15, 2023.

2.      Convictions for all these counts would violate the Double Jeopardy Clause of the U.S. Constitution. Moreover, the unnecessary multiplication of counts will prejudice a jury against Mr. Bingert. Multiplicity arises when "an indictment charges the same offense in more than one count." *United States v. Mahdi*, 598 F.3d 883, 887 (D.C. Cir. 2010), quoting *United States v. Weathers*, 186 F.3d 948, 951 (D.C. Cir. 1999). The Double Jeopardy Clause of the Constitution protects against "multiple punishments for the same offense." *Weathers*, 186 F.3d at 951, cert. denied, 529 U.S. 1005 (2000); U.S. Const. amend. V, cl. 2.

Also, courts have recognized that charging the same offense in multiple counts can "unfairly increas[e] a defendant's exposure to criminal sanctions" because a jury may conclude that given the number of charges, the defendant must be guilty of something. *United States v. Clarke*, 24 F.3d 257, 261 (D.C. Cir. 1994), quoting *United States v. Harris*, 959 F.2d 246, 250 (D.C. Cir. 1992), abrogated on other grounds, *United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001); see also *United States v. Morrow*, 102 F. Supp. 3d 232, 246 (D.D.C. 2015) (multiplicitous charges may suggest to a jury "that a defendant has committed not one but several crimes"), quoting *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981); *United States v. Phillips*, 962 F. Supp. 200, 202 (D.D.C. 1997).

The subject five counts of the Superseding Indictment expose the defendant to double, and even triple jeopardy for the same alleged acts. The Double Jeopardy

Clause protects criminal defendants against both successive punishments and prosecutions for the same criminal offense. *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969)); see also *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008); *United States v Mancuso*, 718 F.3d 780, 791 (9th Cir. 2013). When two different criminal statutes are violated, "the double jeopardy prohibition is implicated when both statutes prohibit the same offense or when one offense is a lesser included offense of the other." *Rutledge v. United States,* 517 U.S. 292, 297 (1996)).

WHEREFORE, for the foregoing reasons and such other reasons that may appear just and proper, Mr. Bingert requests this Court to grant this motion and dismiss Counts 4, 5, 6, 7, & 8 of the Superseding Indictment, as multiplicitous counts.

Defendant, by counsel, requests a hearing on this motion.

Respectfully Submitted,

**Allen H. Orenberg**
Digitally signed by Allen H. Orenberg
Date: 2022.11.06 15:02:36 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Craig Michael Bingert

Dated: November 6, 2022

Clause protects criminal defendants against both successive punishments and prosecutions for the same criminal offense. *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969)); see also *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008); *United States v Mancuso*, 718 F.3d 780, 791 (9th Cir. 2013). When two different criminal statutes are violated, "the double jeopardy prohibition is implicated when both statutes prohibit the same offense or when one offense is a lesser included offense of the other." *Rutledge v. United States,* 517 U.S. 292, 297 (1996)).

WHEREFORE, for the foregoing reasons and such other reasons that may appear just and proper, Mr. Bingert requests this Court to grant this motion and dismiss Counts 4, 5, 6, 7, & 8 of the Superseding Indictment, as multiplicitous counts.

Defendant, by counsel, requests a hearing on this motion.

Respectfully Submitted,

Allen H. Orenberg
Digitally signed by Allen H. Orenberg
Date: 2022.11.06 15:02:36 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Craig Michael Bingert

Dated: November 6, 2022

-3-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :
    :
    v.    :    **Case No. 1:21-cr-0091-RCL-01**
    :
CRAIG MICHAEL BINGERT, et al. :
    Defendant.    :

## ORDER

Upon consideration of the motion for to Dismiss Counts 4, 5, 6, 7 & 8 as

Multiplicitous, opposition thereto, and for good cause shown, it is hereby this _____

day of _____, 2022, the motion is GRANTED.

Counts 4, 5, 6, 7 & 8 of the Superseding Indictment are dismissed.


_____
Judge,
U. S. District Court for the District of Columbia

1

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Four          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

> RECEIVED
> Mail Room
>
> MAR 15 2023
>
> Angela D. Caesar, Clerk of Court
> U.S. District Court, District of Columbia

In reply to : "Case 1:21-cr-00091-RCL Document 115 Filed 03/03/23 Page 1 of 3 COPY IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR SEVERANCE [110] SCHEDULED FOR MARCH 9 2023, Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 CERTIFICATE OF SERVICE Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 ORDER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 115 Filed 03/03/23 Page 1 of 3 COPY IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR SEVERANCE [110] SCHEDULED FOR MARCH 9 2023, Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 CERTIFICATE OF SERVICE Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 ORDER" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 115 Filed 03/03/23 Page 1 of 3 COPY IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR SEVERANCE [110] SCHEDULED FOR MARCH 9 2023, Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 CERTIFICATE OF SERVICE Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 ORDER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

COPY

RECEIVED
Mail Room

MAR 15 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

"Accepted"

MAR 09 2023

Taylor James Johnatakis

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  :
:
v.  :  Case No. 1:21-cr-0091-RCL-01
:
CRAIG MICHAEL BINGERT, et al. :
Defendant.  :

### CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR SEVERANCE, [110] SCHEDULED FOR MARCH 9, 2023

COMES NOW CRAIG MICHAEL BINGERT, by and through counsel, and hereby requests the entry of an order continuing the status hearing and a hearing on defendant Bingert's motion for severance [110], scheduled for March 9, 2023, at 11:30 a.m., to a date convenient to the Court and to the parties. As grounds, the following submitted:

1.   This motion is consented to per AUSA Kaitlin Klamann and AFPD Maria Jacob.[1] The position of *pro se* co-defendant Taylor James Johnatakis is unknown.

2.   On March 3, 2023, the Court issued a Minute Order scheduling a status hearing and a hearing on defendant Bingert's motion for severance [110] for March 9, 2023 at 11:30 a.m. (VTC) A jury trial is scheduled for May 15, 2023.

_____

[1] Counsel is transmitting this motion (and a proposed order) by e-mail to attorney Chris Black, stand-by counsel for *pro se* co-defendant Taylor James Johnatakis.

1

3.    On March 6, 2023, undersigned counsel is starting a 5-8 day bench trial before U.S. District Judge Carl J. Nichols. (21-447-CJN) Consequently, does not expect to be available to this Court on March 9, 2023, at 11:30 a.m.

4.    The following dates/times are suggested:

March 16, 2023 (afternoon) or March 20, 2023 (after 3:30 p.m.).

(Please note undersigned counsel will be out of town and unavailable March 22, 2023 through March 27, 2023.)

If these proposed dates are not good for the Court, then the parties respectfully ask that the Courtroom Clerk contact counsel to discuss good dates/times.

WHEREFORE, for the foregoing reasons and such other reasons which may appear just and proper, the parties request the entry of an order continuing the status hearing and a hearing on defendant Bingert's motion for severance [110], scheduled for March 9, 2023, at 11:30 a.m., to a date convenient to the Court and to the parties.

Respectfully Submitted,

Allen H. Orenberg

Digitally signed by Allen H. Orenberg
Date: 2023.03.03 13:57:32 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. 301-984-8005
Cell Phone No. 301-807-3847
Fax No. 301-984-8008
aorenberg@orenberglaw.com

2

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2023, copies of the foregoing Motion to Continue

Status Hearing and Hearing on Defendant Bingert's Motion for Severance, [110] Scheduled

for March 9, 2023, and a proposed Order, were served to case registered parties by

CM/ECF, and by mail to:

> Taylor James Johnatakis
> 29628 Gamble Place NE
> Kingston, Washington 98346-9560

Allen H. Orenberg

Digitally signed
by Allen H.
Orenberg
Date: 2023.03.03
13:57:53 -05'00'

_____
Allen H. Orenberg, # 395519

3

"Accepted"

MAR 09 2023

*Taylor James Johnston*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,　　　：
　　　　　　　　　　　　　　　　：
　　　v.　　　　　　　　　　　：　　**Case No. 1:21-cr-0091-RCL-01**
　　　　　　　　　　　　　　　　：
CRAIG MICHAEL BINGERT, et al. ：
　　Defendant.　　　　　　　　：

### ORDER

Upon consideration of the consent motion filed by defendant Craig Michael Bingert, to continue the status hearing and a hearing on defendant Bingert's motion for severance [110] scheduled for March 9, 2023, at 11:30 a.m., and for good cause shown, it is hereby this _____ day of March, 2023, the motion is GRANTED.

The status hearing and hearing on defendant Bingert's motion for severance [110] will be scheduled for _____, 2023 at _____a.m ./ p.m., by VTC.


_____
Judge,
U. S. District Court for the District of Columbia

1

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Eight        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 82 Filed 10/17/22 Page 1 of 25 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Crim. Action No. 21-91 (RCL) **ISAAC STURGEON'S MOTION FOR TRANSFER OF VENUE**, Page 2 of 25, Page 2 of 25, Page 3 of 25, Page 4 of 25, Page 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 **CONCLUSION** A. J. Kramer Federal Public Defender for the District of Columbia By: /s/Maria Jacob"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 82 Filed 10/17/22 Page 1 of 25 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Crim. Action No. 21-91 (RCL) **ISAAC STURGEON'S MOTION FOR TRANSFER OF VENUE**, Page 2 of 25, Page 2 of 25, Page 3 of 25, Page 4 of 25, Page 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 **CONCLUSION** A. J. Kramer Federal Public Defender for the District of Columbia By: /s/Maria Jacob" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR 1 4 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 82 Filed 10/17/22 Page 1 of 25 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** Crim. Action No. 21-91 (RCL) **ISAAC STURGEON'S MOTION FOR TRANSFER OF VENUE**, Page 2 of 25, Page 2 of 25, Page 3 of 25, Page 4 of 25, Page 5 of 25, Page 6 of 25, Page 7 of 25, Page 8 of 25, Page 9 of 25, Page 10 of 25, Page 11 of 25, Page 12 of 25, Page 13 of 25, Page 14 of 25, Page 15 of 25, Page 16 of 25, Page 17 of 25, Page 18 of 25, Page 19 of 25, Page 20 of 25, Page 21 of 25, Page 22 of 25, Page 23 of 25, Page 24 of 25, Page 25 of 25 **CONCLUSION** A. J. Kramer Federal Public Defender for the District of Columbia By: /s/ Maria Jacob"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

ISAAC STURGEON,

             Defendant.

Crim. Action No. 21-91 (RCL)

## ISAAC STURGEON'S MOTION FOR TRANSFER OF VENUE

Isaac Sturgeon, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 21(a), hereby respectfully requests that this Court transfer the proceedings to his home district in Montana based on credible findings that he will not be able to receive a fair trial in the District of Columbia. *See* Exhibit 1, Jury Survey.[1]

### ARGUMENT

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is fundamental to Due Process and, notwithstanding constitutional venue prescriptions, when prejudice makes it such

---

[1] The jury survey attached was created by an expert hired by the Office of the Federal Public Defender as an effort to assess the federal jury pool in the District of Columbia. This motion to transfer venue is largely based on a similar motion filed in *U.S. v. Gieswein*, 21-cr-24 (EGS) and *United States v. Sean McHugh*, 21-453 (JDB).

"Accepted"

MAR 0 8 2023

Taylor James Schnabes

that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must* transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias). As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide the lower courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage. [2] *Skilling*, 561 U.S. at 378.

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728

---

[2] Though not relevant to the instant motion, the Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt.

(1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, *voir dire* is simply not a cure for significant and substantiated Due Process concerns about the jury pool.

Each of those concerns is pressing in this case.

### A. The size and characteristics of the District of Columbia jury pool weigh in favor of finding a presumption of prejudice.

The foundation for the presumption of prejudice is found in *Rideau*. 373 U.S. at 727. In *Rideau*, the first factor that the Court weighed in favor of a finding of prejudice was that about half of the small jury pool had been exposed to prejudicial media reporting about the case. *See id.* Despite the fact that *voir dire* revealed that only three jurors had actually seen the broadcasts at issue, the Court found that the share of the pool that was tainted was significant enough as to render the defendant presumptively prejudiced. *See id.*

Because measuring the reach and impact of negative media reporting is difficult, in applying *Rideau*, many courts have focused on population size and diversity as a proxy for the share of the population that was likely impacted. For

example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal, and because Houston is the fourth-largest city in the United States, and is highly diverse, a significant number of prospective jurors would have had no connection to Enron whatsoever. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

In contrast to Houston, the District of Columbia is one of the smaller major US cities, with a population under 700,000.[3] And the impact of the events of January 6 on the residents of the District of Columbia were far more widespread than that of Enron in Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*.

First, as the Court is no doubt aware, a huge proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater DC area (excluding postal workers, federal bureau of investigation workers, and staff on several federal commissions).[4] Nearly 200,000 of those workers and annuitants

---

[3] District of Columbia Population – April 1, 2020, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/washingtoncitydistrictofcolumbia,US.
[4] *Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.

4

are within the District itself. *Id.* With a total population of around 690,000, it seems clear that any given member of the District jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the DC Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in the District itself.[5] And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy.

In particular, nearly 15,000 individuals work for Congress directly, and many more residents have friends and family who do.[6] Another large share are in, or have friends and family in, the many law enforcement groups who took part in responding to January 6.[7] This means that an enormous share of District of Columbia residents

---

[5]*Trends in Federal Employment in DC,* DC Policy Center (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[6]*Vital Statistics on Congress,* Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.

[7] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021-2025,*U.S.Capitol Police (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. *See Metropolitan Police Force Annual Report 2020,* DC.gov (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.pdf ; *see also About Us,* DC National Guard (2020), https://dc.ng.mil/About-Us/. More than 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot,* N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html. And while not all individuals employed by these agencies reported to

have significant and unique connections with individuals or institutions that were affected by January 6. Such connections are not likely to be present in any other comparable district. The government has characterized the events of January 6 – including the attempted obstruction in which the government alleges Mr. Sturgeon participated – as an attack on our elections, government institutions generally, and democracy as a whole, suggest that those District residents closely connected to the government are more likely to view themselves as the direct victims of the events.

Second, even District residents that have no direct connection to the government reported feeling deeply traumatized by the events that took place so close to where they live and work. For example, one DC resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence.[8]

---

the Capitol on January 6, all 9,350 individuals *were* directly and adversely affected by the January 6 events in the form of increased presence and overtime demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021), https://thehill.com/policy/national-security/561832-more-than-75-capitol-police-officers-have-quit-amid-low-morale-since.

[8] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happens-thursday-edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-atrocities-at-u-s-capitol-1.5864894.

Such accounts are typical of those gathered in interviews in the days following January 6, during which the Mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration.[9] District neighborhoods became occupied by the Metropolitan Police and over 25,000 military personnel in the weeks that followed.[10] Indeed, a local subsidiary of the national public broadcasting network, *DCist*, reported that:

> Residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. [...] Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.[11]

---

[9] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today;*Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021) (noting the many street closures),https://www.washingtonian.com/2021/01/11/dc-mayor-says-americans-should-not-come-to-washington-for-the-inauguration/.

[10] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan. 15, 2021),https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.

[11] Jenny Gathright and Rachel Kurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, DCist (Jan. 13, 2021), https://dcist.com/story/21/01/13/dc-state-of-emergency-residents/.

"Accepted" MAR 08 2023 Taylor James Schmables

Moreover, as the Court is no doubt aware, the effects of these events continue to be felt in the District. Indeed, District residents reacted with fear in anticipation of protests planned for September of 2021 that were intended to show support for individuals detained in connection with prosecutions arising from the events of January 6. For example, the *New York Times* ran a piece titled "Washington, D.C. On Edge Over January 6 Protests,"[12] and the Associated Press similarly reported "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing the District's overall tenor and response to these ongoing demonstrations.[13]

Third, an overwhelming number of District of Columbia residents — over 92 percent — voted for President Biden.[14] According to the government's theory of the case, Mr. Sturgeon and the others charged in connection with January 6 did what they did in order to prevent Joseph Biden from becoming President notwithstanding his share of the electoral and popular vote.[15] That is, the government's theory is that Mr. Sturgeon and others were seeking to nullify the votes of an overwhelming majority of District residents[16] – in the *only* national election in which District

---

[12] Jonathan Weisman and Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. Times (Sept. 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html.

[13] Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021),https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters.

[14] *General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

[15] *See, e.g.*, Gov't Mem., ECF No. 19 at 13 (characterizing the events as an attempt to occupy the Capitol in order to prevent the certification of the Electoral College results).

[16] *See id.*

"Accepted"

MAR 0 8 2023

Taylor James Johnston

residents have any say, given their lack of representation in Congress. *See, e.g.*, *Castanon v. United States*, 444 F. Supp. 3d 118, 139 (D.D.C. 2020) ("Article I contemplates that only 'residents of actual states' have and may exercise the House franchise") (citing *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000)), *reconsideration denied*, No. CV 18-2545, 2020 WL 5569943 (D.D.C. Sept. 16, 2020), *aff'd*, No. 20-1279, 2021 WL 4507556 (U.S. Oct. 4, 2021). Finally, the government, the media, and even judges in this division speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat of January 6 can only take place in their home.[17] As such, the residents of the District sitting as jurors are highly likely to view Mr. Sturgeon not only as someone who victimized them, but also as someone who might victimize them again in the future, raising a concern about punishing for propensity.

Given the electoral makeup of the District, it would be impossible to empanel a jury that was not full of people that the government charges were the targets of Mr. Sturgeon alleged offenses. *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (the

---

[17] *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021)
https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html; *see also* Jordan Fischer et. al, *Judge Skewers DOJ At January 6 Sentencing*, WUSA9 (Oct. 28, 2021) (explaining that the sentence was **designed to alert** "others who might consider attacking the Capitol to know their punishment would 'hurt.'"),
https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of-the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl-howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae.

population of the greater metro area, including Virginia and Maryland, was large enough to not support an inference of prejudice by media reporting). Thus, though significantly more populous than the pool in *Rideau*, for example, Mr. Sturgeon submits that the impact of the events of January 6 was felt by a far greater proportion of the residents and felt much more personally and viscerally. The events of January left those residents—and therefore the jury pool—neither impartial nor indifferent.

### B. The nature and volume of national and local media coverage weigh in favor of finding that there is a presumption of prejudice because of greater saturation and impact at the local level.

Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that "prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but dispassionate media reporting. *Skilling*, 561 U.S. at 358 (citing *Irvin*, 366 U.S. at 722). Something more, such as charged rhetoric or the reporting of gruesome details, is needed to establish prejudice. *See id.* (rejecting the argument that media coverage was prejudicial where "media coverage, on the whole, had been

10

objective and unemotional, and the facts of the case were neither heinous nor sensational."). The Court has repeatedly recognized that "something more" exists when the media coverage is particularly inflammatory, and where it pervades the court proceedings. *See Murphy*, 421 U.S. at 799 (1975) ("In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings"); *see also id.* ("[P]roceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled"). Finally, the problematic media must either be local in distribution, or must have greater local saturation or impact than in other districts; otherwise, there is no disparate prejudicial effect between different (comparable) venues.

For example, in *Skilling*, the defendant cited to hundreds of media reports about the Enron scandal in his motion for a transfer of venue. 561 U.S. at 358. He argued that as the former Chief Executive Officer, such articles necessarily implicated him by proxy, if not directly. *See id.* The Court disagreed, referencing its earlier opinions concerning the modern ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See id.* at 382. Rather, it is sensationalism of the type that would be easily remembered—not an objective reporting of the facts—that was found to be prejudicial in prior cases before the Court.[18] *Id.* at 381. The Court observed that the stories that *Skilling* cited about

_____

[18] Of course, as the concurrence in part pointed out, *voir dire* later revealed that these "objective" media reports had indeed created a bias among many potential jurors, and that the District Court failed to properly vet their assurances of impartiality after those biases were revealed. *See id.* at 427 (Sotomayor, J., concurring in part).

11

Enron contained "no confessions, no blatantly prejudicial information," and were "largely objective and unemotional." *Id.* at 370-71, 382 (observing that none of the reports "invited prejudgment of his culpability"). As such, the Court held that it was inappropriate to apply a broad presumption of prejudice.

Here, in a city still feeling the impacts described *supra*, the pre-trial publicity—both national and local—has only served to enhance and sustain the effects and by extension, sentiments about the participants. The volume, depth of coverage, and duration of the reporting about January 6 has been almost entirely unprecedented, perhaps only comparable to the reporting following September 11.[19] And viewers who identified as Democrats—like most of the District population—were 20% more likely to have reported hearing "a lot" about the events than those who identify as Republicans.[20] It has also been sensational, including the repeated showing of select snippets of photographic and video footage appearing to show the destruction of the Capitol property and officers in distress. Indeed, some of these officers have testified before Congress about their experiences that may or may not have been

---

[19] "Nearly seven-in-ten adults (69%) say they have heard 'a lot' about the rioting at the U.S. Capitol on Jan. 6." *Views on the Rioting at the US Capitol*, Pew Research Center (Jan. 15, 2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ ; *compare with The War On Terrorism*, Pew Research Center (May 23, 2002), https://www.pewresearch.org/journalism/2002/05/23/the-war-on-terrorism/.
[20] *See id.*

representative of the whole—testimony that was also widely circulated in print and through video.[21]

The language used in media coverage of the events of January 6 and of the defendants involved in those events has been especially charged and inflammatory. Reporters and their interviewees, including members of Congress, consistently refer to the defendants as "insurrectionists," "rioters," "seditionists," "domestic terrorists" "white supremacists" and "criminals" in the media.[22] For example, in late January, President Biden referred to those involved in the January 6 events as "a group of thugs, insurrectionists, political extremists, and white supremacists."[23] Similarly, representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack."[24] The coverage of the scene itself has also been sensationalist, relying on gruesome details in click-bait headlines to galvanize the public. For example, a recent video released on CNN began:

> Hours after the last rioters had been pushed from the
> Capitol, when there was still glass on the stairs and ***blood***

---

[21] *See, e.g., Police Officers Deliver Emotional Testimony About Violent Day at the Capitol*, Washington Post (July 27, 2021), https://www.washingtonpost.com/politics/2021/07/27/jan-6-commission-hearing-live-updates/.

[22] *See* Ex. 1 (subset of media coverage in summary form).

[23] *Remarks by President Biden at Signing of an Executive Order on Racial Equity*, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-anexecutive-order-on-racial-equity/.

[24] *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892/.

"Accepted"

MAR 08 2023

Taylor James Johnston

> *on the floors*, Congress tried to get back to the business of democracy . . . [25]

Furthermore, recent testimony from the House of Representatives Select Committee chosen to investigate January 6, 2021, further highlights the inflammatory and conclusory nature of statements made by our nation's leaders. In the recent June 9, 2022 hearing of the Select Committee investigating the events of January 6th, Chairman Bennie Thompson started his opening statement with the following:

> I'm from a part of the country where people justify the actions of slavery, the Klu Klux Klan, and lynching. I'm reminded of that dark history as I hear voices today try and justify the actions of the insurrectionists on January 6th, 2021.[26]

This is hardly comparable to the "unemotional" reporting on Enron's collapse and the white collar crime allegations against its management as described by the Court in *Skilling*. 561 U.S. at 371-72, 382. Some courts who have denied similar motions to transfer venue in this district have doubted whether the media coverage has specifically biased the DC community or whether it has been just general national coverage. However, DC community leaders have specifically commented on the topic on a consistent basis – also adding to the inflammatory and conclusory language

---

[25] Wolf, *supra* note 16 (emphasis added).

[26] https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript

regarding all January 6 defendants. See below for a summary of some of these statements clearly affecting specifically the DC community:

(1) **Derrick Johnson, President and CEO of the NAACP in USA today on January 6, 2022:**

White supremacy invaded our Capitol on Jan. 6. It continued to invade our lives through every television news and social media feed that replayed horrifying clips of insurrectionists flooding the halls of democracy. Now, white supremacy is brazenly re-invading our constitutional right to vote.[27]

(2) **Recent Public Testimony at the Select Committee Hearings investigating the events of January 6, 2021:**

Chairman Bennie Thompson started his opening statement with the following:

I'm from a part of the country where people justify the actions of slavery, the Klu Klux Klan, and lynching. I'm reminded of that dark history as I hear voices today try and justify the actions of the insurrectionists on January 6th, 2021.[28]

Capitol Police Officer Caroline Edwards who said she saw officers with "blood all over their faces" and was "slipping in people's blood.[29]"

(3) **The Washington Commanders head coach, Ron Rivera, commenting after fining Defensive Coach Jack Del Rio for comments related to January 6, 2021.**

"[Coach Del Rio's] comments do not reflect the organization's views and are extremely hurtful to our great community in the DMV. As we saw last night in the [Congressional] hearings, what happened on the Capitol on Jan. 6,

---

[27] https://www.usatoday.com/story/opinion/2022/01/06/naacp-white-supremacy-january-6/9092954002/

[28] https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript

[29] https://www.nbcnews.com/video/capitol-police-officer-injured-in-jan-6-riot-says-she-was-slipping-in-people-s-blood-141829189901

"Accepted"
MAR 08 2023
Taylor James Johnatakis

2021, was an act of domestic terrorism. A group of citizens attempted to overturn the results of a free and fair election, and as a result, lives were lost and the Capitol building was damaged. Coach Del Rio did apologize for comments on Wednesday and he understands the distinctions between the events of that dark day and peaceful protests which are a hallmark of our democracy. He does have the right to voice his opinion as a citizen of the United States and it most certainly is his constitutional right to do so. However, words have consequences and his words hurt a lot of people in our community. <u>I want to make clear that our organization will not tolerate any equivalency between those who demanded justice in the wake of George Floyd's murder and the actions of those on January 6 who sought to topple our government.</u>[30]" (emphasis added)

### (4) Statements by District of Columbia Mayor Muriel Bowser at the Congressional Black Caucus hearing on January 13, 2021:

Thank you for holding this hearing on the acts of domestic terrorism and sedition that unfolded in our Nation's Capitol just one week ago.....I'm calling on the Joint Terrorism Task Force to investigate, arrest and prosecute any individual who entered the capitol, destroyed property, or incited the acts of domestic terrorism last week. I urge the Congress to create a non-partisan commission to understand the catastrophic security failures and both to hold people accountable and ensure that it never happens again. It is not lost on me, as we heard in president's comments who stoked the flames of this extremism and on January 6th encouraged the acts of terrorism and sedition that we saw, that resulted in the deaths of two United States Capitol Police Officers and Four Others. As you have heard today, the members of the Congressional Black Caucus know better than most there is inextricable tie between those, and the speech and actions undeniable. This is not the end, this is the beginning of us needing as a country to be focused on radicalization of mostly white men who we saw in the Capitol that Day...[31]

### (5) Statements of DC Delegate Eleanor Holmes Norton

One year ago today, we witnessed an outrageous assault on our U.S. Capitol as Congress was meeting to count the electoral votes from the 2020 presidential election. The attack was not only an attack on

---

[30] https://www.si.com/nfl/2022/06/10/commanders-announce-fine-jack-del-rio-ron-rivera-january-6-comments

[31] https://www.c-span.org/video/?507965-1/congressional-black-caucus-hearing-us-capitol-attack

democracy; it was also an attack on the District of Columbia. The D.C. police department, which is paid for by D.C. residents, who are denied voting representation in the House and Senate and full self-government, moved voluntarily to save the lives of members of Congress and congressional staff, the Capitol and democracy itself. Yet House Republicans thanked D.C. by voting against the D.C. statehood bill only a few months after the attack.[32]

### (6) Statements from Local Senators and Representatives

**Democratic Senator Tim Kaine stated:**

"One year ago, on January 6, 2021, a violent mob attempted to overturn the presidential election results and rob the American people of their duly elected leaders. Urged on by President Trump, right-wing insurrectionists stormed the U.S. Capitol aiming to commit the greatest voter disenfranchisement effort in recent American history. The insurrection led to the tragic loss of multiple heroic law enforcement officers from Virginia, and my heart is with their loved ones on this anniversary.[33]

**A public statement from Democratic Senator John Warner provides, in part:**

"One year ago today, the world watched as a violent mob stormed and desecrated the U.S. Capitol in an effort to rob the American people of the sacred right to elect their President. Despite these insidious efforts, democracy prevailed due to the brave actions of the Capitol Police, Metropolitan Police, Virginia State Police, Maryland State Police, and members of the National Guard who put themselves in peril, saving many lives and in some cases, losing their own. It is my hope that we will continue to honor those who lost their lives by remembering that democracy must be upheld each and every day. We must realize that what happened on January 6 did not end on January 6. Efforts to sow doubts about the integrity of our elections are chipping away at the values upon which our nation was founded. As state legislatures across the country continue to exploit Donald Trump's Big Lie to restrict access to the ballot,

---

[32] https://rollcall.com/2021/12/14/d-c-files-lawsuit-against-two-groups-for-costs-of-jan-6-response/

[33] https://www.kaine.senate.gov/press-releases/kaine-statement-ahead-of-january-6-anniversary

we must act to protect the right to vote and safeguard our democracy once more.[34]"

**A public statement from Democrat Maryland Senator Ben Cardin provides, in part:**

Men and women died on that day and shortly after because of what happened at the U.S. Capitol. Police officers were brutally attacked. A mob went hunting through the hallways for Vice President Mike Pence, Speaker Nancy Pelosi and others. If we do not understand what happened leading up to and on that day, and why it happened, *it will happen again.*[35]

**A public statement from Democrat Maryland Senator Chris Van Hollen provides, in part:**

"The violent mob unleashed by Donald Trump a year ago stormed and sacked this Capitol. Insurrectionists scaled the ramparts, tore through the barricades, and breached this building. They used flagpoles to beat Officer Michael Fanone and used chemical spray to assault Officer Brian Sicknick – who tragically died the next day. A gallows was built outside of this Capitol while rioters chanted, "Hang Mike Pence." Like many others, I recall watching horrifying television footage of a rioter pulling down an American flag and raising up a Trump flag in its place. Confederate flags and banners of far-right extremist groups were paraded through these halls. This citadel of our democracy was violently attacked. The Capitol Hill community was traumatized and so was the country.[36]

**Public statement of Democrat Representative Don Beyer Representing Closest Virginia District to DC, provides, in part:**

"One year ago today insurrectionists launched a violent assault on the home of American democracy.

"The crowd that attacked the Capitol included white supremacists and violent rightwing paramilitary groups. They constructed a gallows, and called for the assassination of the Vice President and the Speaker of the House. Incited by the Big Lie of a lawless President bent on retaining power at any cost – a fact we know is true because the insurrectionists themselves

---

[34] https://www.warner.senate.gov/public/index.cfm/pressreleases?id=B4F94BD9-0BA5-48B6-9AF3-D5D0698197CB

[35] https://www.cardin.senate.gov/letters/not-pretty-but-important/

[36] https://www.vanhollen.senate.gov/news/press-releases/van-hollen-delivers-floor-speech-on-anniversary-of-january-6th-insurrection

repeatedly confirmed it – they hoped to halt the peaceful transfer of power and overturn the results of an American election. They failed.

"They failed because of the courageous actions of heroes in uniform, many of whom have not fully recovered from the significant injuries they suffered that day. Some of them lost their lives. Today we remember the pain and suffering inflicted on those who defended the Capitol, and their incredible heroism. We remember USCP Officers Brian Sicknick and Howie Liebengood and MPD Officers Jeffrey Smith, Kyle DeFreytag, and Gunther Hashida, and the anguish their families still feel.[37]

These public statements were said by local leaders whose audience is the DC community. It is no surprise, then, that the jury survey conducted showed 90% of potential jurors polled were exposed to media coverage and that most of them say the media coverage implied that the defendants are "guilty of the charges brought against them." *See* Exhibit 1, Jury Survey at pg. 3. Seventy-two percent of the respondents said that they are likely to find the defendants guilty, even when given the choice if "it is too early to decide." *Id.* Most notably, it appears as though the overwhelming majority of D.C. respondents have already concluded that those who entered the Capitol were acting with the intent that the government must prove at trial. Respondents overwhelmingly concluded that January 6 defendants were:

- Trying to overturn the election and keep Donald Trump in power (85%)

- Insurrectionists (76%) and/or

- Trying to overthrow the United States government (72%)

---

[37] https://beyer.house.gov/news/documentsingle.aspx?DocumentID=5417

19

*Id.* at 15, 18. Additionally, much of the early reporting has since been shown to be factually inaccurate. For example, immediately following the events of January 6, President Biden, among other high-profile individuals, claimed that January 6 protestors *killed* Officer Brian Sicknick, and he repeated the claim months after it became clear that there was no basis for it.[38] Even the official press release stated that:

> Officer Brian D. Sicknick passed away *due to injuries sustained while on-duty.* Officer Sicknick was responding to the riots on Wednesday, January 6, 2021, at the U.S. Capitol and was injured while physically engaging with protesters.[39]

These claims were widely circulated and did reputational damage to defendants before the medical examiner quietly reported—more than four months later—that Officer Sicknick died of two strokes, and that he sustained no internal or external injuries from his exposure to chemical spray on January 6.[40]

The saturation of this charged and inflammatory reporting in the District is so substantial that it would be surprising to identify any potential jurors who have not been exposed to the coverage. One only need look to the Washington Post comments section to observe the inflammatory attitudes of its readers who convict defendants

---

[38] Christian Datoc and Jerry Dunleavy, *Biden Claims Jan. 6 Rioters Killed Capitol Police Officer Brian Sicknick,* Washington Examiner (June 17, 2021), available at https://www.yahoo.com/now/biden-claims-jan-6-rioters-161300824.html.

[39] *Press Release: Loss of USCP Officer Brian Sicknick,* United States Capitol Police (Jan. 7, 2021) (emphasis added), https://www.uscp.gov/media-center/press-releases/loss-uscp-colleague-brian-d-sicknick.

[40] *Capitol Police Officer Died of Natural Causes, Officials Say,* Washington Post (Apr. 19, 2021), https://www.washingtonpost.com/local/public-safety/brian-sicknick-death-strokes/2021/04/19/36d2d310-617e-11eb-afbe-9a11a127d146_story.html.

who are still pending trial.[41] And although some in the jury pool may not have heard of Mr. Sturgeon specifically, his presence at the Capitol that day will necessarily cause prospective jurors to link his conduct to the January 6 reporting generally. And as the Court found in *Rideau*, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726.

Finally, the inflammatory comments have invaded court proceedings. The media has widely reported comments of U.S. District Court Judges in this District regarding the events of January 6. For example, in comments that were widely reported, a judge stated that "*everyone* participating in the mob contributed to [the January 6] violence," and went on to conclude that "[m]embers of a mob who breach barriers and push back officers to disrupt the joint session of Congress are not trespassers, they are criminals."[42] Other judges in the same district have also made similar comments at sentencing:

> During a sentencing hearing for Kenneth Reda on Wednesday, Senior U.S. District Judge Thomas Hogan said the psychology of the Donald Trump supporters who overran police and stormed the Capitol on Jan. 6 reminded him of "lynchings hundreds of years ago.[43]
>
> **CNN also reported on statements of U.S. District Judge Randolph Moss:**

---

[41] *See* Ralph Joseph Celentano III, accused Capitol rioter, charged with pushing officer over ledge - The Washington Post

[42] https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442; *see also* Fischer et al., *supra* note 16.

[43] https://lawandcrime.com/u-s-capitol-breach/federal-judge-compares-jan-6-riot-to-lynch-mob-they-regret-it-afterwards-but-they-joined-in-it/

"It means that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation. It means that we are now all fearful about the next attack in a way that we never were," Moss said.[44]

**As noted in a CNN article, the chief judge of the federal court in Washington DC emphasized the *local* nature of the damage[45]:**

We're still living here in Washington, DC, with the consequences of the violence that this defendant is alleged to have participated in," she said. "Just outside this courthouse… are visible reminders of the January 6 riot and assault on the Capitol.

There is no doubt that more than only District residents were exposed to these comments, which were in effect legal conclusions about every January 6 defendant who will go before a jury in this District. In reality, the district court has been imposing sentences based on the individual characteristics of the defendants, taking into account each defendant's specific conduct. However, these statements that have been widely reported, nonetheless, do not include the sentencing rationales that individualize each defendant but rather the statements reported are only the sensational and inflammatory ones that have been taken completely out of context when listening to the entirety of these hearings. That is essentially the problem with all of the media reporting – is that it mostly highlights the bad and conveniently leaves out the good, or at a minimum the accurate full picture of what happened at

---

[44] https://lite.cnn.com/en/article/h_31b637faf602c63056995f01ea19baba
[45] https://www.cnn.com/2021/01/28/politics/capitol-beryl-howell-richard-barnett-pelosi/index.html

each hearing. Unfortunately, now, that means the jury pool has only heard and read the bad.

### C. The timing of the proceedings weighs in favor of finding a presumption of prejudice.

Finally, in determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and the trial. For example, in *Skilling*, the Court found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting would have become attenuated. *Skilling*, 561 U.S. at 383.

Here, in the almost two years since January 6, 2021, media reporting about the events of January 6 remains at an all-time high. This has been especially true in recent months, given the high-profile House Select Committee activities focused on investigating the events and airing live testimony also available on Hulu for later viewing.[46] Additionally, many documentaries that include extensive footage of the day have been released—footage that would likely be offered into evidence by the prosecution at trial. For example, HBO just released a feature-length *Four Hours at the Capitol* in late October, which includes one of the most widely-circulated videos from that day: the breaking of a Capitol window.[47] There is no reason to think that

---

[46] Jan. 6 Panel Is Poised To Return Amid Growing Signs That Accountability Is Coming (msn.com); The January 6 committee is holding a collection of public hearings - Insider N News

[47] *Four Hours at the Capitol*, HBO (Oct. 4, 2021); *see also Day of Rage: How Trump Supporters Took the U.S. Capitol* at 18:17-21, N.Y. Times (June 30, 2021),

coverage will wane before Mr. Sturgeon's May trial, especially given the recent activities of the Select Committee.

Lastly, the media coverage regarding recent January 6 trials that have taken place has been consistent. Most notably, all jury trials have resulted in guilty verdicts across the board.[48] These guilty verdicts have a further prejudicial impact on the potential juror pool. Notably, the DC juror candidate pool grows increasingly small as each of these trials takes place. When denying a similar motion filed earlier this year, the Honorable John D. Bates discussed if and how the number of guilty verdicts that pile up could potentially create a bias jury pool. *See United States v. McHugh*, 21-cr-453 (JDB), Motions hearing Transcript on May 4, 2022, at page 14-16. There is little doubt that as each jury is selected for a January 6 trial, that the jury pool becomes more tainted after hearing the many guilty verdicts that preceded before it. More practically speaking, the potential jury pool becomes smaller based on sheer numbers after potentially not being able to find jurors who have not already either served on January 6 trial or at least was selected in the much larger pool initially.

_____

https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

[48] *See US v. Guy Reffit*, 21-cr-032 (DLF); *US v. Thomas Robertson*, 21-cr-034-1 (CRC); *US v. Dustin Thompson*, 21-cr-161 (RBW); *US v. Robert Anthony Williams*, 21-cr-377 (BAH); *US v. Russell Dean Alford*, 21-cr-263 (TSC); *US v. Douglas Jensen*, 21-cr-006 (TJK). (may not be an exhaustive list and does not include the several bench trials that have also resulted in guilty verdicts).

Based on all of these factors, interest in the events of January 6 has been high since that day, and it has not waned in the District in the short time since. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

## CONCLUSION

Because each of the *Skilling* factors weighs in favor of finding a presumption of prejudice, Mr. Sturgeon requests that the Court transfer the case to the District of Montana.

A. J. Kramer
Federal Public Defender for the
District of Columbia

By: /s/Maria Jacob
Assistant Federal Public Defender
625 Indiana Avenue
Suite 500
Washington D.C.
Telephone: (202) 208-7500

25

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Eight     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "U.S. Department of Justice Channing D. Phillips Acting United States Attorney District of Columbia August 3 2021 **BY EMAIL** Christopher Black Re: *United States v. Craig m. Bingers et al* Criminal Case No. 21-cr-91 Page 1 of 12, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 10 of 12, Sincerely yours Channing D. Phillips/ATF By: Angela N. Buckner Page 11 of 12, DEFENDANT'S ACCEPTANCE Page 12 of 12"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "U.S. Department of Justice Channing D. Phillips Acting United States Attorney District of Columbia August 3 2021 **BY EMAIL** Christopher Black Re: *United States v. Craig m. Bingers et al* Criminal Case No. 21-cr-91 Page 1 of 12, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 10 of 12, Sincerely yours Channing D. Phillips/ATF By: Angela N. Buckner Page 11 of 12, DEFENDANT'S ACCEPTANCE Page 12 of 12" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

RECEIVED
Mail Room

MAR 14 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CASE NO. 21-CR-91-3 (RCL) 18 U.S.C. 1512(c)(2) 18 U.S.C. 111(a)(1) STATEMENT OF OFFENSE Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner Page 5 of 6, DEFENDANT'S ACKNOWLEDGMENT ATTORNEY'S ACKNOWLEDGMENT Page 6 of 6"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Channing D. Phillips 555 Fourth St. N.W. Washington D.C. 20530


"Accepted"    *Taylor James Johnatakis*

MAR 0 8 2023



U.S. Department of Justice

Channing D. Phillips
Acting United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

August 3, 2021

**BY EMAIL**

Christopher Black
chris@blacklawseattle.com

Re:    *United States v. Craig M. Bingert et al*
          Criminal Case No. 21-cr-91

Dear Mr. Orenberg:

This letter sets forth the full and complete plea offer to your client, Taylor J. Johnatakis (hereinafter referred to as "your client" or "defendant"), from the Office of the United States Attorney for the District of Columbia (hereinafter also referred to as "the Government" or "this Office"). This plea offer expires on **September 6, 2021**. If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the Plea Agreement (hereinafter referred to as "this Agreement"). The terms of the offer are as follows:

1.    **Charges and Statutory Penalties**

Your client agrees to plead guilty to Counts One and Two in the Superseding Indictment, charging your client with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and § 2, and Assaulting Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

Your client understands that a violation of 18 U.S.C. § 1512(c)(2) and § 2 carries a maximum sentence of 20 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

"Accepted"

MAR 0 8 2023

Your client understands that a violation of 18 U.S.C. § 111(a)(1) carries a maximum sentence of 8 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

In addition, your client agrees to pay a special assessment of $100 per felony conviction to the Clerk of the United States District Court for the District of Columbia. Your client also understands that, pursuant to 18 U.S.C. § 3572 and § 5E1.2 of the United States Sentencing Commission, *Guidelines Manual* (2018) (hereinafter "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation. Further, your client understands that, if your client has two or more convictions for a crime of violence or felony drug offense, your client may be subject to the substantially higher penalties provided for in the career-offender statutes and provisions of the Sentencing Guidelines.

2. **Factual Stipulations**

Your client agrees that the attached "Statement of Offense" fairly and accurately describes your client's actions and involvement in the offenses to which your client is pleading guilty. Please have your client sign and return the Statement of Offense as a written proffer of evidence, along with this Agreement.

3. **Additional Charges**

In consideration of your client's guilty plea to the above offenses, your client will not be further prosecuted criminally by this Office for the conduct set forth in the attached Statement of Offense. The Government will request that the Court dismiss the remaining counts of the Superseding Indictment in this case at the time of sentencing. Your client agrees and acknowledges that the charges to be dismissed at the time of sentencing were based in fact.

After the entry of your client's plea of guilty to the offenses identified in paragraph 1 above, your client will not be charged with any non-violent criminal offense in violation of Federal or District of Columbia law which was committed within the District of Columbia by your client prior to the execution of this Agreement and about which this Office was made aware by your client prior to the execution of this Agreement. However, the United States expressly reserves its right to prosecute your client for any crime of violence, as defined in 18 U.S.C. § 16 and/or 22 D.C. Code § 4501, if in fact your client committed or commits such a crime of violence prior to or after the execution of this Agreement.

4. **Sentencing Guidelines Analysis**

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the Sentencing Guidelines. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the parties agree to the following:

"Accepted"   *Taylor James Johnatolis*

MAR 0 8 2023

## A.   Estimated Offense Level Under the Guidelines

The parties agree that the following Sentencing Guidelines sections apply:

Count One, 18 U.S.C. § 1512(c)(2) and 2

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Cause/ Threat Injury or Damage in Order to Obstruct the Administration of Justice | 8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with the Administration of Justice | 3 |
| | TOTAL | 25 |

Count Two, 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) & (b) | Official Victim | 6 |
| | TOTAL | 20 |

Acceptance of Responsibility

The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence. Furthermore, assuming your client has accepted responsibility as described in the previous sentence, the Government agrees that an additional 1-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1(b), because your client has assisted authorities by providing timely notice of your client's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth above, should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

In accordance with the above, the Estimated Offense Level will be at least 22.

"Accepted"    *Taylor James Johnatakis*

MAR 0 8 2023

**B.    Estimated Criminal History Category**

Based upon the information now available to this Office, your client has no criminal convictions.

Accordingly, your client is estimated to have 0 criminal history points and your client's Criminal History Category is estimated to be I (the "Estimated Criminal History Category"). Your client acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease.

**C.    Estimated Guidelines Range**

Based upon the Estimated Offense Level and the Estimated Criminal History Category set forth above, your client's estimated Sentencing Guidelines range is 41 months to 51 months (the "Estimated Guidelines Range"). In addition, the parties agree that, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level 22, the estimated applicable fine range is $15,000 to $150,000. Your client reserves the right to ask the Court not to impose any applicable fine.

The parties agree that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range set forth above is warranted, except the Government reserves the right to request an upward departure pursuant to U.S.S.G. § 3A1.4, n. 4. Except as provided for in the "Reservation of Allocution" section below, the parties also agree that neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above in subsection A. However, the parties are free to argue for a Criminal History Category different from that estimated above in subsection B.

Your client understands and acknowledges that the Estimated Guidelines Range calculated above is not binding on the Probation Office or the Court. Should the Court or Probation Office determine that a guidelines range different from the Estimated Guidelines Range is applicable, that will not be a basis for withdrawal or recission of this Agreement by either party.

Your client understands and acknowledges that the terms of this section apply only to conduct that occurred before the execution of this Agreement. Should your client commit any conduct after the execution of this Agreement that would form the basis for an increase in your client's base offense level or justify an upward departure (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the probation officer, or the Court), the Government is free under this Agreement to seek an increase in the base offense level based on that post-agreement conduct.

"Accepted"    MAR 0 8 2023    *Taylor James Johnatakis*

5.    **Agreement as to Sentencing Allocution**

The parties further agree that a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below. However, the parties agree that either party may seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

6.    **Reservation of Allocution**

The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charges to which your client is pleading guilty, to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement. The parties also reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein.    In the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein.

In addition, if in this Agreement the parties have agreed to recommend or refrain from recommending to the Court a particular resolution of any sentencing issue, the parties reserve the right to full allocution in any post-sentence litigation.    The parties retain the full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or any proceeding(s) before the Bureau of Prisons.    In addition, your client acknowledges that the Government is not obligated and does not intend to file any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

7.    **Court Not Bound by this Agreement or the Sentencing Guidelines**

Your client understands that the sentence in this case will be imposed in accordance with 18 U.S.C. § 3553(a), upon consideration of the Sentencing Guidelines.    Your client further understands that the sentence to be imposed is a matter solely within the discretion of the Court. Your client acknowledges that the Court is not obligated to follow any recommendation of the Government at the time of sentencing.    Your client understands that neither the Government's recommendation nor the Sentencing Guidelines are binding on the Court.

Your client acknowledges that your client's entry of a guilty plea to the charged offense(s) authorizes the Court to impose any sentence, up to and including the statutory maximum sentence,

**"Accepted"**

*Taylor James Johnatakis*

MAR 0 8 2023

which may be greater than the applicable Guidelines range. The Government cannot, and does not, make any promise or representation as to what sentence your client will receive. Moreover, it is understood that your client will have no right to withdraw your client's plea of guilty should the Court impose a sentence that is outside the Guidelines range or if the Court does not follow the Government's sentencing recommendation. The Government and your client will be bound by this Agreement, regardless of the sentence imposed by the Court. Any effort by your client to withdraw the guilty plea because of the length of the sentence shall constitute a breach of this Agreement.

8. **Conditions of Release**

Your client acknowledges that, although the Government will not seek a change in your client's release conditions pending sentencing, the final decision regarding your client's bond status or detention will be made by the Court at the time of your client's plea of guilty. The Government may move to change your client's conditions of release, including requesting that your client be detained pending sentencing, if your client engages in further criminal conduct prior to sentencing or if the Government obtains information that it did not possess at the time of your client's plea of guilty and that is relevant to whether your client is likely to flee or pose a danger to any person or the community. Your client also agrees that any violation of your client's release conditions or any misconduct by your client may result in the Government filing an ex parte motion with the Court requesting that a bench warrant be issued for your client's arrest and that your client be detained without bond while pending sentencing in your client's case.

9. **Waivers**

A. **Venue**

Your client waives any challenge to venue in the District of Columbia.

B. **Statute of Limitations**

Your client agrees that, should the conviction following your client's plea of guilty pursuant to this Agreement be vacated for any reason, any prosecution, based on the conduct set forth in the attached Statement of Offense, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement)may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution of conduct set forth in the attached Statement of Offense that is not time-barred on the date that this Agreement is signed.

C. **Trial Rights**

Your client understands that by pleading guilty in this case your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute or rule. Your

"Accepted"   *Taylor James Johnatake*

MAR 9 8 2023

client agrees to forego the right to any further discovery or disclosures of information not already provided at the time of the entry of your client's guilty plea. Your client also agrees to waive, among other rights, the right to plead not guilty, and the right to a jury trial. If there were a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to challenge the admissibility of evidence offered against your client, to compel witnesses to appear for the purpose of testifying and presenting other evidence on your client's behalf, and to choose whether to testify. If there were a jury trial and your client chose not to testify at that trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client. Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt. If your client were found guilty after a trial, your client would have the right to appeal your client's conviction. Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of self-incriminating statements in a criminal prosecution. By entering a plea of guilty, your client knowingly and voluntarily waives or gives up your client's right against self-incrimination.

Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily waives the rights that arise under these rules in the event your client withdraws your client's guilty plea or withdraws from this Agreement after signing it.

Your client also agrees to waive all constitutional and statutory rights to a speedy sentence and agrees that the plea of guilty pursuant to this Agreement will be entered at a time decided upon by the parties with the concurrence of the Court. Your client understands that the date for sentencing will be set by the Court.

D.     **Appeal Rights**

Your client agrees to waive, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including but not limited to claim(s) that (1) the statute(s) to which your client is pleading guilty is unconstitutional, and (2) the admitted conduct does not fall within the scope of the statute(s). Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances. Your client also agrees to waive the right to appeal the sentence in this case, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court. In agreeing to this waiver, your client is aware that your client's sentence has yet to be determined by the Court. Realizing the uncertainty in estimating what sentence the Court ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement. Notwithstanding the above agreement to waive the right to appeal the conviction and sentence, your client retains the right to appeal on

"Accepted"   MAR 0 8 2023   *Taylor James Johnatake*

the basis of ineffective assistance of counsel, but not to raise on appeal other issues regarding the conviction or sentence.

### E.   Collateral Attack

Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2), but agrees to waive the right to appeal the denial of such a motion.

### F.   Hearings by Video Teleconference and/or Teleconference

Your client agrees to consent, under the CARES Act, Section 15002(b)(4) and otherwise, to hold any proceedings in this matter – specifically including but not limited to presentment, initial appearance, plea hearing, and sentencing – by video teleconference and/or by teleconference and to waive any rights to demand an in-person/in-Court hearing. Your client further agrees to not challenge or contest any findings by the Court that it may properly proceed by video teleconferencing and/or telephone conferencing in this case because, due to the COVID-19 pandemic, an in-person/in-Court hearing cannot be conducted in person without seriously jeopardizing public health and safety and that further there are specific reasons in this case that any such hearing, including a plea or sentencing hearing, cannot be further delayed without serious harm to the interests of justice.

### 10.   Use of Self-Incriminating Information

The Government and your client agree, in accordance with U.S.S.G. § 1B1.8, that the Government will be free to use against your client for any purpose at the sentencing in this case or in any related criminal or civil proceedings, any self-incriminating information provided by your client pursuant to this Agreement or during the course of debriefings conducted in anticipation of this Agreement, regardless of whether those debriefings were previously covered by an "off the record" agreement by the parties.

### 11.   Restitution

Your client acknowledges that the riot that occurred on January 6, 2021, caused as of May 17, 2021, approximately $1,495,326.55 damage to the United States Capitol. Your client agrees as part of the plea in this matter to pay restitution to the Department of Treasury in the amount of $2,000.

Payments of restitution shall be made to the Clerk of the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, your client agrees to disclose fully all assets in which your client has any interest or over which your client exercises control, directly or indirectly, including those held by a spouse, nominee or other third

"Accepted"   *Taylor James Johnatakis*

MAR 0 8 2023

party.  Your client agrees to submit a completed financial statement on a standard financial disclosure form which has been provided to you with this Agreement to the Financial Litigation Unit of the United States Attorney's Office, as it directs.  If you do not receive the disclosure form, your client agrees to request one from usadc.ecfflu@usa.doj.gov.  Your client will complete and electronically provide the standard financial disclosure form to usadc.ecfflu@usa.doj.gov 30 days prior to your client's sentencing.  Your client agrees to be contacted by the Financial Litigation Unit of the United States Attorney's Office, through defense counsel, to complete a financial statement.  Upon review, if there are any follow-up questions, your client agrees to cooperate with the Financial Litigation Unit.  Your client promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement could be prosecuted as a separate crime punishable under 18 U.S.C. § 1001, which carries an additional five years' incarceration and a fine.

Your client expressly authorizes the United States Attorney's Office to obtain a credit report on your client in order to evaluate your client's ability to satisfy any financial obligations imposed by the Court or agreed to herein.

Your client understands and agrees that the restitution or fines imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States.  If the Court imposes a schedule of payments, your client understands that the schedule of payments is merely a minimum schedule of payments and will not be the only method, nor a limitation on the methods, available to the United States to enforce the criminal judgment, including without limitation by administrative offset.  If your client is sentenced to a term of imprisonment by the Court, your client agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically imposes a schedule of payments.

Your client certifies that your client has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this Agreement and/or that may be imposed by the Court.  In addition, your client promises to make no such transfers in the future until your client has fulfilled the financial obligations under this Agreement.

12.   **Breach of Agreement**

Your client understands and agrees that, if after entering this Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement, or engages in any criminal activity prior to sentencing, your client will have breached this Agreement.  In the event of such a breach: (a) the Government will be free from its obligations under this Agreement; (b) your client will not have the right to withdraw the guilty plea; (c) your client will be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously characterized as "off-the-record" debriefings, and including your client's statements

made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Your client understands and agrees that the Government shall be required to prove a breach of this Agreement only by a preponderance of the evidence, except where such breach is based on a violation of federal, state, or local criminal law, which the Government need prove only by probable cause in order to establish a breach of this Agreement.

Nothing in this Agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement. Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement. In the event of such a breach, your client will not be allowed to withdraw your client's guilty plea.

13.    **Complete Agreement**

No agreements, promises, understandings, or representations have been made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Your client further understands that this Agreement is binding only upon the Criminal and Superior Court Divisions of the United States Attorney's Office for the District of Columbia. This Agreement does not bind the Civil Division of this Office or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

"Accepted"

*Taylor James Johnatakis*

MAR 0 9 2023

If the foregoing terms and conditions are satisfactory, your client may so indicate by signing this Agreement and the Statement of Offense, and returning both to me no later than **September 6, 2021**.

Sincerely yours,

*Channing D. Phillips/ATF*
Channing D. Phillips
Acting United States Attorney

By:  Angela N. Buckner
Assistant United States Attorney



"Accepted"                    *Taylor James Johnatakis*

MAR 0 8 2023

<u>DEFENDANT'S ACCEPTANCE</u>

I have read every page of this Agreement and have discussed it with my attorney, Christopher Black. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offenses identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorney in connection with this Agreement and matters related to it.

Date:_____        _____
                                  Taylor James Johnatakis
                                  Defendant

<div align="center">ATTORNEY'S ACKNOWLEDGMENT</div>

I have read every page of this Agreement, reviewed this Agreement with my client, Taylor James Johnatakis, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: _____        _____
                                  Christopher Black, Esq.
                                  Attorney for Defendant

<div align="center">Page **12** of **12**</div>

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Eight          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CASE NO. 21-CR-91-3 (RCL) 18 U.S.C. § 1512(c)(2) 18 U.S.C. 111(a)(1) STATEMENT OF OFFENSE** Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner Page 5 of 6, DEFENDANT'S ACKNOWLEDGMENT ATTORNEY'S ACKNOWLEDGMENT Page 6 of 6"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CASE NO. 21-CR-91-3 (RCL) 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 111(a)(1) STATEMENT OF OFFENSE** Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner Page 5 of 6, DEFENDANT'S ACKNOWLEDGMENT ATTORNEY'S ACKNOWLEDGMENT Page 6 of 6" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

RECEIVED
Mail Room

MAR 14 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CASE NO. 21-CR-91-3 (RCL) 18 U.S.C. 1512(c)(2) 18 U.S.C. 111(a)(1) STATEMENT OF OFFENSE** Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner Page 5 of 6, DEFENDANT'S ACKNOWLEDGMENT ATTORNEY'S ACKNOWLEDGMENT Page 6 of 6"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Channing D. Phillips 555 Fourth St. N.W. Washington D.C. 20530



"Accepted"

MAR 0 8 2023

*Taylor James Johnatakis*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :

    :     **CASE NO. 21-CR-91-3 (RCL)**

v.     :

    :     **18 U.S.C. § 1512(c)(2)**

TAYLOR JAMES JOHNATAKIS,     :     **18 U.S.C. § 111(a)(1)**

    :

    :

Defendant.     :

RECEIVED
Mail Room

MAR 1 4 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and Taylor James Johnatakis ("Johnatakis" or the "defendant"), with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.     The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3.     On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint

"Accepted"

MAR 0 8 2023

Taylor James Johnatakis

session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m.  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd

encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### The Defendant's Participation in the January 6, 2021, Capitol Riot

8.      On January 6, 2021, Johnatakis, along with Craig Michael Bingert ("Bingert") and Isaac Steve Sturgeon ("Sturgeon," collectively, "the defendants"), picked up a gate and pushed it into police officers. The officers were attempting to prevent the defendants from gaining access to the Capitol grounds and building.

9.      The defendants were at the front of a mob on the west terrace of the U.S. Capitol grounds facing a line of D.C. Metropolitan Police Department ("MPD") officers. Between the officers and the defendants were metal police barricades. The MPD officers were wearing body worn camera ("BWC"), and the defendants were in clear view of several officers' BWC.

10.     Johnatakis waved other rioters forward toward the barricaded line of MPD officers and, using the bullhorn attached to this backpack, yelled to the surrounding crowd, "push them out of here, we're just using our bodies!" Johnatakis then directed the other rioters to push the barricades into the MPD officers, encouraging them as they progressed, yelling "one foot," and "1, 2, 2, go."

11.     Bingert and Sturgeon stood directly to the right of Johnatakis, such that the three men were side-by-side. As Johnatakis counted down, Bingert and Sturgeon joined Johnatakis, using their hands to grab the metal barricade. The defendants, along with other members of the crowd, use their collective force to shove the barricade into the police officers.

12.     At one point, the defendants managed to push the barricade far enough and high enough that they were able to duck underneath it.

13.     In response to the physical aggression, MPD officers used both physical force and chemical irritants to push back the defendants and stop the rioters from breaking through the line of officers.

14.     Before the assault, Johnatakis posted a video to Facebook in which he stated, "Trump's speech is over…he went over the voter fraud…we're walking over to the Capitol right now and I don't know, maybe we will break down the doors." After the assault, Johnatakis posted to Facebook, "If there were ANTIFA, they sprinkled right along with us because we got the same mission and that was to take that Capitol…I organized a push up to the Capitol because I felt like that is exactly what we needed."

15.     The defendant knew at the time he entered U.S. Capitol grounds and pushed the barricade into the police line that he did not have permission to enter the U.S. Capitol grounds and the U.S. Capitol building. The defendant obstructed, influenced, and impeded an official

proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

16.    When the defendant pushed the metal barricade into persons assisting the United States Capitol Police, that is, officers from the Metropolitan Police Department, the defendant knew that the officers were engaged in the performance of official duties.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By:    /s/ Angela N. Buckner
Angela N. Buckner
DC Bar #1022880
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (202) 252-2656
Phone: (202) 252-7692

## DEFENDANT'S ACKNOWLEDGMENT

I, Taylor James Johnatakis, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: _____         _____
                              Taylor James Johnatakis
                              Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: _____         _____
                              Christopher Black, Esq.
                              Attorney for Defendant

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Eight        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 82-1 Filed 10/17/22 Page 1 of 17 **EXHIBIT 1**, Page 2 of 17 February 4 2022, Page 3 of 17, Page 4 of 17, Page 5 of 17, Page 6 of 17, Page 7 of 17, Page 8 of 17, Page 9 of 17, Page 10 of 17, Page 11 of 17, Page 12 of 17 Sincerely yours Harrison Hickman, Page 13 of 17, **Select Litigation Results**, Page 14 of 17, Page 15 of 17, Page 16 of 17, Page 17 of 17 "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 82-1 Filed 10/17/22 Page 1 of 17 **EXHIBIT 1**, Page 2 of 17 February 4 2022, Page 3 of 17, Page 4 of 17, Page 5 of 17, Page 6 of 17, Page 7 of 17, Page 8 of 17, Page 9 of 17, Page 10 of 17, Page 11 of 17, Page 12 of 17 Sincerely yours Harrison Hickman, Page 13 of 17, **Select Litigation Results**, Page 14 of 17, Page 15 of 17, Page 16 of 17, Page 17 of 17" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR 1 4 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 82-1 Filed 10/17/22 Page 1 of 17 **EXHIBIT 1**, Page 2 of 17 February 4 2022, Page 3 of 17, Page 4 of 17, Page 5 of 17, Page 6 of 17, Page 7 of 17, Page 8 of 17, Page 9 of 17, Page 10 of 17, Page 11 of 17, Page 12 of 17 Sincerely yours Harrison Hickman, Page 13 of 17, **Select Litigation Results**, Page 14 of 17, Page 15 of 17, Page 16 of 17, Page 17 of 17"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

MAR 0 8 2023

*Taylor James Johnatakis*

# <u>EXHIBIT 1</u>



RECEIVED
Mail Room

MAR 1 4 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia



**"Accepted"**

MAR 0 8 2022

MAR 14 2023

February 4, 2022

Ms. Ann Mason Rigby
Ms. Elizabeth A. Mullin
Assistant Federal Public Defenders
Federal Public Defender's Office for the Eastern District of Virginia
1650 King Street, Suite 500
Alexandria, VA 22314

*Taylor James Johnstabis*

Dear Ms. Rigby and Ms. Mullin,

As you know, the Federal Public Defenders' Office for the District of Columbia commissioned Select Litigation, LLC, of Washington, D.C., to assess the federal jury pool in the District of Columbia on behalf of the many indigent clients indicted for activities arising out of the January 6, 2021, demonstrations at the U.S. Capitol building who are represented by either Assistant Federal Public Defenders or other counsel appointed pursuant to the Criminal Justice Act. To that end, Select Litigation conducted two public opinion polls, one among jury-eligible citizens of the District of Columbia, and one among jury-eligible citizens of the Atlanta Division of the Northern District in Georgia. Select Litigation also retained the services of a leading media research firm, News Exposure, to analyze news coverage related to the January 6, 2021, demonstrations. For ease of reference, I have numbered the paragraphs of this letter reporting on our results and the results of News Exposure's media study.

### Jury Pool Analysis

1.      The samples for the polls were drawn from current lists including both landlines and cellular devices, and the sampling was done in a manner to ensure that every jury-eligible citizen on the lists from each of the two jurisdictions would have an equal probability of being included in the final sample. Interviewing for the polls was conducted by professional interviewers by telephone January 9-14, 2022. Respondents were interviewed on both landlines and mobile devices. The total sample size was 800 respondents comprised of 400 interviews in each jurisdiction. The wording and ordering of the substantive questions were identical in both jurisdiction, and copies of the questionnaires are included as an addendum to this letter.

2.      All polls are subject to errors related to interviewing a sample of a universe rather than the entire population. The margin of estimation or sample error for a sample size of 400 is 4.9 percentage points at the 95% confidence interval. This means that in 95 out of 100 cases, the responses in these polls should be within plus or minus 4.9 percentage points of the responses that would have been obtained interviewing the entire population in each jurisdiction. The sampling error for

subgroups contained in these samples would be larger. Small adjustments were made to the interviews collected to ensure that the samples are reflective of the best available information about the composition of the populations in these jurisdictions. In this and other respects, the methods used in conducting these polls were according to or exceed professional standards for public opinion research.

3.    In preparation for this research, Select Litigation reviewed numerous polls conducted about the events of January 6. In these polls, Select Litigation included one question taken from a national poll conducted by CBS News/YouGov was included so we could compare results from these two jurisdictions with results for adults nationwide. The CBS News/YouGov poll was conducted December 27-31, 2021, with 2,063 adults. The margin of sampling or estimation error with this size is 2.3 percentage points, plus or minus. The results of the poll are reviewed at https://www.cbsnews.com/news/january-6-opinion-poll-2022/, and a descriptions of its methodology can be found at the bottom of the document located at this link: https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view.

4.    I was the project manager for this research by Select Litigation. Over the past four decades, I have conducted over 3000 public opinion polls. I am a political scientist by training, having earned a degree with departmental honors at Guilford College, an M.A. from the University of Nebraska, completed doctoral course work and comprehensive exams at Tulane University, and did advanced study in opinion research and statistics at the University of Michigan.

## Key Findings of Jury Pool Analysis

5.    Prospective jurors in the District of Columbia have decidedly negative impressions of individuals arrested in conjunction with the activities of January 6, 2021. Their bias against the defendants is evident in numerous results and is reflected in a significant prejudgment of the case: a clear majority admit they would be inclined to vote "guilty" if they were serving on a jury at the defendants' trial. The attitudes of prospective jurors in the District of Columbia are decidedly more hostile toward the defendants than adults nationwide or prospective jurors in a demographically comparable federal court division.

6.    The first part of this document describes the findings from the poll of jury-eligible citizens of the District of Columbia. The next section compares the views of the District of Columbia jury pool with the jury-eligible citizens in the Atlanta Division of the Northern District of Georgia. A final section reviews the findings of a study of the media coverage of the events of January 6.

## The District of Columbia Jury Pool

7.    Essentially every jury-eligible individual in the District of Columbia (99%) is aware of the demonstrations that took place at the Capitol on January 6, 2021. Awareness that "several hundred people were arrested on charges related to those demonstrations" is almost as high (93% aware). *See* Appendix A, Q1, Q3.

8.     Most jury-eligible District of Columbia citizens (80%) express confidence that the current defendants will receive a "fair trial" in the District of Columbia. Fewer than this (67%) believe that they themselves would receive a fair trial if they were defendants in the case.    Other responses undermine the notion that these expressions of confidence in a fair trial are an accurate reflection of what would occur. *See Appendix A*, Q7, Q6.

9.     The vast majority (84%) have an unfavorable opinion of the "people arrested for participating in the events at the Capitol on January 6." Only 6% have a favorable view of those arrested; another 4% volunteer that their opinion is mixed, and 6% do not offer an opinion of those arrested.  *See Appendix A*, Q2.

10.     An overwhelming majority of the District of Columbia jury pool have a prejudgment about the case.  When asked whether they think the "people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them," 71% say "guilty" and 3% say "not guilty."  About one of every six volunteer that "it depends," while only 10% offer no opinion as to the guilt of those arrested. *See Appendix A*, Q4.

11.     This perception of guilt goes beyond a simple, loosely held opinion.  For example, from early in life, most every American is exposed to the monition that, if they serve as jurors, they must treat defendants as "innocent until proven guilty." Despite this, a majority of jury-eligible residents of the District of Columbia (52%) admit in this anonymous interview that if they were "on a jury for a defendant charged with crimes for his or her activities on January 6th," they would be more likely to vote the defendant "guilty." Only 2% say they would be more likely to vote "not guilty." About a third of the jury pool volunteer that "it depends" on how they would vote, and 13% offer no opinion. *See Appendix A*, Q5.

12.     The prejudgment revealed in responses to these two questions are in sharp contrast to the expressions of confidence for a "fair trial."  It is of particular interest that 76% of those who stated that they believe the defendants will receive a fair trial think the defendants are guilty, and 56% of them say they would vote "guilty" if they were on a jury.

13.     Almost all prospective jurors in District of Columbia remember being exposed to media coverage of January 6th (over 90% have seen, read, or heard some). Most of them say the media coverage implied that the defendants are guilty of "the charges brought against them."  Only 4% say the coverage suggests they are not guilty, and 17% say the media coverage had been mixed. *See Appendix A*, Q8, Q9.

14.     These opinions of the defendants among prospective District of Columbia jurors are buttressed by strong underlying beliefs about the defendants' associations, beliefs, actions, and motivations.  First, large majorities accept, and few prospective jurors reject, negative descriptions of the defendants.  Seven of every ten (70%) would describe the defendants as "conspiracy theorists," 62% would describe them as "criminals," 58% would describe them as "white supremacists," and 54% would describe them as "members of a violent right-wing organization."  No more

3

than 30% say they would not use any one of these terms to describe the defendants. *See Appendix A,* Q10.

15. Second, many potential jurors reveal preconceived notions about the intent of at least those defendants who "forced their way into the U.S. Capitol," to use the terminology used in the CBS News/YouGov poll of December 27-30, 2021. More than eight of every ten (85%) think "trying to overturn the election and keep Donald Trump in power" would describe these defendants' actions; only 9% believe that would not be a valid description. Three-quarters (76%) believe that the term "insurrection" would describe their actions on January 6, and 72% believe "trying to overthrow the US government" would be an apt description. About two-thirds (69%) think "a protest that went too far" describes their actions. On the other hand, alternative positive descriptions are roundly rejected. Only 13% think that "patriotism" and only 10% think that "defending freedom" would describe their actions. *See Appendix A,* Q11.

16. Responses to this question raise additional questions about the extent to which prejudgments about the defendants undermine widespread expression of confidence that defendants will receive a "fair trial." That is, overwhelming majorities of those in the District of Columbia jury pool who say that they believe the defendants will receive a fair trial also reveal existing judgments about the motivations and intentions of the defendants. That is, 78% of them believe the term "trying to overthrow the government to keep Donald Trump in power" would describe them; and 82% believe the term "insurrection" is an apt description for their actions. By contrast, only 10% believe "patriotism" would describe them, and only 6% think "defending freedom" would.

17. Note that we used the same question wording as the national CBS News/YouGov December 27-30, 2021, poll to facilitate comparisons between the two juror pools we analyzed with adults nationwide. We used this question wording despite the fact that the CBS News/YouGov question wording is leading and includes language characterizing the defendants that the defendants do not accept as accurate, i.e., "the people who forced their way into the U.S. Capitol."

18. As the following table demonstrates, prospective jurors in the District of Columbia are more likely than adults nationwide, by a statistically significant margin, to believe that the January 6 defendants were trying to overturn the election and keep Donald Trump in power, were involved in an "insurrection," and were "trying to overthrow the U.S. government." And they are less likely to believe that the defendants' actions would be described as "patriotism" or "defending freedom."

| Comparison of Beliefs among Adults Nationwide and Jury-eligible Citizens of DC | | | | |
|---|---|---|---|---|
| Do you believe this term would or would not describe the actions of on January 6?* | | USA | DC | Difference |
| Trying to overturn the election and keep Donald Trump in Power | Would | 63% | 85% | +22 |
| | Would not | 37 | 9 | -28 |

4

"Accepted"

MAR 08 2023

Taylor James Johnston

| | | | | |
|---|---|---|---|---|
| Insurrection | Would | 55% | 76% | +21 |
| | Would not | 45 | 13 | - 32 |
| Trying to overthrow the US government | Would | 54% | 72% | +18 |
| | Would not | 46 | 20 | - 26 |
| A protest that went too far | Would | 76% | 69% | - 7 |
| | Would not | 24 | 24 | + 0 |
| Patriotism | Would | 26% | 13% | - 13 |
| | Would not | 74 | 81 | + 7 |
| Defending freedom | Would | 28% | 10% | - 18 |
| | Would not | 72 | 86 | +14 |

*The wording of the CBS/YouGov poll question was as follows: "Thinking about the people who forced their way into the U.S. Capitol on January 6, 2021. Would you describe their actions as …?" The question on the telephone polls reported here was worded as follows: "Thinking about the people who forced their way into the U.S. Capitol on January 6, 2021, tell me whether you would or would not describe their actions in the following ways. Here's the first description: [READ ITEM] Would you describe or would you not describe the actions of the people who forced their way into the U.S. Capitol on January 6, 2021, in that way?

The fact that the CBS News/YouGov poll was administered on-line and the polls reported here were conducted via telephone accounts for the slight difference in wording. In addition, the fact that the CBS News/YouGov poll did not permit answers other than "yes" and "no" is the reason the responses to those questions all add to 100%. The telephone polls that we conducted included space for the interviewers to note when respondent answers were something other than the offered answers, in particular, "it depends," or some indication of "mixed," and a refusal or reluctance to venture any response ("don't know"). As a result, the DC responses reported here do not add up to 100%.

## Comparison of Jury-Eligible Citizens in
## the District of Columbia and in the Atlanta Division

19. The comparison of results for a comparable question asked nationwide and in the District of Columbia illustrates that prospective jurors in the District of Columbia differ from adults nationwide in their views of the defendants. We also compared the opinions of prospective jurors in the District of Columbia about the defendants with those of prospective jurors in another federal court division.

20. The selection of the additional district in which to poll was based on numerous considerations and research into other divisions of the federal court system. From study and prior experience, we know that most urban areas in the United States have relatively similar distributions of gender, age, and other demographic measures of their populations. One of the biggest differences among the

"Accepted"

MAR 08 2023

Taylor James Johnston

divisions is the racial composition. In that regard, the division with the closest approximation of the racial composition of the District of Columbia is the Atlanta division of the Northern District of Georgia. The following table shows the racial composition of twelve divisions.

| Comparison of the Racial Composition of Various Federal Court Divisions | | | |
|---|---|---|---|
| | White | Black | Hispanic |
| District of the District of Columbia | 41% | 39% | 11% |
| Atlanta Division of Northern District of Georgia | 40% | 38% | 12% |
| | | | |
| Northern Division of Middle District of Alabama | 55% | 37% | 3% |
| Norfolk Division of the Eastern District of Virginia | 55% | 29% | 7% |
| Eastern District of Louisiana | 55% | 29% | 9% |
| District of Delaware | 62% | 21% | 9% |
| Middle District of North Carolina | 62% | 21% | 9% |
| Southern Division of Eastern District of Michigan | 69% | 18% | 4% |
| Eastern Division of the Eastern District of Missouri | 73% | 17% | 3% |
| Eastern District of Pennsylvania | 65% | 16% | 10% |
| Eastern Division of the Northern District of Illinois | 52% | 16% | 22% |
| Southern District of New York | 43% | 16% | 30% |

21.     This is not to say that the Atlanta Division is the same as the District of Columbia in every regard. Adults in the District of Columbia have higher levels of formal education than in other divisions (64% of adults in the District of Columbia have an associate degree or higher). The comparable number in the Atlanta Division is 51%. While the level of formal education is lower in Atlanta, it is higher than any other division examined other than the Southern District of New York which also has 51% with associate degrees or higher.

22.     Another obvious contrast is the percentage of vote won by the candidates in the 2020 Presidential election. Trump won about 5% (to Biden's 92%) in the District of Columbia, while the split in the counties of the Atlanta Division was 65%-33% for Biden. In fact, no other federal court division had a Presidential vote as lopsided as the District of Columbia in 2020; the closest one in the divisions examined here was SDNY (Biden 72%-Trump 26%). But since formal education and political leanings traditionally are not factors to consider in selecting venue, the decision was to use the Atlanta Division because the similarity of the two districts on a variety of demographic measures, including the race/ethnic composition of the two populations.

23.     A poll with identical questions was conducted in the Atlanta Division over the same days as the poll in the District of Columbia discussed above. With one exception, prospective jurors in the District of Columbia have more negative views of the defendants by a statistically significant margin on each of these questions as these examples show.

| Comparison of opinions among prospective jurors in DC and Atlanta Division | | | DC | GA | Difference |
|---|---|---|---|---|---|
| Q2. Opinion of the people arrested for participating in the events at the U.S. Capitol on January 6 | | Favorable | 6% | 18% | -12 |
| | | Unfavorable | 84 | 54 | +30 |
| | Volunteered | (Mixed) | 4 | 16 | -12 |
| | Volunteered | (Don't know/refused) | 6 | 12 | -6 |
| Q4. Opinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges brought against them | | Guilty | 71% | 54% | +17 |
| | | Not guilty | 3 | 10 | -7 |
| | Volunteered | (Depends) | 16 | 19 | -3 |
| | Volunteered | (Don't know/refused) | 10 | 17 | -7 |
| Q5. How are you more likely to vote if on a jury for a defendant charged with crimes for his or her activities on January 6th | | Guilty | 52% | 45% | +7 |
| | | Not guilty | 2 | 9 | -7 |
| | Volunteered | (Depends) | 33 | 37 | -4 |
| | Volunteered | (Don't know/refused) | 13 | 8 | +5 |

24.     The difference in underlying opinions of prospective jurors in the District of Columbia is even more evident on questions about descriptions of the defendants than it is on the questions for which there is an obvious socially acceptable response.  Jury-eligible citizens of the District of Columbia are more likely by a statistically significant margin than their counterparts in the Atlanta division to believe the terms "conspiracy theorists," "criminals," "white supremacists," and "members of a violent right-wing organization" describe most of the January 6 defendants.

| Comparison of Beliefs about January 6 defendants in DC and Atlanta Division Q10. Would you or would you not describe most of the people who were arrested for their involvement in the events on January 6th at the U.S. Capitol building using this description? | | DC | GA | Difference |
|---|---|---|---|---|
| Conspiracy theorists | Would | 70% | 52% | +18 |
| | Would not | 15 | 32 | - 17 |
| Criminals | Would | 62% | 48% | +14 |
| | Would not | 28 | 35 | - 7 |
| White supremacists | Would | 58% | 40% | +18 |
| | Would not | 25 | 41 | - 16 |
| Members of a violent right-wing organization | Would | 54% | 39% | +15 |
| | Would not | 29 | 41 | - 12 |
| NOTE: The results do not add to 100% because some respondents answered in ways not included in the question, most frequently "it depends," "mixed," or offered no opinion. | | | | |

"Accepted"

MAR 08 2023

Taylor James Schattes

25. Prospective jurors in the District of Columbia also are more likely to have formed the opinion that the defendants had specific intent on January 6 than their counterparts in Georgia with one exception. The similarity between the opinions of the Georgia respondents and adults nationwide is additional evidence that the District of Columbia is an outlier in these matters.

| Comparison of Beliefs among Jury-eligible Citizens in DC & Atlanta Division, & Adults Nationwide | | | | |
|---|---|---|---|---|
| Q11. Do you believe this term would or would not describe actions on January 6?* | | USA | DC | GA |
| Trying to overturn the election and keep Donald Trump in Power | Would | 63% | 84% | 68% |
| | Would not | 37 | 9 | 19 |
| Insurrection | Would | 55% | 76% | 55% |
| | Would not | 45 | 13 | 27 |
| Trying to overthrow the US government | Would | 54% | 72% | 57% |
| | Would not | 46 | 20 | 33 |
| A protest that went too far | Would | 76% | 69% | 70% |
| | Would not | 24 | 24 | 21 |
| Patriotism | Would | 26% | 13% | 25% |
| | Would not | 74 | 81 | 63 |
| Defending freedom | Would | 28% | 10% | 21% |
| | Would not | 72 | 86 | 70 |

*See the note on the comparable table above for the wording of the questions and pertinent information about the responses on the nationwide poll and the telephone polls reported here.*

26. In sum, these polls demonstrate that jury-eligible citizens in the District of Columbia are decidedly more biased against the January 6 defendants than either their counterparts in the Atlanta Division of the Northern District of Georgia or adults nationwide. This bias and their clear prejudgment about the case raise significant questions about the viability of obtaining a fair trial in the District of Columbia.

## Comparison of Media Coverage in Two Markets

27. Data generated by a leading media research firm, News Exposure show that stories about and mentions of the January 6 incident were more common by District of Columbia media outlets than by comparable outlets in Atlanta in print, broadcast, and internet. *See Appendix B*. News Exposure's findings and conclusions are summarized below. Their report can be found in Appendix B and at this link:
https://docs.google.com/spreadsheets/d/1-gGzNFhGmQPZAiRkoZjzTO8uqiq9Zve2I4L15mddpqU/edit?usp=sharing

28.    **Print stories.** During the first year after the events of January 6, 2021, the dominant newspaper in the District of Columbia (the Washington Post) ran roughly twice as many stories totally or mostly dedicated to the January 6 matter as the dominant newspaper in Atlanta (the Atlanta Journal-Constitution).   The following table shows the distribution of stories on the demonstration and its aftermath in each publication beginning January 6, 2021.  With a few exceptions (April, May, and October 2021), the Washington Post published more stories on the matter than the Atlanta Journal-Constitution. During the most recent three months, the Post published 57 stories to 9 in the Journal-Constitution.

| Number of Stories in Two Newspapers | | |
|---|---|---|
| | Atlanta Journal-Constitution | Washington Post |
| Jan 2021 | 15 | 28 |
| Feb 2021 | 9 | 19 |
| Mar 2021 | 11 | 10 |
| Apr 2021 | 7 | 5 |
| May 2021 | 3 | 3 |
| Jun 2021 | 9 | 30 |
| Jul 2021 | 11 | 26 |
| Aug 2021 | 8 | 10 |
| Sep 2021 | 7 | 15 |
| Oct 2021 | 10 | 7 |
| Nov 2021 | 4 | 19 |
| Dec 2021 | 2 | 18 |
| Jan 2022 | 3 | 20 |
| **Totals** | **99** | **210** |

29.    **Web coverage.** Disparity between media coverage in the two markets was perhaps greatest on the internet.  As this table shows, the number of hits from internet sites based in the District of Columbia area was four times higher than the comparable number of hits from sites based in the Atlanta area.

| Number of Web Hits in Two Markets | | |
|---|---|---|
| | Atlanta | Washington |
| Jan 2021 | 286 | 8,428 |
| Feb 2021 | 2,016 | 3,570 |
| Mar 2021 | 771 | 2,170 |
| Apr 2021 | 522 | 1,724 |
| May 2021 | 747 | 2,450 |
| Jun 2021 | 659 | 2,562 |
| Jul 2021 | 549 | 2,428 |
| Aug 2021 | 360 | 1,131 |
| Sep 2021 | 486 | 1,441 |
| Oct 2021 | 471 | 1,805 |
| Nov 2021 | 349 | 1,814 |
| Dec 2021 | 389 | 1,873 |
| Jan 2022 | 507 | 1,951 |
| **Totals** | **8,112** | **33,347** |

30. Other common ways of reporting internet broadcasting (e.g. impressions, ad value) show even larger disparities between the District of Columbia and Atlanta. Those are not reported here because controversies over the methodologies could distract from the simple and incontrovertible conclusion that District of Columbia-based sites provided many more hits on the internet than their counterparts in Atlanta.

31. **Broadcast coverage.** The findings are similar with respect to the number of stories broadcast on the local programming of the network television affiliates of ABC, CBS, Fox, and NBC in each market that included significant mention of the events of January 6, 2021, and its aftermath. The comparison is shown in the following table. It is worth mentioning that the larger number of mentions on broadcast news compared to print is in part because of the multiple news broadcasts that appear each day on each outlet.

| Number of Hits on Local Broadcasts | | |
|---|---|---|
| | **Atlanta** | **Washington** |
| Jan 2021 | 1,090 | 1,250 |
| Feb 2021 | 369 | 874 |
| Mar 2021 | 394 | 616 |
| Apr 2021 | 202 | 523 |
| May 2021 | 305 | 549 |
| Jun 2021 | 195 | 388 |
| Jul 2021 | 234 | 561 |
| Aug 2021 | 92 | 356 |
| Sep 2021 | 226 | 533 |
| Oct 2021 | 135 | 423 |
| Nov 2021 | 173 | 473 |
| Dec 2021 | 290 | 444 |
| Jan 2022 | 300 | 310 |
| **Totals** | **4,005** | **7,300** |

32. In addition to the simple difference in the number of hits on the local broadcasts of the network affiliates, the table shows the persistence of the coverage in the District of Columbia market as compared to the Atlanta market. The fewest number of hits on the news broadcast by the District of Columbia affiliates in 2021 was 356 in August of last year. The number of hits during the lowest month in the District of Columbia exceeded the comparable mentions in nine of the twelve months on comparable broadcasts in Atlanta.

33. This disparity of media exposure might help explain the differences in the views of jury-eligible citizens in the District of Columbia and the views of their counterparts in a comparable division and among adults nationwide.

10

Sincerely yours,

s/

Harrison Hickman
Select Litigation, LLC
5301 Wisconsin Ave, NW, Suite 330
Washington, DC 20015

"Accepted"

MAR 0 8 2023

*Taylor James Johnatakis*

"Accepted"

MAR 0 8 2023

*Taylor James Johnatakis*

# Appendix A
# Select Litigation
# Results



"Accepted"

*Jaylor James Johnstakis*

MAR 0 8 2023

Copyright 2022
District of Columbia and Atlanta Division of Northern District of Georgia

January 9 - 13, 2022
SL 3582-3

400/400 Interviews
Margin of Error: +/- 4.9/4.9

Hello, my name is _____ from **[PHONEBANK]**, a national research firm.

**[IF LANDLINE]** We're conducting a survey in (Washington, D.C./Georgia) to get people's opinions on important local issues. This number was selected at random and according to the research procedure, I would like to speak to the youngest **(ALTERNATE: MAN/WOMAN)** at this address who is registered to vote.

**[IF CELL PHONE]** We're conducting a survey of cell phone users in (Washington, D.C./Georgia) to get people's opinions on important local issues. Since you are on a cell phone, I can call you back if you are driving or doing anything else that requires your full attention. Can you talk safely and privately now? **[IF YES, CONTINUE. IF NO, SCHEDULE CALLBACK]**

|  | | D.C. | Atlanta |
|---|---|---|---|
| Number | | 400 | 400 |
| Margin of error | | +/- 4.9 | +/- 4.9 |

**RESUME ASKING ALL RESPONDENTS**

**QA.** To ensure we have a proper sample, would you please tell me the name of the county you live in? **[CODED]**

**QB.** Are you officially registered to vote in (Washington, D.C./Georgia)?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | Yes | 99% | 94% |
| | No | 1 | 6 |
| VOL: | (Don't know) | - | - |

**ASK QC IF NOT REGISTERED TO VOTE OR DON'T KNOW [QB=2,3]**
**QC.** Do you currently have a driver's license with a (Washington, D.C./Georgia) address?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | Yes | 1% | 6% |
| | No/Don't know ————————► | | TERMINATE |
| | Registered to vote | 99 | 94 |

**RESUME ASKING ALL RESPONDENTS**
**QD. [DC ONLY]** And to make sure we interview people in all parts of the city, please tell me the ZIP code at the address where you live. **[CODED]**

**QE.** In the last month, have you received a summons to appear for jury duty?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | No | 100% | 100% |
| | Yes/Don't know ————————► | | TERMINATE |

**QF.** Are you a member of federal, state, or local law enforcement?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | No | 100% | 100% |
| | Yes/Don't know ————————► | | TERMINATE |

**QG.** Are you an active-duty military member?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | No | 100% | 100% |
| | Yes/Don't know ————————► | | TERMINATE |

**QH.** Are you, or any of your immediate family members, congressional staff?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | No | 100% | 100% |
| | Yes/Don't know ————————► | | TERMINATE |

**QI.** Are you, or any of your immediate family members, employed by the Department of Justice, or (D.C./state or local) or federal courts?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | No | 100% | 100% |
| | Yes/Don't know ————————► | | TERMINATE |

**QJ.** Are you, or any of your immediate family members or close personal friends CURRENTLY employed by or have any affiliation with the media?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | No | 100% | 100% |
| | Yes/Don't know ————————► | | TERMINATE |

**Q1.** Are you aware or not aware of the demonstrations that took place at the Capitol on January 6, 2021?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| | Aware | 99% | 93% |
| | Not aware | 1 | 7 |
| VOL: | (Refused) | - | - |

"Accepted" — Taylor James Schnabel

**Q2.** Do you have an unfavorable or favorable opinion of the people arrested for participating in the events at the U.S. Capitol on January 6?

|  |  | D.C. | Atlanta |
|---|---|---|---|
|  | Favorable | 6% | 18% |
|  | Unfavorable | 84 | 54 |
| VOL: | (Mixed) | 4 | 16 |
| VOL: | (Don't know/Refused) | 6 | 12 |

**Q3.** Are you aware or not aware that several hundred people were arrested on charges related to those demonstrations?

|  |  | D.C. | Atlanta |
|---|---|---|---|
|  | Aware | 93% | 87% |
|  | Not aware | 6 | 13 |
| VOL: | (Refused) | 1 | * |

**Q4.** From what you have heard or read, do you think the people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them?

|  |  | D.C. | Atlanta |
|---|---|---|---|
|  | Guilty | 71% | 54% |
|  | Not guilty | 3 | 10 |
| VOL: | (Depends) | 16 | 19 |
| VOL: | (Don't know/Refused) | 10 | 17 |

**Q5.** Assume you are on a jury for a defendant charged with crimes for his or her activities on January 6th. Are you more likely to vote that the person is guilty or not guilty of those charges?

|  |  | D.C. | Atlanta |
|---|---|---|---|
|  | Guilty | 52% | 45% |
|  | Not guilty | 2 | 9 |
| VOL: | (Depends) | 33 | 37 |
| VOL: | (Don't know/Refused) | 13 | 8 |

**Q6.** If you were a defendant charged with crimes for your activities on January 6th, do you think you would or would not get a fair trial in the District of Columbia?

|  |  | D.C. |
|---|---|---|
|  | Would | 67% |
|  | Would not | 21 |
| VOL: | (Depends) | 5 |
| VOL: | (Don't know/Refused) | 7 |

**Q7.** Do you think the defendants currently charged with crimes for their activities on January 6th will or will not get a fair trial in the District of Columbia?

|  |  | D.C. |
|---|---|---|
|  | Will | 80% |
|  | Will not | 10 |
| VOL: | (Depends) | 4 |
| VOL: | (Don't know/Refused) | 5 |

**Q8.** Since the demonstrations took place on January 6th, how much news coverage have you seen, heard, or read about the demonstrations at the Capitol, the investigations, arrests, and court proceeding of individuals involved in those demonstrations – a lot, quite a bit, some, not much, or none at all?

|  |  | D.C. | Atlanta |
|---|---|---|---|
|  | A lot | 33% | 30% |
|  | Quite a bit | 28 | 20 |
|  | Some | 25 | 25 |
|  | Not much | 9 | 18 |
|  | None at all | 4 | 7 |
| VOL: | (Don't know/Refused) | * | * |

**Q9.** Has most of the media coverage you have seen, heard, or read suggested the defendants are likely guilty or are likely not guilty of the charges brought against them?

|  |  | D.C. | Atlanta |
|---|---|---|---|
|  | Likely guilty | 63% | 61% |
|  | Likely not guilty | 4 | 10 |
| VOL: | (Depends) | 17 | 14 |
| VOL: | (Don't know/Refused) | 16 | 16 |

**Q10.** I am going to read some descriptions of people. For each of these, tell me if you would or would not describe most of the people who were arrested for their involvement in the events on January 6th at the U.S. Capitol building using each description. Here's the first one: **[READ ITEM]** Would you describe, or would you not describe most of the people who were arrested for their actions on January 6th as **[ITEM]**?

SCRAMBLE

|  |  | Would | Would not | (Not sure/Don't know) | (Refused) |
|---|---|---|---|---|---|
| • Conspiracy theorists | Washington, D.C. | 70% | 15 | 13 | 2 |
|  | Atlanta | 52% | 32 | 14 | 2 |
| • Criminals | Washington, D.C. | 62% | 28 | 7 | 2 |
|  | Atlanta | 48% | 35 | 16 | 1 |
| • White supremacists | Washington, D.C. | 58% | 25 | 14 | 3 |
|  | Atlanta | 40% | 41 | 17 | 1 |
| • Members of a violent right-wing organization | Washington, D.C. | 54% | 29 | 15 | 2 |
|  | Atlanta | 39% | 41 | 18 | 2 |

Case 1:21-cr-00091-RCL   Document 127-1   Filed 04/13/23   Page 364 of 865

| Select Litigation | SL 3582-3 | District of Columbia and Atlanta Division of Northern District of Georgia | Page 3/4 |

**Q11.** Thinking about the people who forced their way into the U.S. Capitol on January 6, 2021, tell me whether you would or would not describe their actions in the following ways. Here's the first description: [READ ITEM] Would you describe, or would you not describe the actions of the people who forced their way into the U.S. Capital on January 6, 2021, in that way?

| SCRAMBLE | | Would | Would not | (Not sure/Don't know) | (Refused) |
|---|---|---|---|---|---|
| • Trying to overturn the election and keep Donald Trump in power ... | Washington, D.C. | 85% | 9 | 4 | 2 |
| | Atlanta | 68% | 19 | 11 | 2 |
| • Insurrection ..................................................................... | Washington, D.C. | 76% | 13 | 9 | 2 |
| | Atlanta | 55% | 27 | 15 | 3 |
| • Trying to overthrow the U.S government ..................................... | Washington, D.C. | 72% | 20 | 6 | 2 |
| | Atlanta | 57% | 33 | 9 | 1 |
| • A protest that went too far..................................................... | Washington, D.C. | 69% | 24 | 5 | 2 |
| | Atlanta | 70% | 21 | 7 | 2 |
| • Patriotism............................................................................. | Washington, D.C. | 13% | 81 | 5 | 1 |
| | Atlanta | 25% | 63 | 12 | 1 |
| • Defending freedom................................................................ | Washington, D.C. | 10% | 86 | 3 | 2 |
| | Atlanta | 21% | 70 | 8 | 1 |

Now let's go to some final questions with a reminder that this survey is completely confidential.

**D100.** Gender.

| | D.C. | Atlanta |
|---|---|---|
| Male | 46% | 48% |
| Female | 54 | 52 |

**D101.** What is your age?

| | D.C. | Atlanta |
|---|---|---|
| 18-24 | 2% | 8% |
| 25-29 | 8 | 8 |
| 30-34 | 13 | 16 |
| 35-39 | 20 | 8 |
| 40-44 | 12 | 11 |
| 45-49 | 7 | 12 |
| 50-54 | 7 | 7 |
| 55-59 | 7 | 8 |
| 60-64 | 2 | 6 |
| 65+ | 20 | 14 |
| VOL: (Refused) | 3 | 1 |

**D102.** What is the last grade you completed in school?

| | D.C. | Atlanta |
|---|---|---|
| Some grade school (1-8) | * | 1% |
| Some high school (9-11) | 5 | 3 |
| Graduated high school | 8 | 14 |
| Technical/Vocational | 2 | 6 |
| Some college | 13 | 18 |
| Graduated college | 31 | 35 |
| Graduate/Professional | 38 | 21 |
| VOL: (Don't know/Refused) | 4 | 2 |

**Q12.** And when it comes to politics, do you generally think of yourself as a Democrat, an Independent, or a Republican?

| | D.C. | Atlanta |
|---|---|---|
| Democrat | 59% | 36% |
| Independent | 29 | 29 |
| Republican | 4 | 20 |
| VOL: (Other) | 3 | 4 |
| VOL: (Don't know) | 5 | 5 |

**ASK ONLY IF REGISTERED TO VOTE IN QB [QB=1]**
**Q13.** Regardless of how you feel about the parties, how are you registered to vote: as a Democrat, an Independent, or a Republican?

| | D.C. |
|---|---|
| Democrat | 69% |
| Independent | 18 |
| Republican | 4 |
| VOL: (Other) | 2 |
| VOL: (Don't know) | 6 |
| NOT REGISTERED | 1 |

Select Litigation          SL 3582-3          District of Columbia and Atlanta Division of Northern District of Georgia          Page 4/4

## "Accepted"

*Taylor James Johnatakis*

MAR 0 8 2022

**RESUME ASKING ALL RESPONDENTS**

**D300.** And just to make sure we have a representative sample of voters, could you please tell me your race? [IF NECESSARY] Well, most people consider themselves black or white?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| Black | | 44% | 41% |
| White | | 43 | 41 |
| VOL: (Other) | | 8 | 14 |
| VOL: (Don't know/Refused) | | 4 | 4 |

**D301.** Do you consider yourself a Hispanic, Latino, or Spanish-speaking American?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| Yes | | 6% | 11% |
| No | | 91 | 86 |
| VOL: (Don't know/Refused) | | 3 | 3 |

Thank you for taking the time to complete this interview.

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Eight          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 86 Filed 11/06/22 Page 1 of 2 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER, Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 86-1 Filed 11/06/22 Page 1 of 1 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 ORDER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 86 Filed 11/06/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 86-1 Filed 11/06/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 86 Filed 11/06/22 Page 1 of 2 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER, Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: November 6 2022, Case 1:21-cr-00091-RCL Document 86-1 Filed 11/06/22 Page 1 of 1 IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-RCL-01 ORDER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"**Accepted**"

MAR 08 2023

*Taylor James Johnatakis*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :
          v.                       :       Case No. 1:21-cr-0091-RCL-01
                                   :
CRAIG MICHAEL BINGERT, et al.,     :
          Defendant.               :

## DEFENDANT CRAIG MICHAEL BINGERT'S MOTION FOR JOINDER

COMES NOW Defendant, Craig Michael Bingert, by and through undersigned counsel, hereby respectfully moves to join defendant Isaac Steve Sturgeon's (1) Motion to Change Venue (Dkt. No. 82), and (2) Motion to Compel Discovery (Dkt. No. 83). As grounds, Mr. Bingert states as follows:

1.      Craig Michael Bingert, along with co-defendant's Isaac Steve Sturgeon and Taylor James Johnatakis, are charged in all eight counts of the Superseding Indictment. (Dkt. No. 53)

2.      The facts and circumstances set forth in Mr. Sturgeon's two-noted motions are equally and specifically applicable to Mr. Bingert in this prosecution. And the legal arguments and authorities set forth in the subject motions are those which Mr. Bingert would have cited, had he filed a separate motions. It would be entirely duplicative for this defendant to expend compensable and considerable time preparing and filing these motions which would be identical to the motions filed by his co-defendant, Isaac Steve Sturgeon.



RECEIVED
Mail Room

MAR 14 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

-1-

3. Mr. Bingert respectfully request that the Court allow him each to join these motions filed by co-defendant Isaac Steve Sturgeon to the extent that they are applicable to him in the interests of judicial efficiency.

4. Mr. Bingert seeks the same relief applicable to him in the event that any of these subject motions are granted by the Court.

WHEREFORE, for the foregoing reasons and such other reasons which may appear just and proper, Defendant, Craig Michael Bingert, hereby respectfully moves to join defendant Isaac Steve Sturgeon's (1) Motion to Change Venue (Dkt. No. 82), and (2) Motion to Compel Discovery (Dkt. No. 83).

Respectfully Submitted,

Allen H. Orenberg
Digitally signed by Allen H. Orenberg
Date: 2022.11.06 14:37:06 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. (301) 984-8005
Fax No. (301) 984-8008
Cell-Phone (301) 807-3847
aorenberg@orenberglaw.com
Counsel for Craig Michael Bingert

Dated: November 6, 2022

-2-

"Accepted"

MAR 0 8 2023

*Taylor James Johnston*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  :
                         :

    v.  :      Case No. 1:21-cr-0091-RCL-01

                         :

CRAIG MICHAEL BINGERT, et al. :
    Defendant.  :

## ORDER

Upon consideration of the motion for joinder filed by defendant Craig Michael

Bingert, and for good cause shown, it is hereby this _____ day of _____,

2022, the motion is GRANTED.

Defendant, Craig Michael Bingert, is permitted leave of Court to join defendant

Isaac Steve Sturgeon's (1) Motion to Change Venue (Dkt. No. 82), and (2) Motion to

Compel Discovery (Dkt. No. 83).

_____

Judge,
U. S. District Court for the District of Columbia

1

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Eight        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 84 Filed 10/17/22 Page 1 of 1 **UNITED STATES FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL) NOTICE OF PUBLIC AUTHORITY DEFENSE** Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 84 Filed 10/17/22 Page 1 of 1 **UNITED STATES FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL) NOTICE OF PUBLIC AUTHORITY DEFENSE** Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 84 Filed 10/17/22 Page 1 of 1 **UNITED STATES FOR THE DISTRICT OF COLUMBIA No. 21-cr-091 (RCL) NOTICE OF PUBLIC AUTHORITY DEFENSE** Respectfully submitted A.J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104



RECEIVED
Mail Room

MAR 1 4 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

**"Accepted"**

MAR 0 8 2023

*Taylor James Johnstater*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 21-cr-091 (RCL) |
| | ) | |
| ISAAC STURGEON, | ) | |
| | ) | |
| Defendant | ) | |

## NOTICE OF PUBLIC AUTHORITY DEFENSE

Mr. Sturgeon, through counsel, and pursuant to Federal Rule of Criminal Procedure 12.3, hereby gives notice that he may assert as a defense at trial that he was acting under actual or believed public authority at the time of some of the alleged offenses. Mr. Sturgeon submits that, on or about January 6, 2021, he was and believed he was directed and authorized to march to the Capitol building and enter the Capitol Grounds by Donald J. Trump and his various agents and representatives. At the time, Mr. Trump was vested with the full authority of the Executive Branch as President of the United States of America and was acting under color of that authority.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

1

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Eight        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 81 Filed 10/11/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-01 CONSENT MOTION TO EXTEND TIME TO FILE PRE-TRIAL MOTIONS AND PROPOSED BRIEFING SCHEDULE,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: October 11 2022, Case 1:21-cr-00091-RCL Document 81-1 Filed 10/11/22 Page 1 of 1 **ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 81 Filed 10/11/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-01 CONSENT MOTION TO EXTEND TIME TO FILE PRE-TRIAL MOTIONS AND PROPOSED BRIEFING SCHEDULE,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: October 11 2022, Case 1:21-cr-00091-RCL Document 81-1 Filed 10/11/22 Page 1 of 1 ORDER**"** and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR 1 4 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 81 Filed 10/11/22 Page 1 of 2 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-0091-01 CONSENT MOTION TO EXTEND TIME TO FILE PRE-TRIAL MOTIONS AND PROPOSED BRIEFING SCHEDULE,** Page 2 of 2 Respectfully Submitted Allen H. Orenberg Dated: October 11 2022, Case 1:21-cr-00091-RCL Document 81-1 Filed 10/11/22 Page 1 of 1 **ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

MAR 0 8 2023

Taylor James Johnston

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     :
                              :
    v.                        :     Case No. 1:21-cr-0091-RCL-01
                              :
CRAIG MICHAEL BINGERT, et al. :
    Defendant.                :

## CONSENT MOTION TO EXTEND TIME TO FILE PRE-TRIAL
## MOTIONS AND PROPOSED BRIEFING SCHEDULE

COMES NOW THE PARTIES and hereby requests an extension of time to file pre-trial motions up to and including November 7, 2022 and, furthermore submits a proposed briefing schedule. As grounds, the following submitted:

1.     This motion is consented to per AUSA Kaitlin Klamann.

2.     On August 9, 2022, the Court issued a Minute Order directing the parties to file pre-trial motions by October 17, 2022. Trial is scheduled for May 15, 2023.

3.     Defendant's counsel are requesting an extension of time to file pre-trial motions up to and including November 7, 2022. The additional time requested is due to current and ongoing professional obligations primarily to other matters before this District Court, as well as to other matters before other Courts.

4.     Furthermore, the parties jointly propose the following briefing schedule:

- Defendants' pre-trial motions by November 7, 2022.

- Government's response by December 7, 2022

- Replies by December 21, 2022.

1



"Accepted" *Taylor James Johnatakis*

MAR 0 8 2023

5. The proposed briefing schedule should not affect the orderly administration of the Court's business.

WHEREFORE, for the foregoing reasons and such other reasons which may appear just and proper, the parties request an extension of time to file pre-trial motions up to and including November 7, 2022 and, furthermore submits a proposed briefing schedule.

Respectfully Submitted,

Allen H. Orenberg

Digitally signed by Allen H. Orenberg
Date: 2022.10.11 14:02:49 -04'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. 301-984-8005
Cell Phone No. 301-807-3847
Fax No. 301-984-8008
aorenberg@orenberglaw.com

Dated: October 11, 2022

2



**"Accepted"** *Taylor James Johnatakes*

MAR 0 8 2023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Case No. 1:21-cr-0091-RCL-01 |
| | : | |
| CRAIG MICHAEL BINGERT, et al. | : | |
| Defendant. | : | |

## ORDER

Upon consideration of the consent motion requesting an extension of time to file

pre-trial motions up to and including November 7, 2022 and, a proposed briefing

schedule, and the entire record in this case, it is this _____ day of October, 2022, hereby,

ORDERED:

- Defendants' pre-trial motions by November 7, 2022.

- Government's response by December 7, 2022

- Replies by December 21, 2022.

_____

Judge,
U. S. District Court for the District of Columbia

1

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Three        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



In reply to : "Case 1:21-cr-00091-RCL Document 65-1 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 8 2022 9:30 a.m. TRANSCRIPT OF JURY TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 CERTIFICATE OF OFFICIAL COURT REPORTER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 65-1 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 8 2022 9:30 a.m. TRANSCRIPT OF JURY TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 CERTIFICATE OF OFFICIAL COURT REPORTER" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 65-1 Filed 04/13/22 Page 1 of 26 BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case Number 21-cr-32 March 8 2022 9:30 a.m. TRANSCRIPT OF JURY TRIAL BEFORE THE HONORABLE DABNEY L. FRIEDRICH UNITED STATES DISTRICT JUDGE, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 CERTIFICATE OF OFFICIAL COURT REPORTER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

1

2

3  UNITED STATES OF AMERICA,              .

4           Plaintiff,                    .     Case Number 21-cr-32

5      vs.                                .

6  GUY WESLEY REFFITT,                    .     March 8, 2022

7           Defendant.                    .     9:30 a.m.
   - - - - - - - - - - - - - -

8

9                   TRANSCRIPT OF JURY TRIAL
10      BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                 UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the United States:          JEFFREY NESTLER, AUSA
                                    RISA BERKOWER, AUSA
14                                  United States Attorney's Office
                                    555 Fourth Street Northwest
15                                  Washington, D.C. 20530

16  For the Defendant:             WILLIAM WELCH, III, ESQ.
                                    5305 Village Center Drive
17                                  Suite 142
                                    Columbia, Maryland 21044
18

19

20

21  Official Court Reporter:        SARA A. WICK, RPR, CRR
                                    333 Constitution Avenue Northwest
22                                  U.S. Courthouse, Room 4704-B
                                    Washington, D.C. 20001
23                                  202-354-3284

24

25  Proceedings recorded by stenotype shorthand.
    Transcript produced by computer-aided transcription.

"Accepted"

MAR 0 3 2023

*Taylor James Johnston*

P R O C E E D I N G S

(Jury not present.)

COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 21-32, the United States of America versus Guy Reffitt.

Representing Mr. Reffitt, we have Mr. William Welch, and representing the United States, we have Mr. Jeffrey Nestler and Ms. Risa Berkower.

THE COURT:  Okay.  So we'll bring the jury in.  I will read the concluding instructions.

And you all, I take it, have gone through the exhibits and are all on the same page about what's going back in the jury room?

MR. WELCH:  Yes, Your Honor.

THE COURT:  All right.  And you're all okay with the verdict form and the set of instructions I've read thus far and you've seen?

MR. WELCH:  I haven't seen the verdict form.  I've seen the instructions and read them.

THE COURT:  The law clerk has copies.  Why don't you give them those two copies, and then we will have to take one back to go in the binders for the jurors.

MR. NESTLER:  The verdict form is fine with us.  The instructions are fine with us.

This morning, Mr. Welch, Mr. Hopkins, and I went through all of the exhibits, physical items, the multimedia exhibits on

"Accepted"          MAR 0 3 2023          *Taylor James Johnatakis*

1    a flash drive, and also a binder with the photographs.

2              THE COURT:  Okay.

3              Mr. NESTLER:  And we've given them all to Mr. Hopkins

4    and --

5              THE COURT:  Great.

6              MR. NESTLER:  -- believe they are ready to go.

7              THE COURT:  Great.  Are you all going to be, if not in

8    the courthouse, nearby, 15 minutes away?

9              MR. NESTLER:  Yes, Your Honor.

10             THE COURT:  All right.  Mr. Welch, are you okay with

11   everything?

12             MR. WELCH:  Yes.  I will be in the courthouse.

13   Mr. Hopkins knows where to find me.

14             THE COURT:  Okay.  Terrific.

15        Yes, Mr. Nestler.

16             MR. NESTLER:  Sorry.  The only last issue is we had

17   prepared an exhibit list to accompany our exhibits.  Mr. Welch

18   objected to providing the jury with a copy of the exhibit list.

19   And so we leave that question for the Court's consideration.

20             THE COURT:  Mr. Welch, how do you propose that the

21   jury is going to be able to identify what they might want to see

22   on the computer without any kind of list at all?

23             MR. WELCH:  Well, Your Honor, it was all discussed

24   during the evidence phase of trial.  They've been taking notes.

25   And the exhibit list is not evidence and hasn't been entered in

"Accepted"      MAR 0 3 2023      *Taylor James Johnatake*

1    evidence.  I have never had a case where the exhibit list was

2    given to the jury.

3                THE COURT:  Will it be evident to the jurors what the

4    various exhibits on the computer are, or is it just number, you

5    know, random number, 201, 306?

6                MR. NESTLER:  Just numbers.  There's no other

7    identifying information for each file; it's just the number.

8                THE COURT:  Yeah.

9                MR. NESTLER:  And contrary to Mr. Welch, I've never

10   had a trial where the jury didn't have an exhibit list.  I

11   usually found the jury appreciates having an exhibit list.  It

12   makes their deliberations far more efficient.

13               THE COURT:  Mr. Welch, in a case with this number of

14   exhibits, I just don't know how the jury can possibly find what

15   it needs to look at without some list of some type.

16       Is there anything prejudicial about the exhibit list, other

17   than it's a guide, like a table of contents to what's on the

18   computer?

19       If you can explain to me what's objectionable about the

20   list.  If it's just a listing of items that are on the computer,

21   I will entertain it, but I don't see how they can possibly find

22   what they're looking for without spending hours just clicking on

23   files.

24               MR. WELCH:  I need to just review it one more time and

25   make sure that there are no references like "riot" or

"Accepted"   MAR 0 3 2023   Taylor James Johnatakis

1    inappropriate comments in the titles.

2              THE COURT:  That's fine.  And I'm not whetted to the

3    exhibit list itself.  I just think that the jury needs something

4    that identifies by file number what it is so they don't

5    literally click on every item in order to watch the video of,

6    you know, the pepper spray or whatever the case might be.

7              MR. NESTLER:  I totally understand, Your Honor, and I

8    can go over it again with Mr. Welch.  And perhaps Your Honor

9    could instruct the jury that the exhibit list is being provided

10   solely as a guide to identify certain exhibits and it's not in

11   evidence.  That might ameliorate some of the defense's concerns.

12             THE COURT:  All right.  Do you want a few minutes to

13   take a look at it now?

14             MR. WELCH:  I can read that while you're reading the

15   remaining instructions, which are not controversial.

16             THE COURT:  All right.  And then if you are all in

17   agreement, then I would give an instruction similar to what

18   Mr. Nestler proposed, unless you have an alternative.

19             MR. WELCH:  No, that's fine.

20             THE COURT:  Okay.  Mr. Hopkins, do you want to get the

21   jurors?

22             COURTROOM DEPUTY:  Absolutely, Your Honor.

23        (Pause.)

24             THE COURT:  Mr. Welch, will you be nearby?

25             MR. WELCH:  Yes, I will.

"Accepted"   MAR 0 3 2023   *Taylor James Johnston*
(Jury entered courtroom.)

1    THE COURT:  Good morning, ladies and gentlemen.

2    Welcome back.  I hope you had a nice evening.  I have just a few

3    more instructions, and then I will -- we will recess, and you

4    can go to the jury room to begin your deliberations.

5         You will be provided with a verdict form for use when you

6    have concluded your deliberations.  The form is not evidence in

7    this case, and nothing on it should be taken to suggest or

8    convey any opinion by me as to what the verdict should be.

9    Nothing on the form replaces the instructions of law I have

10   already given you, and nothing on it replaces or modifies the

11   instructions about the elements which the government must prove

12   beyond a reasonable doubt.  The verdict form is meant only to

13   assist you in recording your verdict.

14        A verdict must represent the considered judgment of each

15   juror, and in order to return a verdict, each juror must agree

16   on the verdict.  In other words, your verdict must be unanimous.

17        During the course of this trial, a number of exhibits were

18   admitted into evidence.  Sometimes only those parts of an

19   exhibit that are relevant to your deliberations were admitted.

20   Where this has occurred, I have required the irrelevant parts of

21   the statement to be blacked out or deleted.  Thus, as you

22   examine the exhibits and you see or hear a statement where there

23   appear to be omissions, you should consider only those portions

24   that were admitted.  You should not guess as to what was taken

"Accepted" MAR 0 3 2023 *Taylor James Johnat[an]*

1    out.

2        I will be sending into the jury room with you the exhibits

3    that have been admitted into evidence, except for the firearms,

4    ammunition, and bear spray.  You may examine any or all of them

5    as you consider your verdicts.

6        Please keep in mind that exhibits that were only marked for

7    identification but were not admitted into evidence will not be

8    given to you to examine or consider in reaching your verdict.

9        If you wish to examine the firearms, ammunition, or bear

10   spray, please notify the clerk by a written note, and the

11   marshal will bring them to you.  For security purposes, the

12   marshal will remain in the jury room while each of you has the

13   opportunity to examine the evidence.  You should not discuss the

14   evidence or otherwise discuss the case among yourselves while

15   the marshal is present in the jury room.  You may ask to examine

16   the evidence as often as you find it necessary.

17       When you return to the jury room, you should first select a

18   foreperson to preside over your deliberations and to be your

19   spokesperson here in court.  There are no specific rules

20   regarding how you should select a foreperson.  That is entirely

21   up to you.  However, as you go about the task, be mindful of

22   your mission:  To reach a fair and just verdict based on the

23   evidence.  Consider selecting a foreperson who will be able to

24   facilitate your discussions, who can help you organize the

25   evidence, who will encourage civility and mutual respect among

"Accepted"  MAR 0 3 2023  *Taylor James Johnatakis*

1    all of you, who will invite each juror to speak up regarding his

2    or her views about the evidence, and who will promote a full and

3    fair consideration of that evidence.

4         As I have mentioned frequently throughout the trial, there

5    may be reports in the newspapers or on the radio, Internet, or

6    television about this case.  You may be tempted to read, listen

7    to, or watch this media coverage.  But as I've explained

8    already, you must not read, listen to, or watch such reports,

9    because you must decide this case solely on the evidence

10   presented in this courtroom.

11        If you receive automatic alerts from any source, as I've

12   mentioned, you may need to change your push notifications, news

13   subscriptions, or RSS or Twitter needs.  If any publicity about

14   this trial inadvertently comes to your attention, do not discuss

15   it with other jurors or anyone else.  Just let the clerk know as

16   soon as it happens, and I will then briefly discuss it with you.

17        As you retire to the jury room to deliberate, I also wish

18   to remind you of another instruction that I've given you on

19   multiple occasions throughout this trial.  I previously told you

20   not to communicate with anyone about that -- this case.  Now

21   during your deliberations, you may not communicate with anyone

22   who is not on the jury about this case.  This includes any

23   electronic communications such as e-mail or text or any blogging

24   about the case.

25        In addition, you may not conduct any independent

"Accepted"  MAR 0 3 2023  *Taylor James Johnstalar*

1   investigation during deliberations.  This means you may not

2   conduct any research in person or electronically via the

3   Internet or in any other way.

4       If it becomes necessary during your deliberations to

5   communicate with me, you may send a note by the clerk or

6   marshal, signed by your foreperson or by one or more members of

7   the jury.  No member of the jury should try to communicate with

8   me except by such a signed note.  And I will never communicate

9   with any member of the jury on any matter concerning the merits

10  of this case except in writing or orally here in open court.

11      Bear in mind also that you are never, under any

12  circumstances, to reveal to any person, not the clerk, the

13  marshal, or to me, how the jurors are voting until after you

14  have reached a unanimous verdict.  This means that you should

15  never tell me in writing or in open court how the jury is

16  divided on any matter, for example 6 to 6 or 7 to 5 or 11 to 1,

17  or in any other fashion, whether the vote is for conviction or

18  acquittal, or on any other issue in the case.

19      It is your duty as jurors to consult with one another and

20  to deliberate expecting to reach an agreement.  You must decide

21  the case for yourself, but you should do so only after

22  thoroughly discussing it with your fellow jurors.  You should

23  not hesitate to change an opinion when convinced that it is

24  wrong.  You should not be influenced to vote in any way on any

25  question just because another juror favors a particular decision

**"Accepted"** MAR 0 3 2023   *Taylor James Johnston*

1   or holds an opinion different from your own.

2        You should reach an agreement only if you can do so in good

3   conscience.  In other words, you should not surrender your

4   honest beliefs about the effect or weight of evidence merely to

5   return a verdict or solely because of other jurors' opinions.

6        The attitude and conduct of jurors at the beginning of

7   their deliberations are matters of considerable importance.  It

8   may not be useful for a juror, upon entering the jury room, to

9   voice a strong expression of an opinion on the case or to

10  announce a determination to stand for a certain verdict.  When

11  one does that at the outset, a sense of pride may cause that

12  juror to hesitate, to back away from an announced position after

13  a discussion of a case.

14       Furthermore, many jurors find it useful to avoid an initial

15  vote upon retiring to the jury room.  Calmly reviewing and

16  discussing the case at the beginning of deliberations is often a

17  more useful way to proceed.

18       Remember that you are not partisans or advocates in this

19  matter, but you are the judges of the facts.

20       When you have reached your verdict, just send me a note

21  informing me of this fact and have your foreperson sign the

22  note.  Do not tell me what your verdict is.  The foreperson

23  should fill out and sign the verdict form that will be provided.

24  I will then call you into the courtroom and ask your foreperson

25  to read your verdict in open court.

"Accepted" MAR 0 3 2023 *Taylor James Johnstakis*

1      All right.   Counsel, let's discuss the other issue.

2      (Pause.)

3              THE COURT:  I just wanted to raise the issue we

4      discussed before the jurors came in.

5              MR. WELCH:  No issue.

6              THE COURT:  No issue, okay.

7      All right.  Ladies and gentlemen, one last point I would

8      like to make is that the exhibit list is being provided to you

9      solely as a guide to help you identify the exhibits that have

10     been admitted into evidence.  You should understand that the

11     exhibit list itself is not evidence in the case.  It's just a

12     way for you to find what you need on the computer.  All right?

13     All right, Mr. Hopkins.  We will dismiss the jurors to

14     deliberate.

15     Thank you, ladies and gentlemen.

16     (Jury exited courtroom.)

17             THE COURT:  All right.  Anything else?

18             MR. WELCH:  I don't believe so.

19             MR. NESTLER:  No, Your Honor.

20             THE COURT:  All right.  I will be available, and we

21     will be in touch if there's a note from the jury.  Thank you.

22             MR. NESTLER:  Your Honor, just scheduling-wise, if we

23     don't hear anything all day, Your Honor is going to dismiss them

24     at 4:30?

25             THE COURT:  Yes.  And they will probably take an hour

"Accepted   MAR 0 3 2023   Taylor James Johnstaters

1   break for lunch.  But I won't bring them back in the courtroom

2   for that, just to dismiss them.

3          (Jury deliberations.)

4          (Call to order of the court.)

5          THE COURT:  All right.  So we were informed that we

6   have a verdict.  I will have Mr. Hopkins bring the jurors in.

7   Before we bring them in, are there any issues to discuss?

8          MR. NESTLER:  Not from the government, Your Honor.

9          MR. WELCH:  No, Your Honor.

10         THE COURT:  All right.

11         (Jury entered courtroom.)

12         THE COURT:  All right.  Good afternoon, everyone.

13   Who on the jury speaks as its foreperson?

14         (Jury foreperson raises hand.)

15         THE COURT:  All right.  Madam Foreperson, has the jury

16   unanimously agreed on its verdict?

17         FOREPERSON:  Yes, we have.

18         THE COURT:  Okay.  Could you, please, hand the verdict

19   form to the clerk to inspect.

20         (Foreperson complied.)

21         THE COURT:  All right.  Your verdict will now be

22   published.

23         COURTROOM DEPUTY:  As to Count One, transporting a

24   firearm in furtherance of a civil disorder, guilty.

25         As to Count Two, obstruction of an official proceeding,

"Accepted" MAR 0 3 2023 *Taylor James Johnstons*

1  guilty.

2      As to Count Three, entering or remaining in a restricted

3  building or grounds with a firearm, guilty.

4      As to Count Four, obstructing officers during a civil

5  disorder, guilty.

6      And as to Count Five, obstruction of justice, hindering

7  communication through force or threat of physical force, guilty.

8      Dated March the 8th, signed by the foreperson.

9          THE COURT:  Is there a request to poll the jury?

10          MR. WELCH:  Yes, Your Honor.

11          THE COURT:  All right.  The courtroom deputy will now

12  poll the jury.

13          COURTROOM DEPUTY:  Members of the Jury, as your number

14  is called, please indicate if your individual verdict is the

15  same as they were just announced.  If it is, please answer

16  "yes."  If it is not, please answer "no."

17      Juror number 1?

18          JUROR:  Yes.

19          COURTROOM DEPUTY:  Juror number 3?

20          JUROR:  Yes.

21          COURTROOM DEPUTY:  Juror number 4?

22          JUROR:  Yes.

23          COURTROOM DEPUTY:  Juror number 5?

24          JUROR:  Yes.

25          COURTROOM DEPUTY:  Juror number 6?

Case 1:21-cr-00091-RCL Document 65-1 Filed 04/13/22 Page 14 of 28
Case 1:21-cr-00091-RCL Document 127-1 Filed 04/19/23 Page 330 of 865

1496

**"Accepted"** MAR 0 3 2023

1    JUROR:  Yes.

2    COURTROOM DEPUTY:  Juror number 7?    *Taylor James Johnatakis*

3    JUROR:  Yes.

4    COURTROOM DEPUTY:  Juror number 8?

5    JUROR:  Yes.

6    COURTROOM DEPUTY:  Juror number 9?

7    JUROR:  Yes.

8    COURTROOM DEPUTY:  Juror number 11?

9    JUROR:  Yes.

10   COURTROOM DEPUTY:  Juror number 12?

11   JUROR:  Yes.

12   COURTROOM DEPUTY:  Juror number 14?

13   JUROR:  Yes.

14   COURTROOM DEPUTY:  Juror number 16?

15   JUROR:  Yes.

16   COURTROOM DEPUTY:  Your Honor, the jury has been

17   polled, and the verdict is indeed unanimous.

18        THE COURT:  All right.  The clerk is directed to file

19   and record the verdict, the unanimous verdict.

20        All right, ladies and gentlemen.  This ends your duty.  And

21   as I told you many, many times during the trial when you weren't

22   supposed to talk about this case, that ends.  You're now free to

23   talk about this case to anyone, but it is entirely your choice.

24   You are not obligated to talk to anyone, but you may talk to

25   anyone that you decide you want to talk to.

Case 2:21-cr-00091-RCL Document 55-1 Filed 04/13/22 Page 15 of 26
Case 1:21-cr-00091-RCL Document 127-1 Filed 04/19/23 Page 331 of 865

1497

"Accepted"    MAR 0 3 2023    Taylor James Johnstalis

1  We had a lot of unexpected challenges during the trial with

2  the COVID restrictions and with issues with technology, and I

3  just want to thank you on behalf of the entire court for your

4  patience and your dedication.

5  As I said at the outset, our criminal justice system works

6  because of the willingness of citizens like you to come forward

7  and take time out of your busy schedule to fulfill this very

8  important duty.  And you have done so with dedication, and we

9  are all grateful for your service.

10  So with that, I will excuse you now to the jury room.

11  Thank you again.

12  (Jury exited courtroom.)

13  THE COURT:  All right.  So Mr. Welch, we need to set

14  deadlines for the filing of post-trial motions.  I did want to

15  address on the record your earlier motion under Rule 29.  I will

16  give a brief ruling now, but I do, you know, welcome and

17  anticipate briefing from both sides on this.

18  But while I'm thinking about the calendar, does 14 days

19  give you adequate time?

20  MR. WELCH:  Yes, it does.

21  THE COURT:  All right.  So the defense will file any

22  post-trial motions within 14 days, the government shall respond

23  within 14 days with any oppositions, and any reply within seven

24  days.  If there's a need for a hearing, I will let you all know.

25  And in terms of -- well, I should wait for Mr. Hopkins to

"Accepted"   MAR 0 3 2023   *Taylor James Johnstalas*

1    set the sentencing date.  Why don't I, while he's out, go ahead

2    and address the pending motion under Rule 29.

3          Mr. Welch, now that the jury has spoken, did you wish to

4    make any argument on this?

5                MR. WELCH:  I do, Your Honor, but in view of the

6    Court's, not Your Honor's but another judge's ruling on a 1512

7    motion as well, I would like to consider that and see if there's

8    anything that's appropriate for me to include in my written

9    papers.

10               THE COURT:  Absolutely.

11               MR. WELCH:  I don't want to add any oral comments

12   now --

13               THE COURT:  Okay.

14               MR. WELCH:  -- because that would just complicate

15   that.

16               THE COURT:  That's fine.  So I'm going to give you a

17   brief ruling now.  And I am familiar with that decision, and

18   I've taken a look at it.  But I do welcome your briefing.

19         But considering -- this is defendant's motion, Rule 29

20   motion for judgment of acquittal on all counts that was made at

21   the close of the government's case that I reserved ruling on

22   until now.

23         Considering the evidence in the light most favorable to the

24   government, as the Court must, the Court finds that a rational

25   jury could find the essential elements of the crimes charged

"Accepted" MAR 0 3 2023 Taylor James Johnatakis

1    beyond a reasonable doubt. See *U.S. v. Wahl*, 290 F.3d at 375.

2        With respect to Count One, the jury could credit

3    Mr. Reffitt's own statements captured on tape and in text

4    messages, along with Rocky Hardie and Jackson Reffitt's

5    testimony, Mr. Reffitt's cell phone records and photographs that

6    show that Mr. Reffitt transported guns in commerce from Texas to

7    D.C. in 2021.

8        The testimony of Capitol police officers and videos show

9    that the January 6 riot qualifies as a civil disorder, a public

10   disturbance that caused an immediate danger to persons and

11   property.

12       Although some testimony shows that Mr. Reffitt intended to

13   use his firearms for self-defense or to protect others, other

14   evidence, including Mr. Reffitt's own taped statements, show

15   that he was prepared, if necessary, to use at least his handgun

16   at the Capitol.

17       Thus, a jury could well find beyond a reasonable doubt that

18   Mr. Reffitt knew or intended that the guns would be used in

19   furtherance of the civil disorder in violation of Title 18

20   United States Code Section 231(a)(2).

21       For these same reasons, a rational jury could find beyond a

22   reasonable doubt that Mr. Reffitt entered or remained in a

23   restricted area with a firearm in violation of Title 18 United

24   States Code Section 1752(a)(1) and (b)(2).

25       The testimony of Capitol police officers shows that

"Accepted" MAR 0 3 2023 *Taylor James Johnstons*

1    Mr. Reffitt knew he was on restricted grounds and did not have

2 the lawful authority to be there, as he ignored police

3 barricades, signs, and officers' commands to retreat.

4    A rational jury could also find beyond a reasonable doubt

5 that Mr. Reffitt obstructed officers during a civil disorder in

6 violation of Title 18 United States Code Section 231(a)(3).  Not

7 only did the evidence demonstrate that the January 6 riot

8 constituted a civil disorder, the parties stipulated that the

9 riot adversely affected commerce, and the riot adversely

10 affected the Secret Service's plans to protect Vice President

11 Pence and his family, thus interfering with the performance of a

12 federally protected function.

13    A jury could also reasonably credit the Capitol police

14 officers' testimony, along with video evidence of Mr. Reffitt

15 charging up the stairs to the Senate chamber, as establishing

16 his intent to obstruct, impede, or interfere with those

17 officers.

18    And separately, a jury could certainly find that

19 Mr. Reffitt took a substantial step toward obstructing,

20 impeding, or interfering with those officers.

21    A rational jury could also find that Mr. Reffitt obstructed

22 justice by threatening physical force in violation of Title 18

23 United States Code Section 1512(a)(2)(C) or that he took a

24 substantial step toward obstructing justice.

25    A jury could credit Jackson Reffitt's testimony that

"Accepted"   MAR 0 3 2023   Taylor James Johnatakis

1    Mr. Reffitt threatened to shoot his children or put a bullet

2    through his daughter's phone if they informed the FBI about his

3    actions on January 6, and the information that they would have

4    provided, and indeed Jackson had already provided, related to

5    federal offenses.

6         Finally, a rational jury could find beyond a reasonable

7    doubt that Mr. Reffitt obstructed an official proceeding in

8    violation of Title 18 United States Code Section 1512(c)(2) or

9    that he attempted the offense or aided and abetted others in

10   committing the offense.

11        Witness testimony revealed that because of the Capitol

12   breach Congress was forced to halt its joint session to certify

13   the electoral results.  Mr. Reffitt's own taped statements and

14   video footage of his ascent on the west stairs show that he led

15   a throng of people who first breached the Capitol.

16        As he admitted to another Three Percenter, he knew that

17   Congress was in the joint session, and at a minimum, he knew of

18   and intended the natural consequence of that action that

19   Congress would be unable to continue with the joint session.

20        Plus, substantial evidence supports the charge that

21   Mr. Reffitt acted corruptly.  The officers' testimony and video

22   footage shows that he assisted and encouraged others who used

23   unlawful means, namely assaults of federal officers, to forcibly

24   breach the Capitol.  He led the mob and encouraged it to charge

25   toward federal officers, pushing them aside to break into the

Capitol. **"Accepted"** MAR 0 3 2023

1    He also acted with an unlawful purpose to physically over-

2    throw Congress, and he expressed this clear purpose on numerous

3    occasions before, during, and after January 6.  Mr. Reffitt

4    repeatedly said that the government would be destroyed in the

5    fight and that he wanted to drag lawmakers out of the Capitol by

6    their heels with their heads hitting every step.

7    Lastly, a reasonable jury could find that Mr. Reffitt acted

8    with consciousness of wrongdoing.  Despite his stated view that

9    his actions were justified and protected by the Constitution, he

10   knew, as he acknowledged, that the Capitol police officers were

11   faithfully doing their jobs when they ordered them to retreat.

12   Yet, he continually refused their orders.  He also acknowledged

13   many times his violation of D.C. gun laws.

14   A jury could reasonably interpret all of his statements as

15   demonstrating his awareness that his actions were wrong.

16   For those reasons, the Court finds that a rational jury

17   could find that the government has proven all the elements of

18   the charged offenses beyond a reasonable doubt.

19   As Mr. Welch mentioned, last night, another judge in this

20   district issued an opinion dismissing the Section 1512(c)(2)

21   charge in another case, *United States v. Miller*, 21-cr-119.

22   Again, I do anticipate briefs being filed on this issue

23   with respect to the upcoming motion or motions, and I look

24   forward to reviewing them.  But based on what I've read so far,

"Accepted"   MAR 0 3 2023   *Taylor James Johnatakis*

1   I'm not inclined to reconsider my earlier ruling.

2       Once the issue has been fully briefed, I will provide my

3   reasons in greater detail, but for now, let me state that I'm

4   not inclined to follow *Miller*, because as I explained in

5   *Sandlin*, the plain meaning of the words "obstruct," "impede,"

6   and "influence" are broad and encompass all sorts of actions

7   that affect or interfere with official proceedings, including

8   interfering with the evidence that may be considered in an

9   official proceeding or halting the occurrence of the proceeding

10  altogether.

11      And in my view, the plain meaning of the word "otherwise,"

12  which is defined as "any different way or manner, differently,

13  in different circumstances, under other conditions, in other

14  respects."  See *Miller* opinion at 11, quoting Webster's Third

15  New International Dictionary of the English Language Unabridged

16  2002.

17      That definition does nothing to limit the expansive meaning

18  of Section 1512(c)(2)'s verbs.  Rather, the word "otherwise"

19  simply indicates that a defendant violates Section 1512(c)(2) by

20  corruptly obstructing or impeding a proceeding in a manner or

21  respect that is different than altering or concealing documents.

22      Moreover, I don't believe that the Supreme Court's decision

23  in *Begay* alters this conclusion.  The *Begay* Court expressly

24  indicated that its interpretation of the word "otherwise" was

25  not the only permissible one.  See *Begay v. United States*,

"Accepted" MAR 0 3 2023 *Taylor James Johnston*

553 U.S. at 144.

The Court held that a violent felony that otherwise involves conduct that presents a serious physical risk of injury to another must be similar in kind to the example crimes listed before that catchall clause. That's *Begay* at 142.

But the *Begay* Court also recognized that "otherwise" in other contexts could instead be interpreted as a link to what follows the word as opposed to what comes before. *Begay* at 144.

And Section 1512(c) presents a sufficiently different context such that I don't believe *Begay* controls here.

First, the two statutes are structured differently, with Section 1512(c)(2) housed in a separate subsection as opposed to the same sentence. Second, *Begay* found that the examples listed in the Armed Career Criminal Act were insufficiently similar with respect to the serious physical risk of injury that they pose, such that the other violent felonies must be similar to those examples beyond their degree of risk. *Begay* at 142 through 143.

By contrast, the actions covered by Section 1512(c)(1) can each obstruct, impede, or influence a proceeding. So Section 1512(c)(2)'s residual clause can simply cover any different manner of obstructing, impeding, or influencing.

Plus, the *Begay* Court relied on the particular statutory history of ACCA, which is not replicated here. *Begay* at 143 through 144.

"Accepted" MAR 0 3 2023 *Taylor James Johnston*

1    The Court's interpretation admittedly creates

2   superfluities, but as I explained in *Sandlin*, the same is true

3   for a narrowing construction that covers only acts affecting

4   evidence.  See *Sandlin* opinion at 14 through 15.

5        Finally, the rule of lenity is inapplicable here.  The rule

6   applies only when a statute is ambiguous after seizing

7   everything from which aid can be derived.  *Ocasio v. United*

8   *States*, 578 U.S. at 295, Note 8, quoting *Muscarello v. United*

9   *States*, 524 U.S. at 138 through 139.

10       The Supreme Court has underscored that point through its

11  repeated use of the phrase "grievous ambiguity."  See

12  *e.g., Shaw v. United States, 580 U.S. at 71, Salman v. United*

13  *States*, 580 U.S. at 51.

14       As Justice Kavanaugh summarized current Supreme Court

15  precedent in an opinion released just yesterday, a Court must

16  first exhaust all the tools of statutory interpretation and

17  determine the best reading of the statute before the rule of

18  lenity comes into play and only then when the Court has

19  identified a grievous ambiguity.  See *Wooden v. United States*,

20  Slip Opinion at 2, Kavanaugh concurring.

21       That is not the case here.  So this is not one of those

22  rare situations where lenity comes into play.

23       All right.  So for all those reasons, I will deny for now

24  the defense Rule 29 motion.

25       In terms of sentencing, we're looking roughly 90 days out,

"Accepted"   MAR 0 3 2023   *Taylor James Johnstalis*

1   which I think takes us to some time the week of June 6.

2        Mr. Hopkins, if you can consult the calendar.

3        Mr. Welch, I take it this would be an in-person sentencing?

4             MR. WELCH:  Yes, please.

5             THE COURT:  Okay.  Do you have any conflicts that

6   week?

7             MR. WELCH:  No, I don't.

8             COURTROOM DEPUTY:  The first week of June, Your Honor,

9   we are free that week, Your Honor.

10            THE COURT:  The week of June 6?

11            COURTROOM DEPUTY:  Yes, Your Honor.

12            THE COURT:  All right.  I will start with you,

13  Mr. Welch.  Do you have a preference for that week?

14            MR. WELCH:  I do not.

15            THE COURT:  Mr. Nestler?

16            MR. NESTLER:  No preference, Your Honor.

17            THE COURT:  All right.  Bear with me just a moment.

18        All right.  So let's set this for sentencing on June 8 at

19  10:00 a.m.  And I would ask the parties to file their sentencing

20  memoranda 14 days before sentencing, which is May 25, I think.

21            COURTROOM DEPUTY:  You are correct.

22            THE COURT:  And to the extent either side wants to

23  respond to the other -- I'm not asking for that, but you're

24  welcome to do so -- you should file any response by June 1.

25        Mr. Nestler, do you expect any victims to seek to be heard

"Accepted"    MAR 0 3 2023    Taylor James Johnstakis

1    at that sentencing hearing?

2         MR. NESTLER:  It's possible, Your Honor.

3         THE COURT:  Can you let us know sufficiently in

4    advance and let Mr. Welch know?

5         MR. NESTLER:  Of course, Your Honor.

6         THE COURT:  And does either side -- Mr. Welch, do you

7    expect the need for any expert testimony or any other

8    evidentiary testimony?

9         If you don't know now, you can let me know later.  But

10   again, for planning purposes for the calendar, it would be

11   helpful to know ahead of time.

12        MR. WELCH:  I don't expect that.  There might be

13   mitigation witnesses.

14        THE COURT:  All right.  But again, reports or you

15   think testimony?  You're not sure?

16        MR. WELCH:  More like letters and possibly testimony.

17        THE COURT:  All right.  I would ask both of you to let

18   us know two weeks before.

19        Given what I've seen in the trial, I don't need the

20   government -- as I've requested in other January 6 cases, have

21   the government post things on USAfx.  I have it all now.  So I

22   don't need anything additional.

23        Any other issues we should discuss now?

24        All right.  So we have this set for sentencing on June 8 at

25   10:00 a.m.  Mr. Reffitt, we will see you back on June 8.

"Accepted"   MAR 0 3 2023   Taylor James Johnstakis

1   Thank you all.

2       (Proceedings adjourned at 1:57 p.m.)

3

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5

6                 CERTIFICATE OF OFFICIAL COURT REPORTER

7

8       I, Sara A. Wick, certify that the foregoing is a correct

9   transcript from the record of proceedings in the above-entitled

10  matter.

11

12

13

14  /s/ Sara A. Wick_____          March 9, 2022_____

15  SIGNATURE OF COURT REPORTER       DATE

16

17

18

19

20

21

22

23

24

25

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day: Three        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 65 Filed 04/13/22 Page 1 of 26 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S SUPPLEMENTAL BRIEF ADDRESSING 18 U.S.C. 1512(c)(2) AND UNITED STATES V. MILLER, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 Conclusion Respectfully submitted Matthew M. Graves By: Angela N. Buckner James I. Pearce"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 65 Filed 04/13/22 Page 1 of 26 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S SUPPLEMENTAL BRIEF ADDRESSING 18 U.S.C. 1512(c)(2) AND UNITED STATES V. MILLER, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 Conclusion Respectfully submitted Matthew M. Graves By: Angela N. Buckner James I. Pearce" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR - 8 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 65 Filed 04/13/22 Page 1 of 26 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S SUPPLEMENTAL BRIEF ADDRESSING 18 U.S.C. 1512(c)(2) AND UNITED STATES V. MILLER, Page 2 of 26, Page 3 of 26, Page 4 of 26, Page 5 of 26, Page 6 of 26, Page 7 of 26, Page 8 of 26, Page 9 of 26, Page 10 of 26, Page 11 of 26, Page 12 of 26, Page 13 of 26, Page 14 of 26, Page 15 of 26, Page 16 of 26, Page 17 of 26, Page 18 of 26, Page 19 of 26, Page 20 of 26, Page 21 of 26, Page 22 of 26, Page 23 of 26, Page 24 of 26, Page 25 of 25, Page 26 of 26 Conclusion Respectfully submitted Matthew M. Graves By: Angela N. Buckner James I. Pearce"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: James I. Pearce, United States Attorney's Office 555 Forth Street, N.W. Washington, DC 20530

Page 1 of 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

"Accepted"

MAR 0 3 2023

*Taylor James Johnatakis*

UNITED STATES OF AMERICA     :

       v.                :

                                :     **Case No. 21-CR-91 (RCL)**

**CRAIG MICHAEL BINGERT,**     :
**ISAAC STEVE STURGEON,** and
**TAYLOR JAMES JOHNATAKIS,**    :

      **Defendants.**        :

RECEIVED
Mail Room

MAR - 8 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## GOVERNMENT'S SUPPLEMENTAL BRIEF ADDRESSING 18 U.S.C. § 1512(c)(2) AND *UNITED STATES V. MILLER*

On March 15, Defendant Isaac Sturgeon ("the Defendant") supplemented his earlier motion to dismiss (ECF No. 55) with a notice of an additional authority that, in his view, supports his dismissal motion (ECF No. 64). That additional authority, *United States v. Miller*, No. 21-cr-119, ECF No. 73, Order (D.D.C. Mar. 7, 2022), provides no sound reason to grant the Defendant's motion.

In *Miller*, Judge Nichols granted a motion to dismiss a count charging defendant Garret Miller with a violation of 18 U.S.C. § 1512(c)(2), which prohibits corruptly obstructing, influencing, or impeding an official proceeding. *Miller*, ECF No. 73. In Judge Nichols's view, a defendant violates Section 1512(c)(2) only when that individual "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *United States v. Miller*, No. 21-cr-119, ECF No. 72, Memorandum Opinion (Mem. Op.) (D.D.C. Mar. 7, 2022). Because, according to Judge Nichols, the indictment did not allege or imply that Miller took any such action, Judge Nichols dismissed the count charging Section 1512(c)(2). *Id.* at 29.

The decision in *Miller* is flawed for two independent reasons. First, Judge Nichols erred

"Accepted"

MAR 03 2023

Taylor James Jermalws

by applying the rule of lenity. Rejecting an interpretation of Section 1512(c)(2)'s scope that every other member of this Court to have considered the issue and every reported case to have considered the issue (to the government's knowledge) has adopted, Judge Nichols found "serious ambiguity" in the statute. Mem. Op. at 28. The rule of lenity applies "'only if, after seizing everything from which aid can be derived,'" the statute contains "a '*grievous* ambiguity or uncertainty,'" and the Court "'can make no more than a guess as to what Congress intended.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998)) (emphasis added); *see also* Mem. Op. at 9 (citing "'grievous' ambiguity" standard). Interpreting Section 1512(c)(2) consistently with its plain language to reach any conduct that "obstructs, influences, or impedes" a qualifying proceeding does not give rise to "serious" or "grievous" ambiguity.

Second, even if Judge Nichols's document-focused interpretation of Section 1512(c)(2) in *Miller* were correct, such that the government must prove that Miller "took some action with respect to a document," Mem. Op. at 29, Judge Nichols erred in dismissing the count charging a Section 1512(c)(2) violation (Count Three in *Miller*) in full based on the purported insufficiency of the indictment. Count Three sufficiently alleged a violation of Section 1512(c)(2) by tracking the provision's "operative statutory text." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). The indictment did not need to more specifically allege that the obstruction took the form of taking some action with respect to a document. In other words, the indictment's allegations, by charging the operative statutory text, permissibly embrace two theories: (1) that Miller obstructed an official proceeding by "tak[ing] some action with respect to a document," Mem. Op. at 28; and (2) that Miller obstructed an official proceeding without taking some action with respect to a document. Judge Nichols's ruling finding the second theory invalid left the first

2

"Accepted"

MAR 0 3 2023

Taylor James Johnatakis

theory intact. Moreover, Rule 12 of the Federal Rules of Criminal Procedure does not permit dismissal where, as here, additional facts would assist in resolving the pretrial motion. In particular, evidence at trial could establish the documents and records used in the Certification proceeding and prove that Miller's conduct had the natural and probable effect of destroying or imperiling those documents and records. Because the indictment's allegations sufficiently charge the first theory that Miller obstructed the proceeding by taking action with respect to a document, Judge Nichols's should not have dismissed Count Three.

## I.    Relevant Background

On January 6, 2021, Sturgeon, along with Craig Michael Bingert ("Bingert") and Taylor James Johnatakis ("Johnatakis," collectively, "the defendants"), picked up a metal barricade and pushed it into police officers. The officers were attempting to prevent the defendants from gaining access to the Capitol grounds and building. At one point, the defendants managed to push the barricade far enough and high enough that they were able to duck underneath it. In response to the physical aggression, MPD officers used both physical force and chemical irritants to push back the defendants and stop the rioters from breaking through the line of officers.

On February 5, 2021, a grand jury returned an eight count indictment charging the defendants with the following charges: 18 U.S.C. §§ 1512(c)(2), 2 (obstruction of an official proceeding); 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers); 18 U.S.C. § 231(a)(3) (civil disorder); 18 U.S.C. §§ 1752(a)(1), (2) and (4) (entering and remaining in a restricted building or grounds, disorderly and disruptive conduct in a restricted building or grounds, and engaging in physical violence in a restricted building or grounds); and 40 U.S.C. §§ 5104(e)(2)(E) and (F) (impeding passage through the capitol grounds or buildings and act of physical violence in the capitol grounds of buildings). *See* ECF No. 3.

On May 7, 2021, the grand jury returned a superseding indictment that updated the 18 U.S.C. § 111 language in Count Two. *See* ECF No. 34. On November 10, the grand jury returned a second superseding indictment, updating the language in Counts One and Three of the first superseding indictment. *See* ECF No. 53.

On December 7, 2021, Defendant Sturgeon filed his motion to dismiss Counts One, Three, Four, Five, and Six of the Superseding Indictment.[1] *See* ECF No. 55. After a consent motion for extension of time, the government filed its opposition on January 4, 2022. *See* ECF No. 60. Defendant Sturgeon filed his reply on January 11, 2022 (ECF No. 62) and a notice of additional authority supporting the motion to dismiss Count One, 18 U.S.C. §§ 1512, 2, on March 15, 2022 (ECF No. 64).

Congress enacted Section 1512 as a prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" in Section 1102 of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 807, and codified it in Chapter 73 of Title 18 of the United States Code, placing it within the pre-existing Section 1512 as subsection (c).  That prohibition applies to

(c) [w]hoever corruptly--

> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.

18 U.S.C. § 1512(c).  In the *Miller* case, Count Three charged that on January 6, 2021, Miller "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's Certification of the Electoral College vote

---

[1] Defendant Craig M. Bingert moved to adopt and join the motion on December 13, 2021. *See* ECF No. 56. Defendant Taylor J. Johnatakis moved to join the motion on December 29, 2021. *See* ECF No. 59. This Court granted both motions. *See* ECF No. 61; January 28, 2022 Minute Order.

"Accepted"

MAR 0 3 2023

*Taylor James Johnatakis*

as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18." *United States v. Miller*, No. 21-cr-119, ECF No. 61, at 2-3 (D.D.C Nov. 10, 2021). In this case, Count One of the Second Superseding Indictment similarly charges that, "on or about January 6, 2021," the defendants "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. § 15-18. *See* ECF No. 53.

Miller moved to dismiss Count Three on three grounds. He argued that (1) the Certification of the Electoral College vote was not an "official proceeding"; (2) Section 1512(c)(2) did not apply to his alleged conduct because it is limited to conduct impairing the availability and integrity of evidence; and (3) Section 1512(c)(2) is unconstitutionally vague as applied to him. *Id.* Judge Nichols rejected the first argument, *see* Mem. Op. at 9-10, but agreed that Miller's alleged conduct did not fall within Section 1512(c)(2)'s scope, *id.* at 10-29. Judge Nichols did not address Miller's third argument.

Focusing on the word "otherwise" in Section 1512(c)(2), Judge Nichols identified "three possible readings" of Section 1512(c)(2)'s scope. Mem. Op. at 11. First, Section 1512(c)(2) could serve as a "clean break" from Section 1512(c)(1), *id.* at 11-12, a reading that "certain courts of appeals have adopted," *id.* at 14. Judge Nichols, however, identified multiple "problems" with that interpretation, all focused on the interpretation of the term "otherwise." Judge Nichols reasoned that reading "otherwise" in Section 1512(c)(2) to mean "in a different way or manner" is "inconsistent" with the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137 (2008), which considered whether driving under the influence qualified as a "violent felony" under the now-defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1).

"Accepted"

MAR 03 2023

Judge James Boasberg

Mem. Op. at 12-14. Judge Nichols accordingly rejected the first interpretation. *Id.* at 19-20. Second, in Judge Nichols's view, Section 1512(c)(1) could "provide[] examples of conduct that violates" Section 1512(c)(2). *Id.* at 15-16. Third, Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1), such that both provisions are linked by the document-destruction and evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1). *Id.* at 17. After considering Section 1512(c)'s structure, "historical development," and legislative history, Judge Nichols found "serious ambiguity" as to which of the two "plausible" readings—the second and third readings identified above—Congress intended. Applying what Judge Nichols described as principles of "restraint," he then interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding" (the third reading). *Id.* at 28. Because, in Judge Nichols's view, the indictment did not encompass an allegation that Miller took any such action, Judge Nichols dismissed Count Three. *Id.* at 29.

Both before and after the ruling in the *Miller* case, judges on this Court have rejected a document-focused interpretation of Section 1512(c)(2). In *United States v. Sandlin*, No. 21-cr-88, 2021 WL 5865006 (D.D.C. Dec. 10, 2021), the Honorable Dabney L. Friedrich found that Section 1512(c)(2)'s terms are "expansive and seemingly encompass all sorts of actions that affect or interfere with official proceedings" and determined that the use of the word "otherwise" in Section 1512(c)(2) "clarifies" that it "prohibits obstruction by means *other than* document destruction." *Id.* at *5-*6. She did not view the Supreme Court's decision in *Begay* as altering that conclusion, because *Begay* rested on the ACCA's different statutory language and history. *Id.* at *6. Judge Friedrich also rejected the defendant's reliance on *Yates v. United States*, 574 U.S. 528 (2015) (plurality opinion). *Sandlin*, 2021 WL 5865006, at *6-*8. Finally, Judge Friedrich concluded

6

"Accepted"

MAR 0 3 2023

Taylor James Johnston

that, although a plain-text construction of Section 1512(c)(2) creates "substantial overlap" with other provisions in Section 1512 and Chapter 73, it does not create "intolerable overlap." *Id.* at *7-*8 (citing *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring in part and dissenting in part)) (emphasis omitted).

Decisions from other judges on this Court before *Miller* followed suit. For example, in *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718 (D.D.C. Dec. 20, 2021), the Honorable Amit P. Mehta concluded that Section 1512(c)(2) is not "limited" to conduct "affecting the integrity or availability of evidence in a proceeding." *Id.* at *11 (brackets and internal quotation marks omitted); *see id.* at *11-*19 (addressing Section 1512(c)(2)'s text and structure, *Begay*, and *Yates*). In *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891 (Dec. 21, 2021), the Honorable James E. Boasberg found persuasive the analysis in *Sandlin* and *Caldwell*. *See id.* at *11. In *United States v. Nordean*, 21-cr-175, 2021 WL 6134595 (D.D.C. Dec. 28, 2021), the Honorable Timothy J. Kelly reasoned that an interpretation of Section 1512(c)(2) limiting it to "impairment of evidence" could not "be squared with" Section 1512(c)(2)'s "statutory text or structure." *Id.* at *6; *see id.* at *6-*9 (addressing *Yates* and superfluity concerns). And in *United States v. Montgomery*, 21-cr-46, 2021 WL 6134591 (D.D.C. Dec. 28, 2021), the Honorable Randolph D. Moss reached the same conclusion following an extended discussion of Section 1512(c)'s text, structure, and legislative history, as well as the *Begay* and *Yates* decisions. *Id.* at *10-*18; *see also United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.) (reaching the same conclusion on the scope of Section 1512(c)(2)); *United States v. Grider*, 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.) (same).

Following Judge Nichols's decision in *Miller*, two judges on this Court have disagreed with the *Miller* analysis. In denying a defendant's post-trial motion for acquittal under Rule 29 of

the Federal Rules of Criminal Procedure, Judge Friedrich indicated that she was "not inclined to reconsider" her ruling in *Sandlin* and described her points of disagreement with *Miller*. *United States v. Reffitt*, 21-cr-32, Trial Tr. 1502-05 (Mar. 8, 2022) (attached as Exhibit A). And in *United States v. Puma*, 21-cr-454, 2022 WL 823079 (D.D.C. Mar 19, 2022), the Honorable Paul J. Friedman concluded that the word "otherwise" in Section 1512(c)(2) "clarifies" that a defendant violates that section "through 'obstruction by means *other than* document destruction.'" *Id.* at *12 (quoting *Mostofsky*, 2022 WL 6049891, at *11). In reaching that conclusion, Judge Friedman rejected *Miller*'s "premise that any 'genuine ambiguity persist[s],'" *id.* at *12 n.4 (quoting Mem. Op. at 7), and therefore found the rule of lenity "inapplicable," *id.*

## II.    Argument

The ruling in *Miller* is flawed for two reasons. First, Judge Nichols erred by applying the rule of lenity to Section 1512(c)(2) because, as many other judges have concluded after examining the statute's text, structure, and history, there is no genuine—let alone "grievous" or "serious"—ambiguity. Second, even if Judge Nichols's narrow interpretation of Section 1512(c)(2)'s scope were correct, he erred by dismissing the Section 1512(c)(2) count in full because the indictment's allegations, by charging defendant using the statutory text, validly encompassed that narrower theory, particularly in light of proffered evidence that the government would adduce at trial. *See, e.g.*, *United States Firtash*, 392 F.Supp.3d 872, 887 (N.D. Ill. 2019) (upholding money laundering charge in indictment based in part on government's proffer of evidence regarding the nature of the financial transaction).

### A.  The Court's ruling erroneously applied the rule of lenity.

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83

(1955). That principle underlies the "venerable" rule of lenity, Mem. Op. at 8 (quoting *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (Bibas, J., concurring)), which ensures that "legislatures and not courts" define criminal activity given the "seriousness of criminal penalties" and the fact that "criminal punishment usually represents the moral condemnation of the community." *United States v. Bass*, 404 U.S. 336, 348 (1971); *see Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

The rule of lenity, however, does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). In short, some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). "Properly applied, the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'" *Wooden*, 142 S. Ct. at 1074 (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

Judge Nichols erroneously applied the rule of lenity in *Miller*. He referred to the "'grievous' ambiguity" standard when initially discussing the rule, *see* Mem. Op. at 9, and found "a serious ambiguity" regarding the conduct that Section 1512(c)(2) reaches, *id.* at 28; *see also id.*

9

"Accepted"

MAR 0 3 2023

Taylor James Schnabel

at 22 ("[T]he Court does not believe that there is a single obvious interpretation of the statute."). But Judge Nichols's interpretation of Section 1512(c)(2)'s scope places undue emphasis on a single word ("otherwise") and a single Supreme Court decision (*Begay*) that interpreted that word as used in an entirely different statute and statutory context. A proper reading of Section 1512(c)(2)'s text, structure, and history demonstrates that Section 1512(c)(2) prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding, not merely where a "defendant ha[s] taken some action with respect to a document, record, or other object," *id.* at 28, to corruptly obstruct an official proceeding.

Simply put, the rule of lenity is "inapplicable" here. *Puma*, WL 823079, at *12 n.4. Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction between these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute. Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

Confirming the absence of ambiguity—serious, grievous, or otherwise—is that despite Section 1512(c)(2)'s nearly 20-year existence, no other judge has found ambiguity in Section 1512(c)(2), including eight judges on this Court considering the same law and materially identical facts. *See supra* at 5-6.

1. **Section 1512(c)(2)'s text and structure make clear that it covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).**

While Section 1512(c)(1) prohibits the corrupt destruction or alteration of documents, records, and other objects in connection with an official proceeding, Section 1512(c)(2) prohibits corrupt conduct that "otherwise" obstructs, influences, or impedes an official proceeding. Before Judge Nichols's decision to the contrary, every reported case to have considered the scope of Section 1512(c)(2), *see* Gov't Supp. Br., *United States v. Miller*, No. 21-cr-119, ECF No. 74 (*Miller* Supp. Br.), at 7-9,[2] and every judge on this Court to have considered the issue in cases arising out of the events at the Capitol on January 6, 2021, *see supra* at 5-6, concluded that Section 1512(c)(2) "prohibits obstruction by means *other than* document destruction." *Sandlin*, 2021 WL 5865006, at *5. That conclusion follows inescapably from the text of Section 1512(c)'s two

---

[2] *See, e.g.*, *United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects about issuance of arrest warrants before "outstanding warrants could be executed, thereby potentially interfering with an ongoing grand jury proceeding"), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (defendant attempted to secure a false alibi witness while in jail for having stolen a vehicle); *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (defendant solicited information about a grand jury investigation from corrupt "local police officers'); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target); *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (defendant disclosed identity of an undercover officer, thus preventing him from making controlled purchases from methamphetamine dealers); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (false testimony before a grand jury); *United States v. Reich*, 479 F.3d 179, 185-87 (2d Cir. 2007) (Sotomayor, J.) (defendant an opposing part a forged court order that purported to recall and vacate a legitimate order, causing the opposing party to withdraw an application for a writ of mandamus).

"Accepted"

MAR 0 3 2023

Taylor James Johnatakis

subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 2021 WL 6134591, at *12 (internal quotation marks omitted).

Judge Nichols was thus mistaken in concluding that this interpretation either "ignores" that "otherwise" is defined with reference to "something else," namely Section 1512(c)(1), or fails to "give meaning" to the term "otherwise." Mem. Op. at 12. Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *id.*, "otherwise" as used in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). *See Miller* Supp. Br. at 8. That understanding of "otherwise" is both fully consistent with each definition Judge Nichols surveys, *see* Mem. Op. at 11 (noting that "otherwise" in Section 1512(c)(2) may plausibly be read as "in a different way or manner; differently"; "in different circumstances: under other conditions"; or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *id.* at 12. In sum, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

The fact that some cases "could be brought under either or both prongs of Section 1512(c)," *Montgomery*, 2021 WL 6134591, at *12, does not imply that Section 1512(c)(2) "would have the same scope and effect . . . if Congress had instead omitted the word 'otherwise,'" Mem. Op. at 12. For one thing—and as noted in the government's supplemental brief in *Miller*, *see Miller* Supp.

"Accepted"

MAR 03 2023

Judge James Johnston

Br. at 11-13—overlap is "not uncommon in criminal statutes," *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014), and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause . . . serves as a catchall for matters not specifically contemplated." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009). Moreover, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is prohibited and punishable only under Section 1512(c)(1). To be sure, practical considerations may militate against seeking such a potentially Pyrrhic victory—where success leads to reindictment under Section 1512(c)(1)—but those practical considerations provide no reason to reject the straightforward interpretation of Section 1512(c) as divided between a provision that targets evidence destruction (Section 1512(c)(1)) and a provision that applies to "otherwise" obstructive conduct (Section 1512(c)(2)). And, in any event, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

Judge Nichols further concluded that interpreting "otherwise" in the manner described above is "inconsistent" with *Begay*, where, in the Court's view, analysis of what "'otherwise' meant" was "[c]rucial" to the Supreme Court's analysis. Mem. Op. at 12. That conclusion is flawed in several respects. First, in considering whether driving under the influence was a "violent felony" for purposes of the ACCA's residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury," 18 U.S.C. § 924(e)(2)(B)(ii), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than Section 1512(c)(2). *See Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike

13

the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009). Unlike in the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples."[3] *Ring*, 628 F.Supp.2d at 224 n.17. In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in Section 1512(c)(2). *Caldwell*, 2021 WL 6062718, at *14. Although Judge Nichols recognized the structural difference between the ACCA residual clause and Section 1512(c)(2), *see* Mem. Op. at 18-19, he offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.

Second, describing the Supreme Court's interpretation of "what 'otherwise' meant" as "[c]rucial" to that Court's decision in *Begay* is an inaccurate description of *Begay*'s analysis. The majority in *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142. Those examples, the majority reasoned, demonstrated that Section 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 142-43. The majority next drew support for its conclusion from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial

---

[3] The Court suggested (Mem. Op. at 15-16) that "[t]he government also presents an alternative reading" that Section 1512(c)(1) "provides examples of conduct that violates" Section 1512(c)(2). *Id.* at 15. That is incorrect. Neither the government nor Miller nor (to the government's knowledge) any court has proposed or adopted that construction of Section 1512(c)(2). Considering an interpretation that no party advocates and no court has adopted injects the kind of "front-end ambiguity" that "lead[s] to significant inconsistency, unpredictability, and unfairness in application." *Wooden*, 142 S. Ct. at 1076 (Kavanaugh, J., concurring).

"Accepted"

MAR 0 3 2023

*Taylor James Johnston*

use of physical force and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-44. In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must*, cf. *post* at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144.

A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot be described as "crucial." The majority's "remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests otherwise. *Montgomery*, 2021 WL 6134591, at *11; *see Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*). In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why no court should embark on imposing an extra-textual requirement within Section 1512(c)(2). The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed examples, involve "purposeful, violent, and aggressive conduct." 553 U.S. at 144-45. But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause." *Johnson v. United States*, 576 U.S. 591, 600 (2015). Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J., concurring in judgment)

15

(internal quotation marks omitted), so too Judge Nichols engrafted onto Section 1512(c)(2) the requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding, Mem. Op. at 28. In the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases have adopted Judge Nichols's interpretation, and for good reason. That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "taking some action with respect to a document" in order to obstruct an official proceeding. *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object").[4] In brief, Judge Nichols's interpretation is likely to give rise to the very ambiguity it purports to avoid.

Judge Nichols's observation that only "certain courts of appeals," Mem. Op. at 14, have interpreted Section 1512(c)(2) to reach conduct that obstructs an official proceeding other than document destruction significantly understates the case law. Every reported case—both in the

---

[4] Judge Nichols's interpretation of Section 1512(c)(2) resembles the reading given in *Singleton* and *Hutcherson*, both of which are unpublished and neither of which the Miller ruling cites. As noted in the main text, no other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491 F.Supp.3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent— interpretation of § 1512(c)(2) [as] an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

courts of appeals and in district courts—has interpreted Section 1512(c)(2) in that manner. *See Miller* Supp. Br. at 7-9 (discussing cases). Moreover, the Court's effort to distinguish one of those cases, *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015), misses the mark. That *Petruk* did not cite or discuss *Begay*, Mem. Op. at 14, says nothing about the logic of its analysis, particularly given how "remarkably agnostic" *Begay*'s discussion of "otherwise" is. *See Montgomery*, 2021 WL 6134591, at *11. The Court likewise faulted *Petruk* for misreading the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995), where the Supreme Court interpreted the omnibus clause in 18 U.S.C. § 1503 to require a "relationship in time, causation, or logic," *id.* at 599, between the obstructive conduct and the proceeding—a grand jury investigation—at issue in the defendant's case. But the restraint the Supreme Court exercised by interpreting Section 1503 to require that "nexus" is paralleled by interpreting the same nexus requirement to apply to Section 1512(c)(2)—as other judges on this Court have done, *see Miller* Supp. Br. at 20-22 (explaining that the nexus requirement applies to Section 1512(c)(2)); *Montgomery*, 2021 WL 6134591, at *20-*21—and not by imposing an additional, atextual requirement that a defendant must "have taken some action with respect to a document" for his conduct to fall within the scope of Section 1512(c)(2).[5]

### 2. Other tools of statutory interpretation do not undermine that straightforward reading.

Because Section 1512(c)(2)'s text and context make clear that it reaches conduct that

---

[5] Judge Nichols's similar criticism of *United States v. Burge*, 711 F.3d 803 (7th Cir. 2013), Mem. Op. at 15 n.7, fails for the same reason. And Judge Nichols's related criticism that *United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014), which relied in part on *Burge*, "did not even involve a prosecution under § 1503, let alone § 1512(c)(2)," Mem. Op. at 15 n.7, falls short. The defendants in *Volpendesto* were prosecuted for, among other things, conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k), and the jury was instructed on the elements of 18 U.S.C. § 1512(c)(2). *See United States v. Volpendesto*, 08-cr-115, Dkt. No. 518, at 88-95 (N.D. Ill. Dec. 22, 2010).

obstructs, influences, or impedes an official proceeding in a manner other than document destruction or evidence tampering, resorting to other tools of statutory interpretation is not necessary. In any event, those tools reinforce that straightforward interpretation of Section 1512(c)(2)'s scope. *See Miller* Supp. Br. at 9-17. In reaching a contrary conclusion, Judge Nichols erred in several respects.

First, Judge Nichols suggested that reading Section 1512(c)(2) consistently with its plain language and structure as described above would "introduce something of an internal inconsistency" because Section 1512(c)(2) would have greater breadth than neighboring provisions in Section 1512. Mem. Op. at 21; *see id.* (describing Section 1512(c)(2) as an "elephant[] in [a] mousehole[]"). That reasoning is inconsistent with *Yates*, where a plurality of the Supreme Court recognized that Section 1512 consisted of "broad proscriptions," not "specialized provisions expressly aimed at corporate fraud and financial audits." 574 U.S. at 541 (plurality opinion). Moreover, the narrowing construction Judge Nichols imposed on Section 1512(c)(2) fails to consider that Section 1512(c)(2) reaches more broadly precisely because other provisions within Section 1512 leave gaps that Section 1512(c)(2) fills. *Cf. Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949) ("The obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.").

Second, Judge Nichols worried that a reading of Section 1512(c)(2) that encompasses obstructive conduct unrelated to documents or records would give rise to "substantial superfluity problems." Mem. Op. at 21. But even a "broad interpretation of § 1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in

18

Section 1512 is "hardly remarkable." *Sandlin*, 2021 WL 5865006, at \*8; *accord Nordean*, 2021 WL 6134595, at \*8. More troubling, by interpreting Section 1512(c)(2) to require "some action with respect to a document," Mem. Op. at 28, Judge Nichols risks rendering Section 1512(c)(2) itself superfluous in light of the "broad ban on evidence-spoliation" in Section 1512(c)(1), *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted). Moreover, because Section 1512(c)(1) includes both completed and *attempted* evidence tampering, *see* 18 U.S.C. § 1512(c)(1) (reaching "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, *or attempts to do so*) (emphasis added), it is unlikely that a defendant who "take[s] some action with respect to a document, record, or other object," Mem. Op. at 28, has not also taken a "substantial step" toward altering, destroying, mutilating, or concealing that document sufficient to fall within the scope of Section 1512(c)(1). *See United States v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014) (explaining that the "general meaning of 'attempt' in federal criminal law" is "an action constituting a 'substantial step' towards commission of a crime and performed with the requisite criminal intent").

The canon against superfluity, which is "strongest when an interpretation would render superfluous another part of the same statutory scheme," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013), is even stronger when it renders superfluous "other provisions in the *same enactment.*" *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted); *cf. Yates*, 574 U.S. at 543 (plurality opinion) ("We resist a reading of § 1519 that would render superfluous an entire provision passed . . . as part of the same Act."). That principle comes into play here because Sections 1512(c)(1) and 1512(c)(2) were enacted together as part of the Sarbanes-Oxley Act. *See Miller* Supp. Br. at 15-16.

Third, Judge Nichols's discussion of statutory and legislative history, Mem. Op. at 23-28,

provides no sound reason to deviate from the straightforward interpretation of Section 1512(c)(2) described above. For example, Judge Nichols suggested that Congress would have had no reason to add Section 1512(a)(2)(B) three months after enacting Section 1512(c)(2) if the latter provision were construed broadly. Mem. Op. at 25. Section 1512(a)(2)(B) prohibits the use or threatened use of physical force against "any person" with the intent to "cause or induce any person" to take one of four actions, including "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] an object with intent to impair the integrity or availability of the object for use in an official proceeding." 18 U.S.C. § 1512(a)(2)(B)(ii). But as Judge Nichols noted, Mem. Op. at 21 & 23, unlike Section 1512(a)(2)(B), Section 1512(c) aimed generally to impose "direct" liability for obstructive conduct that was not directed at intimidating or influencing another person, *see Miller* Supp. Br. at 16.[6] Understood in that light, Section 1512(a)(2)(B) operates harmoniously with both subsections in Section 1512(c): Section 1512(a)(2)(B)(ii) reaches a defendant's use of force or threatened use of force at *another person* in order to cause that person to destroy documents in connection with an official proceeding; Section 1512(c)(1) reaches a defendant's direct destruction of documents in connection with an official proceeding; and Section 1512(c)(2) reaches a defendant's non-document-related conduct that obstructs or impedes an official proceeding. And while the legislators who enacted Section 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, *see* Mem. Op. at 26-28; *accord Miller* Supp. Br. at 15 (noting floor

---

[6] Judge Nichols suggested (Mem. Op. at 22 n.10) that Section 1512(c)(2) could be read as "creating 'direct' liability for the other types of conduct covered by § 1512—that is, that it makes criminal an individual doing directly those things for which the rest of § 1512 requires action directed at another person." Although the government's supplemental brief described Section 1512(c)(2) in those terms, *see Miller* Supp. Br. at 16 ("Section 1512(c) aimed at closing a 'loophole' in Section 1512: the existing prohibitions did not adequately criminalize a defendant's *personal* obstructive conduct *not* aimed at another person."), Judge Nichols decided (Mem. Op. at 22 n.10) "not [to] address" the interpretation "further" because "[n]either party presses this argument (or anything like it)."

statements addressing concern about document shredding in the *Arthur Andersen* prosecution), "it is unlikely that Congress was concerned with only the type of document destruction at issue in the *Arthur Andersen* case." *Montgomery*, 2021 WL 6134591, at *16. In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'" *Id.*

Finally, an interpretation of Section 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that were not merely odd, but positively absurd"). That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify Electoral College vote results by "drag[ging] lawmakers out of the Capitol by their heels with their heads hitting every step," *United States v. Reffitt*, No. 21-cr-32, Trial Tr. 1502, carrying a gun onto Capitol grounds, *id.* at 1499, and then leading a "mob and encourag[ing] it to charge toward federal officers, pushing them aside to break into the Capitol," *id.* at 1501-02, unless he also picked up a "document or record" related to the proceeding during that violent assault. The statutory text does not require such a counterintuitive result.

### B. Even if the Court's interpretation of Section 1512(c)(2)'s scope were correct, pretrial dismissal based on the indictment's allegations is premature.

Even if Judge Nichols's interpretation of Section 1512(c)(2)'s scope were correct (though it is not), dismissal of the count charging Section 1512(c)(2) in full is improper under Rules 7 and 12 of the Federal Rules of Criminal Procedure.

"Accepted"

MAR 03 2023

Taylor James Schneider

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a full proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005)—neither of which has occurred here. Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.).

Although the defendant in *Miller* styled his challenge to Section 1512(c)(2)'s scope as an attack on the indictment's validity, the scope of the conduct covered under Section 1512(c)(2) is distinct from whether Count Three in *Miller* adequately states a violation of Section 1512(c)(2).[7]

---

[7] Although Miller argued that the indictment must contain "some allegation" that his conduct "undermined an official proceeding's 'truth-finding function through actions impairing the

In *Miller*, Count Three of the indictment put the defendant in *Miller* on notice as to the charges against which he must defend himself, while also encompassing both the broader theory that a defendant violates Section 1512(c)(2) through any corrupt conduct that "obstructs, impedes, or influences" an official proceeding *and* the narrower theory that a defendant must "have taken some action with respect to a document," Mem. Op. at 28, in order to violate Section 1512(c)(2). Judge Nichols's conclusion that only the narrower theory is a viable basis for conviction should not result in dismissal of the count charging a violation of Section 1512(c)(2); instead, Judge Nichols would properly enforce that limitation by permitting conviction on that basis alone. *See United States v. Ali*, 885 F.Supp.2d 17, 33 (D.D.C. 2012) (limiting the government's aiding and abetting theory under 18 U.S.C. § 1651 to acts of piracy committed while the defendant was on the high seas but not dismissing the count), *reversed in part by* 718 F.3d 929, 941 (D.C. Cir. 2013) (disagreeing with the district court's limitation on aiding and abetting liability under Section 1651). Critically, cases involving successful challenges by defendants concerning whether their *conduct*—and not merely the allegations against them—falls within the scope of the charged statute arise not under Rule 12 but following trials that establish the evidentiary record necessary to determine precisely what the defendant's conduct entailed. *See, e.g., Marinello v. United States*, 138 S. Ct. 1101, 1105 (2018) (considering scope of 26 U.S.C. § 7212(a) following defendant's conviction at trial); *Yates*, 574 U.S. at 534-35 (plurality opinion) (considering scope of the phrase "tangible object" in 18 U.S.C. § 1519 following defendant's conviction at trial); *Aguilar*, 515 U.S. at 597 (considering scope of omnibus clause in 18 U.S.C. § 1503 following the defendant's conviction at trial).

It is clear why that is so. Even assuming the Judge Nichols's interpretation of Section

---

integrity and availability of evidence," *United States v. Miller*, No. 21-cr-119, ECF No. 59, at 7, Judge Nichols's ruling does not appear to announce a new rule that his narrowed interpretation of Section 1512(c)(2)'s scope creates a new offense *element* that must be alleged in an indictment.

"Accepted"

MAR 03 2023

Taylor James Schneider

1512(c)(2) were correct, and that the government therefore must prove "Miller took some action with respect to a document, record, or other object in order to corruptly obstruct, impede[,] or influence Congress's certification of the electoral vote," Mem. Op. at 29, no court could ascertain whether a defendant's conduct meets that test until after a trial, at which the government is not limited to the specific allegations in the indictment. And at trial, the government could prove that the Certification proceeding "operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections." *Miller* Supp. Br. at 41. For example, evidence would show Congress had before it boxes carried into the House chamber at the beginning of the Joint Session that contained "certificates of votes from the electors of all 50 states plus the District of Columbia." *Reffitt*, *supra*, Trial Tr. at 1064 (Mar. 4, 2022) (testimony of the general counsel to the Secretary of the United States Senate) (attached as Exhibit B). Evidence would further show that, as rioters began to breach the restricted area around the Capitol building and grounds on January 6, 2021, legislators were evacuated from the House and Senate chambers, and the staff for the Secretary of the United States Senate "took the ballot boxes and other paraphernalia of the proceeding" out of the chamber "to maintain custody of the ballots and make sure nothing happen[ed] to them." *Id.* at 1072.

Additional evidence could establish that a defendant's conduct had the "natural and probable effect," *Aguilar*, 515 U.S. at 599 (internal quotation marks omitted), of destroying or imperiling the ballots and "other paraphernalia" from the Certification proceeding. Although the government does not anticipate presenting evidence that the defendants envisioned placing or in fact placed hands on a document or record connected to the Certification proceeding, their participation in a violent confrontation on the West Terrace of the U.S. Capitol grounds in which they picked up a gate and pushed it into police officers restricting access to the Capitol grounds

and building contributed to the chaos that led to the evacuation of lawmakers, the entrance of a Capitol police officer with a "very long, very large long gun" onto the Senate floor, and the scramble to remove the sealed electoral ballots to safety. *Reffitt*, *supra*, Trial Tr. at 1071-72. In that respect, the defendants here "took" many "action[s]" with respect to Congress's consideration of documents and records central to the Certification proceeding and thereby corruptly obstructed and impeded that Certification proceeding, including blocking lawmakers from considering such documents and records. In acting to thwart the commencement and operation of an official proceeding that involved such documents, the evidence will establish that the defendants in this case violated Section 1512(c)(2) even under an interpretation of Section 1512(c)(2) that requires "some nexus to tangible evidence," *Singleton*, 2006 WL 1984467, at *3, or some "conduct in relation to a tangible object," *Hutcherson*, 2006 WL 270019, at *2; or that the defendants "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding, Mem. Op. at 28.

## III.    Conclusion

For the foregoing reasons and those given in the government's prior opposition, the Court

should not dismiss the Count One of the Second Superseding Indictment.

<div align="center">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:    /s/ Angela N. Buckner
       Angela N. Buckner
       DC Bar #1022880
       Assistant United States Attorney
       United States Attorney's Office
       555 Fourth Street, N.W.
       Washington, DC 20530
       Phone: (202) 252-2656


       /s/ James I. Pearce
       James I. Pearce
       Appellate Counsel to the Capitol Siege
       Section
       United States Attorney's Office
       NC Bar No. 44691
       555 Fourth Street, N.W.
       Washington, DC 20530
       James.Pearce@usdoj.gov
       (202) 532-4991

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Seven        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 101 Filed 12/20/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL DISCOVERY UNDER RULE 16 AND BRADY V. MARYLAND**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12, **Conclusion** Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 101 Filed 12/20/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL DISCOVERY UNDER RULE 16 AND BRADY V. MARYLAND**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12, **Conclusion** Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 101 Filed 12/20/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-091 (RCL) DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL DISCOVERY UNDER RULE 16 AND BRADY V. MARYLAND**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12, **Conclusion** Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

RECEIVED
Mail Room

MAR 13 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

**"Accepted"**

MAR 0 7 2023

*Taylor James Johnatales*

<center>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

</center>

United States of America,

    v.

ISAAC STURGEON,

        Defendant.

Case No. 21-cr-091 (RCL)

<center>

## DEFENDANT'S REPLY IN FURTHER SUPPORT OF MOTION TO COMPEL DISCOVERY UNDER RULE 16 AND BRADY V. MARYLAND

</center>

Defendant Isaac Sturgeon, through undersigned counsel, respectfully submits this reply to the government's response opposing many of the defendant's requests for exculpatory evidence that is material to the preparation of Mr. Sturgeon's defense.

<center>

### Introduction

</center>

The Government's preliminary remarks in its response outline the unprecedented nature of its most extensive prosecution of more than 800 criminal defendants in the January 6 cases. *See* Gov. Res. at 1-2. These remarks outline the government's efforts thus far to work with the Federal Public Defender's Office and its National Litigation Support Team in order to create a system in which to share discovery. Mr. Sturgeon agrees that the government has expended many resources to ensure that defendants have access to a platform capable of carrying "3.86 million files and over 6.95 terabytes of information." *See id.* In order to make this platform

<center>1</center>

accessible to counsel, the Relativity Database was created, which has required extensive training for counsel to navigate.

However, the efforts that the government has undergone to make millions of files available to the defense do not excuse its obligations to *meaningfully* disclose potentially exculpatory and material information at the defendant's request. It is the government that made the choice to prosecute more than 800 individuals, thereby resulting in overall common case discovery in the amount of 6.95 terabytes of data. It is simply not reasonable to suggest that because the government has provided unprecedented amounts of discovery that mostly has nothing to do with Mr. Sturgeon's case, that it can wash its hands (1) of any further obligation to provide specific case discovery that is relevant to Mr. Sturgeon himself, and (2) an obligation to provide *meaningful* access to discovery rather than unreasonably expecting the defense to comb through millions of files to find exculpatory evidence.

I.   **The United States Secret Service is Most Definitely Part of the Prosecution Team**

The government is incorrect when it asserts that the law enforcement entity actually present at the Capitol Building on January 6, 2021, and/or in the immediate vicinity, is not part of the prosecution team – relieving them of a duty to learn of favorable evidence the United States Secret Service (USSS) might have in its possession. *See* Gov. Res. at 4. In fact, in its own timeline of events, the government specifies that the USSS is one of the agencies that were involved in the "multi-agency teleconference" that planned for the January 6, 2021 event. *See* Exhibit 1, Gov. Timeline of events filed under seal. Furthermore, on the day of January 6, 2021, the

2

Capitol Police requested assistance from the Chief of the USSS. *See id.* at 12. Other agencies involved included MPD, US Park Police, and the FBI. *See id.* So to be clear, Mr. Sturgeon is not requesting information from the IRS or BOP, it is requesting information from a law enforcement entity directly involved in the events on January 6, 2021.

The Supreme Court has mandated that an individual prosecutor has a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, *including the police.*" *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). (emphasis added). The government cannot pick and choose which type of police are part of its prosecution team, especially when the USSS was directly involved and is clearly a law enforcement entity.

The government in its response provides a second circuit decision where the court found that a member of the USSS was not considered to be a part of the prosecution team. *See* Gov. Res. at 5 (citing *United States v. Stewart*, 433 F.3d 273,298 (2d Cir. 2006). However, this case is not relevant to the question here as the government in *Stewart* called a civilian employee of the USSS to give an expert opinion as he was the only "national expert for ink." *Stewart*, 433 F.3d at 295. When the defense argued that this expert's false testimony should be imputed to the prosecutors themselves for purposes of *Brady*, the Court rejected that argument explaining that the witness was not an "arm of the prosecution" because that individual did not work in conjunction with police. *Id.* at 298. That is just simply not the scenario here as the defense is not requesting information about an expert

3

"Accepted"

MAR 07 2023

Taylor James Johnston

witness. Here, the USSS was directly involved in its capacity as law enforcement and was present at the actual crime scene itself. *See id.* ("the relevant inquiry is what the person *did*, not who the person *is*.")

Furthermore, judges in this district court have already rejected this same type of argument from the government. For example, the court in *U.S. v. Andre Williams*, 18-cr-090 (PLF) ruled that the Bureau of Prisons halfway house was an arm of the government when the defense filed a motion to dismiss after that halfway house destroyed evidence that could have been favorable in defending Mr. Williams's Escape charge. *See* Memorandum and Order, ECF No. 30, 34. *See also United States v. Safavian*, 233 F.R.D. 12, 14 (D.D.C. 2005) (the "government" includes any and all agencies and departments of the Executive Branch of the government and their subdivisions).

Lastly, the government is incorrect when it asserts that to be an "arm of the prosecution," the entity must have "participated in the investigation" in the particular case. *See* Gov. Res. at 5. To give a clear example - when a local police officer arrests a suspect but then the case is turned over to the FBI for investigation, the government is not then absolved of obtaining information stemming from the local arrest simply because that local police department did not investigate the ultimate case. The same is true here where the USSS was actually at the scene of the crime, were often times witnesses who gave statements to the FBI, and had involvement in what ultimately was determined to be illegal activity by the federal government. The government is obliged to disclose favorable material to Mr. Sturgeon that the USSS

has in its possession relating to their involvement in January 6, 2021. Also to be clear, Mr. Sturgeon also asks for information in the possession of the Department of Homeland Security regarding the open investigation as the USSS deleted messages. *See* Def. Mot. at 2.

## II. Mr. Sturgeon's Requests are Relevant and Material to His Defense

The government in its response breaks down each defense request to argue that the information requested is not relevant. *See* Gov. Res. at 5-9. In doing so, it potentially misunderstands Mr. Sturgeon's requests and is incorrect as to its relevancy for Mr. Sturgeon's defense:

- *The decision to declare parts of the Capitol Grounds and Complex restricted (including identification of any such restricted area and mechanisms used to delineate restricted areas)*

The government misunderstands the reason for this defense request when it asserts it is not required to prove that the defendant "knew why" the building or grounds were restricted. *Id.* at 8. Mr. Sturgeon is not seeking to obtain this information for the purpose of learning *why* the decision was made. Rather, he seeks this information to learn whether or not the procedures surrounding the execution of the restrictions were visible and clear to him. If he did not know the area he was in specifically was restricted, he is not guilty of several charged offenses. Section 18 U.S.C. §1752(a) is not a strict liability offense and requires knowledge that the area is in fact restricted. *See United States v. Bursey*, 416 F.3d 301, 307 (4th Cir. 2005) (holding the court did not need to determine whether the statute requires a physical

demarcation of a restricted area because the boundaries of restricted area were *visibly marked* by officers at the perimeter). (emphasis added).

This defense discovery request simply put asks "When Mr. Sturgeon arrived to the Capitol grounds, what markings were present at that time so that he would be aware the area was restricted?" *See United States v. Matthew Martin*, 21-cr-394, Transcript from Bench Trial, ECF No. 41 (court acquitting defendant of 18 U.S.C. §1752(a) finding that "while the government has shown that the defendant had entered a restricted area at this point, it is has not shown he knowingly did so.")

- *Any steps taken to communicate restricted areas to the public...the status of any sign postings, racks, cordons, or other restrictions after the certification proceedings were halted.*

The government asserts that it has already provided materials responsive to this request. *See* Gov. Res. at 9. To undersigned counsel's knowledge, the government has provided general information in its common case discovery which details the perimeter put into place that was designated restricted with mostly bike barricades. However, it has not provided specific case discovery regarding what communications/markings were given or were present to put Mr. Sturgeon on notice that the areas he entered were restricted at the time he entered the grounds. Furthermore, the second part of the request asks more specifically for any changes to any potential restriction over time. This is relevant because an area that was clearly delineated as restricted may not be so clear after individuals either removed those barriers or they were removed by law enforcement.

6

The government's response to this request further emphasizes the need for the government to provide specific case discovery rather than simply pointing the defense to Evidence.com or Relativity. The terabytes of discovery make it nearly impossible for the defense to find items specifically relating to Mr. Sturgeon. It is just not reasonable to place this burden on the defense, especially when the government is clearly aware of the existence and location of this information within the vast database.

- *Investigation of USSS's retention of communications*

The government asserts in its response that (1) it will look into this request, but that (2) the request raises the question of spoliation and that the defense has not established bad faith. *See* Gov. Res. at 6-8. As an initial matter, the defense does not know whether or not the government (USSS) acted in bad faith because the government has not turned over materials regarding this open investigation. That is one of the reasons for this request, to determine whether or not Mr. Sturgeon's due process rights were violated by acts of bad faith that led to the failure to preserve *potentially useful* evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988) (the government's failure to preserve potentially useful evidence "constitutes denial of due process of law when government acts in bad faith).

Most importantly and *regardless of bad faith*, the government does have a duty to preserve *materially exculpatory* evidence. *Id.* at 57. ("Due process clause of Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant materially

7

exculpatory evidence.") Evidence is "materially exculpatory" if there is any "reasonable probability" that, considering the evidence "collectively, not item by item, "the results of trial or sentencing would be different. *Kyles v. Whitley*, 514 U.S. 419, 433-36 (1995); *see also Bell v. Cone*, 556 U.S. 449, 470 (2009) ("In other words, favorable evidence is subject to constitutionally mandated disclosure when it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (quotation marks and citation omitted)).

The government claims that the exculpatory nature of the material at issue is "speculative at best." *See* Gov. Res. at 8. It is unclear how the government knows that these missing messages do not contain exculpatory value. Its insistence that it is not required to turn over information regarding this investigation or other messages from the USSS that were not destroyed puts us all in a "catch-22" scenario. Even still, there is a "reasonable probability" that these messages do contain some exculpatory value, especially in light of some of the exculpatory information that was revealed by the January 6 House Committee – that the USSS prevented former President Trump from joining his constituents at the Capitol building despite his many efforts to do so. This one revelation begs the question of what else is missing that could potentially exculpate Mr. Sturgeon.

Lastly, it appears as though the government is only referring to exculpatory information that would tend to negate Mr. Sturgeon's guilt. However, it is well established that exculpatory material also includes evidence that is either material to his guilt or relevant to the punishment to be imposed. *California v. Trombetta*, 467

U.S. 479, 485 (1984). This district recognizes that *Brady* information includes, but is not limited to, "information that tends to mitigate the charged offense(s) or reduce the potential penalty," and information probative of "an articulated legally cognizable defense theory or recognized affirmative defense" to the offense charged. LCrR 5.1(b)(1)-(3). *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material *either to guilt or to punishment*"). (emphasis added).

Keeping that well established principle in mind, there is a reasonable probability that the USSS messages close and during to the time and place of the allegations do possess some exculpatory value – whether it is exculpatory to Mr. Sturgeon's guilt or potential punishment. Therefore, Mr. Sturgeon does not need to show bad faith on the part of the government and is entitled to this information because there is a reasonable probability that the results of the trial and/or sentencing would be different if he had access to this information – whether it is because certain information negates his guilt or allows him to mitigate his culpability.

### III.   The Defense Request Number Three Should Be Disclosed

The government in its response simply asserts in a footnote that because the defendant should not be permitted to raise a public authority defense, his request for "communications of the former president" should be denied. *See* Gov. Res. at 8, fn 3.

Firstly, Mr. Sturgeon's full request is "*any communications between President Trump's former staff on the day of January 6, 2021, regarding former President*

9

*Trump's failure to stop the riot as well as affirmative steps he took to further encourage it.*" *See* Def. Mot. at 2. Secondly, the Court has not yet ruled on whether or not Mr. Sturgeon can present this defense and the government cannot base its discovery obligations on undetermined rulings. Even if evidence is later ruled to be inadmissible, the defense is still entitled to potentially favorable evidence that could lead directly to material admissible evidence. *See U.S. v. Johnson*, 592 F.3d 164, 171 (D.C. Cir. 2010) (citing to *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003)).[1] Not only could disclosure of this evidence further support Mr. Sturgeon's argument that he is entitled to present the public authority defense, it also would strengthen the defense itself if permitted to present the evidence at trial.

Moreover, even if the Court ultimately finds that Mr. Sturgeon is not permitted to present the defense, this evidence is certainly relevant and admissible to negate Mr. Sturgeon's intent. *See Cheek v. U.S.,* 498 U.S. 192 (1991) ("forbidding a jury to consider evidence that might negate willfillness would raise a serious question under the Sixth Amendment"). *See also United States v. Ruiz,* 59 F.3d 1151, 1154 (11th Cir. 1995) (Eleventh Circuit has acknowledged that criminal intent may be negated by defendant's honest but mistaken belief that government authorized conduct); *United States v. Juan,* 776 F.2d 256 (11th Cir. 1985) (same).

---

[1] A clear example of this is when *Giglio* evidence disclosed later leads to admissible evidence to impeach a witness. The simple disclosure of *Giglio* evidence does not mean it will automatically be admissible, nonetheless is undisputed that *Giglio* disclosures are mandated.

10

Lastly, this request has become increasingly relevant in the wake of the January 6 House Committee's official findings, including evidence of former President Trump's wrongdoing on January 6, 2021. After an 18 month investigation, the committee released its recommendations on December 19, 2022 – where it referred the former President Trump for serious criminal charges. All of the requested information may very well be disclosed later as part of a related case in the prosecution of Donald Trump. Regardless, it is directly relevant to Mr. Sturgeon's intent and reliance on apparent public authority. Specific Findings/recommendations of January 6 Committee include:

(1) Former President Trump purposefully disseminated false information declaring victory of the election and claiming publically the election had been stolen from him. In doing so, former President Trump told his constituents that former Vice President Mike Pence could lawfully refuse to count electoral counts.

(2) President Trump called on his supporters to come to DC for a rally to confront Congress to change their mind about certifying the election.

(3) As the riot ensued, former President Trump did not issue a public statement telling his supporters to go home until 4:17 p.m., 187 minutes later. When he told people to go home, evidence showed that many of his supporters dispersed from the Capitol.

(4) The committee then referred Donald Trump for criminal charges to the Department of Justice, including Obstruction of an Official Proceeding, Conspiracy to Defraud the United States, Conspiracy to Make a False Statement, and Inciting an Insurrection.[2]

---

[2] See Jan. 6 committee condemns Trump as "central cause" of insurrection in sweeping report, ABC News, December 19, 2022 available at https://www.msn.com/en-us/news/politics/jan-6-committee-condemns-trump-as-central-cause-of-insurrection-in-sweeping-report/ar-AA15ssDw

Case 1:21-cr-00091-RCL Document 121 Filed 12/20/22 Page 12 of 12

## Conclusion

For the reasons set forth above, and for such other reasons as this Court may determine, Mr. Sturgeon respectfully requests that this motion be granted and that the Court order the government to produce the information requested.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

12

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Seven          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 79 Filed 08/31/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) MOTION TO SEVER MR. STURGEION'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS.** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 **Conclusion** Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 79 Filed 08/31/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) MOTION TO SEVER MR. STURGEION'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS,** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 **Conclusion** Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 79 Filed 08/31/22 Page 1 of 9 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-091 (RCL) MOTION TO SEVER MR. STURGEION'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS,** Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9 **Conclusion** Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

**"Accepted"**

MAR 07 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **No. 21-091 (RCL)** |
| | ) | |
| **ISAAC STEVE STURGEON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MOTION TO SEVER MR. STURGEON'S TRIAL FROM THOSE OF HIS CO-DEFENDANTS

Defendant, Isaac Sturgeon, through counsel, respectfully moves this Court, pursuant to Fed. R. Crim. P. 8(b), Rule 14, and other applicable law, to sever his trial from those of his co-defendants.

### FACTUAL AND PROCEDURAL BACKGROUND

Mr. Sturgeon, along with two other co-defendants, Craig Bingert and Taylor Johnatakis, were indicted for one count of Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §1512(c)(2) and (2), one count of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. §111(a)(1), one count of Civil Disorder in violation of 18 U.S.C. §231(a)(3), three counts of 18 U.S.C. §1752(a)(1)(2), and (4), and two counts of 40 U.S.C. §5104(e)(2)(E) and (F). *See* ECF Dkt. No. 53.

Despite the lack of connection between Mr. Sturgeon and his two co-

"Accepted"

MAR 07 2023

*Taylor James Johnatakis*

defendants, the government has grouped them together in a single indictment. These charges are based on allegations arising out of the events on January 6, 2021. The government accuses all three defendants of picking up a gate and pushing it in the direction of officers on the grounds of the Capitol building. The government specifically alleges that Mr. Johnatakis waved a member of the mob forward toward the barricaded line of MPD officers while using a bullhorn to encourage rioters to "push them out of here, we're just using our bodies!" *See* Gov. Opposition to Defendant's Motion to Dismiss at pg. 6, ECF No. 60. The government further alleges that Mr. Johnatakis then directed the "other rioters" to push the barricades into the MPD officers, encouraging them as they progressed, yelling "one foot," and "1,2,3, go." *Id.* The only connection to the other defendants, Mr. Sturgeon and Mr. Bingert, is that they were standing to the right of Mr. Johnatakis and that they allegedly used their hands to also grab the metal barricade.

The government has not alleged that these three defendants know each other or that they even communicated during the events on January 6, 2021. The government only alleges that Mr. Johnatakis was encouraging the whole crowd of rioters – but not that he specifically encouraged Mr. Sturgeon and Mr. Bingert. There is also no evidence that Mr. Bingert ever communicated with Mr. Sturgeon. There is no evidence that these three individuals acted in unison when allegedly grabbing the metal barricade. In fact, there are several other individuals who were on the front line in front of the barricade – yet those individuals are not included in

this indictment.

## ARGUMENT

These three co-defendants are improperly joined as there is no connection between them other than their mere proximity to one another. There is a real danger that the jury will be confused by a joined trial and fail to consider the evidence against Mr. Sturgeon separately from Mr. Bingert and Mr. Johnatakis. Government concerns of judicial economy are substantially outweighed by the prejudice that will result to Mr. Sturgeon if a joint trial occurs.

### I.      The defendants are improperly joined under Rule 8(b)

Rule 8 of the Federal Rules of Criminal Procedure permits joinder of defendants *only* if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). To properly join defendants in this District, the government must sufficiently demonstrate "the existence of a common scheme or plan spanning both transactions *and* both defendants." *United States v. Perry*, 731 F.2d 985, 991 (D.C. Cir. 1984) (emphasis added).

### A. There is an insufficient nexus to support the joinder of Mr. Sturgeon with his other co-defendants.

It is settled law that each defendant must be logically relevant to each of their co-defendants and that our system does not tolerate or invite "mass trial by conduct" as that "way lies the drift toward totalitarian institutions." *Kotteakos v. U.S.*, 328 U.S. 750, 773 (1946). In *Kotteakos,* the Supreme Court reversed a conviction based on improper joinder of the defendant to others in a fraud

conspiracy when the only nexus among them "lies in the fact that one man participated in all." *Id.* It is also well settled D.C. Circuit law that there must be a logical relationship between the acts or transactions. *See Perry*, 731 F.2d at 990; see also *United States v. Jackson*, 562 F.2d 789, 796 (D.C. Cir. 1977) ("[I]f acts were part of a common scheme or plan, or connected together, they could be regarded as a series.").

As an initial matter, Mr. Sturgeon is not charged with conspiracy and the only connection he has to the other co-defendants was his proximity to them on the Capitol Grounds. Unlike other charged January 6 conspiracies, these joined defendants had no shared plans or agreements regarding their conduct that day, traveling from different parts of the country and not knowing each other even while on the Capitol Grounds. There is no evidence that they met up that day or on the Grounds and exchanged words indicating any agreement. The government's only claim for joinder is their speculative allegation that in response to Mr. Johnatakis's statements to the entire crowd – that Mr. Sturgeon and Mr. Bingert had somehow telepathically made an agreement to follow his words. Mr. Sturgeon did not even utter a single word to Mr. Bingert or Mr. Johnatakis and was standing solo the entire time.

Because Mr. Sturgeon's alleged actions were separate from the other co-defendants, these parties are improperly joined. In *Jackson*, the D.C. Circuit court agreed that the defendants' presence at the approximate time and place of the alleged crime was insufficient for joinder when the government failed to establish

any logical link between the two offenses. *Jackson*, 562 F.2d at 797. Similarly, the government here has not established a logical link connecting Mr. Sturgeon's alleged actions to the other two-defendant's alleged actions – other than that all three defendants allegedly committed the same offense. If that theory were to prevail, then hundreds of defendants in that area within an ear shot of Mr. Johnatakis should have also been included in this indictment. For example, in a case cited favorably in *Jackson,* the Fourth Circuit observed:

> The government did not meet its burden of proving that there was any connection between the appellant's offense and Meredith's offense. Carried to its logical conclusion, the government's theory might well allow us to join in a common indictment and trial of two delinquent taxpayers who used the same accountant. Such a result approaches the ridiculous.

*United States v. Whitehead*, 539 F.2d 1023, 1025 (4th Cir. 1976). *See also Jackson,* 562 F.2d at 796 (citing to *Whitehead* for proposition quoted).

The government has also failed to establish why it needs to join these defendants to prove its case against each co-defendant. These offenses are not intertwined and have no bearing on one another.

### B. The conduct alleged against Mr. Sturgeon and the other two co-defendants was not part of the same "transaction" within the meaning of Rule 8(b).

Rule 8 was designed to promote judicial economy through the aggregation of related claims.[1] However, it must be clear that efficiencies actually exist and "where... there are no presumptive benefits from joint proof of facts relevant to all

---

[1] *See* Edward Q. Carr, Some Aspects of Joinder of Causes, 5 Fordham L.R. 452, 457 (1936).

the acts or transactions...Rule 8(b) comes to an end, and joinder is impermissible. *Perry*, 731 F.2d at 990-91 (quoting *Jackson*, 562 F.2d at 794-95). While promoting judicial economy applies to both civil and criminal cases, the D.C. Circuit observed that in criminal cases, "solicitude for efficient judicial administration must sometimes give way to the need to protect the rights of defendants." *Jackson*, 562 at 799.

Because the potential for prejudice in the criminal context is high, the efficiency of joinder must typically be evident from the face of the indictment, as in the case of conspiracy, or clearly established in pre-trial proceedings. *See, e.g., id*; *see also Perry*, 731 F.2d at 990 ("Quite obviously, the indictment might satisfy this requirement, for instance when a conspiracy charge links all of the offenses and defendants. Unlike a common conspiracy charge that ties all of the defendants and charges together, the government cannot identify a common scheme or plan between these three defendants. To argue that Mr. Johntakis's alleged encouragement to the crowd demonstrates this common scheme or plan is clearly insufficient without some other logical link between the defendants and would create an absurd result – permitting joinder of hundreds of January 6 defendants that day. *See United States v. Nicely*, 922 F.2d 850, 854 (criticizing the government's "tenuous connection" and use of the word "symbiotic" comparing it to "a hippopotamus and the small bird that eats ticks off its hide").

**II.** **Even if the Court finds that joinder is appropriate, the Court should still sever Mr. Sturgeon's trial from his co-defendants to protect his substantive rights.**

Rule 14(a) makes it clear that the court may sever the defendants' trial if "the joinder of offenses in an indictment...appears to prejudice a defendant." Fed. R. Crim. P. 14(a). The Supreme Court has observed that severance of properly joined defendants is appropriate where, as here, there the dangers for "transference of guilt from one defendant to another...are so great that no one can really say prejudice to a substantial right has not taken place." *Kotteakos*, 328 U.S. at 750; *See also Nicely*, 922 F.2d at 853 (there are definite limits to what the government can put together in a single indictment). The D.C. District Court reiterated the Supreme Court's concerns that this risk is "heightened" when, for example, "many defendants are tried together...and they have markedly different degrees of culpability." *United States v. Franklin*, 2005 WL 8157514 *2 (D.D.C. Dec. 16, 2005) (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). In *Franklin*, the district court also observed the D.C. Circuit's instruction that severance is required when "evidence against one defendant is far more damaging than the evidence against the other defendants." *Id.* at *3 (quoting *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991)).

There is no doubt here that Mr. Johnatakis's allegations and evidence against him bear a far greater degree of culpability than for Mr. Sturgeon. Johnatakis is alleged to be on video surveillance encouraging the crowd to press on forward to push past the police line. There is no such allegation against Mr. Sturgeon – as he was essentially silent the entire time he was on the Capitol grounds. The joinder of these defendants would prejudice Mr. Sturgeon because it would be difficult for the

jury to compartmentalize the evidence against each of them to judge independently. *Franklin*, 2005 WL 8157514 *3 (the critical question is "whether a jury could reasonably compartmentalize the evidence introduced against each defendant.") (quoting *Halliman*, 923 F.2d at 884). Mr. Sturgeon would not receive a fair trial if joined with the other co-defendants because the evidence against them, specifically Johnatakis would have a "spillover" effect causing the jury to implicate Mr. Sturgeon and would "prevent the jury from making a reliable judgment about [his] guilt or innocence." *Id.* at *15 (quoting *Zafiro*, 506 U.S. at 539).

In *Kotteakos*, the Supreme Court applied these principles and recognized the danger of prejudice where joinder has the tendency to falsely amplify the scope of criminal culpability. *Kotteakos*, 328 U.S. at 773. The Court further held that the trial court's caution to the jury "to consider each defendant's case separately" was not enough to mitigate the error, because it permeated the atmosphere throughout the entire trial. *Id.* at 769-70. Finally, the Court rejected the government's argument that joinder efficiencies can override concerns about prejudice:

> True, this may be inconvenient for the prosecution. But our government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our history individual protections, including those surrounding criminal trial.

*Id.* at 773. There is a grave danger here that the jury will associate each defendant with the alleged collective conduct, especially when the allegations against another co-defendant are much stronger than the ones against Mr. Sturgeon. Every defendant is presumed innocent until/if proven guilty and Mr. Sturgeon has a right to a fair trial where the jury will consider the evidence only against him instead of

listening to misleading and logically irrelevant evidence that would only tend to improperly amplify Mr. Sturgeon's charges.

## Conclusion

For these reasons, this Court should not permit Mr. Sturgeon to be joined with his other co-defendants who are completely unrelated to him.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500
Maria_Jacob@fd.org

"Accepted"

MAR 07 2022

Taylor James Johnston

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

COPY

Notice Date:        Day: Five        Month: Three        Year: 2023 CE

Kaitlin Klamann
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 116 Filed 3/06/23 Page 1 of 4 UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. CRAIG MICHAEL BINGERT
ISAAC STEVE STURGEON and TAYLOR JAMES JOHNATAKIS Defendants Case No.: 1-21-ccr-00091-RCL
GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER, Page 2 of 4, Page 3 of 4, Page 4 of 4
CONCLUSION Respectfully submitted MATTHEW M. GRAVES United States Attorney By: Kaitlin Klamann
Assistant United States Attorney"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your
Presentment "Case 1:21-cr-00091-RCL Document 116 Filed 3/06/23 Page 1 of 4
**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
UNITED STATES OF AMERICA v. CRAIG MICHAEL BINGERT ISAAC
STEVE STURGEON and TAYLOR JAMES JOHNATAKIS Defendants Case
No.: 1-21-ccr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION TO
MOTION TO SEVER,** Page 2 of 4, Page 3 of 4, Page 4 of 4 CONCLUSION
Respectfully submitted MATTHEW M. GRAVES United States Attorney By: Kaitlin
Klamann Assistant United States Attorney" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF
ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

RECEIVED
Mail Room
MAR 13 2023
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Attachment: "Case 1:21-cr-00091-RCL Document 116 Filed 3/06/23 Page 1 of 4 UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. CRAIG MICHAEL BINGERT ISAAC STEVE
STURGEON and TAYLOR JAMES JOHNATAKIS Defendants Case No.: 1-21-ccr-00091-RCL GOVERNMENT'S
RESPONSE IN OPPOSITION TO MOTION TO SEVER, Page 2 of 4, Page 3 of 4, Page 4 of 4 CONCLUSION Respectfully
submitted MATTHEW M. GRAVES United States Attorney By: Kaitlin Klamann Assistant United States Attorney"

COPY

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Five      Month: Three   Year: 2023 CE

Kaitlin Klamann
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20001

cc: Angela D. Caesar, Clerk of Court United States District Court District of Columbia 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Seven        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 71 Filed 07/30/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-01** <u>NOTICE OF FILING</u> Respectfully Submitted Allen H. Orenberg Dated: July 30 2020, Case 1:21-cr-00091-RCL Document 71-1 Filed 07/30/22 Page 1 of 2 **THE ORENBERG LAW FIRM P.C.** Dear Ms. Buckner, Page 2 of 2 Very truly yours THE ORENBERG LAW FIRM P.C. BY: Allen H. Orenberg"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 71 Filed 07/30/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-01** <u>NOTICE OF FILING</u> Respectfully Submitted Allen H. Orenberg Dated: July 30 2020, Case 1:21-cr-00091-RCL Document 71-1 Filed 07/30/22 Page 1 of 2 **THE ORENBERG LAW FIRM P.C.** Dear Ms. Buckner, Page 2 of 2 Very truly yours THE ORENBERG LAW FIRM P.C. BY: Allen H. Orenberg" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

* I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 71 Filed 07/30/22 Page 1 of 1 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-01** <u>NOTICE OF FILING</u> Respectfully Submitted Allen H. Orenberg Dated: July 30 2020, Case 1:21-cr-00091-RCL Document 71-1 Filed 07/30/22 Page 1 of 2 **THE ORENBERG LAW FIRM P.C.** Dear Ms. Buckner, Page 2 of 2 Very truly yours THE ORENBERG LAW FIRM P.C. BY: Allen H. Orenberg"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

RECEIVED Mail Room MAR 13 2023 Angela D. Caesar, Clerk of Court U.S. District Court, District of Columbia



"Accepted"

MAR 07 2023

*Taylor James Johnstaker*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      :
                               :
           v.      :     Case No. 1:21-cr-0091-RCL-01
                               :
CRAIG MICHAEL BINGERT          :
    Defendant.                 :

### NOTICE OF FILING

COMES NOW,  Allen H. Orenberg, and on behalf of defendant Craig Michael

Bingert, gives notice of the filing of a letter to AUSA Angela Buckner, dated July

30, 2022 – which is attached as an Exhibit.

Respectfully Submitted,

**Allen H. Orenberg**
Digitally signed
by Allen H.
Orenberg
Date: 2022.07.30
14:42:59 -04'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. 301-984-8005
Cell Phone No. 301-807-3847
Fax No. 301-984-8008
aorenberg@orenberglaw.com

Dated: July 30, 2020

1

# THE ORENBERG LAW FIRM, P.C.

**12505 PARK POTOMAC AVENUE**
**6TH FLOOR**
**POTOMAC, MARYLAND 20854**

—

Office    (301) 984-8005
Facsimile  (301) 984-8008
Cell-Phone (301) 807-3847

**"Accepted"**

MAR 0 7 2023

*Taylor James Johnatakis*

Allen H. Orenberg
(MD & DC)

aorenberg@orenberglaw.com
www.orenberglaw.com

July 30, 2022

<u>Via E-Mail</u>

Angela Buckner, Esquire
Assistant U.S. Attorney

RE:   <u>USA v. Craig Michael Bingert</u> * No. 1:21-cr-0091-RCL-01
United States District Court for the District of Columbia

Dear Ms. Buckner:

Pursuant to Federal Rule of Criminal Procedure 16, Local Criminal Rule 5.1, and other applicable authority, I write on behalf of Craig Michael Bingert to formally request all information discoverable in this case. Please provide a written response to these requests as soon as possible.

Below is a list of the specific items requested:

1.   Any and all information pertaining to the investigation of the Secret Service after the Department of Homeland Security learned of the deletion of messages before and after January 6, 2021.[1] More specifically, and in addition, letters or memoranda detailing efforts or lack of efforts to preserve these text messages and reasons for the failure to preserve.

———————————

[1] <u>Secret Service identified potential missing text messages on phones of 10 individuals - CNNPolitics; Secret Service erased Jan. 6 texts after officials requested them, watchdog says: NPR</u>: https://www.cnn.com/2022/07/22/politics/secret-service-investigators-text-messages/index.html

AUSA Angela Buckner
July 30, 2022
Page Two

"Accepted"   *Taylor James Johnstater*

MAR 0 7 2023

2.  Any Secret Service communications, including text messages, emails, radio calls
    pertaining to these missing text messages and/or other communications regarding
    the events on January 6, 2021.

3.  Any communications between former President Trump's former staff on the day of
    January 6, 2021, regarding former President Trump's failure to stop the riot as well
    as affirmative steps he took to further encourage it.[2]

All of these requests are pursuant to Fed. R. Crim. P. 16(a)(1)(E); *see also Brady*, 373 U.S.
83 (and its progeny); *Giglio*, 405 U.S. 150 (and its progeny); *United States v. Marshall*, 132 F.3d
63, 67 (D.C. Cir. 1998) (citing Fed. R. Crim. P. 16) (holding inculpatory evidence is not immune
from disclosure); *Kyles v. Whitley*, 514 U.S. 419, 433-36 (1995) (evidence is materially
exculpatory if there is any reasonable probability that, considering the evidence, the results of
trial or sentencing would be different).

Please let me know promptly whether there are any requests set forth in this letter with
which you decline to comply. I am available to discuss any of the above requests at your
convenience. I reserve the right to supplement these requests as I review the discovery materials
and prepare for trial. Please feel free to contact me by e-mail or on my cell-phone.

Very truly yours,

THE ORENBERG LAW FIRM, P.C.

BY: Allen H. Orenberg

AHO/bip
cc: Case File (ECF)

---

[2] Jan. 6 hearing focuses on Trump's inaction during Capitol riot (nbcnews.com);
https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inact
ion-187-minutes-mayhem-rcna36737

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Four        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 115 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR SEVERANCE [110] SCHEDULED FOR MARCH 9 2023,** Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 **CERTIFICATE OF SERVICE** Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 **ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 115 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR SEVERANCE [110] SCHEDULED FOR MARCH 9 2023,** Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 **CERTIFICATE OF SERVICE** Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 **ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 115 Page 1 of 3 **IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL-01 CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR SEVERANCE [110] SCHEDULED FOR MARCH 9 2023,** Page 2 of 3 Respectfully Submitted Allen H. Orenberg, Page 3 of 3 **CERTIFICATE OF SERVICE** Allen H. Orenberg, Case 1:21-cr-00091-RCL Document 115-1 Filed 03/03/23 Page 1 of 1 **ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: James I. Pearce, United States Attorney's Office 555 Forth Street, N.W. Washington, DC 20530

RECEIVED
Mail Room

MAR 13 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

"Accepted"

MAR 0 6 2023

*Taylor James Johnatakis*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   :
                                 :
    v.                       :     **Case No. 1:21-cr-0091-RCL-01**
                                 :
CRAIG MICHAEL BINGERT, et al. :
Defendant.                :

## CONSENT MOTION TO CONTINUE STATUS HEARING AND HEARING ON DEFENDANT BINGERT'S MOTION FOR SEVERANCE, [110] SCHEDULED FOR MARCH 9, 2023

COMES NOW  CRAIG MICHAEL BINGERT, by and through counsel, and hereby requests the entry of an order continuing the status hearing and a hearing on defendant Bingert's motion for severance [110], scheduled for March 9, 2023, at 11:30 a.m., to a date convenient to the Court and to the parties. As grounds, the following submitted:

1.    This motion is consented to per AUSA Kaitlin Klamann and AFPD Maria Jacob.[1] The position of *pro se* co-defendant Taylor James Johnatakis is unknown.

2.    On March 3, 2023, the Court issued a Minute Order scheduling a status hearing and a hearing on defendant Bingert's motion for severance [110] for March 9, 2023 at 11:30 a.m. (VTC) A jury trial is scheduled for May 15, 2023.

---

[1] Counsel is transmitting this motion (and a proposed order) by e-mail to attorney Chris Black, stand-by counsel for *pro se* co-defendant Taylor James Johnatakis.

1

3. On March 6, 2023, undersigned counsel is starting a 5-8 day bench trial before U.S. District Judge Carl J. Nichols. (21-447-CJN) Consequently, does not expect to be available to this Court on March 9, 2023, at 11:30 a.m.

4. The following dates/times are suggested:

March 16, 2023 (afternoon) or March 20, 2023 (after 3:30 p.m.).

(Please note undersigned counsel will be out of town and unavailable March 22, 2023 through March 27, 2023.)

If these proposed dates are not good for the Court, then the parties respectfully ask that the Courtroom Clerk contact counsel to discuss good dates/times.

WHEREFORE, for the foregoing reasons and such other reasons which may appear just and proper, the parties request the entry of an order continuing the status hearing and a hearing on defendant Bingert's motion for severance [110], scheduled for March 9, 2023, at 11:30 a.m., to a date convenient to the Court and to the parties.

Respectfully Submitted,

Allen H. Orenberg

Digitally signed by Allen H. Orenberg
Date: 2023.03.03 13:57:32 -05'00'

Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. 301-984-8005
Cell Phone No. 301-807-3847
Fax No. 301-984-8008
aorenberg@orenberglaw.com

2

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2023, copies of the foregoing Motion to Continue Status Hearing and Hearing on Defendant Bingert's Motion for Severance, [110] Scheduled for March 9, 2023, and a proposed Order, were served to case registered parties by CM/ECF, and by mail to:

Taylor James Johnatakis
29628 Gamble Place NE
Kingston, Washington 98346-9560

Allen H. Orenberg

Digitally signed by Allen H. Orenberg
Date: 2023.03.03 13:57:53 -05'00'

Allen H. Orenberg, # 395519

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,   :
                               :
    **v.**                        :     **Case No. 1:21-cr-0091-RCL-01**
                                 :
CRAIG MICHAEL BINGERT, et al. :
    **Defendant.**              :

## <u>ORDER</u>

Upon consideration of the consent motion filed by defendant Craig Michael Bingert, to continue the status hearing and a hearing on defendant Bingert's motion for severance [110] scheduled for March 9, 2023, at 11:30 a.m., and for good cause shown, it is hereby this _____ day of March, 2023, the motion is GRANTED.

The status hearing and hearing on defendant Bingert's motion for severance [110] will be scheduled for _____, 2023 at _____ a.m ./ p.m., by VTC.

_____
Judge,
U. S. District Court for the District of Columbia

1

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Four        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-00091-RCL Document 66 Filed 05/03/22 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING DEFENDANT'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2), Page 2 of 2 Respectfully submitted Matthew M. Graves United States Attorney"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-00091-RCL Document 66 Filed 05/03/22 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING DEFENDANT'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2), Page 2 of 2 Respectfully submitted Matthew M. Graves United States Attorney" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-00091-RCL Document 66 Filed 05/03/22 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING DEFENDANT'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2), Page 2 of 2 Respectfully submitted Matthew M. Graves United States Attorney"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

RECEIVED
Room

MAR 13 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

"Accepted"

MAR 0 4 2023

*Taylor James Johnatakis*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-CR-91 (RCL)** |
| | : | |
| **CRAIG MICHAEL BINGERT,** | : | |
| **ISAAC STEVE STURGEON, and** | : | |
| **TAYLOR JAMES JOHNATAKIS,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY
REGARDING DEFENDANT'S MOTION TO DISMISS 18 U.S.C. § 1512(c)(2)**

On March 7, 2022, Judge Nichols granted a motion to dismiss a count charging defendant Garret Miller with a violation of 18 U.S.C. § 1512(c)(2), which prohibits corruptly obstructing, influencing, or impeding an official proceeding. *United States v. Miller*, No. 21-cr-119, ECF 73, Order (D.D.C. Mar. 7, 2022). On March 15, 2022, Defendant Isaac Sturgeon filed a "Notice of Additional Authority Supporting [His] Motion to Dismiss,"[1] which cited and discussed Judge Nichols's Order in *Miller*. *See* ECF No. 64. The government responded with a supplement to its memorandum in opposition to the motion to dismiss. *See* ECF No. 65.

The United States of America, by and through undersigned counsel, hereby notifies the Court of additional authority that addresses the arguments considered in *Miller*. Specifically, on May 2, 2022, the Honorable John D. Bates denied a motion to dismiss 18 U.S.C. § 1512(c)(2) and rejected the contention that the statute prohibits only obstruction that occurs with respect to a document, record, or other object. *United States v. Sean McHugh*, 21-cr-453 (JDB), ECF 64 (May 2, 2022). Judge Bates issued a 26-page Memorandum Opinion setting forth the Court's reasoning,

---

[1] On December 7, 2021, Defendant Sturgeon filed his motion to dismiss Counts One, Three, Four, Five, and Six of the Superseding Indictment. Defendant Craig M. Bingert moved to adopt and join the motion on December 13, 2021. *See* ECF No. 56. Defendant Taylor J. Johnatakis moved to join the motion on December 29, 2021. *See* ECF No. 59. This Court granted both motions. *See* ECF No. 61; January 28, 2022 Minute Order.

and a copy of that decision is attached hereto as Exhibit 1.

"Accepted"

MAR 0 4 2023

Taylor James Johnatakis

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Angela N. Buckner
        Angela N. Buckner
        DC Bar #1022880
        Assistant United States Attorney
        United States Attorney's Office
        555 Fourth Street, N.W.
        Washington, DC 20530
        Phone: (202) 252-2656

2

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Two        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



In reply to : "Case 1:21-cr-00091-RCL Document 40 Filed 08/04/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 NOTICE OF LETTER PROVIDED TO DEFENSE COUNSEL Page 2 of 2, Case 1:21-cr-00091-RCL Document 40-1 Filed 08/04/21 Page 1 of 15, Page 2 of 15, Page 3 of 15, Page 4 of 15, Page 5 of 15, Page 6 of 15, Page 7 of 15, Page 8 of 15, Page 9 of 15, Page 10 of 15, Page 11 of 15, Page 12 of 15, Page 13 of 15, Page 14 of 15, Page 15 of 15 Sincerely Channing D. Phillips"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 40 Filed 08/04/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91** <u>**NOTICE OF LETTER PROVIDED TO DEFENSE COUNSEL**</u> Page 2 of 2, Case 1:21-cr-00091-RCL Document 40-1 Filed 08/04/21 Page 1 of 15, Page 2 of 15, Page 3 of 15, Page 4 of 15, Page 5 of 15, Page 6 of 15, Page 7 of 15, Page 8 of 15, Page 9 of 15, Page 10 of 15, Page 11 of 15, Page 12 of 15, Page 13 of 15, Page 14 of 15, Page 15 of 15 Sincerely Channing D. Phillips" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 40 Filed 08/04/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91** <u>NOTICE OF LETTER PROVIDED TO DEFENSE COUNSEL</u> Page 2 of 2, Case 1:21-cr-00091-RCL Document 40-1 Filed 08/04/21 Page 1 of 15, Page 2 of 15, Page 3 of 15, Page 4 of 15, Page 5 of 15, Page 6 of 15, Page 7 of 15, Page 8 of 15, Page 9 of 15, Page 10 of 15, Page 11 of 15, Page 12 of 15, Page 13 of 15, Page 14 of 15, Page 15 of 15 Sincerely Channing D. Phillips"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Case No. 21-cr-91 |
| | : |
| CRAIG MICHAEL BINGERT, | : |
| ISAAC STEVE STURGEON, and | : |
| TAYLOR JAMES JOHNATAKIS, | : |
| | : |
| Defendants. | : |

## NOTICE OF LETTER PROVIDED TO DEFENSE COUNSEL

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, hereby gives notice that the United States gave to counsel of record in

the above-captioned case via USAfx file exchange the discovery listed in the attached letter on the

dates set forth in the letter. The government requests that the attached discovery letter, dated

August 4, 2021, be made part of the record in this case.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

By:   */s/ Angela N. Buckner*
Angela N. Buckner
DC Bar #1022880
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (202) 252-2656


RECEIVED
Mail Room

MAR - 8 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## CERTIFICATE OF SERVICE

On August 4, 2021, a copy of the foregoing notice and attached discovery letter were served on defendants' counsel through the Court's Electronic Filing System with the listed attachments provided to counsel through the means described in the discovery letter.

By:     /s/ Angela N. Buckner
        Angela N. Buckner
        Assistant United States Attorney

"Accepted"

MAR 0 2 2023

Taylor James Johnstons

"Accepted"

MAR 02 2023

Taylor James Johnatakis



U.S. Department of Justice

Channing D. Phillips
Acting United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

August 4, 2021

**By e-mail**

Allen H. Orenberg
aorenberg@orenberglaw.com

Maria Jacob
Maria_Jacob@fd.org

Christopher Black
chris@blacklawseattle.com

Re:     *Craig Bingert, Isaac Sturgeon, and Taylor Johnatakis*
         *Preliminary Discovery for Case Number 21-cr-91*

Dear Counsel:

I have uploaded preliminary discovery to USAfx. As we receive and review additional discovery, it will be uploaded to USAfx. When our investigation and review is complete, I will provide a more formal, bates stamped production which will include items such as serialized 302s and responsive search warrants returns.

For now, I have included below most (if not all) of the warrant affidavits we have sought thus far so that you have an idea of the universe of discovery. Returns will not be provided until they've been properly reviewed for responsive materials. If, however, the search warrant return belongs to your client, then you will receive a full copy. The difference is that I will only provide co-defendants with a copy of what is responsive.

To protect identities and privacy, I have redacted the following: day and month of birthdays, street addresses, names of witnesses and tipsters. Because some tipsters misidentify the "BOLO" photographs, and because co-defendants will have copies of information pertaining to other co-defendants, I believe this is especially prudent.

Additionally, law enforcement officers and agents sometimes use sensitive and confidential databases for searches, such as CLEAR and NCIC. Where the documents involve law enforcement search results utilizing these databases (such as CLEAR or NCIC), I have marked those items "highly sensitive" (HS!). Where the information is obviously personal (such as family, employment, or vehicle information), I have marked those items "highly sensitive" (HS!).

Similarly, where the documents involve sensitive internal FBI databases, such as documentation involving "TTK" and/or "FACES" (facial recognition) searches, I have marked those items "highly sensitive" (HS!). This is an important distinction. There are many instances where witnesses and tipsters were interviewed. In general, I've made efforts to redact and provide that information without marking it "sensitive" or "highly sensitive." However, if the report was uploaded into "TTK" or involved a facial recognition hit, I have marked that information "sensitive."

I have organized the folders by Defendant. Where items are "sensitive" or "highly sensitive," I have placed those files in a separate folder, also organized by defendant.

You will see that there were several tipsters. I've labeled with "misidentification" any tip that did not resolve to a defendant in this case. I've heavily redacted all information for any witness or tipster (regardless of accuracy of information provided). My intent with redactions is to protect identities and is to avoid "sensitive" and "highly sensitive" designations where possible. Please note that the tipster designations (such as "Tipster 3") aren't necessarily the same tipsters that you'll see in warrant affidavits. The numbering convention is different.

Documents uploaded include the serial number ("[3]," for example). Where the serial includes several attachments, I have marked those attachments with an "A" (so the attachment will be labeled "[3A]"). Hopefully this will help you both check what you've got against the list below and also know what you already have when the more formal bates stamped discovery is ready.

If you have any questions, issues, or concerns with how I've marked (or not marked) documents, please let me know and I'm happy to revisit.

The following items were uploaded to USAfx on or about August 4, 2021[1]:

## CRAIG BINGERT

| Phone extraction | Cellebrite report (606 pages) |
| --- | --- |
| Historical Cell Cite Records | 2 PDFs, 2 emails, and 2 excel sheets |

---

[1] These items have not been fully reviewed for responsiveness and therefore are only being provided to counsel for the specific defendant to which the discovery relates.

## ISAAC STURGEON

| Facebook and Instagram Accounts | Isaac.lawncare<br>PDF file (7984 pages), along with zip file containing all linked media.<br><br>Isaac.sturgeon.58<br>PDF file (239 pages), along with zip file containing all linked media.<br><br>Isaaclawncare (Instagram)<br>PDF file (3094 pages), along with zip file containing all linked media. |
|---|---|
| Historical and Prospective Cell Site Records | Location data (two excel sheets and one weblink)<br>Call detail records (9 PDF files and 8 text files) |
| Phone extraction | Full copy of extraction and report provided via external hard drive |

## TAYLOR JOHNATAKIS

| Facebook and Instagram Accounts | peasantpod<br>PDF file (228 pages), along with all linked media.<br><br>Taylor-johnatakis<br>PDF file (3771 pages), along all linked media.<br><br>taylorjohnatakis (Instagram)<br>PDF file (4905 pages), along with zip file containing all linked media. |
|---|---|
| Historical and Prospective Cell Site Records | Location data (two excel sheets and one weblink)<br>Call detail records (9 PDF files and 8 text files) |
| Parler Account | 21 chat logs, 207 photos, and 119 videos |
| Twitter Account | Gone4months (changed from peasantsPod)<br>Text files, along with all linked media. |
| Historical Cell Cite Records | 2 PDFs and 3 text files |

"Accepted"

MAR 02 2023

Taylor James Johnatakis

The following items were uploaded to USAfx on or about May 4, 2021:

**CRAIG BINGERT**

| | |
|---|---|
| Serial 1 | Case Opening (2 pages) |
| Serial 2 | Documents Associated with BOLO 105 (1 page) |
| | Attachment: Criminal History (5 pages) [HSI] |
| | Attachment: Screenshot of Work History (1 photo) [HSI] |
| | Attachment: PA Department of Labor Employment Report (1 page) [HSI] |
| | Attachment: Bingert DMV Information (1 page) [HSI] |
| | Attachment: Screenshot of Linkedin (1 photo) [HSI] |
| Serial 3 | Criminal Complaint and Arrest Warrant (1 page) |
| | Attachment: Statement of Facts (6 pages) |
| | Attachment: Complaint (1 page) |
| | Attachment: Arrest Warrant (2 pages) |
| Serial 4 | Seeking Information BOLO 105 (1 page) |
| | Attachment: Collage (1 page) |
| Serial 5 | MPD BWC Related to Bingert (2 pages) |
| | Attachment: BWC Export Documentation (1 page) |
| Serial 6 | Open and Assign Case (1 page) |
| Serial 7 | Phone Seized (1 page) |
| Serial 8 | TTK FACE Search (1 page) [S] |
| | Attachment: FACE Search Report (2 pages) [S] |
| Serial 9 | Arrest of Bingert (3 pages) |
| | Attachment: Executed Arrest Warrant (11 pages) |

4

|  | Attachment: Consent to Search (1 page) |
|---|---|
| Serial 10 | Indictment (2 pages) |
|  | Attachment: Indictment (5 pages) |
| Serial 11 | Phone Transfer to WFO (2 pages) |
| Serial 12 | TTK FACES Search (3 pages) [S] |
|  | Attachment: FACES Report - Misidentification (10 pages) [S] |
|  | Attachment: FACES Report (1 page) [S] |
| Serial 13 | T-Mobile Search Warrant (1 page) |
|  | Attachment: Application to Seal Search Warrant (8 pages) |
|  | Attachment: Search Warrant (41 pages) |
|  | Attachment: Search Warrant Served (10 pages) |
| Serial 14 | TTK FACES Search (3 pages) [S] |
|  | Attachment: FACES Report (1 page) [S] |
|  | Attachment: FACES Report – Misidentification (6 page) [S] |
| Serial 15 | T-Mobile Search Warrant Served (2 pages) |
|  | Attachment: Search Warrant (10 pages) |
|  | Attachment: T-Mobile Rejection (1 page) |

**ISAAC STURGEON**

| | |
|---|---|
| Serial 1 | Case Opening (2 pages) |
| Serial 2 | Seeking Information BOLO 104 (1 page) |
| | Attachment: Collage (1page) |
| Serial 3 | TTK FACES Request (1 page) [S] |
| | Attachment: TTK FACES Request (2 pages) [S] |
| Serial 4 | Records and Social Media Checks (1 page) |
| | Attachment: Records Check (4 pages) [IHS] |
| | Attachment: Instagram (1 photo) |
| | Attachment: Facebook – Guns (1 photo) |
| | Attachment: Passport Application (1 page) [IHS] |
| | Attachment: Sturgeon NCIC (3 pages) [IHS] |
| | Attachment: Scroll Through Instagram (1 video) |
| Serial 5 | Preservation Requests (2 pages) |
| Serial 6 | Tip Received and Entered into TTK (2 pages) [S] |
| | Attachment: TTK Report for Tip Received (4 pages) [S] |
| Serial 7 | Anonymous Tip 1 (4 pages) |
| | Attachment: Tip 1 Report (5 pages) |
| Serial 8 | Interview of Tipster 2 (3 pages) |
| Serial 9 | Interview of Tipster 3 (1 page) |
| | Attachment: Instagram Screenshot From Tipster 3 (1 page) |
| Serial 10 | Database Searches (3 pages) [IHS] |
| | Attachment: Social Media Screenshot – Officer Hurt (1 photo) |

"Accepted"

MAR 0 2 2023

Taylor James Johnston

|  | Attachment: Social Media Screenshot – Instagram (1 photo) |
|--|--|
|  | Attachment: Social Media Screenshot – Refused to Reject (1 photo) |
|  | Attachment: Sturgeon NCIC (3 pages) [HSI] |
|  | Attachment: Social Media Screenshot – Grid of Instagram Photos (1 photo) |
|  | Attachment: Social Media Screenshot – No Shirt with Gun (1 photo) |
|  | Attachment: Social Media Screenshot – Madness (1 photo) |
|  | Attachment: Social Media Screenshot – WW2 (1 photo) |
| Serial 11 | Tip 4 -Misidentification (4 pages) |
|  | Attachment: Tip 4 Report (4 pages) |
| Serial 12 | Interview with Witness (2 pages) |
| Serial 13 | Tip 5 – Misidentification (2 pages) |
|  | Attachment: Tip 5 Report (4 pages) |
| Serial 14 | Indictment (2 pages) |
|  | Attachment: Indictment (5 pages) |
| Serial 15 | Interview - Misidentification of Same Individual in Tip 5 (1 page) |
| Serial 16 | Arrest Warrant Enter into NCIC (2 pages) |
|  | Attachment: Arrest Warrant (2 pages) |
| Serial 17 | Facebook Post Indicating Kenya (1 page) |
|  | Attachment: Screenshot of Facebook Post Indicating Kenya (1 photo) |

**TAYLOR JOHNATAKIS**

| | |
|---|---|
| Serial 1 | Case Opening (2 pages) |
| Serial 2 | CD containing two videos depicting BOLO-103 (1 page) |
| Serial 3 | Tip 1 Received (3 pages) [S] |
| | Attachment: TTK Report for Tip 1 (4 pages) [S] |
| Serial 4 | Interview of Tipster 1 (2 pages) |
| | Attachment: Video of Woman Shot (1 video) |
| | Attachment: Video – Break Down Door (1 video) |
| | Attachment: Email from Tipster 1 re BOLO – Misidentification (1 page) |
| | Email from Tipster 1 re Podcast (1 photo) |
| | Attachment: Screenshot – Bricks (1 photo) |
| | Attachment: Screenshot – Crime Complete (1 photo) |
| | Attachment: Screenshot – Saw Johnatakis in DC (1 photo) |
| | Attachment: Screenshot – Sardines (1 photo) |
| | Attachment: Screenshot – Lin Wood Pence Goes First (1 photo) |
| | Attachment: Screenshot – Rumble 1st Hand Account (1 photo) |
| | Attachment: Screenshot – Parler (1 photo) |
| | Attachment: Screenshot – Encouraged to Take Down (1 photo) |
| | Attachment: Screenshot – KD 1 (1 photo) |
| | Attachment: Screenshot – KD 2 (1 photo) |
| | Attachment: Screenshot – KD 3 (1 photo) |
| | Attachment: Screenshot – KD 4 (1 photo) |
| | Attachment: Screenshot – FB (1 photo) |

|  | Attachment: Video – 1st Hand Podcast (1 video file) |
|---|---|
| Serial 5 | CD Containing Podcast Download |
| Serial 6 | Tip 2 Received – Misidentification (3 pages) [S] |
|  | Attachment: Report for Tip 2 - Misidentification (4 pages) [S] |
| Serial 7 | TTK (2 pages) [S] |
|  | Attachment: TTK Report (4 pages) [S] |
| Serial 8 | Johnatakis Phone Interview (2 pages) |
| Serial 9 | Twitter Preservation (1 page) |
| Serial 10 | Google Preservation (1 page) |
| Serial 11 | Gab AI (1 page) |
| Serial 12 | TTK Reveals Tip 3 – Misidentification (3 pages) [S] |
|  | Attachment: TTK Report for Tip 3 - Misidentification (3 pages) [S] |
| Serial 13 | Search Warrant to Seize Phone (1 page) |
|  | Attachment: Search Warrant for Phone (55 pages) |
| Serial 14 | Tip 4 Received (1 page) |
| Serial 15 | Interview of Tip 5 (2 pages) |
| Serial 16 | Interview of Tip 1 (2 pages) |
| Serial 17 | Interview of Tip 4 (2 pages) |
|  | Attachment: Facebook Screenshot (1 page) |
|  | Attachment: Facebook Screenshot – Bricks (1 photo) |
|  | Attachment: DMV Information (2 pages) [HS] |
|  | Attachment: Facebook Screenshot – Antifa (1 photo) |
|  | Attachment: NCIC (8 pages) [HS] |
|  | Attachment: Vehicle Information (2 pages) [HS] |

9

Attachment: Woman Being Shot (1 video)

Attachment: Various Social Media Screenshots (21 pages)

Attachment: DL Info (1 page) **[HS]**

Attachment: We Were Violent (1 video)

Attachment: Guardian (10 pages) **[HS]**

Serial 18    Johnatakis Phone Seized (1 page)

Serial 19    Search Warrant Return – Phone (1 page)

Attachment: Search Warrant Return (2 pages)

Serial 20    Cell phone search warrant signed (1 page)

Cell phone search warrant (55 pages)

Serial 21    Email from Johnatakis About BOLO (1 page)

Email (1 page)

Serial 22    Phone Transfer to WFO (2 pages)

Serial 23    Phone Seized (2 pages)

Serial 24    TTK FACES Request (1 page) **[S]**

Attachment: FACES Request (2 pages) **[S]**

Serial 25    TTK FACE Search for BOLO 103 (1 page) **[S]**

TTK FACES Report (66 pages) **[S]**

Serial 26    Tip 6 Received – Misidentification (3 pages)

Attachment: Report for Tip 6 - Misidentification (4 pages)

Serial 27    Tip 7 Received – Misidentification (2 pages)

Attachment: Tip 7 Report – Misidentification (4 pages)

Attachment: Tip 7 Report – Misidentification Update (4 pages)

Serial 28    Interview of Johnatakis (3 pages)

| Serial 29 | Tip 8 Received – Misidentification (3 pages) |
|---|---|
| | Attachment: Tip 8 Report – Misidentification (5 pages) |
| Serial 30 | Tip 9 Received – Misidentification (4 pages) |
| | Attachment: Tip 9 Report – Misidentification (5 pages) |
| Serial 31 | Tip 10 Received – Misidentification (4 pages) |
| | Attachment: Tip 10 Report – Misidentification (5 pages) |
| Serial 32 | Tip 11 Received – Misidentification (3 pages) |
| | Attachment: Tip 11 Report – Misidentification (4 pages) |
| Serial 33 | Tip 12 Received – Misidentification (2 pages) |
| | Attachment: Tip 12 Report – Misidentification (4 pages) |
| Serial 34 | Tip 13 Received – Misidentification (3 pages) |
| | Attachment: Tip 13 Report – Misidentification (4 pages) |
| Serial 35 | Tip 14 Received – Misidentification (3 pages) |
| | Attachment: Tip 14 Report – Misidentification (4 pages) |
| Serial 36 | Indictment (2 pages) |
| | Attachment: Indictment (5 pages) |
| Serial 37 | Tip 15 Received – Misidentification (3 pages) |
| | Attachment: Tip 15 Report – Misidentification (4 pages) |
| Serial 43 | Surrender Arrangements (2 pages) |
| Serial 45 | Podcast Review – 1st Hand Account…" |
| Serial 46 | Tip 16 Received – Misidentification (2 pages) |
| | Attachment: Tip 16 Report – Misidentification (4 pages) |
| Serial 47 | Twitter Search Warrant (1 page) |
| | Attachment: Twitter Sealing Order (11 pages) |

11

"Accepted"

MAR 0 2 2023

Taylor James Schneider

| | |
|---|---|
| | Attachment: Twitter Search Warrant (40 pages) |
| Serial 48 | Facebook Search Warrant (1 page) |
| | Attachment: Facebook Sealing Order (11 pages) |
| | Attachment: Facebook Search Warrant (50 pages) |
| Serial 49 | Parler Search Warrant (1 page) |
| | Attachment: Parler Sealing Order (11 pages) |
| | Attachment: Parler Search Warrant (45 pages) |
| Serial 50 | ATT Search Warrant (1 page) |
| | Attachment: ATT Sealing Order (11 pages) |
| | Attachment: ATT Search Warrant (43 pages) |
| Serial 51 | Tip 17 Received – Misidentification (3 pages) |
| Serial 52 | Tip 18 Received – Misidentification (4 pages) |
| Serial 53 | Tip 19 Received – Misidentification (2 pages) |
| Serial 59 | Search Warrant Return Review (2 pages) |
| Serial 62 | Information Received from Tipster 1 (1 page) |
| Serial 63 | Information Received from Tipster 4 (1 page) |
| Serial 64 | Guardian (1 page) [HS] |
| | Attachment: Guardian (9 pages) [HS] |

The discovery is unencrypted. Please contact me if you have any issues accessing the information, and to confer regarding pretrial discovery as provided in Fed. R. Crim. P. 16.1.

12

As indicated in my April 15, 2021 email, you should have received a link to download the BWC in this case.

Attached to that email and uploaded to USAfx is a list of the BWC by officer. Thus far, we've located 15 separate videos that capture your clients. The videos are quite lengthy, so I've included some time stamps below to get you started.

The most helpful videos will be from the following officers' cameras:

1. Livezey (starting at beginning of video, with assault occurring at minute 8:45),
2. Militar (starting at beginning of video, with assault occurring at minute 8),
3. Ishola (starting at minute 23), and
4. Toussaint (starting at beginning of video, with assault occurring at minute 10.

I recommend starting with Officer Livezey at minute 8:00 so that you can identify each of your clients. Watching the remainder of the footage is much easier once you know who you're looking for. Along those lines, I've also attached a photo (Sturgeon (left), Bingert (middle), Johnatakis (right)).

Time stamps for other videos:

**Officer**: McCloskey
**Advance to:** 20:49, 22:09

**Officer**: Lombardini
**Advance to:** 30:03, 30:10, 49:55

**Officer**: Jefferson
**Advance to:** 03:24, 04:38

**Officer**: Mullen
**Advance to:** 01:35:45, 01:37:06

**Officer**: Yarosis
**Advance to:** 01:35:45, 01:37:02

**Officer**: Tong
**Advance to:** 01:35:17, 01:36:49

**Officer**: 6DLOANER, BWC
**Advance to:** 25:39, 52:13

**Officer**: Roth
**Advance to:** 02:59

13

"Accepted"

MAR 0 2 2023

**Officer**: Jimenez
**Advance to**: 08:11

*Taylor James Johnatakis*

**Officer**: Davis
**Advance to**: 01:27:05

Due to the extraordinary nature of the January 6, 2021 Capitol Attack, the government anticipates that a large volume of materials may contain information relevant to this prosecution. These materials may include, but are not limited to, surveillance video, statements of similarly situated defendants, forensic searches of electronic devices and social media accounts of similarly situated defendants, and citizen tips. The government is working to develop a system that will facilitate access to these materials. In the meantime, please let me know if there are any categories of information that you believe are particularly relevant to your client.

I recognize the government's discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), its progeny, and Rule 16. I will provide timely disclosure if any such material comes to light. Consistent with *Giglio*, *Ruiz*, and 18 U.S.C. § 3500, I will provide information about government witnesses prior to trial and in compliance with the court's trial management order.

I request reciprocal discovery to the fullest extent provided by Rule 16 of the Federal Rules of Criminal Procedure, including results or reports of any physical or mental examinations, or scientific tests or experiments, and any expert witness summaries. I also request that defendants disclose prior statements of any witnesses defendants intends to call to testify at any hearing or trial. *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 255 (1975). I request that such material be provided on the same basis upon which the government will provide defendants with materials relating to government witnesses.

Additionally, pursuant to Federal Rules of Criminal Procedure 12.1, 12.2, and 12.3, I request that defendants provide the government with the appropriate written notice if defendants plans to use one of the defenses referenced in those rules. Please provide any notice within the time period required by the Rules or allowed by the Court for the filing of any pretrial motions.

14

I will forward additional discovery as it becomes available. If you have any questions, please feel free to contact me.

Sincerely,

CHANNING D. PHILLIPS
Acting United States Attorney

By: /s/ Angela N. Buckner
ANGELA N. BUCKNER
Assistant United States Attorney
D.C. Bar No. 1022880
United States Attorney's Office
555 4th Street, N.W.
Washington, DC 20530
Phone: 202-252-2656
Email: angela.buckner@usdoj.gov

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Three          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "CJA-23 (Rev 3/21) **FINANCIAL AFFIDAVIT**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being,
accept your Presentment "**CJA-23 (Rev 3/21) FINANCIAL AFFIDAVIT**"
and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

Taylor James Johnatakis

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

RECEIVED
Mail Room

MAR - 8 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Attachment: "**CJA-23 (Rev 3/21) FINANCIAL AFFIDAVIT**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

| CJA-23 (Rev 3/21) | **FINANCIAL AFFIDAVIT** |
| --- | --- |

**IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT, OR OTHER SERVICES WITHOUT PAYMENT OF FEE**

**IN THE UNITED STATES** ☐ DISTRICT COURT   ☐ COURT OF APPEALS   ☐ OTHER *(Specify Below)*

IN THE CASE OF

_____ V. _____

FOR _____

AT _____

LOCATION NUMBER

PERSON REPRESENTED *(Show your full name)*

1 ☐ Defendant - Adult
2 ☐ Defendant - Juvenile
3 ☐ Appellant
4 ☐ Probation Violator
5 ☐ Supervised Release Violator
6 ☐ Habeas Petitioner
7 ☐ 2255 Petitioner
8 ☐ Material Witness
9 ☐ Other *(Specify)* _____

CHARGE/OFFENSE *(Describe if applicable & check box→)*   ☐ Felony   ☐ Misdemeanor

DOCKET NUMBERS
Magistrate Judge

District Court

Court of Appeals

| ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY |
| --- |

**INCOME & ASSETS**

**EMPLOYMENT**

Do you have a job?  ☐ Yes  ☐ No

**IF YES,** how much do you earn per month? _____

Will you still have a job after this arrest?  ☐ Yes  ☐ No  ☐ Unknown

**PROPERTY**

Do you own any of the following, and if so, what is it worth?

| | APPROXIMATE VALUE | DESCRIPTION & AMOUNT OWED |
| --- | --- | --- |
| Home | $_____ | _____ |
| Car/Truck/Vehicle | $_____ | _____ |
| Boat | $_____ | _____ |
| Stocks/bonds | $_____ | _____ |
| Other property | $_____ | _____ |

**CASH & BANK ACCOUNTS**

Do you have any cash, or money in savings or checking accounts?  ☐ Yes  ☐ No

**IF YES,** give the total approximate amount after monthly expenses  $_____

**OBLIGATIONS, EXPENSES, & DEBTS**

How many people do you financially support? _____

| BILLS & DEBTS | MONTHLY EXPENSE | TOTAL DEBT |
| --- | --- | --- |
| Housing | $_____ | $_____ |
| Groceries | $_____ | $_____ |
| Medical expenses | $_____ | $_____ |
| Utilities | $_____ | $_____ |
| Credit cards | $_____ | $_____ |
| Car/Truck/Vehicle | $_____ | $_____ |
| Childcare | $_____ | $_____ |
| Child support | $_____ | $_____ |
| Insurance | $_____ | $_____ |
| Loans | $_____ | $_____ |
| Fines | $_____ | $_____ |
| Other | $_____ | $_____ |

I certify under penalty of perjury that the foregoing is true and correct.

_____   _____
SIGNATURE OF DEFENDANT                          Date
(OR PERSON SEEKING REPRESENTATION)

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day: Three       Month: Three       Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 32-1 Filed 05/05/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 <u>ORDER</u>**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "**Case 1:21-cr-00091-RCL Document 32-1 Filed 05/05/21 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 <u>ORDER</u>**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 32-1 Filed 05/05/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 <u>ORDER</u>**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104



RECEIVED
Mail Room

MAR - 8 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Page 1 of 1

**"Accepted"**

MAR 0 3 2023

*Taylor James Johnatakis*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    :
      :
      v.      :    Case No. 21-cr-91
      :
CRAIG MICHAEL BINGERT,    :
ISAAC STEVE STURGEON, and    :
TAYLOR JAMES JOHNATAKIS,    :
      :
    Defendants.    :

### ORDER

Upon consideration of the United States' motion to disclose items protected by Federal

Rule of Criminal Procedure 6(e) and sealed materials, it is hereby

ORDERED, that the motion is GRANTED, and it is further

ORDERED, that the United States may provide in discovery materials protected by

Federal Rule of Criminal Procedure 6(e), and it is further

ORDERED, that the United States may provide in discovery sealed materials, pursuant to

the previously entered protective order governing discovery.

Date:                    _____

                      HONORABLE ROYCE C. LAMBERTH
                      United States District Judge



RECEIVED
Mail Room

MAR - 8 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Three          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



MAR - 8 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

In reply to : "Case 1:21-cr-00091-RCL Document 64 Filed 03/15/22 Page 1 of 4 UNITED STATES DISTRICT OF COLUMBIA Case 21-091 (RCL) NOTICE OF ADDITIONAL AUTHORITY SUPPORTING MR. STURGEON'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2) ARGUMENT, Page 2 of 4, Page 3 of 4, Page 4 of 4 Respectfully submitted A.J. KRAMER Maria N. Jacob"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 64 Filed 03/15/22 Page 1 of 4 **UNITED STATES DISTRICT OF COLUMBIA Case 21-091 (RCL) NOTICE OF ADDITIONAL AUTHORITY SUPPORTING MR. STURGEON'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2) ARGUMENT,** Page 2 of 4, Page 3 of 4, Page 4 of 4 Respectfully submitted A.J. KRAMER Maria N. Jacob" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 64 Filed 03/15/22 Page 1 of 4 **UNITED STATES DISTRICT OF COLUMBIA Case 21-091 (RCL) NOTICE OF ADDITIONAL AUTHORITY SUPPORTING MR. STURGEON'S MOTION TO DISMISS 18 U.S.C. 1512(c)(2) ARGUMENT,** Page 2 of 4, Page 3 of 4, Page 4 of 4 Respectfully submitted A.J. KRAMER Maria N. Jacob"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

"Accepted"

MAR 0 3 2023

*Taylor James Johnston*

UNITED STATES OF AMERICA,          )
                               )
     v.     )          Case No. 21-091 (RCL)
                               )
ISAAC STEVE STURGEON               )
                               )
     Defendant.    )

RECEIVED
Mail Room

MAR - 8 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## NOTICE OF ADDITIONAL AUTHORITY SUPPORTING MR. STURGEON'S MOTION TO DISMISS 18 U.S.C. §1512(c)(2)

Defendant Isaac Sturgeon, through undersigned counsel, notifies the Court of additional authority in support of his Motion to Dismiss (*See* ECF No. 55) and further requests that the Court dismiss count one of the Second Superseding Indictment for the reasons set forth in the district court's recent opinion in *United States v. Garret Miller*, 1:21-CR-119 (CJN), ECF No. 72. In *Miller*, the district court found that Miller's alleged conduct failed to fit within the scope of 18 U.S.C. §1512(c)(2). The same is true here. As discussed below, the reasoning in *Miller* applies equally to Mr. Sturgeon. Therefore, the Court should dismiss count one.

## ARGUMENT

In *Miller*, the court found the word "otherwise" in §1512(c)(2) "critical to determining what §1512(c)(2) covers." *Id.* at 11. The court rejected the government's suggestion that "otherwise" "serve[d] as a clean break between subsections (c)(1) and (2)." *Id.* at 11-12. It explained that the government's proffered reading failed to "give meaning to the word 'otherwise,'" and rendered the word "pure surplusage." *Id.* at 12. The court further reasoned that the government's reading was inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), in which the United States Supreme Court concluded that the Armed Career Criminal Act's

1

("ACCA") use of the word "otherwise" tied together the preceding and following words. *Id.* at 12-13. Specifically, the Supreme Court in *Begay* concluded that "the text preceding 'otherwise' influenced the meaning of the text that followed: it 'limited the scope of the clause to crimes that are *similar to the examples themselves.*'" *Id.* at 13 (quoting *Begay*, 553 U.S. at 143). The court went on to explain why cases that adopted the "clean break reading of 'otherwise' in §1512(c)(2)" were incorrect. *Id.* at 14-15.

The court also rejected the government's alternative reading of the statute – "that subsection (c)(1) contains specific examples of conduct that is unlawful under subsection (c)(2)" such that that the "link between" the two subsections "is that the unlawful conduct must relate to an 'official proceeding.'" *Id.* at 15 (citing *United States v. Montgomery*, 2021 WL 6134591, at *12). As the court explained, the problem with this alternative reading is that it renders the word "otherwise" superfluous because both subsections contain the phrase "official proceeding." *Id.* at 15-16.

The court concluded that "[s]ubsection (c)(2) is a residual clause for subsection (c)(1)," operating as a "catchall for the prohibition contained in subsection (c)(1)." *Id.* at 17. Under this interpretation, consistent with the Supreme Court's holding in *Begay*, the link between the two subsections is the conduct prescribed in subsection (c)(1), and "subsection (c)(2) operates to ensure that by delineating only certain specific unlawful acts in (c)(1) . . . – Congress was not 'underinclusive'" by allowing other ways to violate the statute that are similar to the conduct prohibited in (c)(1). *Id.* at 17-18.

Delving deeper, the court reasoned that the structure and scope of §1512 suggests that subsection (c)(2) has a narrow focus, because the other subsections criminalize specific conduct in narrow contexts. *Id.* at 20. The court further reasoned that while subsections (c)(2) and (c)(1)

are different than the other subsections, because they prohibit an individual from taking certain actions directly rather than towards another person, the language in subsection (c)(1) still "homes in on a narrow, focused range of conduct." *Id.* at 21. The court explained that, by contrast, if §1512(c)(2) "signals a clean break" from subsection (c)(1), it would be inconsistent with the statute as a whole because it would be the only provision to not contain a narrow focus. *Id.* The court reiterated that any different reading would improperly render subsection (c)(2) unnecessary. *Id.* at 21-22.

The court also discussed how the historical development of §1512 supports the conclusion that §1512(c)(2) operates as a catchall to (c)(1). *Id.* at 23-25. Per the court, the revisions to §1512(c) in 2002 filled a gap that existed because §1512(b) made it unlawful to cause "another person" to take certain actions but not for a person to take such action directly. The 2002 enactment of 1512(c) fixed that problem and took much of its language directly from 1512(b). *Id.* 23-24. The fact that Congress took much of the language from a provision already contained in subsection (b), shows Congress's intent for subsection (c) to have a narrow, limited focus – just like subsection (b)(2)(B). *Id.* at 25.

Lastly, the court found that the legislative history also supports a narrow reading of subsection (c)(2). *Id.* at 26-28. The court explained the evolution of §1512(c) resulted in a statute that ensured that individuals acting alone would be liable for the same acts that were prohibited in other parts of §1512. *Id.* at. 27-28.

For all those reasons, the court in *Miller* held that §1512(c)(1) limits the scope of (c)(2) and "requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding."[1] *Id.* at 28.

---

[1] The *Miller* court also explained that, even assuming *arguendo* its interpretation was incorrect,

"Accepted"

MAR 0 3 2023

Taylor James Schmaltz

Because the government did not allege that Mr. Miller took any action with respect to records or documents or "other objects," the court held that the indictment failed to state an offense against him. *Id.* at 29.

Here, just as in *Miller*, the indictment does not allege or imply that Mr. Sturgeon took any action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote. *See* Indictment, ECF No. 53. Therefore, it fails to allege a violation of §1512(c)(2).

Mr. Sturgeon respectfully urges this Court to adopt the analysis and reasoning set forth in *Miller*, and find that count one fails to state an offense against him because there is no allegation that he took any action with respect to records or documents.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500
Maria_Jacob@fd.org

---

at the very least the Court would be left with "serious ambiguity in a criminal statute" requiring lenity. *Id.*

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date: Day: Nine     Month:  Twelve     Year: 2022 CE

Angela D. Caesar, Clerk of Court
United States District Court
District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to: "Case 1:21-cr-00091-RCL Document 96 Filed 12/02/22 Page 1 of 11 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION <u>TO</u> <u>DEFENDANT'S NOTICE OF PUBLIC AUTHORITY DEFENSE</u>**, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11 Respectfully submitted, MATHEW M. GRAVES By: <u>/s/ Kaitlin Klamann</u> Assistant United States Attorney"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis, a sentient moral being accept your Presentment "Case 1:21-cr-00091-RCL Document 96 Filed 12/02/22 Page 1 of 11 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S NOTICE OF PUBLICE AUTHORITY DEFENSE**, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11 Respectfully submitted, MATHEW M. GRAVES By: <u>/s/ Kaitlin Klamann</u> Assistant United States Attorney" and return your offer herein attached to you.  I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law, or venue;

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
c/o 29628 Gamble Place NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 96 Filed 12/02/22 Page 1 of 11 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION <u>TO</u> <u>DEFENDANT'S NOTICE OF PUBLICE AUTHORITY DEFENSE</u>**, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11 Respectfully submitted, MATHEW M. GRAVES By: <u>/s/ Kaitlin Klamann</u> Assistant United States Attorney"

cc: Judge Royce C. Lamberth UNITED STATES DISTRICT COURT District of Columbia 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001

Mail Room

DEC 15 2022

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

**"Accepted"**

DEC 0 9 2022

*Taylor James Johnatakis*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

      v.

CRAIG MICHAEL BINGERT, ISAAC
STEVE STURGEON, and TAYLOR
JAMES JOHNATAKIS,

      Defendants.

Case No.: 1:21-cr-00091-RCL

## GOVERNMENT'S RESPONSE IN OPPOSITION
## TO DEFENDANTS' NOTICE OF PUBLIC AUTHORITY DEFENSE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits that this Court should preclude defendants Isaac Sturgeon and Craig Bingert from raising a public authority defense at trial. *See* Dkt. Entries 84 and 88. Defendants' assertions that they cannot be held criminally liable because their actions were authorized by former President Trump must be precluded because "following orders, without more, can[not] transform an illegal act into a legal one" and since "a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability." *United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021).

"Accepted"
DEC 0 9 2022
Taylor James Johnstalas

## ARGUMENT

**I.** **The public authority defense is unavailable because no Executive official could empower defendants, explicitly or implicitly, to commit the criminal conduct they engaged in on January 6, 2021.**

As an initial matter, former President Trump did not have the authority to permit or authorize the criminal conduct engaged in by Bingert and Sturgeon—including assaulting or impeding officers, civil disorder, disorderly conduct, and obstruction of Congress—on January 6. This is not the first time courts have heard the attempted defense that high-ranking government officials authorized criminal misconduct, commonly referred to as the "public-authority" defense. "The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied" on the "actual authority of a government official to engage him in a covert activity.'" *United States v. Fulcher* 250 F.3d 244, 253-54 (4th Cir. 2001); *see* Fed. R. Crim. P. 12.3(a)(1).[1] Here, defendants' "public-authority" defense, if raised at trial, would fail for at least two reasons: no government agent possessed actual authority to order or sanction defendants' criminal actions, and, in any event, it would have been objectively unreasonable to rely on any such order.

"The validity of [the public-authority] defense depends upon whether the government agent in fact had authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the 'public authority' [defense]." *United States v. Burrows*, 36 F.3d 875, 881-82 (9th Cir. 1994) (quoting *United States v. Baptista- Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)). The circuits that have considered the issue are unanimous

---

[1] "Rule 12.3 sets forth a notice requirement but does not limit or expand the public authority defense," which was defined by federal common law prior to that Rule's adoption. *United States v. Burrows*, 36 F.3d 875, 881 (9th Cir. 1994).

"Accepted"

DEC 0 9 2022

*Taylor James Johnston*

on that point. *See, e.g., United States v. Sariles*, 645 F.3d 315, 318-19 (5th Cir. 2011) ("the public

authority defense requires the defendant reasonably to rely on . . . actual, not apparent, authority");

*Fulcher*, 250 F.3d at 254 ("we adopt the unanimous view of our sister circuits that the defense of

public authority requires reasonable reliance upon the actual authority of a government official");

*United States v. Pitt*, 193 F.3d 751, 758 (3d Cir. 1999), *abrogated on other grounds by Honeycutt*

*v. United States*, 137 S. Ct. 1626 (2017); *United States v. Holmquist*, 36 F.3d 154, 161 nn. 6-7 (1st

Cir. 1994) (characterizing as "nonexistent" and "not a defense at all" the "'defense' of apparent

public authority" based "on a mistaken but good-faith belief that one's conduct is authorized by

the government"); *United States v. Duggan*, 743 F.2d 59, 84 (2d Cir. 1984) (declining to adopt

view that "a defendant may be exonerated on the basis of his reliance on an authority that is only

apparent and not real"); *cf. United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980) (noting in dicta

that defendants' claim that CIA officer had conspired with them to murder an ambassador "would

not have created a defense if appellants' participation in the crimes had been established," and

therefore describing evidence of the officer's employment with the CIA as likely "immaterial").

Former President Trump did not have the authority to permit or authorize, nor could he

have lawfully sanctioned the attack on the United States Capitol on January 6 or any of the other

criminal conduct perpetrated by defendants or their fellow rioters. In rejecting the idea of an

entrapment-by-estoppel defense for January 6 defendants, this Court recognized that:

> [A President] cannot, in keeping with his constitutional function and his
> responsibilities under Article II, lawfully permit actions that directly undermine the
> Constitution. Thus, a President cannot, within the confines of his constitutional
> authority, prevent the constitutionally mandated certification of the results of a
> Presidential Election or encourage others to do so on his behalf, nor can he direct
> an assault on the coequal Legislative branch of government. Were a President to
> attempt to condone such conduct, he would act *ultra vires* and thus without the force
> of his constitutional authority. . . . Put simply, even if former President Trump in
> fact [explicitly directed the rioters' actions,] his statements would not immunize

"Accepted"
DEC 0 9 2022
Taylor James Johnstone

defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*Chrestman*, 525 F. Supp. 3d at 32-33.

The D.C. Circuit came to the same conclusion in *United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990). In the wake of the Iran-Contra scandal, Lieutenant Colonel Oliver North faced criminal prosecution for conduct that North said he had been directed to engage in by the National Security Advisor to President Reagan, allegedly with the President's acquiescence or approval. North was a high-ranking government official indisputably working on behalf of the Administration; his superior, the National Security Advisor, had not only condoned but engaged in similar misconduct; and his superior reported directly to the President. North subpoenaed the former President Ronald Reagan to be a witness at his trial. North also requested that the trial court use this jury instruction at his trial: "If you find that . . . North acted in good faith on a superior's apparent authorization of his action, and that his reliance was reasonable based on the facts as he perceived them, that is a complete defense . . . ." *North*, 910 F.2d at 879.

The D.C. Circuit flatly rejected North's claim that he could raise a good-faith defense based on the apparent or implied authorization by his superiors in the Executive Branch:

> North's suggested instruction, quoted above, goes so far as to conjure up the notion of a "Nuremberg" defense, a notion from which our criminal justice system, one based on individual accountability and responsibility, has historically recoiled. In the absence of clear and comprehensible Circuit authority that we must do so, we refuse to hold that following orders, without more, can transform an illegal act into a legal one.

*Id.* at 881. The D.C. Circuit similarly concluded that whether North "was following President Reagan's orders" was "immaterial" to whether North intended to "corruptly" obstruct Congress under 18 U.S.C. § 1505. *Id.* at 884. In so doing, the Court rejected North's "stunning" idea that he

"Accepted"

DEC 0 9 2022

Taylor James Johnstater

could "escape the criminal consequences of his otherwise unlawful acts merely by asserting that his reason for committing the acts was that he was 'following orders.'" *Id.* at 883-84.[2]

Bingert's and Sturgeon's claims of public authorization are weaker than North's unsuccessful claim in virtually every respect. They have no personal connection to any of the individuals who allegedly authorized their conduct. They are not—nor ever have been— government officials, let alone government officials engaged in high-level national security work. Instead, they are members of the public who claim, without any further particularity, that they were "directed and authorized to march to the Capitol building and enter the Capitol Grounds by Donald J. Trump and his various agents and representatives." Dkt. Entries 84 and 88. Based on that, Defendants contend that they are entitled to argue that any ensuing criminal conduct, which included pushing a metal barricade against officers in an effort to enter the U.S. Capitol building

---

[2] The D.C. Circuit's decision in *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) (per curiam) is not to the contrary. In *Barker*, the court reversed the convictions of two defendants who participated in the burglary of Daniel Ellsberg's psychiatrist's office. The defendants claimed they did so at the behest of E. Howard Hunt, a long-time CIA agent who worked under the supervision of John Ehrlichman in the White House. *North*, 910 F.2d at 879. The case featured fractured separate opinions from the three-judge panel. Judge Wilkey, half of the two-judge majority, wrote that a defendant's reasonable reliance on the "apparent authority" of a government official (there, Hunt) to authorize his conduct could make out a defense. *Id.* (quoting *Barker*, 546 F.2d at 949 (opinion of Wilkey, J.). But that portion of *Barker* was not the controlling rationale, and the panel majority in *North* subsequently rejected North's request for an instruction invoking his superiors' "apparent authorization of his action." *Id.* at 881. In any event, Judge Wilkey's application of reasonable reliance in *Barker*—where the defendants, each of whom had worked with the CIA, claimed that a government official (and previous CIA supervisor) authorized what they allegedly were told was a counter-espionage operation—has no analogue here. *Barker* therefore does not undermine the straightforward principle that the President lacks the authority to empower citizens to, assault and/or impede law enforcement officers, enter restricted Capitol grounds and buildings, obstruct congressional proceedings, or engage in civil disorder. *See, e.g., North*, 910 F.2d at 891 n.24.

DEC 0 9 2022 "Accepted"

Taylor James Johnataber

to obstruct Congress's certification of the Electoral College vote, was authorized and immune from prosecution.

## II. Any related entrapment-by-estoppel defense also fails because Defendants cannot point to a government interpretation of the statutes with which they are charged on which they reasonably relied.

Because "[t]he difference between the entrapment by estoppel defense and the public authority defense is not great," in an abundance of caution, the government addresses why the entrapment-by-estoppel defense also must be rejected. *Burrows*, 36 F.3d at 882; *see also United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006) ("The elements that comprise the two defenses are quite similar."). Courts have narrowly confined the entrapment-by-estoppel defense. The Supreme Court first adopted a due process defense to entrapment by public officials in *Raley v. Ohio*, 360 U.S. 423 (1959). In *Raley*, the Supreme Court set aside the convictions of three individuals who refused to answer the questions of the Ohio Un-American Activities Commission, in reliance on inaccurate representations by the Commission "that they had a right to rely on the privilege against self-incrimination" under the Ohio Constitution. 360 U.S. at 425. The Court held that the convictions violated the Fourteenth Amendment's Due Process Clause because they involved "the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him." *Id.* at 438. The Court emphasized that the Commission's advice constituted "active misleading" as to the contours of that "vague and undefined" area of law. *Id.*

A few years later, the Supreme Court revisited the subject in *Cox v. Louisiana*, 379 U.S. 559 (1965). *Cox* reversed the conviction of a protester who had led a group of 2,000 people in a civil rights march across the street from a courthouse and was later prosecuted for violating an anti-picketing statute prohibiting demonstrations "near" a courthouse. 379 U.S. at 560, 564-65.

6

"Accepted"
DEC 0 9 2022
Taylor James Johnatobo

The statute did not define that term. *Id.* at 560. The protesters had been "affirmatively told" by "the highest police officials of the city, in the presence of the Sheriff and Mayor," that protesting across the street from the courthouse was lawful under that statute. *Id.* at 571. The Court determined that the statute's ambiguous term "near" necessarily "foresees a degree of on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing it," and thus found that the demonstrators "would justifiably tend to rely on [the police's] administrative interpretation of how 'near' the courthouse a particular demonstration might take place." *Id.* at 568-69. The Court concluded that the local officials' interpretation of "near" was a "limited administrative regulation of traffic" upon which the protesters reasonably relied. *Id.* at 569. But it also made clear that a defendant cannot reasonably rely on a law enforcement official's attempt to provide "a waiver of law," which the Court described as "beyond the power of the police." *Id.*

Distilling these cases, recent case law has limited the entrapment-by-estoppel defense to the narrow circumstances in which a defendant reasonably relies on a government agent's interpretation of a statute that, if accurate, would render the defendant's conduct non-criminal. "To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Cox*, 906 F.3d at 1191; *see also United States v. Neville*, 82 F.3d 750, 761 (7th Cir. 1996) ("[W]e have required that [1] the government official 'actively mislead the defendant; and that the defendant's reliance be [2] actual and [3] reasonable in light of the identity of the

7

"Accepted"
DEC 0 9 2022
Taylor James Johnstabbs

agent, the point of law represented, and the substance of the misrepresentation."); *Burrows*, 36 F.3d 875 at 882 ("This defense applies when [1] a government official [2] tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime [3] in reasonable reliance on the official's representation." (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)). Last year, another judge of this Court adopted the Tenth Circuit's four-part test from *Cox* in preliminarily rejecting a Capitol riot defendant's claim to the entrapment-by-estoppel defense. *See Chrestman*, 525 F. Supp. 3d at 33.

Here, defendants cannot satisfy any part of the entrapment-by-estoppel test. Defendants were not actively misled. Neither in his speech on January 6, 2021, nor beforehand, did former President Trump or any other government actor purport to interpret the scope of the statutes Bingert and Sturgeon are charged with violating. Said another way, whether or not defendants "believed [they were] directed and authorized to engage in the conduct set forth in the indictment," there is no evidence that former President Trump "affirmatively assured the defendant[s] that certain conduct [was] legal." *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994); *United States v. Troncoso*, 23 F.3d 612, 615 (1st Cir. 1994) (defense fails absent advice from official that conduct "was actually legal").

As Chief Judge Howell observed last year in *Chrestman*, an entrapment-by-estoppel defense by a January 6 rioter:

> would not be premised, as it was in *Raley* [and] *Cox*, . . . on a defendant's confusion about the state of the law and a government official's clarifying, if inaccurate, representations. It would instead rely on the premise that a defendant, though aware that his intended conduct was illegal, acted under the belief President Trump had waived the entire corpus of criminal law as it applied to the mob.

*Chrestman*, 525 F. Supp. 3d at 32; *see also United States v. Smith*, 940 F.2d 710, 715 (1st Cir. 1991) (rejecting entrapment-by-estoppel defense because federal agent allegedly encouraged

"Accepted"

DEC 0 9 2022

Taylor James Johnston

defendant to keep firearms to assist with undercover operation, but never was alleged "to have represented that keeping the guns was, in fact, *legal*"); *North*, 910 F.2d 843 (noting that "North does not even claim that he relied on *any* 'conclusion or statement of *law*'"). Absent any government statement upon which the defendants could have arguably relied, the analysis can stop here.

### III. Defendants' purported beliefs that Trump's statements, or the statutes Defendants are charged with violating, authorized their criminal conduct is objectively unreasonable.

For both the public authority defense and the entrapment-by-estoppel defense, a defendant must also show that his reliance on governmental authority was reasonable as well as sincere. *See, e.g., Chrestman,* 525 F. Supp. 3d at 33 (adopting Cox's four-part test for entrapment-by-estoppel defense); *Burrows,* 36 F.3d at 882 ("a defendant makes out a defense of public authority only when he has shown that his reliance on governmental authority was reasonable as well as sincere"); *Fulcher,* 250 F.3d at 254; *Sariles,* 645 F.3d at 318-19. This reasonableness requirement is necessary to ensure the "uniform enforcement of law;" otherwise, anyone could interpret a public official's actions or statements as authorizing them to engage in criminal conduct. *Id.* (quoting *United States v. Lansing,* 424 F.2d 225 (9th Cir. 1970)). Any claim that defendants sincerely believed they had been authorized as an agent of the Executive Branch to oppose by force the authority of the United States, or forcibly stop Congress's certification of the vote by breaking into the Capitol, would be objectively unreasonable. Similarly, even if former President Trump's or his representatives' statements could be construed as an unexpressed interpretation of the criminal

"Accepted"
DEC 0 9 2022
Taylor James Johnston

laws applicable to defendants' conduct, and even if defendants relied on that interpretation, defendants cannot show that such reliance was reasonable.

"[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (internal quotation marks omitted); *United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting "sincerely desirous" standard). Bingert and Sturgeon, along with a mob of other rioters, took a number of unlawful steps, including picking up and pushing a metal barricade against officer in an effort to enter the U.S. Capitol and obstruct Congress's certification of the Electoral College vote.

Defendants could not have reasonably relied on statements by former President Trump or his representatives—or, indeed, anyone—to conclude that that conduct was lawful. Thus, regardless of former President Trump's and his representatives' intent or the foreseeability of defendants' and other rioters' reactions to their statements, when defendants worked together to push a metal barricade against the police protecting the U.S. Capitol, any reasonable person in his shoes would "[know] he was breaking the law." *Corso*, 20 F.3d at 529. Certainly, one "sincerely desirous of obeying the law" could not have accepted at face value any purported assurance that such conduct was lawful. *Lynch*, 903 F.3d at 1077-78. Defendants therefore cannot rely on these defenses. For these reasons, the Court should reject defendants' attempts to deflect responsibility, and preclude defendants from raising the public authority or entrapment-by-estoppel defense.[3]

---

[3] To the extent defendants may argue that statements from the former President are relevant to his intent, any such evidence should be limited under Federal Rule of Evidence 403 to those statements, and not include any witnesses (other than defendants themselves) to testify about those statements.

"Accepted"

DEC 0 9 2022

*Taylor James Johnstolis*

## CONCLUSION

For the reasons discussed above, this Court should preclude Bingert and Sturgeon from raising

a public authority defense.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
IL Bar No. 6316768
(202) 252-6778
Kaitlin.klamann@usdoj.gov

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date: Day: Nine     Month: Twelve     Year: 2022 CE

Angela D. Caesar, Clerk of Court
United States District Court
District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to: "Case 1:21-cr-00091-RCL Document 91 Filed 11/30/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12 Respectfully submitted, MATHEW M. GRAVES By: _/s/ Kaitlin Klamann_ Assistant United States Attorney"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis, a sentient moral being accept your Presentment "Case 1:21-cr-00091-RCL Document 91 Filed 11/30/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12 Respectfully submitted, MATHEW M. GRAVES By: _/s/ Kaitlin Klamann_ Assistant United States Attorney" and return your offer herein attached to you.  I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law, or venue;

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
c/o 29628 Gamble Place NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 91 Filed 11/30/22 Page 1 of 12 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No.: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER**, Page 2 of 12, Page 3 of 12, Page 4 of 12, Page 5 of 12, Page 6 of 12, Page 7 of 12, Page 8 of 12, Page 9 of 12, Page 10 of 12, Page 11 of 12, Page 12 of 12 Respectfully submitted, MATHEW M. GRAVES By: _/s/ Kaitlin Klamann_ Assistant United States Attorney"

cc: Judge Royce C. Lamberth UNITED STATES DISTRICT COURT District of Columbia 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530 Mail Room
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001

RECEIVED

DEC 15 2022

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

"Accepted"
DEC 0 9 2022
*Taylor James Johnatakis*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

    v.

CRAIG MICHAEL BINGERT, ISAAC
STEVE STURGEON, and TAYLOR
JAMES JOHNATAKIS,

      Defendants.

Case No.: 1:21-cr-00091-RCL

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Response in Opposition to Defendant Isaac Sturgeon's Motion to Sever (Dkt. Entry 79), which was joined by Defendant Craig Bingert (Dkt. Entry 89). Defendants contend that the charges against them were misjoined with those against their codefendants in violation of Federal Rule of Criminal Procedure 8(b) and ask the Court to sever the cases for trial under Rule 14. However, as described in greater detail below, the defendants were properly joined in this case. Additionally, a Rule 14 severance is inappropriate here when defendants have failed to show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence. Therefore, the Court should deny defendants' motions.

### FACTUAL BACKGROUND

The U.S. Capitol is secured 24 hours a day by the United States Capitol Police ("UCSP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

1

DEC 0 9 2022 "Accepted"

Taylor James Johnatakis

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020 ("the Certification"). The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m.

DEC 0 9 2022   "Accepted"
Taylor James Johnatakis

Defendants Isaac Sturgeon and Craig Bingert are two of the individuals who unlawfully entered the grounds of the U.S. Capitol and who have been charged with various crimes relating to the attack on the Capitol. *See* Second Superseding Indictment, Dkt. Entry 53.

As detailed in the Government's Memorandum in Opposition to Defendants' Motions to Dismiss (Dkt. Entry 60), at approximately 2:46 p.m. on January 6, 2021, defendants Isaac Sturgeon, Taylor Johnatakis, and Craig Michael Bingert were at the front of a mob on the west terrace of the U.S. Capitol grounds facing a line of D.C. Metropolitan Police Department ("MPD") officers. The MPD officers were wearing body worn camera ("BWC"), and the defendants were in clear view of several officers' BWC.  Below is a still image of BWC footage depicting the defendants who were standing side by side. Defendant Sturgeon is the individual within the red circle. Defendant Bingert is enclosed in the blue circle and defendant Johnatakis is in the green circle.



As depicted above, between the officers and the defendants were metal police barricades. Johnatakis waved members of the mob forward toward the barricaded line of MPD officers and, using the bullhorn attached to his backpack, yelled at the surrounding crowd, "push them out of

"Accepted"

DEC 0 9 2022

Taylor James Johnatakis

here, we're just using our bodies!" At approximately 2:46 p.m., Johnatakis used his bullhorn to direct the crowd to breach the metal barriers. Specifically, Johnatakis stated, "One foot! 1, 2, 3 go!" On his count, Sturgeon and Bingert, who were still standing next to Johnatakis, grasped the metal barricade and began to push it against the line of MPD officers. Below is a still image from BWC depicting all three codefendants grasping the barricade and pushing it against MPD officers:



After a few seconds of concerted pushing, the defendants raised the barricade high, presumably in an effort to move underneath it. Below is a still image from BWC depicting Sturgeon attempting to duck under the metal barricade after the defendants worked together to raise it:

DEC 0 9 2022 "Accepted"
Taylor James Johnstables



Similarly, below is a still image from BWC footage showing Bingert also ducking below the metal barricade as officers attempted to bring it back down to control the crowd:



For several seconds, a fight ensued between the defendants and other members of the mob, and MPD officers. Ultimately, MPD officers were able to successfully stop the defendants and

"Accepted"
DEC 0 9 2022
Taylor James Johnatakis

other rioters from breaking the line of officers by utilizing both physical force and chemical irritants.

After the assault, Bingert remained in the area for several more minutes. He turned around and faced the crowd while waving a large American flag as the crowd taunted the police line and chanted slogans such as "fuck the police." Sturgeon also remained in the area. Several minutes after the assault, BWC captured Sturgeon approaching law enforcement officers and handing them a large object.

As a result of their actions on January 6, 2021, all three defendants were charged in the Second Superseding Indictment with each of the following:

- Count One: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2;

- Count Two: Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1);

- Count Three: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

- Count Four: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

- Count Five: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

- Count Six: Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4);

- Count Seven: Obstructing, or Impeding Passage Through or Within the Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E); and

- Count Eight: Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

## ARGUMENT

The cases against defendants Bingert, Sturgeon, and Johnatakis are properly joined. In cases with multiple defendants and multiple offenses, the "weight of authority in this circuit and

DEC 0 9 2022 "Accepted"

*Taylor James Johnatakes*

elsewhere regards Rule 8(b) as providing the sole standard for determining the permissibility of joinder of offenses." *United States v. Wilson*, 26 F.3d 142, 153 n. 4 (D.C. Cir. 1994) (citations omitted); *see also United States v. Brown*, 16 F.3d 423, 427 (D.C. Cir. 1994); *United States v. Perry*, 731 F.2d 985, 989 (D.C. Cir. 1984); *United States v. (Melvin) Jackson*, 562 F.2d 789, 793-94 (D.C. Cir. 1977). Rule 8(b) provides:

> JOINDER OF DEFENDANTS. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or *in the same series of acts* or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. Crim. P. 8(b) (emphasis added). "Rule 8 not only may shield a party from prejudicial joinder but also serves to protect a variety of other interests served by joint trials including the interests in 'conserv[ing] state funds, diminish[ing] inconvenience to witnesses and public authorities, and avoid[ing] delays in bringing those accused of crime to trial.'" *Brown*, 16 F.3d at 428 (internal citations and quotations omitted). "There is a preference in the federal system for joint trials." *United States v. Bikundi*, 926 F.3d 761, 780 (D.C. Cir. 2019). This Circuit construes Rule 8(b) broadly in favor of joinder. *See United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991); *United States v. Jackson*, 562 F.2d 789, 796-97 (D.C. Cir. 1977) (Rule 8 is "interpreted broadly in favor of initial joinder"). Thus, it is "difficult to prevail on a claim that there has been a misjoinder under Rule 8(b)." *Nicely*, 922 F.2d at 853.

The propriety of joinder "is determined as a legal matter by evaluating only the 'indictment [and] any *other pretrial evidence offered by the Government.*'" *United States v. Carson*, 455 F.3d 336, 372 (D.C. Cir. 2006) (emphasis added; internal citations omitted). Joinder under Rule 8(b) "is appropriate if there is a 'logical relationship between the acts or transactions' so that a joint

DEC 0 9 2022

*Taylor James Johnatakis*

"Accepted"

trial produces a 'benefit to the courts.'" *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. Cir. 1996) (quoting *United States v. Perry*, 731 F.2d 985, 990 (D.C. Cir. 1984)).

Defendants who are properly joined under Rule 8 "may seek severance under Rule 14, which provides that '[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.'" *United States v. Wilson*, 605 F.3d 985, 1015 (D.C. Cir. 2010) (quoting Fed. R. Crim. P. 14(a)). Rule 14 "does not require severance even if prejudice is shown," and district courts "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). Indeed, district courts retain "significant flexibility to determine how to remedy a potential risk of prejudice, including ordering lesser forms of relief such as limiting jury instructions." *Bikundi*, 926 F.3d at 780 (citing *United States v. Moore*, 651 F.3d 30, 95 (D.C. Cir. 2011)); *see United States v. Butler*, 822 F.2d 1191, 1194 (D.C. Cir. 1987) (acknowledging trial judges are given great latitude to balance interests, including to preserve judicial and prosecutorial resources, and denying defendant's motion to sever).

Once multiple defendants are properly joined in the same indictment under Rule 8(b), "[d]istrict courts should grant severance" under Rule 14 "sparingly because of the 'strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors.'" *United States v. Celis*, 608 F.3d 818, 844 (D.C. Cir. 2010) (quoting *United States v. Mardian*, 546 F.2d 973, 979 (D.C. Cir. 1976) (*en banc*)). The relevant portion of Rule 14 reads as follows:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court

8

DEC 0 9 2022 "Accepted"
Taylor James Johnatakis

may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Although "the standard of 'appears to prejudice a defendant' set out in Rule 14(a) for consideration of severance, does not, on its face, provide an onerous test, the discretion afforded to district courts must be exercised with appreciation of the policy reasons favoring joinder." *United States v. Bikundi*, 14-cr-30 (BAH), 2016 WL 912169, at *42 (D.D.C. Mar. 7, 2016). In fact, the D.C. Circuit has instructed that for severance to be proper "[t]here must be a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Bostick*, 791 F.3d 127, 152-53 (D.C. Cir. 2015) (citation and punctuation omitted); *see also United States v. Glover*, 681 F.3d 411, 417 (D.C. Cir. 2012) (affirming district court's denial of defense motion to sever trial citing same standard). Accordingly, severance is not required simply because a defendant might have a better chance of acquittal if tried separately. *See United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991). Salient factors the Court should consider, and which militate against severance, include whether separate trials would involve (1) the presentation of the same evidence; (2) testimony from the same witnesses; and (3) the same illegal conduct. *See United States v. Manner*, 887 F.2d 317 (D.C. Cir. 1989).

### I.  Joinder is appropriate and severance is unnecessary because the defendants participated in the same "series of acts" and the evidence against them is largely the same.

The defendants were properly joined because Sturgeon, Johnatakis, and Bingert not only all participated in the attack on the U.S. Capitol but they also participated in the same "series of acts" when they worked together to push the metal police barricade against officers in an effort to breach the police line at the U.S. Capitol. Contrary to Sturgeon's claims, the evidence shows that the three defendants acted in unison: they stood side by side and followed the directions of

DEC 0 9 2022 "Accepted"
Taylor James Johnatakis

Johnatakis, each grabbing the metal barricade at approximately the same time and then pushing against officers after Johnatakis counted down from three. The government thus anticipates that the majority of witnesses and evidence that it will present will be largely the same for all defendants.[1] The "'strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors,'" *Celis*, 608 F.3d at 844, thus apply to this case.

That the defendants are not charged with conspiracy is of no importance. *See United States v. Gbemisola*, 225 F.3d 753, 760 (D.C. Cir. 2000); *United States v. Rittweger*, 524 F.3d 171, 177-78 (2d Cir. 2008). What matters is that the defendants' actions during their attack on officers within a narrow, enclosed area and during a circumscribed time period amounted to their "participat[ion] in the … same series of actions …, constituting an offense or offenses." Rule 8(b). The overlap in the charged conduct triggers "the presumption and common practice [that] favor trying together defendants who are charged with crimes arising out of a common core of facts." *United States v. De La Paz-Rentas*, 613 F.3d 18, 23 (1st Cir. 2010). Additionally, each defendant is charged with furthering a civil disorder, which "like a conspiracy, requires multiple people." *United States v. Patrick McCaughey et al.*, No. 1:21-CR-00040 (TNM), 2022 WL 1604655, at *2 (D.D.C. May 20, 2022). Thus, defendants worked together, and it is appropriate for them to be tried together.

Sturgeon cites *United States v. Jackson* as support for his position that the parties are improperly joined, but that case is inapposite. 562 F.2d 789 (D.C. Cir. 1977). As opposed to the facts in *Jackson*, there is a logical link between the defendants' conduct here: the defendants worked together to commit the same offenses – i.e. pushing a metal police barricade against police officers in joint effort to obstruct, assault, or otherwise impede those officers with the goal of

---

[1] However, at this stage of the litigation, the government's investigation is still ongoing, and additional evidence may be developed against one or more of the defendants.

"Accepted"

DEC 0 9 2022

Taylor James Johnatakis

interrupting the certification of the election results. *See e.g.*, *McCaughey*, 2022 WL 1604655, at

*2 (denying motion to sever in a case charging defendants with crimes that occurred on January

6, 2021 and finding that a "clear logical relationship" existed between the defendants' acts when

"defendants allegedly battled police officers in the same location and at the same time.").

Absurdly, defendant's motion acknowledges that the defendants committed the same offense but

claims that is not enough for the defendants to be joined. Dkt. Entry 79 at 5. However, the explicit

language of the Rule undermines that argument.

Defendant's motion also confuses permissible joinder with mandatory joinder, arguing that

if Sturgeon was properly joined "then hundreds of defendants in that area within an ear shot of Mr.

Johnatakis should have also been included in this indictment." *Id.* But that is not the standard. As

the *Jackson* case notes, "Rule 8 is permissive, not mandatory." *Id.* at 797. Furthermore, the

government's argument that joinder is proper here is not just premised on the simple fact that each

defendant participated generally in the riot at the U.S. Capitol. But also on the fact that these three

defendants worked together at the same time, in the same place, and using the same implement –

i.e. a medical barricade – to interfere with and assault officers in an effort to disrupt the

Certification.

Similarly, Sturgeon argues the government has "failed to establish why it needs to join

these defendants to prove its case against each co-defendant." Again, defendant misstates the

standard under Rule 8(b). The government does not have to show that it is *has* to try defendants

together to prove its case. It only needs to show there is a benefit to the courts by trying defendants

together. Here, the clear benefit is the substantial overlapping evidence, namely: (1) the footage of

the defendants' crimes; (2) testimony from victim officers; and (3) testimony from common

"overview" witnesses including witnesses from the U.S. Capitol Police and U.S. Secret Service.

"Accepted"
DEC 0 9 2022
Taylor James Johnatakes

Defendants also utterly fail to identify any potential prejudice that they will suffer if tried together, much less a "serious risk" that a specific trial right would be compromised by a joint trial or that the jury would be confused by a joint trial. Given the strong interest in judicial efficiency presented by a joint trial and the lack of showing of any prejudice, the three defendants should be tried together.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that defendant Sturgeon's motion to sever be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
IL Bar No. 6316768
(202) 252-6778
Kaitlin.klamann@usdoj.gov

COPY

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-three        Month: Two        Year: 2023 CE

Judge G. Michael Harvey
U.S. District Court, District of Columbia (Washington, DC)
333 Constitution Avenue NW
Washington, D.C. 20001

In reply to : "Case 3:21-mj-05036-DWC Document 7 Filed 02/11/21 Page 1 of 1 UNITED STATES DISTRICT COURT Case: 1:21-cr-00091 Assigned to: Lamberth, Royc C. Assign Date: 02/05/2021 Description: Indictment (B) ARREST WARRANT G. Michael Harvey U.S. Magistrate Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 3:21-mj-05036-DWC Document 3 Filed 02/11/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. TAYLOR JAMES JOHNATAKIS Defendant**, Page 2 of 6, Page 3 of 6,  Page 4 of 5, Page 5 of 5 A TRUE BILL: FOREPERSON., Page 6 of 6 **ARREST WARRANT** G. Michael Harvey U.S. Magistrate Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 3:21-mj-05036-DWC Document 3 Filed 02/11/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. TAYLOR JAMES JOHNATAKIS Defendant**, Page 2 of 6, Page 3 of 6, Page 4 of 5, Page 5 of 5 A TRUE BILL: FOREPERSON., Page 6 of 6 **ARREST WARRANT** G. Michael Harvey U.S. Magistrate Judge"

cc: Judge David W. Christel United States Courthouse 1717 Pacific Avenue Room 3100 Tacoma WA 983402
cc: William Kennelly Dreher US ATTORNY'S OFFICE (SEA) 700 STEWART ST STE 5220 SEATTLE WA 98101
cc: WILLIAM M MCCOLL CLERK OF COURT, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON 1717 Pacific Ave., Suite 3100 Tacoma, WA 98402
cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Angela D. Caesar Clerk of Court United States District Court District of Columbia 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

RECEIVED
FEB 28 2023
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia
Mail Room

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: One        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



In reply to : "Case 1:21-cr-00091-RCL Document 6 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** UNDER SEAL CASE: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ORDER** Date: Febuary 5 2021 G. Michael Harvey UNITED STATES MAGISTRATE JUDGE"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 6 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** UNDER SEAL CASE: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ORDER** Date: Febuary 5 2021 G. Michael Harvey UNITED STATES MAGISTRATE JUDGE" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 6 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** UNDER SEAL CASE: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ORDER** Date: Febuary 5 2021 G. Michael Harvey UNITED STATES MAGISTRATE JUDGE"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Judge G. Michael Harvey U.S. District Court, District of Columbia (Washington, DC) 333 Constitution Avenue NW Washington, D.C. 20001

**"Accepted"**

MAR 0 1 2023

*Taylor James Johnatakis*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | |
| | : | **UNDER SEAL** |
| CRAIG MICHAEL BINGERT, | : | |
| ISAAC STEVE STURGEON, and | : | Case: 1:21-cr-00091 |
| TAYLOR JAMES JOHNATAKIS, | : | Assigned To : Lamberth, Royce C. |
| | : | Assign. Date : 02/05/2021 |
| Defendants. | : | Description: INDICTMENT (B) |

### ORDER

This matter having come before the Court pursuant to the application of the United States to seal criminal complaint, the Court finds that, because of such reasonable grounds to believe the disclosure will result in flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and serious jeopardy to the investigation, the United States has established that a compelling governmental interest exists to justify the requested sealing.

IT IS THEREFORE ORDERED that the application is hereby GRANTED, and that the affidavit in support of Indictment, Arrest Warrants for Isaac Steve Sturgeon and Taylor James Johnatakis and other related materials, the instant application to seal, and this Order are sealed until the arrest warrant is executed.

IT IS FURTHER ORDERED that the Clerk's office shall delay any entry on the public docket of the arrest warrants until they are executed.

Digitally signed by G. Michael Harvey
Date: 2021.02.05 16:13:03 -05'00'

UNITED STATES MAGISTRATE JUDGE

Date: February 5, 2021

cc:   ANGELA N. BUCKNER
      GAURI GOPAL
      Assistant United States Attorneys

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-eight        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : " Case 1:21-cr-00091-RCL Document 12 Filed 2/17/21 Page 1 of 3 UNITED STATES DISTRICT COURT for the District of Columbia Case No. C21-91-03 **ORDER SETTING CONDITIONS OF RELEASE**,  Page 2 of 3, Page 3 of 3 Magistrate Judge Robin Meriweather "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 12 Filed 2/17/21 Page 1 of 3 UNITED STATES DISTRICT COURT for the District of Columbia Case No. C21-91-03 **ORDER SETTING CONDITIONS OF RELEASE,** Page 2 of 3, Page 3 of 3 Magistrate Judge Robin Meriweather" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 12 Filed 2/17/21 Page 1 of 3 UNITED STATES DISTRICT COURT for the District of Columbia Case No. C21-91-03 **ORDER SETTING CONDITIONS OF RELEASE**, Page 2 of 3, Page 3 of 3 Magistrate Judge Robin Meriweather"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Judge Robin M. Meriweather U.S. District Court, District of Columbia (Washington, DC) 333 Constitution Avenue NW Washington, D.C. 20001

AO 199A (Rev. 06/19) Order Setting Conditions of Release

Page 1 of **3** Pages

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

"Accepted"

FEB 2 8 2023

*Taylor James Johnatakis*

| United States of America | ) | |
| v. | ) | |
| | ) | Case No. C21-91-03 |
| Taylor James Johnatakis | ) | |
| *Defendant* | ) | |

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1) The defendant must not violate federal, state, or local law while on release.

(2) The defendant must cooperate in the collection of a DNA sample if it is authorized by 34 U.S.C. § 40702.

(3) The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4) The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at: U.S. District Court for the District of Columbia, 333 Constitution Ave NW, WDC

*Place*

Judge Royce C. Lamberth

on 3/12/2021 10:00 am

*Date and Time*

**This hearing will be virtual; counsel to provide details.**

If blank, defendant will be notified of next appearance.

(5) The defendant must sign an Appearance Bond, if ordered.

AO 199B (Rev. 12/11) Additional Conditions of Release

Page **2** of **3** Pages

## ADDITIONAL CONDITIONS OF RELEASE

**Accepted** FEB 2 8 2023
*Taylor James Johnstoton*

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( ) (6) The defendant is placed in the custody of:
Person or organization _____
Address *(only if above is an organization)* _____
City and state _____
Tel. No. _____

who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: _____
Custodian _____ Date _____

( **×** ) (7) The defendant must:

( **×** ) (a) submit to supervision by and report for supervision to the __Pretrial Services weekly via telephone__
telephone number __(202) 442-1000__ , no later than _____ .

( ) (b) continue or actively seek employment.

( ) (c) continue or start an education program.

( ) (d) surrender any passport to: __Pretrial Services Agency__

( ) (e) not obtain a passport or other international travel document.

( **×** ) (f) abide by the following restrictions on personal association, residence, or travel: __Do not travel outside the Western__ __District of Washington without notice to PSA. Court approval needed for travel outside of the continental U.S.__

( ) (g) avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: _____

( ) (h) get medical or psychiatric treatment: _____

( ) (i) return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purposes: _____

( ) (j) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.

( ) (k) not possess a firearm, destructive device, or other weapon.

( ) (l) not use alcohol ( ) at all ( ) excessively.

( ) (m) not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

( ) (n) submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.

( ) (o) participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.

( ) (p) participate in one of the following location restriction programs and comply with its requirements as directed:
( ) (i) **Curfew.** You are restricted to your residence every day ( ) from _____ to _____ , or ( ) as directed by the pretrial services office or supervising officer; or
( ) (ii) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or
( ) (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court.

( ) (q) submit to location monitoring as directed by the pretrial services office or supervising officer and comply with all of the program requirements and instructions provided.
( ) You must pay all or part of the cost of the program based on your ability to pay as determined by the pretrial services office or supervising officer.

( ) (r) report as soon as possible, to the pretrial services office or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

( **×** ) (s) __Stay away from Washington, D.C. except for Court business or meetings with attorney or PSA;__ __Verify address with PSA; Do not possess any firearms.__

Case 1:21-cr-00091-RCL Document 127-1 Filed 04/19/23 Page 465 of 865
Case 1:21-cr-00091-RCL Document 127-1 Filed 02/17/21 Page 3 of 3

Page 3 of 3 Pages

AO 199C (Rev. 09/08) Advice of Penalties

## ADVICE OF PENALTIES AND SANCTIONS

*"Accepted"* FEB 28 2023

*Taylor James Johnatakis*

TO THE DEFENDANT:

### YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

Acknowledged on the record on 2/17/2021.

_____
*Defendant's Signature*

_____
*City and State*

### Directions to the United States Marshal

(xx ) The defendant is ORDERED released after processing.

( ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: ____2/17/2021____

*Nunc pro tunc*

_____
*Judicial Officer's Signature*

Magistrate Judge Robin Meriweather

_____
*Printed name and title*

DISTRIBUTION:   COURT   DEFENDANT   PRETRIAL SERVICE   U.S. ATTORNEY   U.S. MARSHAL

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-seven          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 33 Filed 05/06/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 ORDER** Date: 5/6/21 HONORABLE ROYCE C. LAMBERTH United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 33 Filed 05/06/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 ORDER** Date: 5/6/21 HONORABLE ROYCE C. LAMBERTH United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 33 Filed 05/06/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 ORDER** Date: 5/6/21 HONORABLE ROYCE C. LAMBERTH United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

"Accepted"

FEB 27 2023

*Taylor James Johnatakis*

UNITED STATES OF AMERICA  :
                          :
        v.                :     Case No. 21-cr-91
                          :
CRAIG MICHAEL BINGERT,    :
ISAAC STEVE STURGEON, and :
TAYLOR JAMES JOHNATAKIS,  :
                          :
        Defendants.       :

**ORDER**

Upon consideration of the United States' motion to disclose items protected by Federal

Rule of Criminal Procedure 6(e) and sealed materials, it is hereby

ORDERED, that the motion is GRANTED, and it is further

ORDERED, that the United States may provide in discovery materials protected by

Federal Rule of Criminal Procedure 6(e), and it is further

ORDERED, that the United States may provide in discovery sealed materials, pursuant to

the previously entered protective order governing discovery.

Date:  5/6/24

_____
HONORABLE ROYCE C. LAMBERTH
United States District Judge



# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: One          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 98 Filed 12/06/22 Page 1 of 10 **IN THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN <u>OPPOSITION TO DEFENDANTS' MOTION TO COMPEL</u>,** Page 2 of 10, Page 3 of 10, Page 4 of 10, Page 5 of 10, Page 6 of 10, Page 7 of 10, Page 8 of 10, Page 9 of 10, Page 10 of 10 Respectfully submitted Matthew M. Graves by Kaitlin Klamann"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 98 Filed 12/06/22 Page 1 of 10 **IN THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN <u>OPPOSITION TO DEFENDANTS' MOTION TO COMPEL</u>,** Page 2 of 10, Page 3 of 10, Page 4 of 10, Page 5 of 10, Page 6 of 10, Page 7 of 10, Page 8 of 10, Page 9 of 10, Page 10 of 10 Respectfully submitted Matthew M. Graves by Kaitlin Klamann" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Attachment: "Case 1:21-cr-00091-RCL Document 98 Filed 12/06/22 Page 1 of 10 **IN THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No: 1:21-cr-00091-RCL GOVERNMENT'S RESPONSE IN <u>OPPOSITION TO DEFENDANTS' MOTION TO COMPEL</u>,** Page 2 of 10, Page 3 of 10, Page 4 of 10, Page 5 of 10, Page 6 of 10, Page 7 of 10, Page 8 of 10, Page 9 of 10, Page 10 of 10 Respectfully submitted Matthew M. Graves by Kaitlin Klamann"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104



"Accepted"

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MAR 0 1 2023

UNITED STATES OF AMERICA,

**Case No.: 1:21-cr-00091-RCL**

v.

**CRAIG MICHAEL BINGERT, ISAAC
STEVE STURGEON, and TAYLOR
JAMES JOHNATAKIS,**

                    **Defendants.**

### GOVERNMENT'S RESPONSE IN
### OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Response in Opposition to defendant Sturgeon's Motion to Compel (Dkt. Entry 83), which was joined by defendant Bingert (Dkt. Entry 86). Specifically, defendants move to compel production of three categories of documents, including: (1) information pertaining to text messages sent by members of the U.S. Secret Service before and after January 6, 2021; (2) U.S. Secret Service and U.S. Capitol Police communications pertaining to restricted areas in and around the U.S. Capitol Building on January 6, 2021; and (3) communications between former President Trump's staff regarding President Trump's efforts to stop the riot. As set out below, the government agrees to review materials in its possession for items responsive to certain of defendants' requests. However, defendants' motion to compel communications between former President Trump's staff should be denied for the same reasons defendants should be barred from asserting a public authority defense. Additionally, certain of defendants' requests should be barred as irrelevant and/or as seeking items not within the possession of the prosecution team, as discussed below.

1

## BACKGROUND

The breadth of the government's productions of materials in this case (and all cases arising from the January 6 attack on the Capitol) has been unprecedented. They have far exceeded what is required by rule and caselaw. And they will continue to be.

The government has provided voluminous discovery in this case and has attempted to be as helpful as possible in working with the defense to help them understand and utilize these materials. Since October 2021, all Capitol Siege defense counsel have been able to request a license from the Federal Public Defender for the District of Columbia ("FPD") to access the defense evidence.com video repository. Authorized users of this database can both download and share video files. For context, the files provided amount to over nine terabytes of information. The government has produced over 30,000 files consisting of body-worn and hand-held camera footage from entities including five law enforcement agencies and surveillance-camera footage from three law enforcement agencies to an evidence.com video repository that is managed and administered by FPD and the Defender Service's National Litigation Support Team. The government provided detailed logs describing the custodian, location, and time periods for each video file in evidence.com. In addition, the government has provided hundreds of hours of work product consisting of analytical and mapping information for the sole purpose of assisting defense counsel in identifying video files they may deem relevant.

Since January 2022, all Capitol Siege defense counsel have been able to request a license from FPD to view materials in FPD's Relativity workspace. As of November 18, 2022, over 3.86 million files (over 6.95 terabytes of information) have been provided to the defense Relativity workspace. The materials in these files include (but are not limited to):

- U.S. House of Representatives and U.S. Senate Recording Studio footage;

"Accepted"

MAR 01 2023

Taylor James Johnston

- Reports (including video and audio exhibits) arising from investigations into allegations of officer misconduct on or about January 6, 2021;

- Information pertaining to James "Ray" Epps (Epps has been the subject of widely-publicized claims that "paint him as a secret federal asset in charge of a 'breach team' responsible for setting off the riot at the Capitol." *See* Alan Feuer, A Trump Backer's Downfall as the Target of a Jan. 6 Conspiracy Theory, N.Y. TIMES, July 13, 2022.);

- Video recorded by the D.C. Metropolitan Police Department's Electronic Surveillance Unit;

- The results of searches of 721 digital devices and 398 Stored Communications Act ("SCA") accounts;

- 331 digitally recorded interviews of investigation subjects;

- Radio communications from multiple law enforcement agencies including USCP (including a redacted Transcript of Radio Communications from the Dignitary Protection Detail Channel), Metropolitan Police Department, Virginia State Police, and the U.S. Park Police);

- 2,590 FBI FD-302s and related attachments (FD-302s generally consist of memoranda of interviews and other investigative steps);

- 111,061 (redacted or anonymous) tips;

- Search warrant documents related to the government's collection of comprehensive data from the Capitol's cell tower infrastructure and the collection of geolocation information for the Capitol and restricted perimeter;

- Medical information for officers injured during the siege;

- Case-specific information obtained in connection with the investigation of numerous subjects (charged and uncharged);

- Files provided to the government by multiple law enforcement agencies in response to requests for any potentially discoverable information, including information about individuals who have not been charged;

- Documents the government will use to prove interstate commerce was affected; and

"Accepted"

MAR 01 2023

Taylor James Johnston

- Documents related to the whereabouts of Vice President Pence on January 6, 2021.

All Relativity productions have been accompanied by cover letters describing the contents of the production and indexes that provide further detail. Defense counsel may conduct limitless searches in the FPD Relativity database. To assist in this regard, the government has provided subjective work product fields to the defense Relativity database solely to assist defense counsel in locating materials that may be relevant to specific individuals. Defense counsel can generate detailed indexes of the contents of the entire database or of target portion, *e.g.*, all documents code to the defendant's name.

## ARGUMENT

As set forth above, the government has made more than fulsome disclosures in this case. To the extent the defendant requests materials to which he is entitled, we have already produced the responsive materials. Nevertheless, we will review our holdings with respect to defendant's specific requests, as set forth below. We note, however, that the United States Secret Service ("USSS") is not part of the prosecution team, so our review will be limited to materials that we have acquired from USSS as part of the overall investigation.

### A. The United States Secret Service is not Part of the Prosecution Team.

The government is responsible for the disclosure of materials in the possession or control of the prosecution team: "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Mclaughlin v. Corsini*, 577 F.3d 15, 20 (1st Cir. 2009) (the duty to disclose "does not extend to information possessed by government agents not working

with the prosecution"); *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014) (same).[1]  As explained by the Sixth Circuit: "'Brady clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess.'" *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007).

This is true even where the entity holding the materials is part of the Executive Branch. *See, e.g., United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (USSS not part of prosecution team); *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006) (Welfare Benefits Administration not part of prosecution team); *United States v. Taylor*, 942 F.3d 205 (4th Cir. Nov. 5, 2019) (ATF not part of prosecution team); *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (SEC not part of prosecution team); *United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003) (BOP not part of prosecution team); *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996) (IRS not part of prosecution team).

This case – like all Capitol breach cases – has been investigated by the FBI and the United States Capitol Police.  The United States Secret Service has not participated in the investigation of this matter; thus, they are not part of the prosecution team.  We have, however, obtained certain materials from the USSS in connection with our investigation of the January 6 attack, and we will search those holdings for any materials that are responsive to the defendant's requests.[2]

## B.    The Defendant's Specific Requests.

"Under our law, the adversary system is 'the primary means by which truth is uncovered.' [citation omitted].  We decline to extend the defendant's right to discovery beyond that required

---

[1] Similarly, Rule 16 provides for the production of materials "if the item is within the government's possession, custody, or control . . . ."  Fed. R. Crim. P. 16 (a)(1)(E).

[2] To the extent we call as witnesses any USSS agents, we will of course provide any impeaching material or statements required under 18 U.S.C. § 3500 *et seq.*, as appropriate.

"Accepted"

MAR 01 2023

*Taylor James Schulkes*

by statute or the constitution." *United States v. Tarantino*, 846 F.2d 1384, 1418 (D.C. Cir. 1988); *see also United States v. Presser*, 844 F.2d 1275, 1285 n.12 (6th Cir. 1988) ("[T]he Brady rule, Rule 16 and the Jencks Act, exhaust the universe of discovery to which the defendant is entitled."); *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial"); *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; . . . the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded."); *United States v. Agurs*, 427 U.S. 97, 106 (1976) (the government is under "no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor).

Nevertheless, in this matter – and all cases related to the January 6, 2021 attack on the Capitol – the government has taken a broad view of discovery and produced materials far in excess of those actually required. And we will continue to do so here, as set forth in more detail below.

The defendant has asked for the following categories of materials involving USSS and/or Capitol Police communications:

*1. investigation of USSS's Retention of Communications.*

First, as set forth above, the USSS is not part of the prosecution team. Accordingly, whether they destroyed communications is of no moment to this matter. But we will review USSS materials that are in our possession for any discoverable materials.

Second, the defendant's request for "all information pertaining to the investigation of the Secret Service" regarding possible deletion of communications related to the January 6, 2021 attack is misplaced. It raises a potential question of spoilation. While the determination of whether

the government has suppressed exculpatory evidence pursuant to *Brady* does not turn on the intent

of the government, the Supreme Court has established a different standard, when determining the

ramifications – if any – for the failure to preserve materials potentially favorable to the defense.

*Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988).

> Part of the reason for the difference in treatment is found in the observation made
> by the Court in *Trombetta, supra*, 467 U.S., at 486, that "[w]henever potentially
> exculpatory evidence is permanently lost, courts face the treacherous task of
> divining the import of materials whose contents are unknown and, very often,
> disputed." Part of it stems from our unwillingness to read the "fundamental
> fairness" requirement of the Due Process Clause, *see Lisenba v. California*, 314
> U.S. 219, 236 (1941), as imposing on the police an undifferentiated and absolute
> duty to retain and to preserve all material that might be of conceivable evidentiary
> significance in a particular prosecution. We think that requiring a defendant to
> show bad faith on the part of the police both limits the extent of the police's
> obligation to preserve evidence to reasonable bounds and confines it to that class
> of cases where the interests of justice most clearly require it, i.e., *those cases in
> which the police themselves by their conduct indicate that the evidence could form
> a basis for exonerating the defendant*. We therefore hold that unless a criminal
> defendant can show bad faith on the part of the police, failure to preserve potentially
> useful evidence does not constitute a denial of due process of law.

*Id.* (emphasis added).

When, as here, the exculpatory nature of the material at issue is speculative at best, the

defendant must establish that the government destroyed the material in bad faith. See, e.g., *United*

*States v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016) (when "no more can be said'" about the

evidence "'than that it could have been subjected to tests, the results of which might have

exonerated the defendant,'" there is no denial of due process unless a criminal defendant can

demonstrate the Government's bad faith."); *see also United States v. Kimoto*, 588 F.3d 464 (7th

Cir. 2009) (failure to preserve emails not a due process violation unless, among other things,

exculpatory nature of the emails was apparent before they were destroyed); *United States v. Dunn*,

2011 WL 11533293 *2 (6th Cir. 2013) (rejecting claim that government violated due process by

destroying computer seized in search when defendant's claims of exculpatory value were vague);

*United States v. Lindsay*, 482 F.3d 1285 (11th Cir. 2007) (defendant's claim that destruction of fingerprint card created loss of exculpatory information was both speculative and lacked proof that destruction was done in bad faith). Here, even assuming that any USSS communications were destroyed, the defendant cannot establish that at the time of the destruction the exculpatory nature of the materials with respect to the defendant was known to the USSS. "[T]he police themselves by their conduct [did not] indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58. Accordingly, the defendant's demand for information related to possible destruction of communications by the USSS should be denied.[3]

2. *the decision to declare parts of the Capitol Grounds and Complex restricted (including identification of any such restricted area and mechanisms used to delineate restricted areas)*

This request calls for irrelevant information. Section 1752 does not require the government to prove that the defendant knew why a "restricted building or grounds" was restricted. The "knowingly" adverb in Section 1752(a) modifies the actus reus in each Count—entering or remaining without lawful authority in Count Two (§ 1752(a)(1)), engaging in disorderly or disruptive conduct in Count Three (§ 1752(a)(2))—but does not attach to 18 U.S.C. § 1752(c), which defines the term "restricted building or grounds" in one of three possible ways. How to define a restricted area for purposes of 18 U.S.C. § 1752 has "nothing to do with the wrongfulness of the defendant's conduct," and thus is "not subject to the presumption in favor of scienter." *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019); *see United States v. Bursey*, 416 F.3d 301,

---

[3] Since the defendant should not be permitted to present a public authority defense (*see* Dkt. Entry 93) their request for request for communications of the former president (*see* Dkt Entry 83) should be denied.

309 (4th Cir. 2005). It therefore follows that Section 1752 does not require the government to prove why the area was restricted.

3.    *any steps taken to communicate restricted areas to the public*

All that is relevant here is whether the defendants were put on notice that they, themselves, were entering a restricted area – not what others may or may not have known. Nevertheless, we have already made materials regarding such notifications across the Capitol grounds and throughout the time of the attack available to the defendant, as set forth above.

4.    *the reasons the certification proceedings were delayed*

We have previously produced to the defendant any materials as required by Rule 16(a)(1)(E) regarding this request.

5.    *the status of any sign postings, racks, cordons, or other restrictions after the certification proceedings were halted,*

*See* response to # 3, *supra*.

6.    *the status of any open or unlocked doors after the certification proceedings were halted,*

It bears noting that the status of the doors is not relevant. In other words, whether additional measures could have been taken to prevent a crime is not a defense. In any event, to the extent that we have such information that has not previously been provided, it will be.

7.    *the identity/actions of any law enforcement personnel who encouraged activity among the crowd at the Capitol or Capitol Grounds on January 6, 2021.*

The government does not have any information that any law enforcement personnel "encouraged activity among the crowd." We note, as stated above, that we have already produced all surveillance video depicting law enforcement's interaction with the mob on January 6, 2021. Additionally, we have produced materials related to any allegations of misconduct by law enforcement personnel that day.

9

**CONCLUSION**

Since the government has far exceeded its disclosure obligations in this matter and will review its holdings regarding the specific defense requests, as set forth above, the defendant's motion to compel discovery should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Kaitlin Klamann
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
IL Bar No. 6316768
(202) 252-6778
Kaitlin.klamann@usdoj.gov

"Accepted"

FEB 27 2023

*Taylor James Johnatakis*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    :
                          :

        v.             :     **Case No. 21-cr-91 (RCL)**

                          :

CRAIG MICHAEL BINGERT,    :

ISAAC STEVE STURGEON, and    :

TAYLOR JAMES JOHNATAKIS,    :

                          :

       **Defendants.**       :

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

### PROTECTIVE ORDER GOVERNING DISCOVERY

To expedite the flow of discovery material between the parties and adequately protect the

United States' legitimate interests, it is, pursuant to the Court's authority under Fed. R. Crim. P.

16(d)(1) and with the consent of the parties, ORDERED:

1.      **Materials Subject to this Order.** This Order governs materials provided by the

United States at any stage of discovery during this case and which the United States has

identified as either "Sensitive" or "Highly Sensitive." Examples of materials that the United

States may designate as "Sensitive" or "Highly Sensitive" pursuant to this Order include but are

not limited to:

     a.   Personal identity information as identified in Rule 49.1 of the Federal Rules of
        Criminal Procedure, as well as telephone numbers, email addresses, driver's
        license numbers, and similar unique identifying information;
     b.   Information regarding the government's confidential sources;
     c.   Information that may jeopardize witness security;
     d.   Contact information for, photographs of, and private conversations with
        individuals that do not appear to be related to the criminal conduct in this case;
     e.   Medical or mental health records;
     f.   Sources and methods law-enforcement officials have used, and will continue to
        use, to investigate other criminal conduct related to the publicly filed charges;
     g.   Surveillance camera footage from the U.S. Capitol Police's extensive system of
        cameras on U.S. Capitol grounds;[1]

---

[1] To be clear, this does not include footage from body worn cameras from other police departments that responded
on January 6, 2021, the vast amount of which the United States will *not* designate as Sensitive or Highly Sensitive.
(Body worn camera footage will be marked Sensitive or Highly Sensitive only if it contains material described in

h. Repair estimates from the Architect of the Capitol;

i. Materials designated as "security information" pursuant 2 U.S.C. §1979; and

j. Tax returns or tax information.

This Order will not be used to designate materials as Sensitive or Highly Sensitive unless such designation is necessary for one of the reasons stated in this paragraph or for a similar reason not anticipated by this Order. The government agrees to make every effort to provide discovery in a manner that will allow for most discovery to be produced without such designations.

2. **Defendant.** Any reference to "Defendant" herein refers individually to each defendant identified in the caption above.

3. **Legal Defense Team.** The "legal defense team" includes defense counsel (defined as counsel of record in this case, including any post-conviction or appellate counsel) and any attorneys, investigators, paralegals, support staff, and expert witnesses who are advising or assisting defense counsel in connection with this case.

4. **Rules for the Handling of Sensitive and Highly Sensitive Materials.**

a. **Limitations on Use.** Defendant and the legal defense team may use Sensitive and Highly Sensitive discovery materials solely in connection with the defense of this case and any other case connected to the events at the United States Capitol on January 6, 2021, including any post-conviction or appellate litigation, and for no other purpose, and in connection with no other proceeding, without further order of this Court.

b. **Limitations on Dissemination.** No Sensitive or Highly Sensitive materials, or the information contained therein, may be disclosed to any persons other than Defendant, the legal defense team, or the person to whom the Sensitive or Highly Sensitive information solely and directly pertains or his/her counsel, without agreement of the United States or prior authorization from the Court.

c. **Limitations on Reproduction.** Defendant, the legal defense team, and authorized persons shall not copy or reproduce the Sensitive or Highly Sensitive materials except in order to provide copies of the materials for use in connection with this case by Defendant, the legal defense team, the person to whom the Sensitive or Highly Sensitive information solely and directly

---

paragraph one above or for a similar reason not anticipated by this Order.)

2

pertains or his/her counsel, and other persons to whom the Court may authorize disclosure (collectively, "authorized persons").

If defense counsel provides Defendant access to Sensitive or Highly Sensitive materials, defense counsel must advise Defendant that Defendant may not record any personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure or any telephone numbers, email addresses, driver's license numbers, and similar unique identifying information. By signing the attached affirmation, Defendant agrees not to do so.

Copies and reproductions, and any notes or records made in relation to the contents of the Sensitive and Highly Sensitive materials, are to be treated in the same manner as the original materials.

d. **Court Filings.** Absent prior agreement by the parties or permission from the Court, no party shall disclose materials designated as Sensitive or Highly Sensitive in any public filing with the Court. Such materials shall be submitted under seal in accordance with Local Criminal Rule 49(f)(6). The Clerk of Court shall accept for filing under seal any filings made in compliance with that Rule and so marked by the parties pursuant to this Order.

e. **Court Hearings.** The restrictions in this Order shall not limit either party in the use of the materials in judicial proceedings in this case. The procedures for use of designated Sensitive and Highly Sensitive materials during any hearing or the trial of this matter shall be determined by the parties and the Court in advance of the hearing or trial. No party shall disclose materials designated Sensitive or Highly Sensitive in open court without agreement by the parties that such materials may be disclosed in open court or prior consideration by the Court.

5. **Additional Rules for Handling of Sensitive Materials.** The following additional terms apply to Sensitive materials:

a. **Storage.** Sensitive materials must be maintained in the custody and control of Defendant, the legal defense team, and authorized persons. This restriction shall not apply to the person to whom the Sensitive information solely and directly pertains or his/her attorney.

6. **Additional Rules for Handling of Highly Sensitive Materials.** The following additional rules apply to Highly Sensitive materials:

a. **Additional Limitations on Dissemination.** Defense counsel may not provide a copy of Highly Sensitive materials to Defendant or permit Defendant to

3

view such materials unsupervised by defense counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel. The parties agree that defense counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel, may supervise Defendant by allowing access to Highly Sensitive materials through a cloud-based delivery system that permits Defendant to view the materials but does not permit Defendant the ability to download; provided that, prior to doing so, defense counsel first provides notice to the United States and allow the United States to file an objection with the Court if no agreement is reached.

b. **Additional Limitations on Reproduction.** Counsel agrees that prior to showing materials to Defendant designated as Highly Sensitive, counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel will read Defendant the relevant parts of this Order, and remind Defendant of the consequences of violating the Order. If Defendant takes notes regarding Highly Sensitive materials, counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel must take reasonable steps to determine whether Defendant has copied any personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure or any telephone numbers, email addresses, driver's license numbers, and similar unique identifying information.

c. **Storage.** Highly Sensitive materials must be maintained in the custody and control of the legal defense team and authorized persons. This restriction shall not apply to the person to whom the Highly Sensitive information solely and directly pertains or his/her attorney.

7. **Viewing by Incarcerated Defendants.** If Defendant is in the custody of the United States Marshals Service, defense counsel is authorized to provide a copy of discovery materials to the appropriate point of contact so that the defendant can view the discovery materials, subject to the terms of this Order.

8. **Disputes.** The parties shall make a good faith effort to resolve any dispute about a sensitivity designation before requesting the Court's intervention. The United States may agree to remove or reduce a sensitivity designation without further order of this Court. Whenever the redaction of specified information will resolve the basis for which a sensitivity designation was applied, the United States will agree to redaction, and such redaction will render the materials no longer subject to this Order. Any agreement to reduce or remove a sensitivity designation or to

4

redact specific information shall be memorialized in writing.

9. **Modification Permitted.** Nothing in this Order shall prevent any party from seeking modification of this Order nor prevent the defense from contesting a sensitivity designation. The parties agree that the burden of demonstrating the need for a protective order remains with the government at all times.

10. **Failure not Waiver.** The failure by the United States to designate any materials as Sensitive or Highly Sensitive upon disclosure shall not constitute a waiver of the United States' ability to later designate the materials as Sensitive or Highly Sensitive but the government must separately identify and memorialize the changed status of those materials in writing.

11. **Automatic Exclusions from this Order.** This Order does not apply to materials that:

   a. Are, or later become, part of the public court record, including materials that have been received in evidence in this or other public trials or hearings;

   b. Were derived directly from Defendant or that pertain solely to Defendant. Examples of such materials include Defendant's own financial records, telephone records, digital device downloads, social media records, electronic communications, arrest records, and statements to law enforcement;[2] and

   c. Materials that the defense obtains by means other than discovery.

12. **Government's Discovery Obligations.** Nothing in this Order modifies the United States' obligations at any stage of discovery in this case pursuant to Federal Rules of Criminal Procedure 16 and 26.2, Local Criminal Rule 5.1, 18 U.S.C. § 3500 (the Jencks Act), and the government's general obligation to produce exculpatory and impeachment information in

---

[2] Discoverable materials that were derived directly from Defendant or that pertain solely to Defendant are exempt from this Order regardless of whether the United States has designated any such materials as "Sensitive" or "Highly Sensitive" because the same materials are being provided or made available to co-defendants or other persons charged in connection with the events at the United States Capitol on January 6, 2021.

criminal cases.

13. **Defense Counsel's Obligations.** Defense counsel must provide a copy of this Order to, and review the terms of this Order with, members of the legal defense team, Defendant, and any other person, before providing them access to Sensitive or Highly Sensitive materials. Defense counsel must obtain a fully executed copy of Attachment A before providing Defendant access to Sensitive or Highly Sensitive materials, and must file a copy with the Court within one week of execution.

14. **No Ruling on Discoverability or Admissibility.** This Order does not constitute a ruling on the question of whether any particular material is properly discoverable or admissible and does not constitute any ruling on any potential objection to the discoverability or admissibility of any material.

15. **Duration.** The terms of this Order shall remain in effect after the conclusion of this case and the parties shall be bound by it unless otherwise ordered by the Court.

SO ORDERED this 4th day of May , 2021.

HONORABLE ROYCE C. LAMBERTH
United States District Judge

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day: Twenty-seven       Month: Two       Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 31 Filed 05/04/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>PROTECTIVE ORDER GOVERNING DISCOVERY</u>, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **SO ORDERED** 44th day of May 2021 Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 31 Filed 05/04/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>PROTECTIVE ORDER GOVERNING DISCOVERY</u>, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **SO ORDERED** 44th day of May 2021 Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.



Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 31 Filed 05/04/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL)** <u>PROTECTIVE ORDER GOVERNING DISCOVERY</u>, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **SO ORDERED** 44th day of May 2021 Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C.  20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

**"Accepted"**

FEB 27 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-cr-91-01/03 (RCL)** |
| | : | |
| CRAIG MICHAEL BINGERT and | : | |
| TAYLOR JAMES JOHNATAKIS, | : | |
| | : | |
| Defendants. | : | |

Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## PROTECTIVE ORDER GOVERNING DISCOVERY

To expedite the flow of discovery material between the parties and adequately protect the

United States' legitimate interests, it is, pursuant to the Court's authority under Fed. R. Crim. P.

16(d)(1) and with the consent of the parties, ORDERED:

1.  **Materials Subject to this Order.** This Order governs materials provided by the

United States at any stage of discovery during this case and which the United States has

identified as either "Sensitive" or "Highly Sensitive." Examples of materials that the United

States may designate as "Sensitive" or "Highly Sensitive" pursuant to this Order include but are

not limited to:

    a.  Personal identity information as identified in Rule 49.1 of the Federal Rules of
        Criminal Procedure, as well as telephone numbers, email addresses, driver's
        license numbers, and similar unique identifying information;
    b.  Information regarding the government's confidential sources;
    c.  Information that may jeopardize witness security;
    d.  Contact information for, photographs of, and private conversations with
        individuals that do not appear to be related to the criminal conduct in this case;
    e.  Medical or mental health records;
    f.  Sources and methods law-enforcement officials have used, and will continue to
        use, to investigate other criminal conduct related to the publicly filed charges;
    g.  Surveillance camera footage from the U.S. Capitol Police's extensive system of
        cameras on U.S. Capitol grounds;[1]

---

[1] To be clear, this does not include footage from body worn cameras from other police departments that responded
on January 6, 2021, the vast amount of which the United States will *not* designate as Sensitive or Highly Sensitive.
(Body worn camera footage will be marked Sensitive or Highly Sensitive only if it contains material described in
paragraph one above or for a similar reason not anticipated by this Order.)

"Accepted"

FEB 27 2023

Taylor James Johnatakis

> h. Repair estimates from the Architect of the Capitol;
> i. Materials designated as "security information" pursuant 2 U.S.C. §1979; and
> j. Tax returns or tax information.

This Order will not be used to designate materials as Sensitive or Highly Sensitive unless such designation is necessary for one of the reasons stated in this paragraph or for a similar reason not anticipated by this Order. The government agrees to make every effort to provide discovery in a manner that will allow for most discovery to be produced without such designations.

2. **Defendant.** Any reference to "Defendant" herein refers individually to each defendant identified in the caption above.

3. **Legal Defense Team.** The "legal defense team" includes defense counsel (defined as counsel of record in this case, including any post-conviction or appellate counsel) and any attorneys, investigators, paralegals, support staff, and expert witnesses who are advising or assisting defense counsel in connection with this case.

4. **Rules for the Handling of Sensitive and Highly Sensitive Materials.**

> a. **Limitations on Use.** Defendant and the legal defense team may use Sensitive and Highly Sensitive discovery materials solely in connection with the defense of this case and any other case connected to the events at the United States Capitol on January 6, 2021, including any post-conviction or appellate litigation, and for no other purpose, and in connection with no other proceeding, without further order of this Court.

> b. **Limitations on Dissemination.** No Sensitive or Highly Sensitive materials, or the information contained therein, may be disclosed to any persons other than Defendant, the legal defense team, or the person to whom the Sensitive or Highly Sensitive information solely and directly pertains or his/her counsel, without agreement of the United States or prior authorization from the Court.

> c. **Limitations on Reproduction.** Defendant, the legal defense team, and authorized persons shall not copy or reproduce the Sensitive or Highly Sensitive materials except in order to provide copies of the materials for use in connection with this case by Defendant, the legal defense team, the person to whom the Sensitive or Highly Sensitive information solely and directly pertains or his/her counsel, and other persons to whom the Court may authorize disclosure (collectively, "authorized persons").

If defense counsel provides Defendant access to Sensitive or Highly Sensitive materials, defense counsel must advise Defendant that Defendant may not record any personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure or any telephone numbers, email addresses, driver's license numbers, and similar unique identifying information. By signing the attached affirmation, Defendant agrees not to do so.

Copies and reproductions, and any notes or records made in relation to the contents of the Sensitive and Highly Sensitive materials, are to be treated in the same manner as the original materials.

d. **Court Filings.** Absent prior agreement by the parties or permission from the Court, no party shall disclose materials designated as Sensitive or Highly Sensitive in any public filing with the Court. Such materials shall be submitted under seal in accordance with Local Criminal Rule 49(f)(6). The Clerk of Court shall accept for filing under seal any filings made in compliance with that Rule and so marked by the parties pursuant to this Order.

e. **Court Hearings.** The restrictions in this Order shall not limit either party in the use of the materials in judicial proceedings in this case. The procedures for use of designated Sensitive and Highly Sensitive materials during any hearing or the trial of this matter shall be determined by the parties and the Court in advance of the hearing or trial. No party shall disclose materials designated Sensitive or Highly Sensitive in open court without agreement by the parties that such materials may be disclosed in open court or prior consideration by the Court.

5. **Additional Rules for Handling of Sensitive Materials.** The following additional terms apply to Sensitive materials:

a. **Storage.** Sensitive materials must be maintained in the custody and control of Defendant, the legal defense team, and authorized persons. This restriction shall not apply to the person to whom the Sensitive information solely and directly pertains or his/her attorney.

6. **Additional Rules for Handling of Highly Sensitive Materials.** The following additional rules apply to Highly Sensitive materials:

a. **Additional Limitations on Dissemination.** Defense counsel may not provide a copy of Highly Sensitive materials to Defendant or permit Defendant to view such materials unsupervised by defense counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel.

The parties agree that defense counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel, may supervise Defendant by allowing access to Highly Sensitive materials through a cloud-based delivery system that permits Defendant to view the materials but does not permit Defendant the ability to download; provided that, prior to doing so, defense counsel first provides notice to the United States and allow the United States to file an objection with the Court if no agreement is reached.

    b. **Additional Limitations on Reproduction.** Counsel agrees that prior to showing materials to Defendant designated as Highly Sensitive, counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel will read Defendant the relevant parts of this Order, and remind Defendant of the consequences of violating the Order. If Defendant takes notes regarding Highly Sensitive materials, counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel must take reasonable steps to determine whether Defendant has copied any personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure or any telephone numbers, email addresses, driver's license numbers, and similar unique identifying information.

    c. **Storage.** Highly Sensitive materials must be maintained in the custody and control of the legal defense team and authorized persons. This restriction shall not apply to the person to whom the Highly Sensitive information solely and directly pertains or his/her attorney.

7.    **Viewing by Incarcerated Defendants.** If Defendant is in the custody of the United States Marshals Service, defense counsel is authorized to provide a copy of discovery materials to the appropriate point of contact so that the defendant can view the discovery materials, subject to the terms of this Order.

8.    **Disputes.** The parties shall make a good faith effort to resolve any dispute about a sensitivity designation before requesting the Court's intervention. The United States may agree to remove or reduce a sensitivity designation without further order of this Court. Whenever the redaction of specified information will resolve the basis for which a sensitivity designation was applied, the United States will agree to redaction, and such redaction will render the materials no longer subject to this Order. Any agreement to reduce or remove a sensitivity designation or to redact specific information shall be memorialized in writing.

9.    **Modification Permitted.** Nothing in this Order shall prevent any party from seeking modification of this Order nor prevent the defense from contesting a sensitivity designation. The parties agree that the burden of demonstrating the need for a protective order remains with the government at all times.

10.    **Failure not Waiver.** The failure by the United States to designate any materials as Sensitive or Highly Sensitive upon disclosure shall not constitute a waiver of the United States' ability to later designate the materials as Sensitive or Highly Sensitive but the government must separately identify and memorialize the changed status of those materials in writing.

11.    **Automatic Exclusions from this Order.** This Order does not apply to materials that:

    a.  Are, or later become, part of the public court record, including materials that have been received in evidence in this or other public trials or hearings;

    b.  Were derived directly from Defendant or that pertain solely to Defendant. Examples of such materials include Defendant's own financial records, telephone records, digital device downloads, social media records, electronic communications, arrest records, and statements to law enforcement;[2] and

    c.  Materials that the defense obtains by means other than discovery.

12.    **Government's Discovery Obligations.** Nothing in this Order modifies the United States' obligations at any stage of discovery in this case pursuant to Federal Rules of Criminal Procedure 16 and 26.2, Local Criminal Rule 5.1, 18 U.S.C. § 3500 (the Jencks Act), and the government's general obligation to produce exculpatory and impeachment information in criminal cases.

---

[2] Discoverable materials that were derived directly from Defendant or that pertain solely to Defendant are exempt from this Order regardless of whether the United States has designated any such materials as "Sensitive" or "Highly Sensitive" because the same materials are being provided or made available to co-defendants or other persons charged in connection with the events at the United States Capitol on January 6, 2021.

13. **Defense Counsel's Obligations.** Defense counsel must provide a copy of this Order to, and review the terms of this Order with, members of the legal defense team, Defendant, and any other person, before providing them access to Sensitive or Highly Sensitive materials. Defense counsel must obtain a fully executed copy of Attachment A before providing Defendant access to Sensitive or Highly Sensitive materials, and must file a copy with the Court within one week of execution.

14. **No Ruling on Discoverability or Admissibility.** This Order does not constitute a ruling on the question of whether any particular material is properly discoverable or admissible and does not constitute any ruling on any potential objection to the discoverability or admissibility of any material.

15. **Duration.** The terms of this Order shall remain in effect after the conclusion of this case and the parties shall be bound by it unless otherwise ordered by the Court.

**SO ORDERED** this _____ day of _____, 2021.

_____
HONORABLE ROYCE C. LAMBERTH
United States District Judge

"Accepted"

FEB 27 2023

Taylor James Johnatakis

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-seven          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 25-1 Filed 4/20/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL) PROTECTIVE ORDER GOVERNING DISCOVERY**, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 25-1 Filed 4/20/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL) PROTECTIVE ORDER GOVERNING DISCOVERY**, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 25-1 Filed 4/20/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL) PROTECTIVE ORDER GOVERNING DISCOVERY**, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-seven        Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 25 Filed 04/20/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL) UNOPPOSED MOTION FOR PROTECTIVE ORDER** Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 25 Filed 04/20/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL) UNOPPOSED MOTION FOR PROTECTIVE ORDER** Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 25 Filed 04/20/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91-01/03 (RCL) UNOPPOSED MOTION FOR PROTECTIVE ORDER** Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney By: Angela N. Buckner"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

"Accepted"

FEB 2 7 2023

*Taylor James Johnatakis*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :
    :
       **v.**     :     **Case No. 21-cr-91-01/03 (RCL)**
    :
CRAIG MICHAEL BINGERT and     :
TAYLOR JAMES JOHNATAKIS,     :
    :
        **Defendants.**     :

## UNOPPOSED MOTION FOR PROTECTIVE ORDER

The United States of America hereby respectfully moves the Court for the entry of a protective order governing the production of discovery by the parties in the above-captioned case. The United States, counsel for Defendant Craig Bingert, and counsel for Defendant Taylor Johnatakis have reached an agreement as to the proposed protective order. Therefore, the United States is authorized to represent to the Court that the above referenced Defendants do not oppose this motion or the entry of the attached protective order.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar Number 415793

By:     */s/ Angela N. Buckner*
         Angela N. Buckner
         D.C. Bar No. 1022880
         Assistant United States Attorney
         United States Attorney's Office
         555 Fourth Street, N.W., Room 10-108
         Washington, D.C. 20530
         (202) 252-2656
         Angela.Buckner@usdoj.gov



RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-seven        Month: Two        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 46 Filed 09/24/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE **DONE** this 24 day of September 2021 Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 46 Filed 09/24/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE **DONE** this 24 day of September 2021 Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

How
Attachment: "Case 1:21-cr-00091-RCL Document 46 Filed 09/24/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE **DONE** this 24 day of September 2021 Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"
FEB 27 2023
Taylor James Johnston

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | Case No. 1:21-cr-00091-RCL |
| **vs.** | |
| **CRAIG BINGERT et al.,** | |
| **Defendants.** | |

## ORDER GRANTING AGREED MOTION TO
## CONTINUE STATUS CONFERENCE

THIS MATTER, having come before the Court on an agreed motion to continue the status hearing currently set for Monday, September 27, 2021, and the Court having considered the facts set forth in the motion and the records and files herein, the Court hereby **ORDERS** that the currently scheduled hearing date is stricken and that the hearing is reset to Tuesday, October 19, 2021, at 10:00am.

**DONE** this 24 day of September, 2021.

The Honorable Royce C. Lamberth
United States District Judge

RECEIVED
Mail Room
MAR - 6 2023
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:            Day: Twenty-eight          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 68 Filed 05/25/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER Date: May 25 2022 Hon. Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 68 Filed 05/25/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER Date: May 25 2022 Hon. Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR – 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 68 Filed 05/25/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER Date: May 25 2022 Hon. Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

"Accepted"

FEB 28 2023

*Taylor James Johnatakis*

**UNITED STATES OF AMERICA**

v.

**CRAIG MICHAEL BINGERT** *et al.,*

    *Defendants.*

Case No. 1:21-cr-00091-RCL

<u>**ORDER**</u>

    For the reasons set forth in the accompanying memorandum opinion, defendant Isaac Sturgeon's motion to dismiss [55], which defendants Craig Bingert [56] and Taylor Johnatakis [59] joined, is hereby **DENIED**.

It is **SO ORDERED**.

Date: May 25, 2022

                                     Hon. Royce C. Lamberth
                                     United States District Judge



RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-seven          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 45 Filed 09/22/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL AGREED MOTION TO CONTINUE STATUS CONFERENCE, Page 2 of 2 Christopher Black, Case 1:21-cr-00091-RCL Document 45-1 Filed 09/22/21 Page 1 of 1 ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 45 Filed 09/22/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL AGREED MOTION TO CONTINUE STATUS CONFERENCE**, Page 2 of 2 Christopher Black, Case 1:21-cr-00091-RCL Document 45-1 Filed 09/22/21 Page 1 of 1 **ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE"** and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 45 Filed 09/22/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL AGREED MOTION TO CONTINUE STATUS CONFERENCE**, Page 2 of 2 Christopher Black, Case 1:21-cr-00091-RCL Document 45-1 Filed 09/22/21 Page 1 of 1 **ORDER GRANTING AGREED MOTION TO CONTINUE STATUS CONFERENCE"**

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

FEB 2 7 2023

*Taylor James Johnatakis*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      **Plaintiff,**

    **vs.**

CRAIG BINGERT et al.,

      **Defendants.**

Case No. 1:21-cr-00091-RCL

## AGREED MOTION TO CONTINUE STATUS CONFERENCE

Defendant Taylor Johnatakis, by undersigned counsel, respectfully moves to continue the status conference in this matter currently set for Monday, September 27, 2021 at 1:00 p.m. to one of the following dates: October 19, 2021 (any time), October 21, 2021 (afternoon), October 22, 2021 (any time), or October 26, 2021 (afternoon). The basis for the request is that undersigned counsel will be starting a trial in the Western District of Washington on the day of the currently scheduled status conference. This trial was rescheduled *sua sponte* by the trial judge subsequent to the scheduling of the status conference in this matter.

Undersigned counsel has conferred with counsel for the government and counsel for co-defendants Bingert and Sturgeon about the request for continuance and the proposed dates for the rescheduled hearing. No parties object to the requested continuance and all parties are available on the proposed new dates.

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

For the foregoing reasons, Mr. Johnatakis asks the Court to grant the requested continuance.

Respectfully submitted this 22nd day of September, 2021.

BLACK & ASKEROV, PLLC

Christopher Black, Bar ID # WA0023
Attorney for Taylor Johnatakis
Black & Askerov, PLLC
705 Second Avenue, Suite 1111
Seattle, WA 98104
Phone:        206.623.1604
Fax:            206.658.2401
Email:         chris@blacklawseattle.com

"Accepted"

FEB 27 2023

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

*Taylor James Johnatakis*

UNITED STATES OF AMERICA,

      Plaintiff,

                    Case No. 1:21-cr-00091-RCL

    vs.

CRAIG BINGERT et al.,

      Defendants.

### ORDER GRANTING AGREED MOTION TO
### CONTINUE STATUS CONFERENCE

THIS MATTER, having come before the Court on an agreed motion to continue the status hearing currently set for Monday, September 27, 2021, and the Court having considered the facts set forth in the motion and the records and files herein, the Court hereby ORDERS that the currently scheduled hearing date is stricken and that the hearing is reset to _____.

DONE this _____ day of _____, 2021.

_____
The Honorable Royce C. Lamberth
United States District Judge

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-eight          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 53 Filed 11/10/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE**,Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT** A TRUE BILL: FOREPERSON Mathew M Graves of the United States in and for the District of Columbia"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 53 Filed 11/10/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE**, Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT A TRUE BILL: FOREPERSON** Mathew M Graves Attorney of the United States in and for the District of Columbia" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 53 Filed 11/10/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) INDICTMENT COUNT ONE**, Page 2 of 4 **COUNT TWO COUNT THREE**, Page 3 of 4 **COUNT FOUR COUNT FIVE COUNT SIX**,Page 4 of 4 **COUNT SEVEN COUNT EIGHT A TRUE BILL: FOREPERSON** Mathew M Graves Attorney of the United States in and for the District of Columbia"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

FEB 2 8 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on January 8, 2021**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-CR-091 (RCL)** |
| | : | |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| **CRAIG MICHAEL BINGERT,** | : | **18 U.S.C. § 1512(c)(2), 2** |
| **ISAAC STEVE STURGEON, and** | : | **(Obstruction of an Official Proceeding)** |
| **TAYLOR JAMES JOHNATAKIS,** | : | **18 U.S.C. § 111(a)(1)** |
| | : | **(Assaulting, Resisting, or Impeding** |
| **Defendants.** | : | **Certain Officers)** |
| | : | **18 U.S.C. § 231(a)(3)** |
| | : | **(Civil Disorder)** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| | : | **(Entering and Remaining in a Restricted** |
| | : | **Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(2)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(4)** |
| | : | **(Engaging in Physical Violence in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **40 U.S.C. § 5104(e)(2)(E)** |
| | : | **(Impeding Passage Through the Capitol** |
| | : | **Grounds or Buildings)** |
| | : | **40 U.S.C. § 5104(e)(2)(F)** |
| | : | **(Act of Physical Violence in the Capitol** |
| | : | **Grounds or Buildings)** |

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## I N D I C T M E N T

The Grand Jury charges that:

### COUNT ONE

On or about January 6, 2021, within the District of Columbia and elsewhere, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON, and TAYLOR JAMES JOHNATAKIS**, attempted to, and did, corruptly obstruct, influence, and impede an official

proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the

Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United

States and 3 U.S.C. §§ 15-18.

**(Obstruction of an Official Proceeding and Aiding and Abetting, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)**

## COUNT TWO

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** did

forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of

the United States, and of any branch of the United States Government (including any member of

the uniformed services), and any person assisting such an officer and employee, while such person

was engaged in and on account of the performance of official duties, and where the acts in violation

of this section involve physical contact with the victim and the intent to commit another felony

**(Assaulting, Resisting, or Impeding Certain Officers, in violation of Title 18, United States Code, Section 111(a)(1))**

## COUNT THREE

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** committed

and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer

lawfully engaged in the lawful performance of his/her official duties, incident to and during the

commission of a civil disorder which in any way and degree obstructed, delayed, and adversely

affected commerce and the movement of any article and commodity in commerce and the conduct

and performance of any federally protected function.

**(Civil Disorder, in violation of Title 18, United States Code, Section 231(a)(3))**

"Accepted"

FEB 28 2023

*Taylor James Johnatakis*

## COUNT FOUR

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** did unlawfully and knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so.

**(Entering and Remaining in a Restricted Building or Grounds,** in violation of Title 18, United States Code, Section 1752(a)(1))

## COUNT FIVE

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

**(Disorderly and Disruptive Conduct in a Restricted Building or Grounds,** in violation of Title 18, United States Code, Section 1752(a)(2))

## COUNT SIX

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** did knowingly, engage in any act of physical violence against any person and property in a restricted

3

building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the

United States Capitol and its grounds, where the Vice President was temporarily visiting.

**(Engaging in Physical Violence in a Restricted Building or Grounds, in violation of Title 18, United States Code, Section 1752(a)(4))**

## COUNT SEVEN

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** willfully and knowingly obstructed, and impeded passage through and within, the United States Capitol Grounds and any of the Capitol Buildings.

**(Obstructing, or Impeding Passage Through or Within, the Grounds or Any of the Capitol Buildings, in violation of Title 40, United States Code, Section 5104(e)(2)(E))**

## COUNT EIGHT

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** willfully and knowingly engaged in an act of physical violence within the United States Capitol Grounds and any of the Capitol Buildings.

**(Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings, in violation of Title 40, United States Code, Section 5104(e)(2)(F))**

A TRUE BILL:

FOREPERSON.

Attorney of the United States in
and for the District of Columbia.

4

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-eight          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 34 Filed 05/07/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) <u>INDICTMENT COUNT ONE</u>**, Page 2 of 4 <u>**COUNT TWO COUNT THREE**</u> Page 3 of 4 <u>**COUNT FOUR COUNT FIVE COUNT SIX**</u>,Page 4 of 4 <u>**COUNT SEVEN COUNT EIGHT**</u> A TRUE BILL: FOREPERSON Channing D Phillips Attorney of the United States in and for the District of Columbia"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 34 Filed 05/07/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) <u>INDICTMENT</u> COUNT ONE**, Page 2 of 4 <u>**COUNT TWO COUNT THREE**</u>, Page 3 of 4 <u>**COUNT FOUR COUNT FIVE COUNT SIX**</u>,Page 4 of 4 <u>**COUNT SEVEN COUNT EIGHT**</u> A TRUE BILL: FOREPERSON Channing D Phillips Attorney of the United States in and for the District of Columbia" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 34 Filed 05/07/21 Page 1 of 4 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Grand Jury Sworn in on January 8, 2021 CRIMINAL NO. 21-CR-091-01-03 (RCL) <u>INDICTMENT COUNT ONE</u>**, Page 2 of 4 <u>**COUNT TWO COUNT THREE**</u>, Page 3 of 4 <u>**COUNT FOUR COUNT FIVE COUNT SIX**</u>,Page 4 of 4 <u>**COUNT SEVEN COUNT EIGHT**</u> A TRUE BILL: FOREPERSON Channing D Phillips Attorney of the United States in and for the District of Columbia"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

FEB 2 8 2023

*Taylor James Johnatakis*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on January 8, 2021**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO. 21-CR-091-01-03 (RCL)** |
| | : | |
| v. | : | |
| | : | **VIOLATIONS:** |
| **CRAIG MICHAEL BINGERT,** | : | **18 U.S.C. § 1512(c)(2), 2** |
| **ISAAC STEVE STURGEON, and** | : | **(Obstruction of an Official Proceeding)** |
| **TAYLOR JAMES JOHNATAKIS,** | : | **18 U.S.C. § 111(a)(1)** |
| | : | **(Assaulting, Resisting, or Impeding** |
| **Defendants.** | : | **Certain Officers)** |
| | : | **18 U.S.C. § 231(a)(3)** |
| | : | **(Civil Disorder)** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| | : | **(Entering and Remaining in a Restricted** |
| | : | **Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(2)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(4)** |
| | : | **(Engaging in Physical Violence in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **40 U.S.C. § 5104(e)(2)(E)** |
| | : | **(Impeding Passage Through the Capitol** |
| | : | **Grounds or Buildings)** |
| | : | **40 U.S.C. § 5104(e)(2)(F)** |
| | : | **(Act of Physical Violence in the Capitol** |
| | : | **Grounds or Buildings)** |



RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE

On or about January 6, 2021, within the District of Columbia and elsewhere, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** attempted to, and did, corruptly obstruct, influence, and impede an official

"Accepted"

FEB 2 8 2023

*Taylor James Johnatakis*

proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol Grounds without authority, engaging in disorderly and disruptive conduct, and committing an act of civil disorder.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

## COUNT TWO

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** did forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, while such person was engaged in and on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony

(**Assaulting, Resisting, or Impeding Certain Officers**, in violation of Title 18, United States Code, Section 111(a)(1))

## COUNT THREE

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder, and the civil disorder obstructed, delayed, and adversely affected the conduct and performance of a federally protected function.

(**Civil Disorder**, in violation of Title 18, United States Code, Section 231(a)(3))

"Accepted"                    *Taylor James Johnatakis*

FEB 2 8 2023

## COUNT FOUR

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** did unlawfully and knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, without lawful authority to do so.

(**Entering and Remaining in a Restricted Building or Grounds,** in violation of Title 18, United States Code, Section 1752(a)(1))

## COUNT FIVE

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

(**Disorderly and Disruptive Conduct in a Restricted Building or Grounds,** in violation of Title 18, United States Code, Section 1752(a)(2))   .

## COUNT SIX

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON,** and **TAYLOR JAMES JOHNATAKIS,** did knowingly, engage in any act of physical violence against any person and property in a restricted building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the

3

"Accepted"
FEB 2 8 2023

United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting.

**(Engaging in Physical Violence in a Restricted Building or Grounds**, in violation of Title 18, United States Code, Section 1752(a)(4))

## COUNT SEVEN

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON**, and **TAYLOR JAMES JOHNATAKIS**, willfully and knowingly obstructed, and impeded passage through and within, the United States Capitol Grounds and any of the Capitol Buildings.

**(Obstructing, or Impeding Passage Through or Within, the Grounds or Any of the Capitol Buildings**, in violation of Title 40, United States Code, Section 5104(e)(2)(E))

## COUNT EIGHT

On or about January 6, 2021, within the District of Columbia, **CRAIG MICHAEL BINGERT, ISAAC STEVE STURGEON**, and **TAYLOR JAMES JOHNATAKIS**, willfully and knowingly engaged in an act of physical violence within the United States Capitol Grounds and any of the Capitol Buildings.

**(Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings**, in violation of Title 40, United States Code, Section 5104(e)(2)(F))

A TRUE BILL:


FOREPERSON.


Attorney of the United States in
and for the District of Columbia.

4

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Twenty-eight        Month: Two        Year: 2023 CE

Angela D. Caesar

Clerk of Court United States District Court District of Columbia

333 Constitution Avenue N.W.

Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 114 Filed 02/28/23 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 21-091 (RCL) UNOPPOSED MOTION TO CONTINUE TRIAL, Page 2 of 2 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender, Case 1:21-cr-00091-RCL Document 114-1 Filed 2/28/23 Page 1 of 1 ORDER"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 114 Filed 02/28/23 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA** No. 21-091 (RCL) UNOPPOSED MOTION TO CONTINUE TRIAL, Page 2 of 2 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender, Case 1:21-cr-00091-RCL Document 114-1 Filed 2/28/23 Page 1 of 1 ORDER" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR – 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis

℅ 29628 Gamble PL NE

Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 114 Filed 02/28/23 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA No. 21-091 (RCL) UNOPPOSED MOTION TO CONTINUE TRIAL, Page 2 of 2 Respectfully submitted A. J. Kramer FEDERAL PUBLIC DEFENDER Maria N. Jacob Assistant Federal Public Defender, Case 1:21-cr-00091-RCL Document 114-1 Filed 2/28/23 Page 1 of 1 ORDER"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001

cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530

cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004

cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001

cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

FEB 2 8 2023

*Taylor James Johnsters*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,       )
                                )
      v.                          )       No. 21-091 (RCL)
                                )
ISAAC STEVE STURGEON,           )
                                )
           Defendant.          )
                                )
_____)

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

<u>**UNOPPOSED MOTION TO CONTINUE TRIAL**</u>

      Defendant, Isaac Sturgeon, through counsel, respectfully requests that the Court grant a

continuance of the currently scheduled trial date of May 15, 2023.

(1) Mr. Sturgeon was indicted on February 5, 2021, for one count of Obstruction of an

      Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. §1512(c)(2)

      and (2), one count of Assaulting, Resisting, or Impeding Certain Officers in violation

      of 18 U.S.C. §111(a)(1), one count of Civil Disorder in violation of 18 U.S.C.

      §231(a)(3), one three counts of 18 U.S.C. §1752(a)(1)(2), and (4), and one count of

      40 U.S.C. §5104(e)(2)(E) . *See* ECF Dkt. No. 3.

(2) Mr. Sturgeon was arrested on March 6, 2021 at the John F. Kennedy Airport in

      Queens, New York. *See* ECF Dkt. No. 14.

(3) He was released on that day and to this date, has been compliant with all of his pre-

      trial release conditions and has appeared for all of his court proceedings.

(4) On August 9, 2022, the Court held a status hearing where it set a jury trial date for

      May 15, 2023.

(5) Unfortunately, since that time, several unavoidable conflicts have arisen for

undersigned counsel that conflict with the currently scheduled trial date.

(6) Furthermore, Mr. Sturgeon is considering moving forward with a bench trial versus

a jury trial and has not made a final decision yet.

(7) Lastly, there are outstanding motions that will greatly impact the direction of the

case as well as potential defenses.

(8) For all of these reasons, counsel respectfully requests that the Court grant a

continuance of the currently scheduled trial and to set a status conference to discuss

alternative dates.

(9) Counsel has discussed this request with counsel for Mr. Bingert, who consents to

this request. Counsel has also discussed this request with government counsel, who

does not oppose this request.

(10)   This is the first defense request for a continuance of the trial and is not done for

the purpose of delay and is made in good faith.


Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Maria_Jacob@fd.org

"Accepted"

FEB 28 2023
REC'D

Taylor James Johnston

"Accepted"

FEB 2 8 2023

*Taylor James Johnston*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,      )
                               )
          v.                   )          No. 21-091 (RCL)
                               )
ISAAC STURGEON                 )
                               )
          Defendant.           )
_____)

## ORDER

Upon consideration of the Unopposed Motion to Continue by defendant Isaac Sturgeon, and for good cause shown, it is hereby this _____ day of _____, 2023,

ORDERED that said motion be, and hereby is, GRANTED.

IT IS FURTHER ORDERED that the trial currently scheduled for May 15, 2023, is vacated and that a status hearing be set for _____, _____, 2023, in order to schedule a new date for trial and other trial deadlines.

Dated _____, day of _____, 2023.

_____
Honorable Royce C. Lamberth
Senior United States District Judge

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-seven          Month: Two          Year: 2023 CE

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 32 Filed 05/05/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 MOTION FOR AN ORDER TO DISCLOSE ITEMS PROTECTED BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e) AND SEALED MATERIALS, Page 2 of 2 Respectfully submitted Channing D. Phillips Acting United States Attorney By: Angela N. Buckner"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 32 Filed 05/05/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 MOTION FOR AN ORDER TO DISCLOSE ITEMS PROTECTED BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e) AND SEALED MATERIALS,** Page 2 of 2 Respectfully submitted Channing D. Phillips Acting United States Attorney By: Angela N. Buckner" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 32 Filed 05/05/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 MOTION FOR AN ORDER TO DISCLOSE ITEMS PROTECTED BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e) AND SEALED MATERIALS,** Page 2 of 2 Respectfully submitted Channing D. Phillips Acting United States Attorney By: Angela N. Bucknerr"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

"Accepted"

FEB 27 2023

*Taylor James Johnatakis*

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :     Case No. 21-cr-91 |
| | : |
| CRAIG MICHAEL BINGERT, | : |
| ISAAC STEVE STURGEON, and | : |
| TAYLOR JAMES JOHNATAKIS, | : |
| | : |
| Defendants. | : |

## MOTION FOR AN ORDER TO DISCLOSE ITEMS PROTECTED BY FEDERAL RULE OF CRIMINAL PROCEDURE 6(e) AND SEALED MATERIALS

The United States of America respectfully moves for entry by this Court of an order permitting the disclosure in discovery of materials protected by Federal Rule of Criminal Procedure 6(e). The United States also requests permission to provide in discovery sealed materials, pursuant to the previously entered protective order governing discovery.

The United States conferred with counsel for the defendants regarding this motion and none object.

1

Case 1:21-cr-00091-RCL Document 32 Filed 05/05/21 Page 2 of 2

WHEREFORE, the United States respectfully requests an order authorizing the disclosure in discovery of the materials described above.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar Number 415793

By:     /s/ Angela N. Buckner
Angela N. Buckner
D.C. Bar No. 1022880
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W., Room 10-108
Washington, D.C. 20530
(202) 445-8340
Angela.Buckner@usdoj.gov

2

"Accepted"

FEB 27 2023

*Taylor James Johnston*

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: One          Month: Three          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

In reply to : "Case 1:21-cr-00091-RCL Document 51 Filed 10/19/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER It is **SO ORDERED** Date: October 19, 2021 Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 51 Filed 10/19/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER It is **SO ORDERED** Date: October 19, 2021 Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 51 Filed 10/19/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER It is **SO ORDERED** Date: October 19, 2021 Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

"Accepted"

MAR 0 1 2023

*Taylor James Johnstatos*

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | Case No. 1:21-cr-00091-RCL |
| v. | |
| CRAIG MICHAEL BINGERT *et al.,* | |
| *Defendants.* | |

## ORDER

It is hereby ORDERED that the following schedule shall apply:

- Defendants shall file their motion(s) to dismiss by <u>December 7, 2021</u>;

- The government shall file their response(s) by <u>December 21, 2021</u>; and

- Defendants shall file any reply by <u>January 11, 2022</u>.

It is **SO ORDERED**.

Date: October __ , 2021

_____
Hon. Royce C. Lamberth
United States District Judge

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: One          Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 58 Filed 12/14/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** ORDER It Is So Ordered Royce C. Lamberth United States District Judge Entered:12/14/21"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 58 Filed 12/14/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** ORDER It Is So Ordered Royce C. Lamberth United States District Judge Entered:12/14/21" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR - 6 2023

U.S. [illegible] Court
[illegible]

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 58 Filed 12/14/21 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL)** ORDER It Is So Ordered Royce C. Lamberth United States District Judge Entered:12/14/21"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAR 0 1 2023

*Taylor James Johnatakis*

UNITED STATES OF AMERICA          :
                                  :
        v.                        :        Case No. 21-CR-91 (RCL)
                                  :
CRAIG MICHAEL BINGERT,            :
ISAAC STEVE STURGEON, and         :
TAYLOR JAMES JOHNATAKIS,          :
                                  :
        Defendants.               :

### ORDER

This matter having come before the Court pursuant to a Consent Motion to Extend Filing

Deadline, it is therefore

ORDERED that, for good cause shown, the government's motion to extend its filing

deadlines is granted;

FURTHER ORDERED that, the government's response is due by January 4, 2022 and any

replies due are due by January 18, 2022.

It Is So Ordered.

_____
Honorable Royce C. Lamberth
United States District Judge

Entered: _____12/14/21_____

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: One     Month: Three     Year: 2023 CE



Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 61 Filed 01/05/22 Page 1 of 1 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISACC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE AND SIX OF THE SUPERSEDING INDICTMENT DONE this 4th day of January, 2022 Royce C. Lamberth United States District Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 61 Filed 01/05/22 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISACC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE AND SIX OF THE SUPERSEDING INDICTMENT DONE this 4th day of January, 2022 Royce C. Lamberth United States District Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 61 Filed 01/05/22 Page 1 of 1 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISACC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE AND SIX OF THE SUPERSEDING INDICTMENT DONE this 4th day of January, 2022 Royce C. Lamberth United States District Judge"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

MAR 01 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

TAYLOR JOHNATAKIS,

        Defendant.

Case No. 1:21-cr-00091-RCL

## ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISACC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE, AND SIX OF THE SUPERSEDING INDICTMENT

THIS MATTER, having come before the Court on Taylor Johnatakis's motion to adopt and join co-defendant Isaac Sturgeon's motion to dismiss counts one, three, four, five, and six of the Superseding Indictment, and the Court having considered the facts set forth in the motion and the records and files herein, the Court hereby ORDERS that defendant Taylor Johnatakis's motion to adopt and join co-defendant Isaac Sturgeon's motion to dismiss is granted.

DONE this _4th_ day of _January_, 20_22_

_Royce C. Lamberth_
The Honorable Royce C. Lamberth
United States District Judge

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

**Notice Date:**     Day: One          Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 60 Filed 01/04/22 Page 1 of 54 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) <u>GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**, Page 2 of 54, Page 3 of 54, Page 4 of 54, Page 5 of 54, Page 6 of 54, Page 7 of 54, Page 8 of 54, Page 8 of 54, Page 9 of 54, Page 10 of 54, Page 11 of 54, Page 12 of 54, Page 13 of 54, Page 14 of 54, Page 15 of 54, Page 16 of 54, Page 17 of 54, Page 18 of 54, Page 19 of 54, Page 20 of 54, Page 21 of 54, Page 22 of 54, Page 23 of 54, Page 24 of 54, Page 25 of 54, Page 26 of 54, Page 27 of 54, Page 28 of 54, Page 29 of 54, Page 30 of 54, Page 31 of 54, Page 32 of 54, Page 33 of 54, Page 34 of 54, Page 35 of 54, Page 36 of 54, Page 37 of 54, Page 38 of 54, Page 39 of 54, Page 40 of 54, Page 41 of 54, Page 42 of 54, Page 43 of 54, Page 44 of 54, Page 45 of 54, Page 46 of 54, Page 47 of 54, Page 48 of 54, Page 49 of 54, Page 50 of 54, Page 51 of 54, Page 52 of 54, Page 53 of 54, Page 54 of 54 <u>CONCLUSION</u> Respectfully submitted Matthew M. Graves United States Attorney By: Angela N. Buckner"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 60 Filed 01/04/22 Page 1 of 54 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) <u>GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**, Page 2 of 54, Page 3 of 54, Page 4 of 54, Page 5 of 54, Page 6 of 54, Page 7 of 54, Page 8 of 54, Page 8 of 54, Page 9 of 54, Page 10 of 54, Page 11 of 54, Page 12 of 54, Page 13 of 54, Page 14 of 54, Page 15 of 54, Page 16 of 54, Page 17 of 54, Page 18 of 54, Page 19 of 54, Page 20 of 54, Page 21 of 54, Page 22 of 54, Page 23 of 54, Page 24 of 54, Page 25 of 54, Page 26 of 54, Page 27 of 54, Page 28 of 54, Page 29 of 54, Page 30 of 54, Page 31 of 54, Page 32 of 54, Page 33 of 54, Page 34 of 54, Page 35 of 54, Page 36 of 54, Page 37 of 54, Page 38 of 54, Page 39 of 54, Page 40 of 54, Page 41 of 54, Page 42 of 54, Page 43 of 54, Page 44 of 54, Page 45 of 54, Page 46 of 54, Page 47 of 54, Page 48 of 54, Page 49 of 54, Page 50 of 54, Page 51 of 54, Page 52 of 54, Page 53 of 54, Page 54 of 54 <u>CONCLUSION</u> Respectfully submitted Matthew M. Graves United States Attorney By: Angela N. Buckner" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

RECEIVED
Mail Room

MAR – 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: One      Month: Three  Year: 2023 CE

Attachment: "Case 1:21-cr-00091-RCL Document 60 Filed 01/04/22 Page 1 of 54 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) <u>GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>.** Page 2 of 54, Page 3 of 54, Page 4 of 54, Page 5 of 54, Page 6 of 54, Page 7 of 54, Page 8 of 54, Page 8 of 54, Page 9 of 54, Page 10 of 54, Page 11 of 54, Page 12 of 54, Page 13 of 54, Page 14 of 54, Page 15 of 54, Page 16 of 54, Page 17 of 54, Page 18 of 54, Page 19 of 54, Page 20 of 54, Page 21 of 54, Page 22 of 54, Page 23 of 54, Page 24 of 54, Page 25 of 54, Page 26 of 54, Page 27 of 54, Page 28 of 54, Page 29 of 54, Page 30 of 54, Page 31 of 54, Page 32 of 54, Page 33 of 54, Page 34 of 54, Page 35 of 54, Page 36 of 54, Page 37 of 54, Page 38 of 54, Page 39 of 54, Page 40 of 54, Page 41 of 54, Page 42 of 54, Page 43 of 54, Page 44 of 54, Page 45 of 54, Page 46 of 54, Page 47 of 54, Page 48 of 54, Page 49 of 54, Page 50 of 54, Page 51 of 54, Page 52 of 54, Page 53 of 54, Page 54 of 54 **<u>CONCLUSION</u>** Respectfully submitted Matthew M. Graves United States Attorney By: Angela N. Buckner"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

"Accepted"

MAR 01 2023

*Taylor James Johnatakis*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-CR-91 (RCL)** |
| | : | |
| CRAIG MICHAEL BINGERT, | : | |
| ISAAC STEVE STURGEON, and | : | |
| TAYLOR JAMES JOHNATAKIS, | : | |
| | : | |
| Defendants. | : | |

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to Defendant Isaac S. Sturgeon's (the "Defendant") Motion to Dismiss Counts One, Three, Four, Five, and Six of the Superseding Indictment, filed through counsel on December 7, 2021 (ECF No. 55, hereinafter "Def. Mot."). The referenced counts allege violations of 18 U.S.C. §§ 1512, 2 (Count One), 18 U.S.C. § 231 (Count Three), and 18 U.S.C. §§ 1752(a) (Counts Four through Six). In his motion, the Defendant argues that the referenced counts fail to state an offense and fail to give proper notice to the Defendant. Additionally, he asserts, Count Five unconstitutionally infringes on his First Amendment Rights.

As discussed below, the certification of the Electoral College vote is in fact a "proceeding before the Congress," and the Defendant did act corruptly to obstruct the proceeding. Section 1512 is not vague as applied to the Defendant's conduct, and the Defendant's actions are prohibited by the obstruction statute.

Furthermore, the Defendant's claim that Section 231 provided inadequate notice that he was subject to enforcement under a vague statute is difficult to reconcile with his conduct on January 6, when he intentionally interfered with law enforcement's efforts to protect the Capitol

1

"Accepted"

MAR 01 2023

*Taylor James Johnston*

building and grounds by shoving a gate into officers. Similarly, claims that Section 1752 unnecessarily targets his "expression," in violation of his First Amendment Rights, completely ignores his conduct.

Finally, the Capitol was a restricted area on January 6, with signs prominently posted and law enforcement deployed. Multiple United States Secret Service ("USSS") protectees, including the direct line of succession to the President of the United States, were present during the attack. The statute plainly applies here.

For the reasons set forth below, the Court should deny the Defendant's motion to dismiss the indictment.

## PROCEDURAL HISTORY

On February 5, 2021, a grand jury returned an eight count indictment charging the Defendant and two other individuals with the following charges: 18 U.S.C. §§ 1512(c)(2), 2 (obstruction of an official proceeding); 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers); 18 U.S.C. § 231(a)(3) (civil disorder); 18 U.S.C. §§ 1752(a)(1), (2) and (4) (entering and remaining in a restricted building or grounds, disorderly and disruptive conduct in a restricted building or grounds, and engaging in physical violence in a restricted building or grounds); and 40 U.S.C. §§ 5104(e)(2)(E) and (F) (impeding passage through the capitol grounds or buildings and act of physical violence in the capitol grounds of buildings). *See* ECF No. 3. An arrest warrant for the Defendant issued that same date, and on March 6, 2021, the Defendant was arrested. ECF No. 14.

On May 7, 2021, the grand jury returned a superseding indictment that updated the 18 U.S.C. § 111 language in Count Two. *See* ECF No. 34. On November 10, the grand jury returned

a second superseding indictment, updating the language in Counts One and Three of the first superseding indictment. *See* ECF No. 53.

This Court set a filing deadline of December 7, 2021 for the Defendant's motion to dismiss. The government's response was due on December 21, 2021. *See* ECF No. 51. Defendant Sturgeon filed his motion to dismiss on December 7, 2021 (ECF No. 55), and defendant Craig M. Bingert moved to adopt and join the motion on December 13, 2021 (ECF No. 56). Defendant Taylor J. Johnatakis joined the motion on December 29, 2021 (ECF No. 59). The government filed a consent motion for extension of time to file its opposition. That motion was granted, and the government's opposition is due on January 4, 2022. *See* December 14, 2021 Minute Order, ECF No. 58.

## FACTUAL BACKGROUND

The U.S. Capitol is secured 24 hours a day by the United States Capitol Police ("USCP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time ("EST"). Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

3

"Accepted"

MAR 01 2023

Taylor James Johnatakis

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.

4

USCP ordered a similar lockdown in the House chamber. As individuals attempted to break into the House chamber by breaking the windows on the chamber door, law enforcement officers were forced to draw their weapons to protect the victims sheltering inside.

At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown subjects resulted in the disruption and ultimate delay of the vote Certification.

Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" references members of Congress.

Between 3:25 and around 6:30 p.m. EST, law enforcement officers were able to clear the U.S. Capitol of all subjects. Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol,

including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm EST after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

On January 6, 2021, Sturgeon, along with Craig Michael Bingert ("Bingert") and Taylor James Johnatakis ("Johnatakis," collectively, "the defendants"), picked up a gate and pushed it into police officers. The officers were attempting to prevent the defendants from gaining access to the Capitol grounds and building.

More specifically, the defendants were at the front of a mob on the west terrace of the U.S. Capitol grounds facing a line of D.C. Metropolitan Police Department ("MPD") officers. Between the officers and the defendants were metal police barricades. The MPD officers were wearing body worn camera ("BWC"), and the defendants were in clear view of several officers' BWC.

Johnatakis waved member of the mob forward toward the barricaded line of MPD officers and, using the bullhorn attached to this backpack, yelled to the surrounding crowd, "push them out of here, we're just using our bodies!" Johnatakis then directed the other rioters to push the barricades into the MPD officers, encouraging them as they progressed, yelling "one foot," and "1, 2, 2, go."

Sturgeon and Bingert stood directly to the right of Johnatakis, such that the three men were side-by-side. As Johnatakis counted down, Sturgeon and Bingert joined Johnatakis, using their hands to grab the metal barricade. At approximately 2:46 p.m. EST, the defendants, along with

"Accepted"

MAR 01 2023

Taylor James Johnatakis

other members of the crowd, use their collective force to shove the barricade into the police officers.

At one point, the defendants managed to push the barricade far enough and high enough that they were able to duck underneath it. In response to the physical aggression, MPD officers used both physical force and chemical irritants to push back the defendants and stop the rioters from breaking through the line of officers.

After the assault, Bingert remained in the area for several more minutes. He turned around and faced the crowd while waiving a large American flag as the crowd taunted the police line and chanted slogans in anger, such as "fuck the police."

Sturgeon also remained in the area. Several minutes after the assault, BWC captures Sturgeon approaching law enforcement officers and handing them a large object.

Sturgeon posed in a picture posted to Instagram during the January 6, 2021, riot with a comment which stated, "I fear this is just the beginning." In another post, posted on or about January 6, 2021, Sturgeon commented, "…[t]oday we stand to make a statement, not to hurt the police. But to represent a real issue! STAND." In yet another post, Sturgeon posted a video of rioters, with a comment indicating that the then-Vice President refused to reject the electoral count. Sturgeon also posted a video depicting sparks and smoke in the air as the rioting continued, explaining that a veteran once told him to "…do what you know is right" and that "[t]hose words echo yet still…"

Before the assault, Johnatakis posted a video to Facebook in which he stated, "Trump's speech is over…he went over the voter fraud…we're walking over to the Capitol right now and I don't know, maybe we will break down the doors." After the assault, Johnatakis posted to Facebook, "If there were ANTIFA, they sprinkled right along with us because we got the same

mission and that was to take that Capitol…I organized a push up to the Capitol because I felt like that is exactly what we needed."

## LEGAL STANDARD

Before trial, a defendant in a criminal case may move to dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). A valid indictment must set out "the elements of the offense intended to be charged and sufficiently apprise the defendant of what he must be prepared to meet." *United States v. Pickett*, 353 F.3d 62, 67 (D.C. Cir. 2004). The Government must state the essential elements of the crime and allegations "with sufficient specificity." *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995), *see also United States v. Griffin*, 21-cr-92 (TNM), 2021 WL 2778557 (D.D.C. Jul. 2, 2021).

A pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." *Id.* "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.* Although a court's supervisory powers provide the authority to dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."

"Accepted"

MAR 01 2023

Taylor James Schneider

## ARGUMENT

### I. COUNT ONE STATES AN OFFENSE; THE DEFENDANT'S ALLEGED CONDUCT CLEARLY VIOLATES SECTION 1512

The Defendant argues that Count One of the second superseding indictment fails to state an offense. In support of his arguments, the Defendant claims that the Electoral Count on January 6 was not an "official proceeding" (Def. Mot. at 7), and that 18 U.S.C. §1512(c)(2) is unconstitutionally vague - and especially vague as applied to this case (Def. Mot. at 10, 14). None of these arguments has any merit.

Section 1512(c)(2) provides that "[w]hoever corruptly . . . obstructs, influences, or impedes any official proceeding" has committed a crime. A person violates that statute when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding. *See* 18 U.S.C. § 1512(c)(2); § 1515(a)(1)(B). As several judges in this district have recently concluded, Congress's certification of the Electoral College vote on January 6, 2021 was an "official proceeding." *See United States v. Sandlin,* 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery*, 21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021).

Furthermore, Section 1512(c)(2) is not unconstitutionally vague or overbroad, and nothing in its text, structure, or history limits it to obstruction tied to documentary or tangible evidence. Nor does the Supreme Court's decision in *Yates v. United States*, 574 U.S. 528 (2015)—which construed a different term in a different statute—support imposing such an atextual limitation in Section 1512(c)(2). But even if such a limitation existed, the statute encompasses the Defendant's alleged conduct.

9

## A. The Certification of the Electoral College Vote is an Official Proceeding

Contrary to the Defendant's claims, Congress's joint session on January 6, 2021, to review, count, and certify the Electoral College constitutes an "official proceeding" under the definition in Section 1515(a)(1). Congress's meeting to certify the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress" under Section 1515(a)(1)(B), and therefore an "official proceeding" for purposes of Section 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. *See Caldwell*, 2021 WL 6062718 at * 4 ("A straightforward reading of that definition easily reaches the Certification of the Electoral College vote."). Skipping past the text, the Defendant argues that Congress's intent and other language in the obstruction statute import an "adversarial" or at least a "quasi-adjudicative" requirement into the term "official proceeding" (Def. Mot. at 6, 9). That argument is incorrect, but even if somehow valid, would still not disqualify Congress's Joint Session on January 6.

### 1. Background, Congressional Intent, and Statutory Construction

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Two separate provisions in the Constitution mandate that the Vice President, while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed: The President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the

floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

Here, the Defendant is charged with violating Section 1512(c)(2) by corruptly obstructing, influencing, or impeding any official proceeding. An "official proceeding" for purposes of Section 1512(c)(2) is defined in Section 1515 as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce.

18 U.S.C. § 1515(a)(1) (emphasis added).

The Defendant suggests that legislative history shows that Congress intended the obstruction statute to be interpreted narrowly to protect witness tampering and destruction of evidence (Def. Mot. at 4, 9).[1] Putting aside that the "best evidence of [a statute's purpose] is the

---

[1] The Defendant also cites the Victim and Witness Protection Act (VWPA) of 1982 (Def. Mot. at 9). But the Senate Judiciary Committee report that supported the VWPA justified the inclusion of a "broad residual clause" (in a

"Accepted" MAR 01 2023

"Accepted"

MAR 01 2023

*Taylor James Schnabbs*

statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), the obstruction statute's legislative history in fact underscores that Congress intended "official proceeding" to reach broadly.

Additionally, as other judges of this Court have concluded, *see Montgomery* 2021 WL 6134591, at *15, title of the legislation's section supports a broad interpretation of Section 1512(c). This provision was enacted in 2002 as part of the Sarbanes-Oxley Act, Pub. L. 107-204, specifically Section 1102 of the law, which is titled "Tampering with a Record or Otherwise Impeding an Official Proceeding." In other words, Congress evidenced its intent that "otherwise impeding an official proceeding" would indeed be a crime and would be a separate crime from "tampering with a record."

> ## 2. Congress's Joint Session to Certify the Electoral College Vote is a "Proceeding Before the Congress."

Section 1515(a)(1)(B) defines "official proceeding" as a "proceeding before the Congress." To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted).

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a "proceeding"

---

provision that has since been amended) by noting that the "purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses. There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice." S. Rep. 97-532, at 18 (1982).

refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting Proceeding, Oxford English Dictionary, available at http://www.oed.com). The Defendant does not meaningfully contend that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—under that broad definition. *See* Def. Mot. at 9 (referring to the electoral vote as an "administrative and ceremonial proceeding").

A narrower definition of the term "proceeding" would look to the "legal—rather than the lay—understanding" of the term. *Ermoian*, 752 F.3d at 1170. This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "Proceeding" (11th ed. 2019). Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170; *see also United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512"). For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including the cases relied upon by the Defendant—courts analyze the degree of formality involved in an investigation. *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs

and Border Patrol not an "official proceeding" because that term "contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a *"formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added). Thus, even under this narrower definition, Congress's Joint Session to certify the Electoral College vote—business conducted by an official body, in a formal session—would easily qualify.

Finally, the formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding, *see Perez*, 575 F.3d at 169, even under the narrower legal definition of the term "proceeding." Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Indeed, other judges of this Court have concluded that even if not all actions occurring before Congress constitute an "official proceeding," the certification of the Electoral College does. *Sandlin,* 2021 WL 5865006, at *3-4 (finding that the certification of the Electoral College is an official proceeding because the "Joint Session has the trappings of a formal hearing before an official body[,]… the certificates of electoral results are akin to records or documents produced during judicial proceedings, and any objection to these certificates can be analogized to evidentiary objections."); *Mostofsky*, 2021 WL 6049891, at *10 (concluding that the certification of the Electoral College is an official proceeding within the meaning of 18 U.S.C. §§ 1515, 1512(c)(2)); *Caldwell*, 2021 WL 6062718 at * 4 ("The Certification of the Electoral College vote thus meets

14

the definition of an 'official proceeding.'"); *Montgomery*, 2021 WL 6134591, at *4 ("Although Defendants are correct that not every action taken within the walls of Congress constitutes an 'official proceeding' within the meaning of Section 1512(c), a joint session of Congress convened to verify and count the electoral vote for President and Vice President of the United States does"); *Nordean*, 2021 WL 6134595, at *5 ("For all these reasons, the certification is therefore a 'series of actions' that requires 'some formal convocation,' making it a 'proceeding before the Congress,' 18 U.S.C. § 1515(a)(1)(B), and thus an 'official proceeding,' *id.* § 1512(c)(2).").

Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until "the count of electoral votes" is "completed," and the "result declared." *Id.* In short, the certification of the Electoral College vote is a "proceeding before the Congress." *See* Section 1515(a)(1)(B).

15

3. Section 1515(a)(1)(B) Has No Limitation on the Type of Congressional Proceeding

The Defendant incorrectly asks this Court to limit the interpretation of the "proceeding before the Congress" to encompass only the obstruction of proceedings before Congress which are adversarial in nature (Def. Mot. at 6), such as a congressional committee investigating a violation of the law where witnesses are subpoenaed to appear and give testimony or to provide relevant evidence (Def. Mot. at 7-9). But this narrow reading of the statute finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress." Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, as the Defendant contends, it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency. Indeed, Section 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress could limit the obstruction prohibition under § 1505 to congressional investigations, it could have done so in the text of § 1515(a)(1)(B). But it did not. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.") Instead, Congress enacted broader language— "a proceeding before the Congress"—to cover a broader range of proceedings than the "inquir[ies] and investigation[s]" envisioned in Section 1505. That broader definition includes the Electoral College vote certification. *See, e.g., Caldwell*, 2021 WL 6062718 at * 5 (rejecting the same argument and holding that "Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its

16

adjudicatory, investigative, or legislative functions. And the court will not add a requirement to the statute that Congress did not see fit to include."); *Sandlin*, 2021 WL 5865006, at \*4 ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'"); *Montgomery*, 2021 WL 6134591, at \*6 (rejecting argument that Congress intended to limit the definition of "official proceeding" and "quasi-judicial" proceedings, to proceedings at which witnesses appear and give testimony, or to proceedings related "to the administration of justice"); *Nordean*, 2021 WL 6134595, at \*5-6 (rejecting argument that Congress intended to limit the definition of "official proceeding" to "quasi-adjudicative" or "quasi-judicial" proceedings and finding that, "even if an 'official proceeding' had to be quasi-adjudicative or quasi-judicial in some way—a requirement missing from the plain text of the statute—because Congress's certification of the Electoral College vote has *some* of those features, it would pass the test.").

Rather than engage with Section 1515's text, the Defendant relies on surrounding statutory provisions and legislative intent to argue that the certification of the Electoral College vote is not an "official proceeding" because it does not enhance and protect the criminal justice process (Def. Mot. at 6) (quoting *Ramos*, 537 F.3d at 462). That approach fails in three respects. First, it is methodologically flawed. As discusses above, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, a proceeding before the Congress. Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). The Defendant offers no rationale for breezing past the statute's plain text to reach for other interpretive tools.

17

Second, the Defendant contends that Section 1512 is a witness tampering statute and that an "official proceeding before Congress" is logically limited to the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents destroyed. *See* Def. Mot. at 6 (*citing* S.Rep. No. 107-146, at *6 (2002) and implying that the "official proceeding" definition in Section 1515 does not cover the Electoral College vote certification). However, the specific statutory provision under which the Defendant is charged, 18 U.S.C. § 1512(c)(2), explicitly reaches more broadly than tampering: it "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2104)). The Defendant's narrowed reading of "proceeding before the Congress" in 18 U.S.C. § 1515(a)(1)(B)—importing an extra-textual "administration of justice" requirement—would undercut the broad statute that Congress enacted. That crabbed approach fails to recognize that the certification of the Electoral College vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes." *Sutherland*, 921 F.3d at 426. Whatever the outer limits of a "proceeding before the Congress" for purposes of the obstruction statute, the Electoral College vote certification falls well within them. *See also Montgomery*, 2021 WL 6134591, at *7 ("Section 1515(a)(1) reaches all three branches of government, and the definition of 'official proceeding' is properly understood in the unique context of each branch.").

Furthermore, the Defendant's reliance on cases interpreting the term "proceeding," Def. Mot. at 6, in 1515, is misplaced, because those decisions hinge on the phrase "which is authorized by law" that is absent from subsection (a)(1)(B). In *Ermoian*, the question was whether an FBI

18

investigation was an "official proceeding" that was "authorized by law" under subsection (a)(1)(C). 752 F.3d at 1170. The same question was addressed in *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol); *United States v. Binette*, 828 F. Supp. 2d 402, 404 (D. Mass. 2011) (preliminary SEC investigation); and *Perez*, 575 F.3d at 169 (review panel within the Bureau of Prisons). The Defendant also relies on *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994), but there the D.C. Circuit was interpreting the word "proceeding" in Section 1505, and it rejected Kelley's argument that Section 1505 applies to only adjudicatory or rule-making activities.[2]

Finally, the "adjudicatory" gloss the Defendant purports to give to the "official proceeding" definition in Section 1515(a)(1) finds no support in the statute itself. But even if such a gloss applied, the certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would qualify. Far from a "ceremonial and administrative event" (Def. Mot. at 7), the certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15. That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election. Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress. U.S. Const. amend. XII. Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act. 3 U.S.C. § 15; *see* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. Rev. 1653, 1659 (2002) (Under the Electoral Count Act, "the President-elect is not elected by 'We the People' on election day, or even by the electors on the

---

[2] The D.C. Circuit did not interpret "official proceeding" in Sections 1512 or 1515 because the parties agreed that the phrase had the same meaning as "proceeding" in Section 1505. *Id.* at 1128.

day they cast their votes, but by the joint convention of the Senate and House of Representatives on the day the electoral votes are formally counted"). As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. 3 U.S.C. § 15. And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16.1. Nothing in the history the Defendant describe suggests a different conclusion.

**B.    Section 1512(c)(2) is Not Unconstitutionally Vague or Overbroad.**

The Defendant argues that Section 1512(c)(2) is unconstitutionally vague and does not provide fair notice as to the conduct it punishes (Def. Mot. 10). As several judges of this Court have recently concluded, this argument, too, lacks merit. *Sandlin,* 2021 WL 5865006; *Caldwell,* 2021 WL 6062718; *Mostofsky,* 2021 WL 6049891; *Montgomery,* 2021 WL 6134591; *Nordean,* 2021 WL 6134595.

1.    <u>Legal Standard</u>

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States,* 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein,* 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short,* 454 U.S. 516, 532

(1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). A statute is instead vague where it fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). "As a general matter," however, a law is not constitutionally vague where it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

## 2. Section 1512 is Specific Enough to Provide Notice

The Defendant fails to overcome the strong presumption that Section 1512(c)(2) passes constitutional muster. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly . . . obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

The Defendant's more targeted attack on "corruptly" (Def. Mot. at 10-13), relying on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), is equally unavailing. The D.C. Circuit in *Poindexter* held that the term "corruptly" was "vague . . . in the absence of some narrowing gloss." 951 F.2d at 378. *Poindexter* is inapposite for three reasons.[3] First, the D.C. Circuit

---

[3] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459. As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505

narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id.* at 629-30. Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). The Defendant's invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id.* at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502.

Third, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen*. For purposes of Section 1512(c)(2), "corruptly" includes two components: (1) intent to obstruct, impede, or influence; and (2) wrongfulness. *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an

---

"means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement."

improper purpose" and "with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing") (internal quotation marks omitted); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512(c) ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice.").

That the term "corruptly" requires the government to prove that a defendant acted not only with intent to obstruct but also with "consciousness of wrongdoing" ensures that Section 1512(c)(2) "reaches only" those who have committed felony obstruction. *Andersen*, 544 U.S. at 706. That limitation is particularly important where, as here, the Defendant is alleged to have obstructed a congressional proceeding.

To prove that an attempted or actual obstruction of a congressional proceeding amounts to felony obstruction in violation of 18 U.S.C. § 1512(c)(2), the government must therefore adduce evidence establishing beyond a reasonable doubt that a defendant acted intentionally and with "consciousness of wrongdoing." *Andersen*, 544 U.S. at 706. That standard could be met where, for example, evidence showed that the defendants, intent on storming the Capitol building and preventing the Certification, shoved a barricade into a police line protecting the Capitol grounds and building.[4] *See Montgomery*, 2021 WL 6134591, at \*20 ("It is unsurprising, for example, that

---

[4] The "high maximum[] and no minimum[]" penalty provision that Congress enacted in Section 1512(c)(2), moreover, reflects that obstruction offenses "may run the gamut from major to minor," and empowers district court judges to "recognize differences between such cases" and to "try to make the punishment fit the crime." *Yates*, 574 U.S. at 569-70 (Kagan, J., dissenting); *see Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) (noting that "judges in this country

24

the words 'obstruct' and 'impede,' 18 U.S.C. § 1512(c)(2), mean to come in the way of, to block, or to hold up or that 'a proceeding before the Congress,' *id.* § 1515(a)(1)(B), includes the joint session of the Senate and House of Representatives held to certify the Electoral College vote.").

Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries. The Defendant provides no support for his position. Nor could he. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974). Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section 1512(c)'s "corruptly" element provided ample notice to the Defendant that *his conduct* was criminal. *Mostofsky*, 2021 WL 604891 at *11 ("As a result, to the extent that Mostofsky argues that § 1512(c)(2) is vague on its face, such an argument cannot succeed. . . . The Court will also not dismiss the § 1512 charge as vague as applied to Mostofsky, given that mapping the statutory language on to his conduct") (emphasis in original); *See Sandlin*, 2021 WL 5865006 at *10-14 (rejecting defendant's challenge that "corruptly" was unconstitutionally vague as used in Section 1512(c)(2)); *Montgomery*, 2021 WL 6134591, at *19 ("the Supreme Court did not cast any doubt on the constitutional adequacy of a "corruptly" standard … Neither ignorance about the existence of a statute nor reasonable debate about how best to interpret the statute render the law unconstitutionally vague…"); *Nordean*, 2021 WL 6134595, at *12 (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) and concluding, that

---

have long exercised discretion" to impose sentences within a statutory sentencing range by "taking into consideration various factors relating both to offense and offender"). The same is true of the criminal contempt statute, 18 U.S.C. § 401, which has been applied to a wide range of conduct, *see United States v. McGainey*, 37 F.3d 682, 683 (D.C. Cir. 1994) (threatening gesture that led to "disruption" of a criminal trial constituted "'obstruction of the administration of justice'"); id. at 684-85 (citing other disruption case), and prescribes no maximum or minimum penalty, see 18 U.S.C. § 401 (permitting court the "power to punish by fine or imprisonment, or both, at its discretion").

"Accepted" MAR 01 2023

Taylor James Johnatakis

while "no court has interpreted Section 1512(c)(2) to include the precise allegations made here. But that does not mean that this reading 'unexpectedly broadens' it").

The Defendant cherry picks five Capitol riot cases and argues that this "illustrates how vague and arbitrary the enforcement of the statute can be" (Def. Mot. at 13-14). This effort is flawed. As a threshold matter, the government's charging decisions reflect clear consistency with Section 1512(c)(2)'s offense elements. Each defendant had the intent to "corruptly"—through wrongdoing, whether by violence, force, or other means—obstruct, interfere with, and impede the certification of the Electoral College vote count. Their obstructive methods varied: for instance, some defendants assaulted officers outside the Capitol while others entered the Senate Chamber and rifled through Senators' paperwork. But such factual distinctions lack salience under the statute. Each type of conduct "corruptly" "obstruct[ed], influence[d], or impede[d]" a proceeding before Congress, accordingly, comes within the statute's scope. 18 U.S.C. § 1512(c).

Moreover, the vagueness doctrine asks whether "*the statute … provide[s] a person of ordinary intelligence fair notice of what is prohibited.*" *Williams*, 553 U.S. at 304 (emphasis added). "Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *See Williams*, 553 U.S. at 306. The Defendant cites no authority, and the government has found none, showing that charging decisions postdating the offense conduct have any bearing on this inquiry. The relevant question turns on whether the statute fairly informed the Defendant that he would face criminal sanction for his conduct on January 6, 2021. The answer is yes, for the reasons articulated above. *Nordean*, 2021 WL 6134595, at *13 ("Section 1512(c)(2) is not 'narrow' at all. It sweeps broadly—punishing a host of 'corrupt' conduct. Thus, it hardly lulled Defendants into a false sense of security…").

"Accepted"

MAR 01 2023

Taylor James Johnatakis

The Defendant further states that "the government does not specify what 'influence' these defendants had or how exactly they 'impeded.'" Def. Mot. at 15. But the government does not have to describe in the charging instrument how it will prove those statutory elements at trial. *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (en banc) ("[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the Defendant on notice as to every means by which the prosecution hopes to prove that the crime was committed."). If the government fails to carry its burden on these elements at trial, the jury will say so. But that future presentation has no bearing on the question here— whether Section 1512(c)'s text provided the Defendant with adequate notice.

Ultimately, the Defendant suggests that Section 1512(c)(2) is vague because it does not encompass his conduct. The Defendant cannot be subjected to prosecution, he argues, when he did not even enter the building (Def. Mot. at 15). Yet the Defendant did not further enter the Capitol grounds or buildings because the law enforcement officers against whom he struggled were able to repel his aggressive advance – not because the Defendant did not try to "impede" or "obstruct."

C.    **The Supreme Court's Decision in *Yates v. United States* Does Not Counsel a Different Interpretation.**

The Defendant analyzes the term "tangible object' (Def. Mot. at 5) and argues that "obstruction of an official proceeding before Congress" was never intended to apply to an "event, like the vote count, that involves no witness testimony, documentary or tangible evidence…" (Def. Mot. at 9). However, the Supreme Court's decision in *Yates v. United States*, which considered how to construe the statutory term "tangible object" in Section 1519, 574 U.S. at 532 (plurality opinion), does not undermine the interpretation of Section 1512(c)(2) articulated above. *See Montgomery*, 2021 WL 6134591, at *14; ("… neither the plurality opinion in *Yates* nor Justice Alito's concurrence requires the Court to read Section 1512(c)(2) to only cover acts impairing the

27

availability or integrity of evidence."); *Nordean*, 2021 WL 6134595, at *8 ("Reading Section 1512(c)(2) to include conduct unrelated to the impairment of evidence is most consistent with the text and structure of the statute…")

### 1. Section 1512 is Not Limited to Document-Focused Obstructive Conduct

In *Yates*, a plurality of the Court undertook a "contextual reading" to narrow the scope of "tangible object" in Section 1519 to "only objects one can use to record or preserve information, not all objects in the physical world." *Id.* at 536 (plurality opinion). The contextual features that animated that narrow interpretation in Section 1519 are, however, absent in Section 1512(c)(2).

The Court in *Yates* considered a prosecution brought under Section 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" a federal investigation. 18 U.S.C. § 1519. Yates was a commercial fisherman who ordered his crew to throw his catch back into the sea to prevent federal authorities from determining whether he had harvested undersized fish. *Yates*, 574 U.S. at 531 (plurality opinion). The question presented was whether "tangible object" as used in Section 1519 included a fish. A fractured Supreme Court produced three opinions.

A four-Justice plurality concluded that Section 1519's "context" supported a "narrower reading." *Yates*, 574 U.S. at 539. A holding that "tangible object" included "any and all objects," the plurality concluded, would "cut § 1519 loose from its financial-fraud mooring" in the Sarbanes-Oxley Act. *Id.* at 532. The plurality grounded its analysis in several "[f]amiliar interpretive guides." *Id.* at 539. First, neither Section 1519's caption, "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy," nor the title within the Sarbanes-Oxley Act within which Section 1519 was placed, "Criminal penalties for altering documents," suggested

"Accepted" MAR 01 2023 *Taylor James Schnitdes*

"Accepted"
MAR 01 2023
Taylor James Schneider

that Congress aimed to "sweep" in "physical objects of every kind." *Id.* at 539-40.

Second, the plurality relied on Section 1519's placement within Title 18's Chapter 73. *Yates*, 574 U.S. at 540. Specifically, its placement at the end of the chapter following several provisions "prohibiting obstructive acts in specific contexts," suggested that Congress did not intend Section 1519 as an "across-the-board" spoliation ban. *Id.* In contrast, the plurality noted, Congress directed codification of the Sarbanes-Oxley Act's "other additions . . . within or alongside retained provisions that address obstructive acts relating broadly to official proceedings and criminal trials." *Id.* To illustrate one such "broad[]" provision, the plurality specifically referred to the provision at issue in this case, Section 1512(c), which, as noted above, was titled "Tampering with a record or otherwise impeding an official proceeding," and which Congress placed (as Section 1512(c)) within the "broad proscription[]" found in the "pre-existing" Section 1512. *Id.* at 541.

Third, the plurality compared Section 1519 with the "contemporaneous passage" in the Sarbanes-Oxley Act of Section 1512(c)(1). *See* 574 U.S. at 541. Because Section 1512(c)(1)'s reference to "'other object'" encompassed "any and every physical object," the plurality "resist[ed] a reading of § 1519" that would make Section 1512(c)(1) superfluous. *Id.* at 542-43. Moreover, the plurality reasoned, the fact that Congress's formulation in Section 1519 did not track the language in Section 1512(c)(1) indicated that Congress intended Section 1519 to be construed differently from Section 1512. *Id.* at 545 n.7. More specifically, the plurality concluded that, by adopting those different formulations, Congress intended the phrase "tangible object" in Section 1519 to "have a narrower scope" than the phrase "'other object'" in Section 1512(c)(1). *Id.* at 544-45.

Fourth, the plurality found support for its narrowing construction in the *noscitur a sociis*

29

and *ejusdem generis* interpretive canons. 574 U.S. at 543-46. Because "tangible object" in Section 1519 was the "last in a list of terms that begins 'any record [or] document,'" the *noscitur a sociis* canon counseled interpreting that term "to refer . . . specifically to the subject of tangible objects involving records and documents." *Id.* at 544. That reading, moreover, "accord[ed] with" Section 1519's verbs, which include "'falsif[ying]'" and "'mak[ing] a false entry in'"—terms that commonly "take as grammatical objects records, documents, or things used to record or preserve information." *Id.* (emphasis omitted). Similarly, application of the *ejusdem generis* canon—that "general words" following "specific words" when listed in a statute are "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *id.* at 545 (internal quotation marks omitted)—indicated that Congress "would have had no reason to refer specifically to 'record' or 'document'" if it intended Section 1519 to "capture physical objects as dissimilar as documents and fish." *Id.* at 546.[5]

Finally, the plurality stated that, to the extent its "recourse to traditional tools of statutory construction" left "any doubt" about how to interpret "'tangible object'" in Section 1519, the rule of lenity favored a narrow interpretation of that phrase. 574 U.S. at 547-48. Because a broad reading of Section 1519 would criminalize "tampering with *any* physical object that *might* have evidentiary value in *any* federal investigation into *any* offense, no matter whether the investigation is pending or merely contemplated, or whether the offense subject to investigation is criminal or civil," the plurality reasoned that before it opted for the "harsher alternative," Congress must speak

---

[5] By way of example, the Supreme Court cited its decision in *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015), wherethe Court interpreted the residual clause in the Armed Career Criminal Act (ACCA), which covered "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The ACCA's enumeration of specific crimes suggested that the "otherwise involves" provisions applied only to "*similar*" crimes, rather than *every* crime that"presents a serious potential risk of physical injury to another.'" *Begay*, 553 U.S. at 142.

"in language that is clear and definite." *Id.* at 548 (internal quotation marks omitted).

Justice Alito concurred in the judgment on narrower grounds.[6] Observing that the statutory "question is close," Justice Alito reasoned that the combined effect of "the statute's list of nouns, its list of verbs, and its title" favored the plurality's conclusion. *Yates*, 574 U.S. at 549 (Alito, J., concurring). Section 1519's nouns suggested that "'tangible object'" in that provision "should refer to something similar to records or documents." *Id.* at 550. Similarly, Section 1519's list of verbs are "closely associated with filekeeping," and at least one verb phrase—"'makes a false entry in'"—"makes no sense outside of filekeeping." *Id.* at 551. Finally, Section 1519's title— "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy," § 1519—suggested that "no matter how other statutes might be read," Section 1519 "does not cover every noun in the universe with tangible form." *Id.* at 552.

The decision in *Yates* does not unsettle the straightforward interpretation of Section 1512(c)(2) articulated above because the "familiar interpretive guides" on which the plurality (and to some extent Justice Alito) relied to narrow the scope of Section 1519 do not apply to Section 1512(c)(2).

Consider first, as the plurality did, Section 1512's statutory title. *See Yates*, 574 U.S. at 539-40 (plurality opinion); *see also id.* at 552 (Alito, J., concurring) (considering Section 1519's title). Even leaving aside the "the wise rule" that neither "the title of a statute" nor "the heading of a section" can "limit the plain meaning of the text," *Brotherhood of R.R. Trainmen*, 331 U.S. at 528-29, Section 1512's title, "Tampering with a witness, victim, or an informant," provides no reason to narrow the interpretation of Section 1512(c)(2). *See supra*, at 15-17. For one thing, Congress named that title 20 years before it enacted 1512(c) in the Sarbanes-Oxley Act, and then

---

[6] Under the rule announced in *Marks v. United States*, 430 U.S. 188 (1977), Justice Alito's concurrence represents the binding holding as the narrowest opinion among those concurring in the judgment. *See id.* at 193.

"Accepted"

MAR 01 2023

Taylor James Printers

simply opted not to rename Section 1512 to reflect either of the two new obstruction prohibitions added in Section 1512(c). Section 1512's overarching title therefore does not have the same interpretive force as Section 1519's title, which was enacted by the same Congress that enacted the rest of Section 1519. *See Yates*, 574 U.S. 541 n.4 (plurality opinion). Additionally, whereas Section 1519's title within the Sarbanes-Oxley Act, "Criminal penalties for altering documents," suggested a narrow focus on document destruction, *see id.* at 539-40, Section 1512(c)'s title within the Sarbanes-Oxley Act reflected both the document-destruction prohibition in Section 1512(c)(1) *and* the broader catch-all obstruction provision in Section 1512(c)(2): "Tampering with a record *or otherwise impeding an official proceeding.*" Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered).

Similarly inapposite here is Section 1512(c)(2)'s placement within Chapter 73. *See Yates*, 574 U.S. at 540-41 (plurality opinion). Whereas Congress enacted Section 1519 as a standalone prohibition and placed it at the end of the chapter "together with specialized provisions expressly aimed at corporate fraud and financial audits," it instead inserted Section 1512(c) within the "pre-existing" Section 1512. *Id.* at 541 (plurality opinion). So situated, Section 1512(c)(2)'s functionas a catch-all obstruction prohibition is consistent with Section 1512's role as a "broad proscription" on obstructive acts. *See id.* (plurality opinion).

That reading, moreover, is consistent with how the *Yates* plurality opinion describes Section 1512(c). *See* 574 U.S. at 541-43, 545. Contrasting the term "other object" in the document-destruction provision in Section 1512(c)(1) with "tangible object" in Section 1519, the plurality concluded that Section 1512(c)(1)'s later enactment suggested Congress intended it to reach more broadly than Section 1519. *Id.* at 542-43; *id.* at 545 n.7 ("Congress designed § 1519 to be interpreted apart from § 1512, not in lockstep with it."). And if Congress intended Section

32

1512(c)(1) to cover more ground than Section 1519, Section 1512(c)'s text and structure make plain that it further intended Section 1512(c)(2) to cover more ground than Section 1512(c)(1).

The plurality, 574 U.S. at 544-45, and Justice Alito, *id.* at 550, also drew support for their narrowing construction of Section 1519 from interpretive canons, but those canons do not help the Defendant here. "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370-71 (D.C. Cir. 1998). Section 1519's structure—a list of specific terms ("record" and "document) followed by a more general term ("tangible object")—in a singular provision is susceptible to that analysis. *Yates*, 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring). But Section 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separate numbered provision containing the separate catch-all obstruction prohibition. "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in Section 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has no application to Section 1512(c)(2), which embodies the same structure. *Cf. Loughrin*, 573 U.S. at 359 (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprised "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus

"Accepted"

MAR 01 2023

Taylor James Schuster

placing the clauses on an equal footing and indicating that they have separate meanings").

The *noscitur a sociis* canon is similarly inapplicable here. That canon is used only to construe terms that are "of obscure or doubtful meaning," not to change the meaning of unambiguous terms that are simply broad. *Russell Motor Car Co.,* 261 U.S. at 520. Moreover, the canon may be invoked only "when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *S. D. Warren Co. v. Maine Bd. of Env'tProt.,* 547 U.S. 370, 378 (2006) (internal quotation marks omitted); *see Beecham v. United States,* 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). As noted above, the first and second clauses of Section 1512(c) are not items in a list of related terms; rather, they are distinct offenses phrased in the disjunctive. 18 U.S.C. § 1512(c). That structure therefore does not lend itself to application of *noscitur a sociis. See De Bruhl-Daniels*, 491 F. Supp. 3d at 251 (declining to apply the *noscitur a sociis* canon to Section 1512(c)).

Finally, the *Yates* plurality's reliance on the rule of lenity has no application here.[7] The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). As discussed at length above, there is no grievous ambiguity here. Section 1512(c)(2)'s text, structure, history, and purpose make clear that it functions as a broad catch-all

---

[7] Justice Alito did not rely on several features that guide the plurality opinion, including the rule of lenity. *See* 574 U.S. at 549 (noting that the case "should be resolved on narrow grounds," namely, "the statute's list of nouns, its list of verbs, and its title," but not discussing the Sarbanes-Oxley Act, Section 1519's placement within Chapter 73, the Supreme Court's decision in *Begay*,or the rule of lenity). It follows that that his controlling opinion, *see supra* note 6, makes even more clear that Section 1512(c)(2) should not be interpreted differently than its text and structurewould suggest.

"Accepted"

MAR 01 2023

*Taylor James Schablin*

prohibition on obstructive conduct that covers "otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *Petruk*, 781 F.3d at 447 (internal quotation marks omitted).

The plurality also found the rule of lenity "relevant" in part given the absence of limiting principles under a broad construction of Section 1519. *See Yates*, 574 U.S. at 548. But neither of the features that constrain Section 1512(c)(2)'s reach—the government's requirement to establish that the defendant acted "corruptly" and a nexus to a contemplated official proceeding, *see supra*, 17-22—is present in Section 1519. Section 1519 requires that the defendant act "knowingly" and "with the intent to impede, obstruct, or influence," 18 U.S.C. § 1519, but does not impose the more stringent "corruptly" *mens rea*. And courts of appeals have uniformly concluded that Section 1519 does not include a "nexus" requirement. *See United States v. Scott*, 979 F.3d 986, 992 (2d Cir. 2020) (Supreme Court's decisions in *Marinello*, *Arthur Andersen*, and *Aguilar* do not "overrule[]" existing circuit precedent that Section 1519 "does not have a nexus requirement"); *United States v. Moyer*, 674 F.3d 192, 209 (3d Cir. 2012) (declining to extend nexus requirement from Section 1503 and 1512(b)(2) to Section 1519); *United States v. Kernell*, 667 F.3d 746, 753-55 (6th Cir. 2012); *United States v. Yielding*, 657 F.3d 688, 712-14 (8th Cir. 2011); *see also* S. Rep. No. 107-146, at 14-15 ("[Section 1519] is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter.").[8]

To be sure, no court appears to have applied Section 1512(c)(2) to conduct precisely akin to the Defendant's alleged actions, namely, confronting and assaulting law enforcement officers as

_____

[8] The Defendant's rule-of-lenity argument (Def. Mot. at 3), which relies heavily on the *Yates* plurality's analysis, fails for the same reasons.

the defendants attempted to force their way into the Capitol to halt or delay a congressional proceeding. Even if Section 1512(c)(2)'s application to this case was "not expressly anticipated by Congress," that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (internal quotation marks and brackets omitted). That is so even if the statute's application in a particular case "reaches 'beyond the principal evil' legislators may have intended or expected to address." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)). And any policy-based suggestion "that the current scheme should be altered," *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 778 (2020), ought to be addressed to Congress, not this Court, *see, e.g.*, *United States v. Rodgers*, 466 U.S. 475, 484 (1984) ("Resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress.").

2. Even if Section 1512(c)(2) Required that the Obstructive Act Relate to Documentary or Tangible Evidence, the Defendant's Alleged Conduct Would be Covered

At a bare minimum, Section 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding. If, for example, the Defendant had corruptly blocked the vehicle carrying the election returns to the Capitol for congressional examination at the certification proceeding, that conduct would clearly fit within Section 1512(c)(2). Section 1512(c)(2) would likewise cover blocking a bus carrying the Members of Congress to the Capitol to examine the election returns at the certification proceeding. And it just as readily covers displacing the Members of Congress from the House and Senate Chambers, where they would examine and discuss those returns and other records.

No court following *Yates* has adopted an interpretation of Section 1512(c)(2) that limits it

"Accepted"
MAR 01 2023
Taylor James Johnston

to document-focused obstructive conduct. *See, e.g.*, *Petruk*, 781 F.3d at 447-48; *De Bruhl-Daniels*, 491 F. Supp. 3d at 251; *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021). But even were this Court to adopt the limitation that Section 1512(c)(2) "requires some nexus to tangible evidence," *United States v. Singleton*, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006), or a "tangible object," *United States v. Hutcherson*, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006), the Defendant's alleged conduct would still fall within the scope of Section 1512(c)(2) because the Defendant "otherwise obstruct[ed], influence[d], or impede[d]" Congress's ability to review documents that it was constitutionally and statutorily required to receive and act upon, thereby obstructing the certification of the Electoral College vote.

The certification of the Electoral College vote is rooted in federal constitutional and statutory law that requires the creation and consideration of various documents. Under the Twelfth Amendment, the state Electors must "vote by ballot," marking one set of ballots for the individual voted for as President and "distinct ballots" for the vice-presidential selection. U.S. Const. amend. XII. The Electors must then create "lists" of the presidential and vice-presidential candidates who received votes, "which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States." *Id.* These certified lists, or "certificates," are then opened by the President of the Senate "in the presence of the Senate and House of Representatives." *Id.* After opening them, the President of the Senate hands the certificates to two appointed "tellers," who in turn create a new "list" that comprises "the votes as they shall appear from the said certificates." 3 U.S.C. § 15. During the reading of the certificates, the President of the Senate must open the floor to objections; any objection "shall be made in writing . . . and shall be signed by at least one Senator and one Member of the House of Representatives." *Id.* Congress's certification of the Electoral College vote, therefore, operates through a deliberate and legally prescribed assessment

"Accepted"

MAR 01 2023

of ballots, lists, certificates, and, potentially, written objections.

Had the Defendant sought to alter or destroy any of those documents, he also would have violated Section 1512(c)(1). Instead, the Defendant allegedly sought to stop the Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election. Because the Defendant's alleged conduct thus precluded a full and fair examination of physical or documentary evidence at an official proceeding, the indictment's allegations would satisfy any extratextual "requirement" in Section 1512(c)(2) "for some nexus to a document or other tangible evidence." *Singleton*, 2006 WL 1984467, at *5.

Finally, while Section 1512(c) may have been enacted due to concerns over document destruction and corporate malfeasance, "[s]tatues often reach beyond the principle evil that animated them." *Sandlin,* 2021 WL 5865006, at *9 (finding that Section 1512(c)(2) may apply to defendants who attempted to stop the certification of the Electoral College on January 6, 2021); *see also Mostofsky*, 2021 WL 6049891 at *11 (rejecting defendant's argument that Section 1512 only applies to conduct similar to document destruction and explaining that the defendant's position "would have the Court ignore the plain meaning of the words contained in (c)(2)—to wit, 'obstructs, influences, or impedes'—which cannot be read so narrowly. The use of 'otherwise' is better understood as 'clarif[ying] that the latter prohibits obstruction by means <u>other than</u> document destruction.'") (emphasis in original); *Caldwell*, 2021 WL 6062718 at * 14 ("The natural reading of the two sections is that section 1512(c)(2) 'operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction'").

Congress's certification of the Electoral College vote on January 6, 2021 was an "official proceeding." Section 1512(c)(2) is not unconstitutionally vague or overbroad, and nothing in its text, structure, or history limits it to obstruction tied to documentary or tangible evidence. But even if such a limitation existed, the statute encompasses the Defendant's alleged conduct. Therefore, the Defendant's motion to dismiss Count One should be denied.

## II. SECTION 231 IS NOT VAGUE; IT CLEARLY ENCOMPASSES THE DEFENDANT'S ALLEGED CONDUCT

The Defendant argues that 18 U.S.C. § 231 is void for vagueness because it "improperly hinders a person of ordinary intelligence from discovering what conduct it prohibits" (Def. Mot. at 16), it relies on "subjective reactions" rendering violations unpredictable" (Def. Mot. at 19), and it lacks a scienter requirement (Def. Mot. at 20). A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Johnson*, 576 U.S. 591; *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996). As at least one judge in this district has concluded, *see Nordean*, 2021 WL 6134595, neither applies to Section 231.

Constitutional statutory analysis begins with the statute's plain language. *United States v. Shill*, 740 F.3d 1347, 1351 (9th Cir. 2014). Federal legislation enjoys a presumption of constitutionality that may only be overturned "upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

Section 231(a)(3) criminalizes "any act to obstruct, impede, or interfere with any fireman or law enforcement officer" who is engaged in the lawful performance of his official duties during a civil disorder that obstructed, delayed, or adversely affected the conduct or performance of a

39

federally protected function. 18 U.S.C. § 231(a)(3). And it does so in the context of a civil disorder, which is "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

The civil disorder statute punishes intentional conduct directed against firefighters and law enforcement officers working to protect the public during violent protests. The statute prohibits only concrete "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere" with firefighters or law enforcement. Contrary to the Defendant's arguments, those terms are quite different from statutory terms that courts have found to be vague, such as statutes that turn on subjective judgments of whether a defendant's conduct was "annoying" or "indecent." *See Williams*, 553 U.S. at 306; *see also Nordean*, 2021 WL 6134595, at *16 ("Section 231(a)(3) does not carry the potential for misunderstanding or arbitrary enforcement ... It prohibits any 'act' done "to obstruct, impede, or interfere" with law enforcement responding to a 'civil disorder.' 18 U.S.C. 231(a)(3). These terms are not 'dependent on the subjective reaction of others.'").

The statute's scope consists primarily, if not exclusively, of conduct or unprotected speech, such as threats. In other words, the civil disorder statute prohibits not the presence at a civil disorder, but rather, "an act committed during the course of such disorder." *United States v. Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971). It covers intentional conduct, not "mere inadvertent conduct." *United States v. Featherston*, 461 F.2d 1119, 1122 (5th Cir. 1972). Moreover, Section 231(a)(3) is not unique; many state and federal statutes likewise criminalize obstructing the government's efforts to enforce the law and maintain public order. *See, e.g.*, 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation);

*United States v. Brice*, 926 F.2d 925, 930-31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101-20.305, regulation prohibiting impeding or disrupting government duties); *see also* Cal. Penal Code § 148 (prohibiting resisting, delaying, or obstructing any peace officer or emergency medical technician); *State v. Illig-Renn*, 341 Or. 228 (2006) (rejecting constitutional attacks leveled against O.R.S. 162.247(1)(b), which prohibits interference with a police officer); *State v. Steen*, 164 Wash. App. 789, 808 (2011) (rejecting as applied constitutional challenge to RCW 9A.76.020(1), which criminalizes obstructing police officers).

      The Defendant's argument that the statute lacks an express *mens rea* ignores the fact that Section 231(a)(3) requires intent, which narrows its scope. *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad). The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a firefighter or police officer, *i.e.*, the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 854 F.2d at 854 (construing Section 231(a)(3) to include an intent requirement). This requirement that a defendant who violates Section 231(a)(3) act with the intent to obstruct, interfere or impede is critical to the First Amendment analysis. *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987) (intent requirement prevents application of statute to protected speech). And even if the statute lacked an express scienter requirement, courts "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a mens rea element even when none appears on the face of the statute.").

Accepted
MAR 01 2023
Taylor James Arhabbes

As to the Defendant's arguments that Section 231 is overbroad, potentially including "free speech and expressive conduct" (Def. Mot. at 16, 18), as discussed above, this suggestion directly conflicts with the plain text of the statute, which is directed at "any act to obstruct, impede, or interfere." *See Nordean*, 2021 WL 6134595, at *17 (internal citation omitted). "But even acknowledging the potential for unlawful applications, '[t]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Mostofsky*, 2021 WL 6049891 at *8 (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)); *see also Howard*, 2021 WL 3856290, at *11 (rejecting overbreadth claim that "because the statute does not require a violent act or an assaultive act, the government perhaps could charge someone who yelled at an officer during a civil disorder and could argue that the yelling was an "act" that "attempted to obstruct" an officer performing her lawful duties"). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Laws like Section 231(a)(3) that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124. Indeed an "overbreadth challenge" to such a law will "[r]arely, if ever … succeed." *Id.*

Overbreadth can invalidate a criminal law only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008), quoting *New York v. Ferber*, 458 U.S. 747, 769-771 (1982); *see also City of Houston v. Hill*, 482 U.S. 451, 458 (1987). "A statute is facially invalid if it prohibits a substantial amount of protected speech."

*Williams*, 553 U.S. at 293; *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). An overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as Section 231(a)(3) assuredly does. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

Because "the statute does not attempt to curtail speech the defendants may not challenge it as vague or overly broad if their own conduct may be constitutionally prohibited, since … one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." 854 F.2d at 853, citing *United States v. Raines*, 362 U.S. 17, 21 (1960). Accordingly, as the Court in *Mostofsky* found, Section 231's "plain text, however, indicates that it is 'targeted primarily if not exclusively at conduct rather than speech'" and the defendant's overbreadth challenge was without merit. *Mostofsky*, 2021 WL 6049891 at * 8.

The indictment identifies a federally protected function that was obstructed, delayed or adversely affected by a civil disorder. Because Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden," *Mechanic*, 454 F.2d at 854, the Defendant's motion to dismiss as to Count Three should be denied.

## III.    18 U.S.C. § 1752(a)(1) DOES NOT INFRINGE UPON THE DEFENDANT'S FIRST AMENDMENT RIGHTS

The Defendant suggests that the act of shoving a barricade into police officers tasked with protecting the Capitol building and grounds is somehow shielded from prosecution because it represents expression (Def. Mot. at 21-22). The Defendant's argument is both legally and factually flawed. Notwithstanding the Defendant's efforts to characterize his conduct as mere political

protest to "convey his disagreement with the results of the 2020 election" where the "target of his expression was Congress ... certifying the election results that same day" (Def. Mot. at 22), the Defendant intentionally invaded the Capitol grounds. These unlawful actions by the Defendant plainly distinguish his conduct from lawful assembly. Indeed, the Defendant fails "to identify *any* protected activity that the statute covers—or even chills." *Montgomery* 2021 WL 6134591, at *24 (where government alleged defendants assaulted an officer on Capitol grounds before entering the Capitol building, the Court noted that, to the extent defendants maintain that they merely intended to utilize their First Amendment rights to free speech and assembly, that is a "factual argument for the jury") (emphasis in original).

In *Texas v. Johnson*, 491 U.S. 397, 403, (1989), the Supreme Court explained the procedure for determining whether a defendant may invoke the First Amendment to challenge a criminal charge. First, the court must determine whether the defendant's conduct "constituted expressive conduct." *Id.* If the conduct was not expressive, the challenge fails. *Id.* Second, if the conduct was expressive, the court must determine if the statute is "related to the suppression of free expression." *Id.* If the statute is not related to the suppression of free expression, the court applies the "less stringent standard" for noncommunicative conduct laid out in *United States v. O'Brien*, 391 U.S. 367, 377 (1968). *Johnson*, 491 U.S. at 403. If the statute is related to the suppression of free expression, the court must apply a "more demanding standard" to determine if the government's interest justifies imposition of criminal liability. *Id.*

Under *O'Brien*, the statute is constitutional only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental

"Accepted"

MAR 01 2023

Taylor James Johnatakis

restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377.

Here, the Defendant's conduct was not "expressive," and thus his challenge fails before reaching the *O'Brien* factors. Whatever the Defendant was doing in Washington, D.C. on January 6, there is no doubt that it culminated with him grabbing a barricade on Capitol grounds and pushing it into officers *to gain further access to restricted grounds without lawful authority to do so*. This is the conduct at issue, not his "expressive conduct" (or speech). As an example, say a person, believing an ongoing trial to be unjust, breaks into a courtroom in order to delay a judge from presiding over the trial, and accomplishes that delay by both her presence in the courtroom and her shouting at the judge. The First Amendment does not protect the person from an obstruction of justice charge; her "expressive conduct" of shouting at the judge is not the conduct that the statute criminalizes. To the contrary, it is the person's *actus reus* (presence and physical disturbance in the courtroom) coupled with her *mens rea* (corruptly intending to prevent the trial from proceeding) that violates the obstruction statute. The same is true here. "[E]ven if the charged conduct had some expressive aspect, it lost whatever First Amendment protection it may have had" *Nordean*, 2021 WL 6134595, at *13 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment."); *Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (government may punish physical obstruction); *Cox v. Louisiana*, 379 U.S. 536, 555 (1965) (The First Amendment does not allow a "group of demonstrators" to "insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."); *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir. 2000) ("Activities that

"Accepted" MAR 01 2023 *Taylor James Johnston*

injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message.")).

But even if the *O'Brien* factors apply, the Defendant's argument still fails. The Defendant argues that the government's application here violates the fourth *O'Brien* factor, *i.e.*, the restriction on alleged First Amendment freedoms is greater than is essential to further the government interest (Def. Mot. at 23). But here, the government interest in protecting the integrity and continuity of congressional proceedings is unrelated to any incidental impact that the application of the law may have on the ability to petition government for a redress of grievances. Additionally, the statute goes no further than what is "essential" to prevent the obstruction of official proceedings of Congress. The Supreme Court has upheld restrictions on demonstrations in Washington, D.C., with far less at stake than the integrity of the U.S. Presidential Election. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (upholding a ban on overnight camping on the National Mall and finding a "substantial Government interest in conserving park property, an interest that is plainly served by, and requires for its implementation, measures such as the proscription of sleeping that are designed to limit the wear and tear on park properties").

Ultimately, the Section 1752 does not touch exclusively expressive conduct. The statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…" It does not criminalize speech or peaceful assembly, nor does the government allege such conduct. Instead, the government alleges that the Defendant entered and remained on restricted grounds, engaged in disorderly and disruptive conduct, and committed an act of physical violence against officers. *See* ECF No. 53. The Defendant's attempts to recharacterize his behavior as peaceful assembly fail, and his motion to dismiss Counts Four through Six should be denied.

## IV. COUNTS FOUR THROUGH SIX STATE AN OFFENSE; THE DEFENDANT'S ALLEGED CONDUCT CLEARLY VIOLATES SECTION 1752

The second superseding indictment charges the Defendant with violating 18 U.S.C. § 1752(a) by being unlawfully present on restricted grounds, engaging in disorderly and disruptive conduct, and committing an act of physical violence against officers. The Defendant challenges Counts Four through Six in three respects: (1) the Secret Service was required to establish the restricted grounds; (2) the government did not allege that the Secret Service restricted the Capitol Grounds on January 6; and (3) the Secret Service protectee—whose presence makes certain grounds restricted— was not a "visitor" (Def. Mot. at 24-29). Courts in this district have rightly rejected this contention. *See Griffin*, 2021 WL 2778557; *Mostofsky*, 2021 WL 6049891; *Nordean*, 2021 WL 6134595. Because the U.S. Capitol was a restricted building on or about January 6, 2021, the Defendant's argument fails.

### A. 18 U.S.C. § 1752 Does Not Require the Government to Prove That the Restricted Area Was Restricted at the Secret Service's Direction

The Defendant argues that the indictment should be dismissed for failure to state an offense because the USSS did not designate the "restricted area" under 18 U.S.C. § 1752 (Def. Mot. at 24), and therefore the government cannot allege that the Secret Service restricted the Capitol Grounds on January 6 (Def. Mot. at 25). That argument misunderstands Section 1752's text.

Section 1752 provides in relevant part:

(a) Whoever—

    (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(c) In this section—

    (1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

"Accepted"
MAR 01 2023
Taylor James Johnatakis

    (B) of a building or grounds where the President or other person protected
by the Secret Service is or will be temporarily visiting;

18 U.S.C. § 1752. In short, Section 1752 "prohibits persons from knowingly entering without

lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or

grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson*

*v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir.

2020).

    To determine the meaning of a statute, the Court "look[s] first to its language, giving the

words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal*, 498 U.S. at 108);

*see Public Investors Arbitration Bar Association v. U.S. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C. 2013)

(Howell, J.) ("a reviewing court must accord first priority in statutory interpretation to the plain

meaning of the provision in question."). Where, as here, the statute in question's words "are

unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020)

(internal quotation marks omitted).

    Section 1752's text is clear. It proscribes certain conduct in and around "any restricted

building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term

"restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or

otherwise restricted area . . . of a building or grounds where the President or other person protected

by the Secret Service is or will be temporarily visiting." § 1752(c)(1)(B). Through a cross-

reference, Section 1752 makes clear—and the Defendant does not appear to dispute—that

"person[s] protected by the Secret Service" include the Vice President and the Vice President-

elect. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or

grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, §

1752(a)(1); knowingly and with intent to impede or disrupt government business, engaging in

"Accepted"

MAR 01 2023

Taylor James Johnston

"disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2); and knowingly engaging in any act of physical violence against any person or property, § 1752(a)(4).

That straightforward analysis has a straightforward application to the facts alleged in the Defendant's case. The second superseding indictment alleges that, on January 6, 2021, a protected person was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted—making it a "restricted building or grounds" under § 1752(c)(1). The indictment further alleges that the Defendant knowingly and without lawful authority entered and remained in that restricted buildings and grounds. It also alleges that the Defendant, knowingly and with the intent to impede or disrupt government business, engaged in disorderly conduct that resulted in a disruption to government business. Finally, it alleges that the Defendant knowingly engaged in any act of physical violence against any person or property. In short, the allegations closely track the statutory language.

Looking outside Section 1752's language, the Defendant urges the Court to import an extra-textual requirement that the USSS be required to designate the restricted area. That is so, the Defendant claims, because Section 1752 "does not state that any other agency is permitted to designate events for security…" (Def. Mot. at 25). This argument fails. Section 1752 is directed not at the USSS, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668-69 (2006). Second, the legislative history in fact undercuts the Defendant's argument. As he explains (Def. Mot. at 24), an earlier version of the statute explicitly incorporated regulations

promulgated by the Department of the Treasury (which at the time housed the USSS) governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). But Congress's decision in 2006 to "eliminate reference to regulations" indicates that the statute no longer depends on whether the USSS has defined an area as "restricted."

The Defendant's reliance on statutory purpose and legislative history suffers a bigger flaw: it focuses outside the text when the text itself is clear. Such an inquiry is permissible only where literal application of statutory language either results in an outcome that can truly be characterized as absurd or produces an outcome that is demonstrably at odds with clearly expressed Congressional intent. *See United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940). Here, neither is the case. The statute sets clear limitations on where restricted areas may be established. The statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…" The statute does not criminalize an individual who enters an area in a building or grounds separate from where a Secret Service protectee is present, regardless of restrictions placed by law enforcement.

Nor does the Defendant muster support for the claim that the literal application of the statute would be at odds with Congressional intent. The language of the statute is the best evidence of Congressional intent. *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 84 (1991). This statute was intended to ensure the safety of USSS protectees. If Congress intended to give USSS sole authority to designate a restricted area, it could have written that into the statute or amended the statute to reflect that intent. In 1970, Congress enacted 18 U.S.C. § 1752 to include subsection (d), which gave authority to the Department of Treasury, which then oversaw USSS, to

50

"prescribe regulations governing ingress or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). Congress was clearly aware that the prohibitions in 18 U.S.C. § 1752 could turn on decisions made by USSS but chose not to include that in the revised statute.

### B. Claims That Then-Vice President Pence Was Not a "Visitor" Are Meritless

The Defendant makes much of whether Vice President Pence was merely "visiting" or whether he was working on at his normal place of business on January 6. This distinction is meaningless. Despite the Defendant's assertion that the Vice President "lives and works" in the Capitol (Def. Mot. at 28), the statute itself accounts for where the Vice president resides in Section 1752(c)(1)(A). And, the Vice President regularly "works" in several places. That former Vice President Pence had a permanent office for when he visited the Capitol building does not invalidate the clear text of the statute.

As discussed above, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). At the time the Defendant assaulted officers on Capitol grounds on January 6, 2021, three Secret Service protectees—Vice President Pence and two immediate family members—were present. The Defendant's conduct accordingly falls within the Section 1752's plain sweep because he unlawfully entered restricted grounds while the Vice President and his family were "temporarily visiting."

"Accepted"

MAR 01 2023

*Taylor James Johnston*

The Defendant stresses that Vice President Pence had a permanent U.S. Capitol office. Section 1752(c)(1)(B), however, defines the restricted area by reference to the location of the protectee—not his office. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]."[9]

The verb "visit" means, *inter alia*, "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[10] Either definition describes the Secret Service protectees' activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. Similarly, the Vice President's family members came to the U.S. Capitol for a particular purpose: to observe these proceedings. Finally, as President of the Senate, Vice President Pence oversaw the vote certification. Given the presence of the Vice President and his family members, the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] ... temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

The parties need not go into a deep dive of legislative history to determine the exact length of time needed to qualify as a "temporary visit." To the extent that Vice President Pence's stay was extended, it was because a crowd of rioters, including the Defendant, were holding hostage the certification process. However long that ultimate stay, it did not morph into residence.

---

[9] This argument also ignores the fact that the Vice President's family did not live or work at the U.S. Capitol. Assuming, *arguendo*, the defendant's argument that the Vice President cannot "temporarily visit" a place where he maintains an office, the charges in the Superseding Indictment remain supported because these other Secret Service protectees did not work at the U.S. Capitol or have offices there.

[10] https://www.merriam-webster.com/dictionary/visit

All told: The Defendant's position defies Section 1752's clear purpose. *Cf. Genus Med. Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 637 (D.C. Cir. 2021) ("[I]f the text alone is insufficient to end the inquiry, we may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.") (internal quotation marks and citation omitted). In drafting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or grounds" where they happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B).

The Defendant's cited cases—involving either an arrest or conviction under Section 1752—do not discuss the "temporarily visiting" language (Def. Mot. at 28-29); *see United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot*, 1990 WL 66533 (9th Cir. May 18, 1990); *Blair v. City of Evansville, Ind.*, 361 F. Supp.2d 846 (S.D. Ind. 2005). They accordingly lack relevance to the present dispute. No support exists for the Defendant's effort to insert such large and irrational exceptions into the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (noting that courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it") (citation omitted).

53

All the relevant metrics—plain language, statutory structure, and congressional purpose—foreclose the Defendant's crabbed reading of Section 1752(c)(1)(B). This Court should reject it and should deny the Defendant's motion to dismiss Counts Four through Six.

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the Defendant's motion be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:   */s/ Angela N. Buckner*
Angela N. Buckner
DC Bar #1022880
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (202) 252-2656
Email: angela.buckner@usdoj.gov

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

**"Accepted"**

MAR 01 2023

*Taylor James Johnstales*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,    )
)
        v.                    )      **Case No. 21-091 (RCL)**
)
ISAAC STEVE STURGEON,        )
)
            **Defendant.**    )
)

## DEFENDANT'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE, AND SIX OF THE SUPERSEDING INDICTMENT

The defendant, Isaac Sturgeon, files this motion to dismiss counts 1, 3, 4, 5, and 6 of the

Superseding Indictment filed on November 10, 2021 (*See* ECF No. 53), pursuant to Fed. R.

Crim. P. 12(b). For the reasons discussed below, these counts fail to state an offense and fail to

give proper notice to the defendant. Additionally, count five unconstitutionally infringes on Mr.

Sturgeon's First Amendment rights.

## BACKGROUND

On March 27, 2021, Mr. Sturgeon was arrested on an indictment charging him with

violating 18 U.S.C. §111(a)(1); 18 U.S.C. §231(a)(3); 18 U.S.C. §1752(a)(1), (2), and (4); 40

U.S.C. §5104 (e)(2)(E), and (F); and 18 U.S.C. §1512(c)(2). *See* ECF Dkt. Nos. 3, 14. On May

7, 2021, the government filed a Superseding Indictment alleging the same offenses and changing

the language under Count 2, 18 U.S.C. §111(a)(1) to allege a felony offense. *See* ECF Dkt. No.

34. On November 10, 2021, the government filed a second Superseding Indictment changing the

language in counts 4, 5, and 6 to remove the former Vice President Elect as a person who was

"temporarily visiting." *See* ECF Dkt. No 53. Mr. Sturgeon is charged alongside two other co-

1

"Accepted"

MAR 01 2023

*Taylor James Johntakis*

defendants, Craig Michael Bingert and Taylor James Johntakis. *Id.*

The government alleges that Mr. Sturgeon entered the Capitol grounds on January 6, 2021, and stood with a large group of individuals on the West Terrace in front of a line of Metropolitan Police Officers ("MPD") officers. The government further alleges Mr. Sturgeon committed an act of assault by allegedly joining an effort to push a barricade.[1] However, the government does not allege that Mr. Sturgeon entered the Capitol building at any point in time.

## LEGAL AUTHORITY

An Indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United*

---

[1] When looking at the entirety of the video evidence provided by the government, this allegation is unsupported. The video evidence, does however, show that Mr. Sturgeon actually assisted MPD by handing them an object that accidentally landed on the protester's side that could have been used to hurt them by other protestors.

"Accepted"

MAR 01 2023

Taylor James Johnston

*States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id.* (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole. *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Lastly, government regulation of expressive conduct protected by the First Amendment is only justified if "the regulation is within the constitutional power of the Government; if it furthers an important or substantial governmental interests; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United*

"Accepted"

MAR 01 2023

Taylor James Johnatakis

*States v. O'Brien*, 391 U.S. 367, 377 (1968).

Under the foregoing legal authority, counts 1, 3, 4, 5, and 6 of the Superseding

Indictment should be dismissed by the Court.

### ARGUMENT

I. <u>18 U.S.C. §1512(c)(2) as Alleged in the Superseding Indictment Fails to State an Offense</u>

a. **Congressional Intent and Statutory Construction of 18 U.S.C. §1512(c)(2)**

Analyzing the congressional intent and plain meaning of the statute, it is clear that 18

U.S.C. §1512(c)(2)'s purpose is to protect the integrity of hearings before tribunals by preventing

witness tampering and destruction of evidence.

18 U.S.C. §1512(c) provides: "Whoever corruptly –

(1) Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) Otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so…shall be fine….or imprisoned…

§1512(c). In turn, an "official proceeding" is defined as –

(1) A proceeding before a judge or court of the United States, a United states magistrate judge, bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(2) A proceeding before the Congress;

(3) A proceeding before a Federal Government agency which is authorized by law; or

(4) A proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the

business of insurance whose activities affect interstate commerce;

§1515(a)(1).

18 U.S.C. §1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, which is titled "Corporate Fraud Accountability," and which targets "corporate malfeasance." Pub.L. No. 107-204, 116 Stat. 745. Sarbanes-Oxley was designed to "protect investors and restore trust in financial markets following the collapse of the Enron Corporation" after revelations that Enron's outside auditor had "systematically destroyed potentially incriminating documents." *Yates v. U.S.* 574 U.S. 528, 532 (2015). In *Yates*, the Supreme Court narrowly interpreted the term "tangible object" in §1519 in keeping with the specific context and purpose of Sarbanes-Oxley.[2] Recognizing that, in the Sarbanes-Oxley legislation, "Congress trained its attention on corporate and accounting deception and cover-ups." *Id.* at 532. The Supreme Court held that the Act did not contemplate penalizing the act of tossing undersized fish overboard to avoid the consequences of an inspection by federal authorities. Rather, in the context of the statute's purpose, a "tangible object' must be one used to record or preserve information." *Id.* So while fish are tangible objects in the ordinary sense of that phrase, they do not qualify as tangible objects for purposes of §1519.

In an amendment to §1512, the Sarbanes-Oxley Act added the current subsection (c)(2), which penalizes corruptly obstructing, influencing, or impeding "any official proceeding." The term "official proceeding" is defined in §1515 to include a proceeding "before a judge or court of the United States" and a proceeding "before the Congress." Like the phrase "tangible objects" in

---

[2] 18 U.S.C. §1519 provides: [w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States…..

§1519, the phrase "official proceeding" in §1512 requires interpretation.

"Dictionary definitions of the term 'proceeding' alone...cannot conclusively resolve" whether a proceeding is an "official proceeding" under §1512. *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013). Further, courts have interpreted "official proceeding" to imply something formal. *See, e.g., United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106; *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) ) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses "events that are best thought of as hearings (or something akin to hearings"). As with the phrase "tangible object" in §1519, the phrase "official proceeding" must be interpreted in light of the statute's express purpose, which is "to enhance and protect the necessary role of crime victims and witnesses in the criminal justice process." *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008).

In the context of this "witness tampering" statute, an "official proceeding before the Congress" is logically limited to the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents destroyed. *See* S.Rep. No. 107-146, at *6 (2002). Not only must "the charged conduct have some reasonable nexus to a record, document or tangible object," *United States v. Singleton*, 2006 WL 1984467 *3 (S.D. Tex. 2006), or to witness testimony, *United States v. Kumar*, 617 F.3d 612, 619-20 (2d Cir. 2010), but the obstruction must concern a proceeding involving adjudicative or at least "quasi-adjudicative responsibilities." *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).

In *Ermoian*, for example, the Ninth Circuit held that an "official proceeding" suggests a "formal appearance before a tribunal;" an FBI field investigation did not qualify. 752 F.3d at

1170-71. "[W]hen examining the term 'proceeding' within the grammatical structure of the definition at issue, it becomes clear that the term connotes some type of formal hearing." *Id.* The court focused on the contextual language that §1512 uses when referring to "official proceeding" explaining that §1512 refers to "preventing the attendance or testimony of any person"; "preventing the production of a record, document, or other object, in an official proceeding; and being absent from an official proceeding to which that person has been summoned by legal process." *Id.* at 1171-1172. It was important to the court that the statute used the words, "testimony," "attendance," "production," and "summons," all of which "strongly implies a hearing before a formal tribunal." *Id.* at 1172. *Accord United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014) ("official proceeding" for purposes of §1512(c) did not include an FBI investigation); *Sutherland* at 921 F.3d at 426 (the term "proceeding" implies 'some formal convocation....in which parties are directed to appear") (quoting United States v. Young, 916 F.3d 368, 384 (4th Cir. 2019)).[3]

### b. The Electoral Count on January 6 Was Not an "Official Proceeding"

When considering the legislative history of 18 U.S.C. §1512 and Congress's role in counting electoral votes pursuant to the 12th Amendment and the Electoral Count Act of 1887, later codified in 3 U.S.C. §15, the electoral count is clearly a ceremonial and administrative event that does not qualify as an "official proceeding." The Twelfth Amendment and the Electoral Count Act of 1887 place the responsibility on Congress to count electoral votes after the states have already heard any disputes and certified the vote. *Bush v. Gore*, 531 U.S. 98, 154

---

[3] The D.C. Circuit has not addressed the question, except in a pre-Sarbane-Oxley version of § 1512, one that did not include the current subsection (c)(2), where the Court held that by entering into a plan to encourage others to falsify documents and to testify falsely before the Inspector General in a matter that was to be passed to the grand jury, the defendant obstructed an official proceeding. *United States v. Kelley*, 36 F.3d 1118, 1123 (D.C. Cir. 1994).

(2000) (Breyer, J., dissenting). Members of Congress may make an objection, in writing, and without argument. 3 U.S.C. §15. According to the statute, there is no testimony, no witnesses, no argument, and no evidence. *Id.* Given this, an electoral count is simply not an adjudicative proceeding of the type that falls within the ambit of a witness tampering statute such as 18 U.S.C. §1512(c)(2).

The purpose of the Electoral Count Act of 1887 was to resolve years of confusion as to what exactly Congress's role was in counting the electoral votes. The seven sections of the Act attempt to do five things:

> (1) Give the states enough time between election day and elector balloting day to settle controversies over the appointment of their presidential electors (Section 1);
>
> (2) Encourage the states to establish mechanisms for resolving contests over the appointment of presidential electors prior to the day of electoral balloting (Section 2);
>
> (3) Publicize and place on the record the states' determination of the outcome of their electoral appointment process (Section 3)'
>
> (4) Minimize congressional involvement in resolving controversies over elector appointment not authoritatively resolved by the states (Section 4);
>
> (5) Settle procedural issues for conducting the joint session at which Congress counts the states' electoral votes (Sections 4-7).[4]

The sponsors of the Electoral Count Act hoped that "if the disputes touching the Constitution of the Electoral Colleges in the States could be disposed of in advance of their action, the counting of the electoral votes at the seat of government...would be usually a little more than a *formal ceremony*."[5] Section 5 of the Act provides that the "State's selection of

---

[4] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 578 (2004)

[5] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 585 (2004) (quoting Senator George Edmunds in H.R. Misc. Doc. No. 44-13, supra note 31, at

electors "*shall be conclusive*, and shall govern in the counting of the electoral votes" if the procedural rules have been followed. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J., concurrence) (emphasis added). Thus, the legislative history of the Act demonstrates that Congress's Electoral Count is intended to be a "ceremonial" finalization and recording of the votes that have already been certified by the states. So while Congress is in session on January 6, it is not an "official proceeding" for purposes of §18 U.S.C. 1512(c) and 1515(b).

Count One of the Superseding Indictment, which charges that Mr. Sturgeon intended to "impede or influence" Congress's certification of the Electoral College vote, is based on the belief that the "ceremonial" vote count is an "official proceeding" for purposes of 18 U.S.C. §1512(c). However, as outlined by the legislative history and purpose of the Electoral Act of 1887, "obstruction of an official proceeding before Congress" was never intended to apply to an event, like the vote count, that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication. Many congressional hearings *do* involve witness testimony and documentary evidence, and allow Congress to exercise their investigatory power. In those instances, Section 1512(c) protects the integrity of witness testimony and evidence. *See generally United States v. Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991) (discussing how the Victim and Witness Protection Act of 1982 created a new provision, §1512, which prohibits various forms of witness tampering). By contrast, Congress's counting of the Electoral College votes is not an adjudicative proceeding; Congress was merely tasked the ceremonial and administrative task of confirming the requirements for certification have been followed *after* the states previously have determined that the votes were lawfully certified.

This administrative and ceremonial proceeding is not the target of §1512(c) and

---

18).

the government cannot conveniently group the unique tradition of the Electoral Count with every other Congressional hearing as they are completely different and possess different functions and characteristics. The government also cannot ignore years of precedent and legislative history plainly demonstrating that 18 U.S.C. §1512(c)(2) is limited to adjudicative hearings where there is a potential for destruction of documents and witness tampering.

### c. Even if the Court Determines that the Electoral Count is an "Official Proceeding," 18 U.S.C. §1512(C)(2) is Unconstitutionally Vague and is Especially Vague as Applied to this Case

Under the same principles of *United States v. Johnson,* 576 U.S. 591 (2015) and its progeny, 18 U.S.C. §1512(c)(2) violates due process as it is vague and does not provide fair notice to Mr. Sturgeon as to the conduct it punishes. The statute provides that:

"Whoever *corruptly –*

1. Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an *official proceeding*; *or*

2. *Otherwise obstructs, influences, or impedes any official proceeding*, or attempts to do so…shall be fine….or imprisoned…

18 U.S.C. §1512(c)(1)(2)(emphasis added). Section 1512(c)(2) uses words throughout both sections that require courts – and anyone reading the statute - to speculate as to their meaning in the context of a defendant's particular actions. Courts must speculate as to the meaning of the word "corruptly" acted and the phrase "official proceeding." Even more problematic is that subsection (c)(2) is a "residual clause," one that is ambiguous and requires courts to determine exactly what line must be drawn in determining if a defendant is *otherwise* obstructing, impeding, or influencing an official proceeding before Congress.

In *Johnson,* the Supreme Court explained that "the indeterminacy of the wide-ranging

inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." 576 U.S. at 597. There, the Court found a due process violation where a defendant's sentence was enhanced by the residual clause in the Armed Career Criminal Act if the prior felony "involved conduct that presented a serious potential risk of physical injury to another." *Id.* at 591. The residual clause violated due process because it required speculation in each case as to what could potentially cause injury in each set of circumstances. *Id.* at 598. The resulting ambiguity caused a wide range of interpretation and disparity among courts over the course of nine years and the Court acknowledged that the "failure of persistent efforts to establish a standard can provide evidence of vagueness." *Id.*

Similarly, the discussion above regarding what constitutes an "official proceeding" illustrates just part of the confusion and lack of cohesiveness among jurisdictions as to what does or does not qualify as an "official proceeding" under §1512(c)(2). In each case, the courts have had to speculate and attempt to distinguish "official proceedings" from other proceedings or investigations. While, as discussed above, courts have interpreted "official proceeding" to mean something more than an investigation and something more formal, there is no established standard, leaving ambiguity among the courts. *See United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006); *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019); *United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014).

The vagueness of §1512(c)(2) is not limited to the confusion surrounding what constitutes an "official proceeding." The D.C. Circuit has acknowledged that the word "corruptly" is vague on its face as used in a similar statute, 18 U.S.C. §1505, that prohibits obstruction of a proceeding before departments, agencies or congressional investigations. The

"Accepted"
MAR 01 2023
Taylor James Schnables

court held that "in the absence of some narrowing gloss, people must guess at its meaning and application." *United States v. Poindexter*, 951 F.2d 369, 398 (D.C. Cir. 1991). Previously, in *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir. 1968), the court held a statute that criminalized "leading an immoral or profligate life" vague because it found "immoral" to be synonymous with "corrupt, depraved, indecent, dissolute, all of which would result in "an almost boundless area for the individual assessment of another's behavior." *Poindexter*, 951 F.2d. at 399 (quoting *Ricks*, 414 F.2d at 1097). The court explained that various dictionary definitions of the word "corrupt" did not reduce the confusion as to its meaning for purposes of the statute. *Id.* After an assessment of the legislative history and judicial interpretation, the court concluded that neither of those inquiries provided defendants with the constitutionally required notice that the statute requires, and found the term vague as applied to the defendant making false statements. *Id.* at 406.

Following *Poindexter*, Congress amended §1515 to define "corruptly" for purposes of §1505 only to mean "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." §1515(b). However, this amendment did not resolve the vagueness that still exists in §1512 as Congress did not amend §1515 as it applies to §1512.

Even though the D.C. Circuit later held that the word "corruptly" was not vague as applied, it was because in that case the defendant influenced a witness which fit squarely within the non-vague category that *Poindexter* established. *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996). In *Morrison*, the defendant tried to influence a witness's testimony and "exhorted her to violate her legal duty to testify truthfully in court." *Id.* The Court in *Poindexter*

12

explained that influencing another to "violate their legal duty" was not vague because "it would both take account of the context in which the term "corruptly" appears and avoid the vagueness inherent in words like "immorally." *Poindexter*, 951 F.2d at 379. However, *Morrison* was not faced with the question of what "corruptly" means in the context of Section 1512(c) and does not resolve the ambiguity that the word presents in conjunction with the rest of the statute. The phrase "corruptly influences" does not resolve the ambiguity because "influence" alone is another vague word that may mean many things and lacks the definiteness of "influencing another to violate their legal duty" stated in §1515. The various meanings of the word "influence" also support the inherent vagueness that exists in the statute especially within the context of January 6, 2021. Many individuals who were there and not charged with obstruction were there to protest the vote and hoped that their voices would be heard, just like thousands of protests that have taken place in this country. So in a sense, that is a type of intended "influence," but it cannot be the intention of Congress to criminalize the right to peacefully protest to effect change. There must be something more, such as physically doing something to influence a proceeding, which is not captured by the statute because it simply says "influence.[6]"

The government's approach to charging defendants with violating §1512(c)(2) based on the events on January 6, 2021, illustrates how vague and arbitrary the enforcement of this statute can be. While the government may contend it has some bright line rules, for example by charging individuals with a violation of §1512(c)(2) if defendants entered the Senate floor,[7]

---

[6] *See* Merriam-Webster (2021) defining influence as "the power to change or affect someone or something: the power to cause changes without directly forcing them to happen," "to affect or alter by indirect or intangible means," "to have an effect on the condition or development of."

[7] *See United States v. Paul Hodgkins*, 1:21-CR-188 (RDM); *United States v. Tommy Allan*, 1:21-CR-064 (CKK); *United States v. Jacob Chansley*, 1:21-CR-003 (RCL); *United States v. Bradley Bennett*, 1:21-CR-312 (JEB); United States v. Leo Brent Bozell IV, 1:21-cr-216 (JDB) (not alleged to be a member of the Proud Boys or the Oath Keepers).

"Accepted" MAR 01 2023 Taylor James Johnston

taking a look at some of the defendants that have been charged with a violation of §1512(c)(2), show that improper inconsistencies remain.[8]

(1) *United States v. Sean Michael McHugh*, 21-CR-436: Defendant allegedly employed bear spray in direction of officers and yelled insults at officers. Also allegedly used a megaphone and engaged crowd with chants, such as "our house!" No evidence he entered Capitol building or the Senate floor.

(2) *United States v. Kenneth Grayson,* 21-CR-224: Defendant alleged to have entered Capitol building, but not alleged to have entered the Senate chamber. Prior to January 6, 2021, he allegedly wrote in a private message, "I am there for the greatest celebration of all time after Pence leads the Senate flip! OR IM THERE IF TRUMP TELLS US TO STORM THE FUKIN CAPITOL IME DO THAT THEN!

(3) *United States v. Benjamin Larocca,* 21-CR-317: Defendant allegedly entered Capitol building while screaming "Our House!" Was with an individual who allegedly was yelling, "You fucking oath breakers!" Mr. Larocca is not alleged to have entered the Senate floor and is not a member of the Proud Boys or Oath Keepers.

(4) *United States v. Anthony Puma,* 21-CR-454: Defendant allegedly entered Capitol building while filming with a Go-Pro video. A day prior to January 6, 2021, he allegedly made certain comments on social media about "storming the house of representatives." Mr. Puma did not enter the Senate floor and was not met with resistance from law enforcement when he entered the building. While inside, he was not violent and did not destroy any property.

(5) *United States v. Dale Jeremiah Shalvey,* 21-CR-334: Defendant allegedly entered the

---

[8] These are just a few cases out of hundreds that share the same inconsistencies.

Senate Chamber and is captured on video rummaging through Senator Cruz's notes.

However, he is not alleged to be a part of the Oath Keepers or the Proud Boys.

As these cases illustrate, the government's charging decisions remain inconsistent across the circumstances of each case. Tellingly, the government does not specify what "influence" these defendants had or how exactly they "impeded." The inconsistent charging decisions along with the inherently vague words in the statute, as well as the vague "residual clause" that is the basis for charging these defendants all show that 18 U.S.C. §1512(c)(2) is unconstitutionally vague and does not provide fair notice to Mr. Sturgeon.

Importantly, the statute is especially vague as applied here to Mr. Sturgeon. The government's theory appears to be that by allegedly pushing a barricade outside the Capitol building, then that means he had the intent to obstruct a meeting occurring inside the building, which he never entered or attempted to enter. Based on this, Mr. Sturgeon could not have possibly been on notice that he was committing a felony obstruction of an "official proceeding."

Mr. Sturgeon did not do anything to actually obstruct, influence, or impede Congress. The circumstances of his case mirror those of many defendants on that day whose presence on the Capitol grounds did not place them on notice that they would be committing a felony involving criminal intent to actually "obstruct" or "impede" or "influence" an "official proceeding." Most notably in this matter, Mr. Sturgeon did not enter the Capitol building and was not a part of the group who initially breached the building. His intent was to protest on the grounds of the building and there is no evidence that he had any intent to "influence" or "impede" what was happening inside the building. It is also notable that Mr. Sturgeon did not shout at officers, insult, or threaten them while on the Capitol grounds.

## II. Section 231(a)(3) is Also Unconstitutionally Vague and Fails to Provide Sufficient Notice

15

A criminal statute is void for vagueness when it (1) "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden," *United States v. Harriss*, 347 U.S. 612, 617 (1954); or (2) "encourages arbitrary and erratic arrests and convictions." *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972).  For two additional reasons, § 231(a)(3) is subject to a particularly high level of scrutiny under this test.  First, it imposes criminal penalties, and "[c]riminal statutes must be scrutinized with particular care" under the vagueness test. *Hill* at 459.  Second, it threatens to interfere with First Amendment rights, which means "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

### a. The Statute's Imprecise Language Improperly Hinders a Person of Ordinary Intelligence from Discerning What Conduct It Prohibits

Ordinary citizens are entitled to "be informed as to what the State commands or forbids." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (citing *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).  Here, a person of ordinary intelligence must guess at the meaning of Section 231(a)(3) because it is replete with vague and imprecise terms.  The statute provides:

> "Whoever commits or attempts to commit ***any act* to *obstruct, impede, or interfere*** with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties ***incident to and during the commission of a civil disorde***r which in any way or degree ***obstructs, delays, or adversely affects*** commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.."

18 U.S.C. §231(a)(3) (emphases added).

"Any act" can include anything from protected free speech and expressive conduct to an egregious assault.  Further, "to obstruct, impede, or interfere," contains the identical and improper vagueness as 18 U.S.C. §1512, which is discussed above.  The most problematic part

of the statute, however, is how to decipher what "incident to and during the commission of a civil disorder" means. The statute defines "civil disorder" as:

> "Any public disturbance involving acts of violence by assemblages of three or more persons which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

18 U.S.C. §232(1). However, the statute fails to instruct whether a defendant must have participated in that civil disorder and/or how physically close a defendant must be for the conduct to count as "incident to." Lastly, the statute ends again with the vague words, "in any way *obstructs, delays, or adversely affects* commerce." This phrase opens the door for endless subjectivity over (1) what constitutions obstruction and/or delay, and (2) what does or does not constitute an "adverse effect," and (3) what is sufficiently material "affect upon commerce" to fall within the proscription of the statute.

Unsurprisingly, a South Carolina ordinance with similar language was found unconstitutionally vague in *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 554 (D.S.C. 2013). That ordinance made it unlawful "for any person to interfere with or molest a police officer." *Id.* Like that ordinance, Section 231 (a)(3) "includes no objective standard to guide the police in determining that conduct constitutes unlawful interference...."*Id.* Because there is no standard to provide such guidance, the statute "authorizes, if not encourages, discriminatory enforcement." *Id.* Similarly, the language of Section 231(a)(3) includes the word "interfere" and there is no standard to guide law enforcement to discern what the word means. Furthermore, the neighboring words in the statute do not make the ambiguous words any more clear; if anything, the other words of the statute increase the confusion.

As discussed above with the vagueness of Section 1512(c)(2)'s "residual clause," Section 231(a)(3)'s language requires courts to undertake an indeterminate, "wide-ranging inquiry" that

"Accepted"

MAR 01 2023

Taylor James Arnables

denies defendants fair notice and encourages arbitrary enforcement. *Johnson v. United States*, 576 U.S. 591, 597 (2015). Moreover, it provides no clearly articulated nexus between the act and the "civil disorder." And while Section 232(1) provides a definition of "civil disorder," its definition could apply to virtually any tumultuous public gathering involving more than two people. Because the statute invites the same kind of unwieldy judicial assessment struck down in *Johnson*, Section 231(a)(3) similarly should be held invalid.

Furthermore, by enacting a statute with such imprecise language, Congress created "a criminal prohibition of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). *Hill*, supra, the Court found that an ordinance's sweeping nature was neither "inevitable" nor "essential to maintain public order." 482 U.S. at 464. Because the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," it wrongly gave police "unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.* at 465. Similarly, here, § 231(a)(3) casts far too wide a net. By expansively encompassing "any act" that could interfere with the duties of a police officer or firefighter during a civil disorder, § 231(a)(3) is not limited to "violent acts" or acts that result in bodily injury or that otherwise put persons or property in imminent danger. *C.f. United States v. Reese*, 92 U.S. (2 Otto) 214, 221 (1876) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."). Moreover, the statute does not weed out those acts with protected expressive content or those that occur in a traditional public forum. Instead, Section 231(a)(3) reaches a substantial amount of expressive conduct, and without clear boundaries, the law chills free speech and invites discriminatory application by law enforcement and the government.

18

"Accepted"

MAR 01 2023

Taylor James Johnston

### b. Section 231(a)(3)'s Reliance on Subjective Reactions Renders Violations Unpredictable

Section 231(a)(3) also impermissibly requires individuals to predict how others will react to their conduct. If they fail to predict that reaction accurately, they risk violating the law. This violates the fair notice requirement under the Due Process Clause. For example, in *Coates v. City of Cincinnati*, 402 U.S. 611 (1971), the Supreme Court struck down a statute that criminalized conduct "annoying to persons passing by." *Id.* at 614. The Court reasoned that, while the city was "free to prevent people" from criminalizing certain enumerated conduct, such as "blocking sidewalks" or "littering streets," it could not enforce "an ordinance whose violation may entirely depend on whether or not a policeman is annoyed." *Id.*

Similarly, in *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Supreme Court invalidated a statute that prohibited loitering "with no apparent purpose." *Id.* at 60. The Court observed that it was "difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose." *Id.* at 57.

Here, as in *Coates and Morales*, it is similarly difficult to imagine how an individual could predict the potential consequences of each act he/she commits that is somehow "incident to or during," a "civil disorder." Indeed, Section 231(a)(3) triggers criminal liability whenever the defendant's conduct interferes or impedes with a fireman or police officer performing his official duties. But a gesture, sign, or other act that distracts one officer and makes him/her feel impeded or interfered with, could have no impact at all on another. Moreover, the individual's "act" may be "incident to and during" a civil disorder that he/she is not involved in at all.

These subjective standards leave much discretion of police and prosecutors to determine whether a particular individual's conduct violates the law, and means that a potential defendant is not provided with fair and sufficient notice of what constitutes unlawful behavior. Due to this

lack of predictability and precision, §231(a)(3) violates the fair notice requirement.

### c. Section 231(a)(3) Lacks a Scienter Requirement, Which Weighs in Favor of the Law's Unconstitutionality

The Court has repeatedly affirmed that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests* at 499. But here, there is no such mitigation, because Section 231(a)(3) contains no scienter requirement, thus creating 'a trap for those who act in good faith.'" *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)). This absence weighs in further favor of the statute's unconstitutionality.

Additionally, where, as here, individuals must balance multiple factors, and are subject to strict criminal liability when they balance those factors incorrectly, a statute should be held unconstitutional. *See Colautti*, 439 U.S. at 380-95. In *Colautti*, a Pennsylvania statute required physicians to weigh several variables to determine fetus viability. *Id.* If the physician made the wrong determination after weighing these variables, the statute imposed strict criminal liability. *Id.* at 395. The Court struck down the statute, reasoning that "[t]he perils of strict liability [were] particularly acute . . . because of the uncertainty of the viability determination itself." *Id.*

Here, individuals seeking to exercise their First Amendment rights in political protest must balance several factors. They must consider whether they are sufficiently "incident to" a group of two or more people in a situation amounting to a "civil disorder," whether police or firemen are in the vicinity, and whether "any" of their acts could interfere with "any" police officer's duties, as determined by that officer. If the wrong determination(s) are made, even in good faith, he/she is now subject to criminal liability. To the extent that a scienter requirement is read into the statute, this does not cure the fair notice issue. Instead, this merely leaves police,

"Accepted"

MAR 01 2023

*Taylor James Schmetterer*

prosecutors, and judges to decide after the fact whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what).

### III.  18 U.S.C. §1752(a)(1) is Unconstitutional as Applied to Mr. Sturgeon's Conduct because it Infringes on his First Amendment Rights

Section §1752(a)(1) is unconstitutional as applied to Mr. Sturgeon because his conduct was expressive and the statute's restrictions on his First Amendment rights go beyond what is essential to further the government's interests. To determine whether § 1752(a)(1) unconstitutionally infringes on Mr. Sturgeon's First Amendment rights, the court must first decide whether his conduct was "expressive in nature." *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016).  If it was, the court must then determine whether the challenged statute "is related to the suppression of free expression." *Id.* (citing *Texas v. Johnson*, 491 U.S. 397, 403 (1989). Here, the statute is unrelated, so the court's inquiry is instead governed by the test announced by the Supreme Court in *United States v. O'Brien. Id.*

The O'Brien test has four prongs: "*First*, the challenged regulation must be 'within the constitutional power of government;' *second*, it must 'further[ ] an important or substantial government interest;' *third*, this interest must be 'unrelated to the suppression of free expression;' and *fourth*, the incidental restriction on First Amendment freedoms must be 'no greater than is essential to the furtherance of that interest.'" *Caputo*, 201 F. Supp. 3d at 71 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). If the statute fails to satisfy any of these four prongs, the statute is unconstitutional as applied. *Id.*

### A.  Mr. Sturgeon Engaged in Expressive Conduct

Mr. Sturgeon did not enter the Capitol building and was only protesting on the Capitol steps, an area "traditionally open to the public… and is a unique public forum for free

expression, open to the public throughout the year" *Kroll v. United States*, 590 F. Supp 1282, 1290 (D.D.C. 1983). As such, to prevail on his as-applied First Amendment challenge, Mr. Sturgeon must first demonstrate that his conduct was sufficiently "expressive," keeping in mind that protected expression "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Instead, the court considers "whether '[a]n intent to convey a particularized message was present and [whether] the likelihood was great that the message would be understood by those who viewed it." *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

By protesting on the Capitol grounds on January 6, 2021, Mr. Sturgeon passes this test. He was present at the Capitol to convey his disagreement with the results of the 2020 election and the target of his expression was Congress, which was inside the Capitol building, certifying the election results that same day. *Cf. Tinker v. Des Moines Indep. Cmty, Sc. Dist.*, 393 U.S. 503, 505 (1969) (recognizing the expressive nature of wearing black armbands to protest the Vietnam War). Given these circumstances, Mr. Sturgeon's presence on the Capitol grounds, along with others protesting, "possesses sufficient communicative elements to bring the First Amendment into play...." *Johnson*, 491 U.S. at 404.

## B. Section 1752(a)(1)'s restrictions on Mr. Sturgeon's First Amendment Rights go Beyond What is Essential to Further the Government's Interests

Because Mr. Sturgeon's conduct was expressive in nature, the court must determine whether the statute is related to the suppression of free expression. *See Caputo*, 201 F. Supp. 3d at 71. Here, it is undisputed that the statute is unrelated to the suppression of free expression. *See id.* (finding the same). Therefore, the court must review the as-applied challenge under the *O'Brien* test.

"Accepted"

MAR 01 2023

Taylor James Johnatakis

If § 1752(a)(1) fails any prong of the *O'Brien* test, it is unconstitutional as applied to Mr. Sturgeon. Here, there is no dispute that the statute passes the test's first three prongs. Indeed, the government has both the requisite constitutional power and a substantial government interest in preventing potentially dangerous intruders from accessing Secret Service protectees. But because the statute's restrictions on Mr. Sturgeon's particular conduct are "greater than is essential" to further this government interest, the statute fails the fourth prong. *Id.*

In *Caputo*, the court upheld a prosecution under § 1752(a)(1) of a defendant who jumped a White House fence to protest the flaws in White House security measures. *Id.* at 72. In upholding the charge, the court acknowledged that § 1752(a)(1) "categorically bars" all fence jumping protests. *Id.* at 71-72. However, it reasoned that the restriction was "easily justified, given the Government's profound interest in protecting the White House complex, the President, and the functionality of the executive branch." *Id.* at 72.

Here, a categorical bar on all election certification protests on the Capitol steps is not so easily justified. Unlike White House fence jumpers, who pose a substantial danger to the President, those who protest solely on the Capitol steps pose no similar risk. *See Dellums v. Powell*, 566 F.2d 167, 198 (D.C. Cir 1977) (observing that that there is a "broad and general invitation extended to the citizenry" to visit the Capitol and noting that "Congress invites and welcomes the public"); *Wheelock v. United States*, 552 A.2d 503, 506 (D.C. App. 1988) (quoting *Kroll*, 590 F. Supp. 1282, 1289 (D.D.C. 1983) ("The courts in this jurisdiction have long recognized that 'the United States Capitol is a unique situs for demonstration activity.'").

Moreover, unlike someone who has successfully jumped a fence and entered the White House complex, Mr. Sturgeon retained a substantial distance from both government officials and the election certification. Indeed, Mr. Sturgeon remained behind the barricades that blocked

access to the Capitol building. Given these differences, those who protest only on the Capitol steps cannot properly be treated like white house fence jumpers under the statute. Therefore, § 1752(a)(1) is unconstitutional as applied to Mr. Sturgeon.

IV. **18 U.S.C. §1752 fails to state an offense**

   a. **The United States Secret Service is the Entity that May Designate "Restricted Areas" Under the Statute, Not the United States Capitol Police**

Mr. Sturgeon is charged with three counts of violating 18 U.S.C. §1752 for "entering and remaining in a restricted building or grounds," engaging in "disorderly and disruptive conduct in a restricted building or grounds," and "engaging in physical violence in a restricted building or grounds." *See* ECF Dkt. No 53. When this statute was enacted, it is clear that the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the Treasury. Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. §1752(d)(1). It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." §1752(d)(2). There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

The USSS's duties and responsibilities are outlined in 18 U.S.C. §3056, which include:

> (e)(1): When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.

"Accepted"

MAR 01 2023

Taylor James Schneider

> (2) At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress--

> **(A)** what events, if any, were designated special events of national significance for security purposes under paragraph (1); and

> **(B)** the criteria and information used in making each designation.

§3056(e)(1)(2)(A)(B). The statute does not state that any other agency is permitted to designate events for security purposes and only explains that the USSS would be under the designation of the Department of Homeland Security instead of the Treasury Department. The statute makes the exclusive role of the USSS even clearer in §3056(g), which states:

> (g) The United States Secret Service shall be maintained as a *distinct entity* within the Department of Homeland Security and shall not be merged with any other Department function. *No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service*, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

(emphases added).

### b. The Government Does Not Allege that the Secret Service Restricted the Capitol Grounds on January 6, 2021

The Superseding Indictment charges Mr. Sturgeon with remaining or entering "restricted building or grounds," however it does not allege that the USSS designated that area as being restricted. Nor could it do so now because in *United States v. Griffen*, the government conceded that it was the United States Capitol Police that attempted to designate the area as restricted that day and not the USSS. 21-CR-92 (TNM) at Dkt. No. 33. The court in *Griffen* denied a motion to dismiss a §1752 charge on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas." *Id.* at Dkt. No. 41.

However, the plain language of 18 U.S.C. §1752(c)(B), defines "restricted building or

"Accepted"

MAR 01 2023

grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area "restricted." The legislative history bolsters this interpretation.[9]

The court in *Griffen* also hypothesized that the President would be unable to gave an to rely on the military fortification at Camp David already in existence when he visits that facility if the Secret Service was not the only entity with the statutory authority to restrict the area. *See Griffen* ECF Dkt. No. 41 at pg. 11. However, Camp David is a military installation and is not a "public forum" that needs an entity to "cordon off" areas and restrict them in light of a Presidential visit. Military bases have security and are not otherwise open to the public. And each military installation is subject to other laws that protect the facility, and those within it, from intruders. *See, e.g.*, 18 U.S.C §1382 (barring any person from entering any military installation for any purpose prohibited by law). Military bases are heavily guarded and have entrance and exit points and are different than federal buildings that need sections to be "cordoned" off in order for the general public to know which area is restricted. For these reasons, the example offered by the *Griffen* court is inapposite and does not support the court's decision.

Furthermore, if a deficiency in a statute creates an absurd result or creates arbitrary enforcement, it should not be enforced until it is amended to provide clarity and provide fair

---

[9] Congress enacted 18 U.S.C. §1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report accompanying the current version of §1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

"Accepted"

MAR 01 2023

*Taylor James Johnston*

notice to a defendant. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The *Griffen* court's reasoning creates a different kind of absurd result –viz, anyone claiming to be a part of law enforcement could post a sign designating an area as restricted and a criminal defendant could then be penalized for trespassing because they "willfully" ignored the sign.

### c. Even if the Capitol Police were Authorized to Restrict the Grounds, 18 U.S.C. §1752 is Not Applicable Because Former Vice President Pence Was not "Temporarily Visiting" the Capitol Building on January 6, 2021

Under the plain language of 18 U.S.C. §1752, the statute does not apply here. Section 1752 prohibits conduct in or near "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c); *see United States v. Samira Jabr*, Criminal No. 18-0105, Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts Four, Five, and Six of the Superseding Indictment charge Mr. Sturgeon with conduct "in a restricted building and grounds, that is, any posted, cordoned-off and otherwise restricted area *within the United States Capitol and its grounds, where the Vice President was temporarily visiting* . . ." *See* ECF No. 53, (emphasis added). The government's attempt to shoehorn Mr. Sturgeon's conduct into the statute fails. Accordingly, those three counts should be dismissed.

"Accepted"
MAR 01 2023
*Taylor James Johnatakis*

The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of § 1752(c)(1).

Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit," as the government asserts in the Superseding Indictment.

The plain meaning of "temporary" is "lasting for a time only." Black's Law Dictionary (11th Ed. 2019). "Visiting" is defined as "invited to join or attend an institution for a limited time." Merriam-Webster (2021). Together, the phrase "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis.

The former Vice President was not "temporarily visiting" the Capitol on January 6, 2021. The Capitol is a federal government building in the District of Columbia, where he lived and worked. Moreover, he actually worked at the Capitol Building and grounds—it was his place of employment. In his official capacity as the "President of the Senate," he had a permanent office "within the United States Capitol and its grounds." The Vice President was not "visiting" the Capitol Building, he was working there, carrying out his sworn official duties to by "presiding," over the vote count ceremony. *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer*.") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly "temporarily visiting." *See, e.g., United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his

way through a restricted area where then Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by United States Secret Service agents); *Blair v. City of Evansville, Ind.* 361 F. Supp.2d 846 (S.D. Indiana 2005) (defendant charged with 18 U.S.C. §1752 at protest during then Vice President Richard Cheney's visit to the Centre in Evansville, Indiana). These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose. As a result, those cases are entirely consistent with the plain meaning of section 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally. He was meeting with other government officials in a federal government building where he had a permanent office as part of fulfilling his official duties as Vice President/President of the Senate. Thus, he was not "temporarily visiting" the Capitol building as required by the plain language of 18 U.S.C. §1752.

For the above reasons, Section 1752 does not apply as charged and Counts Five, Six, and Seven, of the Superseding Indictment should be dismissed.

## CONCLUSION

For all of reasons discussed above, the Court should dismiss counts 1, 3, 4, 5, and 6 of the Superseding Indictment.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
D.C. Bar No. 1031486

29

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: One        Month: Three        Year: 2023 CE

Angela D. Caesar

Clerk of Court United States District Court District of Columbia

333 Constitution Avenue N.W.

Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 55 Filed 12/07/21 Page 1 of 30 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91-(RCL) DEFENDANT'S MOTION TO DISMISS COUNTS ONE THREE FOUR, <u>FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>**, Page 2 of 30, Page 3 of 30, Page 4 of 30, Page 5 of 30, Page 6 of 30, Page 7 of 30, Page 8 of 30, Page 9 of 30, Page 10 of 30, Page 11 of 30, Page 12 of 30, Page 13 of 30, Page 14 of 30, Page 15 of 30, Page 16 of 30, Page 17 of 30, Page 18 of 30, Page 19 of 30, Page 20 of 30, Page 21 of 30, Page 22 of 30, Page 23 of 30, Page 24 of 30, Page 25 of 30, Page 26 of 30, Page 27 of 30, Page 28 of 30, Page 29 of 30 <u>CONCLUSION</u> Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Page 30 of 30"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 55 Filed 12/07/21 Page 1 of 30 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91-(RCL) DEFENDANT'S MOTION TO DISMISS COUNTS ONE THREE FOUR, <u>FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>,** Page 2 of 30, Page 3 of 30, Page 4 of 30, Page 5 of 30, Page 6 of 30, Page 7 of 30, Page 8 of 30, Page 9 of 30, Page 10 of 30, Page 11 of 30, Page 12 of 30, Page 13 of 30, Page 14 of 30, Page 15 of 30, Page 16 of 30, Page 17 of 30, Page 18 of 30, Page 19 of 30, Page 20 of 30, Page 21 of 30, Page 22 of 30, Page 23 of 30, Page 24 of 30, Page 25 of 30, Page 26 of 30, Page 27 of 30, Page 28 of 30, Page 29 of 30 <u>CONCLUSION</u> Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Page 30 of 30" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis

℅ 29628 Gamble PL NE

Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 55 Filed 12/07/21 Page 1 of 30 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-91-(RCL) DEFENDANT'S MOTION TO DISMISS COUNTS ONE THREE FOUR, <u>FIVE AND SIX OF THE SUPERSEDING INDICTMENT</u>,** Page 2 of 30, Page 3 of 30, Page 4 of 30, Page 5 of 30, Page 6 of 30, Page 7 of 30, Page 8 of 30, Page 9 of 30, Page 10 of 30, Page 11 of 30, Page 12 of 30, Page 13 of 30, Page 14 of 30, Page 15 of 30, Page 16 of 30, Page 17 of 30, Page 18 of 30, Page 19 of 30, Page 20 of 30, Page 21 of 30, Page 22 of 30, Page 23 of 30, Page 24 of 30, Page 25 of 30, Page 26 of 30, Page 27 of 30, Page 28 of 30, Page 29 of 30 <u>CONCLUSION</u> Respectfully submitted A. J. KRAMER FEDERAL PUBLIC DEFENDER Maria N. Jacob, Page 30 of 30"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500
Maria_Jacob@fd.org



"Accepted"

MAR 0 1 2023

*Taylor James Johnatakis*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

**CRAIG MICHAEL BINGERT, ISAAC
STEVE STURGEON, and TAYLOR
JAMES JOHNATAKIS,**

**Defendants.**

Case No.: 1:21-cr-00091-RCL

> RECEIVED
> Mail Room
>
> MAR - 6 2023
>
> Angela D. Caesar, Clerk of Court
> U.S. District Court, District of Columbia

**GOVERNMENT'S RESPONSE IN
OPPOSITION TO MOTION TO TRANSFER VENUE**

 The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits its Response in Opposition to Defendant Isaac

Sturgeon's Motion to Transfer Venue in this case to the District of Montana (Dkt. Entry 82), which

was joined by defendant Craig Bingert (Dkt. Entry 86), who also asks to transfer venue to an

unspecified district. However, defendants fail to establish that they "cannot obtain a fair and

impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny the motion.[1]

---

[1] Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion. *See United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (Nov. 9, 2022) (TJK); *United States v. Eicher*, No. 22-cr-38, ECF No. 34 (Oct. 20, 2022); *United States v. Nassif*, No. 21-cr-421, ECF No. 42 (D.D.C. Sep. 12, 2022) (JDB); *United States v. Brock*, No. 21-cr-140, ECF No. 58 (D.D.C. Aug. 31, 2022); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Garcia*, No. 21-cr-129, ECF No. 83 (D.D.C. July 22, 2022) (ABJ); *United States v. Bledsoe*, No. 21-cr-204 (July 15, 2022) (Minute Order) (BAH); *United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 176 (D.D.C. June 28, 2022) (APM); *United States v. Williams*, No. 21-cr-377 (June 10, 2022) (Minute Entry) (BAH); *United States v. McHugh*, No. 21-cr-453 (May 4, 2022) (Minute Entry) (JDB); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021)

"Accepted"

MAR 01 2023

*Taylor James Johnalos*

**FACTUAL BACKGROUND**

The government incorporates by reference the factual background set out in its Response in Opposition to Motion to Sever. Dkt. Entry 91.

Defendants Sturgeon and Bingert now move for a change of venue. Dkt. Entry 82. They contend that prejudice should be presumed in this district for several reasons: (1) the characteristics of the D.C. jury pool, (2) the pretrial publicity surrounding the events of January 6, and (3) the results of a survey of potential jurors. Each of the defendants' arguments is without merit, and the motion should be denied.

**ARGUMENT**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best

---

(Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

"Accepted"

MAR 01 2023

*Taylor James Schneider*

course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## I. The characteristics of the District of Columbia's jury pool do not support a change of venue.

The defendants contend that a D.C. jury cannot be impartial because of various characteristics of the District's jury pool: the political makeup of the District's electorate, the impact of January 6 on D.C. residents, and the prevalence of federal employees in the District. Dkt Entry 82 at 3-10. None of these claims has merit.

### A. The number of federal employees who reside in the District of Columbia does not support a change of venue.

First, the defendants argue that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family members. *Id.* at 4-6. But the defendants do not explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror. Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly affected. Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture at the time. And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote. There is therefore no reason to believe

3

"Accepted"

MAR 01 2023

Taylor James Johnatakis

that federal employees with little or no connection to the events at the Capitol could not be impartial in this case. *See United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government. According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017. OPM, Federal Civilian Employment, available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/. But many federal employees who work in the District live outside the District and would not be part of the jury pool. And the District has nearly 700,000 residents. Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

**B.    The size of the District does not support a change of venue.**

The defendants also suggest (Dkt. Entry 82 at 4) that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000. Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau v. Louisiana*, 373 U.S. 723 (1963). The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected. And

4

"Accepted"

MAR 01 2023

Taylor James Johnatakis

*Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

**C.      The impact of January 6 on Washington D.C. does not support a change of venue.**

Additionally, the defendants contend that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew. Dkt. Entry 82 at 6-8. But January 6 is now more than a year and a half in the past. Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed. There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon). In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and

5

Case 1:21-cr-00091-RCL Document 92 Filed 11/30/22 Page 6 of 25

"Accepted" MAR 01 2023 Taylor James Johnston

inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.* In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors. There is no reason to presume prejudice.

**D. The District of Columbia's political makeup does not support a change of venue.**

Lastly, the defendants contend that he cannot obtain a fair trial in the District of Columbia because more than 90% of its voters voted for the Democratic Party candidate in the 2020 Presidential Election. Dkt. Entry 82 at 8-10. The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively. *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part). The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims. But whether individual prospective jurors have

"Accepted"
MAR 01 2023
Taylor James Johnston

such disqualifying biases can be assessed during voir dire. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, Roger Stone, and Steve Bannon have all been tried in the District. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020); *United States v. Bannon*, No. 210-cr-670 (CJN). Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone." 2020 WL 1892360, at *30-31. Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

"Accepted"

MAR 01 2023

Taylor James Johnston

## II. The pretrial publicity related to January 6 does not support a presumption of prejudice in this District.

The defendants also contend that a change of venue is warranted based on pretrial publicity. Dkt. Entry 82 at 10-23. "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau*, 373 U.S. 723. In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Id.* at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these

"Accepted"

MAR 01 2023

Taylor James Johnston

"kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between

"Accepted"

MAR 01 2023

Taylor James Schweibbs

Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g., In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

### A. Nature of the pretrial publicity

The defendants argue that prejudice should be presumed based on statements by President Biden, Representative Bennie Thompson (the Chairman of the Select Committee investigating the events of January 6th), Derrick Johnson (the President and CEO of the NCAAP), Ron Rivera (Washington Commanders head coach), D.C. Mayor Muriel Bowser, D.C. Delegate Eleanor Holmes Norton, and a number of other local senators and representatives. Dkt. Entry 82 at 10-21. But harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice. In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Haldeman*, 559 F.2d at 61. The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of

"Accepted"

MAR 01 2023

*Taylor James Johnston*

Rideau's dramatically staged and broadcast confession." *Id.* The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about the defendants. And, again, statements by local and national politicians are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

The defendants assert that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6. Dkt. Entry 82 at 12. But even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*, 559 F.2d at 61. And a comparatively small percentage of the news coverage of January 6 has focused on defendants Bingert and Sturgeon. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 900 people. The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)). Indeed, many of the news stories that Sturgeon's motion cites were published by media organizations with wide national

"Accepted"  MAR 01 2023  Taylor James Schnaible

circulation, not purely local outlets. *See e.g.*, Dkt. Entry 82 at fns. 21, 23-24, 27, 29-36. As the Select Litigation poll demonstrates, the number of potential jurors exposed to "[a] lot" of news coverage of January 6 differs only slightly between Washing, D.C. (33%) and Atlanta (30%). Dkt. Entry 82-1. Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### B.    Size and characteristics of the community

As explained above, the size and characteristics of the District of Columbia do not suggest that an impartial jury cannot be found in the district. In fact, the Supreme Court has indicated that an impartial jury can be found in jurisdictions much smaller than the District of Columbia, with its nearly 7,000 residents. *See Mu'Min*, 500 U.S. at 429; *Gentile*, 501 U.S. at 1044. This factor does not support a presumption of prejudice.

### C.    Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, 23 months have already elapsed since the events of January 6, and more time will elapse before trial. This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. Moreover, only a relatively small percentage of the recent stories have mentioned Bingert's or Sturgeon's names and much of the reporting has been national is scope, rather than limited to Washington, D.C.

### D.    The jury verdict

Because Bingert and Sturgeon have not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S.

"Accepted"

MAR 01 2023

Taylor James Privatos

at 383—does not directly apply. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice. In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

The defendants seem to suggest that this factor actually *supports* their claim of prejudice because the other jury trials involving January 6 defendants have resulted in prompt and unanimous verdicts. Dkt. Entry 82 at 24. But although the *Skilling* Court indicated that a split verdict could "undermine" a presumption of prejudice, it never suggested that a unanimous verdict—particularly a unanimous verdict in a separate case involving a different defendant—was enough to establish prejudice. The prompt and unanimous verdicts in prior January 6 jury trials resulted from the strength of the government's evidence. And, as explained below, the jury selection in those cases actually indicates that impartial juries can be selected in this district.

III.    **The poll submitted by the defendants does not support a change of venue.**

The defendants rely on a poll conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia. Dkt. Entry 82 at 19; Exhibit A. Select Litigation conducted a telephone poll of potential jurors in the District of Columbia and in the Atlanta Division of the Northern District of Georgia and contracted with a media research firm to analyze news media coverage of January 6 in both of those jurisdictions. That poll does not support the defendants' request for a venue transfer.

A.    **Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.**

The defendants argue that this Court should find a presumption of prejudice based on a poll

13

of prospective jurors. But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias." *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005). As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

"Accepted"
MAR 01 2023
Taylor James Schneider

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such

"Accepted"
MAR 01 2023
Taylor James Shraders

as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls. And the defendants have not offered any reason to depart from that usual practice here. Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice. But, as explained below, the poll submitted by the defendants does not support a presumption of prejudice in any event.

**B.     The Select Litigation poll does not demonstrate pervasive prejudice in the District of Columbia.**

Contrary to the defendants' contention, the Select Litigation poll does not support a

"Accepted"
MAR 01 2023
Taylor James Schroeder

presumption of prejudice in this District. As an initial matter, the Select Litigation poll selected only one comparator jurisdiction—the Atlanta Division of the Northern District of Georgia. Defendants Sturgeon and Bingert have not requested a transfer to that district or division. The Select Litigation survey tells the Court nothing about the views or media exposure of prospective jurors in the defendants requested districts. The poll therefore cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in the defendants' preferred districts. *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc) (per curiam) (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District of Columbia to other districts, the poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C. The number of respondents who had seen "[a] lot" of coverage in each jurisdiction differed only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin of error. Dkt. Entry 82, Exhibit 1 at 15, Q.8. The number of respondents who had seen "[s]ome" coverage was exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of coverage was not significantly different (28% in D.C. versus 20% in Atlanta). *Id.* The total percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news coverage was 86% in Washington, D.C. and 75% in Atlanta. *Id.* This relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

The defendants point out (Dkt. Entry 82 at 19) that "most of" the respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of the charges brought against them.

"Accepted"
MAR 01 2023
Taylor James Schneider

The survey failed, however, to identify (much less define) any of the charges brought against the defendants. It also failed to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area. *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion."). The survey instead gave respondents a binary choice between "guilty or not guilty." Dkt. Entry 82, Exhibit 1 at 15. Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused." *Id.* This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice. In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% here. *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both "No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion." *Id.* at 178 n.2. The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know." *Id.* Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty." *Id.* Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the

"Accepted MAR 01 2023 Taylor James Schmales"

presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty." Dkt. Entry 82, Exhibit 1 at 15 (Questions 3, 4).

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty." Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty." *Id.* In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused." *Id.* Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know." This indicates, if anything, a lower degree of prejudice than was present in *Haldeman.*

Nor should prejudice be presumed because a substantial numbers of respondents "would" describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the election and keep Donald Trump in power" (85%), engaging in "[i]nsurrection" (76%), or "[t]rying to overthrow the U.S. government" (72%). Dkt. Entry 82 at 19. For one thing, this question asked specifically about those who "forced their way into the U.S. Capitol," which suggests a higher degree of culpability than simply entering the Capitol. For another, the poll did not provide an "undecided" option but asked only whether respondents "would" or "would not" use those descriptions. *Id.* Nor did the question define the offenses of "insurrection" or advocating the overthrow of government, *see* 18 U.S.C. §§ 2383, 2385, offenses with which no defendant has

been charged in connection with January 6. And, most importantly, the poll did not answer the key question: whether a sufficient number of prospective jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of prejudice where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box"). In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C. *Skilling*, 561 U.S. at 382.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendants] and so unlikely to be able objectively to judge [their] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

## IV. The January 6-related jury trials that have already occurred have demonstrated the availability of a significant number of fair, impartial jurors in the D.C. venire.

At this point, more than a dozen January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort. *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire"). Instead, the judges presiding over those trials were able to select a jury in one or two days. *See United States v. Reffitt*, No. 21-cr-

32, Minute Entries (Feb. 28 and Mar. 1, 2022); *United States v. Robertson*, No. 21-cr-34, Minute Entry (Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (Apr. 25, 2022); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (May 23, 2022); *United States v. Anthony Williams*, No. 21-cr-377, Minute Entry (June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022); *United States v. Herrera*, No. 21-cr-619, Minute Entry (D.D.C. August 15, 2022); *United States v. Jensen*, No. 21-cr-6, Minute Entries (Sep. 19 and Sep. 20, 2022); *United States v. Strand*, No. 21-85, Minute Entry (D.D.C. Sep. 20, 2022); *United States v. Riley Williams*, No. 21-cr-618, Minute Entries (D.D.C. Nov. 7 and Nov. 8, 2022). Similarly, in a jury trial held in D.C. Superior Court stemming from an unlawful entry on Capitol Grounds during the events of January 6, 2021, a jury was selected in one day, using essentially the same jury pool. *United States v. Micki Larson-Olson*, No. 2021-CMD-454, Minute Entry (September 28, 2022) ("A jury was picked. The Jury Panel was sworn."). The only exception has been a trial involving seditious conspiracy charges against five members of the Oath Keepers, in which the jury selection took three days. *See United States v. Rhodes, et al.*, No. 22-cr-15, Minute Entries (Sept. 27, 28, 29). And, using the first five jury trials as exemplars, the voir dire that took place undermines the defendants' claims that prejudice should be presumed.[2]

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined). *See Reffitt* Trial Tr. 521. The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs

---

[2] Because they remain restricted on PACER, the transcripts from the voir dire proceedings in one of these cases are being submitted under separate cover to the Court and counsel.

that it would make it difficult to be a "fair and impartial" juror. *Reffitt* Trial Tr. 23, 30. The Court then followed up during individual voir dire. Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[3]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%). *See Thompson* 4-11-22 Tr. 169, 171, 180, 189, 192. The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire. *Id.* at 3-4, 34. Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[4]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson* Trial Tr. 302. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Id.* at 14. It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect

---

[3] For those struck based on a professed inability to be impartial, see *Reffitt* Trial Tr. 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046), 172-73 (Juror 443), 174-78 (Juror 45), 202-09 (Juror 1747), 223-35 (Juror 432), 263-74 (Juror 514), 358-69 (Juror 1484). For those struck for other reasons, see *Reffitt* Trial Tr. 168-172 (Juror 313, worked at Library of Congress), 209-24, 281 (Juror 728, moved out of D.C.), 284 (Juror 1650, over 70 and declined to serve), 340-51 (Juror 548, unavailability), 382 (Juror 715, anxiety and views on guns), 398 (Juror 548, medical appointments), 441-43 (Juror 1240, health hardship), 453-65 (Juror 464, worked at Library of Congress), 465-81 (Juror 1054, prior knowledge of facts).

[4] For the three stricken for bias, see *Thompson* 4-11-22 Tr. 52 (Juror 1242), 85 (Juror 328), 158 (Juror 999). For the six stricken for hardship or inability to focus, see *id.* at 43 (Juror 1513), 44 (Juror 1267), 49 (Juror 503), 40 (Juror 1290), 92 (Juror 229), 109 (Juror 1266).

"Accepted" MAR 01 2023 Taylor James Johnston

their ability to be "fair and impartial." *Id.* at 13, 15. The Court followed up on affirmative answers to those questions during individual voir dire. Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[5]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%). *Webster* 4-26-22 AM Tr. 6, though it later excused one of those 35 based on hardship, *Webster* 4-25-22 PM Tr. 217-18. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster* 4-25-22 AM Tr. 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66. Only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[6] The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case. *Webster,* 4-26-22 AM Tr. 7.

---

[5] For those struck based on a professed inability to be impartial, see *Robertson* Trial Tr. 26-34 (Juror 1431), 97-100 (Juror 1567), 121-30 (Juror 936), 136-42 (Juror 799), 160-71 (Juror 696), 189-93 (Juror 429), 256-65 (Juror 1010), 265-68 (Juror 585), 287-92 (Juror 1160). For those struck for other reasons, see *Robertson* Trial Tr. 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.), 156-60 (Juror 1122, language concerns), 193-96 (Juror 505, work hardship), 245-50 (Juror 474, work trip); 279-82 (Juror 846, preplanned trip).

[6] Nine of the 19 stricken jurors were excused based on hardship or a religious belief. *See Webster* 4-25-22 AM Tr. 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster* 4-25-22 PM Tr. 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262). Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office. *See Webster* 4-25-22 AM Tr. at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster* 4-25-22 PM Tr. at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%). *Hale-Cusanelli* Trial Tr. 226, 231. The Court asked prospective jurors questions similar to those asked in the other trials. *See id.* at 72-74 (Questions 16, 20). Of the 15 prospective jurors struck for cause, 11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[7]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728. In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727. The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials have confirmed that voir dire can adequately screen

---

[7] *See Hale-Cusanelli* Trial Tr. 62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 92-93 (Juror 653), 124-25 (Juror 1129), 152 (Juror 182), 156 (Juror 176), 182 (Juror 890), 197-98 (Juror 870), 217 (Juror 1111), 224 (Juror 1412). For the four jurors excused for hardship, *see id.* at 77-79 (Juror 1524), 99 (Juror 1094), 132 (Juror 1014), 151 (Juror 899).

"Accepted" MAR 01 2023 Taylor James Johnston

out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case. The Court should deny the defendants' requests for a venue transfer and should instead rely on a thorough voir dire to protect the defendants' right to an impartial jury.

### CONCLUSION

For the foregoing reasons, the defendants' motions to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Kaitlin Klamann
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
IL Bar No. 6316768
(202) 252-6778
Kaitlin.klamann@usdoj.gov

1037

"Accepted"

MAR 03 2023

1    BEFORE THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF COLUMBIA

3    UNITED STATES OF AMERICA,             .
4              Plaintiff,                  .   Case Number 21-cr-32
                                           .
5         vs.                              .
                                           .
6    GUY WESLEY REFFITT,                   .   March 4, 2022
                                           .   9:02 a.m.
7              Defendant.                  .
     - - - - - - - - - - - - - - - - -

8

9              TRANSCRIPT OF JURY TRIAL
10                 (MORNING SESSION)
        BEFORE THE HONORABLE DABNEY L. FRIEDRICH
11           UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the United States:      JEFFREY NESTLER, AUSA
14                               RISA BERKOWER, AUSA
                                 United States Attorney's Office
15                               555 Fourth Street Northwest
                                 Washington, D.C. 20530

16   For the Defendant:         WILLIAM WELCH, III, ESQ.
17                              5305 Village Center Drive
                                Suite 142
18                              Columbia, Maryland 21044

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
22                              333 Constitution Avenue Northwest
                                U.S. Courthouse, Room 4704-B
23                              Washington, D.C. 20001
                                202-354-3284

24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

1038

# C O N T E N T S

"Accepted"

MAR 0 3 2023

TESTIMONY    *Taylor James Johnston*

DANIEL SCHWAGER    Direct Examination.............. 1053
                   Cross-Examination.............. 1073
                   Redirect Examination........... 1075

PAUL WADE          Direct Examination.............. 1077
                   Cross-Examination.............. 1092
                   Redirect Examination........... 1093

ROCKY HARDIE       Direct Examination.............. 1095
                   Cross-Examination.............. 1159
                   Redirect Examination........... 1165

## EXHIBITS RECEIVED

Government 411, 415, 500, 501.15 through 501.18,
504 through 507, 702, and 703......................... 1048

Government 410 and 221................................ 1077

Government 405, 111, and 163.......................... 1094

Case 1:21-cr-00091-RCL Document 55-2 Filed 04/13/22 Page 3 of 134
Case 1:21-cr-00091-RCL Document 127-1 Filed 04/19/23 Page 640 of 865

1039

"Accepted"

MAR 0 7 2023

P R O C E E D I N G S

1   THE COURT:  Good morning, everyone.  So there is just one

2   brief matter that I wanted to talk to you all about under seal.

3   I know there's a logistical issue.  We could go in the jury

4   room.  That would take her longer.  I think we could also do

5   it -- it shouldn't take that long -- by the phone.

6       (Sealed bench conference.)



1040

"Accepted"

MAR 0 3 2023







"Accepted"

MAR 0 3 2023

Taylor James Schriebes



Accepted
MAR 0 3 2023
Taylor James Schrader



Accepted
MAR 0 3 2023
Taylor James Schneider



9   (End sealed bench conference.)

10          MR. NESTLER:  I just have some logistical matters.

11          THE COURT:  And I have a couple of things, too.

12          COURTROOM DEPUTY:  Your Honor, I don't think I

13  actually called the case for the record.

14      For the record, Your Honor, we're in United States of

15  America versus Guy Reffitt, Docket Number -- Criminal Action

16  21-32.

17      Representing Mr. Reffitt, we have Mr. William Welch, and

18  representing the United States, we have Mr. Jeffrey Nestler and

19  Ms. Risa Berkower.

20      Thank you, Your Honor.

21          THE COURT:  Go ahead, Mr. Nestler.

22          MR. NESTLER:  Thank you, Your Honor.

23      There are several exhibits that we believe are admissible

24  pursuant to a certification from a business record and/or from

25  they're self-authenticating.  We thought, in the interest of

"Accepted" MAR 0 3 2023 Taylor James Christian

"Accepted"

MAR 0 1 2023

Taylor James Schneider

```
 1    efficiency, we would just ask the Court and counsel now to have

 2    them pre-admitted so that when we show them to the juror we're

 3    not --

 4            THE COURT:  Yes.  And I want to address that issue

 5    generally.

 6        I take it you have no objection, Mr. Welch, to introducing

 7    these just outside the presence of the jury, or alternatively,

 8    as soon as the jury comes in, you can say that?

 9        What's your pleasure, Mr. Welch?  But I want to start

10    moving things in in bulk.

11            MR. WELCH:  That would be fine, but I need to know

12    what specific ones they are talking --

13            THE COURT:  It's probably the Constitution --

14            MR. NESTLER:  I can read it right now.

15            COURTROOM DEPUTY:  Forgive me, Mr. Welch.  If you can

16    move the microphone closer.

17            MR. NESTLER:  So these exhibits would be 411, the

18    folio from the Melrose Hotel.  We have a business record

19    certification.  415, Mayor Bowser's curfew order, which is a

20    public document.  We have Exhibit 500, which is the Twelfth

21    Amendment; Exhibits 501.15 through 501.18, which are 3 U.S.C.

22    15 through 3 U.S.C. 18, which are public documents.  We have

23    Exhibit 504, which is Senate Concurrent Resolution 1, also a

24    public document.  Exhibits 505 and 506 are screen shots from the

25    video inside of the House and Senate chambers which we have
```

"Accepted"   MAR 0 3 2023

Taylor James Schnabler

1    business record certifications for.  Exhibit 507 is a video

2    montage that contains some of those same video clips with the

3    same certifications, as well as Congressional Record snippets,

4    which are public documents.

5         Those are the materials we're going to be referring to,

6    Your Honor, and then there's also two additional stipulations we

7    intend to also read in while the witnesses are on the stand.

8    Those are Exhibits 702, about the Electoral College, and 703,

9    about Safeway and commerce.

10              THE COURT:  Any objections, Mr. Welch?

11              MR. WELCH:  No, now that I know what they are.

12              THE COURT:  Okay.  Any objection to him just moving

13   those now --

14              MR. WELCH:  No.

15              THE COURT:  -- or do you want him to do it in front of

16   the jury?

17              MR. WELCH:  No, it's just a matter of knowing what

18   they're going to do.  As long as I know.  They don't tell me

19   what they're doing.  They just do stuff.

20              THE COURT:  So you move to admit all that?

21              MR. NESTLER:  Yes.

22              THE COURT:  No objection?

23              MR. WELCH:  No objection.

24              THE COURT:  So all of those exhibits are admitted.

25         (Government Exhibits 411, 415, 500, 501.15 through 501.18,

1   504 through 507, 702, and 703 received into evidence.)

2              THE COURT:  Now, Mr. Nestler and Ms. Berkower, today

3   we have the agents, I think, Wade and Kennedy.  Tomorrow, we

4   have Hightower and Lane.  I think that's right.  Regardless --

5              COURTROOM DEPUTY:  Monday.

6              THE COURT:  Thank goodness it's Friday.

7       All right.  I know a number of those witnesses will move in

8   physical items, and those will have to be done one by one.  But

9   there's no need to -- correct me if I'm wrong, Mr. Welch, but I

10  see no need for things like photographs and videos, when they

11  have the right witness on the stand, to not say, "You have

12  reviewed Exhibits 1 through 20, and do they fairly and

13  accurately represent?"

14      Do we need to do these, you know, authenticate and publish

15  individually, Mr. Welch?

16             MR. WELCH:  We wouldn't if they would just tell me

17  ahead of time.

18             THE COURT:  Okay.

19             MR. WELCH:  They don't tell me.  They just do this

20  stuff, Your Honor.

21             THE COURT:  All right.  I know that they did try to

22  tell you which witness would be introducing the exhibits, and

23  you wanted them to be individually authenticated.

24      But I think given how this has gone, we're really slowing

25  things down, and it's putting the jurors to sleep.  So I would

"Accepted"

MAR 03 2023

Taylor James Schnakus

 1   like you all to talk before each witness and make sure Mr. Welch

 2   has no issue.  And if not, then at the outset, move them all in.

 3          MR. NESTLER:  We can do that right now, Your Honor.

 4   The witness who has the bulk of the remaining exhibits is

 5   Ms. Kennedy, who took the photographs during the search warrant

 6   of the defendant's house.

 7          We would move to batch admit all of those photographs.

 8   They are in the 100 series in our exhibit list.  They've been

 9   provided to defense counsel many weeks ago.

10          THE COURT:  Any objection, Mr. Welch?

11          MR. WELCH:  No.  And that would be fine, too.  And

12   just for the sake of clarity, the reason this became a problem

13   is when they changed up the other day who they were going to --

14          THE COURT:  Mr. Welch --

15          MR. WELCH:  They didn't tell me --

16          THE COURT:  -- I saw in the witness list -- so the

17   exhibit list just said "certification."  But the witness list

18   mentioned three witnesses would be looking at that document or

19   that exhibit, I think it was 200, and it was identified that

20   that witness -- I don't remember the name of that witness, but

21   that that witness would be referring to that exhibit.

22          So you should have been on notice.  I understand why you

23   thought it was coming in with a different witness, given its

24   location on the exhibit list.  But they did give you notice of

25   that.

1    MR. WELCH:  It's not that these things aren't out

there.  We can look at this.  This is a --

3    THE COURT:  I know, it's long; it's long.  All right.

4    MR. WELCH:  And we can't anticipate what they're going

to do.  They don't tell me what they're going to do, Your Honor.

They just do stuff.

7    THE COURT:  But we're all on the same page for the

remainder of the trial; right?  We can move these things today

at least?  We've covered this one witness for the morning, and

then at lunch, you all talk, and let's cover the other ones for

the afternoon.

Let's just -- the jurors are -- it's mind-numbing to do

these one by one.

14    MR. NESTLER:  We concur, Your Honor.  And just so Your

Honor is aware, we've introduced the bulk of our exhibits

already through our first three witnesses.

17    THE COURT:  Yes, I realize that.  I was asleep at the

switch for a while.

19    MR. NESTLER:  And now we plan to have these witnesses

testify about some of these remaining exhibits but do not have

to introduce much more.

22    THE COURT:  All right.  And when we get to, for

example, the Capitol Police, I get that you want to play certain

aspects so that the jury can hear the audio that wasn't clear

the first day, but to rewatch all that, I really think that

"Accepted"

MAR 0 3 2023

Taylor James Schnabbes

```
 1   you're losing your jurors.
 2           MR. NESTLER:  We understand, Your Honor.
 3           THE COURT:  Okay.  Schwager is the Senate counsel?
 4           MR. NESTLER:  Yes, your Honor.
 5           THE COURT:  So he is going to testify to some of what
 6   he saw that day in the chamber, right, in the gallery?
 7           MR. NESTLER:  Yes, Your Honor.
 8           THE COURT:  I take it none of this relates to the
 9   Ashli Babbitt shooting?
10           MR. NESTLER:  Correct, Your Honor.
11           THE COURT:  All right.  And how much -- at some point
12   I think the potential prejudicial effect of what actually
13   happened in and around that room exceeds the probative value as
14   to Mr. Reffitt.  I get that you are entitled to present some
15   evidence of how close they got, but he never got in the
16   building.
17       So I just want to make sure you're not spending a lot of
18   time on that part of the case, because it's really minimal
19   probative value for him.  All right?
20           MR. NESTLER:  We do need to prove that --
21           THE COURT:  The obstruction.  But I just -- the
22   shooting and all of that seems too far.
23           MR. NESTLER:  We're not mentioning the shooting at
24   all.  It's not a part of the case.
25           THE COURT:  Okay.  I just wanted to make sure.
```

"Accepted"

MAR 0 3 2023

Taylor James Schmittke

1      MR. NESTLER:  This is Mr. Schwager talking about the

2  official proceeding, why it was happening, what he saw, where he

3  went, and then his experiences in the Senate chamber and being

4  evacuated.

5      THE COURT:  Okay.  Great.  Anything else for you,

6  Mr. Welch?

7      MR. WELCH:  No, Your Honor.

8      THE COURT:  All right.

9      MR. NESTLER:  No, Your Honor.  Thank you.

10     THE COURT:  So we've got a few minutes.  Maybe the

11 jurors are here early.  Do you want to go check?

12     COURTROOM DEPUTY:  I can check, but don't hold your

13 breath.

14     (Pause.)

15     THE COURT:  Just one issue.  The law clerk noticed, in

16 reviewing the rough transcript last night, there were five

17 exhibits where they were offered by the government, there was no

18 objection, and then the government immediately said publish it

19 to the jury, and I didn't say they're admitted.

20     We'll need to look and see what the exhibits are.  But I

21 just want to make sure for the record that I've admitted them.

22 I intended to admit all of them, and I want to make the record

23 clear as to that.  So we will get those exhibit numbers and just

24 do that outside the presence of the jury at some point.

25     MR. WELCH:  I don't think that's going to be a

1    problem.  There is nothing that has been admitted that I made an

2    objection to and you hadn't ruled on or anything.

3              MR. NESTLER:  All right.  My recollection is, I

4    thought Your Honor had said "admitted."  So it may have been

5    just --

6              THE COURT:  I probably thought I said admitted when

7    you said what you said.

8              MR. NESTLER:  I apologize if I published something and

9    Your Honor hadn't actually said admitted.

10             THE COURT:  No worries.

11             MR. NESTLER:  May I step out for one minute?

12             THE COURT:  Sure.

13        (Pause.)

14        (Jury entered courtroom.)

15             THE COURT:  Good morning, ladies and gentlemen.

16   Welcome back.  I know you're happy it's Friday.  I think we all

17   are.  I want to remind you that we will be stopping at 4:00

18   today.  And the government is prepared to call its next witness.

19             MR. NESTLER:  Thank you, Your Honor.  The government

20   calls Daniel Schwager.

21        DANIEL SCHWAGER, WITNESS FOR THE GOVERNMENT, SWORN

22                       DIRECT EXAMINATION

23             BY MR. NESTLER:

24   Q.   Good morning, sir.

25   A.   Good morning.

"Accepted"

MAR 0 3 2023

*Taylor James Johnston*

1    Q.   If you are comfortable, you are permitted to remove your

2    mask.

3         Could you please tell us what your name is.

4    A.   Dan Schwager.

5    Q.   And how do you spell your name?

6    A.   Schwager is S-c-h-w-a-g-e-r.  Dan is common spelling.

7    Q.   Mr. Schwager, what was your title on January 6, 2021?

8    A.   I was the general counsel to the Secretary of the U.S.

9    Senate.

10   Q.   What does the general counsel to the Secretary of the U.S.

11   Senate do?

12   A.   I have multiple responsibilities.  Chiefly, I advise the

13   Secretary of the Senate on a host of issues, on legal issues

14   related to her work, on policy issues, on operational issues,

15   and then a lot of general counsel duties, contracts, continuity

16   of government, things like that.

17   Q.   What does the Secretary to the U.S. Senate do?

18   A.   The Secretary can be thought of as the chief administrative

19   officer of the Senate.  She is an officer to the Senate.  She

20   has some constitutional functions, many statutory functions.

21   She is responsible for the financial administration of the

22   Senate.  She is responsible for many administrative offices, the

23   curator of the Senate, the historian, the public records, office

24   of public records, and she's also responsible for the staffing

25   of the floor of the Senate chamber.

"Accepted"

MAR 03 2023

Taylor James Schrabbs

1   The -- all of the different types of legislative clerks are

2   under the Secretary's supervision.  The parliamentarian is under

3   the Secretary's supervision.

4   Q.   How many people approximately work for the Secretary of the

5   Senate?

6   A.   Around 225 or so.

7   Q.   How long did you serve as general counsel to the Secretary

8   of the Senate?

9   A.   Almost six years.

10  Q.   And how long did you work in Congress total?

11  A.   Almost ten years.

12  Q.   How long have you been a lawyer?

13  A.   Over 20.

14  Q.   Do you still work for the Secretary of the Senate?

15  A.   I do not.

16  Q.   How long ago did you leave?

17  A.   At the end of January, this year.

18  Q.   So just about a month ago?

19  A.   Correct.

20  Q.   Why did you leave?

21  A.   I was called by a recruiter and offered an opportunity for

22  a job that was a great opportunity in a lot of ways for me.

23  Q.   Do you now work at a non-profit organization?

24  A.   I do.

25  Q.   Mr. Schwager, how many houses of Congress are there?

1   A.   Two houses of Congress.

2   Q.   Can you please name them?

3   A.   The Senate and the House of Representatives.

4   Q.   Let's start with the House of Representatives.   What is the

5   title of the person who is in charge of the House of

6   Representatives?

7   A.   Well, the member who is -- the person who is chosen by all

8   of the members to perform leadership roles is the Speaker of the

9   House of Representatives.

10  Q.   And who held the role of Speaker of the House of

11  Representatives as of January 6, 2021?

12  A.   Nancy Pelosi.

13  Q.   And moving to the Senate side now, who is the person who is

14  in charge of the agenda and the day-to-day sort of functioning

15  of the Senate?

16  A.   Right.   The person, the party who holds the majority of

17  seats in the Senate chooses from amongst themselves a person to

18  manage the agenda and the day-to-day operations.   That person is

19  known as the majority leader.

20  Q.   And who was the majority leader of the U.S. Senate on

21  January 6 of 2021?

22  A.   Senator Mitch McConnell.

23  Q.   And under the Constitution, is there a different person who

24  formally presides over the United States Senate?

25  A.   Yes, the President of the Senate is different from the

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1   majority leader.

2   Q.    And who is the President of the Senate?

3   A.    The President of the Senate is the Vice President of the

4   United States.

5   Q.    And as of January 6 of 2021, who was the Vice President of

6   the United States?

7   A.    Mike Pence.

8                MR. NESTLER:  At this time we're going to put on the

9   screen, Ms. Rohde, if you could, a stipulation between the

10  parties.  It's stipulation -- it's Exhibit 702.  If you could

11  just highlight the text for me, Ms. Rohde.

12           Mr. Hopkins, if you could please publish that to the jury.

13           And I will now read to the jury stipulation -- Government

14  Exhibit 702.

15           "The United States and defendant Guy Reffitt agree and

16  stipulate to the following:

17           "On January 6, 2021, a joint session of the United States

18  Congress convened at the U.S. Capitol.  During the joint

19  session, elected members of the United States House of

20  Representatives and the United States Senate were meeting in

21  both the House and Senate chambers of the Capitol to certify the

22  vote count of the Electoral College of the 2020 presidential

23  election, which had taken place on Tuesday, November 3, 2020.

24           "On January 6, 2021, the House of Representatives began its

25  session at approximately 12:00 p.m., the Senate began its

"Accepted"

MAR 0 3 2023

Taylor James Schreiber

1   session at approximately 12:30 p.m., and the two Houses met

2   together at approximately 1:00 p.m. in the House of

3   Representatives chamber to begin the joint session.

4       "Vice President Mike Pence was in the Capitol building and

5   presiding over the joint session.  At approximately 1:15 p.m.,

6   the House and Senate adjourned to their separate chambers for up

7   to two hours to resolve a particular objection.

8       "At approximately 2:12 p.m., Vice President Pence evacuated

9   the Senate chamber, and approximately one minute later, the

10  senator who had become the presiding offer in Vice President

11  Pence's absence declared the Senate would stand in recess.

12  Senators evacuated the Senate chamber."

13          THE COURT:  Ladies and gentlemen, let me remind you

14  that a stipulation of fact is something you should consider as

15  undisputed evidence.

16          MR. NESTLER:  Thank you, Your Honor.

17      And just continuing on to page 2, two additional

18  paragraphs.

19      "At approximately 2:15 p.m., Speaker Nancy Pelosi, who was

20  presiding over the House of Representatives, evacuated the House

21  chamber, and approximately 15 minutes later, the representative

22  who had become the presiding officer in her absence declared

23  that the House would stand in recess.  Representatives evacuated

24  the House chamber.

25      "The Senate and House resumed meeting at approximately

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1   8:06 p.m. and 9:02 p.m. respectively.  Congress's joint session

2   continued until approximately 3:44 a.m. on January 7, 2021, when

3   it completed the certification of the Electoral College vote."

4         BY MR. NESTLER:

5   Q.   At this time I would like to display to the jury Government

6   Exhibit 500, already in evidence.

7         Are you familiar with the Constitution of the United

8   States, Mr. Schwager?

9   A.   Generally, yes.

10  Q.   Go to page 2, please, Ms. Rohde.

11        And this is Amendment Twelve.  Do you know what the Twelfth

12  Amendment is, Mr. Schwager?

13  A.   I do.

14  Q.   I'm going to ask you to read the highlighted portion here

15  of the Twelfth Amendment to the U.S. Constitution, please.

16  A.   The first portion says, "The electors shall meet in their

17  respective states and vote by ballot for President and Vice

18  President."

19        The second highlighted section says, "Which lists they

20  shall sign and certify and transmit sealed to the seat of the

21  government of the United States, directed to the President of

22  the Senate, the President of the Senate shall, in the presence

23  of the Senate and House of Representatives, open all the

24  certificates and the votes shall then be counted.  The person

25  having the greatest number of votes for president shall be

"Accepted"

MAR 0 3 2023

Taylor James Abrahams

1    president."

2    Q.    Just remind us, who is the President of the Senate?

3    A.    The Vice President of the United States.

4    Q.    At this time we will go to Government Exhibit 501.15,

5    already admitted into evidence, and this is a portion of the

6    United States Code.

7          Are you familiar with the United States Code, Mr. Schwager?

8    A.    Generally, yes.

9    Q.    What is it?

10   A.    It is the compilation of the federal laws of the United

11   States of America.

12   Q.    And if you could, please, read the title of 3 United States

13   Code 15.

14   A.    "Congress shall be in session on the Sixth day of January

15   succeeding every meeting of the electors.  The Senate and House

16   of Representatives shall meet in the hall of the House of

17   Representatives at the hour of 1 o'clock in the afternoon on

18   that day, and the President of the Senate shall be their

19   presiding officer."

20   Q.    Thank you.  Do you know what the hall of the House of

21   Representatives is?

22   A.    Yes.  We refer to it as the House chamber.

23   Q.    Is that in the U.S. Capitol building?

24   A.    It is.

25   Q.    If we could now go, Ms. Rohde, please, to Exhibit 501.16,

"Accepted"

MAR 0 3 2023

Taylor James Schnabbos

1  already admitted into evidence.   It's 3 United States Code.

2      Mr. Schwager, if you could read the highlighted portion for

3  us.

4  A.   "Such joint meeting shall not be dissolved until the count

5  of electoral votes shall be completed and the result declared."

6  Q.   In this section, when you see the word "dissolved," what

7  does that mean as a part of your job?

8  A.   The adjournment of that session, that day's session, or it

9  could be multiple sessions.

10  Q.   Dissolve, does that mean end?

11  A.   Yes.

12  Q.   Let's go to Exhibit 501.17, which is Title 3 of the United

13  States Code, Chapter 17.  Can you please read the highlighted

14  portion.

15  A.   "When the two Houses separate to decide upon an objection

16  that may have been made to the counting of any electoral vote."

17  Q.   Mr. Schwager, what does it mean when the Houses separate?

18  A.   Since the joint session is in the House chamber, the Senate

19  walks back to the Senate chamber, and they each deliberate on

20  their own in their own chambers.  The House stays in the House

21  chambers.

22  Q.   Thank you.  Ms. Rohde, if you could pull up Exhibit 501.18,

23  already admitted into evidence.

24      And if you could, please, just read the highlighted portion

25  for us, Mr. Schwager.

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1  A.   "While the two Houses shall be in meeting as provided in

2  this Chapter, the President of the Senate shall have power to

3  preserve order."

4  Q.   Thank you.  Now let's move, please, to Exhibit 504,

5  Ms. Rohde, already admitted into evidence.

6       And this is Senate Concurrent Resolution 1.  What is a

7  Senate Concurrent Resolution, Mr. Schwager?

8  A.   A Concurrent Resolution is something short of a law, but

9  it's a legislative act that both chambers agree to.  And if it's

10 called a Senate Concurrent Resolution, then it originates in the

11 Senate.

12 Q.   And if you could, please, read the highlighted portion

13 here.

14 A.   "Resolved by the Senate, the House of Representatives

15 concurring, that the two Houses of Congress shall meet in the

16 hall of the House of Representatives on Wednesday, the 6th day

17 of January, 2021, at 1:00 post meridian, pursuant to the

18 requirements of the Constitution and laws relating to the

19 election of President and Vice President of the United States,

20 and the President of the Senate shall be their presiding

21 officer."

22 Q.   Thank you.  Ms. Rohde, if you could go down to the bottom

23 to the signature section.

24      And do you see at the bottom where it says "attest" and

25 there is somebody's name above Secretary of the Senate?

"Accepted"

MAR 03 2023

Taylor James Schwalbe

1   A.   I do.

2   Q.   Who is that?

3   A.   Julie E. Adams was the Secretary of the Senate at that

4   time.

5   Q.   Was she your boss?

6   A.   She was.

7   Q.   Okay.  Let's move on.  If you could take that down, please,

8   Ms. Rohde.

9        Do you know what the Congressional Record is, Mr. Schwager?

10  A.   I do.

11  Q.   What is it?

12  A.   It is the compilation of the proceedings of each chamber of

13  Congress for every -- every day.

14  Q.   Thank you.  At this time I would like to display for the

15  jury Government Exhibit 507, already admitted into evidence.

16       Mr. Hopkins, if you could take it down from the jury screen

17  just for a quick second.  Thank you.  And if you could put it

18  back up, please.  Thank you.

19       At this time -- it does have audio.  Agent Ryan, if you

20  wouldn't mind manning our speaker contraption.  Thank you.

21       (Video played.)

22  Q.   If you could pause for a minute, Ms. Rohde.

23       Mr. Schwager, do you see those young people walking into

24  the House chamber?

25  A.   I do.

1    Q.   Do you see what they're carrying?

2    A.   I do.

3    Q.   What are they carrying?

4    A.   They are carrying what we refer to as the Electoral College

5    ballots.  They're certificates of votes from the electors of all

6    50 states plus the District of Columbia.

7    Q.   And how do you know what's inside of those boxes?

8    A.   I was involved in ensuring that the ballots were placed

9    inside those boxes.

10   Q.   Thank you.  If we could, please, continue, Ms. Rohde.

11        (Video played.)

12   Q.   Can you, please, pause right there, Ms. Rohde.

13        Mr. Schwager, do you see yourself in this video?

14   A.   I do.

15   Q.   Could you, please, tell us which side you're on and what

16   you're doing?

17   A.   From our perspective, I'm to the left of the Vice President

18   and standing up in front of the -- in between the bottom desk

19   and the middle desk.

20   Q.   Is there anything in front of you?

21   A.   Yes.  There is an Electoral College ballot box, as we refer

22   to it.

23   Q.   Thank you.  If we can continue, Ms. Rohde.

24        (Video played.)

25   Q.   Do you see what chamber we're looking at here,

"Accepted"

MAR 0 3 2023

Taylor James Schneider

1    Mr. Schwager?

2    A.    That's the Senate chamber.

3    Q.    Who is the person sitting in the presiding officer's chair

4    in the Senate chamber?

5    A.    The President of the Senate, Vice President Pence.

6    Q.    This is at 1:39 p.m., according to the time stamp at the

7    bottom; is that correct?

8    A.    That's what it says.

9    Q.    If we could go forward to the next slide, please.

10         And at 1:48 p.m., who was sitting in the presiding

11   officer's chair?

12   A.    Still the President of the Senate.

13   Q.    And if we can go forward, at 1:54 p.m.?

14   A.    President of the Senate.

15   Q.    And if we can go forward, at 2:00 p.m.?

16   A.    President of the Senate.

17   Q.    If we can go forward, at 2:05 p.m.?

18   A.    President of the Senate.

19   Q.    And if we can go forward, at 2:10 p.m.?

20   A.    President of the Senate.

21   Q.    Thank you.  If we could then move to Government

22   Exhibit 506, Ms. Rohde, already admitted into evidence.

23         Do you recognize what chamber this is, Mr. Schwager?

24   A.    That is the House chamber.

25   Q.    Who is standing at the presiding officer's chair in the

"Accepted" MAR 0 3 2023

Taylor James Schneider

1    House chamber?

2    A.    It looks like Nancy Pelosi.  It's a little blurry.

3    Q.    This is at 1:43 p.m.

4          If we can move to the next slide, at 1:48 p.m.?

5    A.    Speaker Pelosi.

6    Q.    If we could move forward, at 1:54 p.m.?

7    A.    The Speaker.

8    Q.    1:49?

9    A.    The Speaker.

10   Q.    If we could move forward, at 2:04 p.m.?

11   A.    The Speaker.

12   Q.    If we could move forward, at 2:10 p.m.?

13   A.    The Speaker.

14   Q.    If we could move forward, at 2:14 p.m.?

15   A.    The speaker.

16   Q.    If we could move forward.  And that is the final slide.

17   Thank you.

18         Okay.  Mr. Schwager, let's talk about your role on

19   January 6 of 2021 and what you observed.

20         If we could, please, start, Mr. Rohde, by pulling up

21   Exhibit 507 and going to 540 on the counter at approximately

22   2:13 p.m.   If we could just stop it at 540.

23         So up on the screen in front of you, Mr. Schwager, this is

24   approximately 2:13 p.m.  Can you identify what chamber we're

25   looking at here?

"Accepted"

MAR 03 2023

Taylor James Schneider

1    A.    Senate chamber.

2    Q.    Are you visible in this view?

3    A.    I am.

4    Q.    Can you please tell us where you're positioned?

5    A.    As you're facing this exhibit, the door on the right, I'm

6    just inside to the left of the door on the right facing forward,

7    the bald guy.

8    Q.    Are you standing or sitting?

9    A.    I am standing up.

10   Q.    Sorry.  You mentioned that you're the bald guy?

11   A.    I am usually the bald guy, yes.

12   Q.    Got it.  Okay.  Were you in this position the entire time

13   the Senate was having its proceeding?

14   A.    I was not.

15   Q.    Why did you take yourself to this position at this time

16   around 2:13 p.m.?

17   A.    Prior to this, maybe a few minutes, judging by Officer

18   Billings (phonetic), prior to this I had been told that --  I

19   was standing at the back of the chamber.

20           MR. WELCH:  Objection.

21        (Bench conference.)

22           THE COURT:  I take it you're not offering this for the

23   truth?

24           MR. NESTLER:  That's correct, to explain why he ended

25   up where he ended up.

"Accepted"

MAR 0 3 2023

Taylor James Schrader

1    THE COURT:  All right.  So Mr. Welch, if you want an

2    instruction, I can give that.

3    MR. WELCH:  Please.

4    (End of bench conference.)

5    THE COURT:  Ladies and gentlemen, the testimony you're

6    about to hear this witness say is not being offered for the

7    truth of the matter, but to explain why he took the actions he

8    took.

9    BY MR. NESTLER:

10   Q.   Please continue, Mr. Schwager.

11   A.   Thank you.  Just prior to this, I had been informed by a

12   Senate staffer that protestors had come into the Capitol

13   building, had breached the Capitol building, and I immediately

14   went down to that position to be near the Secretary of the

15   Senate, my boss, so I could -- and the legislative clerks on the

16   dais, so I could assist them and advise the Secretary and help

17   with whatever came next.

18   Q.   Just prior to you moving down to this position, who had

19   been presiding over the Senate chamber?

20   A.   The last senator presiding who recessed the Senate would

21   have been the President Pro Tempore, which is Senator Chuck

22   Grassley -- was Senator Chuck Grassley at that time.

23   Q.   And prior to Senator Chuck Grassley being there at the

24   presiding officer's chair, did you see who was there just before

25   him?

1   A.   Yeah, the President of the Senate, Vice President Pence.

2   Q.   Did you see Vice President Pence leave the Senate chamber?

3   A.   I did.

4   Q.   How would you characterize his departure from the Senate

5   chamber?

6   A.   He was accompanied by several people that I believed to

7   be -- that were not senators.   I don't know.   They appeared to

8   be officers or Secret Service or something like that.

9   Q.   Had you seen them before?

10   A.   I don't recall if I had seen any of them before.   I don't

11   recall if any of them were people I was familiar with or not.

12   Q.   And when you saw Vice President Pence leave the Senate

13   chamber with these people who you assumed to be his security

14   people, what did you believe was happening?

15   A.   Well, I knew we were in a dangerous situation and that we

16   were about to go into some protocols we had drilled on for

17   locking down, for when the chamber was under threat.

18   Q.   Did you see Senator Grassley leave the chamber?

19   A.   I don't recall exactly when Senator Grassley left the

20   chamber.   I saw him coming down from the presiding officer's

21   chair on the dais.

22   Q.   And the person standing in the presiding officer's chair at

23   2:13 p.m., is that a Capitol police officer?

24   A.   It is.

25   Q.   What did that make you think about what was happening at

"Accepted"

MAR 0 3 2023

Taylor James Johnatakis

1   this time?

2   A.   Well, I had already recognized what was happening as a part

3   of our procedures that we had drilled on when there is a -- for

4   when there is a threat to the chamber.  And so I believed that

5   those were the procedures and those were the posture that we

6   were under.

7   Q.   Around this time, what, if anything, did you observe about

8   the doors to the Senate chamber?

9   A.   At that time, as we had practiced, the Capitol police

10  officers or door keepers were locking all of the doors to the

11  galleries and some of the external doors on the chamber floor.

12  Q.   Are these small doors or large doors?

13  A.   They're very tall doors.  They're large, ornate, wooden

14  doors, and I saw one small police officer had to jump up to lock

15  one.

16  Q.   Do they make noises when they open and close?

17  A.   Typically, we try to avoid them making noises to disturb,

18  but they are heavy doors.

19  Q.   How did you feel when you saw the doors started being

20  locked?

21  A.   Again, I already -- from the moment -- from the moment I

22  was told that protestors had breached the Capitol, I was in a

23  state of alarm, and we were in a grave situation at that point,

24  to my understanding.  And closing the doors was just -- locking

25  the doors was just a part of what we had trained for, and I,

"Accepted"

MAR 0 3 2023

Taylor James Schnabbes

 1    frankly, was happy that they were being locked.

 2    Q.    Were the people inside of the Senate chamber, yourself

 3    included, given any instructions around this time?

 4    A.    Yes.  The Capitol police officer on the -- who was standing

 5    by the presiding officer's chair, his purpose there was to

 6    instruct us that there was a threat and to give us further

 7    instructions from the Capitol Police for our safety.

 8    Q.    Shortly after that, did you come to notice any additional

 9    Capitol police officers with any weapons inside of the Senate

10    chamber?

11    A.    Yes.  I took particular notice of a Capitol police

12    officer -- who I assumed to be a Capitol police officer.  He was

13    in plain clothes but with an orange sash and a very long, very

14    large long gun standing right in the center of the chamber right

15    between the majority leader's desk and the minority leader's

16    desk.

17    Q.    Had you experienced that during any of the drills you had

18    practiced?

19    A.    I don't recall if they ever used an actual gun in those

20    drills or not.  Nothing stands out to me that I've ever seen

21    something like that.

22    Q.    What did you think when you saw a Capitol police officer

23    with a long gun standing in the well of the Senate chamber?

24    A.    Again, I was already in a state of alarm, and things like

25    that, frankly, comforted me, because I already knew there was

"Accepted"

MAR 0 7 2023

Taylor James Johnston

1    a -- my perception already was that we were under severe threat.

2    Q.    Did there come a time when you left the Senate chamber?

3    A.    There did.

4    Q.    And why did you leave the Senate chamber?

5    A.    We were instructed by the Capitol Police to evacuate.

6    Q.    What, if anything, did you do with the boxes containing the

7    certificates of the votes at the time that you were leaving the

8    Senate chamber?

9    A.    I had moved closer to the table before we evacuated, the

10   table where the ballots were, to make sure that while we were

11   standing there waiting for instructions -- lots of people were

12   moving around, and I wanted to make sure nobody was opening the

13   boxes or touching the ballots.

14        At the time we evacuated, a number of our staff and floor

15   staff took the ballot boxes and other paraphernalia of the

16   proceeding with us.  I did not personally carry a ballot box at

17   that time.  I carried some other paraphernalia.

18   Q.    And why was it important to take the ballot boxes and other

19   paraphernalia with you as you evacuated the Senate chamber?

20   A.    First of all, we need to maintain custody of the ballots

21   and make sure nothing happens to them.  There are, by law, other

22   sets, but these were the ones we were using for the proceeding,

23   and we needed to protect those.

24        In addition, it was possible that we would need to

25   reconvene in another location to complete the proceeding.  I

Case 1:21-cr-00091-RCL    Document 65-2    Filed 04/13/22    Page 37 of 134
Case 1:21-cr-00091-RCL    Document 127-1    Filed 04/19/23    Page 674 of 865

1073

1    knew the mission was to complete the proceeding, and so whether

2    we did it in the chamber or whether we had to reconvene in

3    another location, we needed those with us for the proceeding.

4    Q.   Were the senators able to continue meeting when they were

5    not in the chamber here?

6    A.   Were they able to?  They did not reconvene outside of the

7    chamber.  They -- if it had become necessary, we could have.

8    Q.   I'm talking about in the Senate chamber here.  Did the

9    senators -- were they able to meet in the Senate chamber after

10   the time you evacuated?

11   A.   Yes.

12   Q.   While you were evacuated, were the senators meeting in the

13   Senate chamber?

14   A.   No, I'm sorry, not until we had come back at a later time.

15           MR. NESTLER:  Thank you.  No further questions.

16           THE COURT:  Mr. Welch?

17           MR. WELCH:  Thank you, Your Honor.

18                     CROSS-EXAMINATION

19           BY MR. WELCH:

20   Q.   Good morning, Mr. Schwager.

21   A.   Good morning.

22   Q.   My name is Bill Welch.  I'm also going to ask you some

23   questions.

24   A.   Certainly.

25   Q.   To the best of your recollection, was the time stamp of

"Accepted"

MAR 0 3 2023

Taylor James Christensen

1  approximately 1:14 p.m. on January 6 accurate as far as when the

2  joint session in the House chamber adjourned?

3  A.    I wasn't looking at my watch.  So I don't have an

4  independent recollection.

5  Q.    Okay.  Would that be the same as far as the other time

6  stamps that we saw in Government Exhibit 507?

7  A.    Yeah, I don't have any independent recollection of the

8  exact second at which any of these proceedings happened.

9  Q.    Okay.  Would you have any reason to believe that any of

10  them were incorrect?

11  A.    No.

12  Q.    When you were in the Senate chamber and we saw you on

13  Government Exhibit 507, you didn't see my client, Mr. Reffitt,

14  did you?

15  A.    No.

16  Q.    So when you left the Senate chamber at the direction of the

17  Capitol Police and had to go wherever you went, you did not see

18  my client, Mr. Reffitt, did you?

19  A.    I don't know if he was in the periphery of my vision in one

20  of the groups that we might have passed by.  So I don't know.

21  Q.    As you sit there right now -- please, feel free, take a

22  look.  Mr. Reffitt, take your mask down.

23        As you look at him, have you ever seen this man before?

24  A.    I don't know.

25            MR. WELCH:  Pass the witness.

"Accepted"

MAR 03 2023

Taylor James Johnston

1    THE COURT:  Any further questioning?

2    MR. NESTLER:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. NESTLER:

5    Q.   Just briefly, Mr. Schwager, Mr. Welch asked you about the

6    word "adjourned," the House adjourning or the Senate adjourning

7    to its chamber.

8         During the joint session of Congress, when the two Houses

9    are no longer meeting as a joint body but as separate bodies,

10   what do you call that?

11   A.   I'm sorry.  I missed that the word "adjourned" was used.  I

12   would have corrected that.

13        Adjourning is at the end of a session for the day or

14   proceeding.  We had recessed for the purpose of reconvening.  So

15   we had withdrawn to the Senate chamber.  But the proceeding for

16   the day had not been adjourned officially.

17   Q.   And we went over the law earlier that used the

18   word "dissolved."  What happens when the joint session is

19   dissolved?  What's going on at that point?

20   A.   The Vice President, President of the Senate, presiding

21   officer of the joint session, would have gaveled us out is how

22   we say it, and he would have declared the session dissolved.

23        And then I think -- I don't recall whether he adjourned the

24   joint session in the Senate or whether the Speaker did or what

25   happened at that point.

"Accepted"

MAR 03 2023

Taylor James Schneiders

1   Q.   But until the joint session is dissolved, is the joint

2   session still ongoing?

3   A.   It is, and it could have been for a long time.

4        But yes, the joint session was not dissolved until some

5   time after 3:00 a.m.

6   Q.   And were you still there?

7   A.   I was.

8              MR. NESTLER:  No further questions.

9              THE COURT:  May this witness be excused?

10             MR. WELCH:  Yes, Your Honor.

11             THE COURT:  All right.  Thank you, sir.

12             THE WITNESS:  Thank you.

13             THE COURT:  Mr. Nestler, your next witness?

14             MR. NESTLER:  Thank you, Your Honor.  The United

15   States calls United States Secret Service Special Agent Paul

16   Wade.

17             THE COURT:  Mr. Nestler, will there be multiple

18   exhibits for this witness?

19             MR. NESTLER:  There will be three.  Two of them have

20   not been moved in yet, but I will move them in now.

21             THE COURT:  Do you have any objection, Mr. Welch, to

22   the government admitting the two exhibits?  Which numbers?

23             MR. NESTLER:  Exhibit 410, the Head of State

24   Notification Worksheet.

25             MR. WELCH:  No objection to that.

1    MR. NESTLER:  And Exhibit 221 is a surveillance video

2  clip.

3    MR. WELCH:  No objection to that.

4    THE COURT:  All right.  Those exhibits are admitted.

5  (Government Exhibits 410 and 221 received into evidence.)

6    MR. NESTLER:  Thank you, Your Honor.

7    PAUL WADE, WITNESS FOR THE GOVERNMENT, SWORN

8    DIRECT EXAMINATION

9  BY MR. NESTLER:

10  Q.   Good morning, sir.

11  A.   Good morning.

12  Q.   Can you please state and spell your name.

13  A.   Paul Wade, W-a-d-e.

14  Q.   And where do you work?

15  A.   I'm with the United States Secret Service.

16  Q.   And if you could do me a favor, that large black thing in

17  front of you is a microphone.  Move a little bit closer to it

18  when speaking.  Thank you.

19    What is your position with the United States Secret

20  Service?

21  A.   I am a assistant to the Special Agent-in-Charge.

22  Q.   Are you also a Special Agent?

23  A.   Correct.

24  Q.   What does the assistant to the Special Agent-in-Charge do?

25  A.   It's a supervisory special agent position.

Case 1:21-cr-00091-RCL   Document 65-2   Filed 04/13/23   Page 42 of 134
Case 1:21-cr-00091-RCL   Document 127-1   Filed 04/19/23   Page 679 of 865

1078

"Accepted"

MAR 03 2023

Taylor James Schrader

1    Q.    And how many people do you supervise?

2    A.    Four special agent staff assistants.

3    Q.    Where is your physical office located?

4    A.    At the United States Capitol.

5    Q.    How long have you been with the United States Secret

6    Service?

7    A.    22-and-a-half years.

8    Q.    You say your physical office is at the United States

9    Capitol.  Which part of the United States Secret Service are you

10   in?  Which division?

11   A.    Liaison Division.

12   Q.    And what does the Liaison Division do?

13   A.    We primarily coordinate Secret Service protectee visits to

14   the Capitol.

15   Q.    And what is the mission of the United States Secret

16   Service?

17   A.    Dual mission.  It's investigations and protection.

18   Q.    And who are you supposed to protect?

19   A.    We protect the president, vice president, and their

20   families, and foreign heads of state that visit the country.

21   Q.    Is the Secret Service part of an executive department of

22   the United States government?

23   A.    Correct.

24   Q.    Which one?

25   A.    It is the Department of Homeland Security.

1   Q.   Let's talk about prior to January 6 of 2021.  What, if

2   anything, did you do to prepare for security on January 6th?

3   A.   Prior to January 6, we -- the security plan was primarily

4   under the Capitol Police Board, their policies and procedures.

5   We did conduct a couple walk-throughs and sent formal

6   notification to the Capitol Police.

7   Q.   And did you have various conversations with your colleagues

8   at the Capitol Police on a regular basis about security and

9   issues like that?

10  A.   Correct.  We were also planning for the inauguration.  So

11  yeah, almost daily.

12  Q.   Let's pull up on the screen, Ms. Rohde, Exhibit 410,

13  previously admitted into evidence.  And if you could highlight

14  the top portion.

15       Are we looking at an e-mail here, Special Agent Wade?

16  A.   Correct.

17  Q.   Who sent this e-mail?

18  A.   Lanelle Hawa.

19  Q.   Who is Lanelle Hawa?

20  A.   She was one of my agents that I supervised at that time.

21  Q.   Were you copied on this e-mail?

22  A.   Yes.

23  Q.   What was the purpose of her sending this e-mail?

24  A.   The HOS notification is a Head of State Notification, and

25  it is our formal notification to the United States Capitol

"Accepted"

MAR 0 3 2023

Taylor James Schneider

1   Police of a Secret Service protectee visit.

2   Q.   And in the subject line, there are three individuals

3   listed.   Vice President Michael Pence, was he a Secret Service

4   protectee?

5   A.   Yes.

6   Q.   Was Mrs. Pence?

7   A.   Yes.

8   Q.   And was Charlotte Pence?

9   A.   Yes.

10  Q.   And if we could scroll to the next page, please, and if we

11  could start at the "USCP (tail) car," and highlight that,

12  Ms. Rohde.

13       What is a USCP (tail) car rendezvous location, Agent Wade?

14  A.   That's the location the United States Capitol Police would

15  send a vehicle to join up with our protectee's motorcade.

16  Q.   And where was the Capitol Police's vehicle supposed to join

17  up with the protectee's motorcade for January 6 of 2021?

18  A.   The Naval Observatory.

19  Q.   And who lives at the Naval Observatory?

20  A.   The Vice President.

21  Q.   And if we could just scroll down, please, to the itinerary.

22       And why does the Secret Service include an itinerary on the

23  information it provides to the Capitol?

24  A.   It's the latest information derived from staff and

25  sergeant-at-arms entities on the Capitol complex of the

"Accepted"

MAR 0 3 2023

Taylor James Schmitder

"Accepted"

MAR 03 2023

Taylor James Johnston

1    protectee's itinerary.

2    Q.   And so according to the proposed itinerary, approximately

3    what time was the Vice President supposed to arrive at the

4    United States Capitol?

5    A.   Approximately 12:30.

6    Q.   And when it says "via M/C to Senate carriage," what does

7    that mean?

8    A.   Via motorcade.

9    Q.   And why does the Vice President travel in a motorcade?

10   A.   It's an organized Secret Service-protected motorcade.

11   Q.   And why does he use a motorcade, not in a regular car, for

12   instance?

13   A.   For his protection.

14   Q.   And where was the motorcade supposed to stage and wait for

15   the Vice President while he was inside of the Capitol on

16   January 6?

17   A.   On the east side of the Capitol, known as the Plaza.

18   Q.   Which agency is ultimately responsible for the Vice

19   President's security and safety while he is at the Capitol

20   building?

21   A.   The United States Secret Service.

22   Q.   Let's pull up on the screen, if you could, Ms. Rohde,

23   Exhibit 601A, already admitted into evidence.

24        Do you recognize the building in the center of this

25   photograph, Agent Wade?

"Accepted"

MAR 0 7 2023

Taylor James Johnatakis

1    A.   Yes.

2    Q.   What is it?

3    A.   The United States Capitol.

4    Q.   I want to talk about the perimeter on the west side between

5    the Peace monument and the Garfield monument.  Are you familiar

6    with those monuments?

7    A.   Yes.

8    Q.   On the morning of January 6, 2021, did you personally

9    observe that security perimeter?

10    A.   Yes.

11    Q.   What role, if any, would you have had if you believed that

12    the Capitol Police's security perimeter on January 6 of 2021 was

13    inadequate to protect your protectees, including the Vice

14    President?

15    A.   We could have raised any objections to United States

16    Capitol Police.

17    Q.   And on January 6, did you believe the security perimeter to

18    be adequate to protect your protectee when you saw it that

19    morning?

20    A.   Yes.

21    Q.   If we can take this down, please, Ms. Rohde.

22        So, on January 6, 2021, Agent Wade, did the Vice President

23    actually arrive at the Capitol complex?

24    A.   Yes.

25    Q.   How do you know?

1   A.   Because I saw him.

2   Q.   Approximately what time did he arrive?

3   A.   Approximately 12:37.

4   Q.   And what was your role in facilitating his arrival?

5   A.   I was there with an additional liaison to facilitate access

6   for the Vice President, Mrs. Karen Pence, and their daughter

7   Charlotte Pence.

8   Q.   And what's your role with respect to his security while he

9   is there?

10   A.   I was dedicated to Mrs. Pence and Charlotte Pence.

11   Q.   When the Vice President got to the United States Capitol,

12   did he make his way to the Senate chamber?

13   A.   Yes.  Well, he first went to his office.

14   Q.   And around the time he went to the Senate chamber, what did

15   you do?

16   A.   The Senate chamber -- well, first, they went there -- they

17   went to his office as a family.  He went onto the Senate floor.

18   And then I took Mrs. Pence and Charlotte up to the third floor,

19   to the gallery level.

20   Q.   And while they were watching the proceeding from the third

21   floor gallery level, what were you doing?

22   A.   I was in the hallway outside the gallery.

23   Q.   And did there come a time when the Vice President left the

24   Senate chamber to go to the House chamber?

25   A.   Yes.

1   Q.   At that time what did you do?

2   A.   I escorted Mrs. Pence and Charlotte Pence via the third

3   floor over to the House gallery.

4   Q.   And did they enter the House gallery?

5   A.   Yes.

6   Q.   And at the time they entered the House gallery, what did

7   you do?

8   A.   I stood outside the House gallery.

9   Q.   Did there come a time when you escorted Mrs. Pence and

10  Charlotte Pence from the House gallery back to the Senate

11  gallery?

12  A.   Yes.

13  Q.   When you arrived back at the Senate gallery, what did you

14  do?

15  A.   I staged again outside the Senate gallery and engaged my

16  counterparts from the Capitol Police and the vice presidential

17  detail.

18  Q.   Did there come a time when you left that area outside the

19  Senate gallery?

20  A.   Yes.

21  Q.   Why?

22  A.   After briefing up my counterparts on any potential

23  emergency action procedures, I then went to the basement --

24  responded to the basement level to obtain some inauguration

25  paperwork.

"Accepted"

MAR 0 3 2023

Taylor James Schnables

1   Q.   And the basement level of the Capitol, is that where your

2   office is?

3   A.   Yes.

4   Q.   And you mentioned earlier you were also planning for the

5   inauguration around this time; is that right?

6   A.   Yes.  I was the lead liaison planner for the inauguration.

7   Q.   While you were in the basement of the United States

8   Capitol, what, if anything, did you hear that was out of the

9   ordinary?

10   A.   I was only down there a few minutes, and then I heard

11   scuffling and running about outside my office.

12   Q.   What did you think at that time?

13   A.   As I went out -- as I went -- peered outside, I saw

14   officers running and scrambling and saying that people were

15   breaching the bike racks.

16   Q.   What did you think to do?

17   A.   I immediately went to the protectees on the second floor.

18   Q.   And is there a certain place that you went to meet up with

19   the protectees?

20   A.   Yes.  Knowing that his office was on the second floor

21   outside the chamber, that's where I responded.

22   Q.   That's the Vice President's ceremonial office?

23   A.   Correct.

24   Q.   And when you got to the Vice President's ceremonial office,

25   did you observe Mrs. Pence and Charlotte Pence?

"Accepted"

MAR 03 2023

"Accepted"

MAR 0 3 2023

Taylor James Johnatakis

1    A.    Yes.

2    Q.    Was the Vice President there as well?

3    A.    Yes.

4    Q.    Where is the Vice President's ceremonial office located

5    with respect to the Senate chamber itself?

6    A.    It's on the north side of the chamber.

7    Q.    Is it very close to the chamber?

8    A.    Yes, just outside the -- what they call the Senate floor.

9    Q.    Let's discuss the motorcade we talked about a little while

10   ago.  Around this time, did you have any concerns with respect

11   to the Vice President's motorcade?

12   A.    Yes.

13   Q.    What concerns were those?

14   A.    Based on the intel we were receiving from officers and from

15   folks outside in the motorcade, that people were breaching the

16   bike rack and running onto the plaza.  So at that point, our

17   first thought is to relocate the motorcade if we could not use

18   it to relocate the Vice President, if needed.

19   Q.    And why is it important to relocate the motorcade if people

20   were around it?  In other words, what's the problem if people

21   are near the motorcade?

22   A.    The way the intel was, there was perceived threat on the

23   plaza from people breaching the bike racks.

24   Q.    At this time I'm going to pull up Government Exhibit 220,

25   which has been admitted.

```
 1            And are you familiar with this view?
 2    A.    Yes.  That's the east plaza.
 3    Q.    And all of those cars in the center of this view, do you
 4    know what those cars are?
 5    A.    Yes.  The Vice President's motorcade.
 6    Q.    And is this what the Vice President's motorcade looked like
 7    approximately on January 6 of 2021 at around 1:58 p.m.?
 8    A.    I did not witness it get staged there, but that is a common
 9    staging location for the motorcade.
10    Q.    Got it.
11            So if we could play this forward.
12            (Video playing.)
13    Q.    Do you see all those cars moving?
14    A.    Yes.
15    Q.    Which cars are those?
16    A.    Those are -- that's the motorcade package for the Vice
17    President.
18    Q.    And are they at this time leaving the east plaza, where
19    they were supposed to be staged?
20    A.    Correct.
21    Q.    Okay.  You can stop it there, Ms. Rohde.  Thank you.
22            Let's go back to your presence in the Vice President's
23    ceremonial office, Agent Wade.  Did there come a time when the
24    Secret Service escorted the Vice President out of his ceremonial
25    office?
```

"Accepted"

MAR 0 3 2023

Taylor McPhee Schneider

"Accepted"

MAR 0 3 2023

Taylor James Schnabbles

1   A.    Yes.

2   Q.    What role did you have with respect to that?

3   A.    After communicating with my liaison and additional Capitol

4   Police, the information received led us to believe that there

5   was imminent threat, as people were breaching the building at

6   that time.  So the decision was made that the Vice President

7   should be relocated.

8   Q.    And did you escort him while he was being relocated?

9   A.    Yes.

10  Q.    I'm going to pull up on the screen Government Exhibit 221,

11  already admitted into evidence.

12        And before we start playing it, Ms. Rohde, can you help us

13  understand, Agent Wade, what we're looking at here?  Where was

14  this view?

15  A.    You're looking at a lobby area just outside the rear of the

16  Senate chamber.  So that wooden and glass door enters the back

17  lobby area of the Senate floor, which goes into the Senate

18  chamber.

19  Q.    And how close is the Vice President's ceremonial office

20  once one enters through these wooden doors with the glass

21  inserts?

22  A.    Just inside to the right.

23  Q.    Do you see a blonde woman down on the first landing here?

24  A.    Yes.

25  Q.    And who is that?

"Accepted"

MAR 03 2023

Taylor James Johnston

1    A.    That's Lanelle Hawa.

2    Q.    And she's the one who works for you who sent that e-mail

3    that we talked about earlier?

4    A.    Correct.

5    Q.    And the man with his arms outstretched, do you know what

6    agency he works for?

7    A.    Actually, if you could rewind that so I could be clearer.

8    Q.    Sure.  We can play it forward for a second.  If you could

9    pause it there.

10         Do you know what agency he works for?

11   A.    Yeah, the Secret Service.

12   Q.    And do you know what's about to happen here?

13   A.    Yes.  This was just prior to us moving the Vice President.

14   Q.    And if we could play it forward.

15         (Video played.)

16   Q.    And then stop.  This is at 2:25:54 p.m.

17         Who is the man who is just about to walk down the stairs?

18   A.    Which gentleman?

19   Q.    Sure.  Why don't we rewind for a second.

20         The back gentleman.

21   A.    That would be me.

22   Q.    So that's you right there where we see the back of your

23   head?

24   A.    Yes, the third person just about to get to the staircase.

25   Q.    And if we could play it forward, stopping at 2:26 even.

"Accepted"

MAR 0 3 2023

Taylor James Schneider

1     (Video played.)

2   Q.   Who is the woman with the darker blonde hair on the right

3   side?

4   A.   In the front, the first female is Karen Pence.

5   Q.   And who is the woman behind her with the lighter blonde

6   hair?

7   A.   Charlotte Pence.

8   Q.   And if we could play it forward for an extra two seconds.

9        (Video played.)

10  Q.   And stop it there.  Who is the person with the white hair

11  at 2:26:01 who is facing backwards briefly?

12  A.   That's Vice President Mike Pence.

13  Q.   And if we could play it forward, Ms. Rohde.

14       (Video played.)

15  Q.   Thank you, Ms. Rohde.  You can take it down.

16       Agent Wade, did you stay with the Vice President and his

17  family after he exited the area of the Senate chamber?

18  A.   Yes.

19  Q.   And did you return with the Vice President and his family

20  to the Senate chamber area in the evening of January 6 of 2021?

21  A.   Yes.

22  Q.   At approximately what time?

23  A.   Approximately 7:00 p.m.

24  Q.   Now, how would you compare the number of Secret Service

25  personnel at the time you left the chamber when we just looked

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1   at it at about 2:25 to the time you returned to the chamber at

2   about 7:00 p.m.?

3   A.   We added additional agents for his return.

4   Q.   And why did the Secret Service add additional agents for

5   the Vice President's return?

6   A.   Even though the Capitol Police gave us the all clear and

7   they had several tactical teams sweeping the building, just to

8   ensure his safety.

9   Q.   Earlier in your testimony, you used a phrase "emergency

10  action."

11       Do you remember doing that?

12  A.   Yes.

13  Q.   Is that a Secret Service phrase?

14  A.   Yes.

15  Q.   What does an emergency action mean to a layperson?

16  A.   An emergency action plan is something you'd execute if a

17  threatening action or a threatening event happened to a

18  protectee where you had to either move, relocate, or extract a

19  protectee from a situation.

20  Q.   Did the Secret Service take any emergency actions on

21  January 6 with regard to the safety and security of Vice

22  President Pence and his family?

23  A.   Yes.

24  Q.   Can you name some of those emergency actions for us?

25  A.   Well, it was a relocation for his safety.

"Accepted"

MAR 0 3 2023

Taylor James Schaables

1   Q.    So when you relocated the Vice President and his family,

2   that was an emergency action?

3   A.    Yes.

4   Q.    And what about bringing additional Secret Service personnel

5   to the Capitol?

6   A.    That could be considered as well, yes.

7   Q.    And what about relocating the Vice President's motorcade?

8   A.    Yes.

9          MR. NESTLER:  Thank you.  No further questions.

10         THE COURT:  Mr. Welch?

11         MR. WELCH:  Thank you.

12                     CROSS-EXAMINATION

13         BY MR. WELCH:

14   Q.    Good morning, Agent Wade.

15   A.    Good morning, sir.

16   Q.    My name is Bill Welch.  I'm also going to ask you some

17   questions.

18         To the best of your recollection, was the time stamp on the

19   last video that we watched with you and Vice President Pence

20   walking down those stairs at 2:28 p.m., was that approximately

21   correct, to the best of your recollection?

22   A.    Yes.

23   Q.    When you initially went and -- when you initially arrived

24   at the Capitol on January 6, you did not see my client

25   Mr. Reffitt, did you?

"Accepted"

MAR 0 3 2023

Taylor James Schneider

1    A.    No.

2    Q.    Now, when you went to Mrs. Pence and Charlotte Pence and

3    met with them because you were assigned to protect them, you did

4    not see my client Mr. Reffitt, did you?

5    A.    No.

6    Q.    And when you went with them to the Senate gallery and you

7    were in the hall, you did not see my client Mr. Reffitt, did

8    you?

9    A.    At no point on January 6 did I see your client.

10   Q.    At no point?

11         MR. WELCH:  Court's indulgence.

12   I'll pass the witness.

13         THE COURT:  Anything further?

14         MR. NESTLER:  Just briefly, Your Honor.

15                  REDIRECT EXAMINATION

16         BY MR. NESTLER:

17   Q.    Agent Wade, did you take those emergency actions,

18   relocating the Vice President and his family and the motorcade,

19   because of a specific person's actions?

20   A.    No.

21   Q.    Why did you take all those actions?

22   A.    Because we were advised there were hundreds of people

23   breaching the U.S. Capitol building.

24         MR. NESTLER:  No further questions.

25         THE COURT:  All right.  May this witness be excused?

1    MR. WELCH:  Yes, Your Honor.

2    THE COURT:  All right.  Thank you, sir.

3    THE WITNESS:  Thank you.

4    THE COURT:  So ladies and gentlemen, we can take a

5    break now or start with the government's next witness.  Does

6    anyone need a break?

7    Anyone on the trial teams need a break?

8    MS. BERKOWER:  We're ready to start, Your Honor.  And

9    there are three exhibits that are to be admitted:  405, 111, and

10   163.

11   THE COURT:  Why don't you confer with Mr. Welch and

12   see if we can pre-admit those.

13   (Pause.)

14   MS. BERKOWER:  Your Honor, I've spoken to Mr. Welch.

15   I believe he does not object to pre-admitting 405, 111, and 163.

16   THE COURT:  Is there any objection, Mr. Welch?

17   MR. WELCH:  No, Your Honor.

18   THE COURT:  All right.  Those exhibits are admitted.

19   (Government Exhibits 405, 111, and 163 received into

20   evidence.)

21   MS. BERKOWER:  Your Honor, the government calls Rocky

22   Hardie.

23   ROCKY HARDIE, WITNESS FOR THE GOVERNMENT, SWORN

24   THE WITNESS:  May I remove my mask?

25   MS. BERKOWER:  You may.

"Accepted"

MAR 0 3 2023

Taylor James Johnston

"Accepted"

MAR 03 2023

Taylor James Schneller

                        DIRECT EXAMINATION

1               BY MS. BERKOWER:

2        Q.    Good morning.

3        A.    Good morning.

4        Q.    Can you please say and spell your name.

5        A.    My whole name?

6        Q.    Yes.

7        A.    Rocky Hardie, R-o-c-k-y H-a-r-d-i-e.

8        Q.    What state are you from?

9        A.    Texas.

10       Q.    What part of Texas?

11       A.    In the Austin area.

12       Q.    And do you work?

13       A.    Yes, I do.

14       Q.    What kind of work do you do?

15       A.    I build -- I manufacture in-ear earphones for listening to

16  music.

17       Q.    Did you previously belong to a group called the Texas Three

18  Percenters?

19       A.    Yes.

20       Q.    Do you know someone named Guy Reffitt?

21       A.    Yes.

22       Q.    Did you meet him through that group?

23       A.    Yes.

24       Q.    And in January of last year, did you travel to D.C. with

"Accepted"

MAR 0 3 2023

Taylor James Arthusturs

```
 1   him?
 2   A.   Yes.
 3   Q.   Were you present on the U.S. Capitol grounds on January 6?
 4   A.   Yes.
 5   Q.   Did you also travel back to Texas with Mr. Reffitt?
 6             MR. WELCH:  Objection.
 7             THE COURT:  Overruled.
 8             BY MS. BERKOWER:
 9   Q.   You may answer.
10   A.   Yes.
11   Q.   So I'm going to ask you questions about each of those
12   topics.  Okay?
13   A.   Okay.
14   Q.   But I'm going to ask you about a few other things first.
15        Starting with the Texas Three Percenters, you said you were
16   a member of that group?
17   A.   Yes.
18   Q.   Do you also call yourselves by an acronym?
19   A.   You mean the Three Percenters by an acronym or --
20   Q.   The Texas Three Percenters, do you go by an acronym?
21   A.   An acronym?
22   Q.   Is TTP something that you all call the group?
23             MR. WELCH:  Objection.
24             THE COURT:  Overruled.
25             THE WITNESS:  Yes, TTP is what we're known as also.
```

"Accepted"

MAR 0 3 2023

Taylor James Prelates

```
 1              BY MS. BERKOWER:
 2   Q.    Approximately when did you join TTP?
 3   A.    I'm not exactly sure.  It was either the end of 2019 or the
 4   first part of 2020.
 5   Q.    Why did you join TTP?
 6   A.    A matter of concern for my safety.  I was -- during the
 7   summer, they had a lot of riots, and the news media that I would
 8   watch on YouTube, for instance, showed a lot of antifa burning
 9   things down, destroying things, breaking windows, throwing fire
10   bombs at police officers and everything.
11        There is this one video where a guy, they're a part of BLM
12   or somebody, and he says, "Oh, you think this is just down here?
13   We're coming to your community."  And I got to thinking, well,
14   in my community, I don't know -- I don't know anybody that
15   could, you know, could watch my back.
16        And so I started looking around for some group of people
17   that was like-minded, that if I got in trouble I could pick up
18   the phone and say hey, I need some help.
19   Q.    And when you were in TTP, did you have a role assigned to
20   you in the group?
21   A.    I did.
22   Q.    What was the role?
23   A.    I was the comms officer, state-level comms officer.
24   Q.    What does "comms" mean?
25   A.    Comms is short for communications.
```

1   Q.   And what are the beliefs of TTP?

2   A.   The beliefs of TTP?  Well, I will tell you, when I joined,

3   I asked if they were racists, and they said no.  I said are

4   you -- are you like a white supremacist group, and they said no.

5   I said do you hate the government, and they said no.

6   Q.   Mr. Hardie, could you please explain what the beliefs of

7   the group are?

8   A.   What they are?  Okay.  The beliefs of the group -- well,

9   part of it is that they support law enforcement, and they

10  believe in supporting the Constitution, and they believe in

11  supporting the government as long as it follows the

12  Constitution.

13  Q.   And what does the Three Percenters' part of the group name

14  mean?

15  A.   The term 3 percent comes from the concept that during the

16  Revolutionary War of 1776, out of the whole population, only

17  3 percent actually took action, and that the other 97 percent

18  were happy to be under the King's rule.

19  Q.   And did TTP ever have in-person meetings?

20  A.   Yes.

21  Q.   Who was the leader of TTP?

22  A.   The state leader was Russ Teer.

23  Q.   Did he have nicknames in the group?

24  A.   He did.

25  Q.   What are the nicknames?

Accepted

MAR 03 2023

Taylor James Johnston

"Accepted"

MAR 03 2023

Taylor James Johnston

1   A.   His was "Dead Shot."

2   Q.   Did he also have a handle on online communications?

3   A.   Bowen, William Bowen.

4   Q.   Now, was Guy Reffitt in this group?

5   A.   Yes.

6   Q.   Did he have a job assigned to him?

7   A.   Yes.  Well, I would say loosely assigned, but assigned,

8   yes.

9   Q.   What was his job?

10  A.   He was like a vetting officer.  So if anybody wanted to

11  join, he would do research on them to see what their background

12  was before they're admitted.

13  Q.   Did you meet him in person through the group?

14  A.   Yes.

15  Q.   And was one of the group meetings at his house?

16  A.   Yes.

17  Q.   Are you still a member of TTP?

18  A.   No.

19  Q.   Around when did you leave the group?

20  A.   It would -- I think late -- gosh.  It was -- I had a visit

21  by the FBI.  I don't remember the exact date, but it was shortly

22  thereafter I was thinking, well, okay, this is not really what I

23  want to --

24  Q.   Was that before or after January 6 of 2021?

25  A.   It was after January 6th.

"Accepted"

MAR 0 3 2023

Taylor James Schneider

1    Q.    Now let's talk about your relationship with Mr. Reffitt.

2    Okay?  Did you ever hang out with him?

3    A.    A little bit.

4    Q.    Let's talk about the first time you hung out with him.

5    Okay?

6    A.    Okay.

7    Q.    Where did you meet when you went to hang out with him?

8    A.    We met at a park.

9    Q.    And was this before or after the 2020 election?

10   A.    Before.

11   Q.    Why were you interested in meeting him in person?

12   A.    Because I had talked to him on the phone.  I thought he was

13   an interesting person, and I thought we had similar beliefs.

14   Q.    Was there anything else that drew you to him in particular?

15   A.    Yeah.  In life, most people talk, but they don't do.  And

16   he seems to be a person that actually does things.  He gets

17   things done.

18   Q.    And why was that significant to you?

19   A.    Well, because I'm kind of the same way, you know?  If I say

20   I'm going to do something, I'm going to do it.

21   Q.    And when you met, did you bring your cell phones with you?

22   A.    We did bring them, yes.

23   Q.    Did you have them with you while you were sitting in the

24   park together?

25   A.    Not on my person, no.

1    Q.    Do you know if he had his on his person?

2    A.    I believe he did not.

3    Q.    And why didn't you have your phones with you?

4    A.    Because we have a general belief that we can be listened

5    to, and we didn't want to be listened to.

6    Q.    So where was your phone?

7    A.    In my car.

8    Q.    Did you talk about politics when you were in the park with

9    him?

10   A.    Yes.  We talked about a variety of things, but yes,

11   politics.

12   Q.    Generally speaking, did you have similar views?

13   A.    Yes.

14   Q.    And what did you talk about with respect to politics that

15   day?

16   A.    We talked about how the country is pretty much going down

17   the tubes, and we talked about what's going on in Washington and

18   the people that seemed to be corrupt and destroying our country.

19   Q.    Were there any people in particular that you felt were

20   destroying the country?

21   A.    Well, yes, there were.  We talked about a few.

22   Q.    Who?

23   A.    Well, one would be Nancy Pelosi.  We pretty much felt like

24   she's evil incarnate.

25   Q.    And anyone else?

"Accepted"

MAR 0 3 2023

Taylor James Schneider

"Accepted"

MAR 03 2023

Taylor James Schmalless

1  A.    Let me think.  Well, we talked about President Trump, you

2  know, and we talked about what he stood for in the country and

3  everything and trying to make things right.

4  Q.    Now, you mentioned you were drawn to Mr. Reffitt because

5  you felt he was someone who did things?

6  A.    Yes.

7  Q.    Did you talk about doing things with him?

8  A.    We -- let's see.  I don't remember specifically at that

9  time if we talked about doing things.  There were -- there was a

10 thing in Temple at one point, but I don't remember exactly what

11 we talked about.

12 Q.    Did you speak about your philosophy on when it might be

13 appropriate to take action?

14 A.    I don't have a specific memory, but I would say that we --

15 we do ask ourselves, or we did ask ourselves, you know, how far

16 do you let things go before you have to take action and protect

17 your country.

18 Q.    And when you say "take action to protect your country,"

19 what kind of action were you talking about?

20 A.    I don't think that we had a specific -- we didn't have a

21 specific action, but -- let me think just a moment.

22       There was no singular event, for instance, that we were

23 discussing.

24 Q.    Well, let me be clear.  When you were referring to action,

25 were you talking about political action?

"Accepted"

MAR 0 3 2023

Taylor James Schittker

1    A.    It was nebulous.   Political action is one.

2    Q.    Did you also talk about when it might be appropriate to use

3    violent action?

4    A.    I know at various times that topic came up.   I don't recall

5    at that particular meeting if we talked about any kind of

6    violent action, but we knew that something has to be done at

7    some point.

8    Q.    Did the term "1776" come up at that meeting?

9    A.    At that particular meeting?   I don't recall if that term

10   came up, but I'm familiar with the term and what it means.

11   Q.    Did you previously tell the FBI that at that meeting you

12   talked about it being 1776?

13   A.    Oh, you mean like the scenario that we're in is like 1776?

14   Q.    Yes.

15   A.    Yes.

16   Q.    Can you explain what that part of the conversation was

17   about?

18   A.    Okay.  Well, during 1776 is the time of the Revolutionary

19   War when the colonists were rebelling against the King of

20   England.  And the idea was that the king was a tyrant and the

21   people had no redress of grievances.

22         And so basically, the -- this time frame that we're in now

23   is analogous to 1776, where a lot of people in society feel like

24   their government's not listening to them, and so they have no

25   choice but to rebel in some form.

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1    Q.    So let's go on to a different topic.  After the 2020

2    election, did you have concerns about the integrity of the

3    election?

4    A.    Yes, I did.

5    Q.    Did you believe the results needed to be recounted?

6    A.    Yes.

7    Q.    Do you still -- or excuse me.

8          Did you believe the election was stolen?

9    A.    Yes, I did.

10   Q.    Do you hold those beliefs today?

11   A.    Today?  Yes, I do.

12   Q.    After the election but before January 6, did you

13   communicate with others in TTP about these views?

14   A.    Yes.

15   Q.    And did other people in TTP share those views?

16   A.    Yes.

17   Q.    Did you discuss this issue with Mr. Reffitt?

18   A.    Yes.

19   Q.    What was his view of whether the election was stolen?

20   A.    He agreed.  He felt like the election was stolen.

21   Q.    Let's talk now about your trip to D.C.  When did you start

22   considering traveling to D.C. for January 6?

23   A.    It was probably a week or ten days, something like that,

24   beforehand.

25   Q.    And during that time period, were you on a messaging chain

1    with TTP members?

2    A.   Yes.

3    Q.   Why were you considering going to D.C. initially?

4    A.   I guess a couple of reasons.  One, I felt like what's

5    happening in our country right now has historical context.  I

6    felt like the -- my perception that the election was stolen is

7    very, very significant.  It's kind of a catastrophic event for

8    our country, and I felt like I needed to be there.  The

9    president said hey, you know, I'd like 10 million people to show

10   up, and I said, well, I think maybe I need to be counted.

11        And then we had some communications on -- on the Telegram,

12   and then I saw something and said, well, okay, I think I need to

13   go.

14   Q.   So let's pull up some of that Telegram now.  Ms. Rohde, if

15   we could have Government Exhibit 1B4.1, going to PowerPoint

16   slide 2 and 3, and we will start with 2.

17        Mr. Hardie, do recognize you this to be a message that you

18   received over Telegram?

19   A.   Yes.

20   Q.   Who sent this message?

21   A.   That would be Mr. Reffitt, who is also known as Call to

22   Arms.

23   Q.   Was that his handle on Telegram?

24   A.   Yes.

25   Q.   Could you read this message out loud, please.

Accepted

MAR 03 2023

Taylor James Johnston

1    A.    Okay.  "We march on D.C. January the 6th with every beating

2    American heart.  We drain the swamp.  The House and Senate must

3    be held accountable for the tyrannical against the republic of

4    the people.  I will be leaving on January 4th to make the trip

5    and stand in solidarity or fight if needed.  Those of you

6    patriots that are true blooded warriors can join or you can join

7    or be tread on.  It's a commitment and that's no doubt, yet the

8    travel, commitment, and time will either be sacrificed now for

9    the greater good of the future.  Or we will lose the moment

10   forever.  Not making the sacrifice for this short time in your

11   life could be detrimental for the rest of your life.  Stand and

12   be counted."

13   Q.    What date was that sent?

14   A.    December 21st, 2020.

15   Q.    Was this one of the messages you considered when making a

16   decision to travel?

17   A.    Yes, I did, you know.

18   Q.    Could you explain how this impacted your decision?

19   A.    Well, I was already thinking about it, and then I read

20   this, and I said, well, I need to go.

21   Q.    And what about this in particular made you want to go?

22   A.    Stand and be counted, because it was pretty much what I was

23   thinking on my own.

24   Q.    Now, have you participated in various Telegram messaging

25   threads with members of TTP?

Case 1:21-cr-00091-RCL   Document 65-2   Filed 04/13/22   Page 71 of 134
Case 1:21-cr-00091-RCL   Document 127-1   Filed 04/19/23   Page 709 of 865

1107

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1   A.   Yes.

2   Q.   Did some of those include the defendant Mr. Reffitt?

3   A.   Yes.

4   Q.   Generally speaking, what is the tone of the exchanges in

5   those messaging threads?

6   A.   The tone?  Could you clarify "the tone" a little bit?

7   Q.   Well, generally speaking, do people speak in stark terms in

8   the messaging threads?

9   A.   In stark terms?  I think so.  I think there's kind of an

10  apocalyptic tone that permeates the thought process.

11  Q.   And before January 6, how seriously did you take messages

12  that had apocalyptic tone?

13  A.   I didn't take them that serious.  I understand that people

14  were concerned.  I was concerned.  But nobody -- you know, I

15  didn't think people would go down and do anything like other

16  than go to some local or regional protest and things like that.

17  Q.   Now, did you take the trip to D.C. with Mr. Reffitt?

18  A.   Yes.

19  Q.   How did you decide to travel with him?

20  A.   You mean what led to my decision?

21  Q.   How did it come about that the two of you traveled

22  together?

23  A.   Okay.  Well, I was already planning to go by myself, and

24  then I got word from Mister -- from the leader of TTP, Russ

25  Teer, and he said, Oh, well, Call to Arms wants to go, and his

Case 1:21-cr-00091-RCL   Document 65-2   Filed 04/13/23   Page 72 of 134
Case 1:21-cr-00091-RCL   Document 127-1   Filed 04/19/23   Page 710 of 865

1108

"Accepted"

MAR 0 3 2023

Taylor James Schroeder

1    travel companion dropped out.  He said, You might want to

2    contact him.

3         I did.  I called him, and he said yeah, and I said, okay,

4    great, we can save some money, let's go.

5    Q.   And after that, did you connect with Mr. Reffitt about the

6    plans?

7    A.   Yes.

8    Q.   So what did he tell you about the plan?

9    A.   What did he tell me?  Well, we discussed the travel.  I

10   said, Well, how are we going to get there, what's our path?  And

11   he said, We're going to travel up -- I forget what the

12   interstate is, and we will spend the night in Nashville, and

13   then we'll go from there to D.C. on the night before the event.

14   Q.   Did you discuss flying?

15   A.   I don't recall discussing flying.  I think we decided

16   immediately on that we were going to drive.

17   Q.   And who made the bookings for any hotels you were going to

18   stay at?

19   A.   Mr. Reffitt.

20   Q.   Now, during that conversation, did he explain the reason

21   why he wanted to go to D.C.?

22   A.   Well, he wanted to go to D.C. to -- do you have maybe a

23   specific question on that?

24   Q.   Well, did you talk about your separate reasons for wanting

25   to go?

"Accepted"

MAR 0 3 2023

Taylor James Johnatakis

1   A.    Yeah, we talked.

2   Q.    And you said you wanted to go to be counted --

3   A.    Right.

4   Q.    -- and to stand and be counted?  Is that what you testified

5   to a few minutes ago?

6   A.    Right.

7   Q.    What was his part of that conversation?  Why was he saying

8   he wanted to go?

9   A.    Well, we discussed and we talked about the need for the

10  people who are the corrupt people to be removed and replaced

11  with people who are not corrupt.

12  Q.    That was something that he raised or that you raised?

13  A.    He raised.

14  Q.    And what was he saying about needing to -- about these

15  corrupt people?  What did he express about them?

16  A.    That they need to be dragged out.  And he said no matter

17  whether they're Republican or Democrat, they're all corrupt,

18  they need to be dragged out and replaced with people that are

19  patriotic to the country.

20  Q.    What went through your mind as he said things like that?

21  A.    Well, I had pictures in my mind.  I'm a visual person.

22  So -- well, I didn't think it was something that anybody was

23  going to act on.  I had no concept before I went to D.C. that

24  there would be anything other than people standing around

25  listening to the president and then going and standing around

1    the Capitol building.

2    Q.    So did he share any specific plans with you to actually go

3    and remove people from the building?

4    A.    We had discussions that at the time it seemed like we were

5    joking around, and I considered it hyperbole.  And we talked

6    about Nancy Pelosi in particular.

7    Q.    Now, with regard to your plans in D.C., did you expect that

8    you would go to the Capitol area, the building, Capitol building

9    area?

10   A.    I didn't have a clear idea how it would unfold, because I

11   had never really been there.  I knew that the general plan was

12   that we would listen to the president speak, and then at some

13   point, the whole group of people can move toward the Capitol.

14        Other than that general idea, I didn't have anything

15   specific.

16   Q.    Well, what did you think was going to happen at the Capitol

17   itself?

18   A.    Well, you know, part of me counted -- I watched people do

19   protests on TV with signs and everything.  So I thought that

20   with that many people, there was probably over a million people

21   there, that's pretty significant, and I thought for sure that

22   people in the Capitol building would look out the window and say

23   wow, look at all those people, maybe we need to think about

24   this, you know.

25   Q.    Now, let me ask you a few follow-up questions on that.

"Accepted"

MAR 0 3 2023

Taylor James Christian

1   A.   Okay.

2   Q.   Did you know what was happening inside the Capitol building

3   that day?

4   A.   Well, in general terms.  I knew what I read from the media

5   or heard, and that was that they were going to certify the vote.

6   Q.   So you knew they were meeting inside?

7   A.   Yes, uh-huh.

8   Q.   And when you said you were hoping they'd look outside, what

9   exactly were you hoping they would look outside and do?

10  A.   Well, I know that they were supposed to be certifying the

11  vote.  In my mind, I was like they would -- somebody would say

12  hey, you know -- there was a political struggle going on in that

13  building and in our society.  Some people want to stop the vote

14  or want to recertify or cancel it or whatever, and others don't.

15       And so I thought somewhere, somebody would look at it and

16  say okay, we're going to do something.  The end result would be

17  that they didn't certify the vote that day.

18  Q.   They did not certify?

19  A.   In my mind, that was the objection -- the objective, was

20  that by our presence there, that they would not certify the vote

21  that day.

22  Q.   Now, as you were planning the trip with Mr. Reffitt, did

23  you discuss bringing firearms to D.C.?

24  A.   Yes, we did.

25  Q.   Could you explain what discussion you had with him?

"Accepted"

MAR 0 3 2023

Taylor James Johnston

A.    The only thing that I -- well, there's a couple of things.
We discussed it.  I don't remember how it came about, but I
remember that we had a discussion.

       And I have a concealed carry license in Texas, and I asked
what about reciprocity laws -- we're traveling through these
states, are we going to have any issues.  And we discussed,
well, it seems like every state that we're going to go through
is going to have reciprocity except for D.C.

Q.    And who had the information about what the laws were in the
different places you would be going?

A.    Well, I understood the basics of reciprocity.  I didn't
know anything about D.C. law.  And Mr. Reffitt knew a little bit
more than I did, and he said well, we can do these things, but
we can't do those things.

Q.    And when he said -- did he know about the laws in D.C.
specifically?

A.    I don't know how much he knew.

Q.    Did he give you information about the laws in D.C.?

       MR. WELCH:  Objection.

       THE COURT:  Overruled.

       THE WITNESS:  I don't remember anything specific, but
I do remember that we discussed is it legal in D.C. to have a
handgun.

       BY MS. BERKOWER:

Q.    And what was your discussion about that?

1    A.   Well, it's not legal.  And I said, Well, how about getting

2    a permit?  And he said, Well, you're not going to get a permit

3    in D.C.

4    Q.   So going into that conversation, did you know it was not

5    legal to have a handgun in D.C. without a permit?

6    A.   Yes, we did.

7    Q.   Did you personally know that before you spoke with

8    Mr. Reffitt?

9    A.   Yes, I did.

10   Q.   How did you know that?  I thought you just said you didn't

11   know much about the laws.

12   A.   Well, I know that I've read that it's almost impossible to

13   get a -- there may be laws that say yes, you can have a permit,

14   but in practical terms, you're probably not going to get one.

15   Q.   So who provided you with that information?

16   A.   I was reading the -- in that part, I was reading the media.

17   I think we both discussed and agreed that we weren't going to

18   get a permit.

19   Q.   So what conclusions did you reach, at the end of that

20   discussion about firearms, as to whether you would bring

21   firearms to D.C.?

22   A.   Well, first of all, what's the purpose?  The purpose was

23   for self-defense, you know.  And that's based on the things that

24   I had seen on the media before, with all the burning and the

25   looting and the fire bombing and stuff like that.  I had no idea

1    what to expect.

2         At one point, we discussed, you know, what are the

3    consequences, and are we willing to risk the consequences.  And

4    we decided that -- I think we used an expression it's better to

5    be tried by a jury of 12 than carried by six.

6    Q.   What does that mean to you?

7    A.   That means basically if you violate a handgun law and

8    you -- you'll probably go to jail, and at some point you will

9    get out, but if you die, you're not coming back.

10   Q.   And what conclusion did you reach about whether or not you

11   would bring guns to D.C. during that discussion?

12   A.   Well, we agreed on that one concept, and we said okay,

13   we're willing to take that risk.  We felt like that nobody would

14   ever know, nobody would ever get hurt.  We would be in, we would

15   be out, nobody would know, and we would go on with our life.

16   Q.   Now, before we go any further, I'm going to ask you a few

17   questions about an agreement you entered into with the

18   government.  Okay?

19   A.   Okay.

20   Q.   Ms. Rohde, if we could please have Government Exhibit 405,

21   which is in evidence, and may we publish it, please.

22        Mr. Hardie, do you recognize this exhibit?

23   A.   Yes, I do.

24   Q.   Is this an agreement you entered into with the government?

25   A.   Yes.

1    Q.    Did you sign this document?

2    A.    I did.

3    Q.    Did your attorneys sign this document?

4    A.    Yes.

5    Q.    And did Mr. Nestler sign this document on behalf of the

6    government?

7    A.    Yes.

8    Q.    So let's talk about the terms.  And Ms. Rohde, if we could

9    please go back to the first page.  Thank you for scrolling down.

10          Do you see the date on this document?

11   A.    It says May 19, 2021.

12   Q.    Did you first enter into this agreement in connection with

13   testimony you gave to the grand jury that was investigating this

14   matter?

15   A.    I'm sorry.  Could you repeat that, please?

16   Q.    Did you first enter into this agreement in connection with

17   testimony you gave to the grand jury?

18   A.    Yes.

19   Q.    And do you understand the agreement to also cover your

20   testimony here today?

21   A.    Yes.

22   Q.    Does this agreement require you to testify about both what

23   Mr. Reffitt did and what you did, even if that testimony

24   incriminates you?

25   A.    Yes.

1    Q.    And in exchange, has the government agreed not to use your

2    testimony to bring a criminal case against you?

3    A.    That's correct.

4    Q.    To be clear, though, does this mean the government cannot

5    charge you with a crime for what you did on January 6?

6    A.    I believe -- oh, okay.  Could you state that again, please?

7    Q.    Does this agreement prevent the government from charging

8    you with a crime for what you did on January 6?

9    A.    No.

10   Q.    So you can still be prosecuted for what you did?

11   A.    It's possible.

12   Q.    Is it the case that the government could bring a case

13   against you so long as it doesn't use the statements you gave in

14   connection with that agreement?

15   A.    Yes.

16   Q.    And does the FBI know information about you concerning

17   January 6 from sources other than your testimony?

18   A.    Yes.

19   Q.    Before this agreement existed, did you voluntarily talk to

20   FBI agents about what you did?

21   A.    Yes.

22   Q.    Did the FBI search your business?

23   A.    Yes.

24   Q.    Did the FBI search your house?

25   A.    Yes.

"Accepted"

MAR 03 2023

1   Q.   Did the FBI seize your firearms?

2   A.   Yes.

3   Q.   And did the FBI seize and search your electronic devices

4   such as your phone?

5   A.   Yes.

6   Q.   Court's brief indulgence.

7        So Ms. Rohde, you can take that down.

8        Mr. Hardie, let's talk now about your trip itself.  Okay?

9   A.   Okay.

10  Q.   Where did you leave from to go to D.C. for January 6?

11  A.   I left from my home near Austin.

12  Q.   How did you meet up with Mr. Reffitt?

13  A.   I drove to his home in Wylie.

14  Q.   When you got to his house, who else was there?

15  A.   To my knowledge, only Mr. Reffitt and myself.

16  Q.   And what did you -- what did you do when you got to his

17  house?

18  A.   We -- I pretty much transferred things from my car into his

19  car.

20  Q.   And what did you pack?

21  A.   Well, I packed clothing, and then I had an AR-15,

22  ammunition, and then I had a concealed handgun and extra

23  ammunition.

24  Q.   Where did you put your AR-15?

25  A.   The AR-15 was in a plastic case with a lock on it.  It was

"Accepted"

MAR 0 3 2023

Taylor James Schnabbs

1   broken down into two pieces, and it was put in the back cargo

2   area.

3   Q.   And I think, Ms. Rohde, if we could, please, show

4   Government's Exhibit 106 in evidence.  And Mr. Hopkins, please

5   publish it to the jury.  Thank you.

6        Do you recognize this vehicle?

7   A.   Yes.

8   Q.   What vehicle is it?

9   A.   It's a Chevy Equinox.  It's the vehicle we rode to D.C. in.

10  Q.   And where in this vehicle did you put your AR-15?

11  A.   Back in this back cargo area, you know.  They're long.  So

12  we just kind of put them in on kind of the left side in the

13  back.

14  Q.   And you said you brought ammunition for that firearm?

15  A.   Yes.

16  Q.   Where did you put the ammunition?

17  A.   The ammunition was under lock and key, and it was put on

18  the right side of the vehicle.

19  Q.   Did you also bring radios?

20  A.   Yes.

21  Q.   Why did you bring radios?

22  A.   So that we could remain in communication as we got

23  separated.

24  Q.   And how many radios did you bring?

25  A.   I brought two.

1   Q.   Now let's talk about some of the items that Mr. Reffitt

2   brought.  What did you see him pack into the car?

3   A.   Well, I saw that he had an AR, and he had his various gear,

4   various, you know, gear.  He had -- well, when he actually

5   packed the car, I didn't pay that close of attention, you know.

6   Q.   Well, you mentioned an AR.  Did you see him put his AR into

7   the vehicle?

8   A.   I saw him put his AR in the case in the vehicle, yes.

9   Q.   Did you see at that time what was inside the case?

10  A.   I don't recall what was in the case.  I don't think that he

11  actually opened the case.

12  Q.   At a later time, did he open the case, when you were in

13  D.C.?

14  A.   Hang on a second.  Let me think about that statement.  I

15  remember we had to make sure that they were broken down.  And so

16  we might have opened the cases and broken them down.  There's a

17  pivot pin.  You have to pull some pins and take the uppers and

18  lowers apart and set them aside.  We might have done that at

19  that location, but I don't recall specifically.

20  Q.   Did you know how to break yours down?

21  A.   I did, but it had been like 25 years.  I kind of forgot.

22  Q.   So how did you break yours down that day?

23  A.   Well, I had some assistance.  I asked, How do you do this?

24  I forgot.  It's kind of embarrassing.  So basically, you've

25  got -- an AR has a pivot pin here and another pin here, and you

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1    pop the pin, and it can cause the rifle to break apart. Then

2    you pull the other pin out, and you can separate the two halves.

3    Q. And you said you asked someone a question about how to

4    break it down. Who did you ask?

5    A. I asked Mr. Reffitt.

6    Q. And did he assist you?

7    A. Yes.

8    Q. Now, did Mr. Reffitt have any other weapons with him when

9    you were packing the car?

10    A. Yes.

11    Q. What other weapons?

12    A. He had a handgun.

13    Q. What kind of handgun?

14    A. I'm not sure about the make and model, but I just know --

15    it was probably like a 9mm or something like that, I guess.

16    Q. Well, did you examine it yourself?

17    A. No, no, I didn't.

18    Q. So 9mm is just a guess?

19    A. Yeah, okay. So I wouldn't know if it's 9 millimeters or

20    .45.

21    Q. Now, where did you see this handgun?

22    A. Well, in my course of knowing him --

23    Q. Let's focus on the day you were packing the car.

24    A. Okay.

25    Q. Where did you see the handgun?

"Accepted"

MAR 03 2023

Tyler James Johnston

1    A.    Okay.  I don't know that I actually saw the handgun,

2    because it would have been concealed.  Mine is concealed.  So I

3    don't recall seeing it at that particular moment.

4    Q.    Did you later see it in D.C.?

5    A.    Yes.

6    Q.    And you said you had a handgun.  Could you explain where

7    you had your handgun?

8    A.    Yes.  I had a shoulder holster, and I kept my -- I have a

9    .45 caliber, and I kept it under my left armpit, and I had two

10   magazines under my right armpit.

11   Q.    I see you're gesturing under your jacket.  Do you have it

12   with you today?

13   A.    No, I don't.

14   Q.    Now, did you stay long at Mr. Reffitt's house before you

15   started the drive?

16   A.    Not terribly long, just long enough to transfer things over

17   and just kind of get everything organized.

18   Q.    Who drove?

19   A.    He did.

20   Q.    And did you talk along the way?

21   A.    Yes, we did.

22   Q.    About how many hours does it take to drive from that part

23   of Texas to Washington, D.C.?

24   A.    It's about 24 hours when you include your overnights.

25   Q.    And what did you talk about as you drove?

"Accepted"

MAR 0 3 2023

Taylor James McNeil

1   A.   We talked about family, and we talked about what's the

2   purpose of the trip and politics and things like that.

3   Q.   When you say "what's the purpose of the trip," what

4   specifically were you talking about?

5   A.   Talking about, again, you know, the condition of the

6   government and that people need to be -- people need to be taken

7   out of government and, you know, replaced with people who are

8   going to follow the Constitution.

9   Q.   Were there specific phrases that Mr. Reffitt used when he

10  was discussing removing people in government?

11  A.   Do you have like an example or --

12          MR. WELCH:   Objection.

13          MS. BERKOWER:   I can rephrase the question.

14          THE COURT:   Yes, please be more specific so he can

15  answer the question.

16          BY MS. BERKOWER:

17  Q.   Were there specific words Mr. Reffitt used when he talked

18  about removing people from the government?

19  A.   Let me think.   Specific words.   Well, we talked about we

20  gotta get the bastards out of there, and we talked about --

21  well, we kind of made a joke about Nancy Pelosi.

22  Q.   What joke did you make?

23  A.   Well, someone -- and I'm kind of going from a picture in my

24  mind, but we said something about she needs to be dragged out by

25  her ankles or by her feet or something.   And I made a joke,

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1   because I could just imagine as she's going down, her head is

2   going boomp, boomp, boomp down the stairs, and I made a joke

3   about that.

4   Q.   When you talked about removing legislators, did you take

5   him serious at that point in time, as you're driving to D.C.?

6   A.   I didn't think he or anybody was going to get close to the

7   Capitol.  I thought that was impossible.

8   Q.   Why?

9   A.   You watch the news media and you always -- once in a while,

10  there's a news report about someone tries to jump the fence and

11  get close to the Capitol and he gets shot.  And I thought

12  nobody's going to get very close to the Capitol.  So I just

13  never took it seriously.

14  Q.   Did you also talk about TTP in the car?

15  A.   Yes.

16  Q.   What did you talk about with regard to TTP?

17  A.   Let me think.  I don't know specifically.  We talked --

18  Q.   I can ask a more specific question.

19  A.   Yeah.

20  Q.   Did you talk about whether people in TTP had joined you in

21  D.C.?

22  A.   Yeah, we did.  Basically, we were the only two that I know

23  that went up there, and we were kind of complaining about our

24  leader, because he was back there, I call, sorting his sock

25  drawer while he's telling everybody they need to go to D.C., and

Case 1:21-cr-00091-RCL Document 127-1 Filed 04/13/23 Page 92 of 134
Case 1:21-cr-00091-RCL Document 127-1 Filed 04/19/23 Page 726 of 865

1124

"Accepted"

MAR 03 2023

Taylor James Johnston

1  he sits back at home with his family where it's nice and

2  comfortable.  And then that, you know, we made the commitment to

3  go stand and be counted.

4  Q.   When you say we made the decision to stand and be counted,

5  is that a reason that Mr. Reffitt gave you, or is that your

6  reason, or both?

7  A.   Let me think about that.  It was definitely my reason to be

8  counted.  He also wanted to be counted.

9       Do you have another --

10  Q.   I can ask you another question.  As you were driving, did

11  you stop anywhere overnight?

12  A.   Yes, we did.

13  Q.   Where did you stop?

14  A.   We stopped in Nashville, Tennessee.

15  Q.   And why did you stop there?

16  A.   To spend the night, sleep, get rested.

17  Q.   Is that about halfway between -- halfway point in the trip?

18  A.   Pretty much.

19  Q.   When you resumed the drive, in Virginia, did you do

20  something with your firearms before you arrived in D.C.?

21  A.   Yes, we did.

22  Q.   Could you explain what you did?

23  A.   Well, we already had broken down the ARs, because that's

24  what we thought was a legal way to transport them.  And we had

25  our handguns.  And so in Virginia, I believe that's where we

1   stopped, is right outside of D.C., then we took our handguns and

2   put them under lock and key.  We removed the ammunition from the

3   handguns, handguns in one case under lock and key, ammunition in

4   another case under lock and key.

5   Q.   And when you did that, did you see Mr. Reffitt's handgun?

6   A.   I didn't look at it specifically, because I was focused on

7   my own, but I know he had one, and he put it in a case.

8   Q.   And who was driving at the time that you stopped to put

9   these guns in a case?

10   A.   He was.

11   Q.   So did he pull over the car?

12   A.   Yes, he did.

13   Q.   Now, let's talk about what you did when you got to D.C.

14   A.   Okay.

15   Q.   Did you arrive on the night of January 5?

16   A.   Yes.

17   Q.   Did you go straight to the hotel?

18   A.   Yes.

19   Q.   And what hotel did you stay at?

20   A.   I always have a hard time remembering the name of the

21   hotel.  It was -- if you know the name -- I can't remember it,

22   but if you say it, I will remember yes or no if that was

23   correct.

24   Q.   Was it the Melrose Hotel?

25   A.   Yes.

"Accepted"

MAR 03 2023

Taylor James Schnitker

"Accepted"

MAR 03 2023

Taylor James Johnston

1   THE COURT:  Ms. Berkower, sorry to interrupt, but can

2   you estimate how much more direct you have?

3   MS. BERKOWER:  I think we're about halfway done with

4   this witness, Your Honor.

5   THE COURT:  All right.  Ladies and gentlemen, I think

6   it's probably a good time to take a break.  So we will come back

7   in ten minutes, at approximately 11:35.  I will remind you all,

8   no talking, reading, or research.

9   (Jury exited courtroom.)

10  THE COURT:  All right.  You all good?  Any issues?

11  MR. WELCH:  May I be excused for a few minutes,

12  please?

13  THE COURT:  Of course.  You all take a break.

14  (Recess taken from 11:23 a.m. to 11:33 a.m.)

15  (Bench conference.)

16  THE COURT:  Just quickly while the jury is out, I

17  thought I would ask you, Mr. Welch, you've made a reference

18  several times to a witness having a Fifth Amendment issue.  Is

19  there anything we should be addressing now that you expect to

20  spring on cross that would require us to send the jury out?

21  MR. WELCH:  No, I don't imagine, because there's an

22  immunity letter on this witness.  So there wouldn't be a Fifth

23  Amendment privilege.

24  THE COURT:  You said someone might invoke the Fifth.

25  If that's going to happen with this witness -- maybe that's

1127

"Accepted"

MAR 0 3 2023

Taylor James Schnabbe

1  coming with another witness, but I thought this might be the

2  witness.

3      MR. WELCH:  I had thought this might be the witness,

4  too, but if there's an immunity letter, he's probably not going

5  to do that.  And Jackson has already testified.

6      THE COURT:  All right.  I just wanted to check so that

7  we wouldn't keep them waiting.

8      Does the government have another witness on call after

9  Kennedy?

10     MS. BERKOWER:  We do.  We have several, actually, two

11  more.

12     THE COURT:  Great.  Thank you.

13     (End of bench conference.)

14     (Jury entered courtroom.)

15     MS. BERKOWER:  Your Honor, may we bring the witness

16  back in?

17     THE COURT:  Yes, of course.

18     (Witness resumed stand.)

19     THE COURT:  Sir, let me remind you that you're still under

20  oath.

21     BY MS. BERKOWER:

22  Q.  Good morning, again.

23  A.  Good morning.

24  Q.  Mr. Hardie, we were talking when we took a break about your

25  arrival at the hotel in D.C.

"Accepted"
MAR 0 3 2023
Taylor James Schrables

```
 1        Do you remember being asked questions about that?
 2   A.   Yes.
 3   Q.   So let's pick back up there.
 4        When you got to the hotel, what did you do?
 5   A.   I was pretty tired.  I took a few -- I think maybe I took a
 6   bag or something and was in the hotel lobby.
 7   Q.   And what happened with the car?
 8   A.   Mr. Reffitt parked the car.
 9   Q.   Did you remove your firearms from the car at that time?
10   A.   No.
11   Q.   So where were the firearms being kept?
12   A.   They were still under lock and key in the compartment --
13   the cargo area of the vehicle.
14   Q.   And you didn't bring them inside, any of the guns that
15   evening, to your hotel room?
16   A.   No.
17   Q.   After you checked in, what did you do?
18   A.   Went upstairs and relaxed a little bit.
19   Q.   And Ms. Rohde, if we could, please, put up on the screen --
20   and this is admitted into evidence -- Government's Exhibit
21   1B20.1.1.
22        Mr. Hardie, do you recognize this exhibit?
23   A.   Yes, I do.
24   Q.   What is it?
25   A.   It's a selfie that I took of he and I together in the hotel
```

1    room.

2    Q.    And --

3    A.    Go ahead.

4    Q.    Could you explain who the person is on the left in this

5    photo?

6    A.    On the left is Mr. Reffitt.   On the right --

7    Q.    Who is on the right?

8    A.    Myself.

9    Q.    What do you have on your shoulders?

10   A.    That's my shoulder holster.

11   Q.    We can take that down, Ms. Rohde.   Thank you.

12         So let's go on now to what happened on January 6.   That

13   morning, did you and Mr. Reffitt prepare for the day's events at

14   the hotel?

15   A.    I'm sorry?   Say again, please.

16   Q.    Did you and Mr. Reffitt prepare for the day at your hotel

17   that morning on the 6th?

18   A.    Yes.

19   Q.    And in the room -- I should have asked you, when you stayed

20   at the hotel, did you have separate rooms or share a room with

21   Mr. Reffitt?

22   A.    We had a room with two separate beds.

23   Q.    So a shared room with two beds?

24   A.    Yes, uh-huh.

25   Q.    In the hotel room, what did you do to prepare for the day?

1   A.    I had an armored plate, but I didn't have the carrier vest.

2   And so I needed a way of securing it.  So I put newspaper and

3   Gorilla tape and made kind of a thing over my shoulders and

4   around my chest.

5   Q.    And who made the Gorilla tape -- who dealt with the Gorilla

6   tape?

7   A.    Well, I was assisted by Mr. Reffitt.

8   Q.    What else did you do to prepare for the day in your hotel

9   room?

10  A.    Let's see.  What did we do?  Let's see.  We organized --

11  what did we organize?

12  Q.    Well, I can ask you a more specific question.

13  A.    Okay.

14  Q.    Did Mr. Reffitt give you anything for the day?

15  A.    Yes.

16  Q.    What did he give you?

17  A.    He gave me some zip ties.

18  Q.    And what do you mean by -- what are these zip ties?  Why --

19  A.    These are like the real big heavy ones you use as

20  handcuffs.

21  Q.    And did you ask him about those items?

22  A.    Yes.  I said, What are these for?

23  Q.    What did he say?

24  A.    He said, well, in case we need to detain anybody or, you

25  know, something to that effect.

"Accepted"

MAR 0 3 2023

Taylor James Johnstables

1  Q.   Ms. Rohde, if we could please have Government's Exhibit 11

2  in evidence.

3       Mr. Hardie, do you see any items that you recognize in this

4  exhibit?

5  A.   Yes.

6  Q.   Could you explain what they are?

7  A.   On the right is a helmet, and then in the middle is -- are

8  the zip ties.  And then I see --

9  Q.   Let me stop you there.

10  A.   Okay.

11  Q.   So the middle, could you describe what you're referring to

12  as zip ties?

13  A.   Well, they look like -- well, they're folded through and --

14  well, I don't know how you describe it.  It looks like a set of

15  eyeglasses turned sideways.

16  Q.   In this section of the photograph that Ms. Rohde just

17  expanded, are those the zip ties you're referring to?

18  A.   Yes.

19  Q.   Thank you, Ms. Rohde.

20       How many zip ties did the defendant give to you in the

21  hotel room?

22  A.   To the best of my recollection, it was two.

23  Q.   And what did you do with them?

24  A.   Put them on my -- somewhere on my belt or somewhere on my

25  side here.

"Accepted"

MAR 0 3 2023

Taylor James Schnabbs

1   Q.   Did he have any zip ties?

2   A.   Yes.

3   Q.   Where did he have zip ties?

4   A.   In a similar location, on his body.

5   Q.   Now, did you also -- you said that you had packed radios

6   for this trip.

7   A.   Yes.

8   Q.   What did you do with the radios on the morning of the 6th?

9   A.   I believe the radios were still in the vehicle, and then

10  when we left the hotel room, we went down to the vehicle, and we

11  started preparing for our walk to the Capitol.

12  Q.   Okay.  So let's talk about that now.  When you were down at

13  Mr. Reffitt's vehicle, did you take additional preparations for

14  the day?

15  A.   Yes.

16  Q.   Could you explain what you did?

17  A.   Okay.  We opened our cases for our ARs, and we reassembled

18  the ARs, you know, put the pivot pins back in so it's just one

19  long rifle.  We put it back in the case and locked the case.

20       We took out --

21  Q.   Well, let me stop you there and ask you a few more

22  questions about that.

23  A.   Okay.

24  Q.   Who assembled -- who reassembled your AR?

25  A.   I assembled my AR.

1    Q.    And did you see what the defendant was doing with his?

2    A.    I didn't specifically.  I was so focused on what I was

3    doing.  I was kind of in a hurry, nervous, and things like that.

4    Q.    And were you aware of whether he was doing anything with

5    his AR while you were doing that with yours?

6    A.    Well, he was doing the same thing.  He was reassembling his

7    and putting it back in the case.

8    Q.    And where was he standing in relation to you?

9    A.    He would be on my left side.  I'm on the right side.

10   Q.    And how much distance was between you?

11   A.    I don't know, three or four feet.

12   Q.    You're gesturing with your arm.  Fair to say an arm's

13   length between you?

14   A.    Something like that.  Pretty close.

15   Q.    So why were you reassembling your ARs?

16   A.    Because we were being prepared for like what if we needed

17   them, like what if something bad happened and we needed to get

18   them quickly; we don't have time to put everything together.

19   Q.    So what were you anticipating doing with them?

20   A.    Well, we were concerned for our safety, and we were

21   concerned for the safety of the people in general.  That's based

22   on the things that I saw on -- we saw on YouTube videos like

23   where police were being fire bombed, people were in precincts,

24   boarded up, and antifa is trying to burn them out alive, all

25   kinds of stuff like that.

Accepted

MAR 03 2023

Taylor James Schnabbs

1    We just said, well, we don't know what's going to happen,

2  but we may need to protect other people as well as ourselves.

3  Q.   Did your plan for the ARs relate to using them in the event

4  of violent action on the streets?

5  A.   By "violent action," you mean -- okay.  The concept that I

6  had, and I believe -- I'm going to speak for my own self.  The

7  concept that I had was there could be violence on the street

8  from these violent groups like antifa.

9  Q.   And what were you going to do with regard to your ARs if

10  there was violence that day?

11  A.   I didn't have a specific plan, but the idea was if these

12  people were hurting other human beings, then we would use the

13  ARs against them.

14  Q.   Mr. Hardie, didn't you previously say that your plan was to

15  come back and get your ARs if you needed them?

16  A.   Yes.

17  Q.   Is that true?

18  A.   Yes.

19  Q.   And did you discuss that with Mr. Reffitt --

20  A.   Yes.

21  Q.   -- prior to the 6th?

22  A.   Yes.

23  Q.   Now let's talk about other preparations that you made while

24  you were down at the car.

25       Did you see Mr. Reffitt put on any items of clothing?

Accepted

MAR 03 2023

Taylor James Johnston

1   A.   Yes.

2   Q.   What items did he put on?

3   A.   A plate carrier vest, I believe it was green, and there was

4   the helmet that you saw in that last picture, and a GoPro camera

5   on the helmet.

6   Q.   And what kind of vest was it?

7   A.   Well, it kind of looked like an armored vest like you would

8   use in the Army or something.

9   Q.   Did you pick it up?

10  A.   I didn't, no.

11  Q.   Do you know if it had plates in it?

12  A.   I didn't see the plates go in the vest, but I believe there

13  were plates in the vest.

14  Q.   Was that based on things he was saying?

15  A.   Well, it's based on the fact that over the course of time

16  people talked about the plates -- on the messaging, people

17  compared what they were buying:  I bought these plates, and I

18  bought those plates, and I got mine, did you get yours, you

19  know.

20  Q.   Now, did you -- you mentioned that you had left the radios

21  in the car.  So did you do anything with the radios when you got

22  down to the car?

23  A.   Yes.  I just quickly, you know, checked to make sure the

24  batteries were good and that they were on the proper channel and

25  the proper squelch numbers.

"Accepted"

MAR 03 2023

Taylor James Johnston

1     Q.    And did you take one of the radios for yourself?

2     A.    Yes.

3     Q.    What did do you with the other radio?

4     A.    Gave it to Mr. Reffitt.

5     Q.    Did Mr. Reffitt have a coat on?

6     A.    A coat?

7     Q.    Yeah.

8     A.    Yes.

9     Q.    What color?

10    A.    Blue.

11    Q.    And was there anything on top of Mr. Reffitt's helmet?

12    A.    Yes.

13    Q.    What was on top?

14    A.    A GoPro camera.

15    Q.    Did he bring any items -- well, let me rephrase that.

16        Did he give you any items to carry throughout the day?

17    A.    Yes.

18    Q.    What did he give you?

19    A.    Two American flags.

20    Q.    And did he have anything in his hands as you were walking?

21    A.    Yes.

22    Q.    What?

23    A.    He had a megaphone.

24    Q.    Now let's talk about the handguns.

25        You said that before you got to D.C. you had pulled over to

1   the side of the road and put them in a locked case; is that

2   right?

3   A.   Yes.

4   Q.   What did you do with the handgun you brought on the morning

5   of the 6th?

6   A.   I recovered my handgun from its case, and I loaded it with

7   a magazine, put the handgun in my shoulder holster, and I put

8   two additional magazines also in my shoulder holster.

9   Q.   What did Mr. Reffitt do with his handgun?

10  A.   I didn't see specifically, but he would have it on his hip.

11  Q.   And after that, what did you do next?

12  A.   We locked the car and began walking toward the Capitol.

13  Q.   And to be clear, where were the ARs when you locked the car

14  and walked off?

15  A.   Okay.  The ARs were in their respective carry cases under

16  lock and key in the cargo area, the rear cargo area of the car.

17  Q.   Were they assembled or disassembled?

18  A.   They were assembled.

19  Q.   So after you assembled them, you left them assembled?

20  A.   That's correct.

21  Q.   Court's brief indulgence.

22       Now, after this, where did you go?

23  A.   We walked on the street, kind of like in the front of the

24  hotel.  I don't remember the name of the street, but we were

25  walking in the general direction of the Capitol.

1    Q.    Did you go to the National Mall and the Ellipse area?

2    A.    Yes.

3    Q.    And were you with Mr. Reffitt at that time?

4    A.    Yes.

5    Q.    What did you find when you got to the Mall?

6    A.    A lot of people.

7    Q.    And what did you do at the Mall?

8    A.    I was there, I was watching -- well, let's see.  What did

9    we do at the Mall?  I took pictures.  Myself, I took pictures.

10   Mr. Reffitt was in the crowd as well.

11   Q.    Was Mr. Reffitt speaking with people?

12   A.    Yes.

13   Q.    Could you hear the content of what he was saying?

14   A.    No.  I wasn't really paying attention.

15   Q.    Now, Ms. Rohde, if we could, please, pull up -- and this is

16   already admitted into evidence, so we can have the jury screen

17   on as well -- Government Exhibit 1B20.2.1.

18         Mr. Hardie, do you see them on the screen in front of you?

19   A.    Yes.

20   Q.    Prior to coming to court, did you review this exhibit?

21   A.    Yes.

22   Q.    And can you tell us what you see on the screen in front of

23   you?

24   A.    It looks like a wide-angle view of Mr. Reffitt looking

25   upward from about the waist.

"Accepted"

MAR 03 2023

Taylor James Johnston

1    Q.   Do you see a black box in the center of the screen?

2    A.   A black box?

3    Q.   Well, a square item, rectangular item.

4    A.   Yes.  It looks like the radio that I provided.

5    Q.   Now, Ms. Rohde, if you could just play the video from the

6 start to 12 seconds.

7       (Video played.)

8    Q.   You can stop it there at 13 seconds.  Thank you.

9       Mr. Hardie, did you see yourself in those few seconds of

10 video?

11    A.   Yes, I did.

12    Q.   Where were you standing?

13    A.   I was standing in close proximity to Mr. Reffitt.

14    Q.   And did you hear him say "all right, Rocky," or "okay,

15 Rocky, gotta push forward"?

16    A.   I would have, but I turned my body to turn in another

17 direction, but yes.

18    Q.   Was he referring to you?

19    A.   If he said Rocky, he was referring to me.

20    Q.   While you were on the Mall, did you listen to the

21 president's speech?

22    A.   I listened to it on and off.  I wasn't really -- I couldn't

23 hear very well.  My attention was more on the people at the

24 crowd.

25    Q.   After the speech, what did you do next?

"Accepted"

MAR 0 3 2023

Taylor James Johnston

1  A.    After the speech, the whole crowd started just -- like a

2  herd of cattle started moving in one direction, and I just

3  followed along with them.

4  Q.    And where was Mr. Reffitt at this point?

5  A.    Well, just before that, somebody called and said oh, we

6  need help, somebody needs medical attention, or something to

7  that effect.  And I think he might have raised his voice and

8  said, I can help, or something like that.

9         Anyway, he was following through, and people were kind of

10  opening up, and he was going through, and I was trying to follow

11  behind him.

12  Q.    As far as you know, does Mr. Reffitt have any medical

13  training?

14  A.    I don't know that he does.

15  Q.    Okay.  And at that point, after he left through the crowd,

16  were you still with him, or were you separated?

17  A.    I lost track of him.

18  Q.    So did you continue to communicate with him after that

19  point?

20  A.    Yeah, at various times, yes, I would make radio contact.

21  Q.    Was that through the radios you had provided?

22  A.    Yes.

23  Q.    And so when -- after that point when he went through the

24  crowd, when did you next see him?  Not talk to him but actually

25  see him.

"Accepted"

MAR 03 2023

Taylor James Johnston

1   A.   Oh, back at the hotel that evening.

2   Q.   In the interim time, while you were still at the Mall and

3   walking to the Capitol, did you communicate with him on the

4   radio?

5   A.   Yes.

6   Q.   And what information did you get from him over the radio?

7   A.   His location.  He was well ahead of me.  And he said, "I'm

8   at the Capitol," and I said, "I'll be there soon."

9   Q.   And were you still heading in that direction?

10  A.   Yes.

11  Q.   Now, let's put a pin in what Mr. Reffitt was telling you

12  and talk about what you did at this point.  Okay?

13  A.   Okay.

14  Q.   Did you actually walk all the way down to the Capitol area

15  or the area of the Capitol building?

16  A.   Yes, I did.

17  Q.   What did you do when you got there?

18  A.   I was taking pictures and making videos and commentary and

19  just looking at people.

20  Q.   Did you go inside the building?

21  A.   No.

22  Q.   Did you go up the stairs, up to where the -- to the outside

23  of the building?

24  A.   Okay.  When I first got there, it was kind of what I call

25  the back of the building.  That's the place where people were

"Accepted"

MAR 03 2023

Taylor James Johnston

1    climbing up scaffolds and things like that.

2    Q.    What went through your mind when you saw people climbing up

3    scaffolds and things like that?

4    A.    Well, I first noticed it at a distance, and they looked

5    like spiders climbing up walls, and I said wow, these people are

6    really doing it, these guys are, like, climbing the walls of the

7    Capitol.

8    Q.    And when you got closer, what did you do?

9    A.    I continued taking pictures.  I got closer, and I got to

10   the point where there was a police barricade.

11   Q.    And what happened when you got to the police barricade?

12   A.    There were -- I could hear agitators around me, and then

13   there were people, you know, shouting, and then at one point,

14   police came out, and they just kind of did like this

15   (indicating).  And the police went back, and people started

16   shaking the barricades and pushed the barricades over.  And then

17   they started fighting with police and things like that.

18   Q.    Now, let's be clear about something.  Did you yourself have

19   any encounters with police that day?

20   A.    When you say "encounters," what do you mean?

21   Q.    Did you have any physical fights with police that day?

22   A.    No.

23   Q.    Did you have any verbal exchanges with police that day?

24   A.    I had a one-way.  When I was at the barricade, I said to

25   one of the -- there was a Capitol Police in riot gear in front

"Accepted"

MAR 0 3 2023

Taylor James Johnstabs

1    of me, and I said, "You know, we're all people."  I said, "Your

2    family is the same as my family.  It doesn't matter what color

3    we are or where we come from.  Those assholes up there are

4    making laws that affect us."  And I said, "I support law

5    enforcement.  I've got friends and family in law enforcement."

6         And that was the gist of what I said.

7    Q.   Did the police officer respond to you?

8    A.   No.

9    Q.   Did you engage in any other fights or physical

10   confrontations with people that day?

11   A.   No.

12   Q.   And how close did you get to the Capitol building?

13   A.   On the back wall, I actually got close enough to touch it.

14   Q.   Were you still on the ground, or had you climbed up?

15   A.   I never climbed.  I was always on the ground.

16   Q.   And how long did you stay in the area of the Capitol

17   building?

18   A.   I'm going to estimate about 30, 40 minutes on the back

19   side.

20   Q.   Why did you leave?

21   A.   I had a radio communication from Mr. Reffitt saying he was

22   going around to the other side.  At some point, I said, "Okay,

23   I'm going to go around there and meet you."

24   Q.   Let's talk more about the radio communications you were

25   getting from Mr. Reffitt.

Accepted

MAR 0 3 2023

Taylor James Schneider

1   A.   Okay.

2   Q.   What do you remember him telling you over the radio about

3   what he was doing at the Capitol?

4   A.   Well, at some point, he said he was trying to go inside the

5   building.

6   Q.   And could you see him at that point?

7   A.   No.

8   Q.   Did he mention whether or not he had gotten sprayed with

9   pepper spray?

10  A.   At some point, he did.

11  Q.   What did he say about that?

12  A.   He said, "I can't continue any farther.  This" -- I don't

13  remember specifically, but basically that he had gotten sprayed,

14  and he was in some pretty bad shape, and he was going to go back

15  to the hotel.

16  Q.   And did he -- did he tell you whether or not he was

17  continuing to try to advance toward the building?

18  A.   During the time we're at the Capitol, I don't recall

19  specifically that he said he did, but I know that we had a

20  conversation back at the hotel.

21  Q.   So while he was -- while you were at the Capitol building,

22  did you see Mr. Reffitt at all?

23  A.   No.

24  Q.   And the communications -- the information that you had

25  about him, where was that coming from?

1    A.    From my radios.

2    Q.    And about how many radio transmissions did you have with

3    him?

4    A.    Over the course of the day?

5    Q.    Just while you were at the Capitol building and you were

6    separated from each other.

7    A.    It could have been six, seven, something likes that.

8    Q.    Were they brief or long?

9    A.    Fairly brief.  The communication was broken because the

10   Capitol building blocked the signal.

11   Q.    So what did you do after that?

12   A.    Well, I -- are you asking what did I do after I left the

13   Capitol building?

14   Q.    Sorry.  I can ask a more specific question.

15         Let's go now to the next time you saw Mr. Reffitt.  Okay?

16   A.    Okay.

17   Q.    You said earlier that was when you were back at the hotel?

18   A.    Right, yeah.

19   Q.    So what happened when you saw Mr. Reffitt back at the

20   hotel?

21   A.    I walked in.  I was pretty tired.  And he said, "Man, this

22   bear spray or whatever," he said, "Man, this is kicking my ass."

23   He said, "My lips feel like they're on fire."

24   Q.    Did he give you details about his day?

25   A.    Over the course of time, yeah.

1   Q.   So what did he tell you about his day?

2   A.   Well, he said that he tried to get in, and he said there

3   was a lady Capitol Police and that she had been shooting him

4   with the rubber -- round rubber balls and shot him in the breast

5   plate.   And he said that she was really surprised that they

6   didn't phase him.   He said her eyes got big.   And then he said,

7   "Hmm, I thought for a moment she was going to shoot me in my

8   nuts, and she considered that and shot me in the legs instead."

9   Q.   What did he say about how far he got toward the building?

10   A.   Well, I remember him saying he didn't get inside, but he

11   was attempting to go inside, and then he was being shot.   And

12   this Capitol police officer was a female, and he said she just

13   looked oh, my God, you know.   And he said, "Lady, I don't want

14   to hurt you, but every time you shoot me, I'm going to keep

15   going forward."   He said at one point, "Would you just stop

16   doing that?   It hurts, you know."

17   Q.   And what else did he tell you about going -- his

18   interaction with the police?

19   A.   Let me think.   I don't know if it was that female officer

20   or if it was somebody else, but they had used a smaller canister

21   of --

22   Q.   Let me stop you there.   Did he tell you what you're

23   describing now?

24   A.   Yes.   I didn't see it.

25   Q.   So what did he tell you about the other officers?

"Accepted"

MAR 03 2023

Tyler James Silvester

1    A.    Basically, that one person tried to -- sprayed him with

2    some kind of pepper spray.    Then they brought out kind of like

3    bear spray, and he said it was all over after that.    He said, "I

4    just couldn't go any further."

5    Q.    And did he express to you whether or not he wanted to go

6    further but for this pepper spray?

7    A.    Yes.

8    Q.    What did he say?

9    A.    He said, "Well, I couldn't continue on, but I made it

10   possible for other people to continue."

11   Q.    What else did he tell you about the other people that

12   continued?

13   A.    Nothing specific comes to mind right now.    I mean, there's

14   one person, a female, who offered him water and assistance, and

15   he felt like that she was his angel, you know.    That's the only

16   thing I can think of.

17   Q.    And as he told you this, what, if any, emotion was he

18   expressing?

19   A.    Could you give me an example of emotion?

20          MR. WELCH:    Objection.

21          THE COURT:    Just answer the question.    If you can't

22   answer the question, just say that.

23          THE WITNESS:    All right.    Emotion.

24   Back at the hotel, well, there was pain, obviously, and

25   then there was -- we talked about what we did, and we were kind

"Accepted"

MAR 0 3 2023

Taylor James Schrades

1    of bragging a little bit.

2              BY MS. BERKOWER:

3    Q.   Was he proud?

4    A.   Yeah.

5    Q.   And how did he look physically?

6    A.   He looked in pretty bad shape.  His face was red --

7    Q.   Okay.  Sorry.  Describe what you mean by that.

8    A.   I'm sorry?

9    Q.   I'm sorry I interrupted you.  What did you mean by he

10   looked like he was in pretty bad shape?

11   A.   I guess it was bear spray or something, pretty strong

12   stuff.  He was red all over his body.  And then I took a picture

13   of his legs, where he had been shot with the little rubber

14   balls.

15   Q.   And Ms. Rohde, if we could please have Government's

16   Exhibit 163 in evidence.

17        Is this the photo you took?

18   A.   Yes.

19   Q.   And could you explain what's significant about this photo

20   to you?

21   A.   Well, he had told me that he got shot in the legs.  Of

22   course, this is where he got shot.

23   Q.   What are you referring to when you say "this is where he

24   got shot"?

25   A.   On each leg, there are round regular circles or disks.  On

1    the right side, you see one; on the left side, you see two.

2    Q.    And what did you understand those to be?

3    A.    The welts -- the welt marks from being shot by the Capitol

4    Police in the legs with the rubber balls.

5    Q.    You can take that down, Ms. Rohde.   Thank you.

6          When you got back to the hotel that day, how did you feel

7    about what you had done?

8    A.    I was kind of excited and a little fascinated.

9    Q.    What were you excited about?

10   A.    I think just having -- well, I had this experience that's

11   like a once-in-a-lifetime experience, and I felt like it was

12   kind of historically significant.   I actually showed up, and I

13   saw a lot of different things that I don't normally see.

14   Q.    Were you proud of what you had done?

15   A.    I would say yeah.   I wasn't ashamed.   I was proud, yeah.

16   Q.    And when Mr. Reffitt told you about what he had done, how

17   did you feel about what he had done?

18   A.    Well, I was pretty impressed that he did what he did.

19   Q.    Why were you impressed?

20   A.    Well, I felt like he had more courage than I did.   I wasn't

21   going to go up there.

22   Q.    Now, that night, did you stay again in that same hotel room

23   you had been in the night before in D.C.?

24   A.    Yes, we did.

25   Q.    And did you see Mr. Reffitt's handgun that evening?

"Accepted"

MAR 03 2023

Taylor James Johnatakis

"Accepted"

MAR 03 2023

Taylor James Schneider

1    A.    I did.

2    Q.    Where did you see it?

3    A.    It was on the nightstand between the two beds.

4    Q.    Was it in a holster or not?

5    A.    I'm not sure.  I'm trying to see a picture in my mind, and

6    I don't see a clear picture of whether it was in a holster.  I

7    just remember seeing from the back.  I remember kind of seeing

8    it from the back side.

9    Q.    And where did you have your handgun that night?

10   A.    I would have had it in my shoulder holster.

11   Q.    That night while you were sleeping?

12   A.    Okay.  So we're talking about when we came back from the

13   Capitol --

14   Q.    Yes.

15   A.    Well, I wasn't sleeping with it like a teddy bear, but I

16   had it somewhere in my room.

17   Q.    Court's brief indulgence.

18         All right.  Let's talk now about your trip back to Texas.

19   A.    Okay.

20   Q.    When did you leave?

21   A.    The morning of the 7th.

22   Q.    And what did you do to prepare for your trip home?

23   A.    We packed our bags and took -- of course, we wore our

24   handguns going down to the parking garage, and we took our bags

25   down and put them in the car.

Q.   So coming in to D.C., you had disassembled and locked up your handguns; is that right?

A.   That's correct.

Q.   Returning to Texas, did you follow that same procedure?

A.   Yes.  We returned our handguns to their case and the ammunition to its case.  We opened the cases for the ARs, and we disassembled them and relocked the cases and left them basically in the rear area of the vehicle.

Q.   And did you do that for your AR?

A.   Yes.

Q.   Did you see Mr. Reffitt do that for his AR?

A.   Yes.  I know that he also disassembled his.

Q.   And what about the handguns?  Did you see Mr. Reffitt disassemble his?

A.   I don't recall specifically seeing him, but -- I don't have a specific visual memory of him doing that.

Q.   And did you disassemble yours, or did you just bring it on your person for the drive home?

A.   I disassembled mine and -- I disassembled -- I've got to stop and think for a moment.  I'm trying to remember specifics.

Q.   Take your time.

A.   Okay.  Yeah, we -- so we took our handguns and put them back in the cases and the ammunition as we're preparing to drive.

Q.   When did you reassemble the handguns?

"Accepted"

MAR 03 2023

Taylor James Schneider

1    A.   I don't recall specifically.

2    Q.   While you were driving back, did you make another overnight

3    stop?

4    A.   Yes.

5    Q.   Where did you stop?

6    A.   We stopped in Nashville.

7    Q.   Again?

8    A.   Yes, uh-huh.

9    Q.   Did you have your handguns on your persons while you were

10   in Nashville?

11   A.   I want to say we did, and I don't recall -- I don't recall

12   specifically what happened, but I think we did.

13   Q.   When you got back to Texas, did you have your handgun on

14   your person?

15   A.   Yes.

16   Q.   So at some point after leaving D.C., did you return your

17   handgun to your shoulder holster?

18   A.   Yes.

19   Q.   And what about Mr. Reffitt?  When he got back to Texas, did

20   he have his handgun out again?

21   A.   I -- well, okay.  I don't have a visual recollection of

22   seeing his handgun on him, but I believe that he did, because it

23   was our habit to carry them.

24   Q.   So -- hold on a second.

25          THE COURT:  Ms. Berkower, can you pick up?

1    (Bench conference.)

2         THE COURT:  How much longer are you going to go on the

3    handguns back in Texas?  Why is this so relevant?

4         MS. BERKOWER:  I believe Jackson Reffitt testified

5    that when Mr. Reffitt walked in the door his handgun was on his

6    hip.

7         THE COURT:  But the whole trip to Texas?

8         MS. BERKOWER:  Understood, Your Honor.  I'm trying to

9    see --

10        (End of bench conference.)

11        BY MS. BERKOWER:

12   Q.   During your trip home, did you speak with Mr. Reffitt about

13   the events of January 6?

14   A.   Yes.

15   Q.   And what was the conversation on the way home?

16   A.   We talked about -- kind of rehashed some of the things that

17   happened there.

18   Q.   And did you view that conversation differently than you had

19   viewed the conversation on the way up to D.C.?

20   A.   How do you mean?

21   Q.   Well, did you talk about similar topics that you talked

22   about on your way to D.C.?

23   A.   Similar, yes.

24   Q.   And you said previously when you drove up to D.C., you

25   didn't take it very seriously; right?

"Accepted"

MAR 0 3 2023

1    A.    Yeah.

2    Q.    Did you view this conversation differently on your way home

3    to Texas?

4    A.    Yes.

5    Q.    Why?

6    A.    Because when we were going up, everything was hypothetical,

7    and then the actual events happened.  Then people were climbing

8    the walls and trying to get into the Capitol building, and so

9    that was something I didn't anticipate whatever happened, and I

10   saw it happen.  So I said wow, people are serious.

11   Q.    And what about specifically with regard to Mr. Reffitt?

12   A.    Well, I guess he was serious.

13   Q.    And was that based on what he told you about the events of

14   January 6?

15   A.    It was based on my knowing from conversation that he had

16   attempted to go into the building, yes.

17   Q.    When you got back to Mr. Reffitt's house, what did you do?

18   A.    I transferred my equipment from his car to mine, and then I

19   went inside their home.

20   Q.    What did you do inside his home?

21   A.    I met his wife and his son and daughter.

22   Q.    How long did you stay there?

23   A.    I'm going to guess maybe it was 45 minutes.  I'm guessing.

24   Q.    What did you do while you were there?

25   A.    Talked to his wife, and we just kind of in general talked

Case 1:21-cr-00091-RCL   Document 65-2   Filed 04/13/22   Page 119 of 134
Case 1:21-cr-00091-RCL   Document 127-1   Filed 04/19/23   Page 757 of 865

1155

1   about the trip.

2   Q.   After that, did you return to your home?

3   A.   I did.

4   Q.   Now, when you got back to D.C., did you continue to

5   communicate with members of TTP?

6   A.   I'm sorry.  Could you repeat that, please.

7   Q.   I'm sorry.  Mr. Nestler pointed out I misspoke.

8        After you left Mr. Reffitt's house, did you return to your

9   home?

10  A.   Yes.

11  Q.   When you got back to D.C. -- sorry.

12       When you got back to Austin or home --

13  A.   Yes.

14  Q.   -- did you continue to communicate with members of TTP?

15  A.   Yes.

16  Q.   What platform did you use?

17  A.   Primarily Telegram.

18  Q.   Did you also have -- participate in a Zoom meeting with two

19  other people from TTP?

20  A.   I did.

21  Q.   Who were those other two people?

22  A.   The other two that I remember were Mr. Russ Teer and then

23  Mr. Reffitt and myself.

24  Q.   Were you there for the very start of the conversation?

25  A.   I was a little bit late, I think, and I was trying to

"Accepted"

MAR 0 3 2023

Taylor James Schablee

"Accepted"

MAR 03 2023

Taylor James Schroeder

1   get -- they had already started, and I entered into the meeting.

2   Q.   Ms. Rohde, if you can pull up what's already been admitted

3   into evidence as Government Exhibit 1B.20.2.3.2.  If we could

4   publish to the jury.  If you could, please, play that exhibit

5   now.

6        Actually, before you push play, Mr. Hardie, do you

7   recognize the person on the screen?

8   A.   Yes.

9   Q.   Who is that?

10  A.   That's Mr. Reffitt.

11  Q.   Please play the exhibit.

12       (Video played.)

13  Q.   Mr. Hardie, do you recognize who that person is?

14  A.   Yes.

15  Q.   Who is it?

16  A.   That's Russ Teer.

17       (Video played.)

18  Q.   So in that clip that you just watched, was that you joining

19  that Zoom meeting?

20  A.   Yes, yes, it was.

21  Q.   Did you stay for the rest of the meeting?

22  A.   I believe I did.

23  Q.   Did you hear Mr. Reffitt refer to you as Oracle?

24  A.   Yes.

25  Q.   What is that a reference to?

1   A.    People have different handles.  Like Mr. Reffitt had Call

2   to Arms, and Mr. Teer had Dead Shot, and somebody else had

3   something else.  And I asked Mr. Teer -- I said, "Well, what

4   kind of handle would you give me?"  And he thought, and he said,

5   "Oracle."

6   Q.    Did you hear Mr. Reffitt reference Oscar and Tango in that

7   clip?

8   A.    Yes.

9   Q.    What was he talking about?

10  A.    When we used the radios, it was an abbreviation.  So Oscar

11  is the phonetic phrase for the letter O of the alphabet, because

12  O for Oracle.  And Call to Arms, Tango would be for the T in the

13  Call to Arms, so Tango and Oscar.

14  Q.    And when you said you were communicating with Oscar and

15  Tango, when were you using those names?

16  A.    That would be during the time we're -- of January the 6th

17  in the area of the Capitol.

18  Q.    Is that when you were separated and communicating by radio?

19  A.    Right.

20  Q.    Now, after this meeting, did someone learn that the leader

21  of TTP had been taken in for questioning?

22  A.    Yes.

23  Q.    Questioning by who?

24  A.    Law enforcement.  I don't know exactly who.

25  Q.    And did you learn that from a Telegram message?

1   A.   Yes.

2   Q.   Ms. Rohde, if we could, please, have what's been already

3   admitted into evidence as Government's Exhibit 1B4 and go to

4   PowerPoint slide 34.

5        Mr. Hardie, do you recognize this message?

6   A.   Yes.

7   Q.   Could you read it, please.

8   A.   "Everyone be aware.  As of this very minute, our state

9   leader is being escorted by three state officers for questioning

10  of things said on an app.  This is not a drill.  This is not a

11  drill.  He has just called me to spread the word.  Be prepared,

12  the shit is now hitting the fan."

13  Q.   What date was that?

14  A.   January the 10th, 2021.

15  Q.   And who sent that message to the group?

16  A.   That was -- it says Call to Arms.  That would be

17  Mr. Reffitt.

18  Q.   When you saw this message, what went through your mind?

19  A.   Huh-oh.  That's what came to my mind, is --

20  Q.   Why huh-oh?

21  A.   I know that we had gone to D.C., and it seems like for

22  some -- for whatever reason, things were coming back to us.

23  Q.   And Ms. Rohde, if we could go on to slide 39, please.  I

24  think we're one before that -- two before that, actually, 39.

25  Oh, I'm sorry.  The one before that.

1    Did Mr. Reffitt also send this message to the group?

2    A.   Yes.

3    Q.   Could you read it, please.

4    A.   "Start purge of all previous conversations."

5    Q.   What did you understand this to be a reference to?

6    A.   To delete any of the Telegram conversations or any kind of

7    conversation on your mobile phone.

8    Q.   Did you do that?

9    A.   I did delete some things, yes.

10   Q.   And what things did you delete?

11   A.   I had -- there was like the main Telegram, and then also I

12   had -- at one point, I had different sub-Telegrams for different

13   topics.  I don't remember specifics, but I did delete messages.

14   Q.   What were those messages about that you deleted?

15   A.   They would have been messages leading up to and following

16   January 6th.

17        MS. BERKOWER:  No further questions, Your Honor.

18        THE COURT:  All right.  Mr. Welch?

19        MR. WELCH:  Yes, Your Honor.

20                    CROSS-EXAMINATION

21        BY MR. WELCH:

22   Q.   Good afternoon, Mr. Hardie.

23   A.   Hello.

24   Q.   My name is Bill Welch.  I'm also going to ask you some

25   questions.

Case 1:21-cr-00091-RCL   Document 65-2   Filed 04/13/23   Page 124 of 134
Case 1:21-cr-00091-RCL   Document 127-1   Filed 04/19/23   Page 762 of 865

1160

"Accepted"

MAR 0 3 2023

Taylor James Schrattes

1   A.   Okay.

2   Q.   Around the 16th of January, 2020, some agents came to your

3   house, didn't they?

4   A.   Yes.

5   Q.   And they wanted to speak with you; correct?

6   A.   Yes.

7   Q.   And you agreed to do so?

8   A.   Yes.

9   Q.   They asked you about where you had been; correct?

10  A.   Yes.

11  Q.   They asked you what you had been doing there; correct?

12  A.   They asked several questions, but in general, yes.

13  Q.   They asked to take a look at your phone; correct?

14  A.   At that particular meeting?  There was two visits.  There

15  was -- the first visit was on a Saturday morning, and then there

16  was a subsequent, you might say, raid on my home and my business

17  a few days afterwards.

18       So which one are you referring to?

19  Q.   I'm referring to the first one.

20  A.   Okay.

21  Q.   Do you remember that, the one at your home?

22  A.   Yeah.  When they went to my home, I don't recall them

23  asking to see anything on my phone, and I didn't offer it.

24  Q.   So you didn't share anything with -- you didn't give your

25  phone to the agents when they came to your house?

1   A.   No.

2   Q.   In fact, you didn't give them anything when they came to

3   your house; correct?

4   A.   Right.   They had asked if they could come inside, and I

5   declined.

6   Q.   And you answered some of their questions, but you didn't

7   answer all of their questions that day, did you?

8   A.   I probably -- well, I don't know what it means, all of

9   them.   I believe I answered the questions that they asked me.

10   Q.   Well, isn't it true that they asked you about whether you

11   had a firearm with you in D.C., and you didn't answer that?

12   A.   Probably not, not at that time.

13   Q.   And you did agree to send them some items by e-mail; is

14   that right?

15   A.   I don't remember that discussion.

16   Q.   Okay.   Well, then, several days after that, they show up at

17   your place of business with a warrant; correct?

18   A.   Yes, uh-huh.

19   Q.   And they ultimately seized a lot of stuff from your

20   business; correct?

21   A.   Yes.

22   Q.   They seized your computers?

23   A.   Yeah -- well, my laptop.   Not every computer in the office,

24   but my laptop specifically.

25   Q.   They seized your firearms; correct?

"Accepted"

MAR 0 3 2023

Taylor James Christabel

1    A.    They seized my AR-15, related ammunition, and they seized

2    my .45-caliber handgun and related ammunition.

3    Q.    And they showed you a copy of the search warrant on which

4    they were relying; correct?

5    A.    Yes.

6    Q.    And did you look at it?

7    A.    I was pretty nervous.  I looked at it, but I wasn't really

8    focused on everything that it said.

9    Q.    Eventually, did you sit down and read it?

10   A.    I looked at it again.  I don't remember how closely I

11   looked at it.

12   Q.    Do you recall seeing whether it indicated that you were

13   under investigation for crimes involving restricted buildings or

14   grounds?

15   A.    I don't remember that.

16   Q.    Do you recall whether it indicated that you were under

17   investigation for interstate travel with intent to riot?

18   A.    I remember reading that somewhere.  I don't remember if I

19   read it from a warrant.  But something to that effect, I did see

20   something like that.

21   Q.    Do you recall reading whether you were under investigation

22   for obstruction of Congress?

23   A.    These types of questions, I don't specifically recall

24   reading.  I mean, I got a search warrant, yes.  I was pretty

25   nervous that day.

Accepted

MAR 03 2022

Taylor James Schnather

1    Q.    And then eventually things progress, and a few months

2    later, you enter into the immunity agreement with the

3    government, which is Government's Exhibit 405.

4         You remember that; right?

5    A.    Yes.  That's the one we saw earlier.

6    Q.    Now, do you recall who has discretion under that agreement

7    about whether you have honored it or not?

8    A.    Who has discretion?

9    Q.    Yes.

10   A.    On whether I've honored it or not?

11   Q.    Yes.

12   A.    I think what you mean is who is deciding if I've honored it

13   or not?

14   Q.    Yes.

15   A.    Is that what you mean?  Okay.  I think that would be the

16   government.

17   Q.    Correct.  And who represents the government in this case?

18   A.    Well, it would be the attorney -- I'm sorry.  Nestler and

19   Berkower.

20   Q.    So for instance, it's not up to Judge Friedrich whether

21   you've honored that agreement or not; right?

22   A.    Well, that's a good question.  I never thought about it in

23   that detail.  Somebody in the government is going to decide did

24   I lie or did I not lie.

25   Q.    And it is your understanding that it is they, Mr. Nestler

1   and Ms. Berkower, who would decide whether you've lied or not;

2   correct?

3   A.   I would assume that would be the case.

4   Q.   Ms. Berkower, when she was asking you about the agreement,

5   said that there's no guarantee that you wouldn't be charged with

6   a crime; correct?

7   A.   Right.

8   Q.   But as of now, you have not been charged with a crime as a

9   result of your conduct on January 6; correct?

10   A.   That's correct.

11   Q.   And you would agree that you have testified here today that

12   you went on restricted grounds; correct?

13   A.   That I went on restricted grounds?   Yes.

14   Q.   You would agree that you have testified here today you

15   carried a firearm onto restricted grounds; correct?

16   A.   Correct.

17   Q.   But you still haven't been charged with a crime; correct?

18   A.   That's true.

19   Q.   And you've been allowed in the meantime to go about your

20   business; isn't that right?

21   A.   That's true.

22   Q.   You've been able to travel to Mexico on business?

23   A.   Yes.

24   Q.   Florida on business?

25   A.   Yes.

1165

```
 1    Q.    And you have another trip for business planned for next

 2    month; isn't that right?

 3    A.    I have another trip, yes.

 4    Q.    And where is that?

 5    A.    That's going to be to Thailand.

 6    Q.    Court's indulgence, please.

 7          You would agree that Mr. Reffitt brags, doesn't he?

 8    A.    Yes.

 9    Q.    You would agree that Mr. Reffitt uses hyperbole, doesn't

10    he?

11    A.    Yes.

12    Q.    A lot, doesn't he?

13    A.    From time to time.

14    Q.    You would also agree that things he says are embellished;

15    correct?

16    A.    Yes.

17    Q.    And that things he says are dramatized; correct?

18    A.    Yes.

19              MR. WELCH:   Court's indulgence, please.

20          I pass this witness.

21              THE COURT:   Ms. Berkower?

22                        REDIRECT EXAMINATION

23              BY MS. BERKOWER:

24    Q.    Good afternoon.

25    A.    Good afternoon.
```

1   Q.   Mr. Hardie, did you meet Mr. Reffitt in person in 2020?

2   A.   2020?  Yes.

3   Q.   And I think you testified earlier about a meeting in a

4   park --

5   A.   Yes.

6   Q.   -- with Mr. Reffitt.  That was the first time you met him

7   in person?

8   A.   Yes.

9   Q.   How many times after that did you see him in person before

10  you took this trip with him?

11  A.   The time that comes to mind was when I drove up to his home

12  for a meeting.

13  Q.   Did you have any other one-on-one hangouts?

14  A.   Hangouts?

15  Q.   Or social occasions with him.

16  A.   Let me think.  There was a time when, you know, people were

17  tearing down statues, like it was related to the BLM things.

18  And so in Temple, there was an event there where people were

19  going to go and just kind of help just kind of keep the peace,

20  so to speak, and I was there.

21  Q.   Was he there as well?

22  A.   I believe so.

23  Q.   Were other members of TTP there?

24  A.   Well, there were other members of TTP.  I'm trying to

25  remember if I saw him specifically there.  That's a fuzzy part

1    of my memory.

2    Q.   Sitting here today --

3              THE COURT:  Wait.  Let him finish his answer.

4              THE WITNESS:  I can't say -- I just brought this up.

5    I mentioned this thing in Temple, but right now, I'm trying to

6    visualize if I saw him.  I don't recall a picture in my mind

7    where I saw him.  But I was there.

8        Let me think.

9              THE COURT:  It's all right, sir, if you can't

10   remember.

11             THE WITNESS:  I want to be accurate, but -- okay.

12             BY MS. BERKOWER:

13   Q.   Sitting here today, how many times do you remember seeing

14   Mr. Reffitt in person after that initial meeting you described

15   in the park before you went to D.C. with him?

16   A.   Okay.  I saw him at his home at that meeting.  I can't

17   think of a specific event other than that.  I believe we --

18   wait, wait.  Before or after -- oh, before.  Let me think.

19       Okay.  I had a meeting in my office warehouse.

20   Q.   Was that another TTP meeting?

21   A.   Yes.  I volunteered to host it.

22   Q.   So did he come to that?

23   A.   Yes.

24   Q.   So we have the meeting in the park; is that right?

25   A.   Uh-huh.

1   Q.   The TTP meeting at his house, is that what you were

2   referring to?

3   A.   Yes, and then my location.

4   Q.   And then the other meeting of TTP members at your business?

5   A.   Right, right.  So right now, we're discussing three; right?

6   Q.   Yes.

7   A.   Okay.  Yeah.

8   Q.   Now I'm going to ask you, do you remember seeing him in

9   person any other time before you met up with him to travel to

10  D.C.?

11  A.   I can't recall anything specifically.  These three main

12  events I can recall.

13  Q.   And about how far away is Austin from Wylie, drivewise?

14  A.   Probably close to 200 miles.

15  Q.   And was your contact with Mr. Reffitt primarily in

16  TTP-related messaging?

17  A.   Yes.  We would send messages through Telegram, or we would

18  make telephone calls to each other through Telegram.

19  Q.   One last question.  Mr. Welch mentioned the FBI coming to

20  your home.  Did you leave TTP of your own free will or because

21  of something that the FBI did?

22  A.   After the FBI came to visit me, I said oh, crap, this is

23  getting really weird.  I didn't really want any part of what

24  was -- well, I left of my own choice, basically.  Nobody

25  suggested it.  Nobody twisted my arm or anything like that.

"Accepted"

MAR 0 3 2023

Taylor James Schnieders

1   　　　　　MS. BERKOWER:  Nothing further, Your Honor.  Thank

2   you.

3   　　　　　THE COURT:  May this witness be excused?

4   　　　　　MR. WELCH:  Yes.

5   　　　　　THE COURT:  All right.  Thank you, sir.

6   　　　Ladies and gentlemen, I think this is a good time to take a

7   break for lunch.  So if you could, please, come back at 1:35,

8   and we will resume with the rest of the government's case.

9   　　　Again, another reminder, no talking about the case or

10  reading or doing any research, please.

11  　　　(Jury exited courtroom.)

12  　　　　　THE COURT:  All right.  So we will see you back at

13  1:35.

14  　　　And counsel, I'm going to warn you, I'm going to start

15  cutting you off in front of the jury.  You're asking a lot of

16  cumulative questions.  There's jurors who, you know, are getting

17  frustrated.  You guys can move this more quickly.  I don't

18  understand why you're asking the same point ten different ways.

19  　　　All right.  Anything we need to address?

20  　　　　　MR. WELCH:  No, Your Honor.

21  　　　(Recess taken at 12:38 p.m.)

22  　　　(Afternoon session of this proceeding was reported by

23  Lorraine Herman and is bound under separate cover.)

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3         I, Sara A. Wick, certify that the foregoing is a

 4    correct transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7

 8    /s/ Sara A. Wick                   March 5, 2022

 9    SIGNATURE OF COURT REPORTER        DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:          Day: Twenty-eight          Month: Two          Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : " Case 1:21-cr-00091-RCL Document 43 Filed 02/16/21 Page 1 of 4 UNITED STATES DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** G. Michael Harvey, U.S. Magistrate Judge, Page 2 of 14, Page 3 of 14, Page 4 of 14, Page 5 of 14, Page 6 of 14, Page 7 of 14 **ARREST WARRANT**, Page 8 of 14 Page 9 of 14 David 2. Christel United States Magistrate Judge, Page 10 of 14 **APPEARANCE BOND CASE No.: MJ21-5036-DWC**, Page 11 of 14 David Christel United States Magistrate Judge, Page 12 of 14 BOND CLOSED PASSPORT, Page 13 of 14, Page 14 of 14 "

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 43 Filed 02/16/21 Page 1 of 4 UNITED STATES DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** G. Michael Harvey, U.S. Magistrate Judge, Page 2 of 14, Page 3 of 14, Page 4 of 14, Page 5 of 14, Page 6 of 14, Page 7 of 14 **ARREST WARRANT**, Page 8 of 14, Page 9 of 14 David 2. Christel United States Magistrate Judge, Page 10 of 14 **APPEARANCE BOND CASE No.: MJ21-5036-DWC**, Page 11 of 14 David Christel United States Magistrate Judge, Page 12 of 14 **BOND CLOSED PASSPORT**, Page 13 of 14, Page 14 of 14" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Twenty-eight     Month: Two    Year: 2023 CE

Attachment: "Case 1:21-cr-00091-RCL Document 43 Filed 02/16/21 Page 1 of 4 UNITED STATES DISTRICT COURT for the District of Columbia Case: 1:21-cr-00091 Assigned To: Lamberth Royce C Assign. Date: 02/05/2021 Description: INDICTMENT (B) **ARREST WARRANT** G. Michael Harvey, U.S. Magistrate Judge, Page 2 of 14, Page 3 of 14, Page 4 of 14, Page 5 of 14, Page 6 of 14, Page 7 of 14 **ARREST WARRANT,** Page 8 of 14, Page 9 of 14 David 2. Christel United States Magistrate Judge, Page 10 of 14 **APPEARANCE BOND CASE No.: MJ21-5036-DWC,** Page 11 of 14 David Christel United States Magistrate Judge, Page 12 of 14 **BOND CLOSED PASSPORT,** Page 13 of 14, Page 14 of 14"

cc: Judge David W. Christel United States Courthouse 1717 Pacific Avenue Room 3100 Tacoma WA 983402
cc: WILLIAM M MCCOLL CLERK OF COURT, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON 1717 Pacific Ave., Suite 3100 Tacoma, WA 98402
cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Judge G. Michael Harvey U.S. District Court, District of Columbia (Washington, DC) 333 Constitution Avenue NW Washington, D.C. 20001

WD/WA: 3:21-MJ-5036-DWC

AO 442 (Rev. 01/09) Arrest Warrant

FILED _____ LODGED
_____ RECEIVED

February 11, 2021

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

District of Columbia

United States of America
v.
Taylor James Johnatakis

_____ Defendant

)
)
)
)
)

Case: 1:21-cr-00091
Assigned To : Lamberth, Royce C.
Assign. Date : 02/05/2021
Description: INDICTMENT (B)

"Accepted" Taylor James Johnatakis

FEB 28 2023

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    Taylor James Johnatakis                                              ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment    ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☐ Complaint
☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    ☐ Order of the Court

This offense is briefly described as follows:
18 U.S.C. §§ 1512(c)(2), 2 - Obstruction of an Official Proceeding; 18 U.S.C. § 111(a)(1) - Assaulting, Resisting, or
Impeding Certain Officers; 18 U.S.C. § 231(a)(3) - Civil Disorder; 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a
Restricted Building or Grounds; 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or
Grounds; 18 U.S.C. § 1752(a)(4) - Engaging in Physical Violence in a Restricted Building or Grounds;
40 U.S.C. § 5104(e)(2)(E) - Impeding Passage Through the Capitol Grounds or Buildings; 40 U.S.C. § 5104(e)(2)(F) -
Act of Physical Violence in the Capitol Grounds or Buildings.

Digitally signed by G. Michael
Harvey
Date: 2021.02.05 16:15:25 -05'00'

Date:  02/05/2021

_____
*Issuing officer's signature*

City and state:   Washington, D.C.

G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* 2-05-2021 , and the person was arrested on *(date)* 2-11-2021 at *(city and state)* Kingston, WA . |
| Date:  2-11-2021 |

_____
*Arresting officer's signature*

SA Kathryn Hamstra, FBI
*Printed name and title*

"Accepted"

FEB 28 2023

*Taylor James Johnatakis*

FILED _____ LODGED
_____ RECEIVED

**February 11, 2021**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

FILED

FEB 0 5 2021

Clerk, U.S. District and
Bankruptcy Courts

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on January 8, 2021**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| v. | : | |
| | : | |
| | : | **GRAND JURY ORIGINAL** |
| | : | |
| **TAYLOR JAMES JOHNATAKIS,** | : | **VIOLATIONS:** |
| | : | **18 U.S.C. § 1512(c)(2), 2** |
| **Defendant** | : | **(Obstruction of an Official Proceeding)** |
| | : | **18 U.S.C. § 111(a)(1)** |
| | : | **(Assaulting, Resisting, or Impeding** |
| | : | **Certain Officers)** |
| | : | **18 U.S.C. § 231(a)(3)** |
| | : | **(Civil Disorder)** |
| | : | **18 U.S.C. § 1752(a)(1)** |
| | : | **(Entering and Remaining in a Restricted** |
| | : | **Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(2)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **18 U.S.C. § 1752(a)(4)** |
| | : | **(Engaging in Physical Violence in a** |
| | : | **Restricted Building or Grounds)** |
| | : | **40 U.S.C. § 5104(e)(2)(E)** |
| | : | **(Impeding Passage Through the Capitol** |
| | : | **Grounds or Buildings)** |
| | : | **40 U.S.C. § 5104(e)(2)(F)** |
| | : | **(Act of Physical Violence in the Capitol** |
| | : | **Grounds or Buildings)** |

RECEIVED
Mail Room

MAR - 6 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

**I N D I C T M E N T**

The Grand Jury charges that:

**COUNT ONE**

On or about January 6, 2021, within the District of Columbia and elsewhere,

**TAYLOR    JAMES**

**JOHNATAKIS** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol Grounds without authority, engaging in disorderly and disruptive conduct, and committing an act of civil disorder.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

## COUNT TWO

On or about January 6, 2021, within the District of Columbia,

**TAYLOR JAMES JOHNATAKIS** did forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, while such person was engaged in and on account of the performance of official duties.

(**Assaulting, Resisting, or Impeding Certain Officers**, in violation of Title 18, United States Code, Section 111(a)(1))

## COUNT THREE

On or about January 6, 2021, within the District of Columbia,

**TAYLOR JAMES JOHNATAKIS** committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder, and the civil disorder obstructed, delayed, and adversely affected the conduct and performance of a federally protected function.

(**Civil Disorder**, in violation of Title 18, United States Code, Section 231(a)(3))

2

"Accepted

FEB 28 2023

Taylor James Johnatakis

## COUNT FOUR

On or about January 6, 2021, within the District of Columbia,

**TAYLOR JAMES JOHNATAKIS** did

unlawfully and knowingly enter and remain in a restricted building and grounds, that is, any posted,

cordoned-off, or otherwise restricted area within the United States Capitol and its grounds, where

the Vice President and Vice President-elect were temporarily visiting, without lawful authority to

do so.

> (**Entering and Remaining in a Restricted Building or Grounds**, in violation of Title 18,
> United States Code, Section 1752(a)(1))

## COUNT FIVE

On or about January 6, 2021, within the District of Columbia,

**TAYLOR JAMES JOHNATAKIS** did

knowingly, and with intent to impede and disrupt the orderly conduct of Government business and

official functions, engage in disorderly and disruptive conduct in and within such proximity to, a

restricted building and grounds, that is, any posted, cordoned-off, or otherwise restricted area

within the United States Capitol and its grounds, where the Vice President and Vice President-

elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the

orderly conduct of Government business and official functions.

> (**Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation
> of Title 18, United States Code, Section 1752(a)(2))

3

"Accepted"

FEB 2 8 2023

Taylor James Johnatakis

## COUNT SIX

On or about January 6, 2021, within the District of Columbia,

**TAYLOR JAMES JOHNATAKIS** did

knowingly, engage in any act of physical violence against any person and property in a restricted

building and grounds, that is, any posted, cordoned-off, or otherwise restricted area within the

United States Capitol and its grounds, where the Vice President and Vice President-elect were

temporarily visiting.

(**Engaging in Physical Violence in a Restricted Building or Grounds**, in violation of
Title 18, United States Code, Section 1752(a)(4))

## COUNT SEVEN

On or about January 6, 2021, within the District of Columbia,

**TAYLOR JAMES JOHNATAKIS** willfully

and knowingly obstructed, and impeded passage through and within, the United States Capitol

Grounds and any of the Capitol Buildings.

(**Obstructing, or Impeding Passage Through or Within, the Grounds or Any of the
Capitol Buildings**, in violation of Title 40, United States Code, Section 5104(e)(2)(E))

4

## COUNT EIGHT

On or about January 6, 2021, within the District of Columbia,

**TAYLOR JAMES JOHNATAKIS** willfully

and knowingly engaged in an act of physical violence within the United States Capitol Grounds

and any of the Capitol Buildings.

(**Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings**, in violation of Title 40, United States Code, Section 5104(e)(2)(F))

A TRUE BILL:

FOREPERSON.

Attorney of the United States in
and for the District of Columbia.

5

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

United States of America
v.
Taylor James Johnatakis

)
)
)
)
)
)

Case: 1:21-cr-00091
Assigned To : Lamberth, Royce C.
Assign. Date : 02/05/2021
Description: INDICTMENT (B)

_Defendant_

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

_(name of person to be arrested)_    Taylor James Johnatakis

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment  ☐ Superseding Indictment  ☐ Information  ☐ Superseding Information  ☐ Complaint
☐ Probation Violation Petition  ☐ Supervised Release Violation Petition  ☐ Violation Notice  ☐ Order of the Court

This offense is briefly described as follows:
18 U.S.C. §§ 1512(c)(2), 2 - Obstruction of an Official Proceeding; 18 U.S.C. § 111(a)(1) - Assaulting, Resisting, or Impeding Certain Officers; 18 U.S.C. § 231(a)(3) - Civil Disorder; 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds; 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 18 U.S.C. § 1752(a)(4) - Engaging in Physical Violence in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(E) - Impeding Passage Through the Capitol Grounds or Buildings; 40 U.S.C. § 5104(e)(2)(F) - Act of Physical Violence in the Capitol Grounds or Buildings.

Digitally signed by G. Michael Harvey
Date: 2021.02.05 16:15:25 -05'00'

Date:  02/05/2021

_Issuing officer's signature_

City and state:    Washington, D.C.

G. Michael Harvey, U.S. Magistrate Judge

_Printed name and title_

| Return |
| --- |

This warrant was received on _(date)_ _____ , and the person was arrested on _(date)_ _____

at _(city and state)_ _____

Date: _____

_Arresting officer's signature_

_Printed name and title_

"Accepted"
Taylor James Johnatakis
FEB 28 2023



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

TAYLOR JAMES JOHNATAKIS,

               Defendant.

CASE NO. MJ21-5036-DWC

WAIVER OF RULE 5(c)(3)(D)
HEARING AND ORDER OF
TRANSFER

### WAIVER OF RULE 5(c)(3)(D) HEARING

I, TAYLOR JAMES JOHNATAKIS, have appeared before a United States Magistrate Judge in the Western District of Washington, who has advised me of the provisions of Rule 20 of and my right to a further hearing pursuant to Rule 5(c)(3)(D) of the Federal Rules of Criminal Procedure.  I wish to waive my right to such further hearing, therefore:

    (a)    I acknowledge that I am the person named in an indictment, information or warrant pending in the U. S. District Court for the District of Columbia  (1:21-CR-00091-RCL).

WAIVER OF RULE 5(C)(3)(D) HEARING AND
ORDER OF TRANSFER- 1

"Accepted"

FEB 28 2023

Taylor James Johnston

(b) I waive my right to production of the warrant or any other original papers relating to these charges or certified copies thereof;

(c) If I am entitled to a preliminary examination, I elect to have it conducted in the district where the prosecution is pending; and,

(d) I consent to the issuance of an order directing me to appear and answer in said district where the charges are pending.

Dated this ___11th___ day of February, 2021.

_____
Defense Counsel

Signed on Defendant's behalf by counsel

_____
Signature of Defendant    with Defendant's consent

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### ORDER OF TRANSFER

Based upon the foregoing Waiver, it is hereby ORDERED that further proceedings in this case shall be conducted in the U. S. District Court for the District of Columbia.

The Clerk of this Court shall forthwith transmit to the Clerk in said district the records of proceedings conducted in this district.

Unless defendant is released on bond, the U. S. Marshal is directed to transport defendant as promptly as possible to that district.

If released on bond, defendant is directed to appear in that district for further proceedings at the time and place specified on the bond, or as otherwise directed by court order.

_____
David W. Christel
United States Magistrate Judge

WAIVER OF RULE 5(C)(3)(D) HEARING AND
ORDER OF TRANSFER- 2



**United States District Court**
*Western District of Washington*

"Accepted"

FEB 28 2023

*Taylor James Johnatakis*

| |
|---|
| _____ FILED _____ LODGED |
| _____ RECEIVED |

UNITED STATES OF AMERICA,

vs.

**Taylor James Johnatakis**

**February 11, 2021**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

# APPEARANCE BOND
## CASE No: MJ21-5036-DWC

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

- **Court Appearances.** I must appear in court at the *United States Courthouse, 333 Constitution Ave NW, Washington, DC*; *Courtroom: AS DIRECTED VIA ZOOM*, on Wednesday, February 17, 2021 at 1:00 PM and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 5 YEARS IMPRISONMENT AND A FINE OF $250,000.**
- **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.
- **DNA Testing.** I must cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. § 14135a.
- **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.
- **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day.
- **Restrictions on Travel.** I must not travel outside the Continental United States or as directed below under 'Other Conditions'.
- **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. § 1503, 1512, and 1513.

**The defendant has had a full opportunity to review this Appearance Bond and confer with his attorney. During the initial appearance and detention hearing, conducted by video/telephone during the COVID-19 Health Emergency, defendant orally agreed to be bound by the terms of the bond. A copy of this executed document shall be provided to the defendant at the hearing's conclusion via US Marshal.**

**OTHER SPECIAL CONDITIONS:**

- Travel is restricted to the Western District of Washington and District of Columbia (for legal purposes only), or as directed by Pretrial Services.
- Surrender all current and expired passports and travel documents to the court. Do not apply for/obtain a new passport or travel document from any country without permission of the court. If the surrendered passport is a foreign passport, it shall be forwarded to Immigration and Customs Enforcement if defendant is convicted of an offense, unless otherwise ordered by the Court.
- You shall not have direct contact or indirect contact with any existing and/or future co-defendant(s) in this case.

Appearance Bond
Page 2 of 2

**"Accepted"** FEB 2 8 2023 *Taylor James Johnatakis*

Taylor James Johnatakis

MJ21-5036-DWC

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

X _____
Signature

**February 11, 2021**
Date Signed

**Kingston, Washington**
City, State of Residence

---

## ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as he or she complies with the provisions of this Appearance Bond, or until further order of the Court.

**February 11, 2021**
Date Signed

David Christel
UNITED STATES MAGISTRATE JUDGE

*cc: Defendant, Defense Counsel, U.S. Attorney, U.S. Marshal, Pretrial Services*

Query　Reports　Utilities　Help　What's New　Log Out

BOND,CLOSED,PASSPORT

# U.S. District Court
## United States District Court for the Western District of Washington (Tacoma)
## CRIMINAL DOCKET FOR CASE #: 3:21-mj-05036-DWC-1

Case title: USA v. Johnatakis

Other court case number: 1:21-CR-00091-RCL District of Columbia

Date Filed: 02/11/2021

Date Terminated: 02/11/2021

Assigned to: Judge David W. Christel

**Defendant (1)**

**Taylor James Johnatakis**
*TERMINATED: 02/11/2021*

represented by **Christopher R Black**
BLACK & ASKEROV PLLC
705 2ND AVE #1111
SEATTLE, WA 98104
206-623-1604
Email: chris@blacklawseattle.com
*ATTORNEY TO BE NOTICED*

**Pending Counts**

None

**Disposition**

**Highest Offense Level (Opening)**

None

**Terminated Counts**

None

**Disposition**

**Highest Offense Level (Terminated)**

None

**Complaints**

18:1512(c)(2),2 - Obstruction of an Official
Proceeding; 18:111(a)(1) - Assaulting,
Resisting, or Impeding Officers; 18:231(a)
(3) - Civil Disorder; 18:1752(a)(1) -
Entering and Remaining in a Restricted
Building; 18:1753(a)(2) - Disorderly
Conduct in a Restricted Building;
18:1752(a)(4) - Engaging in Physical
Violence in a Restricted Building;
40:5104(e)(2)(E) - Impeding Passage

**Disposition**

FEB 28 2023

"Accepted"

Taylor James Johnatakis

Through the Capitol Grounds; 40:5104(e)
(2)(F) - Act of Physical Violence in the
Capitol Grounds or Buildings

**Plaintiff**

**USA**               represented by   **William Kennelly Dreher**
US ATTORNEY'S OFFICE (SEA)
700 STEWART ST
STE 5220
SEATTLE, WA 98101-1271
206-553-7970
Email: william.dreher@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2021 | 1 | NOTICE OF ATTORNEY APPEARANCE: Christopher R Black appearing for Taylor James Johnatakis (Black, Christopher) (Entered: 02/11/2021) |
| 02/11/2021 | 3 | CHARGING DOCUMENT RECEIVED FROM OTHER COURT (Indictment, Warrant) as to Taylor James Johnatakis (KEB) (Entered: 02/11/2021) |
| 02/11/2021 | | Arrest of Taylor James Johnatakis on 2/11/2021. (KEB) (Entered: 02/11/2021) |
| 02/11/2021 | 4 | Minute Entry for proceedings held before Judge David W. Christel- CRD: *Kim Brye*; AUSA: *William Dreher*; Def Cnsl: *Christopher Black*; PTS: *Jamie Halvorson*; Time of Hearing: *2:30 PM*; Session #: *Zoom Audio/Video*; **INITIAL APPEARANCE IN RULE 5(c)(3) PROCEEDINGS VIA ZOOM** as to Taylor James Johnatakis held on 2/11/2021. Defendant present via Zoom from Tacoma Courthouse. Defendant consents to video appearance. Defendant advised of rights and charges. Defendant files Waiver of Rule 5 Hearing. Court signs Order of Transfer. Parties discuss conditions of release. Defendant placed on bond. (KEB) (Entered: 02/11/2021) |
| 02/11/2021 | 5 | Appearance Bond Entered as to Taylor James Johnatakis (1) PTS bond with standard and special conditions. (cc: PTS/USPO/USMO) (KEB) (Entered: 02/11/2021) |
| 02/11/2021 | 6 | WAIVER OF RULE 5 HEARINGS AND ORDER OF TRANSFER to District of Columbia as to Taylor James Johnatakis by Judge David W. Christel. (cc: PTS, USMO) (KEB) (Entered: 02/11/2021) |
| 02/11/2021 | 7 | Arrest Warrant Returned Executed on 2/11/2021 in case as to Taylor James Johnatakis. (KEB) (Entered: 02/11/2021) |
| 02/11/2021 | 8 | The Court Orders as follows: Pursuant to the Due Process Protection Act, counsel for the government is reminded of his/her obligations pursuant to *Brady v. Maryland* and its progeny to disclose exculpatory material and information, as required by applicable statute and case law. The failure to do so in a timely manner may result in dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, or any other remedy that is just under the circumstances. By Judge David W. Christel. *(No.pdf image attached)* (KEB) (Entered: 02/12/2021) |
| 02/12/2021 | 9 | LETTER from WD/WA to District of Columbia re Rule 5 transfer as to defendant Taylor James Johnatakis (KEB) (Main Document 9 replaced on 2/12/2021) (KEB). (Entered: |

| | | 02/12/2021) |
|---|---|---|
| 02/12/2021 | 10 | NOTICE of Corrected Image/Document (correcting hearing date) as to defendant Taylor James Johnatakis re 9 Letter. (Service of corrected image is attached). (KEB) (Entered: 02/12/2021) |
| 02/19/2021 | 11 | Receipt for Surrender of Passport as to Taylor James Johnatakis. Passport issued by USA. Stored at Seattle office. (KMP) (Entered: 02/26/2021) |

"Accepted"

FEB 28 2023

*Taylor James Johnatakis*

COPY

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

**Notice Date:**         Day: Twenty-three         Month: Two         Year: 2023 CE

Judge G. Michael Harvey
U.S. District Court, District of Columbia (Washington, DC)
333 Constitution Avenue NW
Washington, D.C. 20001

In reply to : "Case 3:21-mj-05036-DWC Document 7 Filed 02/11/21 Page 1 of 1 UNITED STATES DISTRICT COURT Case: 1:21-cr-00091 Assigned to: Lamberth, Royc C. Assign Date: 02/05/2021 Description: Indictment (B) **ARREST WARRANT** G. Michael Harvey U.S. Magistrate Judge"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 3:21-mj-05036-DWC Document 3 Filed 02/11/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. TAYLOR JAMES JOHNATAKIS Defendant,** Page 2 of 6, Page 3 of 6, Page 4 of 5, Page 5 of 5 A TRUE BILL: FOREPERSON., Page 6 of 6 **ARREST WARRANT** G. Michael Harvey U.S. Magistrate Judge" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue;
- I request you close the Account and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

Please respond within (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 3:21-mj-05036-DWC Document 3 Filed 02/11/21 Page 1 of 6 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA UNITED STATES OF AMERICA v. TAYLOR JAMES JOHNATAKIS Defendant,** Page 2 of 6, Page 3 of 6, Page 4 of 5, Page 5 of 5 A TRUE BILL: FOREPERSON., Page 6 of 6 **ARREST WARRANT** G. Michael Harvey U.S. Magistrate Judge"

cc: Judge David W. Christel United States Courthouse 1717 Pacific Avenue Room 3100 Tacoma WA 983402
cc: William Kennelly Dreher US ATTORNY'S OFFICE (SEA) 700 STEWART ST STE 5220 SEATTLE WA 98101
cc: WILLIAM M MCCOLL CLERK OF COURT, UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON 1717 Pacific Ave., Suite 3100 Tacoma, WA 98402
cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Angela D. Caesar Clerk of Court United States District Court District of Columbia 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Two        Month: Three        Year: 2023 CE



Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 63 Filed 02/14/22 Page 1 of 20 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) UNITED STATES' MEMORANDUM <u>REGARDING STATUS OF DISCOVERY AS OF FEBRUARY 9 2022</u>,** Page 2 of 20, Page 3 of 20, Page 4 of 20, Page 5 of 20, Page 6 of 20, Page 7 of 20, Page 8 of 20, Page 9 of 20, Page 10 of 20, Page 11 of 20, Page 12 of 20, Page 13 of 20, Page 14 of 20, Page 15 of 20, Page 16 of 20, Page 17 of 20, Page 18 of 20 <u>CONCLUSION</u>, Page 19 of 20, Page 20 of 20 Respectfully submitted MATTHEW M. GRAVES By: Emily A. Miller By: Angela N. Buckner"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 63 Filed 02/14/22 Page 1 of 20 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) UNITED STATES' MEMORANDUM <u>REGARDING STATUS OF DISCOVERY AS OF FEBRUARY 9 2022</u>,** Page 2 of 20, Page 3 of 20, Page 4 of 20, Page 5 of 20, Page 6 of 20, Page 7 of 20, Page 8 of 20, Page 9 of 20, Page 10 of 20, Page 11 of 20, Page 12 of 20, Page 13 of 20, Page 14 of 20, Page 15 of 20, Page 16 of 20, Page 17 of 20, Page 18 of 20 <u>CONCLUSION,</u> Page 19 of 20, Page 20 of 20 Respectfully submitted MATTHEW M. GRAVES By: Emily A. Miller By: Angela N. Buckner" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 63 Filed 02/14/22 Page 1 of 20 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) UNITED STATES' MEMORANDUM <u>REGARDING STATUS OF DISCOVERY AS OF FEBRUARY 9 2022</u>,** Page 2 of 20, Page 3 of 20, Page 4 of 20, Page 5 of 20, Page 6 of 20, Page 7 of 20, Page 8 of 20, Page 9 of 20, Page 10 of 20, Page 11 of 20, Page 12 of 20, Page 13 of 20, Page 14 of 20, Page 15 of 20, Page 16 of 20, Page 17 of 20, Page 18 of 20 <u>CONCLUSION,</u> Page 19 of 20, Page 20 of 20 Respectfully submitted MATTHEW M. GRAVES By: Emily A. Miller By: Angela N. Buckner"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104
cc: Emily A. Miller Chief, Capital Siege Discovery Unit United States Attorney's Office 555 Fourth Street, N.W., Room 5826 Washington, DC 20530

**"Accepted"**

MAR 0 2 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-CR-91 (RCL)** |
| | : | |
| CRAIG MICHAEL BINGERT, | : | |
| ISAAC STEVE STURGEON, and | : | |
| TAYLOR JAMES JOHNATAKIS, | : | |
| | : | |
| Defendants. | : | |

RECEIVED
Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

**UNITED STATES' MEMORANDUM**
**REGARDING STATUS OF DISCOVERY AS OF FEBRUARY 9, 2022**

The United States files this memorandum for the purpose of describing the status of

implementation of our Capitol Siege[1] global discovery plan, i.e., our plan for producing or making

accessible to all defense teams voluminous data collected by the government in relation to the

Capitol Siege investigation, so they may identify information they deem relevant.[2] Under our

global discovery plan, the data that is being made accessible to all defendants far exceeds the

---

[1] The "Capitol Siege" refers to the events of January 6, 2021, when thousands of individuals entered the U.S. Capitol and U.S. Capitol grounds without authority, halting the Joint Session and the entire official proceeding of Congress for hours until the United States Capitol Police ("USCP"), the Metropolitan Police Department ("MPD"), and other law enforcement agencies from the city and surrounding region were able to clear the Capitol of rioters and to ensure the safety of elected officials.

[2] By way of illustration, the data subject to the global discovery plan includes items such as:

1. Investigations into all allegations of officer misconduct arising out of January 6, 2021 (regardless of whether sustained);
2. Thousands of hours of surveillance footage from the USCP, MPD, the United States Secret Service ("USSS"), and the Senate and House floors, and body-worn-camera ("BWC") footage from multiple law enforcement agencies that responded on January 6, 2021;
3. Radio transmissions for multiple law enforcement agencies that responded on January 6, 2021;
4. Location history data for thousands of devices that connected to the Capitol's cellular network infrastructure, or whose presence within the restricted perimeter was captured in records obtained from Google and multiple data aggregation companies;
5. Thousands of tips;
6. Relevant materials from other subjects' case files, including results of searches of digital devices, Stored Communications Act ("SCA") accounts, and interviews of other subjects, witnesses, tipsters and victims (redacted of identifying information as appropriate); and
7. All reports and exhibits related to allegations of officer misconduct or complicity on January 6, 2021.

information to which any defendant is entitled under Federal Rule of Criminal Procedure 16, the

Jencks act, or our *Brady* obligations.[3] We are making such vast quantities of data available due to

the unique circumstances of this matter, i.e., literally hundreds of similar crimes being committed

in the same place contemporaneously.

This memorandum addresses the status of:

A. Production of voluminous amounts of video to the Federal Public Defender ("FPD") instance of evidence.com (access available since October 18, 2021), and the multiple tools the government has provided to assist the defense in locating footage they may consider relevant;

B. The ability of inmates housed in the D.C. Department of Corrections ("DOC") to access those same materials through a separate DOC instance of evidence.com (beginning as of February 4, 2022);

C. Voluminous documents produced since our last status memorandum dated November 5, 2021;

D. The ability of legal defense teams to obtain access to FPD's Relativity workspace (beginning as of January 21, 2022), and the current contents of that database;

E. Manner of production of voluminous documents in view of defense counsel access to Relativity (beginning as of February 3, 2022);

F. Plans for an e-discovery room in the DOC;

G. Access by inmates to laptops made available through the DOC's e-discovery program;

H. Access to voluminous discovery by *pro se* defendants;

I. Challenges we are overcoming; and

J. Our plan for certain trials that may proceed before our discovery plan is substantially executed.

***

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963)

**A. Status of Production of Video Footage to FPD Instance of Evidence.com**

Since our last status memorandum describing the status of discovery (dated November 5, 2021), the following video footage has been shared to the defense instance of evidence.com and is accessible to any Capitol Siege defense counsel who requests a license from FPD:

1. 1,063 files consisting of approximately 714 hours of BWC footage recorded by 675 MPD officers.

2. 104 files consisting of approximately 102 hours of BWC and pole camera footage recorded by approximately 54 Arlington County Police Department ("ACPD") officers

At this juncture, just over 24,000 files consisting of USCP closed circuit video ("CCV") footage, BWC from multiple law enforcement agencies, and USSS surveillance footage have been made available to the defense instance of evidence.com. For context, the files provided via evidence.com amount to over nine terabytes of information and would take 102 days to view. Accordingly, solely to assist Capitol Siege defense teams in identifying video files they may consider relevant in specific cases, we have also produced the following analytical and mapping tools, all of which comprise substantial government work product:

1. MPD Radio Global Positioning Satellite ("GPS") Spreadsheet: The Discovery Team learned that radios provided to MPD officers by the D.C. Office of Unified Communications ("OUC") provide GPS location data when four or more satellites are visible to the radio. Under these circumstances, the data is transmitted: (1) every ten minutes; (2) when there is an emergency activation on the radio; and (3) each time an officer pushes the button to talk over the radio. The Discovery Team obtained MPD radio GPS records for January 6, 2021 and created a spreadsheet of data that may be plotted on a time-scaled map using commercially available GPS mapping software. In many instances, the subscriber alias for a radio is an individual officer's Computer Aided Dispatch ("CAD") number and last name. Since MPD BWC footage in evidence.com is also frequently saved under an officer's CAD number and name, a particular officer's radio location information can be used to search for BWC footage from the same time and location in evidence.com;

2. BWC Summary Spreadsheet and related zone maps: This 752-page spreadsheet was initially created by over sixty individuals as an investigative tool to assist

3

prosecutors in locating relevant BWC footage from responding law enforcement agencies including MPD, Montgomery County Police Department, and Fairfax County Police Department. With respect to over 2,800 BWC video files, the spreadsheet provides: (1) the name and CAD number of the officer associated with the video, (2) the video start time, (3) a short summary of notable events observed by the reviewer including potential crimes observed and the time the camera appears to enter the Capitol, if any; and (4) the apparent location of the camera between noon and midnight, using 15-minute periods of duration. The locations identified correspond to zone maps that section the interior of the Capitol, the Lower West Terrace, and the Capitol Grounds into smaller areas;

3. USSS video spreadsheet: The Discovery Team created a spreadsheet containing the filenames/titles, starting times, video length, and date of USSS video;

4. 15 camera maps of the interior of Capitol Visitor's Center and the interior of the Capitol, and one camera map of the Capitol grounds. The maps depict the general location of the cameras that are identified by unique number in each USCP CCV video filename;

5. ACPD spreadsheet: The Discovery Team created a spreadsheet listing start times of handheld camera video from Arlington County Police Department; and

6. A timeline of events drafted by the USCP, beginning December 16, 2020, memorializing critical events occurring in advance of and during the Capitol Siege.

**B. Status of Access to Evidence.com by Defendants Housed in the D.C. Department of Corrections**

Through an unprecedented collaboration among the government, FPD, FPD's National Litigation Support Team ("NLST"), American Prison Data Systems ("APDS"), the DOC, and Axon Enterprise, Inc. ("Axon"), as of February 2, 2022, a separate, stand-alone instance of evidence.com has been made available to allow in-custody Capitol Siege defendants who are pending trial to view video footage. This DOC instance of evidence.com is a mirror image of the FPD instance of evidence.com. The government and FPD have drafted a memorandum of understanding describing the contents of the DOC instance, the applicable technical settings, and the requirements for inmates to obtain access. In brief, the government will make a request for an

"Accepted"

MAR 0 2 2023

Judge James Johnston

inmate to gain access to the DOC instance of evidence.com once the assigned prosecutor notifies the Capitol Siege Discovery Unit Chief that one of the following three things has occurred:

1. The inmate has signed Attachment A to the protective order;

2. The inmate has stated on the record in court that s/he has read the protective order, reviewed it with his/her attorney, understands the protective order, and agrees to abide by it; or

3. (a) A defense attorney has represented to the assigned prosecutor in writing that they have reviewed the protective order with their client and have been authorized to sign Attachment A on their client's behalf; and (b) the defense attorney also agrees that at the next scheduled hearing in which the client is present, s/he will put on the record that s/he signed Attachment A on the client's behalf after reviewing the protective order with him or her.

Based upon information provided by APDS, as of February 9, 2022, twenty Capitol Siege inmates should have received access to evidence.com over their APDS educational tablets.[4] As of today, assigned prosecutors are still waiting for defense counsel who represent an additional fifteen Capitol Siege defendants to confirm their respective client's agreement to abide by the terms of the protective order.

**C. Status of Production of Documents to Date**

Global productions made to defense counsel since November 5, 2021 (Global Production Nos. 8 to 11) have continued to focus on materials most frequently requested by defendants and include items (in addition to some of the tools referenced above) such as:

1. Two new USCP Office of Professional Responsibility ("OPR") reports and 16 associated exhibits;

2. Forty additional exhibits to previously produced USCP OPR reports;

3. One hundred sixty-two USCP Use of Force reports and exhibits;

4. A collection of MPD Use of Force reports and exhibits;

---

[4] Although APDS attempted to make the link accessible on February 4, there were technological issues. As of February 9, we understand that those issues have been resolved.

Case 1:21-cr-00091-RCL   Document 63   Filed 02/14/22   Page 6 of 20

5. Sixty-five video files of the Capitol Siege recorded by MPD's Electronic Surveillance Unit and six related reports;

6. Ten video files of footage from the Senate floor from the Senate Recording Studio;

7. Ten video files of footage from the House floor from the House Recording Studio;

8. Sixty-four audio recordings of Virginia State Police radio communications;

9. Eight audio files of USCP radio communications and conference bridge;

10. A redacted transcript of the USCP Dignitary Protection Detail radio channel;

11. 18,484 anonymous tips received by MPD;

12. Documents relevant the interstate commerce element of charged offenses; and

13. USSS files related to Vice President Elect Kamala Harris and Vice President Michael Pence's whereabouts on January 6, 2021.

These materials are substantial. For example, the exhibits to USCP OPR and MPD Use of Force reports described above include approximately 94 audio-recorded interviews of officers and witnesses (35 USCP OPR interviews and 59 MPD use of force interviews).

### D. Access to FPD Relativity Workspace

On Friday, January 21, 2022, FPD circulated instructions to defense attorneys on how to gain access to the FPD Relativity workspace. Capitol Siege defense attorneys were advised that since the Relativity database is in a FedRAMP,[5] secure environment, completing the process for obtaining access is time-consuming for FPD and its vendor. Thus, counsel should expect the process for gaining access to the database to take *at least* four to five business days from when counsel first submits a Relativity License Request Form.

---

[5] The Federal Risk and Authorization Management Program (FedRAMP) was established in 2011 to provide a cost-effective, risk-based approach for the adoption and use of cloud services by the federal government. FedRAMP empowers agencies to use modern cloud technologies, with an emphasis on security and protection of federal information.

### E.  **Manner of Production Going Forward**

Approximately two weeks after Capitol Siege defense counsel were notified to apply for Relativity access, and after providing ample notice to defense counsel, the Discovery Team began making its global productions directly to the defense Relativity workspace and discontinued the practice of making voluminous productions via USAfx.[6]  Using a defense Relativity workspace to receive materials produced by the government in discovery will have several benefits for defense teams, including but not limited to avoiding any challenges they may have experienced in downloading large productions from USAfx.[7]  They will no longer need to download productions to review them, as the materials will already be available for review in the database.  Additional benefits will include the ability to perform keyword searches across the materials in the database, including searches of audio and video that has been "machine" transcribed.[8]  Also, within the database, materials that are linked to each other (e.g., a report and multiple exhibits), will be easily identified as connected to each other for reviewing purposes, even if the materials were not initially provided in the same discovery production.[9]  Notably, many of the materials we will be providing, such as thousands of tips or the results of searches of other defendants' devices and SCA accounts, would be of little value if produced in any other manner.  In addition to the fact that they would likely exceed the capacity of our file transfer system or defense downloading capabilities – and

---

[6] We expect prosecutors will continue use USAfx to make productions in individual cases.

[7] USAfx is merely a tool for file transfer using the Internet, while Relativity is an online search and review database. USAfx is not an optimal nor in many cases even a workable manner of transferring extremely large volumes of data.

[8] Machine transcription is an imperfect tool that is intended to assist defense teams in locating relevant information. On high-quality audio files (e.g., equivalent to a deposition or court hearing), machine-transcription is more accurate than on audio files that contain background noise or in which the speakers are not clearly enunciating (e.g., cell phone videos, custodial interviews, radio communications, voicemails).

[9] In e-discovery parlance, linked documents (such as a report and exhibits, or an email and attachments), are also known as a document "family."

thus require an enormous number of storage devices to be provided in every single case – there would be no way to search the contents universally.

Defendants will not be provided access to the FPD Relativity workspace, given the extensive volume of highly sensitive materials currently therein and those that we will produce in the future. Pursuant to the protective order issued in Capitol Siege cases, defense counsel may not permit defendants to view such materials unsupervised by defense counsel or an attorney, investigator, paralegal, or support staff person employed by defense counsel.[10] By way of illustration, highly sensitive materials currently in the database include allegations about officers' use of force or complicity with rioters (even if ultimately not sustained), and CCV camera maps of the Capitol and grounds containing information that, if further disclosed, could negatively impact the security of the U.S. Capitol. In the future, such materials will grow to include relevant materials derived from searches of subjects' digital devices and social media accounts; interviews with defendants, tipsters, witnesses, and victims; background information accumulated about investigation subjects; and financial, communications, and travel records pertaining to investigation subjects that may bear little or no relevance to most other defendants. Notably, such information may pertain to subjects who are not currently and who may never be charged.

Of course, we will continue to notify the defense of materials have been added to the FPD Relativity workspace so that counsel and defendants may collaborate to identify any materials a defendant should review in a particular case. Subject to the protective order, defense counsel can share such documents with their respective clients through a variety of mechanisms including

---

[10] The protective order places the burden of demonstrating need for protection on the government, and it gives the assigned prosecutor ample flexibility to negotiate sensitivity designations and redactions with respect to individual documents in specific cases. It further permits defendants to contest any sensitivity designation when no agreement may be reached.

"Accepted"

MAR 0 2 2023

Taylor James Johnatakis

"Accepted"

MAR 02 2023

*Taylor James Armatas*

Internet-based file transfer systems or traditional storage devices, such as hard drives, flash drives, and discs.[11]

At this juncture, the defense Relativity workspace contains Global Productions 8 to 11, and portions of Global Production No. 2 (all of which were already made accessible to defense teams via USAfx). We are in the process of transferring Global Production Nos. 1 through 7 to the defense Relativity workspace and anticipate that process will be completed this week.

Among the materials the government expects to provide in the near future are:

1. The remainder of discoverable documents we received from the USCP and MPD in response to requests by the Discovery Team.[12]

2. Over 900 records pertaining to Federal Bureau of Investigation ("FBI") interviews of law enforcement officers. These records are currently being redacted to remove information such as officer's personal telephone numbers;

3. Search warrant documents related to the FBI's collection of: (a) cell tower data from Verizon, AT&T, and T-Mobile/Sprint; (b) Google account subscriber information and location data from the Capitol and restricted perimeter, i.e., the Google geofence warrants; (c) anonymized location data collected by ten data aggregation companies; and (d) basic subscriber information for Facebook/Instagram accounts linked to the anonymized advertising identifiers obtained pursuant to the data aggregation warrants. These materials are currently being redacted to remove law enforcement sensitive information, for example, the

---

[11] FPD and its vendor are also attempting to determine if it will be possible for defendants to view selected materials within the Relativity workspace, utilizing permissions that would ensure the selected materials are viewable only by the relevant client.

[12] We have nearly completed our assessment and review of approximately 56,000 records provided by the USCP and MPD. Discoverable documents from both data sets continue to be turned over to the defense on a rolling basis. Those discoverable materials not yet produced will be shared to the FPD Relativity workspace as soon as the on-going review and redaction process is completed.

Of approximately 22,000 MPD records we received, we determined that approximately 19,300 were unique (not duplicates) and needed review. Of those, approximately 18,200 have been reviewed and deemed discoverable – they are now in the redaction process. There are still approximately 1,000 MPD records undergoing review. The remainder have been deemed not discoverable.

Of approximately 34,000 USCP records we received, we removed a large number of files from the review process because: (1) they consisted of unscoped digital devices or social media accounts, or (2) they were duplicative. At this juncture, of the remaining approximately 13,200 documents, approximately 3,000 documents are still undergoing review, and approximately 4,200 are in the process of being redacted.

precise location of cellular network infrastructure that provided cellular service to the Capitol on January 6, 2021;

4. Archived Parler[13] posts and comments from around the period of January 6, 2021, hosted by the Internet Archive Project and retrieved by the FBI; and

5. Videos scraped from Parler that were deemed potentially relevant to the Capitol Siege after the FBI's review of thousands of videos from a two-week period encompassing January 6, 2021.

Finally, we currently have a surge team reviewing for discoverability and sensitivity an additional 26,000 FBI documents that were previously loaded into our Relativity database. Relevant documents will be provided after appropriate redactions are completed.

**F. Status of Access to Documents in Defense Team Relativity Workspace by Inmates Housed in the D.C. Department of Corrections**

We continue to collaborate with FPD and DOC with respect to the creation of an e-discovery room in the Correctional Treatment Facility in which Capitol Siege defendants can access materials provided to them by counsel from the defense team Relativity workspace. The government and FPD's vendors have worked together to establish a plan for production options and formats for detained defendants. Broadly, the options under consideration would allow counsel to share productions to detained defendants in one of two ways:

---

[13] Parler is social media website that was used by some individuals to coordinate in advance of the Capitol Siege. *See, e.g.,* Timberg, Craig and Harwell, Drew, *"Pro-Trump forums erupt with violent threats ahead of Wednesday's rally against the 2020 election,* The Washington Post, (Jan. 5, 2021), https://www.washingtonpost.com/technology/2021/01/05/parler-telegram-violence-dc-protests/; Frenkel, Sheera, *The Storming of Capitol Hill was Organized on Social Media,* The N.Y. Times, (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/protesters-storm-capitol-hill-building.html. Parler went offline on January 10, 2021, when Amazon Web Services canceled its hosting services. *See* Room, Tony and Lerman, Rachel, *"Amazon suspends Parler, taking pro-Trump site offline indefinitely,* The Washington Post, (Jan. 11, 2021), https://www.washingtonpost.com/technology/2021/01/09/amazon-parler-suspension/. Concerned that Parler was going to be taken offline, the government attempted to collect and preserve publicly available Parler posts, comments, and videos through a variety of methods.

1. An HTML production format that would provide a "CSV"[14] file with metadata fields and links to the documents for review. The CSV file would also contain a column in which inmates could make notes about individual documents and send them back to counsel for review. The CSV would be delivered to inmates on a storage device or via a file transfer program.

2. Productions could be viewed within the Relativity workspace in the manner being considered per footnote 11.

Fifteen laptop computers that FPD ordered to support the proposed program are in transit to FPD. The government, FPD and DOC have made significant progress on a memorandum of understanding that will govern each party's duties and responsibilities in relation to such a program.

The implementation of this solution has met with some delays recently, in part due to the need to identify individuals who would be willing to staff the room. Under the agreement in principle, FPD will be responsible for providing necessary staffing of an e-discovery room. At a bare minimum, staff will be responsible for assigning computers for review and ensuring defendants are able to access the relevant programs.[15] Finding staff with the requisite computer skills who are willing to work full-time in a correctional setting is challenging, and that challenge is further exacerbated by the existence of the COVID-19 pandemic. In any event, even if staff were currently available, it is questionable whether the program could have been made accessible to large groups of inmates in recent months. Pursuant to medical stay-in-place protocols issued

---

[14] A CSV (comma-separated values) file is a text file that has a specific format which allows data to be saved in a table structured format. It can be opened in a wide variety of programs and is commonly opened in Microsoft Excel and appears as a spreadsheet.

[15] Ideally, such staff would be able to provide additional support including troubleshooting issues with computers and assistance with accessing and reviewing productions.

December 22, 2021, the DOC has suspended all in-person small group activities and volunteer services in the effort to combat the spread of COVID-19.[16]

### G. Status of Access to Laptops Through DOC's E-Discovery Program

In the interim, the DOC's e-discovery laptop program has presented inmates with a reasonable alternative for viewing voluminous documentation. As described in our prior submissions, there are over 20 computers in the DOC's e-discovery program, and inmates may keep them for up to two weeks at a time once they are eligible. Based on the most recent version of the laptop waitlist (dated February 4, 2022), it appears there are approximately 18-22 inmates on the waitlist, and 14 of them were added no earlier than January 21, 2022.

### H. *Pro Se* Defendants

The government and FPD continue to collaborate about a discovery plan for *pro se* defendants. Currently, subject to the terms of the protective order, standby counsel can use their own licenses for the FPD instance of evidence.com to share videos with non-detained *pro se* defendants, and detained *pro se* defendants can view video in the DOC instance. As we have previously made defense counsel aware, we have agreed to waive the requirement that a defendant be supervised while reviewing highly sensitive video in cases where access is provided through evidence.com and:

1. A protective order has been entered in the relevant case;

2. The defendant has executed the written acknowledgement to the protective order (or been subject to an equivalent admonishment by the Court); and

3. The ability of the defendant to download or reshare is suppressed by counsel before the video is shared to the defendant.

---

[16] We understand that the DOC imminently intends to revert to the modified stay-in-place protocols that were in effect prior to December 22, 2021.

"Accepted"

MAR 02 2023

Taylor James Christie

"Accepted" MAR 0 2 2023 *Taylor James Johnatakis*

For the reasons elaborated in part 5 above, the government will not agree to providing *pro se* defendants unfettered access to FPD's Relativity workspace. However, prosecutors assigned to *pro se* case will share production indexes with both defendants and their standby counsel. Standby counsel should discuss the materials on the production index with the *pro se* defendant, and subject to the protective order, s/he can share any materials requested utilizing the same mechanisms available to represented defendants described above. Further, in those instances where a *pro se* defendant wishes to view highly sensitive documents, standby counsel or his/her staff must supervise the defendant unless: (1) the defendant and the assigned prosecutor are able to reach a suitable compromise or (2) the Court orders otherwise.

## I. **Challenges We Are Overcoming**

In November, we projected that by the end of January 2022, we would provide the discoverable portions of several hundred thousand FBI records. We were unable to meet this goal for several reasons. Our plan was to identify all data in the FBI's case management system associated with any Capitol Siege investigation subject, and then export that data for review in Relativity (after culling it of any material arguably protected by Federal Rule of Criminal Procedure 6(e)). Our request to extract this volume of data from the FBI's case management system was unprecedented. An FBI data scientist worked closely with the developers of the FBI's case management system to create a technological solution that would identify the relevant case materials and export the data for uploading to Relativity. In November 2021, we understood that the technological solution had been successfully deployed, and we expected to receive over 400,000 documents for further discovery processing at about that time. Upon subsequent review of the export, however, our technology experts recognized that the solution developed was not as successful as originally believed. Although the materials were identified and exported, they were

13

no longer organized in any logical fashion, i.e., by individual investigation and in chronological order. As a result, the government was required to develop additional technological solutions to ensure that documents were associated to appropriate case files and properly sequenced before they were loaded to Relativity. This was an iterative process that took time. Efforts to move quickly were also frustrated by COVID-related quarantines and snowstorms that limited access of key personnel to the technology labs necessary to complete their work. As a result of all the above, this entire process took far longer than was originally anticipated.

Ultimately, approximately 380,000 documents from the FBI's case management system were delivered to Deloitte on February 7, 2022.[17] Given the volume of material, it may take up to ten days for it to finish being uploaded. Once these materials complete uploading, they will require in-depth analysis and customization so that they may be produced to the FPD database in a standardized format, vastly facilitating future searching and review by defense teams. This process is required prior to any human review and is expected to take an additional several weeks. During this same period, we will also leverage Relativity's analytical tools to deduplicate files, potentially eliminating thousands of documents from the need for any further review. (A highly preliminary review suggests that approximately one-third to one-half of the documents may be duplicative in nature.) During this time, we also expect to identify certain types of documents that may be "bulk-coded" as for production without the need for additional human review. Once the remaining

---

[17] An additional 50,000 documents that were contained in results of searches for materials potentially protected by Rule 6(e) will be separately delivered directly to the government for review. Based on recent experience, our search terms were intentionally designed to be overinclusive and we expect that a sizeable portion of these materials will be sent to our Relativity database.

materials are ready for human review, we have a surge staffing plan in place to perform review and redactions, and to quality-check proposed productions.[18]

Another challenge we continue to confront is our plan to provide defense teams the ability to view materials scoped from other subjects' devices and SCA accounts, as well as law-enforcement recorded interviews of other investigation subjects. As of today, we have provided over 900 items in these categories to Deloitte for ingestion into the government's Relativity database. Processing and loading these materials is complicated because there are no cookie-cutter solutions that may be applied to all devices and interviews. There is a wide variability in the format of results obtained from searches of digital devices and SCA accounts. Similarly, subject interviews were recorded in proprietary player formats unique to the recording devices used. All this data requires thoughtful examination and decision-making to ensure it will be accessible, organized, and searchable once it is loaded to FPD's Relativity database. In addition, we are providing assigned prosecutors a short timeframe to verify there are no security concerns with the production of such items to a global database. At this juncture, almost 300 such items have been uploaded to the government's Relativity database, and we expect to begin providing them to FPD's Relativity database shortly. We are continuing to process and upload such items on a rolling basis.

## J.  Short-Term Discovery Plan for Certain Trials

The events of January 6 were historic, not only because they represented the first time that American citizens had stormed the Capitol, but because the amount of information and evidence involved is unprecedented. As defendants are in a better position to determine what evidence they believe is exculpatory and will help in their defense, we maintain that our plan – to provide the

---

[18] The extracted FBI case files discussed above represent the FBI's Capitol Siege case files as of approximately September 2021. The lessons learned from this first extraction have led to significant improvements in the overall process. We will begin the next extraction after we complete application of the technological solution to the 50,000 documents that were contained in results of searches for materials potentially protected by Rule 6(e).

"Accepted" MAR 02 2023 Taylor James Johnston

defense with all data that may contain such information, but in a manner that will facilitate search, retrieval, sorting, and management of that information – continues to be reasonable and appropriate.[19] Notwithstanding the challenges arising from organizing and producing unprecedented amounts of data that are frequently complex in nature, our plan is being executed promptly and in good faith. We have produced terabytes of organized and searchable data in hundreds of cases and continue to do so as quickly as possible.

In addition, we have developed a short-term discovery plan that will enable certain trials to proceed before our discovery plan is substantially executed. To be clear, this is not the plan we recommend, nor one that would be workable in multiple cases or complex cases. Time spent executing this plan will reduce resources available to execute the global plan described above.

---

[19] The government's approach is also consistent with the Recommendations for Electronically Stored Information (ESI) Discovery Production developed by the Department of Justice and Administrative Office of the U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System. *See https://www.justice.gov/archives/dag/page/file/913236/download.* It is also the generally accepted approach for ensuring that arguably exculpatory materials are provided in cases involving voluminous information.

Notably, every circuit to address the issue has concluded that, where the government has provided discovery in a useable format, and absent bad faith such as padding the file with extraneous materials or purposefully hiding exculpatory material within voluminous materials, the government has satisfied its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and progeny. *See United States v. Yi*, 791 F. App'x 437, 438 (4th Cir. 2020) ("We reject as without merit Yi's argument that fulfillment of the Government's obligation under *Brady* requires it to identify exculpatory material."); *United States v. Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (noting that the "government's duty to disclose generally does not include a duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence") (internal citations omitted); *United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) ("We have previously rejected such 'open file' *Brady* claims where the government provided the defense with an electronic and searchable database of records, absent some showing that the government acted in bad faith or used the file to obscure exculpatory material."); *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("The government is not obliged to sift fastidiously through millions of pages (whether paper or electronic)... [and] is under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence.") (quotation marks and citations omitted); *Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) (rejecting *Brady* claim on the ground that the defendant "points to no authority requiring the prosecution to single out a particular segment of a videotape, and we decline to impose one"); *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010) ("As a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence"); *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009)(same), aff'd in part, vacated in part, remanded, 561 U.S. 358 (2010); *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005) ("*Brady* and its progeny ... impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed."); *United States v. Jordan*, 316 F.3d 1215, 1253-54 (11th Cir. 2003) (concluding that the defendant's demand that the government "identify all of the *Brady* and *Giglio* material in its possession," "went far beyond" what the law requires).

16

Pursuant to our short-term plan, we will create lists describing substantially all our holdings. Defense teams can review the lists to request specific items they believe may be relevant. We expect these lists will identify the physical and digital evidence that has been accumulated across all Capitol Siege investigations; and categories of potentially discoverable information from materials that are in our possession but have not yet been produced in global discovery, e.g., the FBI materials recently provided to Deloitte; small amounts of material from other law enforcement agencies that played a role on the January 6, 2021; damage estimates from the Architect of the Capitol; and grand jury transcripts.[20]

In addition, pursuant to this plan, assigned prosecutors will ensure that searches based on the defendant's personal and/or device identifiers, as relevant, have been or will be conducted within of the following sets of data, as appropriate:

1. Cell tower data from Verizon, AT&T, and T-Mobile/Sprint Cell for devices that connected to the Capitol's cellular network infrastructure;

2. Google account subscriber information and location data from the Capitol and restricted perimeter obtained pursuant to the Google geofence warrants;

3. Location data obtained by the FBI from multiple data aggregation companies;

4. Basic subscriber information and call records obtained pursuant to applications made to twelve cell service providers under 18 U.S.C. 2703(d) for devices that, according to location data obtained pursuant to the Google geofence warrants, were present within the U.S. Capitol on January 6, 2021;

5. A repository of Archived Parler posts and comments from around the period of January 6, 2021, hosted by the Internet Archive Project and retrieved by the FBI;[21]

---

[20] If additional materials requested by defense teams are extensive, we will likely need to request a continuance and tolling of the Speedy Trial Act to allow the defense adequate time to prepare for trial. This is especially true in the case of requests for the results of multiple other subjects' digital devices and SCA accounts that have not yet been scoped for relevant information. Further, if the requested materials have not been loaded and organized within our Relativity database yet, they will be turned over in their native format and the defendant will be unable to leverage FPD's Relativity's search tools to review them.

[21] Items 1-4 will never be provided *en masse* in global discovery because they contain highly sensitive personal identifying information for members of Congress, their staff, and law enforcement who were all lawfully present on

"Accepted"

MAR 0 2 2023

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

   6. A repository of digital media tips maintained by the FBI; and

   7. The government's discovery databases.

We will also perform searches of the data described above in response to defense counsel requests for materials that we are obligated to produce under Federal Rule Criminal Procedure 16, the Jencks Act, and our *Brady* obligations.[22]

Further, prosecutors will ensure that a facial recognition search has been performed within a repository of images and video that the FBI continually populates, so that all identifiable images of the defendant within that repository at a time close to trial are produced.

Finally, prosecutors will confirm that FBI case agents conduct searches of FBI databases before trial, to ensure that all relevant documents concerning a specific case or any witnesses have been identified and produced.

## CONCLUSION

The government has taken its Capitol Siege discovery obligations seriously from the inception of this investigation and has made substantial efforts to produce vast quantities of information that is varied and frequently complex in nature in hundreds of cases. These efforts have included:

- Appointing a Capitol Siege Discovery Coordinator in January 2021;

- Assembling a Capitol Siege Discovery Team consisting of experienced attorneys, project managers, and litigation technology professionals;

- Collecting information from multiple sources involved in the response to and investigation of the Capitol Siege;

---

January 6, 2021, and the process of locating that information and eliminating it from these results continues even today.

[22] We will not perform searches for materials that are not required pursuant to the above-described obligations. We advise defendants who wish to perform wider-ranging searches to wait for the substantial completion of our global discovery plan.

- Collaborating with FPD to develop a standard protective order for Capitol Siege cases;

- Identifying database solutions for making terabytes of video and documents accessible to hundreds of defendants;

- Funding defense databases and obtaining licenses for all Capitol Siege defense counsel, and collaborating with FPD to execute these solutions;

- Reviewing specific discovery requests by defense counsel to ensure the appropriate materials are prioritized for production;

- Creating protocols and procedures to ensure that (a) case-specific discovery is provided, (b) defendants will receive complete copies of their own unscoped devices and SCA accounts upon request; (c) devices and SCA accounts are systematically filtered for attorney-client communications; (d) relevant scoped digital data and custodial interviews will be uploaded to the government's discovery databases for production to all; and (e) increasing access to discovery by detained defendants.

We have now made substantial progress in our effort to provide the defense appropriate discovery review platforms for both documents and digital media, to populate those platforms, and to use alternative means to provide the most relevant discovery without delay. We will diligently continue to transfer data to our vendors, process it for production, and make productions as expeditiously as possible. As we continue to implement our plan, we will continue to file status memoranda with the Court on a regular basis.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:     /s/ Emily A. Miller
Emily A. Miller
Chief, Capitol Siege Discovery Unit
DC Bar No. 462077
United States Attorney's Office
555 Fourth Street, N.W., Room 5826
Washington, DC 20530
Emily.Miller2@usdoj.gov
Phone: (202) 252-6988

By:     /s/ Angela N. Buckner
Angela N. Buckner
Assistant United States Attorney
DC Bar #1022880
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Angela.Buckner@usdoj.gov
Phone: (202) 252-2656

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:    Day: Two    Month: Three    Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



RECEIVED
Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

In reply to : "Case 1:21-cr-0091-RCL Document 47 Filed 10/17/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) <u>NOTICE OF FILING</u>** Page 2 of 2, Document 47-1 Page 1 of 11, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11, Document 47-2 Page 1 of 2 **EXHIBIT A**, Page 2 of 2, Document 47-3 Page 1 of 9, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9, Document 47-4 Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **Conclusion**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-0091-RCL Document 47 Filed 10/17/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) <u>NOTICE OF FILING</u>** Page 2 of 2, Document 47-1 Page 1 of 11, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11, Document 47-2 Page 1 of 2 **EXHIBIT A,** Page 2 of 2, Document 47-3 Page 1 of 9, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9, Document 47-4 Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 <u>Conclusion</u>" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-0091-RCL Document 47 Filed 10/17/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) <u>NOTICE OF FILING</u>** Page 2 of 2, Document 47-1 Page 1 of 11, Page 2 of 11, Page 3 of 11, Page 4 of 11, Page 4 of 11, Page 5 of 11, Page 6 of 11, Page 7 of 11, Page 8 of 11, Page 9 of 11, Page 10 of 11, Page 11 of 11, Document 47-2 Page 1 of 2 **EXHIBIT A,** Page 2 of 2, Document 47-3 Page 1 of 9, Page 2 of 9, Page 3 of 9, Page 4 of 9, Page 5 of 9, Page 6 of 9, Page 7 of 9, Page 8 of 9, Page 9 of 9, Document 47-4 Page 1 of 6, Page 2 of 6, Page 3 of 6, Page 4 of 6, Page 5 of 6, Page 6 of 6 **Conclusion**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAR 0 2 2023

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-cr-91 (RCL) *Taylor James Johnatakis* |
| | : | |
| CRAIG MICHAEL BINGERT, | : | |
| ISAAC STEVE STURGEON, and | : | |
| TAYLOR JAMES JOHNATAKIS, | : | |
| | : | |
| Defendants. | : | |

RECEIVED
Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

### NOTICE OF FILING

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, hereby gives notice of the following:

To illustrate the government's consistent and diligent efforts to produce voluminous

discovery materials arising out of the breach of the United States Capitol on January 6, 2021 (the

"Capitol Breach"), the government has, in several cases, filed status memoranda describing the

efforts of the Capitol Breach Discovery Team on a regular basis since July 2021.

The government requests that those memoranda, attached hereto and listed below, be made

part of the record in this case:

1.  Memorandum Regarding Status of Discovery as of July 12, 2021 (and Exhibit A);

2.  Memorandum Regarding Status of Discovery as of August 23, 2021; and

3.  Memorandum Regarding Status of Discovery as of September 14, 2021.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By:  /s/ Emily A. Miller                By:  /s/ Angela N. Buckner
     EMILY A. MILLER                          ANGELA N. BUCKNER
     Capitol Breach Discovery Coordinator     Assistant United States Attorney
     DC Bar No. 462077                        D.C. Bar No. 1022880
     United States Attorney's Office          United States Attorney's Office
     555 Fourth Street, N.W., Room 5826       555 Fourth Street, N.W.
     Washington, DC 20530                     Washington, D.C. 20530
     Emily.Miller2@usdoj.gov                  Angela.Buckner@usdoj.gov
     (202) 252-6988                           (202) 252-2656

"Accepted"

MAR 0 2 2023

Taylor James Johnston

"Accepted"

MAR 0 2 2023

Taylor James Schneider

# UNITED STATES' MEMORANDUM
## REGARDING STATUS OF DISCOVERY AS OF JULY 12, 2021

The United States files this memorandum for the purpose of describing the status of

discovery. As an initial matter, substantial discovery has already been provided in this case.

However, as set forth below, because the defendant's criminal acts took place at the same

general time and location as many other charged crimes, the government's investigation into the

breach of the United States Capitol on January 6, 2021 (the "Capitol Breach") has resulted in the

accumulation and creation of a massive volume of data that may be relevant to many defendants.

The government is diligently working to meet its unprecedented overlapping and interlocking

discovery obligations by providing voluminous electronic information in the most

comprehensive and useable format.

### The Capitol Breach

On January 6, 2021, as a Joint Session of the United States House of Representatives and

the United States Senate convened to certify the vote of the Electoral College for the 2020 U.S.

Presidential Election, a mob stormed the U.S. Capitol by breaking doors and windows and

assaulting members of law enforcement, as others in the crowd encouraged and assisted those

acts. Thousands of individuals entered the U.S. Capitol and U.S. Capitol grounds without

authority, halting the Joint Session and the entire official proceeding of Congress for hours until

the United States Capitol Police ("USCP"), the Metropolitan Police Department ("MPD"), and

other law enforcement agencies from the city and surrounding region were able to clear the

Capitol of rioters and to ensure the safety of elected officials. This event in its entirety is

hereinafter referred to as the "Capitol Breach."

"Accepted"
MAR 02 2023
Taylor James Johnstone

## Scope of Investigation

The investigation and prosecution of the Capitol Breach will be the largest in American history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence.  In the six months since the Capitol was breached, over 500 individuals located throughout the nation have been charged with a multitude of criminal offenses, including but not limited to conspiracy, tampering with documents or proceedings, destruction and theft of government property, obstruction of law enforcement during civil disorder, assaults on law enforcement, obstruction of an official proceeding, engaging in disruptive or violent conduct in the Capitol or on Capitol grounds, and trespass.  There are investigations open in 55 of the Federal Bureau of Investigation's 56 field offices.

## Voluminous Materials Accumulated

The government has accumulated voluminous materials that may contain discoverable information for many, if not all, defendants.  An illustrative list of materials accumulated by the government includes:

- o  Thousands of hours of closed circuit video ("CCV") from sources including the USCP, MPD, and United States Secret Service, and several hundred MPD Automated Traffic Enforcement camera videos;

- o  Footage from Cable-Satellite Public Affairs Network (C-SPAN) and other members of the press;

- o  Thousands of hours of body worn camera ("BWC") footage from MPD, Arlington County Police Department, Montgomery County Police Department, Fairfax County Police Department, and Virginia State Police;

- o  Radio transmissions, event chronologies, and, to a limited extent, Global Positioning Satellite ("GPS") records for MPD radios;

- o  Hundreds of thousands of tips, including at least 237,000 digital media tips;

"Accepted"

MAR 02 2023

Taylor James Johnatakis

- o  Location history data for thousands of devices present inside the Capitol (obtained from a variety of sources including two geofence search warrants and searches of ten data aggregation companies);

- o  Subscriber and toll records for hundreds of phone numbers;

- o  Cell tower data for thousands of devices that connected to the Capitol's interior Distributed Antenna System (DAS) during the Capitol Breach (obtained from the three major telephone companies);

- o  A collection of over one million Parler posts, replies, and related data;

- o  A collection over one million Parler videos and images (approximately 20 terabytes of data);

- o  Damage estimates from multiple offices of the U.S. Capitol;

- o  A multitude of digital devices and Stored Communication Act ("SCA") accounts; and

- o  Responses to grand jury subpoenas, of which over 6,000 have been issued, seeking documents such as financial records, telephone records, electronic communications service provider records, and travel records.

We are still collecting and assembling materials from the numerous entities who were involved in the response to the Breach, and we are still investigating – which means the amount of data (phones, devices, legal process, investigative memoranda) is growing.

### Voluminous Legal Process and Investigative Memoranda

In addition to the materials collected, tens of thousands of documents have been generated in furtherance of the investigation, to include interviews of subjects, witnesses, tipsters and officers; investigations into allegations concerning officer conduct on January 6; source reports; evidence collection reports; evidence analysis reports; chain-of-custody documents; legal documents including preservation letters, subpoenas, 2703(d) orders, consent forms, and search warrants; and memoranda of investigative steps taken to evaluate leads or further investigations.

"Accepted"

MAR 0 2 2023

*Taylor James Schuster*

### Interrelated Crimes and Discovery

The Capitol Breach involves thousands of individuals inside and outside the Capitol, many of whom overwhelmed and assaulted police. (According to a Washington Post analysis of the events, "the mob on the west side eventually grew to at least 9,400 people, outnumbering officers by more than 58 to one.") *See*

https://www.washingtonpost.com/investigations/interactive/2021/dc-police-records-capitol-riot/?itid=sf_visual-forensics. The cases clearly share common facts, happening in generally the same place and at the same time. Every single person charged, at the very least, contributed to the inability of Congress to carry out the certification of our Presidential election.

These circumstances have spawned a situation with overlapping and interlocking discovery obligations. Many defendants may be captured in material that is not immediately obvious and that requires both software tools and manual work to identify, such as video and photos captured in the devices and SCA accounts of other subjects. Accordingly, the defense is generally entitled to review all video or photos of the breach whether from CCV, BWC or searches of devices and SCA accounts. Notably, we have received a number of defense requests for access to such voluminous information, and requests for the government to review the entirety of the law enforcement files related to this investigation. For example, in support of a motion to compel access to all of the footage, one such counsel stated:

> The events of January 6, 2021 were memorialized to an extent rarely, if ever, experienced within the context of federal criminal cases. The Government itself has a wealth of surveillance video footage. Virtually every attendee in and around the Capitol on January 6, 2021 personally chronicled the events using their iPhone or other similar video device. Many of the attendees posted their video on one or more social media platforms. Many held their videos close to their vests resulting in little if any publication of same. News media outlets from around the world captured video footage. Independent media representative from around the world captured video footage. Intelligence and law enforcement personnel present at the Capitol on January 6, 2021 also captured video footage of events of the day. By

4

the Government's own admission, the Government has an overwhelming amount of video footage of the events of January 6, 2021. During the handlings of January 6 cases, the Government has garnered and continues to garner access to added video footage from, among other sources, the general public and the defendants themselves. ***Upon information and belief, the Government is not capable of vetting, cataloging and determining materiality of the video footage such as to ensure that disclosure of same is timely made in all cases to which the footage is material for disclosure purposes.*** The "information and belief" in this regard is a function of the undersigned counsel's personal knowledge relative to footage given to the Government, familiarity with other January 6 cases both as counsel for other January 6 defendants and as counsel familiar with other counsel representing January 6 defendants and the understanding that the footage provided to the Government does not appear to have been produced to other defendants whose cases warrant similar disclosure by the Government of material evidence. ***Defendant has requested the Government confirm whether there is a single repository for all video footage amassed relative to the events at the Capitol on January 6, 2021 and, further, has requested access to same for inspection and examination for determination of materiality and disclosure of the Government's protocol to determine materiality.***

*United States v. Jacob Chansley*, 21-cr-00003 (RCL) (Document No. 58)(emphasis added).

Examples of additional similar discovery requests we have received in Capitol Breach cases are quoted in Exhibit A, attached hereto.

## Early Establishment of Discovery Team

Shortly after the Capitol Breach, the U.S. Attorney's Office established a Capitol Breach Discovery Team to create and implement a process for the production of discovery in January 6 cases. The Discovery Team is staffed by federal prosecutors who have experience in managing complex investigations involving voluminous materials, Department of Justice experts in project management and electronic discovery management, and a lead discovery agent from the Federal Bureau of Investigation. Members of the Discovery Team consult regularly with Department of Justice subject matter experts, including Associate Deputy Attorney General and National Criminal Discovery Coordinator Andrew Goldsmith. As discussed further below, members of

the Discovery Team also meet and confer on a regular basis with Federal Public Defender

("FPD") leadership and electronic discovery experts.

## Recognition of Need for Vendor Promptly Addressed

Following the Capitol Breach, the United States recognized that due to the nature and

volume of materials being collected, the government would require the use of an outside

contractor who could provide litigation technology support services to include highly technical

and specialized data and document processing and review capabilities.  The government drafted

a statement of work, solicited bids, evaluated them, and selected a vendor.  This was an

unprecedented undertaking which required review at the highest levels of the Department of

Justice and was accomplished as quickly as possible.

On or about May 28, 2021, the government contracted Deloitte Financial Advisory

Services, LLP ("Deloitte"), a litigation support vendor with extensive experience providing

complex litigation technology services, to assist in document processing, review and production

of materials related to the Capitol Breach.  As is required here, Deloitte furnishes secure,

complex, and highly technical expertise in scanning, coding, digitizing, and performing optical

character recognition – as well as processing, organizing, and ingesting a large volume of

Electronically Stored Information ("ESI") and associated metadata in document review platforms

– which is vital to the United States' ability to review large data/document productions and is

essential to our ability to prosecute these cases effectively.

"Accepted"

MAR 0 2 2023

Taylor James Johnston

"Accepted"

MAR 0 2 2023

## Implementation of Contract with Deloitte

We have already begun transferring a large volume of materials to Deloitte (as of July 7, 2021, over 200 disks of data and 34,000 USCP records), who is populating the database.  Specific processing workflows and oversight are being established between the United States Attorney's Office and the vendor.  We have already coordinated with Deloitte to use various tools to identify standard categories of Personal Identifying Information ("PII") and to redact them.  Once the database is accessible, we will begin systematically reviewing materials for potentially discoverable information, tagging when possible (e.g., video by a location or type of conduct, interviews describing a particular event), and redacting when necessary.  Among other things, the vendor is also building a master evidence tracker to assist us in keeping records of what is provided to us and what is ultimately produced, which is part of our approach to a defensible discovery protocol.

## Systematic Reviews of Voluminous Materials

We are implementing and continuing to develop processes and procedures for ensuring that voluminous materials have been and will continue to be systematically reviewed for information that, *inter alia,* may be material to the defense, e.g.:

- o Comparing all known identifiers of any charged defendant against tips, Parler data, ad tech data, cell tower data, and geofence data; and

- o Searching all visual media (such as CCV, BWC, social media or device search results) – the collection of which grows on a regular basis – against known images of charged defendants.

"Accepted"

MAR 0 2 2023

*Taylor James Johnston*

### Certain Specific Defense Requests

Multiple defense counsel have inquired about investigations into officers who were *alleged* to have been complicit in the January 6 Capitol Breach.  We have received copies of investigations into officer conduct, have finished reviewing them, and plan to disclose the relevant materials shortly.

### Complexities Require Careful Consideration

Producing discovery in a meaningful manner and balancing complex legal-investigative and technical difficulties takes time.  We want to ensure that all defendants obtain meaningful access to voluminous information that may contain exculpatory material, and that we do not overproduce or produce in a disorganized manner.  That means we will review thousands of investigative memoranda, even if there is a likelihood they are purely administrative and not discoverable, to ensure that disclosures are appropriate.

#### *Legal-Investigative Considerations*

We must also carefully ensure we are adequately protecting the privacy and security interests of witnesses and subjects from whom those materials were derived.  For example, we cannot allow a defendant's PII to be disseminated – without protection – to hundreds of others. Similarly, we cannot allow personal contact information for Congressional members, staffers, and responding police officers – targets and victims of these crimes – whose phones may have connected to the Capitol's DAS network to inadvertently be produced.  We also must protect Law Enforcement Sensitive materials by ensuring they are carefully reviewed for discoverability and, if they are discoverable, that they are disclosed in an appropriate manner.  We continue to develop workable paradigm for disclosing a vast amount of Capitol CCV while ensuring that the Capitol's security is maintained. We are also scrupulously honoring defendants' attorney-client

8

"Accepted"

MAR 0 2 2023

Taylor James Schneider

privilege by employing a filter team that is continually reviewing devices and accounts for potentially privileged communications.

### *Technological Considerations*

A large volume of the information that has been collected consists of ESI.  ESI frequently contains significant metadata that may be difficult to extract and produce if documents are not processed using specialized techniques.  Metadata is information about an electronic document and can describe how, when and by whom ESI was created, accessed, modified, formatted, or collected.  In the case of a document created with a word processing program, for example, metadata may include the author, date created, and date last accessed.  In the case of video footage, metadata may identify the camera that was used to capture the image, or the date and time that it was captured.  Metadata may also explain a document's structural relationship to another document, e.g., by identifying a document as an attachment to an investigative memoranda.

Processing, hosting, and production of the voluminous and varied materials described above, to include the preservation of significant metadata, involves highly technical considerations of the document's source, nature, and format.  For example, the optimal type of database for hosting and reviewing video footage may differ from the optimal type of database for hosting investigative memoranda.  Similarly, a paper document, a word processing document, a spreadsheet with a formula, video footage from a camera, or video footage associated with a proprietary player may each require different types of processing to ensure they are captured by database keyword searches and produced with significant metadata having been preserved.

"Accepted"

MAR 02 2023

Taylor James Johnakin

### Involving Defense Counsel in Voluminous Discovery Plan

The Discovery Team regularly meets with FPD leadership and technical experts with respect to discovery issues. Given the volume of information that may be discoverable, FPD is providing input regarding formats that work best with the review tools that Criminal Justice Act panel attorneys and Federal Defender Offices have available to them. Due to the size and complexity of the data, we understand they are considering contracting with third party vendors to assist them (just as the United States Attorney's Office has done for this matter). So as to save defense resources and to attempt to get discovery more quickly to defense counsel, there were efforts made to see if FPD could use the same vendor as the United States Attorney's Office to set up a similar database as the government is using for reviewing the ESI, but for contractual and technical reasons we have recently learned that was not feasible. We are in the on-going process of identifying the scope and size of materials that may be turned over to FPD with as much detail as possible, so that FPD can obtain accurate quotes from potential database vendors. It is hoped that any databases or repositories will be used by FPD offices nationwide that are working on Capitol Breach cases, counsel that are appointed under the Criminal Justice Act, and retained counsel for people who are financially unable to obtain these services. A database will be the most organized and economical way of ensuring that all counsel can obtain access to, and conduct meaningful searches upon, relevant voluminous materials, e.g., thousands of hours of body worn camera and Capitol CCV footage, and tens of thousands of documents, including the results of thousands of searches of SCA accounts and devices.

### Compliance with Recommendations Developed by the Department of Justice and Administrative Office of the U.S. Courts Joint Working Group on Electronic Technology

As is evidenced by all of the efforts described above, the United States is diligently working to comply with the *Recommendations for Electronically Stored Information (ESI)*

*Discovery Production* developed by the Department of Justice and Administrative Office of the

U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System in

February 2012.[1]  *See* https://www.justice.gov/archives/dag/page/file/913236/download. For

example, we are: (1) including individuals with sufficient knowledge and experience regarding

ESI; (2) regularly conferring with FPD about the nature, volume and mechanics of producing

ESI discovery; (3) regularly discussing with FPD what formats of production are possible and

appropriate, and what formats can be generated and also maintain the ESI's integrity, allow for

reasonable usability, reasonably limit costs, and if possible, conform to industry standards for the

format; (4) regularly discussing with FPD ESI discovery transmission methods and media that

promote efficiency, security, and reduced costs; and (5) taking reasonable and appropriate

measures to secure ESI discovery against unauthorized access or disclosure.

---

[1] These *Recommendations* are explicitly referenced in the Advisory Committee Note to Rule 16.1. Importantly, the two individuals primarily responsible for developing the Recommendations are Associate Deputy Attorney General Andrew Goldsmith, who (as noted earlier) is working closely with the prosecution's Discovery Team, and Sean Broderick, the FPD's National Litigation Support Administrator, who is playing a similar role for the D.C. Federal Defender's Office on electronic discovery-related issues. Messrs. Goldsmith and Broderick have a long history of collaborating on cost-effective ways to address electronic discovery-related issues, which undoubtedly will benefit all parties in this unprecedented undertaking.

11

**EXHIBIT A**

**Additional Examples of Defense Discovery Requests**

*Taylor James Johnatakis* "Accepted" MAR 0 2 2023

| | |
|---|---|
| 1 | "Videos in the government's possession that filmed the interior of the capital building from approximately 2:50 PM to 3:35 PM on January 6, 2021." |
| 2 | "[A]ll photographs or video footage obtained or confiscated by the government from outside sources during the investigation of this case are material to the defense's preparation." |
| 3 | "Our position is that the government must identify any evidence it believes to capture [defendant], regardless of whether it intends to rely on the same in its case in chief." |
| 4 | "Copies of any and all documents, photographs, and video received by the U.S. Attorney's office and/or Metropolitan Police Department or any other law enforcement agency from any law enforcement officer or prosecutor from any other jurisdiction regarding this case." |
| 5 | "I write to request that the United States review the contents of the FBI's "I" drive and disclose any and all exculpatory evidence identified therein." |
| 6 | "Network news outlets aired footage of one or more Officers directing protestors towards doors and seemingly invited them to enter the building -- this is Brady material for our clients." |
| 7 | "The discovery I'm requesting is all video and/or audio footage in which Capitol Police and any other Gov't officials or agents remove barriers and/or interact with protestors who entered the Capitol or gained access to the patios or other structures connected to the Capitol building complex." |
| 8 | "This request also includes any video footage, including from cameras owned by MPD (crime and red light) and DDOT (which are operated and maintained by MPD, and to which MPD has access), as well as any footage that government actors reviewed. This request also includes any video footage from MPD District where the defendant was taken, and all body worn camera footage that may have captured any portion of the alleged incident, investigation or arrest of my client." |
| | "The request includes all Body Worn Camera (BWC) footage from all offices involves in any and all searchers, arrests, and investigations associated with this case and/ or labels with the CCN Number associated with this case; information that will permit undersigned counsel to identify the officer wearing the BWC; metadata related to any and all BWC footage; information from the AUSA's office and/or MPD specifying any edits or redactions made to the footage and the corresponding justifications. Please also provide the access logs for the BWC footage for any and all officers involved in this case." |
| 9 | "All **photographs**, including those of the defendant, **sketches, diagrams, maps, representations or exhibits** of any kind, that relate to this case, regardless of whether the government intends to introduce them in its case-in-chief . . .Including all video recordings related to the January 6, 2021 events." |
| 10 | "I further request that you review all documentation related to or generated in connection with this case that may be outside of the government's official case file (e.g., materials in the FBI's "I-Drive" or other similar repositories of investigation documents in the possession of federal or local agencies or law enforcement authorities." |

1

**"Accepted"** *Taylor James Johnatakis*

MAR 0 2 2023

**EXHIBIT A**

**Additional Examples of Defense Discovery Requests**

| | |
|---|---|
| 11 | "Any evidence (whether or not reduced to writing) that law enforcement or Capitol employees allowed any protestors into the building. Such evidence might include (without limitation) moving barricades, opening doors, instructing protestors they could enter, failing to intervene when protestors entered, etc…" |
| 12 | "Any evidence that concerns any Capitol police officers who were suspended and/or disciplined for removing barriers, opening doors, etc. on January 6th." |
| 13 | "I am also concerned about the thousands or tens of thousands videos the government has received from public sources, particularly how the government is searching, indexing, and storing these videos, and whether the government is withholding any video footage in its possession; Based on my review of the discovery thus far, there is official video surveillance and publicly sourced video footage that is exculpatory to the defendants. Many of those videos show [defendant] and other[s] peacefully walking around the Capitol. In these videos, they, like thousands of others, are doing nothing illegal with the possible exception of being present in the building, all of which is potentially exculpatory." |
| 14 | "All information regarding any Capitol Police, MPD, National Guard, other law enforcement officer or other person in position of authority ("LEOs") who moved guard rails, opened or held doors open, stepped aside, allowed persons to enter or stay within the Capitol or otherwise did not direct, instruct or signify to public -- implicitly or explicitly -- to vacate the Capitol or that the Capitol was closed to the public or restricted for public entry." |
| 15 | "Any audio or video footage of [defendant] relevant to any of the charges in the indictment that has not previously been provided, whether captured by body-cameras worn or phones carried by Metropolitan Police Department officers, by body-cameras worn or phones carried Capitol Police officers, or by phones or other recording devices carried by any other witness." |
| 16 | "For purposes of this letter, all photographs or video footage obtained or confiscated by the government from outside sources during the investigation of this case are material to the defense's preparation. Please provide notice of any decision not to produce requested photographs, video footage, or recorded communications so that a judicial decision as to production may, if warranted, be sought. Please also provide all photographs, video footage, and recorded communications relating to the *Brady* and *Giglio* requests articulated below." |

2

"Accepted"

MAR 0 2 2023

Taylor James Schneider

# UNITED STATES' MEMORANDUM
## REGARDING STATUS OF DISCOVERY AS OF AUGUST 23, 2021

The United States files this memorandum for the purpose of describing our overall approach to discovery, and our discovery plan in relation to voluminous sets of data that the government collected in its investigation of the Capitol Breach cases, among which may be interspersed information the defense may consider material or exculpatory. The materials upon which this memorandum is focused include, for example, thousands of hours of video footage from multiple sources (e.g., Capitol surveillance footage, body-worn-camera footage, results of searches of devices and Stored Communications Act ("SCA") accounts, digital media tips, Parler video, and unpublished news footage), and hundreds of thousands of investigative documents including but not limited to interviews of tipsters, witnesses, investigation subjects, defendants, and members of law enforcement. Further, we write to provide the Court with the status of our implementation of that plan as of August 23, 2021.

## I.   The Government's Approach to Discovery is Intended to Ensure that All Arguably Exculpatory Materials are Produced in a Comprehensive, Accessible, and Useable Format.

The government has always understood the magnitude and complexity of the discovery project presented by the January 6 attack on the Capitol. We have taken a very expansive view of what may be material or potentially exculpatory and thus discoverable in Capitol Breach cases. Defense counsel in Capitol Breach cases have made requests including any and all information that captures an individual defendant's conduct or statements; shows people "peacefully walking around the Capitol"; or suggests that a member (or members) of law enforcement allowed people to enter or remain in the Capitol or on restricted grounds, acted friendly or sympathetic to the rioters, or otherwise failed to do their jobs. Of course, there may be additional types of information a defendant may consider material or exculpatory, but since

the government does not know the defense theory in any particular case, it is impossible to for

the government to determine what other types of information a defendant may believe to be

material.

To the extent the type of information described above may exist, it may be interspersed

among the voluminous sets of data referenced above. Given the volume of material, and because

"[d]efendants are in a better position to determine what evidence they believe is exculpatory and

will help in their defense,"[1] it is our intent to provide the defense with all data that may contain

such information, but in a manner that will facilitate search, retrieval, sorting, and management

of that information.

## II. Our General Plan for Production of Voluminous Materials Involves Two Separate Platforms.

We have developed and begun implementing a plan to use two primary platforms to

process and produce discoverable voluminous materials: one for documents (e.g., items such as

law enforcement investigation files and business records) and one for digital materials (e.g.,

video footage). (These two platforms have frequently been referred to as our "database"

although, in fact, they are two separate information repositories hosted by unrelated vendors.)

We are working collaboratively with Federal Public Defender ("FPD") leadership and electronic

discovery experts, including Sean Broderick, the National Litigation Support Administrator for

---

[1] *United States v. Meek,* No. 19-cr-00378-JMS-MJD, 2021 WL 1049773 *5 (S.D. Ind. 2021). *See also United States v. Ohle*, No. S3 08 CR 1109 (JSR), 2011 WL 651849 *4 (S.D.N.Y. 2011)(not reported in F.Supp.2d)("placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once. Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client. This is especially true considering that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located.")

"Accepted"   MAR 02 2023   Taylor James Johnatakis

the Administrative Office of the U.S. Courts, Defender Services Office, to ensure that Federal

Public Defender offices nationwide that are working on Capitol Breach cases, counsel that are

appointed under the Criminal Justice Act, and retained counsel for people who are financially

unable to obtain these services will have access to the same platforms, including technological

functionality commensurate to that available to the government, for the purpose of receiving and

reviewing discoverable materials.

### A. We will Share Documents from Our Own Relativity Workspace to a Defense Relativity Workspace, and are Making Rolling Productions Via Alternative Means Until the Defense Workspace is Available.

#### 1. Overview

Deloitte is hosting a Relativity database, or "workspace," for the government to manage

and produce documents.  Relativity is a cloud-based eDiscovery platform that offers

functionalities including document organization, review, production, and analytics within a

single environment, and is an industry leader in eDiscovery hosting.  As further elaborated

below, we are in the process of ingesting hundreds of thousands of documents into our Relativity

workspace, so that we may review them, apply necessary redactions, and produce the documents

as appropriate to the defense.

Ultimately, our plan is for all discoverable documents to be shared to a wholly separate

defense Relativity workspace, also hosted by Deloitte, but wholly inaccessible to the

government.  Deloitte is currently creating such a defense workspace within Relativity for receipt

of discoverable documents, and we are working toward a modification of our contract to fund the

additional hosting and support of that database.[2]

---

[2] Hosting refers to storing and organizing documents in a case within a database for document review, organizing, searching, categorizing, and redacting, and providing users with accounts to access the database.  Typically, providing discovery in a format that allows it to be loaded into a

"Accepted"

MAR 02 2023

Taylor James Schindler

A Relativity workspace will allow Capitol Breach defense teams to leverage Relativity's search and analytics capabilities to search the voluminous documents we expect to produce for information they believe may be material to their individual cases.  Defense teams will be able to perform key term searches and metadata searches across hundreds of thousands of documents in the defense workspace.  Further, in conjunction with any staff they designate to support their workspace, they will be able to design coding panes that allow them to "tag" items received in discovery as they deem relevant to their cases, e.g., by location ("Lower West Terrace") or defense theories of the case ("Police Let Defendants In"); and then generate search reports based on the results associated with a particular tag or multiple tags.[3]

As elaborated below, although Relativity significantly increases the pace at which we may review and process materials to make appropriate productions, performing these tasks correctly and comprehensively takes time.  Nevertheless, we expect to begin making

---

database satisfies the government's discovery obligations.  We understand that neither the Federal Public Defender nor the Criminal Justice Act panel has a vehicle in place through which they may engage in expedited contracting for the hosting and licensing services that are necessary to meet the demands of this unprecedented volume of materials.  Thus, the government has agreed to provide the necessary hosting and licensing services through Deloitte.  The government has been closely coordinating with FPD to ensure that when we modify our contract with Deloitte, we obtain sufficient licenses to cover the needs of current cases as well as those of cases that may be brought in the future.

[3] We believe that to ensure defendants have meaningful access to the defense Relativity workspace, FPD will require additional support for the workspace.  As the Court is aware, "Even if the discovery is produced in an optimal way, defense counsel may still need expert assistance, such as litigation support personnel, paralegals, or database vendors, to convert e-discovery into a format they can use and to decide what processing, software, and expertise is needed to assess the [Electronically Stored Information]."  *See Criminal e-Discovery: A Pocket Guide for Judges*, Chapter II (Common Issues in Criminal e-Discovery), at 12.  The *Pocket Guide* serves as a supplement to the federal judiciary's bench book. We are engaging in frequent and productive discussions with FPD in the effort to resolve contractual and technical details related to the implementation of an adequate support plan.

"Accepted" MAR 02 2023 Taylor James Johnatakis

documentary productions from Relativity within the next two weeks, as discussed in more detail below, and will do so on a rolling basis going forward. Until the defense Relativity workspace is operational and defense accounts are established documents will continue to be produced in individualized cases via other available methods – most frequently cloud-based file sharing through USAfx.

### 2. The Government is Steadily Populating its Own Relativity Database with Materials.

We have already populated our Relativity database with over 30,000 records from the U.S. Capitol Police ("USCP") and USCP reports related to allegations of misconduct by law enforcement in connection with the events of January 6, 2021. We are currently using our Relativity platform to process materials related to allegations of police misconduct, and plan to make those reports available within approximately the next two weeks. Capitol Breach prosecution teams will disseminate these materials once they become available. We are prioritizing these materials and Metropolitan Police Department ("MPD") use-of-force investigation files because many defendants have requested them.

We are steadily working to ingest into Relativity potentially discoverable documents that we requested and received from multiple law enforcement agencies, while ensuring that materials that are or may be protected by Federal Rule of Criminal Procedure 6(e) are adequately protected. Of course, Federal Bureau of Investigation ("FBI") files account for the majority of documentary evidence that we will need to ingest and review. The FBI estimates that there are approximately 750,000 investigative memoranda and attachments in its files associated with the Capitol Breach investigation. We intend to organize, deduplicate, and produce these materials as appropriate, using all of Relativity's tools to do so as quickly as possible. As discussed below,

"Accepted"

MAR 02 2023

Taylor James Christie

however, these processes are not wholly automated, and will require both technical expertise and manual assistance.

### 3.   The Workflow in Processing Materials for Discovery Takes Time.

The process of populating Relativity with potentially discoverable material, all in varied formats and from different sources, is complicated.  It is *not* like copying and pasting a file, or even like duplicating a hard drive.  Before the hundreds of thousands of investigative files at issue here are ever loaded to Relativity, they must be meaningfully organized into folder structures that will make sense to reviewers and recipients.  The materials must also be quality-checked, e.g., we must ensure that we have the password for protected documents, that the documents were provided in a format that will open, and that we remove irrelevant software and system files that would only cloud the workspace and confuse reviewers.  After materials are loaded to Relativity, we must customize the manner in which they are displayed so as to be meaningful to reviewers who will make discoverability determinations and apply appropriate redactions and sensitivity designations.  Not all documents are created equal, e.g., financial records and forensic cell phone search reports cannot meaningfully be displayed in the same way.

All of these processes will be assisted by leveraging Relativity's tools as much as possible, such as by using keyword searches to identify items that must be excluded or redacted; and deduplication tools to recognize documents that have already been processed so that they are not analyzed or reproduced multiple times.  Although these processes are time-consuming, they are necessary to avoid production of unorganized data dumps, unreadable files, and unusable databases; or a failure of the government to take adequate steps to prevent both victims and defendants' private information from being shared with hundreds of defendants.

**B. We will Share Digital Evidence from Our Own Evidence.com Instance to a Defense Evidence.com Instance, and Make Rolling Productions as Digital Media is Processed.**

Relativity was primarily designed as document review platform and not to manage terabytes of digital evidence. Although it is technologically possible to view and share video evidence within Relativity, in this case, the volume of video would significantly reduce Relativity's performance speed.

Accordingly, we will use evidence.com as a platform to manage, review, and share digital media evidence. Evidence.com is a cloud-based digital evidence management system designed by Axon Enterprise, Inc. ("Axon"), an industry leader in body-worn-camera systems. Axon refers to a singular environment of evidence.com as an "instance." The government has agreed to fund a defense instance of evidence.com and to provide the necessary licensing services through Axon. This instance will be managed and administered by FPD, and the government will have no ability to log into or retrieve information from this instance. As recently as Saturday, August 21, 2021, we consulted with representatives from Axon about our plan and we expect our contract with Axon will be modified expeditiously. As with Relativity, the government has been closely coordinating with FPD to ensure that we cover the needs of current cases as well as those of cases that may be brought in the future. We understand that legal defense teams will likely wish to share voluminous evidence with defendants. Axon has additional infrastructure referred to as my.evidence.com that will allow defense attorneys to share voluminous evidence with individual defendants.

We have already migrated over 2,900 body-worn-camera videos totaling over 2,300 hours (nearly 100 days) into our instance of evidence.com. For the reasons relayed above, from a technological perspective, we expect to be able to share this footage with FPD's evidence.com

"Accepted"

MAR 0 2 2023

Taylor James Schaletes

instance within approximately the next two weeks.  Before we can share voluminous video footage with FPD, we must also ensure that the footage is adequately protected.  Based on a review of the body-worn-camera footage conducted by our Office, the footage displays approximately 1,000 events that may be characterized as assaults on federal officers.  As these officers now, or in the future may, qualify as victims under the Crime Victims Rights Act, they have the "right to be reasonably protected from the accused" and the "right to be treated with fairness and with respect of the victim's dignity and privacy."  18 U.S.C. §§ 3771(a)(1) and (8).

When we share the footage, we also intend to share information we have developed that will help facilitate efficient defense review of body-worn-camera footage.  For example:

- Individuals in our Office who reviewed all the body-worn-camera footage in our instance created a spreadsheet that identifies footage by agency, officer, video start time, a summary of events, and location of the camera in 15-minute increments.  The locations are defined in zone map they created.  We will share our zone map and the spreadsheet with the legal defense teams, subject to adequate protection.

- We obtained from MPD Global Positioning Satellite ("GPS") information for radios that may be of assistance in identifying the location of officers whose body-worn-camera footage is relevant to the defense.  We will share this information with the legal defense teams, subject to adequate protection.

We will continue to ingest video evidence into evidence.com on a rolling basis, and to produce it regularly.  As evidence.com was designed to function in coordination with body-worn-cameras designed by Axon, ingesting body-worn-camera footage into our instance was fairly simple.  Other footage will need to be converted from proprietary formats before it can be ingested into evidence.com, and so processing will take longer.

At this time, the FBI is in the process of transmitting Capitol surveillance footage for ingestion into evidence.com.  Because of the size of the footage, it will take several weeks to receive and ingest the footage.  Based on our current understanding of the technical complexities involved, we expect to start rolling productions from 7,000 hours of footage that the USCP

provided the FBI within approximately the next four weeks.  An additional 7,000 hours of footage is not relevant to this case and, therefore will not be produced.

### III.   Conclusion.

In sum, while we have not resolved every contractual or technical detail, and while our discovery plan continually evolves to address issues as they arise, we are making substantial progress in our diligent efforts to provide the defense comparable discovery review platforms for both documents and digital media, to populate those platforms, and to use alternative means to provide the most relevant discovery without delay.  We are confident that our plan will come to fruition, and although we have not reached agreement on every aspect of this plan, we continue to have good faith, productive discussions with FPD regarding production of voluminous data. In the interim, we will diligently continue to transfer data to our vendors, process it for production, and make interim productions by other means until the defense platforms are in place.  As we continue to implement our plan, we will continue to file status memoranda with the Court on a regular basis.

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

## UNITED STATES' MEMORANDUM
## <u>REGARDING STATUS OF DISCOVERY AS OF SEPTEMBER 14, 2021</u>

The United States files this memorandum for the purpose of describing the status of

implementation of our discovery plan in relation to voluminous sets of data that the government

collected in its investigation of the Capitol Breach cases, among which may be interspersed

information the defense may consider material or exculpatory.  The materials upon which this

memorandum is focused include, for example, thousands of hours of video footage from multiple

sources (e.g., Capitol surveillance footage, body-worn-camera footage, results of searches of

devices and Stored Communications Act accounts, digital media tips, Parler video, and

unpublished news footage), and hundreds of thousands of investigative documents including but

not limited to interviews of tipsters, witnesses, investigation subjects, defendants, and members

of law enforcement.

### <u>Capitol Breach Defense Discovery Liaison Established</u>

The Federal Public Defender for the District of Columbia ("FPD") has agreed to serve as

the Discovery Liaison for defense counsel in Capitol Breach cases.  FPD will be the common

point of contact between the U.S. Attorney's Office for the District of Columbia, the U.S.

District Court for the District of Columbia, the Administrative Office of U.S. Courts, Defender

Services Office, and defense counsel.

### <u>Status of Defense Access to Discovery Databases</u>

As noted in our Memorandum Regarding Status of Discovery as of August 23, 2021 (the

"August 23 Memo"), incorporated herein by reference, under our discovery plan, we will use

two primary platforms to process and produce discoverable voluminous materials, evidence.com

for voluminous digital media materials (e.g., body-worn-camera footage and U.S. Capitol Police

("USCP") surveillance footage) and Relativity for documents (e.g., items such as law

enforcement investigation files and business records). Further, we will ensure that all Capitol Breach legal defense teams will have access to the same platforms, including technological functionality commensurate to that available to the government, for the purpose of receiving and reviewing discoverable materials.

*Evidence.com*

On September 3, 2021, the United States modified its contract with Axon Enterprise, Inc. ("Axon"), our evidence.com vendor. Pursuant to the modification, the government has funded a Capitol Breach defense instance of evidence.com and purchased licenses that will enable legal defense teams to gain access to a defense discovery database. The defense instance is managed and administered by FPD, and the government has no ability to log into or retrieve information from the defense instance. FPD is currently working with Defender Service's National Litigation Support Team to create a structure for distributing and tracking Axon licenses for defense counsel. As we stated in our previous memo, defense counsel can share evidence from the defense instance with individual defendants using a cloud-based file-sharing service offered by Axon called my.evidence.com (as well as provide downloaded video, except when prohibited by a sensitivity designation).

As a result of September 3, 2021 contract modifications, we are now technologically able to share approximately 2,300 hours of body-worn-camera videos to the defense instance of evidence.com. To ensure this enormous production is organized and meaningful for the defense, we are currently categorizing and tagging the videos. Further, to ensure that the videos (which display approximately 1,000 assaults upon officers and include occasional references to personal identifying information) are adequately protected, we are also exploring whether it is

2

"Accepted"

MAR 02 2023

Taylor James Johnatakis

technologically possible for downloading to be automatically suppressed when highly sensitive video is shared by defense counsel to defendants.

We are hopeful we will be able to transfer the body-worn-camera footage to the defense instance of evidence.com by the end of this week (Friday, September 17, 2021), and expect to produce it no later than the end of next week (Friday, September 24, 2021).[1]

We have uploaded approximately twenty percent of the relevant USCP surveillance footage to our instance of evidence.com (i.e., in excess of one terabyte of video, consisting of about 140 cameras, 4,900 files, and 1,600 hours of footage). We are nearly finished applying sensitivity designations to these files. We expect to be able to share them to the defense instance next week.

FPD anticipates updating defense counsel with the status of their work to distribute and track Axon licenses approximately one week after the first significant production of discovery is loaded into the defense instance evidence.com platform.

*Relativity*

Deloitte Financial Advisory Services, LLP ("Deloitte"), our Relativity vendor, has established a Capitol Breach defense Relativity workspace. We continue to work toward a modification of our contract to fund the additional hosting and support of that database. Modifying the Deloitte contract presents multiple contractual, technical, and legal challenges that were not posed by the Axon contract, but we are moving with as much haste as possible given the various complexities. We believe that by October, the contract modifications will be

---

[1] As elaborated in our August 23 Memo, we will also provide information we have developed that will help facilitate defense review of the footage.

completed, thus allowing for defense access to the Relativity database.[2]  To give the Court a

sense of just some of the challenges that we are addressing, they include formulating concrete

plans describing the staffing and technological safeguards that will be put into place to eliminate

the possibility of work product being shared from one workspace to another.  We must also

ensure the modification, which must be fairly detailed under applicable government contracting

rules and regulations, will be sufficient to support hundreds of defense cases, and are working

closely with FPD in support of that effort.  As this undertaking by FPD is also unprecedented,

handling the contract modification correctly takes time.  FPD will work with Defender Service's

National Litigation Support Team to create a structure for distributing and tracking Relativity

licenses and anticipates updating defense counsel with the status of their work approximately one

week after the contract is modified to provide access to FPD.  Finally, we must ensure that in

making available hundreds of thousands of documents to hundreds of legal defense teams, we

are careful to ensure that materials are properly scoped pursuant to the terms of any applicable

warrants, and that access to the database is restricted in a manner that will ensure our compliance

with applicable privacy laws.  We are currently consulting with Department of Justice experts in

privacy and discovery to ensure that these issues are properly handled.

Until the defense Relativity workspace is accessible, as we stated in our August 23

Memo, we will continue to provide voluminous documents from our Relativity database through

individualized productions.  (Any productions we make will also be added to the defense

Relativity workspace.)  On Friday, September 10, 2021, the Discovery Team made available for

production in all Capitol Breach cases approximately 850 pages consisting of redacted reports

---

[2] To be clear, while we expect the defense Relativity database will be partially populated in October, we do not expect it to be complete at that time.

from USCP investigations of alleged wrongdoing by USCP officers on January 6, 2021. We anticipate providing Metropolitan Police Department internal investigation reports (approximately 600 pages) by next week. We are still reviewing the approximately 30,000 files in Relativity that were provided to us by USCP.

As the Discovery Team continues to receive additional documents, we cull them of any materials potentially protected by Federal Rule of Criminal Procedure 6(e) and provide the remainder (a majority) to Deloitte for ingestion into our Relativity database for discovery review. At this time, we have provided Deloitte the following additional documents for ingestion into our Relativity database:

- Discovery productions (approximately 11,500 records) that have been made in complex Capitol Breach cases (e.g., multi-defendant conspiracies involving Oathkeepers and Proud Boys);[3] and

- Approximately 24,000 Federal Bureau of Investigation records.

This week, we also expect to provide Deloitte discovery productions that have been made in 75 individual cases (approximately 32,000 documents).[4] As we have described in our prior discovery status memos, the process of populating Relativity with potentially discoverable material is complicated and takes time.

### Incarcerated Defendants

In collaboration with FPD, we are developing proposals to increase access by incarcerated defendants to voluminous materials, which we expect to share with the D.C. Department of Corrections and to discuss within the next two weeks.

---

[3] Although these productions were already made in the relevant cases, they will ultimately be made accessible to all Capitol Breach defendants through the defense Relativity workspace.

[4] Although these productions were already made in the relevant cases, they will ultimately be made accessible to all Capitol Breach defendants through the defense Relativity workspace.

### Conclusion

In sum, while we have not resolved every contractual or technical detail, and while our discovery plan continually evolves to address issues as they arise, we are making substantial progress in our diligent efforts to provide the defense comparable discovery review platforms for both documents and digital media, to populate those platforms, and to use alternative means to provide the most relevant discovery without delay.  We are confident that our plan will come to fruition, and although we have not reached agreement on every aspect of this plan, we continue to have good faith, productive discussions with FPD regarding production of voluminous data. In the interim, we will diligently continue to transfer data to our vendors, process it for production, and make interim productions by other means until the defense platforms are in place.  As we continue to implement our plan, we will continue to file status memoranda with the Court on a regular basis.

"Accepted" MAR 0 2 2023

*Taylor James Johnston*

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:       Day: Two        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 5 Filed 02/05/21 Page 1 of 3 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** <u>UNDER SEAL</u> **GOVERNMENT'S MOTION TO SEAL INDICTMENT AND TO DELAY ENTRY ON THE PUBLIC DOCKET** <u>OF THE FILING OF THIS MOTION TO SEAL AND RELATED MATTERS</u>, Page 2 of 3, Page 3 of 3 Respectfully submitted MICHAEL R. SHERWIN Assistant United States Attorney, Case 1:21-cr-00091-RCL Document 5-1 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** <u>UNDER SEAL</u> **ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 5 Filed 02/05/21 Page 1 of 3 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** <u>UNDER SEAL</u> **GOVERNMENT'S MOTION TO SEAL INDICTMENT AND TO DELAY ENTRY ON THE PUBLIC DOCKET** <u>OF THE FILING OF THIS MOTION TO SEAL AND RELATED MATTERS</u>, Page 2 of 3, Page 3 of 3 Respectfully submitted MICHAEL R. SHERWIN Assistant United States Attorney, Case 1:21-cr-00091-RCL Document 5-1 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** <u>UNDER SEAL</u> **ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 5 Filed 02/05/21 Page 1 of 3 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** <u>UNDER SEAL</u> **GOVERNMENT'S MOTION TO SEAL INDICTMENT AND TO DELAY ENTRY ON THE PUBLIC DOCKET** <u>OF THE FILING OF THIS MOTION TO SEAL AND RELATED MATTERS</u>, Page 2 of 3, Page 3 of 3 Respectfully submitted MICHAEL R. SHERWIN Assistant United States Attorney, Case 1:21-cr-00091-RCL Document 5-1 Filed 02/05/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CRIMINAL NO.** <u>UNDER SEAL</u> **ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    :    **CRIMINAL NO.**
     :
   v.      :
     :    <u>UNDER SEAL</u>
CRAIG MICHAEL BINGERT,    :
ISAAC STEVE STURGEON, and    :
TAYLOR JAMES JOHNATAKIS,    :
     :
   Defendants.      :

### GOVERNMENT'S MOTION TO SEAL INDICTMENT
### AND TO DELAY ENTRY ON THE PUBLIC DOCKET
### <u>OF THE FILING OF THIS MOTION TO SEAL AND RELATED MATTERS</u>

The United States of America, by and through the United States Attorney for the District

of Columbia, respectfully moves for an order to place and maintain under seal, until the Arrest

Warrants are executed, the Indictment, the Arrest Warrants for Defendant Isaac Steve Sturgeon

("Sturgeon") and Taylor James Johnatakis ("Johnatakis"), this Motion and Supporting

Memorandum, the proposed Order attached to this Motion, and any Order granting this motion.

In support thereof, the government states as follows:

     1.    On February 5, 2021, a grand jury for the District of Columbia returned an

indictment, charging Defendants Craig Michael Bingert, Isaac Steve Sturgeon ("Sturgeon"), and

Taylor Hames Johnatakis ("Johnatakis") with violations of: (1) Obstruction of an Official

Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2; (2) Assaulting, Resisting, or Impeding

Certain Officers, in violation of 18 U.S.C. § 111(a)(1); (3) Civil Disorder, in violation of 18 U.S.C.

§ 231(a)(3); (4) Entering and Remaining in a Restricted Building or Grounds, in violation of 18

U.S.C. § 1752(a)(1); (5) Disorderly and Disruptive Conduct in a Restricted Building or Grounds,

in violation of 18 U.S.C. § 1752(a)(2); (6) Engaging in Physical Violence in a Restricted Building

or Grounds, in violation of 18 U.S.C. § 1752(a)(4); and (7) Impeding Passage Through the Grounds

Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

"Accepted"

MAR 0 2 2023

or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E); (8) Act of Physical Violence in the Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

2.      Defendant Sturgeon and Defendant Johnatakis have not been arrested.  Law enforcement is locating the defendants and preparing to arrest them.  Moreover, law enforcement is endeavoring to identify additional individuals who were involved in the assaultive conduct in the instant case.

3.      Placing the defendants' indictment on the public docket at this time could cause the defendants to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual.  These are compelling reasons for the sealing of these documents.

4.      As stated in *Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1999), there is a presumption of access to Court proceedings.  But, this can be overridden if "'(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest.'"  Id. at 290 (quoting *Oregonian Pub. Co. v. United States Dist. Court*, 920 F.2d 1462, 1466 (9th Cir. 1990)).

3.      In this matter, the United States has a compelling interest in preserving the integrity of its investigation and arresting the defendants.  A limited sealing order ensuring that filings related to the Indictment and Arrest Warrants are not accessible from the Court's public files is narrowly tailored to serve a compelling interest.

4.      Furthermore, the United States respectfully submits that complying with the normal notice requirements of *Washington Post* would defeat the purpose of the motion to seal.  Persons

2

who know the criminal justice system also know that docketing a motion to seal an Affidavit in Support of Indictment and Arrest Warrant, or a resulting sealing order, means that the defendant is charged with a crime, and the Government intends to arrest him/her.  Thus, if this Motion or a sealing order were to become public, it would be the same as making public the Indictment and Arrest Warrants.

**WHEREFORE**, the United States respectfully requests that this Court issue an Order directing that the Clerk of the Court place and maintain under seal, until execution of the Arrest Warrants, the Indictment, the Arrest Warrants for Sturgeon and Johnatakis, this Motion and Supporting Memorandum, the proposed Order attached to this Motion, and any Order granting this motion.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
N.Y. Bar Number 4444188

By:   s/Angela N. Buckner
ANGELA N. BUCKNER
Assistant United States Attorney
D.C. Bar No. 1022880
United States Attorney's Office
555 4th Street, N.W., Room #10-108
Washington, DC 20530
Phone: 202-445-8340
Email: angela.buckner@usdoj.gov

3

"Accepted

MAR 0 2 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA      :      **CRIMINAL NO.**
     :
        v.      :
     :      <u>**UNDER SEAL**</u>
**CRAIG MICHAEL BINGERT,**      :
**ISAAC STEVE STURGEON, and**      :
**TAYLOR JAMES JOHNATAKIS,**      :
     :
     Defendants.      :

<u>**ORDER**</u>

This matter having come before the Court pursuant to the application of the United States to seal criminal complaint, the Court finds that, because of such reasonable grounds to believe the disclosure will result in flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and serious jeopardy to the investigation, the United States has established that a compelling governmental interest exists to justify the requested sealing.

IT IS THEREFORE ORDERED that the application is hereby GRANTED, and that the affidavit in support of Indictment, Arrest Warrants for Isaac Steve Sturgeon and Taylor James Johnatakis and other related materials, the instant application to seal, and this Order are sealed until the arrest warrant is executed.

IT IS FURTHER ORDERED that the Clerk's office shall delay any entry on the public docket of the arrest warrants until they are executed.

_____
UNITED STATES MAGISTRATE JUDGE

Date: _____

cc:     ANGELA N. BUCKNER
       GAURI GOPAL
       Assistant United States Attorneys

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

**Notice Date:**       Day: Two       Month: Three       Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 57 Filed 12/14/21 Page 1 of 3 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) CONSENT MOTION TO EXTEND FILING DEADLINE**, Page 2 of 3, Page 3 of 3, Case 1:21-cr-00091-RCL Document 57-1 Filed 12/14/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Cas No. 21-CR-91 (RCL) ORDER**"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 57 Filed 12/14/21 Page 1 of 3 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) CONSENT MOTION TO EXTEND FILING DEADLINE,** Page 2 of 3, Page 3 of 3, Case 1:21-cr-00091-RCL Document 57-1 Filed 12/14/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Cas No. 21-CR-91 (RCL) ORDER**" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

RECEIVED
Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Attachment: "Case 1:21-cr-00091-RCL Document 57 Filed 12/14/21 Page 1 of 3 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-CR-91 (RCL) CONSENT MOTION TO EXTEND FILING DEADLINE,** Page 2 of 3, Page 3 of 3, Case 1:21-cr-00091-RCL Document 57-1 Filed 12/14/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Cas No. 21-CR-91 (RCL) ORDER**"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-CR-91 (RCL) |
| | : | |
| CRAIG MICHAEL BINGERT, | : | |
| ISAAC STEVE STURGEON, and | : | |
| TAYLOR JAMES JOHNATAKIS, | : | |
| | : | |
| Defendants. | : | |

## CONSENT MOTION TO EXTEND FILING DEADLINE

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves for an extension of its filing deadline to respond to defendant Isaac S. Sturgeon's motion to dismiss, filed through his attorney. The Defendant, through counsel, consents to this motion. In support of its motion, the government states the following:

1. As captured on D.C. Metropolitan Police Department Body Worn Camera, on January 6, 2021, defendant Sturgeon picked up a gate and pushed it into police officers in an apparent attempt to gain access to the Capitol grounds and building.

2. On February 5, 2021, a grand jury returned an eight count indictment charging defendant Sturgeon and two other individuals with the following charges: 18 U.S.C. §§ 1512(c)(2), 2 (obstruction of an official proceeding); 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers); 18 U.S.C. § 231(a)(3) (civil disorder), 18 U.S.C. §§ 1752(a)(1), (2) and (4) (entering and remaining in a restricted building or grounds, disorderly and disruptive conduct in a restricted building or grounds, and engaging in physical violence in a restricted building or grounds); and 40 U.S.C. §§ 5104(e)(2)(E) and (F) (impeding passage through the capitol grounds or buildings and act of physical violence in the capitol grounds of buildings). *See* ECF No. 3. An

RECEIVED
Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

"Accepted"

MAR 0 2 2023

Taylor James Johnatakis

Arrest warrant for the Defendant issued that same date, and on March 6, 2021, the Defendant was arrested. ECF No. 14.

3. On May 7, 2021, the government superseded the Indictment, updating the 18 U.S.C. § 111 language in Count Two of the Indictment. *See* ECF No. 34.

4. On November 10, the government superseded the Indictment, updating the language in Counts One and Three of the First Superseding Indictment. *See* ECF No. 53.

5. On October 19, 2021, this Court ordered Motion(s) to dismiss due by December 7, 2021. The government's response is due by December 21, 2021, and any replies are due by January 11, 2022. *See* October 19, 2021 Minute Order.

6. On December 7, 2021, defendant Sturgeon filed a Motion to Dismiss Counts One, Three, Four, Five and Six of the Superseding Indictment. *See* ECF No. 55. Defendant Bingert filed a Motion to Adopt and Join the Motion to Dismiss. *See* ECF No. 56. The government anticipates defendant Johnatakis will file a similar motion.

7. The undersigned is working on the government's opposition to the motion to dismiss. In his motion, defendant Sturgeon raises legal issues that, to the undersigned's knowledge, have not yet been litigated by the government in other Capitol Breach cases. Therefore, the government requires more time to fully brief the legal issues and respond to defendant Sturgeon's arguments.

8. The undersigned has contacted counsel for all three defendants, and all defendants, through counsel, have indicated that they do not object to an extension of time. The government has proposed January 4, 2022 to file its response and January 18, 2022 for defendants to file their replies.

WHEREFORE, the government respectfully requests that this Court grant its motion for a

two-week extension of its deadline to file a response.

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:       */s/ Angela N. Buckner*
          Angela N. Buckner
          DC Bar #1022880
          Assistant United States Attorney
          United States Attorney's Office
          555 Fourth Street, N.W.
          Washington, DC 20530
          Phone: (202) 252-2656

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :
:
v. :      Case No. 21-CR-91 (RCL)
:
CRAIG MICHAEL BINGERT, :
ISAAC STEVE STURGEON, and :
TAYLOR JAMES JOHNATAKIS, :
:
    Defendants. :

## ORDER

This matter having come before the Court pursuant to a Consent Motion to Extend Filing

Deadline, it is therefore

ORDERED that, for good cause shown, the government's motion to extend its filing

deadlines is granted;

FURTHER ORDERED that, the government's response is due by January 4, 2022 and any

replies due are due by January 18, 2022.

It Is So Ordered.

_____
Honorable Royce C. Lamberth
United States District Judge

Entered: _____

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:     Day: Two     Month: Three     Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001



In reply to : "Case 1:21-cr-00091-RCL Document 59 Filed 12/29/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL DEFENDANT TAYLOR JOHNATAKIS'S MOTION TO ADOPT AND JOIN CO-DEFENDANT ISAAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT, Page 2 of 2 BLACK & ASKEROV PLLC Christopher Black"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 59 Filed 12/29/21 Page 1 of 2 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL DEFENDANT TAYLOR JOHNATAKIS'S MOTION TO ADOPT AND JOIN CO-DEFENDANT ISAAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT**, Page 2 of 2 BLACK & ASKEROV PLLC Christopher Black" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 59 Filed 12/29/21 Page 1 of 2 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL DEEFNDANT TAYLOR JOHNATAKIS'S MOTION TO ADOPT AND JOIN CO-DEEFNDANT ISAAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT, Page 2 of 2 BLACK & ASKEROV PLLC Christopher Black"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104



"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

vs.                                                     **Case No. 1:21-cr-00091-RCL**

**TAYLOR JOHNATAKIS,**

**Defendant.**

---

### DEFENDANT TAYLOR JOHNATAKIS'S MOTION TO ADOPT AND JOIN CO-DEFENDANT ISAAC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE, AND SIX OF THE SUPERSEDING INDICTMENT

Defendant Taylor Johnatakis, by undersigned counsel, Christopher Black, respectfully moves this Court for leave to adopt and join the motion to dismiss counts one, three, four, five, and six of the Superseding Indictment filed by co-defendant Isaac Sturgeon. Dkt. No. 55.

The facts and circumstances set forth in co-defendant Isaac Sturgeon's motion to dismiss are equally applicable to Taylor Johnatakis. The legal arguments and authorities contained in Mr. Sturgeon's motion are identical to those which Mr. Johnatakis would have cited had he filed a separate motion. It would be duplicative for Mr. Johnatakis to spend considerable time preparing a motion which would contain identical arguments and authorities to the motion filed by Mr. Sturgeon.

For the foregoing reasons, Mr. Johnatakis respectfully moves for the entry of an

Order granting leave to adopt and join the above-referenced motion to dismiss filed by Mr.

Sturgeon.

Respectfully submitted this 29th day of December, 2021.

BLACK & ASKEROV, PLLC

Christopher Black, Bar ID # WA0023
Attorney for Taylor Johnatakis
Black & Askerov, PLLC
705 Second Avenue, Suite 1111
Seattle, WA 98104
Phone:      206.623.1604
Fax:        206.658.2401
Email:      chris@blacklawseattle.com

"Accepted"

MAR 02 2023

Taylor James Johnatakis

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Two        Month: Three        Year: 2023 CE



Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 59-1 Filed 12/29/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISSAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 59-1 Filed 12/29/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING MOTION TO ADOPT AND JON CO-DEFENDANT ISSAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
℅ 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 59-1 Filed 12/29/21 Page 1 of 1 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 1:21-cr-00091-RCL** ORDER GRANTING MOTION TO ADOPT AND JON CO-DEFENDANT ISSAC STURGEON'S MOTION TO DISMISS COUNTS ONE THREE FOUR FIVE AND SIX OF THE SUPERSEDING INDICTMENT"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

vs.

**TAYLOR JOHNATAKIS,**

**Defendant.**

Case No. 1:21-cr-00091-RCL

## ORDER GRANTING MOTION TO ADOPT AND JOIN CO-DEFENDANT ISACC STURGEON'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE, AND SIX OF THE SUPERSEDING INDICTMENT

THIS MATTER, having come before the Court on Taylor Johnatakis's motion to adopt and join co-defendant Isaac Sturgeon's motion to dismiss counts one, three, four, five, and six of the Superseding Indictment, and the Court having considered the facts set forth in the motion and the records and files herein, the Court hereby ORDERS that defendant Taylor Johnatakis's motion to adopt and join co-defendant Isaac Sturgeon's motion to dismiss is granted.

DONE this _____ day of _____, 20____.



RECEIVED
Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

_____
The Honorable Royce C. Lamberth
United States District Judge

## NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:        Day: Two        Month: Three        Year: 2023 CE

Angela D. Caesar
Clerk of Court United States District Court District of Columbia
333 Constitution Avenue N.W.
Washington, D.C. 20001

In reply to : "Case 1:21-cr-00091-RCL Document 52 Filed 10/25/21 Page 1 of 8 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES' MEMORANDUM REGARDING <u>STATUS OF DISCOVERY AS OF OCTOBER 21 2021</u> Page 2 of 8, Page 3 of 8, Page 4 of 8, Page 5 of 8, Page 6 of 8, Page 7 of 8, Page 8 of 8 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney"

**PLEASE TAKE NOTICE** that I, Taylor James Johnatakis a sentient moral being, accept your Presentment "Case 1:21-cr-00091-RCL Document 52 Filed 10/25/21 Page 1 of 8 **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES' MEMORANDUM REGARDING <u>STATUS OF DISCOVERY AS OF OCTOBER 21 2021</u>** Page 2 of 8, Page 3 of 8, Page 4 of 8, Page 5 of 8, Page 6 of 8, Page 7 of 8, Page 8 of 8 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.
- I do not argue the facts, jurisdiction, law or venue.

RECEIVED
Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Sincerely,

*Taylor James Johnatakis*

Taylor James Johnatakis
% 29628 Gamble PL NE
Kingston, Washington

Attachment: "Case 1:21-cr-00091-RCL Document 52 Filed 10/25/21 Page 1 of 8 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA Case No. 21-cr-91 (RCL) UNITED STATES' MEMORANDUM REGARDING <u>STATUS OF DISCOVERY AS OF OCTOBER 21 2021</u> Page 2 of 8, Page 3 of 8, Page 4 of 8, Page 5 of 8, Page 6 of 8, Page 7 of 8, Page 8 of 8 Respectfully submitted CHANNING D. PHILLIPS Acting United States Attorney"

cc: Judge Royce C. Lamberth 333 Constitution Avenue N.W. Washington, D.C. 20001
cc: Matthew M. Graves United States Attorney Judiciary Center 555 Fourth St., N.W. Washington, D.C. 20530
cc: Maria Jacob OFFICE OF THE FEDERAL PUBLIC DEFENDER 625 Indiana Ave, N.W. Washington DC 20004
cc: Kaitlin Klamann Assistant United States Attorney 601 D Street NW Washington, D.C. 20001
cc: Allen H. Orenberg, The Orenberg Law Firm, P.C. 12505 Park Potomac Avenue 6th Floor Potomac Maryland 20854
cc: Christopher R Black BLACK AND ASKEROV PLLC 705 2ND AVE #1111 SEATTLE WA 98104

"Accepted"

MAR 0 2 2023

*Taylor James Johnatakis*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-cr-91 (RCL)** |
| | : | |
| **CRAIG MICHAEL BINGERT,** | : | |
| **ISAAC STEVE STURGEON, and** | : | |
| **TAYLOR JAMES JOHNATAKIS,** | : | |
| | : | |
| Defendants. | : | |

### UNITED STATES' MEMORANDUM REGARDING
### STATUS OF DISCOVERY AS OF OCTOBER 21, 2021

The United States files this memorandum for the purpose of describing the status of implementation of our discovery plan in relation to voluminous sets of data that the government collected and continues to collect in its investigation of the Capitol Breach cases, among which may be interspersed information the defense may consider material or exculpatory. The materials upon which this memorandum is focused include, for example, thousands of hours of video footage from multiple sources (e.g., Capitol surveillance footage, body-worn-camera footage, results of searches of devices and Stored Communications Act ("SCA") accounts, digital media tips, Parler video, and news footage), and hundreds of thousands of investigative documents including but not limited to interviews of tipsters, witnesses, investigation subjects, defendants, and members of law enforcement.

### Status of Defense Evidence.com Database

On September 3, 2021, the United States modified its contract with Axon Enterprise, Inc. ("Axon"), our evidence.com vendor. Pursuant to the modification, the government funded a Capitol Breach defense instance of evidence.com and purchased licenses that will enable legal defense teams to gain access to evidence.com and view voluminous video evidence. The defense

Mail Room

MAR - 7 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

"Accepted"

MAR 02 2023

Taylor James Schneider

instance is managed and administered by the Federal Public Defender for the District of Columbia ("FPD"), who is acting as the Discovery Liaison for defense counsel in Capitol Breach cases, and the government has no ability to log into or retrieve information from the defense instance.

In conjunction with the Defender Service's National Litigation Support Team, FPD created a structure for distributing and tracking evidence.com licenses for defense counsel. As of October 18, 2021, FPD has sent emails to all Capitol Breach defense counsel with instructions on how to request a license for the legal defense team to view videos in evidence.com. FPD also developed a "Quick Start Guide" that it simultaneously circulated to all Capitol Breach defense counsel, with instructions for registering an account, logging into evidence.com, and further describing how video discovery may be shared with their clients through the evidence.com platform consistent with the standard Capitol Breach protective order.

<div align="center">

**Status of Production of Video Footage**

</div>

The following video footage has been shared to the defense instance of evidence.com and is accessible to any Capitol Breach defense counsel who requests a license:

- 16,925 U.S. Capitol Police ("USCP") Closed Circuit Video ("CCV") files consisting of approximately 4,800 hours (over four terabytes) of footage from 515 cameras located inside the U.S. Capitol Visitor Center and on the Capitol grounds. To assist the defense in locating relevant USCP CCV, we have also produced (via USAfx) 15 camera maps of the interior of Capitol Visitor's Center and the interior of the Capitol.

- 1,676 Metropolitan Police Department ("MPD") body-worn-camera ("BWC") files consisting of approximately 1,600 hours of footage recorded by over 900 officers between 1:00 p.m. and 6:00 p.m. on January 6, 2021. To assist the defense in locating officers who may have recorded body-worn-camera footage at a particular location and time, we also produced (via USAfx) a spreadsheet created by the Discovery Team based on MPD radio Global Positioning Satellite records.

"Accepted"

MAR 0 2 2023

Taylor James Johnatakis

## Status of Defense Relativity Workspace

On October 13, 2021, the United States modified its contract with Deloitte Financial Advisory Services, LLP ("Deloitte") to fund a Capitol Breach Relativity workspace and purchase licenses that will enable legal defense teams to gain access to the database. FPD is now consulting with Deloitte concerning the construction and organization of the defense workspace and creating a structure for distributing Relativity licenses to defense counsel. FPD will notify Capitol Breach defense counsel on how to obtain Relativity license access once the defense workspace is constructed and organized and is ready to be populated with documents.

## Status of Production of Documents

Since our last filing describing the status of discovery as of September 14, 2021, the following materials and a corresponding index have been made available for sharing with Capitol Breach defense counsel via USAfx:

- 42 files that consist of MPD internal investigation reports and exhibits (739 pages);
- 31 files consisting of digital exhibits to previously produced USCP Office of Professional Responsibility ("OPR") reports;[1] and
- USCP radio communications and draft transcripts.

## Contents of Government Relativity Database

Our Relativity database currently contains over 33,000 records from USCP, 23,000 records from MPD, and 56,000 records from the FBI's main Capitol Breach file (of which about 29,000 pertain to individual defendants and are likely to overlap with materials already produced in the specific cases to which they are most directly relevant).

---

[1] On September 10, 2021, we made available via USAfx 35 files consisting of 28 reports from USCP OPR investigations of alleged wrongdoing by USCP officers on January 6, 2021.

"Accepted".
MAR 02 2023
Taylor James Johnatakis

### Manner of Productions Going Forward

In terms of the manner in which discovery will be produced going forward:

- We will continue to utilize evidence.com to produce voluminous video footage in all Capitol Breach cases.

- Until Relativity access is available to Capitol Breach defense counsel, limited productions such as those described above will continue to be made available to counsel via USAfx, as well as produced to the defense Relativity workspace.

- Once defense counsel have access to Relativity, it will become the primary method for producing voluminous documents. However, we will still continue to make organized productions and issue discovery letters to defense counsel describing materials that have been added to the defense database.

- Certain materials, because of their nature or volume, will only be produced to the defense Relativity workspace. E.g., case-specific discovery that has been provided in *other* defendants' cases and the results of searches of devices and SCA accounts. Those materials will become accessible to defense counsel once FPD distributes licenses for Relativity.

### Incarcerated Defendants

In collaboration with FPD, we have developed a proposal to increase access by incarcerated defendants to discovery materials by providing access to e-discovery (by providing limited evidence.com and Relativity access to inmates via wi-fi and increasing the number of computers available for discovery review). FPD and our office had a productive meeting with representatives from the D.C. Department of Corrections ("DOC") about the e-discovery proposal on Wednesday, October 20, 2021. At the meeting, representatives of DOC indicated they would explore with the Director whether a pilot e-discovery program consistent with our proposal, beginning with Capitol Breach defendants, may be implemented consistent with the DOC's security concerns and Internet capacity. We are meeting again on October 27, 2021, at which time we expect to obtain requested technical and logistical information from the DOC that would be essential to implementing our joint proposal.

4

Case 1:21-cr-00091-RCL  Document 52  Filed 10/25/21  Page 5 of 8

We understand there are four defendants who are currently proceeding *pro se*, three of whom are detained. We are currently developing a plan for access to voluminous materials by *pro se* defendants and will inform the Court once we have finalized our approach, after collaboration with FPD.

### **Future Productions**

Among the documents we expect future productions to include are:

- The remainder of USCP CCV (4,204 files), which is mainly comprised of footage that has been deemed Highly Sensitive, e.g., footage of the interior of the Capitol;[2]

- The remainder of MPD BWC footage (largely consisting of footage outside the 1:00 to 6:00 p.m. timeframe), and BWC footage from Arlington County Police (124 files), Fairfax County Police (24 files), Montgomery County Police (60 files), and Virginia State Police (48 files);

- U.S. Secret Service surveillance camera footage (143 videos);

- Video recordings made by officers of MPD's Electronic Surveillance Unit;

- Camera map for Capitol grounds;

- Supplemental exhibits to USCP OPR reports;

- USCP After Action Reports;

- MPD Aerial Surveillance Unit Photos;

- Permits for Demonstrations at the U.S. Capitol;

- Additional MPD internal investigation reports;

- MPD and Virginia State Police radio transmissions;

- Legal process pertaining to the collection of geolocation data from Google, Inc. and various additional providers;

---

[2] To be clear, we are not producing via evidence.com footage that constitutes "Security Information" pursuant to 2 U.S.C. § 1979, i.e., the 17 hours of CCV footage that relate to the evacuation of Congressional Members. The disclosure of this footage will be handled separately.

"Accepted"

MAR 0 2 2023

- BWC Spreadsheet and zone maps (work product created to assist in review of BWC footage);

- Statements made by members of law enforcement during interviews arising out of the Capitol Breach investigation;

- Discoverable MPD, USCP and FBI records and memoranda currently (or shortly to be ingested) into Relativity;

- Case-specific discovery of other defendants (i.e., discovery already produced to the defendant for whom it is directly relevant, but which will be made accessible to all defendants);

- Results of searches of devices and SCA accounts; and

- Custodial statements of (other) defendants.

## Substantial Completion of Discovery

We understand that the Court would like us to project when production of voluminous materials will be substantially complete. As an initial matter, to reach the point where we can assess a potential date of substantial completion, the government has taken and continues to make substantial efforts, including:

- Appointing a Capitol Breach Discovery Coordinator in January;

- Assembling a Capitol Breach Discovery Team consisting of experienced attorneys, project managers, and litigation technology professionals;

- Collecting information from multiple sources involved in the response to and investigation of the Capitol Breach;

- Collaborating with FPD to develop a standard protective order for Capitol Breach cases;

- Identifying database solutions for making terabytes of video and documents accessible to hundreds of defendants, funding defense databases and obtaining licenses for all Capitol Breach defense counsel, and collaborating with FPD to execute these solutions;

- Reviewing specific discovery requests by defense counsel to ensure the appropriate materials are prioritized for production;

- Creating protocols and procedures to ensure that (a) case-specific discovery is provided, (b) defendants will receive complete copies of unscoped devices and SCA accounts upon request; (c) devices and SCA accounts are systematically filtered for attorney-client communications; and (d) relevant scoped data and custodial interviews will be uploaded to the government's discovery databases for production to all; and

- Creating proposals for increasing access to discovery by incarcerated defendants.

We will soon begin to load into Relativity several hundred thousand FBI records (a substantial portion of which may not be directly related to any charged defendants). These materials that have been undergoing pre-processing to ensure, among other things, that any materials that might be subject to protection under Federal Rule of Criminal Procedure Rule 6(e) are segregated for processing internally. Once these documents are loaded in Relativity, we will be able to better assess and execute our plan for reviewing them and producing them in discovery. We are also currently engaged in a concerted effort to consolidate scoped search results from thousands of devices and SCA accounts for ingestion by Deloitte. We thus expect to be in a better position to provide the Court an estimate of the time necessary for substantial completion within the next two weeks.

As many documents may not be discoverable or may be duplicative, neither the Court nor defense counsel should expect the size of the productions to the defense to mimic the size of the government's Relativity workspace.

## Conclusion

In sum, we have made substantial progress in our diligent efforts to provide the defense comparable discovery review platforms for both documents and digital media, to populate those platforms, and to use alternative means to provide the most relevant discovery without delay. We will diligently continue to transfer data to our vendors, process it for production, and make interim

7

productions by other means until the defense platforms are in place. As we continue to implement our plan, we will continue to file status memoranda with the Court on a regular basis.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By:  /s/ Emily A. Miller
EMILY A. MILLER
Capitol Breach Discovery Coordinator
DC Bar No. 462077
United States Attorney's Office
555 Fourth Street, N.W., Room 5826
Washington, DC 20530
Emily.Miller2@usdoj.gov
(202) 252-6988

By:  /s/ Angela N. Buckner
ANGELA N. BUCKNER
Assistant United States Attorney
D.C. Bar No. 1022880
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Angela.Buckner@usdoj.gov
(202) 252-2656

"Accepted"

MAR 02 2023

Taylor James Arbuckle

8