**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-91 (RCL)** |
| **TAYLOR JOHNATAKIS,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court depart or vary upwards to sentence Taylor Johnatakis to 108 months' incarceration, three years' supervised release, $2,000 in restitution, a $385 mandatory assessment, and a monetary fine.

## I.    INTRODUCTION

The defendant Taylor Johnatakis participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

As further detailed below, on January 6, 2021, Johnatakis traveled to Washington, D.C.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

from Washington State to obstruct Congress' certification of the electoral college votes by whatever means necessary.   Indeed, Johnatakis came equipped to organize rioters by strapping a megaphone onto his back, and he led the charge up the Southwest stairs of the U.S. Capitol.   Once there, Johnatakis coordinated a violent assault on a line of police officers defending the U.S. Capitol.   But Johnatakis did not just encourage other rioters to be violent—he participated in the assault himself.   He used a metal barricade to attack officers head on and grabbed one officer to prevent him from defending himself against other attacking rioters—contributing to that officer's physical injury.

On November 21, 2023, a jury convicted Johnatakis of seven counts in the Second Superseding Indictment, including obstruction of an official proceeding, interfering with law enforcement during a civil disorder, assault of law enforcement officers, and various misdemeanors.   Johnatakis was charged in the Second Superseding Indictment with two co-defendants, Craig Bingert and Isaac Sturgeon.   The Court severed Johnatakis from his two co-defendants, who were convicted by this Court on May 24, 2023 following a bench trial.   On September 26, 2023, the Court sentenced defendant Bingert to 96 months of imprisonment and defendant Sturgeon to 72 months of imprisonment.

The government recommends that the Court sentence Johnatakis to 108 months' incarceration, which is above the Guidelines range calculated by the government and the final Presentence Report ("PSR") after issuance of the D.C. Circuit's decision in *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024).   The government submits that an upward departure or variance to a sentence of 108 months' imprisonment is warranted here in light of the serious nature of this offense, the defendant's history and characteristics, and the need for both specific and general deterrence.   Such a sentence is also consistent with the sentences given by this Court to Johnatakis' two co-defendants, Bingert and Sturgeon, after taking into account

Johnatakis' more significant role and culpability.

## II.     FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts filed in this case (*see* ECF 1-1 at 1) for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.      Taylor Johnatakis' Actions on January 6, 2021

Even before January 6, 2021, Johnatakis posted numerous messages to social media revealing his intent to obstruct the election certification.   For instance, on January 1, 2021, in response to someone else's post about arresting former Vice President Pence for treason and facing execution by a firing squad, Johnatakis wrote: "Them is fighting words.   5 days."   (Trial Exhibit 904E).   On January 5, 2021, Johnatakis posted: "…and that's why I am going to DC, to CHANGE the course of HISTORY #stopthesteal" (Trial Exhibit 309).   That same day, he posted: "[B]urn the city down.   What the British did to DC will be nothing…"   (Trial Exhibit 904G).

Johnatakis put his words into action and traveled across the country from his home in Washington state to Washington, D.C.   On the night of January 5, he stayed at a hotel in Arlington, Virginia.   The next morning, Johnatakis attended the "Stop the Steal" rally near the White House where he heard the former president speak.   Johnatakis wore a black puffer jacket, a green backpack, and a red hat with "Make America Great Again" in white letters, and he carried a large megaphone strapped to his back.

After the rally, Johnatakis marched to the U.S. Capitol. Along the way, he recorded a video and posted it to his Facebook account with the status "#stopthesteal."   In the video, he said:

> Trump's speech is over.   It was awesome.   Some of you may have seen it

online.   He went over all the voter fraud.   I am very concerned about Mike Pence.   I have no idea what he is going to do.   Did not love the way the president talked about that.   And, I don't know.   We'll see.   Anyways, we're walking over to the Capitol right now, and I don't know, maybe we'll break down the doors.

(Trial Exhibit 901N).

Johnatakis marched onto the restricted Capitol grounds that were closed to the public. While doing so, he yelled into his megaphone, at one point encouraging the crowd by saying: "Michael Pence has become a traitor to this nation.   He's been one.   We just didn't want to recognize it or admit it.   It's over. Michael Pence has voted against the president.   We are down to the nuclear option." (Trial Exhibit 303).

