UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TAYLOR JAMES JOHNATAKIS,<br><br>  *Defendant.* | Case No. 1:21-cr-91-RCL-3 |

### NOTES FOR SENTENCING

Today, the Court sentenced Taylor James Johnatakis. The Court ordered that Mr. Johnatakis be committed to the custody of the Bureau of Prisons for a term of 87 months. The following are the notes that the Court used when delivering portions of its oral sentencing.

\*\*\*

The Court has received over twenty letters from friends and family of Mr. Johnatakis. Those letters speak to Mr. Johnatakis's good works, good nature, and good character. Most ask for the Court to release him right away. Many say he did nothing criminal on January 6 and is no danger to society. I appreciate that the defendant has, with exceptions, been courteous and respectful to the Court, and I harbor no personal animosity toward him. The Court agrees that Mr. Johnatakis, like many January 6 defendants, is not an inherently bad person. That is what makes these cases hard. As the Court has said many times, I take no great pleasure in locking up defendants who led good lives until their actions on January 6, 2021. After thirty-seven years on the bench, the Court knows how disruptive a prison sentence can be for defendants and their families. Nevertheless, the Court cannot let people entirely off the hook for their actions that day. In light of the defendant's supportive letters, the Court would like to take a moment to explain

1

what it is trying to accomplish when it sentences a defendant such as Mr. Johnatakis for events arising out of the January 6 attack on the Capitol.

A society in which everyone does what is right by his own lights, where adherence to the law is optional, would be a society of vigilantism, lawlessness, and anarchy. As my late friend Justice Antonin Scalia once wrote, "[i]t is the proud boast of our democracy that we have 'a government of laws and not of men.'" *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting). A person dissatisfied with the government or the law has various non-violent ways to express his or her views. The First Amendment protects freedom of speech. It also enshrines "the right of the people peaceably"—let me repeat, *peaceably*—"to assemble." And history has shown there is some role for the civil disobedience of Henry David Thoreau and Martin Luther King, Jr., in which a citizen engages in principled and peaceful—let me repeat, *peaceful*—disobedience of the law in order to protest a perceived injustice. In that situation, the person acknowledges they have broken the law and accepts the legal consequences that follow.

But what the jury found Mr. Johnatakis to have done on January 6 was neither First Amendment-protected activity nor civil disobedience. As the Court has said before, "the First Amendment does not give anyone the right to enter a restricted area or to engage in riotous activity in the Capitol." *See United States v. Little* (*Little Notes for Resentencing*), No. 1:21-cr-315 (RCL), 2024 WL 386718 (D.D.C. Jan. 25, 2024). It obviously does not give anyone the right to assault the police. Nor was the January 6 riot an act of civil disobedience, because it was *violent*, not peaceful; *opportunistic*, not principled; *coercive*, not persuasive; and *selfish*, not patriotic.

The portrayal of Mr. Johnatakis as either a peaceful protestor or someone simply swept up by the crowd does not match the reality established at trial. One thing that strikes me about the letters is that few of the authors seem to know what he actually did. One person even wrote me

2

that they know he has never done anything violent and never would.  Perhaps Mr. Johnatakis has contributed to this misperception, because although he repeatedly expressed his "heartfelt and sincere" regrets at trial, *see, e.g.*, Nov. 20, 2023 Trial Tr. at 71, ECF No. 256, since his conviction he has denied his conduct and downplayed the January 6 riot itself.  But the Court knows the facts of this case because it has heard from the witnesses and examined the evidence, including police body camera footage and videos filmed by Mr. Johnatakis himself.  The Court would therefore like to set the record straight about what Mr. Johnatakis did that day.

In any angry mob, there are leaders and there are followers.  Mr. Johnatakis was a leader.  He knew what he was doing that day.  On January 5, he posted on social media: "[B]urn the city down.  What the British did to DC will be nothing . . ."  Trial Exhibit 904G.  The next day, while marching to the Capitol, he recorded and posted a video in which he proclaimed "we're walking over to the Capitol right now, and I don't know, maybe we'll break down the doors."  Presentence Report (PSR) ¶ 26, ECF No. 266.  Once he got to the restricted grounds of the Capitol, he made his way to the vanguard of the crowd, all the while yelling into the megaphone he had brought with him.  PSR ¶¶ 27–29.  As Metropolitan Police Department Captain David Augustine testified at trial, rioters eventually overwhelmed the police line and forced the officers to retreat up the Capitol's Southwest stairs, under the scaffolding created for the inauguration.  The video played at trial shows that Mr. Johnatakis led the charge up the stairs.  He soon reached a fallback line of barricades manned by police in order to protect the Capitol building itself and the Members of Congress, staff, and others inside.  *See* PSR ¶¶ 29–31.  When he got there, he waved on more people toward the police line, and through his megaphone barked commands to "pack it in!"  PSR ¶ 32.  So, although one of the letters claims that Mr. Johnatakis "set out with good intentions and

3

ended up in a crowd of orchestrated out of control protestors," in fact it was Mr. Johnatakis himself who organized protestors to violence that day.

