```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

    * * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,          )  Criminal Action
               Plaintiff,          )  No. 21-CR-091-3
vs.                                )
                                   )
TAYLOR JAMES JOHNATAKIS,           )  April 3, 2024
               Defendant.          )  10:07 a.m.
                                   )  Washington, D.C.
    * * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE JUDGE ROYCE C. LAMBERTH,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>:

FOR THE UNITED STATES:
                         COURTNEY HOWARD
                         ASHLEY AKERS
                         U.S. Attorney's Office
                         for the District of Columbia
                         601 D Street NW
                         Washington, DC 20530
                         (202) 252-6778
                         Email: courtney.howard@usdoj.gov


FOR DEFENDANT JOHNATAKIS:
                         CHRIS BLACK
                         Black & Askerov, PLLC
                         705 2nd Avenue, Suite 1111
                         Seattle, WA 98104
                         (206) 623-1604
                         Email: chris@blacklawseattle.com


Court Reporter:          Elizabeth Saint-Loth, RPR, FCRR
                         Official Court Reporter


            Proceedings reported by machine shorthand.
        Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

1           THE COURTROOM DEPUTY:  We are on the record in

Criminal Case 21-091-3, United States of America versus

Taylor James Johnatakis.

           Starting with the government, please approach the

podium and state your appearance for the record.

           MS. HOWARD:  Courtney Howard and Ashley Akers for

the government, Your Honor.  Good morning.  Also with us at

counsel table is Special Agent Mike Kiley [sic] from the FBI.

           THE COURT:  Okay.

           THE DEFENDANT:  I am Taylor James Johnatakis.  I

am here by special appearance, not general appearance.  And

I reserve all my rights with explicit reservation without

prejudice.

           THE COURT:  Good morning, Mr. Johnatakis.

           MR. BLACK:  Good morning, Your Honor.  Chris

Black, stand-by counsel, for Mr. Johnatakis.

           THE COURT:  The Court is obligated under the

sentencing rules to first determine the guidelines, and then

I will hear allocution from both sides.  I have the

presentence report.

           Is there any objection by the defendant to the

presentence report as prepared?

           THE DEFENDANT:  Judge, does the record reflect

that I have accepted all the offers, presentments of demands

1    of the Court, the Clerk, the -- the probation -- or

2    probation, is that correct? -- department?

3            THE COURT:  Yes.

4            THE DEFENDANT:  And you, Judge Lamberth, and I

5    return them for settlement and closing in the accounting of

6    this matter.

7            THE COURT:  Okay.  Thank you, Mr. Johnatakis.

8            Any objections by the government to the

9    presentence report as written?

10           MS. HOWARD:  No, Your Honor.

11           I will just note one thing for the record.  The

12   government agrees with the PSR's determination that the

13   total offense level is 27, and the Criminal History

14   Category I.

15           But just one note.  We had in our sentencing memo,

16   on page 19, Footnote 2, that the government does disagree

17   with the final PSR's failure to apply a 6-level enhancement

18   to Count 1 pursuant to 3A1.1(c), but the resulting grouping

19   would still be an offense level 27.

20           THE COURT:  Okay.

21           MS. HOWARD:  Thank you.

22           THE COURT:  All right.  Based on that then, I will

23   determine the total offense level of 27, Criminal History

24   Category I.  So the guideline provisions for Counts 1 and 2

25   would be 70 to 87 months in custody; Count 3 would be -- 60

1    months would be the guideline provision; Counts 4 to 6 would

2    be 12 months; Count 8 would not have equitable guidelines.

3             For Counts 1 to 3, supervised release would be --

4    1 to 3 years would be the guidelines; for Counts 4 to 6, 1

5    year would be the guideline; and Count 8 would be not

6    applicable.

7             The defendant would not be eligible for probation

8    on Counts 1 to 6; and on Count 8 that's not applicable.

9             The guidelines for the fine would be 25,000 to

10   250,000 on Counts 1 to 3, and 4 to 6; and Count 8, the

11   guidelines would not be applicable.

12            Restitution will be determined based on the

13   restitution arguments.

14            The special assessment required to be imposed by

15   statute would be $100 for Counts 1 to 3, each; $25 for

16   Counts 4 to 6, each; and $10 on Count 8, required to be

17   imposed by statute.

18            So with those guideline calculations then, the

19   Court will hear the allocution of each side as to what the

20   appropriate sentence in the case will be.  The government

21   will go first, and then I will hear from the defendant.  At

22   the end of that, I will announce the sentence.

23            MS. HOWARD:  Thank you, Your Honor.

24            Prior to discussing the 3553(a) factors, if Your

25   Honor permits, just briefly we'll discuss a few grounds for

1    departure for an upward variance here.

2              THE COURT:  Sure.

3              MS. HOWARD:  The government is requesting an

4    upward departure or an upward variance here to a sentence of

5    108 months in order to adequately account for the uniquely

6    horrifying events of January 6th and, in particular, the

7    defendant's egregious conduct on that day.

8              There are two grounds for departure that the

9    government has identified:  5K2.7 for a significant

10   disruption of a governmental function; and 5K2.14, a

11   departure if national security, public health, or safety was

12   significantly endangered.

13             The government requests that if the Court does

14   apply a departure, if Your Honor would, for the record, also

15   specify that it would have imposed the same sentence as a

16   variance.

17             Briefly, Your Honor, on the significant disruption

18   of a governmental function, a departure here is appropriate

19   if it's an unusual circumstance where the guidelines do not

20   reflect the appropriate punishment for the offense.