By approximately 2:30 p.m., Johnatakis had made his way through the crowd on the West Front where the inaugural stage was under construction.   By then, rioters had flooded the area and were actively overpowering the police line (*see* Trial Exhibit 737 below).



*Trial Exhibit 737: photograph from Johnatakis' phone showing the scene on restricted Capitol grounds as Johnatakis made his way toward the Southwest stairs*

Video footage introduced at trial showed Johnatakis making his way to the front of the mob of rioters while yelling into his megaphone (*see* Trial Exhibit 301A screenshots below). As he reached the front of the mob, vastly outnumbered police officers attempted to maintain a line and keep rioters away from the Capitol.



*Trial Exhibit 301A: Screenshot of video footage showing Captain Augustine and fellow officers moments before they were forced by the crowd to retreat*



*Trial Exhibit 301A: Screenshot of video footage showing Johnatakis yelling into his megaphone as police officers retreat up the Southwest stairs*

Metropolitan Police Department ("MPD") Captain David Augustine testified, consistent with his body worn camera video, that as the crowd grew and tension rose, the police officers on the line were overwhelmed by the rioters and ultimately forced to retreat up the Southwest stairs under the scaffolding of the inaugural stage. (11/17/23 Trial Tr. at 121). Captain Augustine testified that rioters followed closely behind, and, as a Captain, he took it upon himself to try and protect the officers from further attacks from the rioters following closely behind. (11/17/23 Trial Tr. at 122).



*Trial Exhibit 301A: Screenshot of video footage showing Johnatakis maneuvering to the front of the crowd and following retreating police officers up the Southwest stairs*

Video evidence introduced at trial shows Johnatakis leading the charge under the scaffolding, up the stairs toward the retreating police officers and the Capitol Building. (*See* Trial Exhibit 201A.2 below).



*Trial Exhibit 201A.2: Screenshot of body worn camera footage showing Johnatakis yelling at retreating police officers at the front of the mob*

Police officers retreated and formed another police line to protect the Capitol Building and the members of Congress inside at the top of the stairs.   Johnatakis was among the first rioters to march up the Southwest stairs to confront them (*see* Trial Exhibits 201A and 204A.1, below).



*Trial Exhibit 201A: Screenshot of body worn camera footage showing Johnatakis as one of first rioters to chase police up the stairs*



*Trial Exhibit 204A.1: Screenshot of body worn camera footage showing Johnatakis approaching the police line as he yelled into his megaphone while rioters followed closely behind*

As the rioters filled the staircase, Johnatakis took charge.   Using his megaphone, Johnatakis organized his fellow rioters, waving them toward the police line and instructing them to "PACK IT IN – PACK IT IN!" (*see* screenshots from Trial Exhibit 205A below).   He began arranging and preparing the mob to assault the officers.   *Id*.



*Screenshot of video footage at 2:36:14 p.m. showing Johnatakis yelling into his megaphone at the officers*



*Screenshot of video footage at 2:38:27 p.m. showing Johnatakis summoning rioters to confront the police line*



*Screenshot of video footage at 2:44:44 p.m. showing Johnatakis coordinating with another rioter in preparation to charge forward and attack the police line*

Still using the megaphone, Johnatakis instructed the rioters: "ONE FOOT, ONE FOOT" and "PUSH THEM OUT OF HERE, WE'RE JUST USING OUR BODIES!"   He synchronized

the efforts of other rioters (including co-defendants Craig Bingert and Issac Sturgeon) by counting down over the megaphone, "one, two, three, GO!"   As he shouted "GO!" to his fellow rioters, Johnatakis and the other rioters collectively grabbed the barricades and forcibly pushed them directly into the line of police officers.   (*See* Trial Exhibit 204A).   Johnatakis and the other rioters lifted the barricades up to head- and eye-level so that he and others could fight the officers directly. (*See* Trial Exhibit 204A, below).



*Trial Exhibit 204A: screenshot of body worn camera footage showing Johnatakis forcefully pushing a metal barricade into police officers*

During the brawl, Johnatakis forcefully made physical contact with one police officer by grabbing his arms. (*See* Trial Exhibits 204A.6 and 204A.7, below).