Once enough rioters had heeded his calls and swarmed against the police line, Mr. Johnatakis deployed his megaphone to give encouragement and step-by-step instructions for overpowering the police. PSR ¶ 33. As he announced "one, two, three, GO!" he and his fellow rioters—including his co-defendants Craig Bingert and Isaac Sturgeon—picked up the metal barricades and slammed them into the police officers. PSR ¶ 33. Mr. Johnatakis and the others then raised the barriers higher until they were about head-level with the officers, so that the mob could brawl with the officers without the barriers getting in the way. PSR ¶ 33. In the resulting melee, Mr. Johnatakis seized MPD Officer Juan Gonzalez by the arm. PSR ¶ 33. Officer Gonzalez testified at trial that with Mr. Johnatakis holding his arm in place, he was unable to hold back the line of rioters or protect himself. Nov. 20, 2023 Trial Tr. at 67. By effectively disarming Officer Gonzalez, Mr. Johnatakis made him vulnerable to serious injury, or worse. Indeed, Officer Gonzalez said that during the assault, he felt like he had suffered a "serious injury" and perhaps even broken his leg. Nov. 20, 2023 Trial Tr. at 58. Another officer who was standing alongside this officer, Officer Marc D'Avignon, thought he was going to die. Nov. 20, 2023 Trial Tr. at 51.

As Mr. Johnatakis walked away from the Capitol, he recorded several videos in which he expressed his satisfaction with what had occurred and pride in the role he had played. He crowed that "for the first time since 1817 that Capitol was stormed" and that members of Congress were forced to evacuate. PSR ¶ 37. He boasted that the crowd was so "irate" that "we probably would have murdered a few of" the Members of Congress "had we seen exactly who they were." PSR ¶ 37. He summed up his conduct: "I was on the front line. I was on the gate. I organized a push up to the Capitol because I felt like that is exactly what we needed." PSR ¶ 37. He also exclaimed

it was "1776 again," as if he were fighting for freedom against a foreign oppressor, rather than battling his own elected, representative government. PSR ¶ 36.

As the Court has said before, "[o]n January 6, 2021, a mob of people invaded and occupied the United States Capitol, using force to interrupt the peaceful transfer of power mandated by the Constitution and our republican heritage." *Little Notes for Resentencing*, 2024 WL 386718, at *3. There can be no room in our country for this sort of political violence. The Framers designed our constitutional system so that the people govern through their representatives, according to law. Decisions are the result of elections, debates, and compromise. The people, through their representatives, decide. By contrast, those who think political ends justify violent means seek to replace persuasion with intimidation, the rule of law with "might makes right." Violence risks begetting a vicious cycle that could threaten cherished conventions and imperil our very institutions of government. In that sense, political violence rots republics. Therefore, January 6 must not become a precedent for further violence against political opponents or governmental institutions. This is not normal. This cannot become normal. We as a community, we as a society, we as a country cannot condone the normalization of the January 6 Capitol riot.

This is the context in which the Court must sentence those convicted for their actions on January 6. To be sure, many people that day exercised their right to protest peacefully, without violating any laws. But others have pleaded guilty to crimes or been convicted after a bench or jury trial. When it comes to sentencing these defendants, a court must consider the same factors as in any other sentencing, including "the need for the sentence imposed" "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "(B) to afford adequate deterrence to criminal conduct;" and "(C) to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2). When sentencing a person

convicted for January 6 offenses, the Court aims to discourage these defendants from future violence, dissuade others from taking inspiration from the Capitol riot, and express the community's moral disapproval of this conduct. The Court must bear these considerations in mind, even as it is sensitive to the fact that every prison sentence leaves a void in the lives of the defendant's friends and family.