21             Here, certainly, the obstruction of the Electoral

22   College certification on January 6th is precisely the kind

23   of unusual circumstance that the Sentencing Commission could

24   not have anticipated, and that warrants an upward departure.

25             This was an unprecedented day in American history.

1    The defendant and others obstructed the certification

2    proceeding and the peaceful transfer of power; more than 100

3    police officers and more than -- were injured, and more than

4    $2.9 million in losses were suffered as a result.

5         So few, if any, disruptions of governmental

6    functions have been more substantial than this one.  It was

7    a disruption that was far from the heartland of the typical

8    obstruction offense, and so this upward departure under the

9    guideline would be appropriate.

10        Second, 5K2.14 allows for a departure of national

11   security, public health, or safety was significantly

12   endangered.  Here, given the dangerous circumstances created

13   by the riot allows for this as an additional grounds for

14   departure.  The assault on the Capitol endangered the safety

15   of the public, police, and elected officials in a way that's

16   not already reflected in the defendant's guideline range.

17        So with that, Your Honor, the government will move

18   to discussion of the 3553(a) factors in this case.  And in

19   their totality, the government submits that they support an

20   upward variance here in a sentence of 108 months for the

21   defendant.

22        Beginning with the nature and circumstances of

23   this offense, the severity of the defendant's conduct on

24   January 6th is critically important for the Court to

25   consider when fashioning a sentence here, especially in

1    light of the defendant's refusal to acknowledge his crimes

2    and his minimization of his conduct in some of his recent

3    public statements, which we will get to shortly.

4           The defendant joined a massive riot that

5    obstructed the certification of the presidential vote and

6    the peaceful transfer of power.  But the defendant wasn't

7    just any rioter here, Your Honor, he was a leader.  He

8    pushed his way to the front of the violent mob on the West

9    Front of the Capitol, and he led that mob up the southwest

10   stairs to the Capitol Building.

11          He came to the riot equipped with a megaphone on

12   his back, and he used that megaphone to organize and to

13   coordinate an attack on police officers defending the

14   Capitol.

15          None of this was a mistake or a misunderstanding.

16          Johnatakis flew to Washington, D.C., and he did so

17   with the intent to obstruct the certification.

18          The day before the riot, the defendant posted to

19   social media, quote:  "Burn the city down.  What the British

20   did to D.C. will be nothing."

21          The next day, on January 6th, the defendant

22   marched from the "Stop the Steal" rally to the U.S. Capitol,

23   and along the way he recorded a video and he posted it to

24   social media.  In that video, in part, he said, quote:

25   "We're walking over to the Capitol right now, and I don't

1    know, maybe we'll break down the doors."

2            Again, his intent was clear.

3            When he got near Capitol grounds, the defendant

4    yelled into his megaphone and he encouraged the surrounding

5    crowd saying, in part, quote:  "Michael Pence has become a

6    traitor to this nation.  Michael Pence has voted against the

7    President.  We are down to the nuclear option."

8            Then he made his way to the West Front of the

9    Capitol, where the inaugural stage was still being

10   constructed.  And that scene, which Your Honor will recall

11   from several videos from the trial, was incredibly violent

12   and chaotic.  And the police were vastly outnumbered by the

13   rioters who were pushing their way through the line toward

14   the Capitol.  There was tear gas in the air, rioters were

15   throwing things at officers, there were assaults on

16   officers, and they were attempting to get through the line

17   up to the Capitol Building.

18           The video footage played at trial showed the

19   defendant pushing his way to the front of that mob on the

20   West Front and then leading the charge up the southwest

21   stairs.  He was leading that mob up the southwest stairs in

22   the face of the retreating police officers who were walking

23   backward up the stairs defending the officers behind them.

24           He was face-to-face with Captain Augustine who

25   testified at trial.  He was the last -- one of the last ones

1    of up the staircase, and he was retreating backward while

2    holding, Your Honor will recall, a large OC spray canister

3    in an attempt to defend himself and his fellow officers.

4         And Your Honor will recall -- and there are

5    screenshots of this in our sentencing memo -- that Captain

6    Augustine looked at that point like he had been through a

7    battle.  He was covered in orange chemical spray and

8    chemical irritants, and blood was dripping all over the side

9    of his face.

10         Johnatakis was right in front of him.  And the

11   defendant pushed forward up the stairs, toward the building;

12   and then he waved other rioters up the stairs encouraging

13   them to pack in, pack in, right in front of that police

14   line.  He yelled into his megaphone:  "Pack it in.  Pack it

15   in."  And then he coordinated with other rioters to get the

16   assault planned.

17         And then the defendant yelled into his megaphone:

18   "One foot, one foot, push them out of here, we're just using

19   our bodies."  And then he counted down over that megaphone,

20   coordinating the rioters to assault all at the same time:

21   "One, two, three, go."

22         At that point, the defendant and the other rioters

23   grabbed the metal barricade and they used it to push into

24   the line of police officers, assaulting them with it.  And

25   then they lifted the barricade up over their heads and

1    crawled underneath it in order to engage directly and fight

2    the officers directly.  And the defendant even grabbed the

3    arm -- and we have a still shot of that in the sentencing

4    memo -- grabbed the arm of one of the officers who testified

5    at trial that he wasn't able to defend himself.  He