*Trial Exhibit 204A.6: screenshot of body worn camera footage showing Johnatakis grabbing an officer's arm as the officer attempted to fend of the impending assaults by the crowd*



*Trial Exhibit 204A.7: screenshot of body worn camera footage showing Johnatakis forcefully pushing the metal barricade and grabbing an officer's arm*

At trial, MPD Officers Marc D'Avignon and Juan Gonzalez testified about this assault.

Officer D'Avignon described forming a line behind the metal barricades at the top of the stairs

with other officers and explained how rioters grabbed those barricades and tried to use them to break through the police line to gain access to the Capitol building.   He described the scene as "frightening" and explained the precarious position of he and his fellow officers after losing the metal barricades as rioters pulled the barricades into the crowd.   He explained, "If there was some physical object between you and a crowd that appears very aggressive and very violent, and to lose that, just left me with a real sense of vulnerability."   (11/20/23 Trial Tr. at 37).   Describing the assault, D'Avignon testified, "I thought they were going to come through.   I thought we were going to be trampled.   I thought we were going to be hurt.   I thought we were going to die." (11/20/23 Trial Tr. at 51).

Likewise, Officer Gonzalez testified that standing at the top of the Southwest stairs in the face of the aggressive crowd "was a scary situation for us, for me."   (11/20/23 Trial Tr. at 57). He described fighting directly with Johnatakis after Johnatakis made his way under the metal barricade during the assault.   Regarding Johnatakis grabbing his arm, Officer Gonzalez testified, "I'm not able to defend myself if someone is holding my arms.   So it was preventing me from being able to, not only hold the line, but also from protecting myself."   (11/20/23 Trial Tr. at 67). Officer Gonzalez also explained that, during the assault, he injured his leg while battling with the rioters – Johnatakis included – who were pushing the bike racks into the police line. Officer Gonzalez explained: "[d]uring the assault, I felt like I had sustained a serious injury.   I thought I had broken my leg because the racks were being pushed against us."   (11/20/23 Trial Tr. at 58).

After the assault, with the riot still raging around him, Johnatakis recorded more videos of himself bragging about his participation in the riot, posting some to social media.   In one video recorded on the West Front, Johnatakis said:

> So the scene unfolding behind me is really chaos. We are in the Capitol.   It is ours. We own it.   That's scaffolding, that's all Joe Biden's stands up there, it's all taken over.   I was up on the front, up on the gate, and I organized a push in.   Anyways,

I got gassed, smacked, I'm probably going to be bruised everywhere. I'm still trying to catch my breath and my eye, my right eye is full of gas, they gassed it directly. Broke my glasses, got wailed on by a nightstick—that's a new one for me. But, 1776 again right? Let's go!

(Trial Exhibit 901P).

As Johnatakis walked away from the Capitol, with the building in the video behind him,

he recorded another video expressing his pride in participating in the riot, stating in part:

And for the first time since 1817 that Capitol was stormed. And taken. They had to run Congressmen and Senators out of the Capitol with black bags over their heads. Black bags. Why black bags? Black bags because the crowd was so irate, we probably would have murdered a few of them had we seen exactly who they were. So they put black bags so they could be ushered out of the Capitol in shame. In shame. They got ushered out of the Capitol in shame. They haven't done the right thing. Online stuff is breaking off, we're finding out more and more crimes of these elites that are literally taking our country from us. I will tell you right now, reporting from the ground in Washington, D.C., the attitude on the ground is: where were you when antifa showed up? Where were you when BLM showed up? The cops showed up with nerf sticks. And they just murdered one of us within an hour of showing up. An hour. They're that afraid of us. They're that afraid of us. They had to usher the Congressmen and Senators out of the House in shame with black bags. I got gassed. I got hit pretty dang hard a couple times with a nightstick, it's not funny it hurt. And we're done. I am walking away from the Capitol. I've shed some tears. I am very sad about what I have watched firsthand unfold.

And I can tell the story. I was on the front line. I was on the gate. I organized a push up to the Capitol because I felt like that is exactly what we needed.