The Court would also like to address Mr. Johnatakis's conduct since the jury convicted him. At trial, he repeatedly expressed contrition to the Court and the jury. But he changes his story depending on his audience. Since conviction, he has frequently offered public commentary about his actions and January 6, including by issuing letters and giving speeches and podcast interviews from jail. The D.C Jail and United States Marshals Service have reported to me that to give interviews, he purposefully bypassed the D.C. Jail's safeguards. When the jail blocked him from calling into a podcast directly, rather than consult the jail's authorities to see if such an interview would be permitted, he devised a workaround to reach the podcast host. It has come to the attention of the Court that this particular podcast episode was ultimately published on YouTube on January 9, 2024. *See* Quite Frankly, *"D.C. Gulag & NYC Tunnels" ft. Taylor James Johnatakis 1/9/24*, YouTube (Jan. 9 2024), https://www.youtube.com/watch?v=hXKBKeJBQas&t=1756s [https://perma.cc/NP55-YWZT]. Mr. Johnatakis's message was this: "[W]e did nothing. We touched a gate. We got pepper sprayed, we moved back. That was it." He also said that "[e]verything about January 6 is just overblown." Similarly, in a December 12, 2023 letter, he explained his actions by saying: "I chose to get rowdy, but not violent, at the time I felt it was a right born of necessity." *See* Gov. Sentencing Mem. 16, ECF No. 270. These comments suggest that Mr. Johnatakis sought to mislead the Court and the jury when he repeatedly expressed his contrition for his actions on January 6, for instance by asking witnesses to "please accept my

sincere apology for my role in the events of that day." *See, e.g.*, 11/20/23 Trial Tr. at 30; *see also id.* at 51, 71, 127.  Moreover, these remarks leave no doubt that Mr. Johnatakis, unlike many January 6 defendants sentenced by the Court, does not accept responsibility for his actions and does not show true remorse.  Indeed, he did not do so today.

And although his speech itself is protected, a person who violates the rules of his confinement through subterfuge nevertheless does not demonstrate that the court should depart from the guidelines for these offenses, or even give him a low end of the guidelines.  This subterfuge recalls his brazen attempts to abuse the trial process by making improper comments to the jury.  Before the trial began, the Court went to great pains to remind Mr. Johnatakis that in exercising his Constitutional right to self-representation, he would be expected to adhere to "the same rules, the same procedure and the same substantive law as any other defendant." Nov. 17, 2023 Trial Tr. at 37, ECF No. 252.  The Court specifically advised him that if he was "unsure whether a particular argument is appropriate for the jury," he should either consult with his standby counsel or speak to me outside earshot of the jury. Nov. 17, 2023 Trial Tr. at 39.  In response, Mr. Johnatakis said that he "accepted" the Court's statement. Nov. 17, 2023 Trial Tr. at 40.  For most of the trial, Mr. Johnatakis was courteous and respectful to the Court.  But he as soon as he began his closing arguments, he started telling the jury facts not in the record.  He was effectively trying to testify without being subject to cross-examination.  Then, he tried to argue for jury nullification. *See* Nov. 20, 2023 Trial Tr. at 159–161.  After the Court shut down both attempts, it required Mr. Johnatakis to read to the Court what he planned to say next to the jury.  Yet as soon as the Court approved his remarks, he began making further improper remarks that he had not cleared with the Court.  *See* Nov. 20, 2023 Trial Tr. at 163–65.  His efforts to subvert the judicial process through

various unorthodox means, combined with his lack of remorse, make me worry that if given the chance he will again engage in violent, criminal activity.

Finally, the Court would like to address the insights into Mr. Johnatakis's character offered by his letters of support. Under 18 U.S.C. § 3553(a)(1), one factor the Court considers in every sentencing is the "the history and characteristics of the defendant." The Court is grateful that so many people took the time to submit thoughtful letters in support of the defendant. The Court respects their views of Mr. Johnatakis. I read every letter and took into account their comments about the good qualities he has exhibited over a lifetime. Yet in our system of justice, we punish people not for their overall *character*, but for their *actions*. Living an otherwise-blameless life does not grant anyone a free pass. Mr. Johnatakis is not here today because of who he *is*, but to be accountable for what he *did*. Like the jury, I listened to the witnesses and examined the evidence of his actions on January 6. Having done so, the Court concludes that, unfortunately for him, his friends, his family, and our society, it seems Mr. Johnatakis left his good qualities at home when he went to the Capitol on January 6. The actions of Mr. Johnatakis are inexcusable, and his choices have consequences. The Court takes no pleasure in sending any defendant to prison, but it will not shirk its solemn duty to enforce law and order.

So that Mr. Johnatakis's friends and family can understand the sentence imposed today, the Court will order the Clerk of Court to send a copy of these remarks to each person who submitted a letter on behalf of Mr. Johnatakis. I am pleased that some of his family can be here today to hear my words. I will decline to vary or depart upwards from the sentencing guidelines, and I will impose a guidelines sentence in this case.

Date: 4-2-24

Royce C. Lamberth
United States District Judge