6    testified that, quote:  "It was a scary situation for us,

7    for me."

8         Another victim of the defendant's assault

9    testified that the scene was, quote:  "Frightening."  That

10   victim also testified, quote:  "I thought they were going to

11   come through.  I thought we were going to be trampled.  I

12   thought we were going to be hurt.  I thought we were going

13   to die."

14        One of the victims also suffered an injury to his

15   leg.  And he was in so much pain that, after the assault, he

16   stumbled from the police line down to the stairs and fell on

17   the steps because of the pain.

18        Following the assault, the defendant bragged about

19   his role in the riot in several videos, and he posted some

20   of them online.

21        He said, quote:  "Organized a push-up to the

22   Capitol."  He described the mob, quote:  "Taking the

23   Capitol," causing congressmen and senators to evacuate with

24   black bags over their heads because -- quote -- "the crowd

25   was so irate we probably would have murdered a few of them

1    had we seen exactly who they were."

2        His words of violence accompany comparisons of

3    January 6th to 1776, the American Revolution.

4        So, Your Honor, the nature and the circumstances

5    of the offenses here were of the utmost seriousness, and

6    they fully support a sentence of 108 months.

7        Next, the history and characteristics of the

8    defendant are also worthy of consideration here and support

9    an upward variance.  The defendant has yet to accept

10    responsibility for his crimes.  He has expressed no remorse,

11    either before, during, or after trial.  In fact, he's done

12    the opposite.

13        As detailed in the government's sentencing memo,

14    since his conviction, the defendant has been speaking

15    publicly -- both in interviews that have been posted online

16    and in letters posted to his website -- about the injustice

17    of his prosecution and the prosecutions of other January 6th

18    defendants.  He writes and speaks about suffering and

19    enduring the burden of unequal justice, and guilt by

20    association.

21        What these interviews and posts demonstrate is a

22    continued lack of remorse and a refusal by the defendant to

23    accept responsibility for his actions.

24        For example, in one interview, the defendant

25    described his conduct -- his assault on the officers, he

1    described it as, quote, "touching a gate."

2            He said, quote:  "And when I tell you we did

3    nothing, we did nothing."  "We touched a gate."  "Everything

4    about January 6th is just overblown."

5            I just briefly, Your Honor, want to play, as a

6    reminder to the Court, the assault on the officers that the

7    defendant has described as "touching a gate."

8            If you will just give me a moment.

9            (Whereupon, a video was published.)

10           MS. HOWARD:  At trial, the defendant also showed

11   his lack of genuine sympathy for the victim officers

12   depicted in that assault by play acting in front of the jury

13   and asking the officers for forgiveness in front of the

14   jury, putting his own assault victims in the impossible

15   position of having to accept his apology in front of the

16   jury.

17           His disingenuous [sic] at trial is even more clear

18   upon review of Johnatakis's statements that he has made

19   publicly posttrial, which show his refusal to accept

20   responsibility for his crimes and show any remorse, and

21   describing the assault as "doing nothing," it's "overblown,"

22   and he was just "touching a gate."

23           He is going so far as to portray himself as a

24   persecuted victim.

25           All of these facts that I have just discussed,

1      Your Honor, they also go to the need for the sentence here

2      to afford specific deterrence to this particular defendant.

3              His statements before and during January 6th, as

4      well as his actions leading the assault on January 6th,

5      demonstrate that he believes that violence is an appropriate

6      solution to his own political grievances.  So a lengthy

7      period of incarceration is necessary here.

8              In addition, the sentence of 108 months is

9      necessary to provide general deterrence, which is

10     particularly important, as Your Honor knows, in domestic

11     terrorism cases like the attack here on the Capitol on

12     January 6th.

13             Finally, Your Honor, a sentence of 108 months is

14     consistent with the sentences the Court handed to

15     Johnatakis's two codefendants, Craig Bingert and Isaac

16     Sturgeon.

17             Given Johnatakis's role leading the mob, leading

18     the assault on the officers, and given his culpability as

19     well as the seriousness of the offense, the history and

20     characteristics of the defendant, and the need for

21     deterrence, the government would ask the Court to sentence

22     the defendant to 108 months.

23             THE COURT:  Thank you, Counsel.

24             All right.  Mr. Johnatakis.

25             THE DEFENDANT:  Judge Lamberth, does the record

1   reflect that I have repented my sins?

2          THE COURT:  Yes.

3          THE DEFENDANT:  The record -- does the record

4   reflect that I have accepted all of the offers,

5   presentments, and demands of the Clerk; this court; and you,

6   Judge Lamberth, and return them for settlement and closure

7   in the accounting of this matter?

8          THE COURT:  Yes.

9          THE DEFENDANT:  Does the Court record reflect that

10  the accepted offers and presentments returned in this matter

11  constitute a liability on the Court Clerk; this court; the

12  prosecutor; and you, Judge Lamberth, to settle and close the

13  matter, the -- the liability and the accounting in this

14  matter?

15         THE COURT:  Whatever that means.

16         THE DEFENDANT:  Is that a yes?

17         THE COURT:  Yes.

18         I got something from you last night I have added

19  in.  I got something in the mail from you last night that I

20  have added in, where it says:  You accept -- whatever.

21         THE DEFENDANT:  Okay.

22         THE COURT:  It doesn't matter whether you accept

23  it or not, I am here to sentence you today.

24         THE DEFENDANT:  Does the record reflect that there

25  is no contract?