(Trial Exhibit 746).

On January 6, 2021, Johnatakis posted to Twitter: "The transition won't be peaceful" (Trial

Exhibit 311) and then later that night/early on January 7, 2021, he posted: "The crime is complete."

(Trial Exhibit 312).

### C.      Taylor Johnatakis' Post-Trial Conduct

Following trial, the Court remanded Johnatakis pending sentencing, and he has been in

custody in the DC Jail since late November 2023. Since that time, Johnatakis has been speaking

publicly through letters and interviews about his views of the "injustice" January 6 defendants are

experiencing—portraying himself as a victim.   Johnatakis' letters are posted on a website (*see* Sentencing Exhibit A for selected posts), which is linked to a fundraising website maintained by his family members—which as of March 29, 2024, has raised $59,277.   In addition, Johnatakis has repeatedly given interviews from the DC Jail that are posted on YouTube and other websites.

Johnatakis' interviews and posts demonstrate a continued lack of remorse and a refusal by Johnatakis to accept responsibility for his actions.   For example, in an interview posted on YouTube dated January 9, 2024 entitled "DC Gulag & NYC Tunnels ft. Taylor James Johnatakis," Johnatakis described his assault on the police line with the metal barricade as "touch[ing] a gate":

> I'm looking – I had codefendants that were severed from the case, they went to trial before me. I'm looking at anywhere from like – the government is probably going to ask 11-14 years, uh my codefendants got sentenced to 6 and 8 years. **And when I tell you that we did nothing, I mean we did nothing. We touched a gate. We got pepper sprayed, we moved back. That was it. I mean, it was, it was - the video that may or may not be out there on twitter or whatever, but I mean it's pretty insignificant when you start thinking about 6 and 8 year sentences.** Um, so, it's pretty wild. I know the Department of Justice they hate it when we say this kind of stuff on– on the – you know, over the phones, and to people, but it's just the truth. **Everything about January 6 is just overblown**.

(Emphasis added.)   Likewise, in a written post on his website dated December 12, 2023, Johnatakis wrote:

> I chose to get rowdy, but not violent, at the time I felt it was a right born of necessity.
>
> …
>
> Ultimately I was convicted, no surprise there. The definition of a railroad is a track or course where the destination is determined. The J6 experience is a railroad….I accept that. Judge Lamberth told me, emphatically before trial, with emotion in his voice, 'when you are done with this, you are going to jail'. He made good on his promise, remanding me one day before Thanksgiving to the DC gulag.

### III.   THE CHARGES AND TRIAL

On November 10, 2021, a federal grand jury returned the Second Superseding Indictment charging Johnatakis (as well as co-defendants Bingert and Sturgeon) with the following eight counts:

Count One:   Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2;

Count Two:   Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C.  § 111(a)(1);

Count Three:   Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

Count Four:   Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

Count Five:   Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

Count Six:   Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4);

Count Seven:   Obstructing, or Impeding Passage Through or Within, the Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E); and

Count Eight:   Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings, in violation of Assaulting, Resisting or Impeding Certain Officers, in violation of 40 U.S.C. § 5104(e)(2)(F).

The Court severed Johnatakis from his two co-defendants, and on May 24, 2023, following a bench trial, the Court convicted co-defendants Bingert and Sturgeon on Counts One through Six and Count Eight (the government voluntarily dismissed Count Seven prior to trial). On September 26, 2023, the Court sentenced defendant Bingert to 96 months of imprisonment and defendant Sturgeon to 72 months of imprisonment.

On November 21, 2023, a jury convicted Johnatakis on Counts One through Six and Count Eight (the government similarly voluntarily dismissed Count Seven prior to trial).