```
 1                    THE COURT:  There is no?

 2                    THE DEFENDANT:  Contract.

 3                    THE COURT:  There is no contract.  There doesn't

 4      need to be a contract.

 5                    THE DEFENDANT:  Judge, are you making me a new

 6      offer?

 7                    THE COURT:  I am not making you any offer.  I am

 8      sentencing you today.

 9                    THE DEFENDANT:  Okay.

10                    THE COURT:  I am offering you nothing.

11                    THE DEFENDANT:  Judge -- Judge Lamberth --

12                    THE COURT:  I am following the law.

13                    THE DEFENDANT:  Thank you, Judge.

14                    THE COURT:  The law requires me to impose a

15      sentence for the crimes you have committed.

16                    THE DEFENDANT:  Does the record reflect that I do

17      not and have not, in this matter, argued the facts, the law,

18      the jurisdiction, or the venue?

19                    THE COURT:  I don't know about that.  But the

20      record -- I am not commenting on what the record reflects at

21      this point.  I am just allowing you to make whatever

22      statements you want to make.

23                    THE DEFENDANT:  Thank you.

24                    Does the record reflect I request you issue me the

25      appearance bond and waive all public costs?
```

1        THE COURT:  I am not answering questions here.

2    You make whatever statements you want to make.

3        THE DEFENDANT:  Okay.

4        I request you issue me the appearance bond and

5    waive all public costs.  I request you close the account and

6    issue the order of the Court to me --

7        THE COURT:  I am not closing any account until I

8    sentence you.

9        THE DEFENDANT:  Thank you.

10       I request you adjust and set off all public

11   charges by the exemption in accord with public policy, and I

12   request discharge.

13       Judge, I am aware of compelled performance, but I

14   am not aware of any international, admiralty, maritime, or

15   commercial agreement bearing my signature that would compel

16   me to acquiesce to further incarceration; however, if you

17   would please present it, I will honor it to the letter of

18   the law.  Otherwise, I do not consent.  I do not consent.  I

19   do not consent.

20       Judge, again, does the record reflect I have

21   repented of my sins and any dishonors in this manner?

22       THE COURT:  Whatever it is you are requesting,

23   it's denied.

24       THE DEFENDANT:  Are you -- are you -- are you

25   imposing a contract upon me of which I am not able to

1    accept?

2            THE COURT:  I am not imposing a contract on you, I

3    am sentencing you in accordance with the law.

4            THE DEFENDANT:  Is that an imposition of a

5    sentence?

6            THE COURT:  Yes.

7            THE DEFENDANT:  Is an imposition not a tax?

8            THE COURT:  I don't know what that means.

9            THE DEFENDANT:  A tax?

10           THE COURT:  I don't know what you are talking

11   about.  It's gobbledygook to me.

12           THE DEFENDANT:  Judge Lamberth, thank you.

13           I hold no ill will to this Court, to any of the

14   officers or those involved in this matter.

15           The record -- I would like the record to reflect,

16   I do repent of my sins.  I accept accountability in this

17   matter.  And I do not argue the facts, law, jurisdiction, or

18   venue.  Thank you.

19           THE COURT:  Okay.

20           Would standby counsel like to add anything on his

21   behalf?

22           I don't know if you have talked to him about that

23   or not.

24           MR. BLACK:  No.  Thank you, Your Honor.

25           THE COURT:  Okay.

1          I am going to make a statement for the record

2     about sentencing before I call the defendant up to impose

3     the sentence.

4          I have received over 20 letters from friends and

5     family, including from Mr. Johnatakis's wife, his mother,

6     and others.  Those letters speak to Mr. Johnatakis's good

7     works, good nature, and good character.  Most ask for the

8     Court to release him right away.  Many say he did nothing

9     criminal on January 6th and is no danger to society.

10          I appreciate that the defendant has, with

11     exceptions, been courteous and respectful to the Court, and

12     I harbor no personal animosity toward him.

13          The Court agrees that Mr. Johnatakis, like many

14     January 6th defendants, is not an inherently bad person;

15     that is what makes these cases hard.  As the Court has said

16     many times, I take no great pleasure in locking up

17     defendants who led good lives until their actions on

18     January 6, 2021.

19          After 37 years on the bench, the Court knows how

20     disruptive a prison sentence can be for defendants and their

21     families; nevertheless, the Court cannot let people entirely

22     off the hook for their actions that day.

23          In light of the defendant's supportive letters,

24     the Court would like to take a moment to explain what it's

25     trying to accomplish when it sentences a defendant, such as

1    Mr. Johnatakis, for events arising out of the January 6th

2    attack on the Capitol.

3         A society in which everyone does what is right by

4    his own lights, where adherence to the law is optional,

5    would be a society of vigilantism, lawlessness, and anarchy.

6         As my late friend Justice Antonin Scalia once

7    wrote:  It is the proud boast of our democracy that we have

8    a government of laws and not of men, in the case of *Morrison*

9    *v. Olson.*

10        A person dissatisfied with the government or the

11   law has various nonviolent ways to express his or her views.

12   The First Amendment protects freedom of speech, it also

13   enshrines the right of the people peaceably -- let me

14   repeat -- peacefully to assemble.

15        History has shown there is some role for the civil

16   disobedience of Henry David Thoreau and Martin Luther King

17   Jr. in which a citizen engages in principled and peaceful --

18   let me repeat -- peaceful disobedience of the law in order

19   to protest a perceived injustice.  In that situation, the

20   person acknowledges they have broken the law and accepts the

21   legal consequences that follow.

22        But what the jury found Mr. Johnatakis to have

23   done on January 6th was neither First Amendment-protected

24   activity nor civil disobedience.

25        As the Court has said before, the First Amendment

1  does not give anyone the right to enter a restricted area or

2  to engage in riotous activity in the Capitol, citing my own

3  opinion in *U.S. v. Little*.  It obviously does not give

4  anyone the right to assault the police; nor was the

5  January 6th riot an act of civil disobedience because it was