## IV.     STATUTORY PENALTIES

Johnatakis now faces sentencing on Counts One through Six and Eight.   As noted by the Presentence Report ("PSR"), the defendant faces: (1) on Count One (Obstruction) up to 20 years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100; (2) on Count Two (Assault on Federal Officer) up to 8 years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100; (3) on Count Three (Civil Disorder), up to five years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100; (4) on Count Four (Remaining on Restricted Grounds), up to one year of imprisonment, a supervised release term of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25; (5) on Count Five (Disorderly Conduct on Restricted Grounds), up to one year of imprisonment, a supervised release term of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25; (6) on Count Six (Engaging in Act of Violence on Restricted Grounds), up to one year of imprisonment, a supervised release term of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25; and (7) on Count Eight (Engaging in Act of Violence on Capitol Grounds), up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.     Guidelines Calculation

The government agrees with the PSR's determination that the total offense level is 27, and that with a criminal history category of I, the advisory guideline range is 70 to 87 months.[2]   The fine range is $25,000 to $250,000.

### B.     Upward Departure or Variance

After determining the defendant's Guidelines range, a court then considers any departures or variances.   *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background).   The Guidelines apply to a "heartland of typical cases."   *Koon v. United States*, 518 U.S. 81, 94-95 (1996).   A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole.   *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up). Specific departure statements reflect Commission guidance on what makes a case "atypical" and when departures are "encouraged."   *Koon,* 518 U.S. at 94-95.

The government notes that the final PSR does not apply either the three-level enhancement pursuant to U.S.S.G. § 2J1.2(b)(2) or the eight-level enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B).   On March 1, 2024, the United States Circuit Court for the District of Columbia

---

[2] The government disagrees with the final PSR's failure to apply a six-level enhancement, pursuant to § 3A1.2(c), to Johnatakis' Group One violation of 18 U.S.C. § 1512(c)(2) (it was applied in the draft PSR with no objections from either party). During the course of Johnatakis' violation of this statute, Johnatakis coordinated an attack on police officers using metal bike racks—lifting them up to eye and head-level and using them to assault the officers.   Johnatakis thus created a substantial risk of serious bodily injury to these officers, who were located at the top of a set of stairs, and who were in a vulnerable and precarious situation during the assault.   At least one officer was in fact injured, and another officer testified: "I thought we were going to be trampled.   I thought we were going to be hurt.   I thought we were going to die."   (11/20/23 Trial Tr. at 51.). However, the government notes that if this enhancement were applied, then all counts would group together, and the resulting combined offense level would remain at 27.

issued *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. March 1, 2024). *Brock* held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id*. at *8. Accordingly, U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

Following *Brock*, the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply. But that decision does not undercut the severity of Johnatakis' crime. If anything, assaulting officers and the Capitol in an attempt to stop Congress from certifying a presidential election is *far more serious* than interfering with a routine court proceeding. *See Brock*, 2024 WL 875795, at *15 ("interference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work"). Although the D.C. Circuit has held that §§ 2J1.2(b)(1)(B) and (b)(2) do not technically apply to the certification of the electoral vote count, that does not prevent this Court from considering how the uniquely horrifying events of January 6 factor into an appropriate sentence. Precisely because the D.C. Circuit held, in *Brock*, that the Sentencing Guidelines do not account for this crucial factor, the Court should depart or vary to impose the government's requested sentence.[3] *See, e.g.*, *United States v. Bender*, 21-cr-508-BAH, ECF 161 at 3 n.1 ("The D.C.

---

[3] As originally calculated in the Draft PSR, applying the enhancements in U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) here would result in a total offense level of 31, and accordingly, the

Circuit issued an opinion on March 1, 2024 in *United States v. Brock*, No. 23-3045, holding that the sentencing enhancement at U.S.S.G. § 2J1.2(b)(2) does not apply to convictions under 18 U.S.C. § 1512(c)(2) for conduct disrupting Congress's counting and certification of the electoral college votes on January 6, 2021, but that decision does not influence the outcome in this case, since *the Court would have varied upwards by at least three offense levels to account for the significant disruption of a critical and important governmental function as a result of defendants' offense conduct if the specific offense characteristic at U.S.S.G. § 2J1.2(b)(2) did not apply.*") (emphasis added).   Indeed, pursuant to *Brock*—which was ultimately a technical dispute over the interpretation of a specific offense characteristic—a person who obstructed justice during a routine court proceeding, causing substantial interference, and even using violence or the threat of such violence, would receive a vastly higher punishment than a person who corruptly intended to stop a proceeding involving the democratic transfer of power inherent to the U.S. Constitution.   That alone warrants an upward variance.