6  violent, not peaceful; opportunistic, not principled;

7  coercive, not persuasive; and selfish, not patriotic.

8          The portrayal of Mr. Johnatakis as either a

9  peaceful protester or simply someone swept up by the crowd

10  does not match the reality established at trial.

11          One thing that strikes me about the letters is

12  that few of the authors seem to know what he actually did.

13  One person even wrote me that they know he has never done

14  anything violent and never would.

15          Perhaps Mr. Johnatakis contributed to this

16  misperception; although, he repeatedly expressed his

17  heartfelt and sincere regrets at trial.  For example, in the

18  trial transcript on November 20th, at page 71, his sincere

19  conviction that he's denied his conduct and downplayed his

20  January 6th -- the January 6th riot itself.  But the Court

21  knows the facts of this case because it heard from the

22  witnesses and examined the evidence, including the police

23  body camera footage and videos filmed by Mr. Johnatakis

24  himself.

25          The Court would, therefore, like to set the record

1     straight about what Mr. Johnatakis actually did that day.

2         In any angry mob there are leaders and there are

3     followers, Mr. Johnatakis was a leader.  He knew what he was

4     doing that day.

5         On January 5th, he posted on social media:  "Burn

6     the city down.  What the British did to D.C. would be

7     nothing."  Trial Exhibit 904G.

8         The next day, while marching to the Capitol, he

9     recorded and posted a video in which he proclaimed:  "Were

10    we're marching over to the Capitol right now, and I don't

11    know, maybe we'll break down the doors."  That's in the

12    presentence report at paragraph 26.

13        Once he got to the restricted grounds of the

14    Capitol, he made his way to the vanguard of the crowd, all

15    the while yelling into the megaphone he brought with him.

16    That's in the presentence report at paragraphs 27 to 29.

17        As Metropolitan Police Department Captain David

18    Augustine testified at the trial, rioters eventually

19    overwhelmed the police line; forced the officers to retreat

20    up the Capitol southwest stairs under the scaffolding

21    created for the inauguration.

22        The video played at trial shows that

23    Mr. Johnatakis led the charge up the stairs.  He soon

24    reached the fallback line and barricades manned by the

25    police in order to protect the Capitol Building itself and

1    the members of Congress, staff, and others inside.

2            When he got there, he waved on more people toward

3    the police line; and through his megaphone, he barked

4    commands to pack it in.

5            So although one of the letters claims

6    Mr. Johnatakis set out with good intentions and ended up in

7    a crowd of orchestrated, out-of-control protesters, in fact,

8    it was Mr. Johnatakis himself who organized the protesters

9    to violence that day.

10            Once again, rioters had heeded his calls and

11    swarmed against the police line.  Mr. Johnatakis deployed

12    his megaphone to give encouragement in step-by-step

13    instructions for overpowering the police.

14            As he announced "One, two, three, go," he and his

15    fellow rioters, including his codefendants -- Craig Bingert

16    and Isaac Sturgeon, who were just on that video that the

17    government played here at sentencing -- picked up the metal

18    barricades and slammed them into the police officers.

19    That's in the presentence report at paragraph 33.

20            Mr. Johnatakis and the others then raised the

21    barriers higher, until they were about head level with the

22    officers, so the mob could brawl with the officers without

23    the barriers getting in the way.  In the resulting melee,

24    Mr. Johnatakis seized MPD Officer Juan Gonzalez by the arm.

25    In presentence report, paragraph 33.

1          Officer Gonzalez testified at the trial that with

2     Mr. Johnatakis holding his arm in place he was unable to

3     hold back the line of rioters or protect himself.  Trial

4     transcript on November 20th, at 67.

5          By effectively disarming Officer Gonzalez,

6     Mr. Johnatakis made him vulnerable to serious injury or

7     worse.  Indeed, Officer Gonzalez said that during the

8     assault he felt like he had suffered a serious injury and

9     perhaps even broken his leg.  That's the trial testimony at

10    page 58.

11         Another officer who was standing alongside this

12    officer, Officer Mark D'Avignon, thought he was going to

13    die.  Trial testimony at 51.

14         As Mr. Johnatakis walked away from the Capitol, he

15    recorded several videos in which he expressed his

16    satisfaction with what had occurred and prided his role that

17    he had played.  He crowed that: "For the first time since

18    1817, that Capitol was stormed," and that members of

19    Congress were forced to evacuate.  That's in the presentence

20    report at paragraph 37.

21         He boasted:  "The crowd was so irate that we

22    probably would have murdered a few of the members of

23    Congress had we seen exactly who they were."  That's in the

24    presentence report at paragraph 37.

25         He summed up his conduct:  "I was on the front

1    line, I was on the gate.  I organized a push-up to the

2    Capitol because I felt like that was exactly what we

3    needed."  That's also in paragraph -- the presentence report

4    at 37.

5         He also explained it was 1776 again, as if he were

6    fighting for freedom against a foreign oppressor, rather

7    than battling his own elected representative government.

8    That's in paragraphs 36 of the presentence report.

9         As the Court has said before:  On January 6, 2021,

10   a mob of people invaded and occupied the Capitol using force

11   to interrupt the peaceful transfer of power mandated by the

12   Constitution and our republican heritage.  That's in my

13   resentencing in the *Little* case.

14        There can be no room in our country for this sort

15   of political violence.  The framers designed our

16   constitutional system so that people governed through their

17   representatives according to law; decisions are the result

18   of elections, debates, and compromise; the people through

19   their representatives decide.

20        By contrast, those who think political ends

21   justify violent means seek to replace persuasion with

22   intimidation, the rule of law with "might makes right."

23        Violence risks begetting a vicious cycle that

24   could threaten cherished conventions and imperil our very

25   institutions of government.  In that sense, political

1    violence rocks republics; therefore, January 6th must not

2    become a precedent for further violence against political