As the PSR notes (PSR ¶¶ 136, 136a), Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure.   U.S.S.G. § 5K2.0(a)(2)(A).   One such circumstance is when an offense results in "a significant disruption of a governmental function."   U.S.S.G. § 5K2.7.[4]   A departure under this guideline is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense.   *Id*.   In such circumstances, "the court may increase the sentence above the authorized

---

Guidelines range would have been 108-135 months' imprisonment.   *See* Draft PSR ¶ 98.

[4]  This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765-66, 771 (D.C. Cir. 2011).

guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."  *Id.*

Although by its own terms § 5K2.7 "ordinarily" does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021 is the type of unusual circumstance that the Sentencing Commission could not have anticipated and that warrants an upward departure.   As the commentary explains, departure under § 5K2.7 is appropriate if the disruption of a governmental function is "substantial," meaning "substantially in excess" of the disruption ordinarily involved in an obstruction offense.  *See* § 5K2.0 cmt. 3(B)(ii).  Those who obstructed the certification proceedings on January 6 targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy.   They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses.[5]  Defendants like Johnatakis "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work."  *Brock*, 2024 WL 875795, at *15.   It was an unprecedented day in American history.  Surely few, if any, disruptions of governmental functions have been more "substantial," and it was a disruption far "in excess of . . . that which ordinarily is involved in" an obstruction offense (such as impeding a single judicial proceeding).   § 5K2.0(a)(3); *id.* cmt. 3(B)(ii).  But, following *Brock*, the seriousness of the crimes committed by defendants like

---

[5] Given the dangerous circumstances created by the riot, the Court could depart under § 5K2.14 in addition to, or as an alternative to, departing under § 5K2.7. Section 5K2.14 provides for a departure if "national security, public health, or safety was significantly endangered." The assault on the Capitol endangered the safety of the public, police, and elected officials in a way not already captured by Johnatakis' guidelines range, so a departure would be appropriate. *Cf. United States v. Calloway*, No. 21-3057, 2024 WL 925790, at *3 (D.C. Cir. Mar. 5, 2024) (affirming departure under § 5K2.14 where district court found that the defendant "created a serious risk that multiple individuals could have been killed or injured").

Johnatakis is not adequately captured by the applicable Guideline, § 2J1.2.   At least one judge in this district has already applied § 5K2.7 in a January 6 case.   *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").[6]

If the Court decides not to apply § 5K2.7, an upward variance to the government's recommended sentence is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors.   An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range."   *United States v. Murray*, 897 F.3d 298, 308-09 (D.C. Cir. 2018) (cleaned up).

Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense.   As discussed throughout this memorandum, Johnatakis' obstruction of justice on January 6 was a serious offense that attacked the fundamentals of American democracy.   As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding…* [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87 (emphasis added).

---

[6] If the Court does apply a departure, the government requests that the Court also specify that it would have imposed the same sentence as a variance.   *See United States v. Brevard*, 18 F.4th 722, 728-29 (D.C. Cir. 2021) (upholding the district court's sentence where the departure was erroneously applied but the district court indicated that it was also imposing the sentence as a variance).

The specific facts and circumstances of Johnatakis' case further (discussed in more detail below) support an upward variance to 108 months' incarceration. *See United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a *significant* upward variance would be warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself") (emphasis added); *see also United States v. Bender, et al.*, 21-cr-508 (BAH), Memorandum Opinion (March 6, 2024), ECF 161 at 3 n.1.   Accordingly, the government requests that the Court vary upwards and sentence Johnatakis to 108 months' imprisonment in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

### C.     No Zero Point Offender Adjustment is Warranted

The government agrees with the U.S. Probation Offices that Johnatakis is not eligible for an adjustment under U.S.S.G. § 4C1.1 (Adjustment for Zero Point Offender), *see* PSR ¶ 68, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   In particular, section 4C1.1 does not apply here because Johnatakis used violence and credible threats of violence in connection with his offenses. *See* U.S.S.G. § 4C1.1(a)(3) (providing that the adjustment for zero-point offenders only applies if "the defendant did not use violence or credible threats of violence in connection with the offense").

### VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, the Section 3553(a) factors weigh in favor of an above-Guidelines sentence of 108 months.

### A.     Nature and Circumstances of the Offense

As discussed above, Johnatakis' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out,

frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Johnatakis was willing and eager to commit numerous offenses to stop the certification on January 6—including joining a violent mob that broke down the police line on the West Front, pushing his way to the front of the mob and climbing through scaffolding of the inaugural stage immediately behind officers who were retreating for their safety, and ultimately using a barricade to assault a line of police officers defending the Capitol.   Johnatakis was not just any rioter:   he led, organized, and encouraged the assault of officers at the U.S. Capitol on January 6.   Johnatakis led the mob up the Southwest stairs, he encouraged and organized rioters to push up to the police line, and he used his megaphone to orchestrate and coordinate the assault on the officers.

The defendant's words and actions on that day and the days surrounding January 6 show his intent and purpose.   For example, while he marched toward the Capitol, he posted a video to social media noting "concern" that Mike Pence might not stop the certification himself and stating "maybe we'll break down the doors."   A video from January 6 shows Johnatakis yelling into his megaphone to fellow rioters, "We are down to the nuclear option."   He waved rioters up the stairs to the police line and instructed them with his megaphone to "push them out of here, we're just using our bodies!"   He counted down, "one, two, three, GO!" – coordinating the mob's assault on the police officers.   Following the assault, Johnatakis proudly bragged on social media in a video that he "organized a push up to the Capitol."   In the same video, he described the mob "taking" the Capitol, causing Congressmen and Senators to evacuate with "black bags over their heads" because "the crowd was so irate, we probably would have murdered a few of them had we seen exactly who they were."   His words of violence accompanied comparisons of January 6 to "1776"—the American revolution.

The nature and circumstances of Johnatakis' offense were of the utmost seriousness and

fully support the government's recommended sentence of 108 months' incarceration.

### B.   Defendant's History and Characteristics

Johnatakis is 40 years old and earned a Bachelor of Arts degree from Bringham Young University.   Prior to his incarceration, he was self-employed installing septic systems.   He has no criminal history.

Unlike many criminal defendants, Johnatakis' family history, education, and employment provided him with ample opportunity to succeed and make lawful choices.   He has a supportive family, a good education, and a job; his crimes were not crimes driven by poverty, neglect, or abuse.   Despite these advantages, Johnatakis chose to travel across the country to obstruct the peaceful transfer of power.   He didn't join the attack on the U.S. Capitol by mistake or accident— his social media posts and videos illustrate his clear intent.   For example, on January 5, 2021, Johnatakis posted: "[B]urn the city down. What the British did to DC will be nothing…" (Trial Exhibit 904G).   Johnatakis came to the U.S. Capitol with a megaphone strapped to his back, showing his intent to do exactly what he did: lead and organize rioters in an assault on members of law enforcement entrusted with protecting the building and members inside.

In addition, Johnatakis' antics before and during trial are worthy of the Court's consideration, as they show a lack of remorse, a disrespect for this Court, and a disrespect for the rule of law.   In addition to the repeated "notices of dishonor" and other "notices" he has sent to the Court and read to the Court on the record (see, e.g., ECF 76, 77, 78, 127, 260), Johnatakis failed to cooperate with the initial competency evaluation that the Court ordered (ECF 175).   At trial, Johnatakis showed his lack of genuine sympathy for the victim officers by play-acting in front of the jury and asking the officers for forgiveness—putting his own assault victims in the impossible position of having to accept his apology in front of the jury.   Indeed, his disingenuousness at trial is even more clear upon review of Johnatakis' statements post-trial, which

show his refusal to accept responsibility for his crimes and show any remorse—going so far as to portray himself as a persecuted victim.