3    opponents or governmental institutions.  That is not normal.

4    This cannot become normal.

5           We as a community, we as society, we as a country

6    cannot condone the normalization of the January 6th Capitol

7    riot.  This is the context in which the Court must sentence

8    those convicted for their actions on January 6th.

9           To be sure, many people that day exercised their

10    right to protest peacefully without violating any laws, but

11    others have pleaded guilty to crimes or have been convicted

12    to crimes after a bench or jury trial.

13           When it comes to sentencing these defendants, the

14    Court must consider the same factors as in any other

15    sentencing, including for the need for the sentence imposed:

16    A, to reflect the seriousness of the offense, to promote

17    respect for the law, and to provide just punishment for the

18    offense; B, to afford adequate deterrence to future criminal

19    conduct; and C, to protect the public from further crimes of

20    the defendant, quoting 18 U.S.C. Section 3553(a)(2).

21           When sentencing a person convicted for January 6th

22    offenses, the Court aims to discourage these defendants from

23    future violence, dissuade others from taking inspiration

24    from the Capitol riot, and express the community's moral

25    disapproval of this conduct.  The Court must bear these

1    considerations in mind even as it is sensitive to the fact

2    that every prison sentence leaves a void in the lives of the

3    defendant's family and friends.

4            The Court would also like to address

5    Mr. Johnatakis's conduct since the jury convicted him.

6            At trial he repeatedly expressed contrition to the

7    Court and the jury but he changes his story depending on his

8    audience.  Since conviction, he's frequently offered public

9    commentary about his actions on January 6th, including

10   issuing letters and giving speeches and podcast interviews

11   from the jail.

12           The D.C. Jail and the marshal service have

13   reported to me that to give interviews he reportedly

14   bypassed the D.C. Jail's safeguards.  When the jail blocked

15   him from calling into a podcast directly, rather than

16   consult the jail's authorities to see if such an interview

17   would be permitted, he devised a workaround to reach the

18   podcast hold.  It has come to the attention that this

19   particular podcast episode was ultimately published on

20   YouTube on January 29, 2024.  See Quite Frankly "D.C. Gulag

21   & NYC Tunnels," Taylor James Johnatakis, 1/9/24 YouTube,

22   January 9, 2024, httpswww.youtube.com/watch- [sic] -- the

23   whole site there.  I will put in a written version of this

24   that I will file on the court record.

25           But Mr. Johnatakis's message was this:  "We did

1   nothing.  We touched a gate.  We got pepper sprayed.  We

2   moved back."  That was it.

3          He also said that everything about January 6th is

4   just overblown.

5          Similarly, in a December 12, 2023, letter he

6   explained his actions by saying:  I chose to get rowdy, but

7   not violent.  At the time I felt it was a right borne of

8   necessity.

9          The government cites that in their sentencing memo

10   at page 16.

11          These comments suggest that Mr. Johnatakis sought

12   to mislead the Court and the jury when he expressly --

13   repeatedly expressed his contrition for his actions on

14   January 6th, for instance, by asking the witnesses to:

15   Please accept my sincere apology for my role in the events

16   that day.  Trial transcript at 30, 51, 71, and 127.

17          These remarks leave no doubt that Mr. Johnatakis,

18   unlike many January 6th defendants sentenced by the Court,

19   does not accept responsibility for his actions and does not

20   show true remorse.  Indeed, he did not do so today.

21          Although his speech itself is protected, a person

22   who violates the rules of confinement through subterfuge

23   nevertheless does not demonstrate that the Court should

24   depart from the guidelines for these offenses or even give

25   him the low end of the guidelines.  This subterfuge recalls

1    his brazen attempts to abuse the trial process by making

2    improper comments to the jury.

3            Before the trial began, I went to great pains to

4    remind Mr. Johnatakis that, in exercising his constitutional

5    right to self-representation, he would be expected to adhere

6    to the same rules, the same procedures, the same substantive

7    law as any other defendant.

8            The Court specifically advised him that if he was

9    unsure about whether a particular argument was appropriate

10   for the jury he should either consult his standby counsel or

11   speak to me outside the earshot of the jury.

12           In response, he said he accepted the Court's

13   statement.  For most of the trial, Mr. Johnatakis was

14   courteous and respectful of the Court; but as soon as he

15   began his closing arguments, he started telling the jury

16   facts not in the record.  He was effectively trying to

17   testify without being subject to cross-examine.  Then he

18   tried to argue for jury nullification.  Trial transcript at

19   159 to 161.

20           After the Court shut down both attempts, it

21   required Mr. Johnatakis to read to the Court what he planned

22   to say next to the jury.  Yet, as soon as the Court approved

23   his remarks, he began making further improper remarks he had

24   not cleared with the Court.  Trial transcript at 163 to 165.

25           His efforts to subvert the judicial process

1    through various unorthodox means combined with his lack of

2    remorse makes me worry that, if given the chance, he will

3    engage again in violent criminal activity.

4          Finally, the Court would like to address the

5    insights into Mr. Johnatakis's character offered by his

6    letters of support.

7          Under 18 U.S.C. Section 3553, one factor the Court

8    considers in every sentencing is the history and

9    characteristics of the defendant.

10          The Court is grateful that so many people took the

11   time to submit thoughtful letters in support of the

12   defendant.  The Court respects their views of

13   Mr. Johnatakis, I read every letter.  I took into account

14   their comments about the good qualities he has exhibited

15   over a lifetime.

16          Yet, in our system of justice, we punish people

17   not only for their overall character, but for their actions.

18   Living an otherwise blameless life does not grant anyone a

19   free pass.

20          Mr. Johnatakis is not here today because of who he

21   is, but to be accountable for what he did.  Like the jury, I

22   listened to the witnesses and examined the evidence of his

23   actions on January 6th.  Having done so, the Court concludes