Accordingly, the history and characteristics of the defendant counsel in favor of the recommended sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration for Johnatakis. His criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a significant term of incarceration.   Johnatakis' own words before, during, and after January 6 called for additional violence, (e.g., "The transition won't be peaceful") and evidenced a lack of remorse for his assault on police and his involvement in the Capitol riot (e.g., "I was up on the front, up on the gate, and I organized a push in. . . But, 1776 again right?   Let's

---

[7] See 18 U.S.C. § 2331(5) (defining "domestic terrorism").

go!"). These statements demonstrate that Johnatakis believes violence is an appropriate solution to his political grievances, and a lengthy period of incarceration is necessary to deter Johnatakis from committing future crimes of violence, especially in future election cycles.   Moreover, Johnatakis has never expressed any remorse for his conduct—either after his arrest, during trial, or since his conviction.   Indeed, as detailed above, he writes publicly about the injustice of his and the other January 6 prosecutions—portraying himself and the other defendants as victims of an unjust government.   He has failed to acknowledge or accept responsibility for his crimes, which also go to the need for specific deterrence.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct by Johnatakis' two co-defendants, whom the Court has already sentenced, provide suitable comparisons to the relevant sentencing considerations in this case. *See United States v. Craig Bingert and Isaac Sturgeon*, 21-CR-91 (RCL). On September 26, 2023, the Court sentenced Bingert to 96 months of imprisonment and Sturgeon to 72 months of imprisonment. While Bingert's and Sturgeon's offense conduct was similar, Bingert obstructed the prosecution by testifying untruthfully at trial (as detailed in the Court's factual findings following the bench trial (ECF 166)), which accounted for Bingert's more serious sentence.

Like Johnatakis, Bingert and Sturgeon traveled to Washington, D.C., attended the Stop the Steal rally, and then marched to the U.S. Capitol grounds. And, like Johnatakis, Bingert and Sturgeon went onto restricted grounds and joined the mob on the West Front, at the base of the inaugural stage, when the mob reached its full strength, violently breaking down the police line and forcing the officers to retreat. After the officers were forced up the Southwest stairs under the scaffolding, Johnatakis followed the officers and led the rioters up the stairs to the newly formed police line. Bingert and Sturgeon followed the officers and Johnatakis mere minutes later. They stood next to Johnatakis at the top of the Southwest stairs and, along with other rioters, followed the instructions Johnatakis yelled through his megaphone to "pack it in" and move toward the barricade in front of the officers. On Johnatakis' count to three, Bingert, Sturgeon, Johnatakis, and the other rioters grabbed the barricades and used them to assault the police officers to try to get through the police line to the U.S. Capitol.

Of the three co-defendants, Johnatakis' role in the obstruction of Congress and the assault on officers is the most significant. Johnatakis led the charge up the Southwest stairs, waved rioters up the stairs toward the police, and used his megaphone to lead the assault on the officers.

Bingert and Sturgeon were present and took the direction Johnatakis gave them to assault the police line, but they did not organize or lead the assault.  In addition, as detailed above, Johnatakis bragged about his role "on the front line" and how he "organiz[ed] a push up to the Capitol" (Trial Exhibit 746), and he made is intent clear through words of violence to describe breaking down the doors, murdering members of Congress, and comparing January 6 to the revolutionary war. Given his culpability, as well as the other Section 3553(a) factors discussed above, the government submits that Johnatakis should receive a higher sentence than both Bingert and Sturgeon.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), from a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Johnatakis was convicted of a violation of an offense under Title 18, and so the VWPA does

apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court . . . may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Johnatakis to pay $2,000 in restitution for his convictions on Counts One through Six and Eight. This amount fairly reflects Johnatakis' role in the offenses and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Indeed, this Court ordered Johnatakis' co-defendants Bingert and Sturgeon to each pay $2,000 in restitution. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 108 months' imprisonment, three years' supervised release, restitution in the amount of $2,000, and a significant fine.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   */s/ Courtney A. Howard*
COURTNEY A. HOWARD
Trial Attorney, Criminal Division
Detailed to the U.S. Attorney's Office
601 D Street NW
Washington, D.C. 20001
NY Bar No. 4513909
202-514-3130
Courtney.Howard2@usdoj.gov

By: */s/ Ashley Akers*
ASHLEY AKERS
Trial Attorney
Detailed to the U.S. Attorney's Office
601 D Street NW
Washington, DC 20001
Missouri Bar No. 69601
202-353-0521
Ashley.Akers@usdoj.gov