24   that unfortunately for him, his friends, his family, and our

25   society, it seems that Mr. Johnatakis left his good

1    qualities at home when he went to the Capitol on

2    January 6th.  The actions of Mr. Johnatakis are inexcusable,

3    his choices have consequences.

4         The Court takes no pleasure in sending any

5    defendant to prison, but it will not shirk its solemn duty

6    to enforce the law and order.

7         So Mr. Johnatakis's friends and family can

8    understand the sentence I have imposed today, I will order

9    the Clerk of Court to send a copy of these remarks to each

10   person who submitted a letter on Mr. Johnatakis's behalf.  I

11   am pleased that some of his family could be here to hear my

12   own words of why I am doing what I am doing.

13        I will decline to depart upward or vary upward on

14   the guidelines, but I will impose the guideline sentence in

15   the case.

16        If you could come forward at this time,

17   Mr. Johnatakis, I will announce your sentence.

18        Pursuant to the Sentencing Reform Act of 1984 and

19   in consideration of the provisions of 18 U.S.C. Section

20   3553, it is the judgment of the Court that you, Taylor James

21   Johnatakis, hereby are committed to the custody of the

22   Bureau of Prisons for concurrent terms of 87 months on

23   Counts 1 and 2; 60 months on Count 3; 12 months on each of

24   Counts 4, 5, and 6; and 6 months on Count 8.  All to be

25   served concurrently.

1          In addition, you are ordered to pay special

2     assessments of a total of $385; 100 each on Counts 1 to 3;

3     25 each on Counts 4 to 6; and $10 on Count 8.

4          The Court will waive imposition of a fine.

5          Restitution in the amount of $2,000 will be

6     ordered to be made to the Architect of the Capitol.

7          I find you do not have the ability to pay

8     interest, and waive interest and penalties on the

9     restitution amount as well without harming your family.  So

10    restitution -- I will waive interest on the restitution as

11    well.

12         Restitution payments must be made to the Clerk of

13    the Court of the U.S. District Court for the District of

14    Columbia for disbursement to the Architect of the Capitol,

15    Office of the Chief Financial Officer, Ford House Office

16    Building, Room H2-205B, Washington, D.C., 21515.

17         You will be sentenced to a term of supervised

18    release on Counts 1 to 3 of three years each; on Counts 4 to

19    6 of one year.  While on supervision, you shall abide by the

20    mandatory conditions of supervised release as well as all

21    discretionary conditions recommended by the probation

22    office, in Part D, Sentencing Options, of the presentence

23    report, which are imposed to establish the basic

24    expectations for your conduct while on supervision.

25         Mandatory conditions include:

1          One, you must not commit another federal, state,
2     or local crime.
3          Two, you must not unlawfully possess a controlled
4     substance.
5          Three, you must refrain from any unlawful use of a
6     controlled substance.  You must submit to one drug test
7     within 15 days of placement on supervision and at least two
8     periodic drug tests thereafter as determined by the Court.
9          Four, you must cooperate in the collection of DNA
10     as directed by the probation office.
11          Five, you must make restitution in accordance with
12     18 U.S.C. Section 3663 and 3663(a) or any other statute
13     authorizing the sentence of restitution.
14          The restitution payments are a special condition
15     of supervised release, as well as the following special
16     conditions:
17          One, you must provide the probation office access
18     to any requested financial information, authorize the
19     release of financial information until the restitution has
20     been paid.
21          Two, you must participate in a mental health
22     treatment program, follow the rules and regulations of that
23     program.  The probation office in consultation with the
24     treatment provider shall supervise your participation in the
25     program, provider, location, modality, duration, et cetera.

1          The financial obligation of restitution of the

2     $385 are payable to the Clerk of Court, U.S. District Court,

3     333 Constitution Avenue Northwest, Washington, D.C. 20001.

4     Within 30 days of any change of address, you shall notify

5     the Clerk of Court of the change until such time as the

6     financial obligation is paid in full.

7          The probation office shall release the presentence

8     investigation report to all appropriate agencies, which

9     includes the probation office in the approved district of

10    residence in order to execute the sentence of the Court.

11         Treatment agencies shall return the presentence

12    report to the probation office upon the defendant's

13    completion or termination from treatment.

14         Pursuant to 18 U.S.C. Section 3742, you have a

15    right to appeal the verdict in this case and this sentence.

16    If you choose to appeal, you must file your appeal within

17    14 days after the Court enters judgment.  If you are unable

18    to afford the cost of an appeal, you may request permission

19    from the Court to file an appeal without cost to you.

20         As defined in 28 U.S.C. Section 2255, you have the

21    right to appeal the conviction entered or sentence imposed

22    if new or currently unavailable information becomes

23    available to you.  If you are unable to afford the cost of

24    an appeal, again, you may request permission to file an

25    appeal without cost to you.

1             Are there any objections to the sentence as

2      imposed not already noted on the record?

3             MS. HOWARD:  None from the government.  Thank you.

4             THE COURT:  Okay.  Do you want to make objections

5      to the sentence?

6             THE DEFENDANT:  Does the record reflect I repented

7      my sins?

8             And I accept your offer, I return it for

9      settlement and closure, and I request discharge in this

10     matter.

11            THE COURT:  Okay.  That's denied.

12            Is there a facility in which -- have you talked to

13     your lawyer or anyone about what I should recommend about a

14     facility where you go?

15            THE DEFENDANT:  No.

16            THE COURT:  Okay.  Mr. Black, do you have any

17     suggestions about that?

18            MR. BLACK:  Your Honor, I discussed that with

19     Mr. Johnatakis, and he has asked me not to make any requests

20     for recommendations.

21            THE COURT:  I can't hear you.  You better come up

22     to the podium.

23            THE DEFENDANT:  My -- my family will be moving to

24     Iowa.  So anywhere near Iowa.

25            THE COURT:  Close to Iowa?

```
 1              THE DEFENDANT:  Yeah.

 2              THE COURT:  Okay.  I can make a recommendation.

 3    Bureau of Prisons is not required because they have to

 4    figure out their staffing needs, but I am happy to make a

 5    recommendation.

 6              As I say to you, Mr. Johnatakis -- and I said at

 7    some length there -- you have been very -- you and I have,

 8    throughout this process, had an interesting relationship.

 9              I understand what you are trying to do.  I wanted

10    to set forth what I am trying to do as well; we have a

11    difference of opinion, obviously.

12              Good luck to you in the Court of Appeals.

13              THE DEFENDANT:  Judge, thank you so much.  I do

14    honor what you do for this country and what you have done in

15    your career.

16              THE COURT:  I appreciate that.

17              THE DEFENDANT:  And I appreciate you allowing me

18    to stand on my rights.

19              THE COURT:  I understand why you are doing what

20    you are doing.  And I --

21              THE DEFENDANT:  It is my belief that when you

22    stand on your rights you injure no one.

23              THE COURT:  -- I have to say, I know you believe

24    it.  And I have to say, we're each doing the roles that we

25    have in this position, and I appreciate the fact that you
```

1    have never been obstreperous.  You have stated your position

2    throughout.

3              I have had defendants who wanted to get in fights

4    with the marshal and everything else, you have never been

5    like that.  I appreciate the fact that we got through

6    this -- we got through today respecting each other's

7    positions, and I appreciate that.

8              THE DEFENDANT:  Accept.  Thank you.

9              THE COURT:  The Court will be in recess.

10             (Whereupon, the proceeding concludes, 11:00 a.m.)

11                          *  *  *  *  *

12                          **CERTIFICATE**

13             I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
14   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
15   ability.

16             This certificate shall be considered null and void
     if the transcript is disassembled and/or photocopied in any
17   manner by any party without authorization of the signatory
     below.

18

19
               Dated this 30th day of August, 2024.
20
               /s/ Elizabeth Saint-Loth, RPR, FCRR
21             Official Court Reporter

22

23

24

25